## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXANDER NORRIS d/b/a WEBCOMIC NAME<br><br>                    Plaintiff,<br><br><br>                    v.<br><br>Marc Goldner, Individually and as Officer of GOLDEN BELL ENTERTAINMENT, LLC, a California company and GOLDEN BELL STUDIOS, LLC, GOLDEN BELL ENTERTAINMENT, LLC., a California Company and GOLDEN BELL STUDIOS, LLC.<br><br><br>                    Defendants. | **No.**<br><br>**ECF Case**<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, complaining of the defendants, by and through his attorneys, CHINTA, PERDOMO, BERKS & FRATANGELO, LLP, alleges as follows:

### NATURE OF THE ACTION

1.      This action arises from a business dispute between a noted and respected visual artist and author, and an unethical, deceitful, and incompetent distributor and marketer of books, games, stories and similar goods.

2.      Plaintiff asserts claims for copyright and trademark infringement, false designation of origin, cancellation of trademark registrations, breach of contract, and declaratory judgment.

3.      This action is related to *Jason Wiseman d/b/a Jason Anarchy Games and Wiseman Innovation v. Marc Goldner, Golden Bell Entertainment LLC, and Golden Bell*

*Studios LLC*, Case 1:19-cv-01282-AJN. The cases share multiple common facts and have identical defendants.

## THE PARTIES

4.      At all relevant times, plaintiff was a citizen and resident of the United Kingdom.

5.      Upon information and belief, at all relevant times defendant Marc Goldner ("Goldner") was a New York citizen and resident.

6.      Upon information and belief defendant, Golden Bell Entertainment, LLC ("GB Entertainment"), is a California limited liability company whose principal place of business is in Roslyn, New York, and transacts business in New York.

7.      Upon information and belief defendant, Golden Bell Studios, LLC ("GB Studios"), is a California limited liability company whose principal place of business is in Roslyn, New York, and transacts business in New York.

8.      Upon information and belief, Goldner is a member and officer of GB Entertainment and GB Studios.

9.      Upon information and belief, Goldner operates GB Entertainment and GB Studios interchangeably in business dealings, including written communications, negotiations, payments, and governmental filings.

10.      Upon information and belief GB Studios holds a license from GB Entertainment for assets it acquired from plaintiff that are the subject of this action.

11.      Upon information and belief, GB Entertainment uses the website http://www.goldenbellstudios.com as one of its online e-commerce sites.

12.      GB Studios is a necessary party only to the extent that any judgement or order

affecting GB Entertainment's interest in plaintiff's property may affect GB Studios' interest in and to any agreement or license it has with GB Entertainment.

### JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. §§1331, 1338, 15 U.S.C. §§ 1119, 1125(a), 17 U.S.C. § 501, 28 U.S.C. § 2201-02, and 28 U.S.C. § 1367(a).

14.     Upon information and belief, venue is proper in this district under 28 U.S.C. §1391 because defendants reside in this district.

### FACTUAL BACKGROUND

15.     Plaintiff is a visual artist, comics illustrator, and an author of short stories, webcomics, comic books and strips. He is the creative mind of the viral webcomic "Webcomic Name" which has captured the heart of over half a million social media followers with its main character, the disappointed "Blob."   The character's resigned "Oh No" phrase has become a recognizable mark, tapping into the current internet zeitgeist of self-conscious pessimism to hilarious and heartbreaking effect. See, Plaintiff's Declaration ("Declaration"), ¶ **3, 4.**

16.     Plaintiff is the author and illustrator of the characters embodied in his webcomic "Webcomic Name." Id.

17.     Plaintiff's work has been featured on various webcomic sites such as *Comics Blog*, *Bored Panda*, *GoComics, It's Nice That* and *The Nib*. Mr. Norris' work is also well known in the United States. Id. ¶ 6.

18.     In 2016, plaintiff conceived the mark "Webcomic Name" and acquired the domain name http://www.webcomicname.com to promote his comics, illustrations, short stories and workshops. Since 2016, plaintiff has used the mark "Webcomic Name" to market and promote plaintiff's works. Id. Ex. 2.

19.     Plaintiff first launched "Webcomic Name" as a weekly webcomic strip featuring a distinctive character, the "Blob" which plaintiff conceived in 2015.  The character's pessimistic "Oh No" punchline is an accompaniment and complementary phrase to the "Webcomic Name" comic strips as consumers of plaintiff's works associate "Oh No" with plaintiff's goods and services. Id., ¶ 4.

20.     Plaintiff actively sells and markets goods bearing his "Webcomic Name" and "Oh No" marks through his website http://www.theohnoshop.com. Id., Ex. 1.

21.     Plaintiff is also the creative mind behind "Dorris McComics," a pseudonym under which plaintiff writes and shares comics on and through social media, comics, and illustrations. Id., ¶ 3.

22.     In the summer of 2017, plaintiff and his editor negotiated a publishing agreement with Andrews McMeel Publishing, LLC, a United States publisher ("McMeel") to publish a compilation of plaintiff's "Webcomic Name" comics.  On April 2, 2019, McMeel published plaintiff's book entitled "Oh No." Id., ¶ 12.

23.     In early 2017, Jason Wiseman ("Wiseman"), a table card game creator and self-publisher based in Canada, approached plaintiff to discuss a mutually beneficial collaboration in a table card game incorporating elements of plaintiff's webcomic "Webcomic Name" (hereinafter the "Game"). Id., ¶ 8.

24.     Since the Game would incorporate the style, concept and characters of plaintiff's "Webcomic Name" comics, plaintiff and Wiseman used *Webcomic Name Game* as a placeholder. Id.

25.     Plaintiff and Wiseman planned to jointly publish the Game via Kickstarter and commercialize it through Wiseman's distribution channels. Id., ¶ 8.

26.     Wiseman told plaintiff he had discussed publishing and distributing the Game with defendants. Id., ¶ 9.

27.     Plaintiff and Wiseman agreed defendants would publish and distribute the Game through their larger distribution network and business infrastructure because it would lead to substantially greater sales than if they self-published. Id., ¶ 10.

28.     Wiseman signed an agreement with defendants to create and deliver them four games, three of which, including the Game, were either in their conceptual or development phase.  Plaintiff was not a party to Weisman's contract. Id., ¶ 11.

29.     On July 3, 2017 GB Entertainment sent plaintiff a proposed Collaboration Agreement. Id., ¶ 14, Ex. 5.

30.     Plaintiff told Goldner in writing that since the Game "will heavily feature elements that are part of Webcomic Name already," he wanted "to make it clear that in no way does Golden Bell take ownership of any of the characters, images or story content except in its application in a tabletop game." Id., ¶¶ 14,15, Ex. 4.

31.     Plaintiff also told Goldner that he was working with publishers on a book featuring "Webcomic Name" elements and that he wanted to ensure that their agreement would not interfere with the publishing contract. Id

32.     On July 11, 2017, Goldner told plaintiff he was "in the free to and clear to work on your property outside of the context of our contract," explained that the contract is specifically for the "game" and stuffed animal, and added to the agreement the following language: "Artist has the right to pursue his Comic "Webcomic Name" outside of the context of this agreement". Id., ¶ 15, Ex. 4.

33.     Because of Goldner's written statements, plaintiff reasonably believed the

scope of the Collaboration Agreement was limited to his work as an illustrator and that it did not grant or transfer any rights to his past, present, and future works, including plaintiff's trademarks.  Id., ¶¶ 16, 17.

34.    Plaintiff and GB Entertainment signed their Collaboration Agreement on August 10, 2017. Id., Ex. 5.

35.    The Collaboration Agreement states that plaintiff is "known as Alex Norris of Webcomic Name." Id., Ex. 5 ¶ 1G.

36.    At the time the Collaboration Agreement was signed, plaintiff had yet to illustrate Game and the plush toy. Id., ¶ 18.

37.    In exchange for the right to use plaintiff's illustrations in the Game, GB Entertainment agreed to advance of $3,125.00 to plaintiff within 30 days of delivery of the final files of the Game and another advance of $2,500.00 upon delivery of the final print-ready files, the PSD files, the AI files and the InDesign Files.  GB Entertainment also agreed to pay plaintiff 10% of net royalties and deliver to him 725 copies of the Game. Id., ¶ 21, Ex. 5 ¶ 1G.

38.    Plaintiff delivered the final 400 illustrations panels to defendants on October 2, 2018, and the final Game files on November 2, 2019. Id., ¶ 19, Ex. 6.

39.    GB Entertainment does not dispute it is pre-selling copies of the Game and using plaintiff's marks in commerce. Id. Exhibits 7B, 9, 10 and 14,

40.    GB Entertainment and GB Studios are using the website http://www.goldenbellstudios.com to actively sell merchandise bearing plaintiff's marks including the plush toys "Sexy Blob",  the "OH NO" pillow, and the "Webcomic Name Plush".  Id., Ex. 16.

41.    Upon information and belief, defendants are selling merchandise bearing

plaintiff's marks at toy conventions. See Id., Ex. 16, p. 4. (GB Studios stand at Pax East).

42.    GB Entertainment did not pay plaintiff's advances or deliver copies of the Game.  Id., ¶ 20.

### Plaintiff's Copyrighted Works

43.    Plaintiff's artistic portfolio in connection to his "Webcomic Name" trademark and illustrations is available to the general public through the website http://webcomicname.com.

44.    Plaintiff is the sole author and exclusive rights holder of his original illustrations registered with the United States Copyright Office under registration No. VA 2-128-773 (the "Registered Works"). Id., Ex. 3.

45.    Plaintiff is the sole author and exclusive rights holder to original illustrations created or published for the first time in the United Kingdom ("Foreign Works"). Id., Ex 15.

46.    The Registered Works and the Foreign Works are plaintiff's Copyrighted Works and are part of his intellectual property portfolio. Id. ¶¶ 31-34.

47.    Goldner and GB Entertainment had access to plaintiff's Copyrighted Works through plaintiff's public website and social media sites. Id., ¶ 31.

48.    Goldner and GB Entertainment deliberatively, willfully and without authorization, reproduced plaintiff's Copyrighted Works from his Facebook page and used them as specimens of use for its applications Serial. Nos. 88185795, 88147369, and 87703934 for the marks "Webcomic Name" and "OH NO," respectively. Id., Exhibits, 7, 7B, 9 and 10.

49.    Goldner and GB Entertainment deliberatively, willfully and without authorization, reproduced plaintiff's Copyrighted Works from his Facebook page and used them to market and sell plush toys on defendants' website http://www.goldenbellstudios.com.  Id.,

Ex. 16.

### GB Entertainment's "Webcomic Name" Application Serial No. 87703934

50.     On November 30, 2017, Goldner and GB Entertainment filed a trademark application Serial No. 87703934 ("934 Application") on an intent to use basis for the mark "Webcomic Name" in class 028 (Board games; Card games; Game cards; Party games; Plush dolls; Plush toys; Stuffed dolls and animals; Stuffed toy animals; Tabletop games; Soft sculpture plush toys; Stuffed and plush toys). Id., Ex. 7.

51.     The application stated that applicant had a "bona fide intention and is entitled, to use the mark in commerce on or in connection with the identified goods/services.   Id.

52.     Defendants filed the application without plaintiff's knowledge and consent and before plaintiff had finalized and delivered the illustrations for the Game and plush toy. Id., ¶¶ 19, 22.

53.     Goldner and GB Entertainment made false statements and submissions to the USPTO in the 934 Application, to wit:

  i.   GB Entertainment is the owner of the mark.

  ii.  To the best of their  "knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."

  iii. All of the facts recited in the application were accurate.

54.     Goldner and GB Entertainment made these statements with actual knowledge that (i) the Collaboration Agreement did not mention an assignment of the mark "Webcomic

Name", but referred to an assignment of the copyrights in a game *tentatively* entitled "Webcomic Name Game" and a plush toy *tentatively* entitled "Webcomic Name Stuffed Animal"; (ii) he proposed to include a provision stating that plaintiff retained "the rights to pursue his comic Webcomic Name outside of the context of this agreement."; (iii) at the time the applications were submitted, plaintiff was using his "Webcomic Name" mark and commerce in relation to goods and services including comic strips, illustrations and t-shirts, others, and services, and his work was associated with the mark "Webcomic Name". Id., Ex. 5.

55.     On October 9, 2018, Goldner and GB Entertainment filed statements of use for the 934 Application, and reiterated the statements made in the initial application and further attested to the following:

  i.     GB Entertainment's first use of the was as early as June 26, 2016 and that it first used the mark in commerce in connection to Board games; Card games; Game cards; Party games; Plush dolls; Plush toys; Stuffed dolls and animals; Stuffed toy animals; Tabletop games; Soft sculpture plush toys; Stuffed and plush toys on July 12, 2017.

  ii.    the mark was in use in commerce at the time of the statement in connection with all the goods/services in the application.

  iii.   that all of the facts recited in the application are accurate. Id. Ex. 8.

56.     Goldner and GB Entertainment knew that these statements were false because the final Game files were not yet delivered. Id.,¶ 19.

57.     On December 11, 2018, as a result of Goldner's misrepresentations, the USPTO approved the 934 Application, and issued GB Entertainment, Registration No. 5629281 for "Webcomic Name." Id. Ex. 8.

**Golden Bell "Webcomic Name" Application Serial No. 88147369**

58.     On October 9, 2018, Goldner and GB Entertainment filed an application Serial Number 88147369 ("369 Application") for the mark "Webcomic Name," in International Class 016 (Comic books; Comic strips; Comic strips' comic features; Comics; Newspaper comic strips), and International Class 025 (T-shirts). Id. Ex., 9.

59.     Upon filing the 369 Application, Goldner and GB Entertainment stated:

   i.     GB Entertainment is the owner of the trademark sought to be registered.

   ii.    To the best of their "knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."

   iii.   GB Entertainment's first use the mark in commerce as early as June 26, 2016 in connection with Comic books; Comic strips; Comic strips' comic features; Comics; Newspaper comic strips and T-shirts on June 26, 2016.

   iv.    The mark was in use in commerce at the time of the application.

   v.     All of the facts recited in the application were accurate.

60.     Goldner and GB Entertainment made these statements with the knowledge that they were false.

61.     Goldner and GB Entertainment knew that: (i) plaintiff did not agree to assign his mark "Webcomic Name" to defendants; (ii) Goldner proposed to include a provision stating that plaintiff  retained "the rights to pursue his comic Webcomic Name outside of the context of this agreement."; (iii) that plaintiff was using the  "Webcomic Name" mark in

commerce in relation to these very same goods, comic strips and t-shirts, among others, and his work was associated with the mark "Webcomic Name" due to plaintiff's popularity and the fact that the Agreement itself acknowledges that plaintiff is "known as Alex Norris of Webcomic Name," (iv) Goldner knew that plaintiff was releasing a book related to "Webcomic Name" and expressly requested assurances from Goldner about the limited scope of the Agreement.  Id., Ex. 5.

62.     **The 369  Application is currently pending registration. Id., ¶ 25.**

**Golden Bell's application for the mark "OH NO" Serial Number 88185795**

63.     On November 8, 2018, Goldner and GB Entertainment filed an application, serial number 88185795 ("795 Application"). This time they attempted to register plaintiff's comedic trademark punchline "Oh No". Id. Ex, 10.

64.     Goldner, as principal of Goldner Bell filed the 795 Application for "Oh No" in class 016 (Bookmarkers; Bookmarks; Comic books; Comic magazines; Comic strips; Comic strips' comic features; Comics; Stickers; Newspaper comic strips), and class 025 (T-shirts; Graphic T-shirts; Short-sleeved or long-sleeved t-shirt). Id.

65.     Upon filing the application, Goldner and GB Entertainment stated:

  i.   GB Entertainment is the owner of the mark;

 ii.   That to the best of their "knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."

iii.   GB Entertainment's first's use of the Mark was as early as June 26, 2016 and that it first used the mark in commerce in connection to Bookmarkers; Bookmarks; Comic books; Comic magazines; Comic strips; Comic strips' comic features; Comics; Stickers; Newspaper comic strips and T-shirts; Graphic T-shirts; Short-sleeved or long-sleeved t-shirts on June 26, 2016.

iv.   The mark was in use in commerce at the time of the application in connection with all the goods/services in the application.

v.   That all of the facts recited in the application were accurate.

66.   Goldner and GBE made these statements knowing they were false. Indeed, Goldner knew that: (i) plaintiff never assigned his rights to his "Oh No" trademark to any of the defendants, in fact, in fact the agreement does not even mention the mark; (ii) defendants have never used the mark in connection to the applied for goods; (iii) the specimens of use submitted were screenshots of plaintiff's Facebook page and plaintiff's webcomicname.com website.

67.   Goldner and GB Entertainment filed this application without plaintiff's knowledge or consent. Id., ¶26

68.   **The USPTO has since divided the 795 Application as Serial No. 88975215 and 88185795 and are currently pending registration.** Id., ¶27.

### Plaintiff Applies for His Own Webcomic Name Serial No. 88216127

69.   On November 2018, plaintiff filed an application, serial number 88216157 ("127 Application") for *Webcomic Name* in class 041 (providing online non-downloadable webcomics and comic strips, books, reviews, periodicals and magazines in international class), and class 016 (for comic books; comic strips and comic strip's comic features, appearing in

print media, namely, comic books, books, newspapers, magazines). Id., Ex. 11.

70.     The USPTO denied the 127 Application because of the likelihood of

confusion with Goldner's and GB Entertainment's fraudulent 934 Application, which it

granted. Id., Ex. 8.

71.     On March 25, 2019 plaintiff commenced a cancellation proceeding before the

Trademark Trial and Appeal Board in connection to GB Entertainment's Registration No.

5629281 for "Webcomic Name" in International Class 28.  See Exhibit 15 to Plaintiff's

Declaration. Id., Ex. 13.

72.     On March 28, 2019, defendant's counsel sent a cease and desist letter to

plaintiff's publisher demanding it refrain from publishing plaintiff's book, and claiming *inter

alia,* that its publication of "Oh No" infringed defendants marks including "Webcomic Name."

Id., Ex. 17.

73.     On March 29, 2019, defendant's counsel also sent cease and desist letter to

plaintiff's counsel in this case claiming that GB Entertainment was the rightful owner of the

"Webcomic Name," had trademark rights to the name "Oh No," and that plaintiff's copyright

registration for his illustrations and webcomics was invalid. Id. Ex. 18.

74.     There is no mention in the Collaboration Agreement of the mark "Oh No"

which is the punchline that The Blob character delivers in every single of plaintiff's

"Webcomic Name" comic strips. Id. Ex. 5.

75.     On April 4, 2019, defendants counsel sent a second letter to plaintiff and his

publisher. Id., Ex. 19.

76.     Plaintiff's publisher nevertheless published the "Oh No" book on April 2,

2019.

**AS AND FOR A FIRST CAUSE OF ACTION**
**COPYRIGHT INFRINGEMENT**
**(against GB Entertainment and Goldner)**

77.     Plaintiff repeats and realleges each and every allegation of the foregoing paragraphs of its Complaint, with the same force and effect as if set forth fully herein.

78.     Plaintiff is a British citizen and at all relevant times was a resident and domiciliary of the United Kingdom.

79.     Under the law of Great Britain plaintiff owns the copyrights in his illustrations, copyright protection lasts 70 years from the death of the author, and copyright registration is not required for enforcement of a copyright owner's rights.

80.     Plaintiff's Registered Works are registered under U.S. Registration No. VAu 1-337-956.

81.     Plaintiff's Foreign Works are not United States works as defined by 17 U.S.C. §101 because they were published for the first time outside the United States or are unpublished.

82.     Plaintiff did not consent to, authorize, permit or allow in any manner defendants' use of plaintiff's Copyrighted Works.

83.     With knowledge of plaintiff's ownership of the illustrations constituting the Copyrighted Works, Goldner and GB Entertainment deliberately and willfully infringed plaintiff's copyrights.

84.     Goldner and GB Entertainment had access to plaintiff's Copyrighted Works through his publicly available website and social media sites.

85.     Goldner and GB Entertainment copied plaintiff's Copyrighted Works and submitted them as specimens used in support of their 795 Application and 369 Application for

the marks "Webcomic Name" and "Oh No."  Id.

86.     GB  Studios also reproduced Illustration #1 to promote merchandize on its website http://www.goldenbellstudios.com and at conventions (for instance at the PAX East Convention) without plaintiff knowledge or consent.

87.     Goldner and GB Entertainment's infringement was willful and was done in furtherance of their fraudulent trademark applications.

88.     Plaintiff is entitled to injunctive relief, actual damages, and lost profits as a result of defendants' actions in connection to plaintiff's Foreign Works; additionally, plaintiff is entitled to injunctive relief, statutory damages, attorneys' fees and the costs of this action in connection to plaintiff's Registered Works.

**AS AND FOR A SECOND CAUSE OF ACTION**
**FOR FALSE DESIGNATION OF ORIGIN**
**(Against GB Entertainment and GB Studios)**

89.     Plaintiff repeats and realleges each and every allegation of the foregoing paragraphs of its Complaint, with the same force and effect as if set forth fully herein.

90.     Plaintiff is the owner of the marks "Webcomic Name" and "Oh No." He conceived and developed both marks and the public associates these marks with plaintiff's goods and services.

91.     Plaintiff did not assign and never intended to assign to GB Entertainment or GB Studios his rights in and to "Webcomic Name" and "Oh No."

92.     The Collaboration Agreement does not mention or address "Oh No" in any way, and does not and cannot transfer the mark "Webcomic Name", but GB Entertainment nevertheless filed applications with the USPTO falsely claiming use of the mark in commerce, and supported its "use" with examples of plaintiff's own use. These actions

indicate an unequivocal intent to misappropriate plaintiff's trademarks.

93.     GB Entertainment did not dispute that it has received pre-orders of the Game and is commercializing the Game and plush toys and using the mark in commerce.

94.     Upon information and belief, defendants are using the website http://www.goldenbellstudios.com to actively sell merchandise bearing plaintiff's marks, including the plush toys "Sexy Blob",   the "OH NO" pillow, and the "Webcomic Name Plush".

95.     Upon information and belief, defendants are also selling merchandise bearing plaintiff's marks at toy conventions.

96.     Plaintiff actively sells and markets goods bearing his "Oh No" mark at his website www.theohnoshop.com.

97.     Plaintiff's "Webcomic Name" and  "Oh No" trademark are identical to the marks GB Entertainment applied for and registered because the goods and services are the same or closely related, which actually causes consumer confusion as to the true source because the goods are marketed to the same consumers.

98.     Plaintiff has been injured by defendants' unauthorized and willful infringing use of his marks and is entitled to damages, injunctive, and equitable relief.

**AS FOR A THIRD CAUSE OF ACTION**
**FOR CANCELLATION OF FRAUDULENT REGISTRATIONS**
**(Against Goldner and Golden Bell)**

99.     Plaintiff repeats and realleges each and every allegation of the foregoing paragraphs of its Complaint, with the same force and effect as if set forth fully herein.

100.    15 U.S.C. § 1119 provides that:

In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations,

16

and otherwise rectify the register with respect to the registrations of any party to the action. Decrees and orders shall be certified by the court to the Director, who shall make appropriate entry upon the records of the Patent and Trademark Office, and shall be controlled thereby.

101.    On November 30, 2017, defendants filed the 934 Application without plaintiff's knowledge or consent.

102.    At the time the parties signed the Collaboration Agreement, plaintiff was in the process of illustrating the Game for defendants (tentatively entitled "Webcomic Name Game"), and the plush toys did not have a working name (it was tentatively entitled  "Web Comic Name Stuffed Animals").

103.    The Game was tentatively entitled *Webcomic Name Game* because it was inspired by plaintiff's popular webcomic name comic strip and brand and was to be marketed as illustrated "by Alex Norris of Webcomic Name."

104.    Plaintiff never intended to transfer rights on his "Webcomic Name" trademark as evidenced by the July 3, 2017 exchange between the parties.

105.    Plaintiff could not transfer trademark rights to *Webcomic Name Game* or the plush toy to defendants because at the time of the Collaboration Agreement, neither the Game nor the toy was in existence and trademark rights could not attach.

106.    The 934 Application was filed on an intent to use basis *precisely because* the mark was not in use at the time of the application, let alone at the time the Collaboration Agreement was signed.

107.    Any purported or attempted assignment of the mark to defendant under the Collaboration Agreement fails as a matter of law since that would be considered an in gross transfer of rights.

108.    GB Entertainment did not have the right or authority to apply for the mark

or to tack its date of first use back to the date of plaintiff's first use.

109.    As a result of Goldner's misrepresentations to the USPTO, it granted the 934 Application and on December 11, 2018, issued "Webcomic Name" Registration No. 5629281.

110.    On March 25, 2019, plaintiff filed a petition to cancel GB Entertainment's registrations.

111.    GB Entertainment moved to dismiss the petition, stating that "the Board has not been Statutorily Authorized to Determine the Scope and Validity of the … Collaboration Agreement."

112.    GB Entertainment is not entitled to this registration because it is not the rightful owner of the marks.

### AS FOR A THE FOURTH CAUSE OF ACTION
### FOR BREACH OF CONTRACT
### (against GB Entertainment)

113.    Plaintiff repeats and realleges each and every allegation of the foregoing paragraphs of its Complaint, with the same force and effect as if set forth fully herein.

114.    GB Entertainment breached the Collaboration Agreement by failing to pay the required advances in full, deliver copies of the Game, commercialize the works, and otherwise.

115.    GB Entertainment agreed to pay plaintiff $3,125, within 30 days of delivery of the final Game files, and $2,500, upon delivery of the final print-ready files, the PSD files, the AI files and the InDesign Files. Id at 1G.

116.    GB Entertainment promised to give plaintiff 725 complementary copies of the Game.

117.     On October 2, 2018, plaintiff delivered the files to GB Entertainment.

118.     GB Entertainment failed to pay plaintiff's advances and deliver copies of the Game as agreed.

119.     GB Entertainment owes plaintiff $5,625.00 in advances, 725 copies of the Game and royalties.

WHEREFORE, Plaintiff respectfully requests an award of compensatory damages in an amount to be determined at trial as a result of Golden Bell's material breach of the Agreement.

**AS FOR A FIFTH CAUSE OF ACTION**
**FOR A DECLARATORY JUDGMENT**
**(Against GB Entertainment and GB Studios)**

120.     Plaintiff repeats and realleges each and every allegation of the foregoing paragraphs of its Complaint, with the same force and effect as if set forth fully herein.

121.     The Collaboration Agreement is specifically for the Game and a plush toy.

122.     Plaintiff believed and understood that the Collaboration Agreement only covered the Game and a plush toy, and asked Goldner to acknowledge that it did not prevent him from using his characters and working with collaborators on unrelated projects.

123.     On or about July 11, 2017 plaintiff asked Goldner to confirm that the scope of the Agreement would be limited the Game and one plush toy as follows:

"The main query I have about the contract is the part about 'the artist will retain 0% of the copyright" and similar clauses. Obviously the game will heavily feature elements that are part of Webcomic Name already, and I want to make it clear that in no way does Golden Bell take ownership of any of the characters, images or story content except in its application in a tabletop game. At the moment the wording is very broad and could apply to Webcomic Name in general, rather than simply in relation to a tabletop game."  Id. Ex. 6.

124.     In response, Goldner sent the following email to plaintiff on July 11, 2017:

"Hey Alex! I am resending the contract with now with this new language and also specified its for game and stuffed animal.

A.      ARTIST has the right to pursue his Comic "Webcomic Name" outside of the context of this agreement." Id.

125.      Plaintiff informed Goldner prior to executing the Collaboration Agreement that he was working on a Webcomic Name book and needed to confirm that Goldner understood that GB Entertainment could not affect his work outside of the Game and the plush toy.

126.      On July 11, 2017, plaintiff told Goldner:

"I will be working with publishers on a book and I am going to send them a copy of the contract before signing to make sure there is no breach of my contract with them. Obviously the book and tabletop game are very separate but will contain the same elements and I don't want signing this contract to come back to bite me in the future!" Id.

127.      Goldner replied to plaintiff that same day and said that plaintiff was "in the free to and clear to work on your property outside of the context of our contract", which plaintiff words was for a game and a plush toy. Id.

128.      Goldner knew or expected or should reasonably have known or expected that plaintiff would rely on his statements in executing the Collaboration Agreement.

129.      Plaintiff executed the Collaboration Agreement in good faith and relying on Goldner's written assurances.

130.      Plaintiff would not have entered into the Collaboration Agreement but for Goldner's statements confirming plaintiff's understanding regarding the scope of the Collaboration Agreement.

131.      Subsequent to Goldner's confirmation, Goldner and GB Entertainment told plaintiff they owned an option to plaintiff's future works.

132.      This statement was grossly inaccurate and misstated the terms and

intentions of the Collaboration Agreement.

133.    GB Entertainment has asserted multiple times in writing that the Collaboration Agreement also covers plaintiff's books, comic strips, his valuable trademarks "Webcomic Name" and "Oh No," and the merchandise associated with plaintiff's works including t-shirts.

134.    The text of the Collaboration Agreement is also vague, confusing, and contradictory in material respects.

135.    Sections 1A, IB, and 1H of the Collaboration Agreement each provide different, conflicting, and in some cases mutually exclusive rights and privileges regarding what property is transferred or retained.

136.    Based on these facts, there is now uncertainty, insecurity, and controversy between the plaintiff and GB Entertainment as to the scope, meaning, and interpretation of the Collaboration Agreement, and a judicial declaration of the respective rights and obligations of the parties will clarity and settle their legal relations.

137.    GB Entertainment has already told the USPTO that "the Board has not been Statutorily Authorized to Determine the Scope and Validity of the … Collaboration Agreement."

138.    Only this Court can provide the required relief to the parties.

**WHEREFORE**, plaintiff respectfully requests that this Court:

1.      On the First Cause of Action, awarding plaintiff a money judgment for actual damages, lost profits; and

2.      On the First Cause of Action, enjoining defendants from continuing to use the copyrighted material without plaintiff's consent; and

3.      On the Second Cause of Action, awarding monetary damages to plaintiff in an amount to be determined at trial as a result of defendants' willful infringement of plaintiff's trademarks resulting from defendants' profits in exploiting plaintiff's marks.

4.      On the Second Cause Action, issuing a permanent injunction preventing Goldner and GB Entertainment from using the "Webcomic Name" mark or anything confusingly similar thereto; enjoining Goldner and GB Entertainment from using any false designation or representation of origin in connection with the offering for sale or sale of goods and under the "Webcomic Name" and "Oh No" marks or any false description or representation, including words or other symbols, tending falsely to describe or represent defendants as "Webcomic Name" or associated or connected to "Webcomic Name" or "Oh No"; Order Goldner and GB Entertainment to implement corrective advertising rectifying the false statements in all their sales, marketing and distribution channels or avenues and remove any references to plaintiff's "Webcomic Name" and "Oh No" marks; and

7.      On the Third Cause of Action, ordering the cancellation of U.S. trademark Registration No. 5629281, pursuant to 15 U.S.C. § 1119; and

8.      On the Fourth Cause of Action, awarding plaintiff a money judgment against Golden Bell Entertainment, LLC in an amount to be proven at trial, plus interest as allowed by law; and

9.      On the Fifth Cause of Action, a judicial declaration of the respective rights and obligations of the parties respecting the agreements between the parties that are the subject of this action, reform or rescind same; and

10.     Awarding plaintiff legal fees, cost, and disbursements; and

11.     Granting plaintiff such other and further relief as to the Court is just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury pursuant to FRCP 38.

Dated:  New York, New York
        June 12, 2019

CHINTA PERDOMO BERKS &
FRATANGELO, LLP

/s/

Francelina M. Perdomo (#4429)
Antoaneta Tarpanova (#2287)
17 State Street, Suite 4000
New York, NY 10004
fperdomo@chintaperdomo.com
atarpanova@chintaperdomo.com
