

Kyle G. Kunst, Esq.
kgk@gdblaw.com

September 14, 2022

**Via ECF**
Honorable Sarah Netburn
United States Magistrate Judge
Southern District of New York
40 Foley Square, Room 430
New York, NY 10007

Re: *Norris v. Goldner, et al.*;
Case No. 19-cv-05491-AJN-SN

Dear Judge Netburn:

On behalf of Plaintiff Alexander Norris ("Norris"), we submit this opposition to Defendants motion to amend their answer to add counterclaims pursuant to the Court's September 9, 2022 Order, *Doc. No.* 107.

Defendants motion must be denied for several reasons. First, Defendants unjustifiably delayed amendment to add brand-new counterclaims. Second, amendment at this time is highly prejudicial to Plaintiff. Third, Defendants failed to move with diligence to amend their answer. Fourth, amendment is futile because Defendants' claims are meritless.

1. Defendants Unjustifiably Delayed Moving to Amend.

The Court may deny the motion to amend, pursuant to Fed. R. Civ. Proc. 15(a), for "good reason," which typically includes one of the following four reasons: amendment would be futile, amendment was sought in bad faith, undue delay in seeking amendment, or undue prejudice to the opposing party. *McCarthy v. Dun & Bradstreet Corp*., 482 F.3d 184, 200 (2d Cir. 2007) (*citing Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). The evidence on record with the Court establishes that Defendants' justification for their delay is false.

The Complaint in this matter was initially filed on June 12, 2019. *Doc. No.* 1. Defendants were given an extension of time to answer the Complaint, *Doc. No.* 19., and filed their answer on August 2, 2019. *Doc. No.* 21. The Court entered the Scheduling Order on December 2, 2019, requiring amendment within 30 days of that Order. *Doc. No.* 26. Plaintiffs moved to amend the Complaint on February 24, 2020, which was unopposed and subsequently granted. *Doc. No.* 27-29.

After settlement discussions fell apart, on July 21, 2022, the Court ordered the parties to provide a deposition schedule and provide the Court with any outstanding discovery issues and warned that discovery would end on August 24, 2022. *Doc. No.* 91.[1] While Defendants claimed

[1] Defendants claim that the Court's July 21, 2022 Order set forth a deadline "of September 7, 2022 to inform this Court, via letter, of any intention to file a motion." Defendants claimed that "[p]ursuant to that order, we are filing this






that as "incoming counsel, Defendants needed to conduct written discovery," Defendants did not disclose they intended to file counterclaims.

Defendants finally agreed to produce Marc Goldner for a deposition on August 24 – the day discovery closed. On the afternoon of August 23, the day before that deposition, Defendants produced 3,169 documents. Defendants had never informed Plaintiffs that those documents would be forthcoming. The following evening, after Goldner's deposition had already been conducted, Defendants served an additional 681 documents. Again, Defendants had not informed Plaintiffs that any further documents would be forthcoming.

Two weeks later the parties filed letters to the Court to initiate summary judgment motions. Defendants' letter included a request to amend their answer to add counterclaims but did not provide any hint as to what those counterclaims would be.

Defendants claimed their more than two-and-a-half-year delay seeking amendment was justified for the following reasons:

> "Further, Defendants delay in filing such claims was justified. Shortly after the case was filed, the parties began advanced settlement talks to resolve the dispute. Additionally, like many cases throughout the country, the case ground to a halt with the Covid-19 pandemic, causing even further delays. During that time, Defendants counsel relinquished his New York Bar License, and relocated to Florida. During that time, believing the parties were nearing a settlement agreement, Mr. Goldner decided to represent the parties *pro se*."

*Doc. No.* 106.

Defendants' justification for the delay is no justification at all. While Defendants hint that "advanced settlement talks" and "Covid-19" prevented them from filing their amended answer, the fact of the matter is that Defendants filed their amended answer on August 21, 2020, *during* those settlement discussions and *during* the height of the pandemic. *Doc. No.* 40.

Why did Defendants not add their counterclaims when they had already amended their answer? Why did they not alert the Court and Plaintiff that amendment was necessary when

---

letter noting our intention to file a motion seeking a leave to amend Defendants' answer to add counterclaims…" But that is not what that Order says. The deadlines set forth in Your Honor's July 21, 2022 Order were limited to motions for summary judgment: "Any party that wishes to file a ***motion for summary judgment*** shall file a pre-motion letter with Hon. Paul A. Engelmayer by September 7, 2022." *Doc. No.* 91 (Emphasis added). Defendants characterize the Order broadly, in an attempt to slip in this untimely motion to amend.






settlement had collapsed in July 2022, when discovery had not yet ended? Why did Defendants wait until two weeks after discovery ended to file that motion? Why did Defendants wait until summary judgment was pending to seek amendment?

Defendants also blame their former counsel, Robert Garson and Kevin Kehrli of the law firm GS2 Law, claiming that counsel "relinquished his New York Bar Licenses, and relocated to Florida." A review of the publicly-available New York attorney registration site shows that both attorneys are still registered with the New York bar, and both still work at GS2 Law, which maintains its New York office. https://www.gs2law.com. As of today's filing, Garson is still described as an "advisor" to Golden Bell. https://www.goldenbellstudios.com/about. With respect to Defendants' claim that "Goldner decided to represent the parties *pro se*," Goldner is accustomed to filing motions in the Southern District of New York *pro se*, having filed a complaint and emergency injunction to prevent the airing of an episode of the People's Court on April 2, 2020 – during the earliest stages of the pandemic and during settlement negotiations. *Goldner v. Ralph Edwards/Stu Billet Productions, et. al.*, 20-cv-02764-AT-BCM, *Doc. No.* 1.

Defendants further claim that their new counsel recognized the need to file these counterclaims – a reason flatly rejected by the Second Circuit. *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir. 1985) ("Ansam alleges that it was only after new counsel was substituted in March, 1983, that it discovered the information that formed the basis of its newly proposed claim. However, this is simply an insufficient reason for prejudicing Cola by forcing it to proceed to trial, post-discovery, on a new complaint."). This assertion also begs the question – which is the reason that Defendants are presenting to the Court that justifies their delay? That "that previous counsel neglected to file" these counterclaims? That they were hampered by Covid? That they were attempting to settle? That Marc Goldner was proceeding *pro se*? Which is it?

The Court should deny the motion to amend due to the Defendants' undue delay.

2. Defendants' Motion is Prejudicially Untimely.

Defendants claim there is no prejudice, but without any real analysis, simply copying and pasting the elements of prejudice from this Court's decision in *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 454 (S.D.N.Y. 2016). Defendants merely state,

> "Here, no such substantial prejudice would arise. The counterclaims arise out of the same series of transactions between the parties governing the original complaint, i.e. the Collaboration Agreement and the development of the 'Webcomic Name Game' and stuffed animals. Allowing amending of Defendants answer would not unduly prejudice Plaintiff, as it would not cause Plaintiff to expend






> significant resources conducting discovery or preparing for trial, significantly delay resolving the dispute, or prevent the Plaintiff from bringing a timely action in another jurisdiction."

This statement is false and belied by controlling Second Circuit precedent. First, the proposed counterclaims do not all "arise out of the same series of transactions between the parties governing the original complaint." Rather, Defendants seek to add a new cause of action for "tortious interference with prospective economic advantage," a non-contract claim with a three-year statute of limitations.

Defendants originally claimed that amendment is not prejudicial "as it would not cause Plaintiff to expend significant resources conducting discovery or preparing for trial, significantly delay resolving the dispute," but *now* they tell the Court that extensive discovery is needed to prove their claims:

> "With respect to the anticipated discovery for the above stated causes of action, Defendants believe that limited RFP's, Special Interrogatories, and two to three third-party depositions or subpoenas are appropriate and sufficient to allow Defendants' to prove their causes of action."

That appears to be more discovery than has been exchanged in this case thus far and is only one side of the coin, because the Defendants merely identify the discovery "sufficient to allow Defendants' [sic] to prove their causes of action." This says nothing about the discovery Plaintiffs need to defend against those causes of action. The discovery that Defendants alone now seek will obviously cause Plaintiff to expend significant resources and will obviously delay this dispute, which is on the cusp of summary judgment.

Defendants deflect from their own failure to diligently pursue amendment, claiming that "It should be noted that Defendants' previously served RFP's on Plaintiff that would have been sufficient, however Plaintiff chose to ignore those requests, failing to provide any response at all." This is also false – how would Plaintiff's responses to requests for production have negated Defendants' newly-stated need to depose "two to three third part[ies]"? Further, Plaintiff is not required to respond to discovery that is relevant to unfiled counterclaims and Defendants claim that they sought discovery for those unfiled counterclaims is a tacit admission (1) that discovery was served for an improper purpose; and (2) Defendants recognized they had counterclaims long ago yet failed to diligently seek amendment.

When amendment is sought after discovery has closed and summary judgment is pending, prejudice to the non-moving party is obvious and has been consistently recognized in this Court and the Second Circuit for decades. *Werking v. Andrews*, 526 F. App'x 94, 96 (2d Cir. 2013) ("We






are particularly likely to find prejudice where the parties have already completed discovery and the defendant has moved for summary judgment."); *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 727 (2d Cir. 2010); *Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 88 (2d Cir. 1998); *Ansam Associates v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir.1985) ("[a] proposed amendment ... [is] especially prejudicial ... [when] discovery had already been completed and [non-movant] had already filed a motion for summary judgment."); *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.*, 262 F. Supp. 2d 134, 151 (S.D.N.Y. 2003); *Cahill v. O'Donnell*, 75 F.Supp.2d 264, 279 (S.D.N.Y.1999) ("Our Circuit has consistently found prejudice and denied amendments where discovery has already been completed and summary judgment motions have been filed.").

3. Defendants failed to act with diligence.

Defendants' motion to amend must be denied pursuant to Fed. R. Civ. Proc. 16(a) since it is filed years after the date set forth for amendment in the Court's Scheduling Order and Defendants failed to act with diligence. *Parker*, 204 F.3d at 340 ("We now join these courts in holding that despite the lenient standard of Rule 15(a), a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause. Moreover, we agree with these courts that a finding of 'good cause' depends on the diligence of the moving party.").

Defendants simply do not address their diligence in seeking amendment. Defendants fail to identify the time that they became knowledgeable of any of these claims and fail to address why they waited so long to amend, which occurred just last week.

4. Amendment is Futile Because Defendants' Proposed Counterclaims are Meritless.

Given the issues raised above, the Court may deny Defendants' motion to amend without even passing on the merits of the proposed counterclaims. *Parker*, 204 F.3d at 339 ("Regardless of the merits of Parker's breach of contract claim, the district court did not abuse its discretion in denying Parker's motion on the ground that the motion was brought after the court-ordered deadline for amending the pleadings.").

Even turning to the merits of Defendants' proposed counterclaims, amendment would be futile due to Defendants' inability to withstand a motion to dismiss those counterclaims. *Kiarie v. Dumbstruck, Inc.*, 473 F. Supp. 3d 350, 356 (S.D.N.Y. 2020).

A. Breach of Contract.

Defendants breach of contract cause of action is premised on four contract provisions. First, Plaintiff failed to complete the game by February 17, 2018; second, Plaintiff failed to provide





"final" Game files; third, Plaintiff failed to grant Defendants the option to publish the book "Oh No"; and fourth, Plaintiff failed to provide access to social media accounts.

Defendants never expressed concern to Plaintiff about this so called "deadline." In fact, Defendants' own document production shows that Jason Wiseman was actively working on the game mechanics weeks after the "deadline" expired. Plaintiff was merely illustrating the game and could not complete the game without Mr. Wiseman's contributions.

Also, "final" is not defined anywhere in the Collaboration Agreement, and Defendants admitted that they were in the process of "editorializing" the files that Plaintiff had provided.

Moreover, Defendants conflate the terms "final files" with "final print-ready" files, but they are not the same:

> "The ARTIST will receive a $3,125 upfront advance against net sales royalties within 30 days of the COMPANY receiving the final files noted above for "Webcomic Name Game" for a game developed with Jason Wiseman and the ARTIST known as Alex Norris of Webcomic Name tentatively titled "Webcomic Name Game" by the COMPANY. The COMPANY will then pay an additional $2,500 to the ARTIST upon delivery to the COMPANY of the final print-ready files, the PSD files, the AI files, the InDesign Files, and any other files pertaining to the game created by the ARTIST and Jason Wiseman."

"Print ready" files are different from "final" files. Plaintiff obviously cannot provide the final "print-ready" files if Defendant is still "editorializing" the "final" files.

Defendants' own document production shows that (i) Plaintiff informed Defendants he was working on the "Oh No" book with Andrews McMeel before he signed the Collaboration Agreement and that book was not subject to the Collaboration Agreement; and that (ii) any prospective option would be solely for a book about animals that Plaintiff intended to self-publish.

In fact, while the parties were negotiating the Collaboration Agreement, Plaintiff expressly informed Defendants about that pending book,

> "The main query I have about the contract is the part about 'the artist will retain 0% of the copyright' and similar clauses. Obviously the game will heavily feature elements that are part of Webcomic Name already, and I want to make it clear that in no way does Golden Bell take ownership of any of the characters, images or story content





> except in its application in a tabletop game. At the moment the wording is very broad and could apply to Webcomic Name in general, rather than simply in relation to a tabletop game. I will be working with publishers on a book and I am going to send them a copy of the contract before signing to make sure there is no breach of my contract with them. Obviously the book and tabletop game are very separate but will contain the same elements and I don't want signing this contract to come back to bite me in the future!"

Defendants responded back that they were adding language to the Collaboration Agreement to meet Plaintiff's concern and expressly noted that the Collaboration Agreement is limited to the game and stuffed animal,

> "I am resending the contract with now with this new language and also specified its for game and stuffed animal.
>
> > A. ARTIST has the right to pursue his Comic 'Webcomic Name' outside of the context of this agreement.
>
> "To answer your question about copyright, Jason had agreed to us purchasing the rights for the game already and that part of the deal was already done. If you have any questions please let me know and I hope to work on any issues that may crop up and solve them as much as possible. You are obviously in the free and clear to work on your property outside of the context of our contract."

Regarding Defendants' claim that Plaintiff failed to provide access to his social media, any social media access was limited to the "WORKS":

> "COMPANY will exclusively handle all worldwide distribution, production, marketing, reprinting, sales, logistics, warehousing, social media, and publication of the WORKS. COMPANY and ARTIST shall share access to all Social Media accounts with administrative privileges and COMPANY shall be the Domain Registrant and Administrator of any domains."
>
> "ARTIST and COMPANY will jointly credit each party on all forms of publicity for WORKS, such as on social media, and accreditation."






Since the WORKS do not exist, there is nothing to share on social media. Rather, this is a preemptive attack by Defendants, attempting to explain away the fact that Marc Goldner took unauthorized screenshots of Plaintiff's social media accounts and filed those pictures with the United States Patent and Trademark Office as if they were his own.

B. Tortious Interference with Prospective Economic Advantage.

All the "allegations" that Defendants provide in support of this proposed counterclaim surround events in late 2018 and early 2019, well past the three-year statute of limitations for a tortious interference claim. *MBI Int'l Holdings Inc. v. Barclays Bank PLC*, 151 A.D.3d 108, 116, 57 N.Y.S.3d 119, 126 (1st Dept. 2017). Further, a tortious interference claim must be predicated on an independent tort – and Defendants' claim that Plaintiff made "disparaging" statements lacks the requisite detail to establish such a claim. *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189, 818 N.E.2d 1100, 1102 (2004).

C. Copyright Infringement.

Defendants' copyright infringement claim is premised on copyrights of characters that do not exist yet. Defendants claim that a provision gives them rights to all characters that Plaintiff created,

> "ARTIST shall submit to COMPANY all sequels to the WORKS or other works using characters that appear in the WORKS and any other unrelated characters. COMPANY will take due diligence to copyright all said works with the same percentages and profit splits as discussed above for future works relating to the WORKS above."

But that provision is limited to characters that appear in the "WORKS" which are an as-of-yet created table game and plush toy. Defendants even claim that Plaintiff prevented those products from being created. How, then, can characters that exist in something that does not yet exist be copyrighted?

For these reasons, Defendants' motion to amend must be denied.

Respectfully submitted,
*/s/ Kyle G. Kunst*
Kyle G. Kunst