Page 1

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Co. 1:19-cv-05491-AJN

4   - - - - - - - - - - - - - - - - - - - -x

5   ALEXANDER NORRIS d/b/a WEBCOMIC NAME,

6                         Plaintiff,

7            -against-

8   Marc Goldner, Individually and as Officer
    of GOLDEN BELL ENTERTAINMENT, LLC,

9   a California company and GOLDEN BELL
    STUDIOS, LLC, GOLDEN BELL ENTERTAINMENT,

10  LLC., a California Company and GOLDEN
    BELL STUDIOS, LLC.

11
                          Defendants.

12
    - - - - - - - - - - - - - - - - - - - -x

13
                          August 24, 2022

14                        10:05 a.m. (EST)

15

16      Video recorded Deposition of Marc

17  Goldner, the Defendant in the

18  above-entitled action, held at the above

19  time and place, taken before Garry J.

20  Torres, a Stenographer and Notary Public

21  of the State of New York, pursuant to the

22  Federal Rules of Civil Procedure, Notice

23  and stipulations between Counsel.

24

25              *      *      *

Page 2

```
 1    APPEARANCES:
 2
         GALLET DREYER & BERKEY LLP
 3            Attorneys for Plaintiff
              ALEX NORRIS d/b/a WEBCOMIC NAME
 4            845 Third Avenue, 5th Floor
              New York, New York 10022
 5            TEL: (212) 935-3131
              EMAIL: kgk@gdblaw.com
 6
         BY:  KYLE G. KUNST, ESQ.
 7
 8
         GERARD FOX LAW P.C.
 9            Attorneys for Defendants
              Marc Goldner et al.
10            1880 Century Park E #1410
              Los Angeles, California 90067
11            TEL: (310) 441-0500
              EMAIL: rdolan@gerardfoxlaw.com
12
         BY:  GERARD FOX, ESQ.
13            RYAN DOLAN, ESQ.
14
15       ALSO APPEARING:
16            FRANCELINA PERDOMO
              ALLAN PALLER, VIDEOGRAPHER
17
                    *       *       *
18
19
20
21
22
23
24
25
```

Page 3

1                STIPULATIONS

2      IT IS HEREBY STIPULATED AND AGREED, by

3  and among counsel for the respective

4  parties hereto, that the filing, sealing

5  and certification of the within deposition

6  shall be and the same are hereby waived;

7      IT IS FURTHER STIPULATED AND AGREED

8  that all objections, except as to form of

9  the question, shall be reserved to the

10  time of the trial;

11      IT IS FURTHER STIPULATED AND AGREED

12  that the within deposition may be signed

13  before any Notary Public with the same

14  force and effect as if signed and sworn to

15  before the Court.

16                *     *     *

17

18

19

20

21

22

23

24

25

1          THE VIDEOGRAPHER:  Good morning.
2      We're going on the record at
3      10:06 a.m. on August 24, 2022.  Please
4      note that this deposition is being
5      conducted virtually.  The quality of
6      the recording depends on the quality
7      of the camera and internet connection
8      of the participants.  What is seen
9      from the witness and heard on the
10     screen is what will be recorded.
11     Audio and video recording will
12     continue to take place unless all
13     parties agree to go off the record.
14         This begins media unit Number 1
15     of the video recorded deposition of
16     Marc Goldner taken by counsel for the
17     plaintiff in the matter of Alexander
18     Norris d/b/a Webcomic Name versus Marc
19     Goldner individually and as officer of
20     Golden Bell Entertainment et al. filed
21     in the U.S. District Court for the
22     Southern District of New York Case
23     Number 1:19-CV-05491.
24         This deposition is being
25     conducted virtually using virtual

1    technology.  My name is Allan Paller

2    representing Veritext New York.  I'm

3    the videographer and the court

4    reporter is Garry J. Torres also from

5    Veritext.

6          I am not authorized to

7    administer an oath, I am not related

8    to any party in this action nor am I

9    financially interested in the outcome.

10   If there are any objections to

11   proceeding please state them at the

12   time of your appearance.

13         And at this time counsel will

14   now state their appearance and

15   affiliations for the record beginning

16   with the noticing attorney.

17         MR. KUNST:  Good morning.  Kyle

18   Kunst of Gallet Dreyer & Berkey with

19   my colleague Francelina Perdomo, 845

20   Third Avenue, Fifth Floor, New York,

21   New York 10022 appearing on behalf of

22   plaintiff.

23         MR. FOX:  This is Gerard Fox,

24   Gerard Fox Law.  I'm here to defend

25   the deposition of Marc Goldner and I'm

1     here on behalf of the defendants.

2

3  M A R C   G O L D N E R, the Defendant

4  herein, having first been duly sworn by

5  the Notary Public, was examined and

6  testified as follows:

7  EXAMINATION

8  BY MR. KUNST:

9     Q.    Good morning, Mr. Goldner.  Can

10  you hear me okay?

11     A.    I hear you just fine.  Nice to

12  see you again.

13     Q.    Thank you.  You too.  And you

14  have had your deposition taken before,

15  correct?

16     A.    I believe you had taken it once

17  before.

18     Q.    Correct.  Have you had any --

19  have you taken any other depositions aside

20  from the one I conducted?

21     A.    No.  Not to my recollection, no.

22     Q.    Okay.  I'm going to go over just

23  some of the ground rules for a deposition.

24  I'm sure you probably remember them, but

25  I'm nonetheless going to restate them.

Page 7

1          When I ask you a question please

2     provide me a whole complete answer.  No

3     shaking of the head uh-huh or huh-uh.  If

4     you do that I'll ask you to clarify or

5     I'll say is that a yes, is that a no.  I'm

6     not trying to be rude, but as you know

7     this is being recorded and we have to have

8     a full record.

9          Is there any reason you cannot

10    provide full and complete responses today

11    to questions based upon anything you may

12    have taken that would affect your memory?

13         A.    I've just had a cup of coffee

14    which is half done today.

15         Q.    Okay.  If you need to take any

16    breaks that's fine.  Let us know.  Let us

17    know how long you want to take.  If

18    there's a question pending you have to

19    answer the question first, but then we can

20    take a break.

21         A.    Okay.

22         Q.    And then again you recognize

23    that this is a virtual deposition and

24    we're all appearing via Zoom, correct?

25         A.    Correct, yes.  I would have --

```
 1      Q.    Where are you currently
 2  physically located?
 3      A.    I am at my parents' house, 15
 4  Peacock Drive, Roslyn, New York 11576.
 5      Q.    Is there anyone in the room with
 6  you that we can't see?
 7      A.    No.  I can spin the camera
 8  around if you'd like.
 9      Q.    No.  And are there any documents
10  near you pertaining to this case?
11      A.    No.  I have my phone on the
12  table which is on airplane mode, car keys,
13  my sunglasses, a bottle of water and a
14  coffee.
15      Q.    I'm just going to go over some
16  background information.  I'm sure you
17  remember this as well, but can you just
18  give me a brief history of your education
19  leading up to all degrees you currently
20  hold?
21      A.    Sure.  Sure.  So I believe last
22  time we spoke I was concurrently doing the
23  four degrees.  I guess is timeline
24  chronological best for you?
25      Q.    Yes, please.  Let's start with
```

1   high school on forward?

2       A.      Sure.  So I went to Roslyn High

3   School in Roslyn Heights.  I had graduated

4   I believe in May or June of 2008.  I then

5   proceeded to go to undergrad.  I had a

6   couple of working stints in between.  I

7   had worked in water purification very

8   briefly and then I had wound up going to

9   the Ohio State University in undergrad.

10              I had -- went to the Fisher

11  College of Business.  I had majored in a

12  research distinction in entrepreneurship

13  in conjunction Glenn School of Public

14  Policy where I had done research on

15  patents, intellectual property on

16  different types of future type --

17  futuristic type technologies.

18              I worked with Dr. Harris Kagan

19  at the holography lab which was moved from

20  New York to the Ohio State holo lab and,

21  yeah.  I was at Fisher till 2015.  I

22  graduated 2015 and graduated magna cum

23  laude.

24              And then I had taken a few years

25  off as I was starting the business, the

Page 10

1   businesses with Rachel and Rob, first

2   started Golden Bell Entertainment and

3   Golden Bell Studios and then a bunch of

4   things in between and after and then I

5   believe it was 2019 that I had decided to

6   apply to the University of Connecticut

7   School of Law.

8          I had gotten in and I had went

9   as of August 2019.  I had went for -- I

10  began one year.  I had applied to the

11  Hinkle Entrepreneurship Award.  I had won

12  that in my 1L and I had focused on legal

13  innovation software called Access to

14  Justice in my docket which is something

15  similar to My Chart.  There was a small

16  scholarship grant.  I believe it was

17  $5,000 plus legal work on patents.  Don't

18  quote me on the 5,000.  It could have been

19  a little bit more.  Maybe it could have

20  been 7500.  I don't recall.  I'd have to

21  check.

22          And then I was -- it was I

23  believe December of 2019 or it could have

24  been January.  I was sitting in civil

25  procedure talking with one of my

1   professors Jennifer Mailly and I had

2   decided to pursue a joint degree either an

3   MBA or an MPA because UConn Law had a dual

4   degree program where you can essentially

5   get a second degree for just an extra year

6   rather than two years.

7            I had met with the business

8   school.  I believe I went with my mom to

9   visit that school and the director of the

10  business program of the MBA at UConn said

11  nearly verbatim, he recommends me not

12  going because I would be very bored

13  because it was a very introductory MBA for

14  people that were not working.  I was

15  already working full time in between 100,

16  120 hours a week prior to law school.

17           From there I kind of pushed the

18  MBA aside and I wound up meeting with the

19  advisor of the MPA program which is the

20  master of public administration.  I had

21  then went to the school which was in

22  Hartford in the city proper where Uconn is

23  just like I think in West Hartford or five

24  minutes outside of the city and I had -- I

25  want to give you the exact chronology

```
                                    Page 12
 1   here.
 2              I had met with the director and
 3   I think the dean of the program or maybe
 4   it was the lead advisor.  I don't remember
 5   exactly who it was, but they had wanted me
 6   to come to study there.  They said just
 7   put in an application.  You're essentially
 8   not like officially accepted
 9   quote/unquote, but you have a very good
10   chance and you're the type of student that
11   we like to see here.
12              I had then kind of done a lot
13   more research over the next couple of
14   months about the MPA programs and I had
15   realized that just based on my interest
16   with different types of policy,
17   technology, innovation, where intellectual
18   property is moving, to explore other
19   degree programs outside of the dual degree
20   offered at UConn.
21              From there I wound up applying
22   to Columbia's SIPA, The School of
23   International Public -- and Public Affairs
24   at Columbia University in New York.
25              I concurrently applied to the
```

Page 13

```
 1   University of Pennsylvania's graduate
 2   school of education dual degree program
 3   between GSC and the Wharton School which
 4   is jointly conferred between the two
 5   schools and has a program with the
 6   Weitzman Design.  I think Weitzman Design
 7   School where it's like design thinking and
 8   things like that, not engineering and then
 9   I had also applied to TRIUM's global
10   executive MBA which is a jointly conferred
11   degree between three of the leading
12   business institutions; New York
13   University's Stern School of Business, HEC
14   Paris and the London School of Economics.
15       Q.    So what degrees -- then aside
16   from your undergrad degree at Ohio State
17   what degrees do you currently hold?
18       A.    So since we last spoke I
19   finished up a couple of things a little
20   bit earlier than expected.  I graduated
21   the University of Pennsylvania's GSC
22   Wharton program with a masters of science
23   and education in entrepreneurship.  I had
24   graduated with a 3.97 GPA.  I have also
25   graduated TRIUM's Global Executive MBA so
```

```
 1   I hold an MBA from TRIUM.  There I was the
 2   elected academic class rep and I'm leading
 3   a lot of alumni efforts between the three
 4   schools and I should be completing
 5   Columbia's SIPA, the executive MPA program
 6   in December which is about a year earlier
 7   than I expected because I had taken four
 8   classes this summer in UN and development,
 9   international relations, the security
10   course that's required and oh jeez, and
11   the economics course.  So I have --
12        Q.    How do you spell TRIUM?
13        A.    T-R-I-U-M.
14        Q.    Okay.  Okay.  Have you
15   identified for us all the degrees you
16   currently hold?
17        A.    Yes, the MBA and masters in
18   science and education and in progress is
19   the JD at UConn Law and MPA at Columbia.
20        Q.    Got you.  Okay.  And you are
21   also a member and co-founder of Golden
22   Bell Entertainment, LLC, correct?
23        A.    That is correct, yes.
24        Q.    And you are also a member and
25   co-founder of Golden Bell Studios, LLC,
```

Page 15

1   correct?

2        A.    Yes, that's correct.

3        Q.    Can you tell me when Golden Bell

4   Entertainment was first created?

5        A.    So are you asking when was it

6   created conceptually, was it

7   foundationally created?  I mean I --

8        Q.    Foundationally, if you can just

9   give me --

10             (Whereupon, simultaneous

11        conversation took place disrupting the

12        record, and the court reporter

13        requested one person speak at a time

14        without interruption from anyone

15        else.)

16        Q.    My question was just

17   foundationally, year, date, day, month if

18   he has it.

19        A.    So it was about the spring of

20   2014 towards the end of the semester at

21   Ohio State.  I was walking Rachel back

22   home.  I had lived on I believes it was 20

23   East 14th Street --

24        Q.    Oh, no no no no.  You've

25   misunderstood my question.  I don't want

1  to know when it was conceived.  I want to

2  know when the actual filings were made to

3  create it as its own separate entity?

4      A.    Well, that's a tricky question

5  because since Rachel, Rob and I were all

6  working together prior to the formation

7  and we were creating copyrighted works

8  which were later assigned, the assignment

9  dates for the creation of intellectual

10 property that we created date back to 2014

11 regardless of the formation docs of the

12 LLC so --

13     Q.    Okay.  When were the foundation

14 docs filed to create Golden Bell

15 Entertainment?

16     A.    I believe the formation docs

17 were filed I think with Legal Zoom or one

18 of those business -- the legal business

19 services.  I think it was in April of 2015

20 because we joked that it was on Rob's

21 birthday.  I think it was April 18th of

22 2015 is when it was filed.  We were

23 seniors in undergrad.  All three of us

24 were seniors in undergrad.

25     Q.    Same question regards to the

1  filing date to create Golden Bell Studios,

2  LLC?

3      A.    I believe that was October of

4  2016.  Don't quote me, but I think it was

5  maybe, like, October 8th or 10th.  Around

6  there.

7      Q.    Who are the other members of

8  Golden Bell Entertainment, LLC?

9      A.    So Rachel and Rob are the UBOs,

10  the other members of the company.

11      Q.    And can you spell Rachel's last

12  name for the record?

13      A.    Yes.  K-O-R-S-E-N.

14      Q.    And can you spell Rob's last

15  name for the record?

16      A.    Gross like how something is

17  gross.

18      Q.    G-R-O-S-S, correct?

19      A.    Yes.

20      Q.    Now, when did you come to meet

21  Alexander Norris?

22      A.    So I had met Alex.  I had

23  actually not known Webcomic Name or

24  Alexander Norris prior to meeting Jason

25  Wiseman.  So Jason Wiseman was at the time

Page 18

```
 1   one of our game designers who brought in a
 2   ton of games that he claimed he had
 3   100 percent free reign over to do whatever
 4   he wanted -- anything from games, stuffed
 5   animals, fidget spinners, snap bracelets,
 6   books -- and he had introduced us to Alex
 7   months later after signing with him where
 8   we had acquired Pretending to Grownup
 9   where Alex was a guest artist where Alex
10   had drawn a Webcomic Name guest artist
11   card which was called "Unexpected
12   Pregnancy."  And that card, he had signed
13   full ownership to Jason to do anything in
14   terms of any future use.
15            In that time, Jason was working
16   on -- we were working together on the
17   Pretending to Grownup fulfillment.  Jason
18   was working on the Turtles Riding Airships
19   game with Peter Chiykonski; on Parenting
20   is Easy with Christopher Grady who has the
21   comic Lunarbaboon which is one of Golden
22   Bell's properties that we acquired from
23   Chris and from Jason; and with Alexander
24   Norris on a game for Webcomic Name and a
25   stuffed animal and branding line of
```

```
                                      Page 19
 1   merchandise including T-shirts, an option
 2   on a book and -- amongst other things.
 3            We had not spoken with Alex
 4   until June 25th or June 27th of 2017.  It
 5   was about six months or so after speaking
 6   with Jason; however, my business partner
 7   Rob had met Jason Wiseman at a convention
 8   called PAX East years prior and had always
 9   been a fan of Jason's work, as a fan, had
10   played I think one of his games, Drinking
11   Quest, which was one of Jason's first,
12   like, really popular games.  And then it
13   was -- yeah, it was kind a joint
14   collective idea to reach out to Jason, see
15   if we could kind of collaborating, working
16   together.  And in that time, that's kind
17   of -- Jason was the introduction to this
18   where, yeah, he had told us that he had
19   the rights 100 percent free reign on
20   Webcomic Name, that he can do whatever he
21   wanted with it, and this was all produced
22   in discovery.  I mean, these are emails
23   from Jason, from his words, quote,
24   100 percent free reign, and then he lists
25   the things that he has 100 percent free
```

Page 20

1   reign on.

2             So honestly, Kyle, it seems like

3   you're suing the wrong person but I guess

4   I'm not a lawyer so I can't really tell

5   you and your client what to do.  But it

6   seems like there's a little bit of a

7   misunderstanding in terms of who actually

8   is, like, the culprit here.

9      Q.    Okay.  I'm going to show you a

10  document -- actually, first, what I'm

11  planning on doing is uploading these so

12  that all parties to this Zoom have a copy.

13  Let me make sure I have this correct.

14     A.    I don't see it.  Where are you

15  uploading it?

16     Q.    I'm uploading it to the chat

17  box, but I'm also going to be doing a

18  share screen as well so that everyone has

19  a copy.  Okay?

20            Mr. Goldner, can you see the

21  document that's up on the share screen

22  right now?

23     A.    It's downloading very slowly.

24     Q.    I have it up on the share

25  screen.  Rather than attempting to

                                        Page 21

1   download the document, I have the same

2   document up on the share screen.  Can you

3   see it?

4        A.    Yes.

5              THE WITNESS:  Jerry, can you

6        confirm it's the same document that's

7        downloaded?

8        Q.    If you prefer to download the

9   document, there's no problem.  You can do

10  that as well.

11             THE WITNESS:  Jerry, you're on

12       mute by the way.

13             MR. FOX:  I did that on purpose.

14             Yeah, it looks like it's the

15       same document.

16             THE WITNESS:  Okay.

17       A.    All right.

18       Q.    All right.  So, Mr. Goldner, you

19  had earlier discussed, I think, entering

20  into a contract with Mr. Wiseman?

21       A.    Yes.

22       Q.    Is this that -- is this that

23  contract that's up on the screen?

24       A.    Well, I mean, there were several

25  drafts we had negotiated with Jason,

```
                                              Page 22
 1    several drafts on email, on phone calls.
 2    There were tons sent back and forth.  Can
 3    we scroll down to the signature page to
 4    ensure this is the final agreement?
 5         Q.    Sure.
 6              MR. FOX:  And you have the right
 7         to read any of these documents for as
 8         long as you want when a question's
 9         asked about them and ask for them to
10         be fully scrolled or to take a break
11         and have the document sent to you and
12         read it.
13              THE WITNESS:  Yeah, this is a
14         long document.
15         A.    But for the most part I know
16    everything about this.  Always good to
17    refresh and clarify, though.  Okay.  That
18    looks authentic.
19         Q.    Okay.  We're on page 6 of 26.
20              MR. KUNST:  And for the record
21         I'd like to mark this document as
22         Exhibit Number 1.
23         Q.    Mr. Goldner, up on the screen,
24    page 6 of 26 of Exhibit 1, is that your
25    electronic signature at the bottom of this
```

1   document?

2       A.    Yes.   This was conducted on

3   HelloSign which should be on the last

4   page.   Yes.

5       Q.    Okay.   And did you draft this

6   document?

7       A.    Jason and I drafted it together

8   so it was -- we both had written

9   provisions and edited it together.

10      Q.    Who made the first draft of this

11  document?

12      A.    Either myself or someone at the

13  company.   This is six years ago so I don't

14  want to say I 100 percent wrote the first

15  draft.   I definitely was part of it.

16  There have been so many changes to this

17  agreement through the years that -- Rachel

18  can have suggestions.   Rob has had

19  suggestions.   We've had attorneys that

20  have had suggestions.   We've had creators,

21  designers like Jason that have had

22  suggestions to change, improve, make more

23  clear.   So I don't know if that answers

24  your question.

25      Q.    Well, you said that this

1    document was signed six years ago.  I

2    would note, the first line, it says it's

3    made February -- early February 2017 was

4    what I said.

5        A.    Five and a half years ago.  I

6    apologize.

7        Q.    That's fine.

8              Around the time that this

9    contract was created, how many employees

10   did Golden Bell Entertainment, LLC, have?

11       A.    I don't see how that's relevant

12   whatsoever.  Are you trying to fish for

13   information from the other case for

14   pervis?  This is not an employment related

15   case, and no one here is an employee in

16   this contract.  So that seems completely

17   irrelevant.

18            MR. FOX:  You actually -- yeah

19       you --

20       Q.    You're still required to answer

21   the question --

22            MR. FOX:  Yeah, we can -- just

23       so you know, we can move at the time

24       of trial to, you know, argue that

25       something's irrelevant but for

1        deposition purposes there's a pretty

2        broad spectrum that's allowed.  Not

3        wildly irrelevant but, you know, how

4        many employees and things like that, I

5        mean, you can answer that or estimate

6        it.

7        A.    I don't recall how many

8   employees that we had at the time of the

9   signing of this contract.  I'd have to

10  check with the accountants, and you should

11  have the accounting records, if there's

12  any 1099s or W2s that were filed which

13  you've already subpoenaed.  So I can't

14  state accurately how many employees we had

15  at that time.

16       Q.    Well, who other than you around

17  the time that this contract was entered in

18  to would take part in drafting it that

19  worked for Golden Bell Entertainment, LLC?

20       A.    I don't recall the exact time of

21  when someone like Jim -- Jim was our first

22  and -- employee that we had brought on,

23  Jim Coyne, who we also -- you know about

24  very well.  Jim could have been involved.

25  I just don't remember.  I mean, this is

1   five and a half, six, almost six years

2   ago.

3       Q.    Would Rachel Korsen be involved

4   in drafting contracts like this?

5       A.    I mean, Rachel definitely had a

6   lot of editorial input.  She has a

7   brilliant legal mind.  She has, I guess, a

8   mind for being able to identify anything

9   that's not clear to make things more

10  clear.  So she absolutely could have been

11  involved in some provisions of the

12  contract.  I don't remember which ones.

13      Q.    And same question with respect

14  to Rob Gross?

15      A.    Rob, same thing, another guy

16  that's -- brilliant legal mind.  He has a

17  knack for detail and being able to make

18  sure everything is as crystal clear as

19  possible in making sure that the designers

20  and creators we signed understood what

21  they were signing and wanted to make

22  things as clear and upfront as possible in

23  the agreements.  So he definitely had

24  editorial legal input.  Whether you

25  consider that drafting or not, I -- again,

```
 1   I'm not a lawyer so --
 2        Q.     So I guess, as you sit here
 3   today other than yourself you don't recall
 4   who, if anyone, assisted you in drafting
 5   Exhibit 1; is that accurate?
 6        A.     No, it's not accurate.  I
 7   literally said that I'm sure that other
 8   people did.  I don't remember exactly who.
 9   I'm sure we had one of our attorneys look
10   it over as well, but again, I do not
11   remember who.
12        Q.     Okay.  So it's accurate that you
13   don't recall who else may have assisted
14   you in drafting this then, correct?
15        A.     Well, I'm telling you who likely
16   was.  I'm not 100 percent sure.
17        Q.     Okay.  So you'll note in the
18   first paragraph of Exhibit 1, the second
19   sentence starts, with respect to the
20   production of the properties tentatively
21   entitled, and then it lists a number of
22   properties --
23        A.     Yep.
24        Q.     -- among which are Webcomic Name
25   Game, correct?
```

1     A.     Yes, correct.

2     Q.     Okay.  Now, can you tell me what

3  the purpose of this agreement was with

4  respect to Webcomic Name Game?

5     A.     So --

6          MR. FOX:  I'm going to object.

7     The document speaks for itself, and,

8     you know, I'll make that objection.

9          THE WITNESS:  Should I still

10     answer?

11          MR. FOX:  Yeah.  Yeah, you have

12     to answer unless I instruct you not to

13     answer.  These are objections for

14     purposes of --

15          THE WITNESS:  Okay.

16     A.     I mean, I think it's pretty

17  straightforward in that we're having this

18  conversation.  I am a little bit

19  flabbergasted --

20          MR. FOX:  No.  No.  You can't

21     comment on questions.  You just have

22     to answer them.  It'll be a long day

23     if you do that.

24          THE WITNESS:  I apologize.

25     A.     It says purchase agreement at

```
 1   the top.  This is a purchase agreement.
 2       Q.    Okay.  So by your answer I
 3   understand you're saying you were
 4   purchasing Webcomic Name Game from Jason
 5   Wiseman, is that correct?
 6       A.    No.  No.  No.  We were
 7   purchasing the assets for Pretending to
 8   Grownup, all the intellectual property for
 9   Pretending to Grownup, anything relating
10   to Pretending to Grownup, Parenting,
11   Turtles Riding Airships, Webcomic Name
12   Game.  The key words there are
13   "tentatively entitled," and because we
14   have final editorial we are able to make
15   those names whatever we choose based on
16   the assets provided.
17           So in Parenting, Parenting is
18   not called Parenting at the end of the
19   day.  We had wound up signing an agreement
20   with Christopher Grady who created
21   Lunarbaboon and that tentatively entitled
22   Parenting has changed to Lunarbaboon's
23   Parenting is Easy, which we own
24   Lunarbaboon, we own Parenting is Easy, we
25   own the Anxiety Troll, all the assets that
```

1  are part of the game, Parenting is Easy,

2  that was originally Parenting, and we have

3  a great relationship with Chris.  We're

4  publishing one of his comics.  We're about

5  to do another comic.  We co-wrote a

6  children's book together that I had come

7  up with called ABCs of Parenting.  We had

8  made the Anxiety Troll stuffed animal

9  plush.  We are about to publish the board

10  game Parenting is Easy, which has been

11  worked on for quite a long time.

12          And that same line of logic

13  applies exactly to Webcomic Name where we

14  were making a game for Webcomic Name, we

15  were making stuffed animals which Alex

16  knew about because he designed the

17  original designs for the stuffed animals

18  that were sent and said he loved them and

19  was excited about them.  He knew we had an

20  option on Webcomic Name because he emailed

21  us first about the option and said that

22  you have an option on my future book.

23          He then signed another agreement

24  with a publisher, Andrews McMeel, after he

25  signed with us, breaching 3D of our

1  contract with him, saying that we have an

2  option but that he wound up trying to get

3  out of our contract, going and

4  circumventing us to another publisher.

5          So I think it's pretty clear

6  that this was a purchase agreement and

7  Jason had said that, again, prior to us

8  signing this, that he had 100 percent free

9  reign on these properties including

10 Webcomic Name which we produced in the

11 discovery.

12         So the mindset that we had was

13 that we went into this negotiating a

14 contract with some of these artists like

15 Chris, like Peter, like Alex -- Alex

16 Norris, that we had owned the rights

17 already and that we were just essentially

18 saying we love Alex, we love his work, we

19 think it's really funny.  I mean, I think

20 Webcomic Name is hilarious.  I think the

21 existentialism and the humor that is

22 portrayed is extremely funny so we wanted

23 to be a very creative, friendly company.

24 We wanted to work with the creators.  We

25 didn't want to be like a big Disney

```
 1   behemoth where we -- or a Marvel where we
 2   just acquire a property and then kick the
 3   creators to the curb.  We wanted to work
 4   with our artists so that they can continue
 5   the brand rather than going to hire
 6   someone else to go write Webcomic Name
 7   panels for a game or for an animation that
 8   we had planned on doing that we told Alex
 9   was part of the media provision --
10       Q.    So it's -- I'm going stop you
11   because I don't think you're responding to
12   anything.  So when you -- I think your
13   testimony is that you learned at some
14   point that Jason did not possess
15   100 percent interest in Webcomic Name Game
16   or am I misconstruing that?  And if I am,
17   please tell me how.
18       A.    I am not an attorney.  I don't
19   know if there's an agreement between Jason
20   Wiseman and Alex Norris.  He told me that
21   at one point he had agreements with the
22   artists.  The only agreement that has been
23   produced to me from Wiseman was the guest
24   artist contract which we produced between
25   Jason Wiseman and Alex Norris for the
```

1    guest card for Pretending to Grownup which

2    granted any future use.

3              So maybe in Jason's mind that

4    means that he was -- that he owned the

5    copyright and that card was -- that

6    contract transferred the card art which

7    transferred the copyrights.  We had said

8    that this would be a full form agreement

9    with Alex and we wanted to work with him,

10   and there had been numerous addendums with

11   Jason relating to this issue.

12             So no, I'm not saying I don't

13   think Jason didn't own the rights.  I

14   think Jason definitely owned some rights

15   to something.  At what point in time did

16   they transfer?  I don't feel comfortable

17   saying.  I'm not an attorney and I can't

18   make that legal distinction.

19        Q.    So I scrolled down to

20   paragraph H of Exhibit 1.  Do you see that

21   up on your screen?

22        A.    Yes.

23        Q.    Can you take a look at the --

24   read the first sentence, please?

25        A.    The creator will receive a

1   $6,250 upfront advance against net sales

2   royalties within 30 days of the company

3   receiving the final files noted above for

4   Turtles Riding Airships for a game created

5   with artist Alex Norris of Webcomic Name

6   paid by the company.

7       Q.    So it seems like at least as of

8   the date this agreement was signed you

9   were aware that Alex Norris was associated

10  with Webcomic Name, correct?

11      A.    Jason introduced us to Alex

12  Norris in the email that we produced to

13  you saying that we should check out

14  Webcomic Name and here is the link to it.

15          So he referred to Alex Norris of

16  Webcomic Name.  He also referred to Chris

17  Grady of Lunarbaboon.  That's just a way

18  to talk.  It's a marketing -- it's a

19  mechanism for marketing.  It's not that

20  uncommon.  Like, if I work at Goldman

21  Sachs, like, I would say that I work at

22  Goldman Sachs.  I mean, it's not something

23  so outrageous.  He had other comics so we

24  wanted to delineate that this wasn't Alex

25  Norris of Dorris McComics or of How to

Page 35

1   Love or of Hello World.

2           So he was being very specific

3   that this was his pseudonym of the comics

4   for Webcomic Name and that it was being

5   delineated that this is about Webcomic

6   Name, not about the other comics which

7   were already on WEBTOON.  And WEBTOON had

8   obviously had an agreement with Alex

9   because he's -- they're a publisher, a

10  digital comics publisher.

11      Q.    So let me ask you this:  Why was

12  it important to delineate Alex Norris as

13  associated with Webcomic Name rather than

14  the other comics you just listed?

15      A.    Well, that's untrue because in

16  the clause right below it it says, for a

17  game developed with artist Christopher

18  Grady of Lunarbaboon.

19          So this is a very consistent

20  message throughout.  You're taking

21  something --

22      Q.    Right.  But my question, again,

23  is about -- it's about Alex Norris of

24  Webcomic Name, and so you just identified

25  a number of other works that Alex Norris

```
 1   either created or maybe associated with
 2   and I'm wondering why Alex Norris of
 3   Webcomic Name was used rather than any of
 4   the other particular works he had created?
 5        A.    Because we were acquiring and
 6   purchasing Webcomic Name.  Is that what
 7   you're asking?  I mean, I'm sorry if I
 8   don't understand, but --
 9        Q.    No, that's fine.  If that's your
10   answer, I understand.
11             MR. FOX:  Yeah -- it's really
12        important to the deposition -- I'm
13        speaking to my client, Marc -- that
14        you know, that you simply answer the
15        questions.  There's no jury, there's
16        no judge here.  Editorializing,
17        commenting just makes it a long day,
18        makes the transcript more expensive.
19        So just try to listen, pause, answer
20        the question straight on.  Don't
21        editorialize, don't comment.
22             All right.  Let's go.
23             THE WITNESS:  Okay.
24             MR. FOX:  Let's go forward.
25             MR. KUNST:  Thank you.
```

1      Q.    So do you recall reaching out to

2   Alex -- well, I guess -- actually, strike

3   that.  Never mind.

4             So I'm going to take Exhibit 1

5   down.  So if Golden Bell Entertainment was

6   obtaining Webcomic Name from Jason

7   Wiseman, why was it necessary to enter

8   into a later agreement with Alex Norris

9   for Webcomic Name Game and the

10   collaboration?

11      A.    Sure.  Sure.  So I had mentioned

12   it previously, but I'm happy to kind of

13   reiterate.  So it's multipronged of why

14   that was done.  First, we didn't find

15   Jason's contract to be all-encompassing

16   where it said any future use, but we

17   wanted other classifications in order to

18   make sure Alex would still be compensated

19   outside of just games, for instance.  So

20   we had wanted to work with Alex, like I

21   said, where we didn't want to go hire

22   another artist.  And why would we pay Joe

23   on the streets who has never been involved

24   or passionate about Webcomic Name and pay

25   him $5,000, $10,000 to make a game when we

```
                                        Page 38
 1   can go give that money to Alex who,
 2   obviously, I would assume, likes the brand
 3   because he made it originally.  And we
 4   gave him that money to create the games.
 5   Same thing about how, like, on Marvel,
 6   they have -- they can acquire something,
 7   and then they're paying one of their
 8   artists like Jack Kirby to continue making
 9   comics or like how he goes to DC and makes
10   The New Gods, and then he's paid to
11   continue making those.
12            So Jason, in Alex's contract it
13   says that Jason is to pay Alex for the
14   royalty on the game, but in that same
15   contract it says that Alex is the one that
16   gets the majority of the stuffed animal
17   between Jason.  They might think it's,
18   like, five percent of the stuff animal
19   royalties, but then Jason is negotiating,
20   saying he wants two percent of the
21   Webcomic Name, all things relating to it
22   like the stuffed animals or the fidget
23   spinners that he suggests.
24            And then with Alex, we wanted
25   him involved, and that's why in 2B we have
```

```
 1   things like animation rights, other
 2   ancillary rights like publishing rights,
 3   and we wanted to do a book with Alex.
 4              So we could have gone to do a
 5   book on our own.  Like, we could do that
 6   with Lunarbaboon, but why would we?  I'd
 7   rather -- but yeah.  We wanted to work
 8   with Alex on, like, a book like we did
 9   with Lunarbaboon.  It's more fun to
10   collaborate, write with someone else, come
11   up with something.  We're not just
12   publishers or distributors.
13              As I said earlier, we're also
14   creators.  Rachel's an artist.  Rob and I
15   are writers so this isn't something coming
16   out of nowhere.  Like, one of our taglines
17   for the company is "a company for creators
18   by creators."  So this is not, like,
19   something out of the blue where we're
20   just, like, a publisher/distributor
21   approaching them.  We're also --
22      Q.    Okay.  I'm going to put another
23   exhibit up on the screen.
24      A.    Okay.
25      Q.    Mr. Goldner, I've put another
```

```
                                              Page 40
 1   document up on the share screen --
 2        A.    Yes.
 3        Q.    -- and I've also added it to the
 4   chat function.
 5        A.    Okay.
 6        Q.    Do you see the document that's
 7   up on the share screen right now?
 8              THE WITNESS:  Jerry, am I good
 9        to review this?
10              MR. FOX:  Yeah, with all these
11        documents you can ask him to scroll it
12        for you or to have time off the
13        record.  We can take a break and you
14        can read the whole document.  You're
15        allowed to read the whole document,
16        not just the parts that he puts on the
17        screen.
18              THE WITNESS:  Okay.  I guess you
19        want me to read this for a minute.
20        A.    I mean, I remember this email so
21   I don't really need --
22              MR. FOX:  It's up to you.
23        A.    Yeah, I mean, that's up to you,
24   Kyle.  This is not something that's
25   unusual.
```

1      Q.    No, that's fine.  So you just
2   said you recall this email, correct?
3      A.    Yeah.
4      Q.    Okay.  I'm going to mark this
5   document as Exhibit 2, and I'll be clear,
6   the email that's up on the screen on this
7   two-page document is an email from Alex
8   Norris to you on Monday, July 3rd, 2017,
9   correct?
10     A.    July 20.  I was scrolled down a
11  little bit because I downloaded it.  Yes,
12  July 3rd, 2017, correct, and then I
13  responded on July 11th, 2017, at 3:27 p.m.
14     Q.    Okay.
15     A.    Yes.
16     Q.    So if we scroll up from
17  Mr. Norris's July 3, 2017, email on
18  Exhibit 2, we reach your response to
19  Mr. Norris on July 2017 --
20     A.    Yes.
21     Q.    -- July 11, 2017, correct?
22     A.    Correct.
23     Q.    Okay.  And in Mr. Norris's email
24  from July 3, 2017, he voices concern with
25  the zero percent copyright clause in the

Page 42

1  contract, correct?

2      A.    I don't know if this is concern.

3  Can you quote exactly what you're talking

4  about?  He says it's a query --

5      Q.    Okay.  Well --

6      A.    -- concern.

7      Q.    Sure.

8      A.    It's a question.  "Query" is a

9  question.  Doesn't mean he's concerned

10  about it.

11      Q.    Okay.  So he notes, quote,

12  obviously the game will heavily feature

13  elements that are part of Webcomic Name

14  already and I want to make it clear that

15  in no way does Golden Bell take ownership

16  of any of the characters, images or story

17  content except in its application in a

18  tabletop game.  At the moment the wording

19  is very broad and could apply to Webcomic

20  Name in general rather than simply in

21  relation to a tabletop game.  I will be

22  working with publishers on a book and I am

23  going to send them a copy of the contract

24  before signing to make sure there is no

25  breach of my contract with them.

1  Obviously the book and tabletop game are

2  very separate, but will contain the same

3  elements and I don't want signing this

4  contract to come back and bite me in the

5  future, end quote.

6          Correct, that's what he wrote in

7  that email?

8      A.    That is what he wrote, and I

9  think you're misconstruing what he wrote

10  and what we had thought --

11          MR. FOX:   Okay.   Guys, I'm going

12      to object here.   Number one, Counsel,

13      document speaks for itself.   Getting

14      him to agree what the document says is

15      a waste of our time.

16          And, Marc, you're not here to

17      argue with him.   So you just -- if he

18      asks a question about a document, you

19      can simply state the words in the

20      document.   You're not there to

21      interpret them or to agree with his

22      argument about them which is -- he

23      should be saving that for court.   You

24      shouldn't be arguing with him, all

25      right?

Page 44

```
 1            THE WITNESS:  Right.
 2            MR. FOX:  Thanks.
 3       A.    I'm not trying to be
 4   argumentative, Kyle, so I'm sorry if
 5   you --
 6       Q.    Okay.  And so in response to
 7   this email you write, I am resending the
 8   contract with now -- with this new
 9   language and also specified it's for game
10   and stuffed animal, period.
11            Correct?
12       A.    That is what it says but there
13   is more to that.  There is more to that
14   email so you're taking that one sentence
15   out of --
16       Q.    Sure.  Like your attorney said,
17   it's an exhibit now.  So let's go ahead
18   and look at the next line.  It's, one,
19   artist has the right to pursue his comic,
20   Webcomic Name, outside the context of this
21   agreement, period.
22            And was language, was that exact
23   language later added to the collaboration
24   agreement that was signed between Golden
25   Bell Entertainment and Mr. Norris?
```

```
                                          Page 45

 1      A.    So what was added was pretty

 2   simple, outside the context of agreements,

 3   is we weren't going -- like, we weren't

 4   harming Alex or taking away his

 5   livelihood.  So we were specifying that

 6   we're essentially, like, living with our

 7   creators.  We're admiring them.  He was

 8   free to make money on Patreon or to

 9   continue selling at conventions --

10      Q.    Hold on a second, Mr. Goldner.

11   Hold on a sec.  My question is a little

12   different.  My question is:  Was the

13   language set forth in this email -- Number

14   1, ARTIST has the right to pursue his

15   comic, Webcomic Name, outside the context

16   of this agreement -- added to the

17   collaboration agreement that was later

18   entered into between Golden Bell

19   Entertainment and Mr. Norris?

20           MR. FOX:  And, Marc, that's a

21       yes-or-no question, and, you know, if

22       you have to look at the other

23       agreement to see if that exact

24       language is in it, you're allowed to

25       take a break to do it.
```

1    A.    Just note that that was added

2  after in order to allow him to work on his

3  other comics.

4    Q.    Okay.  What other comics are you

5  referencing when you say, "work on his

6  other comics"?

7    A.    So in our first recorded call

8  that you -- we have produced, he also

9  works with WEBTOON and was salaried there

10 for Hello World and -- I think which is

11 part of Dorris McComics -- and How to

12 Love.  So from my memory, there are things

13 that he can make, like, money from payment

14 gateways for people to read his digital

15 comics, right, or for making money from

16 the salary from WEBTOON.  So he's able to

17 continue making those comics.

18            But since Webcomic Name had

19 appeared in Dorris McComics, I believe, in

20 2015 or '16 prior to Webcomic Name

21 existing, I wanted to make sure that that

22 was delineated, that he was able to pursue

23 a book for Dorris McComics.  And he said

24 that's how he was spending half of his

25 time because he was split between the two.

Page 47

1           So that was added because we
2   wanted to make -- allow him to still be
3   able to generate money from, like,
4   advertising revenue from the social media
5   pages.  So it was really a near
6   limitless -- was that the contract was
7   defined in terms of us being able to make
8   products or being able to expand the works
9   or the brand where everyone would be
10  making a ton of money and we'd be the
11  brand shepherds on the physical and
12  digital world in terms of, like, product
13  development and, like, median branding
14  which, I believe, was understood from day
15  one.
16          So I mean I wish I could
17  answer -- I don't believe it's a simple
18  yes-or-no question.  There's a thought
19  behind why that was added.  This was about
20  his other comics.
21      Q.    Okay.  But you're -- there's
22  nowhere in this email -- and perhaps I'm
23  missing it -- where you reference other
24  comics, correct?
25      A.    Well, there is.  So --

Page 48

1      Q.      Well, can you please point me to
2    that?
3      A.      Yeah.  So I had specifically
4    said -- which you're conveniently taking
5    out of context -- that when Alex asked
6    about the copyright, and I said, quote,
7    that part of the deal is done.
8              So I understand that in your
9    complaint you left that sentence out in
10   the third paragraph, that first and second
11   sentence you had left out.  Because when
12   Alex asked about the copyright I replied
13   that part of the deal is done.  So he's
14   querying, asking about the copyright.
15             And I'm saying, well, we can
16   pull it up and we can -- like, we can pull
17   it up with him and talk with him.  But
18   it's -- like, this was already a done deal
19   with Jason.  We already acquired the
20   copyright and the trademark.  So in our
21   mind that part of the deal is done.  I
22   don't know why we're bringing up something
23   that already happened.
24             So, like, not only did Alex know
25   this in our minds, but in Alex's own

1   contract which you pulled up before he

2   knows he's getting paid by Jason on

3   royalties and he knows that we have an

4   agreement with Jason about Webcomic Name

5   because Jason was negotiating for Webcomic

6   Name, everything from the advance to the

7   percentage.  So where did this number come

8   from in Alex's contract about the advance

9   that he's getting or the royalties?  It

10  didn't come out of thin air.  Jason

11  negotiated it for him.

12          So you are taking this email as

13  completely out of context because there

14  were literally dozens of emails prior to

15  this with Wiseman acting as his -- I don't

16  know if "agent" is the right word or

17  "negotiator," whatever you want to say --

18  but that is -- you're really taking apples

19  and chocolate here and trying to make them

20  the same thing.

21      Q.    So let me -- I don't think I

22  understand what you're looking at.  It's

23  your assertion, claim -- I'm not sure how

24  to characterize it -- but you're saying

25  that in the sentence, to answer your

Page 50

```
 1   question about copyright, Jason had agreed

 2   to us purchasing the rights for the game

 3   already and that part of the deal was

 4   already done.

 5            And you are saying that that

 6   indicates that the contract with

 7   Mr. Norris only meant he could work on

 8   works that were not Webcomic Name?

 9      A.    No, that's not what I'm saying.

10      Q.    Okay.

11      A.    I'm saying --

12      Q.    All right.  I don't understand

13   it so can you describe to me what --

14      A.    I'm sorry.  I'm happy to clarify

15   this.  So it's saying, quote, outside of

16   the context of this agreement.

17            So what is in this agreement?

18   We have the game.  We have the stuffed

19   animal.  We have the option on the next

20   full length completed book.  We have 2B

21   which is animation rights, digital rights,

22   gaming rights.  So we are a media company.

23            And I explained to this Jason --

24   he knew this -- on the recorded calls with

25   Alex, both of them.  We told him that we
```

Page 51

```
 1   are a media company.  We are essentially
 2   like a baby Disney meets Hasbro sprinkled
 3   with a little bit of Nintendo, and that's
 4   our vision for the company.  But we're
 5   very young.  It's -- like, Disney wasn't
 6   built in a day.  They're not a
 7   trillion-dollar company overnight.
 8            So this agreement was about --
 9   with Jason, we had a game, but games, as
10   you know, are turned into movies.  Look at
11   Magic:  The Gathering.  It's being spun
12   off in a Netflix show as a TV show.  Or
13   you can look at something like Cyberpunk
14   which is a game, and then it's turned into
15   a video game because its other derivative
16   works.  So games are often turned into
17   movies.  Look at Uncharted -- all I was
18   saying was, like, Uncharted was a video
19   game that was turned into a movie with
20   Mark Wahlberg.  This is not unusual for a
21   game to be spun off into other types of
22   rights -- or there have been, I believe,
23   Uncharted comic books so --
24       Q.    Let me ask you this then --
25       A.    Yes.
```

1    Q.    -- if the collaboration
2  agreement and week with Mr. Norris was
3  meant to convey rights in Webcomic Name in
4  addition to the game and the stuffed
5  animal why did you put in this email
6  that -- this new language and also
7  specified it's for game and stuffed
8  animal?
9    A.    Yes.  Because the game and the
10  stuffed animal were what he was being paid
11  for.  So he was being paid for an advance
12  for the game but that game could still be
13  spun off later.  He may not work on the
14  animated show that we develop after the
15  game is complete and becomes popular.
16        So he -- the context of this
17  agreement is about the media rights of
18  what is being granted because games can
19  become nearly anything, but he's still
20  allowed to pursue his comic, Webcomic
21  Name, outside of the context of this
22  agreement, where, as I said, he's allowed
23  to make money.  He's free to make money on
24  Patreon --
25        MR. FOX:  Marc, slow down.  Slow

1        down.  Slow down.  You have to talk in

2        a deposition almost like a computer.

3        You know, like on those computer

4        calls.  You have to slowly pronounce

5        your words.  It's good practice for

6        trial.  The judge would get hot if you

7        talk this fast.

8               THE WITNESS:  You know it's such

9        a problem.  I talk so much and so --

10              MR. FOX:  It's just a

11       discipline.  Just a discipline.

12       A.    So yeah, I mean, outside the

13   context of this agreement is that he could

14   do other things that are not part of the

15   media part of the contract, not part of

16   the, like, the option or not part of the

17   game or the stuffed animals or the

18   animation.  He's allowed to go make money

19   on Patreon.  He's allowed to go sell

20   Webcomic Name prints at comic cons.  He's

21   allowed to go make pins which he has made

22   before.  Like, this is not something that

23   he's not allowed to do.  We were not

24   trying to take away his livelihood, nor

25   have we ever told him you can't do this.

Page 54

1    You're not allowed to do this.

2              We were very, very clear that,

3    yo, we're cool.  Like, if you want to make

4    some money we're not going to stop you.

5    You're going to make money.  We're going

6    to try to make money, grow the brand.  We

7    marketed this brand.

8              And he has increased his

9    followers by over 100,000 people partly

10   due to our efforts going to consumer

11   conventions, promoting Webcomic Name with

12   our banner.  That is marketing dollars

13   that have been spent to help increase his

14   brand exposure, and we're here getting

15   sued.  I'm sorry.  This is crazy to me.

16             MR. FOX:  Excuse me.  Marc.

17        Marc.  Marc, I got you.  There is no

18        jury and no judge here, and the judge

19        won't even read these comments.  So

20        all of your editorializing, A, costs

21        money because the court reporter,

22        every word they type costs money, and

23        you're talking beyond -- the way the

24        whole thing goes is question, answer;

25        no comments.  No one's listening to

Page 55

1          you.   No one's --

2                  THE WITNESS:  I will try.

3                  MR. FOX:  Okay.  So they'll just

4          listen to your answers.  The comments

5          are expensive wastes of time.

6                  MR. KUNST:  Thank you.

7          Q.    So I guess to kind of follow up

8     on what you previously said, so even after

9     Mr. Norris signed the collaboration

10    agreement he was still free to create the

11    actual comic series, Webcomic Name, and

12    that was completely his own property; is

13    that correct?

14        A.    That is not what I'm saying, no.

15        Q.    Okay.  So why then was he not

16    permitted to keep Webcomic Name, the

17    comic, after he entered into the

18    collaboration agreement?

19        A.    So I think we need to delineate

20    the word capital C with comic with lower

21    case comic because there is a delineation

22    between those two.

23        Q.    Okay.  What is that delineation?

24        A.    So comic, upper case C, is the

25    same thing as comic book.  It's a

1    classification.  So we are looking at --

2    he's allowed to be making the comic.  He's

3    allowed to literally draw it, post it on

4    his social media, and we're not stopping

5    him.  We're not stopping him from going to

6    post that on social media, make

7    advertising revenue.  We've not stopping

8    him from posting it on his Tumbler to get

9    page views.  We're not stopping him from

10   posting his comics on Patreon where he

11   posts Blob Erotica and tries to damage the

12   brand by doing -- where he's essentially

13   posting pornography of the brand where he

14   agreed not to damage it without having any

15   data analytics or marketing insight if

16   this would upset his audience.  What if

17   he's drawing porn of these blobs -- which

18   he is -- and the target audience is

19   families or children?  So we --

20       Q.    Okay.  So in what context would

21   he not be able to use his or create his

22   Webcomic Name comic without paying Golden

23   Bell Entertainment something?

24       A.    He's not allowed to be

25   publishing it where there's -- like, to a

1  digital comics publisher like WEBTOON.  So

2  he was allowed to go do Hello World,

3  Dorris McComics, How to Love on WEBTOON,

4  but he wasn't allowed to go put Webcomic

5  Name on WEBTOON because that's another

6  publisher.  So there is a difference.

7              And I know that this is very

8  subjective.  Is Facebook a publisher

9  because it's section 230?  But Facebook is

10 a platform.  There are just -- he's not

11 being paid by Facebook to go post a comic,

12 but he's being paid by WEBTOON to post his

13 other comics.  So he's not allowed to go

14 print a Webcomic Name physical book and

15 try to get clever and call it Oh No by

16 working with another publisher, McMeel,

17 when we have an option on that next book

18 based on the terms of the agreement.

19              So if we wanted to go make a

20 Webcomic Name book, we could.  If we

21 wanted to work with him and he wanted to

22 work with us, we'd pay him, but he would

23 still get royalties no matter what on that

24 book, whether we made it or he made it.

25              Is this answering your question?

1      Q.     I mean, I think you're answering

2   it the way you're best able to.  My

3   question though is:  In Mr. Norris's

4   July 3rd, 2017, email, he tells you that

5   he's working on a book regarding Webcomic

6   Name, correct?

7      A.     He is not saying that.

8      Q.     Okay.  Well --

9      A.     Where does he say -- can you

10  please read to me -- I know that's been

11  your allegation but where did he ever

12  say -- show me one place where he said, I

13  am working on a Webcomic Name book.

14     Q.     Well, he's discussing his

15  concern with the copyright --

16     A.     Because --

17     Q.     -- percentage that Golden Bell

18  will retain in the collaboration agreement

19  and he identifies that he is working on

20  the book --

21     A.     No, he --

22     Q.     -- and he notes that it is --

23            Okay.  So you're not aware --

24     A.     -- characterize --

25     Q.     Okay.  Well --

1          MR. FOX:  Guys.  Guys.  Guys.

2     Guys.  Guys.  Both of you, we're not

3     in a deposition format.

4          Counsel, you're asking him to

5     speculate about documents and intent

6     and what a guy's doing.  Documents all

7     speak for themselves --

8          MR. KUNST:  No, I'm asking him

9     what he -- I'm asking him what he

10    understood when he received an email,

11    and if he doesn't -- if that wasn't

12    his understanding, he can say that

13    wasn't his --

14         MR. FOX:  You're putting words

15    in -- you're putting your own spin on

16    these emails, and that's improper --

17         MR. KUNST:  I'm asking him if

18    that's what he understood, and he

19    doesn't know it.

20         So your objection is noted.

21         MR. FOX:  Try to ask just

22    pointed, factual questions instead of

23    arguing your case, and it'd make it

24    easier for Marc not to argue back and

25    for us all to be here hours longer

Page 60

1     than we need to.

2          MR. KUNST:   Thank you.

3     Q.    So let me ask you this then:   At

4     the point that you received Mr. Norris's

5     July 3, 2017, email, you did not

6     understand that to mean that he was

7     working on a book of Webcomic Name comics;

8     is that correct?

9     A.     I've said several times now

10    Webcomic Name was part, at one time, of

11    Dorris McComics.  Webcomic Name as its own

12    page was relatively new.  So this was

13    under the assumption that if we are

14    signing and acquiring an entire brand that

15    we are putting our sweat equity into as a

16    new startup, that yes, he's not going to

17    go make Webcomic Name with another

18    publisher.  We assumed he's talking about

19    a book that's part of Dorris McComics --

20    which Webcomic Name was in Dorris

21    McComics -- and we assumed another book --

22    since he didn't say it was Webcomic

23    Name -- was either Dorris McComics, Hello

24    World or How to Love which I specified on

25    the September 2017 recorded call with him.

1    Because why would I bring up Dorris

2    McComics on that call on September 2017 if

3    I didn't think that's what the book he was

4    working on is?  Because Dorris McComics

5    had been around for years prior, it had

6    already developed a larger audience with

7    way more views on WEBTOON than Webcomic

8    Name.  So it wasn't even a thought in my

9    mind that he is going to double-dip and

10   sell the rights to two different

11   publishers.  It's nonsensical.  I wouldn't

12   even think that's a thing because it's not

13   like he's SpongeBob.  He's not licensing

14   something.  He's selling something.

15   Companies acquire properties.  This is not

16   the most unusual thing.  Disney acquired

17   Winnie-the-Pooh.  It's not unusual.  They

18   acquired Marvel.

19        Q.    Okay.  Let me take this down.

20   Okay.  I've added another document to the

21   chat box.  This is Exhibit 3.  I put it up

22   on the screen.

23        A.    Okay.

24        Q.    Mr. Goldner, I'm going to ask

25   you if this looks familiar to you, but

1    first, do you need me to scroll down

2    through it?

3        A.    Yes, please, to the signature

4    page.

5        Q.    Okay.  I can keep scrolling

6    down.  There's two more pages.

7        A.    Well, there's a -- no.  Okay.

8    Yes, this looks authentic.

9        Q.    Okay.  Is this the collaboration

10   agreement that you signed on behalf of

11   Golden Bell Entertainment with Alex

12   Norris?

13       A.    This looks like the

14   collaboration agreement that I had signed

15   with Alex, yes.

16       Q.    I'd like to mark this as

17   Exhibit 3.  Mr. Goldner, did you draft

18   this contract?

19       A.    Again, this is an evolution of

20   our contract.  Same as I said before, I

21   would suggest comparing on draftable.com,

22   slash, compare of the differences between

23   this contract and the Wiseman contract.  I

24   cannot say what provision is different and

25   who drafted what clauses.  You asked this

Page 63

1   before.
2       Q.    Did you draft -- did you create
3   the first draft of this contract?
4       A.    I told you I don't recall who
5   created what draft.  There was -- I do
6   remember that our first contract that was
7   sent to creators for the Sunday Comics --
8   which was our first project -- was, like,
9   a one-page agreement that I think we all
10  wrote together --
11      Q.    I'm only asking about this one.
12      A.    I don't know who primarily
13  drafted this.  I don't remember.
14      Q.    And is it also true you do not
15  know who created the first draft of this
16  contract?
17      A.    It could have been from
18  LegalZoom or Rocket Lawyer, and we added
19  things on there.  And we had attorneys
20  review it, or we edited things that we
21  felt were important.  This is over five
22  years ago.  I don't remember every word
23  that was written and who wrote what.  I'm
24  sorry.  I would tell you.  I don't find it
25  to be a big deal so I just don't remember.

1    Q.    So do you know if Golden Bell
2  Entertainment sent Mr. Norris the first
3  draft of the contract that became this
4  collaboration agreement?
5    A.    That is false characterization
6  of events.  We sent him a draft and then
7  he asked for changes after having his
8  agent review it -- which he claimed he had
9  his agent review it.  We made changes to
10  that agreement and then we sent it.  And
11  he signed it a month later.  He didn't
12  sign it on the spot.
13    Q.    Okay.  So let's take that one
14  step at a time.  You sent him the first
15  draft; is that correct?
16    A.    I don't know if I sent it or
17  Rachel sent it or Rob sent it.  Golden
18  Bell Entertainment had sent him a draft of
19  a contract which was never signed.
20    Q.    Okay.  And that was the first
21  draft exchanged between Golden Bell and
22  Mr. Norris; is that correct?
23    A.    Yes.  And there was a series of
24  emails, there were changes made, they were
25  sent, he had his agent review the contract

Page 65

1  over that month that he viewed the
2  contract.  So if we scroll down to when he
3  viewed it we'll see the date is roughly
4  three weeks from when he viewed it to when
5  he signed because he said an agent
6  reviewed that contract.
7      Q.    Do you happen to know the name
8  of that agent?
9      A.    I would think your client does.
10 I do not know the name of the agent
11 because he just said "agent."  So I would
12 be speculating if I said a name.
13     Q.    Okay.  Now, do you know if there
14 were any changes to this agreement that
15 were made in writing signed by both
16 parties to this agreement?
17     A.    The same change from the email
18 that we just discussed earlier.  There was
19 an addition to, I believe, section 1 at
20 the bottom where it was saying that,
21 outside of the context of this agreement,
22 that he would be able to pursue the comic
23 outside of the context.  I believe it was
24 1H or 1K.  You'd have to check.  It's
25 right there.

1      Q.     Sure.  Let's scroll up real

2   quick.  So, Mr. Goldner, we're on page one

3   of Exhibit 3, and before us is

4   paragraph 1H.  Do you see that language?

5      A.     Yeah.  Yeah.  That's what I was

6   just saying.

7      Q.     Okay.  Yes, that's what I was

8   saying.  That's the language you were just

9   referring to regarding a change that was

10   made to the draft of this agreement,

11   correct?

12      A.     Correct.  It was an addition,

13   yes.

14      Q.     Okay.  Addition.  Fine.  Now,

15   after this agreement was signed -- and

16   I'll go back down to the signature --

17   well, let's go down to this HelloSign

18   page.  So we can see on this page the

19   dates upon which each party signed the

20   collaboration agreement, correct?

21      A.     Yeah.  But you should scroll up

22   a little bit to show when it was viewed.

23      Q.     Sure.

24      A.     Yeah.  So he viewed it on

25   7/11/2017, and then he signed it on

Page 67

1   8/10/2017, nearly a month later.

2        Q.     Okay.  And then you, on behalf

3   of Golden Bell Entertainment, signed on

4   August 10th, 2017, correct?

5        A.     I -- yes, I signed on 8/10/2017

6   after he signed.  Correct.

7        Q.     Okay.  So my question is:  After

8   you signed the collaboration agreement was

9   there any changes made to the

10  collaboration agreement in writing signed

11  by both parties?

12       A.     Can you please repeat the

13  question?

14       Q.     Sure.  After you signed the

15  collaboration agreement were there any

16  changes made to the collaboration

17  agreement in writing signed by both

18  parties?

19       A.     Not that I recall.  Don't quote

20  me.  I'm not -- I don't believe there was.

21  Not to my recollection.  There's no -- are

22  you asking:  Is there's another HelloSign

23  document with Alex?  The only other

24  contract that I know that's relevant is

25  the guest ARTIST contract for Webcomic

Page 68

```
 1   Name and Pretending to Grownup with
 2   Wiseman and Norris.  I don't think there's
 3   another one unless you have it and I
 4   don't.
 5        Q.    No.  I'm just trying to
 6   determine if after this contract was
 7   signed by both parties whether or not any
 8   changes were made to it.  That's it.
 9        A.    I just don't believe any changes
10   were made to this contract.  I know that
11   Alex just never performed under the
12   contract and was late months and months.
13              MR. FOX:  Marc, you're not
14         understanding today.  You can tell
15         that to a jury.  We can put together
16         your direct, but he asked -- you're
17         just supposed to answer his questions
18         and not make a firm statement like
19         that.  It's improper.  The judge will
20         get upset at you.  Why would you want
21         to do something that would upset a
22         judge?
23              THE WITNESS:  Yeah, I'm not
24         trying to --
25              MR. FOX:  But I want to --
```

                                            Page 69

1       because it's fair.  I like to teach.

2       This is discovery where they ask

3       questions.  You want name, rank,

4       serial number type answer.  Everything

5       that you say on top of it leads them

6       to ask other questions and feeds them

7       more information than they're question

8       asks for.  You're making their job

9       easier and giving them free

10      information by making these statements

11      and a judge would get upset at you

12      which is not the name of the game

13      here.

14              THE WITNESS:  I'm sorry.  I was

15      just trying to be fully transparent --

16              MR. FOX:  No.  No.  No.  No.

17      No.  No.  It's not fully transparent.

18      You're actually making -- like, you're

19      right jabbing.  You're right jabbing

20      back.  And I'm telling you:  Answer

21      the question name, rank, serial number

22      and move on.  That's it.  Okay?

23              THE WITNESS:  Okay.

24              MR. FOX:  Thanks.

25      Q.    Okay.  So --

Page 70

```
 1              MR. FOX:  By the way, in about

 2         five minutes, we would have been going

 3         for an hour and a half.  We should

 4         take a 10-minute break so people can,

 5         you know, get coffee or refuel or use

 6         restrooms or do what they need to --

 7              MR. KUNST:  I'm fine with that.

 8         We can take 10 minutes right now.  I

 9         think it's a natural stopping point.

10              MR. FOX:  Okay.  Very good.

11              MR. KUNST:  So we'll come back

12         at 11:35.

13              MR. FOX:  Yes.  Very good.

14         Thanks.

15              THE VIDEOGRAPHER:  This

16         concludes media Number 1.  The time is

17         11:25.  We are off the record.

18              (Whereupon, a recess was taken.)

19              THE VIDEOGRAPHER:  This begins

20         media Number 2.  The time is 11:43.

21         We are on the record.

22              MR. KUNST:  Okay.  Thank you

23         very much.

24         Q.    Mr. Goldner, the collaboration

25    agreement contains a provision regarding
```

Page 71

1  how net profits are split between Golden

2  Bell Entertainment and Mr. Norris,

3  correct?

4      A.   Can we pull it up?  Are you

5  talking about 2B or 1A?  There's two

6  separate --

7      Q.   Currently -- sure.  Let's pull

8  it up.  So the first I'm looking at, I

9  believe this is paragraph 2B.  Do you see

10 that in front of you?

11     A.   Correct.  Yes, I do see it.

12     Q.   Okay.  And 2B provides that

13 Mr. Norris will receive five percent of

14 the net profits from the works in relation

15 to the different mediums it will be

16 produced in as stated above, correct?

17     A.   That's -- I don't know if you're

18 completely characterizing it correctly

19 because there's also 1A which defines net

20 sales and then Jason's agreement which is

21 about the royalties for the game.

22     Q.   Okay.  So let's -- I'm sorry --

23 you said 1A?

24     A.   There's 1A, okay, and then there

25 is, I think, 1F.  I think 1F and then 2B.

1   There's three -- and then 1G is the

2   advance.  So there's four provisions, I

3   believe, about money.  So we need -- if --

4   you're questioning you have to be very

5   specific about what you're asking.

6       Q.    Sure.  So let's start with 1A.

7   Pursuant to 1A, if any of the works were

8   sold pursuant to the collaboration

9   agreement, what percentage of the net

10  sales would Mr. Norris be entitled to?

11      A.    I think the agreement speaks for

12  itself.  It's five percent of the net

13  sales of the works for the first 18 months

14  and then it will revert to four percent of

15  the net sales of the works thereafter.

16      Q.    And then the -- I'm sorry -- the

17  next provision regarding, perhaps -- I

18  don't know -- distribution of sales,

19  distribution of profits, perhaps, did you

20  say that was 1F?

21      A.    Where it says, the ARTIST hereby

22  confirms that all rights, interest and

23  licenses relating to the multimedia

24  property, Webcomic Name Game, has been

25  transferred to the company upon signing of

Page 73

1   this agreement and the contract signed

2   between Jason Wiseman and the company.

3         Then it says, the ARTIST

4   acknowledges that any money earned on the

5   property, Webcomic Name Game, will be

6   covered by the contract signed between the

7   company and Jason Wiseman.

8     Q.    Okay.  Now, we can pull up

9   Mr. Wiseman's contract if necessary, but

10  do you recall, pursuant to paragraph 1F,

11  what sales of Webcomic Name Game would

12  permit, what percentage of those sales to

13  Mr. Norris?

14    A.    I would have to pull it up.  I

15  don't want to misspeak.  I think we can

16  just go back to Exhibit 1 which shows the

17  percentages, and we can also discuss the

18  complimentary units which were a primary

19  consideration of the agreement as most

20  publishers only give 25 and we were giving

21  nearly 1,000 between both of them.

22    Q.    Let's scroll down, and I think

23  the complimentary units is -- Mr. Goldner,

24  do you happen to have the citation to the

25  complimentary units provision?  Here it

1   is.  We're on paragraph 6B of the

2   collaboration agreement, and there is a

3   provision in here that -- well, let me ask

4   you this:  Is paragraph 6B the provision

5   that provides for complimentary units to

6   Mr. Norris?

7       A.    Yes, I believe so.

8       Q.    Okay.  And is it accurate that

9   6B provides that Mr. Norris will be

10  provided with at least 725 physical copies

11  of the Webcomic Name Game in printed form?

12      A.    Once the game would be finished

13  with final files which he never completed

14  so there's nothing to provide him

15  complimentary units of.

16      Q.    So is it then accurate to say

17  that the Webcomic Name Game was never

18  created?

19      A.    It has been developed.

20  Development can take years.  So created --

21  created, I don't know, that's a legal term

22  of art, but it's been in development.

23  What I would consider the Hollywood joke

24  is "development hell" for years.  There

25  has been a lot of progress, but it is not

1  completed as Alex has not delivered the

2  final files to this date.

3      Q.    Okay.  So the Webcomic Name Game

4  as you sit here today is not in a form in

5  which it can be sold; is that correct?

6      A.    As of today I don't believe so.

7  I would have to check with my partners as

8  they run the day-to-day operations and the

9  art and design.  The graphic design, I

10  don't deal with that.  I just helped come

11  up with the game itself.

12      Q.    Okay.  So as you sit here today

13  to your knowledge has the Webcomic Name

14  Game ever been sold in any form?

15      A.    No, the game has not been sold.

16  It has been marketed, but it has not been

17  sold.  We have not done a mass production

18  copy and sold it to consumers or B-to-C or

19  B-to-B retailers.  That has not occurred

20  yet.

21      Q.    Okay.  I've added another

22  document to the chat box for download.

23      A.    Yes, I remember this ridiculous

24  email.  Yes.

25      Q.    I will be putting up what

1   Mr. Goldner, I believe to saying he
2   remembered this ridiculous email, but I'll
3   nonetheless ask you some foundational
4   questions about it.
5        A.    Okay.
6        Q.    I'm going to scroll down through
7   the document and I'd like to mark this as
8   Exhibit Number 4.  Scroll back up to the
9   top.  Now, Mr. Goldner, do you recognize
10  Exhibit Number 4?
11       A.    Yes, I do.
12       Q.    Is this an email from Mr. Norris
13  to yourself and Rob Gross and Rachel
14  Korsen on October 1, 2018?
15       A.    That's what it appears to be.
16       Q.    And did Mr. Norris attach two
17  invoices to that email?
18       A.    He attached two invoices
19  incorrectly to the email.  He wasn't due
20  any money, but yes, there are two invoices
21  attached that are not due.
22       Q.    Okay.  So let me ask you this:
23  Prior to receiving this email had
24  Mr. Norris sent you any copies or files
25  regarding Webcomic Name Game that he

1   claimed were the game?

2       A.    He sent sketch black-and-white

3   cards which needed to go through a round

4   of approval and editorial and as by his

5   own admission in this email not all --

6   quote, not all of the print ready files

7   have been delivered yet, end quote.

8           And in our contract with him, he

9   is paid upon delivery of the final files.

10  He is not owed any money and he's sending

11  us invoices for files he admitted to not

12  finishing.  So I'm not really sure where

13  this is going.

14      Q.    Sure.  I've added another

15  document to the chat box, and this is

16  unfortunately upside down.  Okay.

17      A.    You can click rotate view

18  clockwise.

19      Q.    Yeah.  I've done that on the

20  copy up on my screen.

21      A.    Okay.

22      Q.    Okay.  Now, Mr. Goldner, do you

23  recognize these emails that are -- pardon

24  me -- for the record, I'd like to mark

25  this as Exhibit 5.

1      A.      These are not the Bates stamped

2   ones so I'm not sure.

3      Q.      Sorry.  Can you be more specific

4   what you're not sure about?

5      A.      I don't know if this is the

6   entire email thread.  It looks like it's

7   cut off.  Actually, I'm nearly certain

8   that this is an email thread that includes

9   about 81 emails -- maybe less, maybe

10   more -- and it's not the Bates stamped

11   version because this email thread also

12   says that Alex deleted any files that he

13   claims to have sent to us.  So I do not

14   believe that what is -- this document is

15   in its entirety.

16      Q.      Okay.  Can I ask you about

17   specific emails?  And perhaps you'll

18   recognize specific emails in this Exhibit

19   Number 5.  Let's start with -- there's an

20   email kind of at the middle of the

21   document.  If you look at the right-hand

22   side, it appears to have been sent

23   October 3, 2018, from you to Alex.

24              Do you recognize that email?

25      A.      It's cut off so I can't even see

1    that entire email.  It's cut off on the

2    sides on the right.  I just know that

3    October 3rd is the day that he posted on

4    Facebook defaming and disparaging us with

5    the Golden Bell slash emoji.  That's the

6    significance I know of this date of

7    October 3rd, 2018, but --

8              MR. FOX:  Marc.  Marc, again,

9         you're making affirmative claims

10        and -- instead of just answering the

11        question which is not helping.

12        A.    The email is cut off.  So I

13   don't know how much of it is cut off, but

14   this doesn't seem to be an appropriate

15   exhibit.

16        Q.    Well, let me ask you this:  When

17   Mr. Norris sent the files -- and I'm not

18   asking you to confirm that those are

19   final -- but he sent, I think you said,

20   black-and-white photos or black-and-white

21   drawings; is that correct?

22        A.    He sent sketches that changed on

23   numerous occasions.

24        Q.    Okay.  And Mr. Norris had sent

25   black-and-white sketches, and then as of

Page 80

1    October 1, as we saw in Exhibit 4, he was

2    requesting the advance set forth in the

3    collaboration agreement, correct?

4         A.    No, this is a

5    mischaracterization of events.  He had

6    sent black-and-white sketches over the

7    summer, I believe, in June or July for

8    play testing, and then he goes around and

9    claims that I thought, quote/unquote,

10   final files meant PDFs of sketches.

11              He knew those weren't final

12   files because in the emails that you're

13   not showing I specifically say that final

14   files have to be colored, print ready,

15   deliverable.  Like, these -- I don't know,

16   really, what you're getting at, but --

17        Q.    Let me ask you this -- my

18   question is a little bit different.

19   Again, I'm not asking you to confirm under

20   the contract whether those files were

21   final or not.  It's really just more a

22   question of what happened at a particular

23   time.  And my question is:  As of

24   October 1, 2018, Mr. Norris was seeking

25   payment of the advance under the

```
                                            Page 81
 1    collaboration agreement, correct?
 2         A.    I don't know.  The email is cut
 3    off.  So are you talking about -- I don't
 4    know what you're talking about?  Are you
 5    talking about this email --
 6         Q.    Let's go back to Exhibit 4.
 7    Okay.  So, Mr. Goldner, I have Exhibit 4
 8    back in front of you, correct?
 9         A.    Okay.
10         Q.    Okay.  And Exhibit 4, as we've
11    noted, is an October 1, 2018, email from
12    Mr. Norris, correct?
13         A.    Correct.
14         Q.    And he was seeking payment, what
15    he calls, first part being paid as
16    promptly as possible, correct?
17         A.    No.  You're taking a sentence
18    out of context.  So if we're going to read
19    the sentence we need to read the entire
20    paragraph, not something that's in the
21    middle.
22         Q.    Okay.  Well he attaches two
23    invoices to this email, correct?
24         A.    There are two invoices attached
25    to this email, yes.
```

1      Q.    Okay.   And he was seeking

2   payment of those invoices, correct?

3      A.    Improperly, when he admits that

4   the final files have not been delivered

5   yet, quote.

6      Q.    Okay.   But he nonetheless was

7   seeking payment of those two invoices as

8   of October 1, 2018, correct?

9      A.    No.   He's threatening us saying

10   he's only going to upload the files once

11   the payment has gone through.

12      Q.    Okay.   So he wanted to be paid

13   as of October 1, 2018, correct?

14      A.    I don't believe that is a way of

15   someone sending an invoice, getting paid.

16   That is a threat to withhold files and

17   that is not a standard way of submitting

18   an invoice.   So that invoice is only

19   triggered upon delivery of the final files

20   as per our contract.

21      Q.    Okay.   When you say "that

22   invoice," are you referencing both of the

23   invoices attached to this email or are you

24   referencing one?

25      A.    One.   The 401 invoice, 401 which

```
                                              Page 83
 1    I assume is the first part of the advance,
 2    is a separate invoice due at a separate
 3    time as per the contract.
 4         Q.    So you said "the 401 invoice"?
 5         A.    That's what it --
 6         Q.    I don't know --
 7         A.    I assume 401, dot -- the 401 PDF
 8    is the first invoice which says advance
 9    one of two.
10         Q.    Okay.  Okay.  I understand what
11    you mean.  Okay.  So advance one of two is
12    for $3,125, correct?
13         A.    Yes.
14         Q.    Okay.  And that is an amount
15    that is set forth in the collaboration
16    agreement, correct?  And let me be clear,
17    I'm not asking you to confirm that amount
18    was due; I'm simply asking whether or not
19    the amount of $3,125 is set forth in the
20    collaboration agreement?
21         A.    I don't want to say 100 percent
22    without checking Exhibit 3 which is the
23    collaboration agreement to make sure that
24    is the correct amount.  I believe it is,
25    but we can check.
```

1    Q.    Sure.  Let's -- before we do

2    that, let's go down to the next invoice.

3    And this is advance two of two for $2,500,

4    correct?

5    A.    Yes.

6    Q.    Okay.  Exhibit 3 is back up on

7    the screen, and in front of us is

8    paragraph 1G of Exhibit 3, do you see

9    that?

10    A.    1G says, the ARTIST will receive

11    $3,125 upfront advance against net sales

12    royalties within 30 days of the company

13    receiving the final files noted above for

14    Webcomic Name Game for a game developed

15    with Jason Wiseman, the ARTIST.

16          Yeah.  It's blah, blah, blah,

17    blah.  It keeps going, then the 2,500 to

18    ARTIST upon delivery of the company, PSD

19    files, AI, et cetera, InDesign files.

20    Q.    Okay.  So we can confirm then --

21    and again, I'm not asking you to confirm

22    that the money was due; I'm simply asking

23    you to confirm that the amount of $3,125

24    is an amount set forth in the

25    collaboration agreement; is that correct?

```
 1      A.    As Jerry said earlier, I think
 2   the document speaks for itself.  That is
 3   what I see, that is what I signed and
 4   that's -- yeah, I mean, that's what it
 5   says.
 6      Q.    Okay.  And same question with
 7   respect to the amount of $2,500?
 8      A.    Again, same answer.
 9      Q.    Okay.  Now, Mr. Norris had sent
10   files and was then demanding -- well, let
11   me strike that.
12            Did you inform Mr. Norris as to
13   why no payment would be made to him?
14      A.    Absolutely --
15      Q.    -- after he made that -- I'm
16   sorry.  Please go ahead and tell me what
17   you told him.
18      A.    Exactly what I told you before.
19   The files were deleted.  We never
20   downloaded anything.  We never received
21   any files.  When I clicked the link that
22   he sent, it said the file has been
23   deleted.  He was informed on October 15th
24   that the files were deleted.  He's asking
25   for payment for files he never
```

Page 86

1   deleted (sic).  He spent literally a month

2   trying to figure out how to upload files.

3   I don't buy that.  I'm sorry.  Like, I

4   don't buy it.  My mother can upload a file

5   to Dropbox.

6       Q.    So he had provided the

7   black-and-white sketches.  And did he at

8   any time inform you that he believed those

9   black-and-white sketches were files that

10  entitled him to payment?

11      A.    Only on October 3rd in the email

12  you showed, that was the first time.

13  Months and months of silence and then

14  suddenly on October 3rd, two days after he

15  sent the invoice he says, I thought the

16  sketches were final files.

17          But if he thought that,

18  shouldn't he have sent the invoice back in

19  June when he sent this -- black-and-white

20  sketches files?

21      Q.    So can you explain to me why

22  those files, the black-and-white sketches

23  were not considered final?

24      A.    I'm almost in shock.  Okay.

25  Sure.

Page 87

1      Q.     I'm sorry.

2      A.     Sure.  No.  No.  It's fine.  We

3   can play this game that you guys want to.

4   Final files need to be able to be colored,

5   you know, not black-and-white sketches

6   that aren't final inks, not sketch files

7   that have sloppy lines and aren't drawn to

8   scale.  They need to be properly inked and

9   drawn where they're actually on-model with

10  the characters so there isn't a lack of

11  consistency for the art.  That's why

12  there's actual, established guidelines in

13  the art creation process of sketching --

14  of blocking, sketching, inking, coloring,

15  lettering.  There was no final lettering.

16  There was no final colored files.  There

17  was no -- the cards weren't put into a

18  proper format.  The cards weren't created

19  for InDesign.  There was no back of the

20  cards.  There was no rule book design,

21  there was no box art that was completed.

22  There was no bottom of the box.  There was

23  no token assets that are required in

24  illustrator files or even sketches of the

25  tokens.

1          The game could not be created or

2     sold in entirety with sketches because the

3     game is not just 200 sketches where, in

4     the email, he knows that there's 400

5     cards -- or 500 cards -- 4 to 500, but he

6     only delivers sketch files of about, I

7     think, 350.  So he doesn't even have a

8     complete count of all the cards.  So you

9     can't have final files when he admits in

10    the email you just showed that he is

11    missing the 45 new cards to make up the

12    punch line cards to 150 in the Exhibit 4

13    that you showed.

14          By his own definition he's

15    admitting to not sending the final files.

16    You don't need my definition.  He's

17    admitting it.  He's saying, quote, not all

18    the print-ready files have been delivered

19    yet, in the same email he's sending an

20    invoice.  Your client has a lack of

21    consistency in his communication because

22    he's trying to play games or be coy with

23    us.

24       Q.    Okay.  Did you inform him at any

25    time that there would be an editorial

Page 89

```
 1   process after you received those
 2   black-and-white sketches and that --
 3   sorry.  Go ahead.
 4       A.    Yes, many times.  There was many
 5   emails that have all been produced in
 6   discovery where there's a clear editorial
 7   process, where they admitted -- Jason and
 8   Alex -- to talking privately, when I'm one
 9   of the designers of the game, Rob is one
10   of the designers of the game and all Alex
11   does is just stroke Jason's ego, saying
12   what a brilliant designer he is when Alex
13   doesn't understand that we are one of the
14   guys that came up with the game and
15   designed a lot of the mechanics.
16            So it's actually creatively
17   insulting for him to be singling out
18   Jason, thinking that Jason is God's gift
19   from heaven, and we're just the dirty,
20   evil publishers.
21       Q.    Okay.  And far as those -- the
22   reasons why you considered them not to be
23   final, are those guidelines set forth
24   anywhere in the collaboration agreement?
25       A.    I'd have to read that entire
```

Page 90

1    collaboration agreement, and we'd have to

2    go through old emails.

3        Q.    It's in your chat box.  Why

4    don't you go ahead and take a look?

5        A.    You want me to read the entire

6    contract now?  It will take me 20 minutes.

7        Q.    Well, I want to know -- you've

8    identified a number of guidelines which

9    defined what is a final submission, and I

10   want to know where, if anywhere, in the

11   collaboration agreement those guidelines

12   exist.  Would you like to take a break

13   while you do that?

14       A.    I mean, we can sit here if you

15   want to sit here.  I don't care if you

16   want to watch me read.

17       Q.    Okay.  No that's fine.

18            MR. KUNST:  Let's go off the

19        record, and you can let us know when

20        you've finished.

21            THE VIDEOGRAPHER:  Off the

22        record at 12:11.

23            (Whereupon, an off-the-record

24        discussion was held.)

25            (Whereupon, a recess was taken.)

Page 91

```
1              THE VIDEOGRAPHER:  We are back
2       on the record at 12:21.
3       Q.     All right.  Mr. Goldner, you've
4   had the opportunity to review the
5   collaboration agreement and my question
6   is:  Where in the collaboration agreement
7   does it define what final files are?
8       A.     So there's actually a couple
9   places where it is.  So final files are in
10   that same clause where it says print-ready
11   files, and the only difference between the
12   3,125 is the final files, whether they
13   would be in low-res or a PDF and not
14   separated into PSD files.
15              But the entire issue here is
16   since there was editorial as cards have
17   changed from sketches, once colored files
18   would be submitted, those would be edited
19   as well, whether it's for color correction
20   or consistency as per 2A in the contract
21   where the parties shall collaborate in the
22   writing, drawing, illustration, animation
23   if applicable and sketches of the work.
24              So I don't think that -- well, I
25   know that Alex was sent by either Jason or
```

Page 92

1   Rachel a file, a PSD file to put the cards

2   in so that they would be in the correct

3   format and size, and it's not

4   reasonable -- it's not like Alex submitted

5   to McMeel sketch files --

6       Q.    We're getting a lit bit off base

7   so let's go back.  And my question is:

8   With respect to paragraph 1G, the first

9   sentence, there's a provision in there

10  strictly with respect to final files.

11          And my question is:  Where in

12  the collaboration agreement is final files

13  defined?

14      A.    I don't know if you're just

15  trying to, like, trap me into a question

16  here, but final files is pretty

17  self-explanatory.  It means final files.

18  I don't know if -- like, what you're

19  thinking, but I don't know.  These -- this

20  is a game that you're playing.  Final

21  files is self-explanatory.  It's a term of

22  art that can be googled.  If you're going

23  to sit here and tell me that

24  black-and-white sketches are final files,

25  it's laughable and actually insulting to

Page 93

1    the craft.

2        Q.    Okay.  So is it accurate to say

3    that the phrase "final files" is not

4    defined anywhere within the collaboration

5    agreement?

6        A.    No, it's not accurate to say.  I

7    literally just said, if you look at the

8    next sentence, it says, final print-ready

9    files.  He is not --

10       Q.    Okay.  Well, I'm not asking

11   about final print-ready files.  I'm asking

12   about final files.

13            MR. FOX:  Okay.  Guys.  Okay.

14       Counsel, I'm going to object, and I'm

15       going to instruct him not to answer

16       anymore.  He answered your question.

17       You don't like the answer.  We're not

18       going to play this game.  He gave you

19       what he thinks is a further

20       clarification, definition, whatever

21       word you want to use on final files.

22       He's told you a heck of a lot more.

23            And I'm not going, and I'm not

24       going to spend my time listening to

25       you, Counsel, just trying to argue

                                                    Page 94

1        your side of the case or --

2              MR. KUNST:  Well, I'm not

3        arguing --

4              MR. FOX:  Yeah.  Yeah --

5              (Whereupon, simultaneous

6        conversation took place disrupting the

7        record, and the court reporter

8        requested one person speak at a time

9        without interruption from anyone

10       else.)

11             MR. FOX:  Counsel.  Counsel.

12       Counsel, the document speaks for

13       itself.  He has told you where he

14       believes the definition is, and you're

15       arguing with him.  I'll terminate the

16       deposition if you don't stop this.  I

17       don't want your argument anymore.  Do

18       you understand it?  He answered your

19       questions.  It's there.  It's there.

20       It's in --

21             (Whereupon, simultaneous

22       conversation took place disrupting the

23       record, and the court reporter

24       requested one person speak at a time

25       without interruption from anyone

Page 95

1      else.)

2           MR. FOX:  No.  No.  Sir, it's

3      there.  It's in --

4           MR. KUNST:  Why are you

5      screaming?

6           MR. FOX:  Because you are being

7      insulting to everyone here; the court

8      reporter, me, my client.  I don't have

9      the time to listen to you argue.  I've

10     said it nicely 20 times, sir.  There

11     is a question and an answer.

12           MR. KUNST:  So first off, you

13     need to calm down.

14           MR. FOX:  No, I don't --

15           (Whereupon, simultaneous

16     conversation took place disrupting the

17     record, and the court reporter

18     requested one person speak at a time

19     without interruption from anyone

20     else.)

21           MR. FOX:  I'm asking you as

22     nicely as I can, and I'm telling you:

23     When he gives you an answer, the fact

24     you don't like it -- it is

25     unprofessional, it is -- shows a lack

1      of an understanding of the purpose of

2      a deposition and you're wasting all of

3      our time.  Question, answer; answer,

4      period.  You don't like it, that's

5      your problem.  Deal with it at trial.

6           MR. KUNST:  Okay.  Well, we'll

7      move on, and I'll just mark it for a

8      ruling.  And we'll move forward,

9      but --

10          MR. FOX:  Yeah, I think it's

11     pretty clear.

12          MR. KUNST:  -- I don't think

13     screaming is necessary.

14          MR. FOX:  No.  No.  First of

15     all --

16          MR. KUNST:  We haven't even been

17     here that long.

18          MR. FOX:  Sir.  Sir, I asked you

19     repeatedly -- and I've been very

20     strong with my client on the break --

21     you need to ask questions and stop

22     arguing your case, and he needs to

23     answer questions and stop arguing his

24     case.  So I laid into him on the

25     break, and now I'm getting a little

1    bit short with you because this is not

2    a deposition anymore.  It is you and

3    him -- and he's intelligent -- just

4    arguing your case, but there's no jury

5    here, there's no judge here.  And we

6    have a videographer and a court

7    reporter.  It is very expensive.  I've

8    asked him as hard as I could, be tough

9    with him on a break.

10          And I'm asking you now, Counsel,

11   the more you argue your side of the

12   case, the more he argues his side of

13   the case, it's all going to be

14   inadmissible, it'll all be stricken,

15   it's all a waste of time.

16          So there you go.

17          MR. KUNST:  I disagree.  I'm

18   really just asking for a contract

19   definition --

20          MR. FOX:  Okay.  First of all,

21   the contract speaks for itself.  He's

22   not a lawyer and -- so come on,

23   Counsel.  I could just school you on

24   this.  He's not a lawyer --

25          MR. KUNST:  His company drafted

```
 1     it.
 2            MR. FOX:  Counsel.  Counsel,
 3     he's not a lawyer, and the contract
 4     speaks for itself.
 5            So, you know, I will pretty soon
 6     terminate this deposition and go to
 7     our magistrate and say, look at this
 8     transcript, look what he's doing.  The
 9     document speaks for itself.  It's a
10     nonlawyer deponent and Counsel is
11     arguing with him.  And we have a court
12     reporter and a videographer.  And I
13     can't get Counsel to stop.
14            So stop arguing with me, stop
15     arguing with him.  Just ask questions,
16     get answers and move on, please.
17            MR. KUNST:  I'm trying to.
18            MR. FOX:  No.  No.  No.  Look,
19     the document speak for itself.  He's
20     not a lawyer --
21            (Whereupon, simultaneous
22     conversation took place disrupting the
23     record, and the court reporter
24     requested one person speak at a time
25     without interruption from anyone
```

```
 1      else.)
 2           MR. KUNST:  I've heard it.
 3      We're going to mark.  We'll mark it.
 4      We'll raise it if we need to.
 5           MR. FOX:  Yeah.  Okay.
 6           MR. KUNST:  I told you we'll
 7      move on.
 8           MR. FOX:  Thank you very much.
 9           MR. KUNST:  You're welcome.
10      Okay.
11      A.   I understand it gets heated.
12  I'm doing my best here so let's just try
13  to move on.
14           MR. FOX:  No.  No.  No.  For
15      both of you -- and I want to say this
16      very nicely, and I got tough with you
17      on a break; I got tough with him.
18           I know you both want to get it
19      on at trial and argue your sides of
20      the case, but there's no jury here and
21      the documents all speak for
22      themselves.  This is his chance to ask
23      you questions, not argue with you, and
24      for you to answer and not argue with
25      him.  And when you have a videographer
```

Page 100

1      and a court reporter, it's very

2      expensive.  So it's a massive waste of

3      time when either of you are arguing

4      your side of the case, okay?

5           THE WITNESS:  Apologize to Garry

6      and Alan for that so --

7      Q.    Okay.  So with respect to the

8  plush animals -- or actually, let me

9  rephrase this.  The collaboration

10 agreement -- and I'm going to put it back

11 up on the screen -- includes production of

12 the properties tentatively entitled

13 Webcomic Name stuffed animals, correct?

14     A.    It says tentatively entitled,

15 yes.

16     Q.    How many Webcomic Name stuffed

17 animals were to be created pursuant to the

18 collaboration agreement?

19     A.    There was no limits on what we

20 could do.  We could make a stuffed animal

21 from every Webcomic Name character or

22 thing or object whether it was the cat,

23 the dog, the orange blob, the pink blob,

24 the giraffe that he wound up making on the

25 animals book that we had the option to or

Page 101

```
 1   whatever we wound up having the option to.
 2   We could make a cloud.  We could make a
 3   dressed up pink blob wearing a wizard hat.
 4   We could have one flying like a superhero.
 5   I don't know.  There's no limit here.  It
 6   says stuffed animals, plural, and he did
 7   designs for five of them, for the pink
 8   blob, the orange blob, the sexy blob, the
 9   -- I guess that was the butt plush -- the
10   cat and the speech bubble that said "oh
11   no" with a backside that said "okay."
12            So he did those designs.  He
13   knew that they were multiple.  This is not
14   coming as a surprise, and there's lots of
15   toys that turned into media properties.
16   Something like a My Little Pony which is a
17   toy line that then becomes an animated
18   show based on the toy line.  It's not --
19   this is not something that, like, we
20   created an entirely new business model out
21   of the thin air.  This is something that's
22   existed for decades that has been
23   perfected by major companies.
24       Q.    So I've added another document
25   to the chat box, and again, it's
```

Page 102

```
 1   upsidedown so you'll need to rotate it.
 2   But I will also put it up on the share
 3   screen -- Mr. Goldner, I've got -- and I'd
 4   like to mark this document as Exhibit
 5   Number 6.
 6        A.    Yes.
 7        Q.    Mr. Goldner, there's a number of
 8   emails on this document, but I'd like to
 9   draw your attention to the second one from
10   the top.  Do you recognize that email?
11        A.    Oh, I remember this comical
12   email of Alex flip-flopping and trying to
13   make things up on the fly.  Yeah, of
14   course, I remember.
15        Q.    Is this an email that you
16   received from Mr. Norris on October 8,
17   2018?
18        A.    As did Rachel and Rob,
19   conveniently, after the breakdown of
20   communication.  Yeah, I do recall.
21        Q.    I'd like to draw your attention
22   to -- it's the first full paragraph -- I
23   guess the fourth line or the fourth
24   sentence, I guess, it is in the email.  It
25   starts, about the stuffed animals.
```

1          Do you see that portion?

2     A.    I'm looking at it.

3     Q.    Did you ever discuss with

4   Mr. Norris the -- after this email was

5   sent that Golden Bell Entertainment was

6   permitted to create more than one stuffed

7   animal?

8     A.    You want me to answer that?

9   You're just hurting your own case.  That's

10  fine.  So him claiming I wasn't aware you

11  were creating a range, quote, that was not

12  agreed, you previously asked for a

13  promotional stuffy, so we agreed to only

14  do one.

15          So not only is your client a

16  liar because he actually created five

17  designs, okay, that he posted in the

18  WhatsApp group chat and emailed us for the

19  pink blob, the orange blob, the butt plush

20  the oh nos and okay speech bubble and the

21  cat.  So he knew it wasn't some,

22  quote/unquote, promotional stuffy.  I

23  never used that word in communication with

24  him or in a contract.  He knew it was for

25  multiple.  Him claiming he wasn't aware we

```
 1   were creating a range when he himself

 2   designed five --

 3        Q.    Well, we're getting a little far

 4   afield again --

 5             (Whereupon, simultaneous

 6        conversation took place disrupting the

 7        record, and the court reporter

 8        requested one person speak at a time

 9        without interruption from anyone

10        else.)

11        Q.    My question was a little bit

12   different.  My question was:  After he

13   sent this email, did you discuss the issue

14   of whether or not Golden Bell

15   Entertainment was permitted to create more

16   than one stuffed animal?

17        A.    I don't know.  Are you talking

18   internally, what we spoke about?  Are you

19   talking about with Alex --

20        Q.    No.  With Alex.

21        A.    Alex stopped responding to

22   emails.  He didn't respond.  So what do

23   you mean did we talk to him?  He cut off

24   contact and then sued us.  Like, I don't

25   know what you're asking.  You have all the
```

Page 105

1    communications in discovery.

2         Q.    I'm asking whether there was a

3    discussion you have had with Alex after

4    this email was sent regarding whether or

5    not Golden Bell Entertainment was

6    permitted to create more than one stuffed

7    animal?

8         A.    What do you mean were we

9    permitted?  I didn't need to ask him

10   permission.  We were permitted to as per

11   the contract.  He sent the designs.  We

12   made the samples.  He said --

13        Q.    Okay.  So again, we're getting a

14   little far afield again, and really, this

15   a yes-or-no question, whether or not --

16   and I'll specify -- you had an oral

17   discussion with Alex after this email was

18   sent regarding the stuffed animals.

19        A.    We never spoke with Alex on the

20   phone after this date, if that's what

21   you're trying to get at.

22        Q.    That's my only question.

23        A.    Okay.  What?

24        Q.    And in case I haven't done it

25   before, I'd like to mark that as

1    Exhibit 6.

2              THE WITNESS:  And, Jerry, just

3         so you know, they're taking

4         screenshots of a very long email

5         thread and mischaracterizing them as

6         individual emails when this is all

7         part of a very long thread.

8              MR. FOX:  Yeah, but just so you

9         know, if he's distorting a

10        conversation, you know, you can only

11        answer as best you can, and then we

12        will, you know, address that with the

13        judge on a motion or at trial.  I

14        mean, you know, he runs the risk of

15        having his questions struck if he

16        doesn't provide a complete document to

17        you.  He knows that.

18             MR. KUNST:  Jerry, I can't

19        really hear you that well.  I can hear

20        Marc fine but I can't hear you.

21             THE VIDEOGRAPHER:  Your volume

22        dropped down.

23             MR. FOX:  Is it better now?  Is

24        it better?

25             MR. KUNST:  Yeah, that's it.

```
 1           MR. FOX:  Anyhow, hopefully
 2      everyone heard.
 3           THE WITNESS:  I did.
 4      Q.    So I've added another document
 5   to the chat box.  I'll put it up on share
 6   screen.
 7      A.    Yeah, I know this image.
 8      Q.    Okay.  And I'd like to mark this
 9   as Exhibit 7.  Okay.  So, Mr. Goldner, can
10   you tell me what this image is showing?
11      A.    As per the title of the PDF you
12   just uploaded it's called a convention
13   photo.  This is a convention photo.
14      Q.    Sure.  Did you take this photo?
15      A.    I -- all I was saying is I don't
16   remember who took the picture.  It could
17   have been myself.  It could have been
18   Rachel.  Could have been Rob.  I don't
19   remember who took a picture years ago.
20      Q.    Do you know where this photo was
21   taken?
22      A.    Yes.
23      Q.    Where was this --
24      A.    Keystone Con in Philadelphia.
25      Q.    Do you recall the date that this
```

1  picture was taken?

2      A.    No.

3      Q.    What about the year?

4      A.    I couldn't tell you.  I mean, I

5  have no idea.

6      Q.    Do you recall --

7      A.    -- estimate -- what?  Do I

8  recall what?

9      Q.    Sorry.  You said you were going

10  to estimate?

11      A.    No, I said we could estimate.

12      Q.    What is your estimate -- your

13  best estimate as far as --

14      A.    Before the coronavirus pandemic

15  hit the world and after we signed the

16  contract with Alex.

17      Q.    Okay.  You see -- in the

18  right-hand portion of the screen, do you

19  see the banner?  It's pink, green, purple.

20  It appears to have Webcomic Name pictured

21  on it.

22      A.    I see the banner that helped

23  promote Webcomic Name to further notoriety

24  and pretty much had people in the tens of

25  thousands, hundreds of thousands through

Page 109

1   free marketing that he was getting for

2   being part of our company.  That's the

3   banner you're talking about.  That's the

4   one I see.

5       Q.   Do you recall if any Webcomic

6   Name merchandise was sold at this Keystone

7   Comic-Con at which this photo was taken?

8       A.   I honestly have to almost

9   comically, internally laugh.  This is

10  insulting that you're accusing us of

11  making merchandise and not telling him.

12  No.  He never --

13          MR. FOX:  Marc.  Marc.  Marc.

14      Marc.  Marc.  Marc.  Marc.  Marc.

15      Marc --

16      A.   This is insulting.

17          MR. FOX:  Marc.  Marc.  You're

18      not getting the process -- and it's

19      okay; you're just a first-time

20      litigant.  When he asks a question:

21      Was any merchandise sold?  The answer

22      is either yes or no, and not a speech

23      about your positions about why you

24      could sell the merchandise if you

25      wanted to.  You're not here -- just

1    like, look, I got upset with him, and

2    I'm getting upset with you now.

3         Neither of you are here to make

4    a single argument.  That happens in

5    motion papers and in trial.  So if he

6    asks you:  Was merchandise sold?  Your

7    duty, under the law, Marc, is to say

8    yes or no, not launch into your

9    argument about why you can do it.  You

10   understand the process?  Do you

11   understand it?

12        THE WITNESS:  I understand.

13   A.    So the answer is:  No, we did

14  not sell any Webcomic Name merchandise at

15  this convention.

16        THE VIDEOGRAPHER:  This

17   concludes media unit Number 2 at

18   12:42.  We are off the record.

19        (Whereupon, an off-the-record

20   discussion was held.)

21        (Whereupon, a recess was taken.)

22        THE VIDEOGRAPHER:  This begins

23   media Number 3.  The time is 12:50.

24   Q.    I'd like to -- the prior

25  document we're reviewing -- and it's in

1    the chat box -- is convention photo 1.  To

2    the extent I haven't done it, so I'd like

3    to have it marked as Exhibit 7.  Okay.

4    I've added another PDF to the chat box,

5    and I'm also going to bring it up on my

6    share screen.

7         A.    Okay.

8         Q.    Mr. Goldner, are you familiar

9    with this photograph?

10        A.    I believe this -- yeah, I

11   believe I remember it.  I'm not

12   100 percent sure, but yeah, this is our

13   booth.

14        Q.    Do you recall who took this

15   photograph?

16        A.    Either Rachel, Rob or myself.

17        Q.    And do you know where this

18   photograph was taken?

19        A.    It's tough.  I want to say -- I

20   want to say it was Gen Con in

21   Indianapolis -- not Indianapolis.  Is it

22   Indianapolis?  It's in Indiana -- because

23   I'm looking at the booth next to us.  It's

24   hard to see.  Overtone.  Daedalic.  I want

25   to say Gen Con, but I'm not 100 percent

1    sure.  I think it was Gen Con, though.  I

2    think it was.  I think.

3        Q.    Okay.  And this, you said, was

4    your booth at whichever particular

5    convention this was, correct?

6        A.    I mean, it says Golden Bell

7    Studios at the top of the drayage so, yes,

8    it's Golden Bell Studios's booth.  It's

9    not my personal booth.  Everything is an

10   off serve of the entity.  So yes, this is

11   Golden Bell Studios's booth.

12       Q.    Has Golden Bell Entertainment

13   ever assigned any of the rights to the

14   Webcomic Name Game to Golden Bell Studios?

15       A.    It's very possible.  I'd have to

16   check.  Most likely it would have been

17   sales or manufacturing rights because

18   Golden Bell Studios is the manufacturing

19   sales arm of the entity -- of the two

20   entities, and GBE, Golden Bell

21   Entertainment, is the intellectual

22   property entity and the licensing arm.  I

23   don't have it off the top of my head, but

24   yes, I mean, Golden Bell Studios has the

25   customs bond, deals with the supply chain

Page 113

```
 1    logistics, deals with the sales.  And GBE
 2    is more on the creative and licensing and
 3    IP development.  Is that what you're
 4    asking?
 5         Q.    No.  I was just asking whether
 6    or not Golden Bell Entertainment had
 7    assigned any of the rights to Webcomic
 8    Name to Golden Bell Studios?
 9         A.    The answer looks like, yes.
10    That's -- I don't --
11         Q.    Okay.
12              MR. KUNST:  Well, I'll call for
13         the production of that assignment to
14         the extent it exists.
15         Q.    Do you know if Golden Bell
16    Entertainment had assigned any other
17    rights to Webcomic Name to any entity or
18    individual aside from Golden Bell Studios?
19         A.    I'd have to check because Rachel
20    is the managing member of Golden Bell
21    Entertainment.  I'd have to check with
22    her.  I mean, it's very possible.  Yeah.
23    I have no idea.
24              MR. KUNST:  To the extent any
25         such assignment exists, I'll call for
```

1       its production.

2       Q.     Okay.  So, Mr. Goldner, do you

3   see the Webcomic Name banner in the

4   photograph?

5       A.     Yes, I do.  Front and center.

6       Q.     And same question regarding the

7   Webcomic Name merchandise:  Did Golden

8   Bell Entertainment sell any Webcomic Name

9   merchandise at this convention.

10      A.     The answer is still no, and to

11  be clear, we did not sell any Webcomic

12  Name merchandise which I have said

13  numerous times.

14      Q.     And what about Webcomic Name

15  Game merchandise?  Is there a distinction?

16      A.     I'm not trying to pull a fast

17  one on you, Kyle.  We didn't produce any

18  Webcomic Name Game merchandise, any

19  Webcomic Name stuffed animals.  I'm not

20  trying to be sneaky and coy like your

21  client.  The answer is, no.

22      Q.     Okay.  I think that's all I have

23  for this exhibit so why don't we go off

24  the record?

25              MR. KUNST:  And we'll take lunch

Page 115

1        and how about we come back at 1:30?

2              Mr. Fox, you're on mute.

3              MR. FOX:  Look, that sounds

4        great, and, you know --

5              MR. KUNST:  Okay.

6              MR. FOX:  -- we will try to have

7        Marc argue less when we come back and

8        it seems like Counsel is doing his

9        part.  He's not arguing.  So maybe

10       we'll just move slicker and quicker.

11       And it will be good for everyone I

12       think in the long run.

13             MR. KUNST:  Well, I'm nothing if

14       not a peacemaker, and lunch will make

15       everybody feel better.

16             MR. FOX:  Yeah.  So Marc is --

17       you know, he'll stop with his extra

18       comments, okay?  Thanks.

19             MR. KUNST:  All right.  Sounds

20       good.  See everybody at 1:30 then.

21             THE VIDEOGRAPHER:  All right.

22       Off the record at 12:57.

23             (Whereupon, an off-the-record

24       discussion was held.)

25             (Whereupon, a lunch break was

Page 116

 1      taken at 12:57 p.m.)

 2           THE VIDEOGRAPHER:  We are back

 3      on the record.  The time is 1:32.

 4      Q.    So I'm going to add another

 5  document to the chat, and I'm going to put

 6  it up on share screen.  And I'll mark this

 7  as Exhibit 9.

 8      A.    Okay.

 9      Q.    Mr. Goldner, I'm going to scroll

10  down this document and ask if you know

11  what this is, Exhibit 9.

12      A.    I think this is the -- one of

13  the trademark applications, but I don't

14  know which one it is.  I don't know if

15  it's ours or --

16      Q.    All right.  Well, on page one,

17  you'll see, in the left-hand column,

18  there's a field, literal element, and then

19  the corresponding column is Webcomic Name?

20      A.    Okay.

21      Q.    You see that?  Okay.  Go ahead.

22      A.    I don't think I said anything.

23      Q.    Below applicant information

24  owner of mark is noted as Golden Bell

25  Entertainment, LLC, correct?

Page 117

1      A.    Yes.

2      Q.    And if we scroll down to the

3  bottom of page one, international class is

4  Number 16, correct?

5      A.    Okay.

6      Q.    If we continue to scroll down

7  there's information, in large capital

8  letters, signature information, do you see

9  that?

10     A.    I see -- what page is this?

11     Q.    This is page three of nine.

12     A.    I see that I'm signing on behalf

13  of a company, yes.

14     Q.    So that is, in fact, the

15  electronic signature you placed on this

16  application, correct?

17     A.    I would assume so.

18     Q.    And attached to this

19  application -- and if you need at any

20  point to review this, please let me

21  know -- attached to this application --

22  and I'm going to scroll down and show you

23  the -- I'm going to zoom out and show you

24  this entire document.  If you look at the

25  upper caption of this document, we see

```
 1   page number, and we see page number six of
 2   nine in blue, do you see that?
 3        A.    Yes.
 4        Q.    Now, did you attach this
 5   document to this application?
 6        A.    I definitely did not attach.
 7   This is a text word mark that, when you
 8   type something into the USPTO, it
 9   auto-generates a word mark.  This is not a
10   design mark application.
11        Q.    Did you type this word mark into
12   the application?
13        A.    Yes, the mark says Webcomic
14   Name.
15        Q.    And to be clear you typed this
16   in, correct?
17        A.    So the mark statement on one
18   says, this, the mark, consists of standard
19   characters without claim to any particular
20   font style, size or color.
21        Q.    Okay.  My -- I just want to make
22   sure I'm clear because there's a
23   differentiation you made between attaching
24   a document and typing information into the
25   application, and so I just want to be
```

1    clear that you typed Webcomic Name into

2    the application, correct?

3         A.    Yes, I believe so.  I mean --

4         Q.    Okay.  So if we scroll down, do

5    you see that we're now on page seven of

6    nine?

7         A.    Yes.

8         Q.    Okay.  Now, is this a picture

9    that you attached to this application?

10        A.    Possibly.  I don't recall a

11   specific image that was attached or if it

12   was an image.  I don't know if this was an

13   intent to use mark that was filed or if it

14   was already in use.  I'd have to check my

15   records.

16        Q.    Okay.  My question's just a

17   little different.  It's as far as whether

18   or not you attached this document to this

19   application, not how it was used.

20        A.    It looks likes I did because

21   it's my Facebook, I would assume since it

22   says Marc at the top of the Facebook.  So

23   I don't know.  Are you asking when I did

24   it or --

25        Q.    Well, let me ask you this:  You

Page 120

1    said it says Marc at the top of this

2    Facebook.  And I'm going to use my cursor

3    and show it to you but also describe it

4    for the record.  Underneath the address

5    bar there's a blue bar that has text on it

6    and there's a portion that says Marc.  And

7    then there's a little picture next to it.

8              When you say this is your

9    Facebook, it says Marc at the top, are you

10   referring to that portion on the blue bar

11   near the top that has M-A-R-C on it?

12       A.    Yeah.  I'm saying something very

13   clear.  I don't know when this image was

14   submitted.  Clearly I submitted it.  I

15   don't know if it was submitted upon the

16   application or if it was submitted later

17   on after a -- after the intent to use.  I

18   think it's six months after filing.  I

19   don't remember when this was submitted.

20   It was clearly submitted.  I just don't

21   know if it was submitted upon application

22   filing or if it was upon registration

23   approval or when exactly.  That's all I'm

24   saying.

25       Q.    Okay.  Now, this, page seven of

Page 121

1   nine, reflects a Facebook page, correct?

2       A.    Correct.

3       Q.    Is this the Webcomic Name

4   Facebook page?

5       A.    This is the Webcomic Name

6   Facebook page that Alex refused to grant

7   us access to as per the contract.

8       Q.    So how then did you take -- how

9   then did you acquire this picture to be

10  uploaded with this application?

11      A.    It's a screenshot because we

12  acquired the rights.

13      Q.    But you said that Alex refused

14  to grant you access to it --

15      A.    So him breaching --

16      Q.    Is that correct?

17      A.    Him breaching a provision of the

18  agreement does not prevent any person in

19  the world from screenshotting a Facebook

20  page as an exhibit to prove that something

21  is in use when the rights were transferred

22  to us.

23      Q.    Okay.  Let me -- before we move

24  on to the next image, I'm going to scroll

25  back up to the top and find the -- what I

Page 122

```
 1    believe to be the date upon which this was
 2    at least signed.  I'm going to -- we're
 3    now on page three of nine, and you'll see
 4    there's a portion, date signed, 10/9/2018,
 5    you see that?
 6        A.    Yep.
 7        Q.    Does that refresh your
 8    recollection at all as far as when these
 9    pictures were uploaded?
10        A.    No.  I'm repeating what I said.
11    I don't know if that image was sent on
12    October 9th or six months after because I
13    don't remember if this was an intent to
14    use application or if it was an in-use
15    application.  We have over 100 trademarks
16    and over 100 applications that have been
17    filed.  It is unreasonable to expect me to
18    remember the dates of when something was
19    uploaded four years ago.
20        Q.    So we're now on page eight of
21    nine of Exhibit 9.
22        A.    Okay.
23        Q.    Can you tell me what this
24    picture is?
25        A.    The Webcomic Name Patreon page.
```

Page 123

1      Q.    Okay.  And how did you obtain
2   this picture?
3      A.    By going to patreon.com,
4   slash, the URL which has Webcomic Name.
5   Alex Norris is creating Webcomic Name and
6   other comics which he has failed to
7   actually produce for his patrons every
8   week or multiple times a week which he
9   says he would have done.  So this is why
10  he's actually lost patrons because he
11  doesn't upload.
12     Q.    So did you also take a
13  screenshot of this Patreon account that's
14  on page eight of nine?
15     A.    I believe at some point I did.
16  The date, I do not remember what date I
17  took the screenshot.
18     Q.    And did Mr. Norris also refuse
19  to give you access to this Patreon
20  account?
21     A.    He refused to give us access to
22  anything.  I don't remember ever asking
23  for Patreon because we wanted him to be
24  able to make money on the Patreon like I
25  said earlier today.  Him posting on

Page 124

1   Patreon to make money from patrons for him

2   to maintain his livelihood has nothing to

3   do with whether the mark is in use and

4   whether we have the rights or he has the

5   rights.  Stretching.  Really stretching.

6       Q.    I'm sorry.  I missed that last

7   part.

8       A.    Nothing.  I just said you're

9   stretching.  That's all.

10      Q.    Oh.

11            MR. FOX:  And, Marc, I just will

12      ask you again:  If you're not

13      answering a question don't make

14      comments, okay?  Like, the stretching

15      comment, a judge would clip you on.

16            MR. KUNST:  Gerard, you're

17      still -- you're going in and out a

18      little bit.

19            MR. FOX:  There you go.

20            MR. KUNST:  Yeah, there you go.

21            MR. FOX:  But anyhow, Marc, you

22      can't make those comments.  The judge

23      will clip you on that.  You're not

24      allowed to comment on stretching,

25      things like that, okay?

1      Q.    Okay.  Mr. Goldner, we're on

2   page nine of nine of Exhibit 9, and

3   this -- well, can you tell me what this

4   picture is?

5      A.    The Webcomic Name Facebook page.

6      Q.    And is this another screenshot

7   of the Webcomic Name Facebook page that

8   you took?

9      A.    Looks like it, yep.

10      Q.    And again, Mr. Norris had not

11   provided you access to that Facebook page,

12   correct?

13      A.    No, he has not.  Upon numerous

14   requests, he did not provide it.

15      Q.    Okay.  I'm done with this page.

16          Okay.  I've added another

17   document to the chat function, and I'll be

18   putting it up on the share screen as well.

19      A.    Okay.

20      Q.    I'd like to mark this document

21   as Exhibit 10.  Mr. Goldner, I'll scroll

22   down this document and please let me know

23   if it's familiar to you.

24      A.    Again, when I submit a trademark

25   application this is not how it looks.  So

```
 1    I don't know if this is how you obtained
 2    this but when you apply for a trademark
 3    there are individual pages -- I think,
 4    like, five or six -- and it doesn't look
 5    like this colored -- I'm partially
 6    colorblind -- but, like, a greenish Excel
 7    cell background.  So I don't -- the reason
 8    why I don't know why this is familiar is
 9    because this is not how you apply for a
10    trademark for -- the way I've done it.
11    Maybe this is --
12         Q.     Okay.
13         A.     -- processed.  I don't know.
14    I've never seen this.
15         Q.     Well, let me ask you this then:
16    You see the -- at the top of page one, you
17    see the filing date, 11/30/2017?
18         A.     Yes.
19         Q.     Okay.  And then you see the
20    literal element is Webcomic Name, correct?
21         A.     Yes, I see that.
22         Q.     So on or around November 30th of
23    2017, did you file an application with the
24    United States Patent and Trademark Office
25    for Webcomic Name?
```

```
                                    Page 127
 1      A.    Yes.  And Alex had known about
 2   it because we told him on a call that we
 3   have the trademark and the copyright to
 4   the game and the stuffed animals at that
 5   time because we spoke to him on
 6   February 26, 2018, when he asked about it
 7   and this was filed before.  This is not a
 8   secret.  He knew about it.  We discussed
 9   it.  It's in the contract.  It's not a
10   surprise.
11      Q.    Okay.  And this is in -- did you
12   file this application in class 28?
13      A.    If that's what it says then
14   that's classification that it is.
15      Q.    And we see the -- okay.  When
16   you filed for this application, did you
17   place an electronic signature on the
18   application?
19      A.    Again, this is not the signature
20   page that I had seen when I filed the
21   application, but if this is what is, I
22   guess, downloadable after the application
23   is filed, then that's what it is.
24      Q.    Okay.  So I'm scrolling down
25   again, and again you'll notice there's
```

1  page numbers in blue in the top caption --

2      A.    Yep.

3      Q.    -- of this document -- and I'm

4  on page five of five now -- and you can

5  see that on page five of five is the text

6  Webcomic Name, correct?

7      A.    Yes.  Again, this is not a

8  design mark so this, I believe, is

9  auto-generated.  None of us drew that name

10 if that's what you're asking.

11     Q.    No.  I just wanted to clarify --

12 well, let me strike that and just ask this

13 a different way.

14           Is it then accurate that,

15 because this is just text, you typed it

16 into the application for this mark?

17     A.    Again, I don't know what is

18 procedurally generated from the trademark

19 website.  I wrote at one point what mark

20 is being registered.  I don't know if this

21 is procedurally auto-generated from their

22 back-end platform.

23     Q.    Sure.  You said you wrote it in.

24 Do you recall -- and correct me if I'm

25 wrong -- do you recall writing it in

1   during that application process for this

2   particular mark, I mean?

3        A.    I mean, obviously the mark is

4   for Webcomic Name that we applied for.

5   This is not -- the document speaks for

6   itself.  This is not, like, a secret.  We

7   applied for the trademark, the Webcomic

8   Name, in classification 28.  I don't

9   really know what you're asking.  The

10  document is very -- it's self-explanatory.

11  You don't need me to confirm that.

12       Q.    So I've added another document

13  to the chat box.

14       A.    Okay.

15       Q.    I'm adding on share screen

16  another document.

17       A.    Okay.

18       Q.    Okay.  Mr. Goldner, do you --

19  and let me mark this as Exhibit 11.

20  Mr. Goldner, do you recognize this

21  document?

22       A.    This, I believe, is the

23  trademark registration.  I think it was

24  mailed to us for Webcomic Name, I believe.

25       Q.    And this is -- I will scroll out

1    a little bit.  If you need me to zoom back

2    in on a text let me know, but this is the

3    trademark that was registered under

4    class 28, correct?

5         A.    Yes, that's what it says.

6         Q.    Okay.  And so you'll see kind of

7    in the center of the document class 28 and

8    then you'll see a number of, perhaps,

9    product descriptions.  And specifically

10   what I'm referring to is board games, card

11   games, game cards, party games, plush

12   dolls, plush toys, stuffed dolls and

13   animals, stuffed toy animals, tabletop

14   games, soft sculpture plush toys, stuffed

15   and plush toys.

16        A.    Okay.

17        Q.    So as of December 11, 2018, had

18   Golden Bell Entertainment sold any of

19   those types of items with the Webcomic

20   Name mark emblazoned on them?

21        A.    It was in commerce.  None have

22   been sold.  There's a difference.  When

23   you are marketing, promoting to buyers,

24   looking to get solicitations, whether it's

25   MOQs -- which is in our catalog -- it is

1   in use.  It is being actively solicited

2   and attempted to be sold so that when

3   Alex, if he would have finished the game

4   on time, by the deadline, then we would

5   have been able to actually take orders.

6   But instead he missed the deadline without

7   even really a care in the world.  So I

8   don't really know what you're asking me.

9   It's in commerce but it wasn't --

10       Q.    Let me go back because we're

11  getting a little bit far afield again.  My

12  question is:  As of December 11, 2018,

13  with respect to the items described under

14  class 28, did Golden Bell Entertainment,

15  LLC, sell any such items with the Webcomic

16  Name mark attached to it?

17       A.    I don't really know what you're

18  asking.

19       Q.    Did Golden Bell Entertainment,

20  LLC, as of December 11, 2018, sell any

21  Webcomic Name board games?

22       A.    Golden Bell Entertainment, LLC,

23  is not a sales arm or division that sells

24  product -- physical, produced products.  I

25  said this earlier.

1      Q.     Is that a yes or a no?

2      A.     I don't know what you're asking.

3  Are you asking:  Did we sell the

4  distribution rights, the sales rights

5  where we --

6      Q.     No.  No.  No.  No.  No.  So

7  let's -- we'll start over.  My question

8  is:  As of December 11, 2018, did Golden

9  Bell Entertainment, LLC, sell any Webcomic

10  Name board games?

11      A.     So yeah, you're trying to trap

12  me into a question.  This is a legal

13  definition of what counts as a sale or

14  solicitation to get a trademark.  So the

15  answer is:  I don't know what you consider

16  a sale and what is defined as -- under the

17  UCC as a sale.  I don't know.

18      Q.     Okay.

19      A.     I'm not a lawyer.

20      Q.     So you don't know whether or not

21  any sales were made, correct?

22      A.     I am telling you I don't know if

23  you consider a sale or what the USPTO

24  considers a sale as selling a physical

25  mass manufactured game or if it counts as

```
1    if you're soliciting and marketing
2    something which we were told by our
3    attorneys that if something is on a
4    website being solicited --
5         Q.    I'm not asking about the USPTO's
6    definition.  My question is much more
7    simple.
8         A.    Okay.
9         Q.    So let me ask you this:  As of
10   December 11, 2018, had Golden Bell
11   Entertainment, LLC, created any Webcomic
12   Name board games to be sold?
13        A.    We have created games, but we
14   have not manufactured any mass -- any
15   games to sell.
16        Q.    And that's true as of today,
17   correct?
18        A.    That is true as of today.  We
19   have not mass manufactured any games or
20   plush toys outside of any samples which
21   your client has seen.
22        Q.    Has -- aside from those samples
23   and aside from mass manufacturing has
24   Golden Bell Entertainment, LLC,
25   manufactured any Webcomic Name board
```

Page 134

1   names?

2       A.    Outside -- can you please repeat

3   the question?

4       Q.    Sure.  Outside of mass

5   manufacturing and outside of samples has

6   Golden Bell Entertainment, LLC,

7   manufactured any Webcomic Name board

8   names?

9       A.    No.  We have made the samples

10  which were used as solicitation devices in

11  order to get sales for B-to-B and to

12  promote the works.  It is our job and

13  obligation to be marketing, to

14  pre-promote, to put into commerce, to

15  build the brand.  I really don't know what

16  you're asking.  You're essentially just

17  trying to trick me into saying something

18  you want me to say.  Like, I don't

19  understand --

20      Q.    So let's -- let me ask you this:

21  Has Golden Bell Entertainment, LLC, been

22  given any money in exchange for any

23  Webcomic Name board game as of

24  December 11, 2018?

25      A.    There may have been rights that

1   have been transferred.  I don't know if

2   there was any monetary exchange.  So it is

3   entirely possible that in the licensing

4   change of rights from Golden Bell

5   Entertainment to Golden Bell Studios being

6   able to produce the products and

7   manufacturer them and sell them, that

8   there was money that changed hands, but I

9   don't remember if it was just a strict

10  royalty that GBS is due to GBE or if there

11  was money paid in advance from GBS to GBE.

12       Q.    So aside from any transfers of

13  funds between GBS and GBE with respect to

14  Webcomic Name board games was there any

15  other transfer of funds to Golden Bell

16  Entertainment with respect to Webcomic

17  Name board games as of December 11, 2018?

18       A.    Transfer of funds in which way?

19       Q.    In terms of Golden Bell

20  Entertainment being given funds in

21  exchange for a Webcomic Name board game?

22       A.    Golden Bell Entertainment did

23  not have any other funds except from the

24  things I just told you relating to

25  Webcomic Name.

1      Q.    Let's move on to card games.  So

2  as of December 11, 2018, had Golden Bell

3  Entertainment created any Webcomic Name

4  card games for sale?

5      A.    Again, we did create the game,

6  but the art is not done because there was

7  no final files produced.  This is the same

8  line of questioning of what you asked

9  before.

10     Q.    So it's just a yes-or-no

11  question.

12     A.    The answer is I don't know what

13  you're asking.  You did this in the last

14  deposition.  I don't know what you're

15  asking because it doesn't seem like you

16  understand our business.

17     Q.    Okay.  Well, let's just try to

18  find this out then.  As of today has

19  Golden Bell Entertainment, LLC, created a

20  Webcomic Name card game for sale?

21     A.    We have created.  We have not

22  mass produced.  There are things that have

23  been created to make a game.  We do not

24  have the final files from Alex, the final

25  art file that he is due -- that is due to

1  us.  You're asking -- the word "creation"

2  is essentially the entire thing of this

3  case.  We did create a big part of the

4  game for Webcomic Name because Rob and I

5  created it before even signing with Jason

6  because it was originally the Sunday

7  Comics game which we've said this.

8       Q.    So let's move on to game cards.

9  As of December 11, 2018, has Golden Bell

10  Entertainment, LLC, created any Webcomic

11  Name game cards?

12      A.    It's the same answer.  I guess

13  game cards, we can classify as the

14  Pretending to Grownup guest artist card

15  that says Unexpected Pregnancy so that is

16  a game card that has been produced in

17  Pretending to Grownup which Alex assigned

18  the rights to Wiseman which we acquired --

19      Q.    Well, hold on again.  We're

20  getting a little far afield --

21           (Whereupon, simultaneous

22       conversation took place disrupting the

23       record, and the court reporter

24       requested one person speak at a time

25       without interruption from anyone

1      else.)

2      Q.    I'm only asking about Webcomic

3   Name.  So let's just stick with Webcomic

4   Name.

5            (Whereupon, simultaneous

6      conversation took place disrupting the

7      record, and the court reporter

8      requested one person speak at a time

9      without interruption from anyone

10     else.)

11           MR. FOX:  Marc, you have to let

12     him finish his question.  Take a pause

13     and a beat and give a slow answer.

14     Answer only the question asked, not a

15     different question, okay?  Thanks.

16           MR. KUNST:  Thanks.

17     Q.    So as of December 11, 2018, has

18   Golden Bell Entertainment, LLC, sold any

19   Webcomic Name game cards?

20     A.    Again, there is a guest ARTIST

21   card of Webcomic Name in Pretending to

22   Grownup.

23     Q.    So let's try this again.  Has

24   Golden Bell Entertainment, LLC, sold any

25   Webcomic Name game cards as of

Page 139

1   December 11, 2018?

2       A.      There is a game card in

3   Pretending to Grownup that is of Webcomic

4   Name which is one of the featured cards on

5   Amazon which is in discovery.  That game

6   card is in a game, Pretending to Grownup,

7   that has been sold.

8       Q.      Okay.  And was that game card

9   submitted to the USPTO as any specimen for

10  the application of this trademark?

11      A.      I don't recall.

12      Q.      Okay.  With respect to party

13  games, has Golden Bell Entertainment, LLC,

14  sold any Webcomic Name party games as of

15  December 11, 2018?

16      A.      Again, the Webcomic Name Game is

17  in the party game, Pretending to Grownup,

18  which transferred the rights for any

19  future rights to Jason which we acquired

20  Pretending to Grownup which is for sale on

21  Amazon and on other outlets which is in

22  the pictures of the conventions that you

23  saw.

24      Q.      As of December 11, 2018, has

25  Webcomic Name -- pardon me -- has Golden

Page 140

1    Bell Entertainment, LLC, sold any Webcomic
2    Name plush dolls?
3         A.    We have not sold any en masse or
4    mass manufactured.  We have made --
5         Q.    Have you sold any?
6         A.    We have only made the sample and
7    have solicited.
8         Q.    Okay.  So have you sold any?
9         A.    No.  It is in commerce.  It is
10   in use because we are actively trying to
11   sell.
12        Q.    So is that a yes or no?  Have
13   you sold any?
14        A.    Any -- there have been no mass
15   manufacturing of the plush toys.  So how
16   can you sell something you haven't mass
17   manufactured?  I don't -- I really don't
18   understand this question.  This is --
19            MR. FOX:  Marc.  Marc.  Marc.
20        Look, I got to tell you something.
21        The answer to the question's obviously
22        no, and you want to explain why not in
23        your answer.  That's not what we're
24        here to do today.  The answer is no,
25        period.  The explanation and your

1    arguing with him to explain that you

2    couldn't do it because he didn't do

3    this part of the deal is just

4    prolonging the deposition.  We all

5    know what our position is.  He can ask

6    a question.  Might be useless because

7    his client didn't uphold his end of

8    the deal or that, you know, the more

9    full answer is that you were looking

10   for preorders or whatever.

11        But he's asking very narrow

12   questions, did you sell, did someone

13   actually purchase.  And if the answer

14   is no, it's okay to say no.  It

15   doesn't destroy your case.  This is

16   not the entirety of your whole, you

17   know, submissions to the court.  It's

18   just him asking questions and you

19   answering them.  So try to remember

20   that.

21        THE WITNESS:  I understand that.

22   A.    It's just that there are

23   nuances, Kyle, that I want to make sure

24   I'm very specific with you about how there

25   is things like a Webcomic Name card in

1  Pretending and that is a game card.

2      Q.    Okay.  So with respect to

3  stuffed dolls and animals, has Golden Bell

4  Entertainment, LLC, sold any Webcomic Name

5  stuffed dolls and animals as of

6  December 11, 2018?

7      A.    No, we have not sold because we

8  haven't manufactured them or mass

9  manufactured.

10      Q.    With respect to stuffed toy

11  animals -- which I believe we have not got

12  to yet -- has Golden Bell Entertainment,

13  LLC, sold any Webcomic Name stuffed toy

14  animals as of December 11, 2018?

15      A.    Again, we have not mass

16  manufactured so we could not have sold

17  them.

18      Q.    Is that a no?

19      A.    I guess it's a no.  As I said,

20  it's the same answer as before.  We

21  solicited.  The answer is no.

22      Q.    Okay.  With respect to tabletop

23  games, has Golden Bell Entertainment, LLC,

24  sold any Webcomic tabletop games as of

25  December 11, 2018?

```
                                      Page 143
 1        A.     Pretending to Grownup is a
 2   tabletop game, and the Webcomic Name Guest
 3   Artist Card is in Pretending to Grownup
 4   which has been sold and Alex was
 5   compensated for it.
 6        Q.     With respect to soft sculpture
 7   plush toys, has Golden Bell Entertainment,
 8   LLC, sold any Webcomic Name soft sculpture
 9   plush toys as of December 11, 2018?
10        A.     Again, it's in commerce.  We've
11   solicited.  We have not mass manufactured
12   or sold.
13        Q.     So is that -- is your answer,
14   no?
15        A.     It's the answer that I just
16   said.
17        Q.     So --
18        A.     I don't believe -- you're asking
19   for a yes or no.  I don't believe this is
20   a yes-or-no question.  Just because you're
21   asking for it to be yes or no, I don't
22   believe it's a yes-or-no question.  So
23   you're asking me to answer something not
24   it in a way that I would answer, and I
25   testified to -- under oath to answer
```

1   truthfully.  I'm answering truthfully.

2   That is how -- what I believe the answer

3   is.  It is not a yes or no.  It is the

4   answer I just told you.

5            MR. KUNST:  So, Garry, can I

6        have his answer back to the last

7        question?

8            (Whereupon, a portion of the

9        record was read back.)

10           "ANSWER:  Again, it's in

11       commerce.  We've solicited.  We have

12       not mass manufactured or sold."

13       Q.   Okay.  That's good.  I'll move

14  on to the -- I think the final entry is

15  stuffed and plush toys.  As of

16  December 11, 2018, has Golden Bell

17  Entertainment, LLC, sold any stuffed --

18  pardon me -- any Webcomic Name stuffed and

19  plush toys?

20       A.   Again, we have had it in

21  commerce.  We have generally solicited.

22  We have not mass manufactured or sold,

23  even though Wiseman told us that we could,

24  and so did Alex.

25       Q.   Okay.  Thank you.

1      A.     Am I allowed to have a snack or
2   no?
3      Q.     Yeah, sure.
4             Do you need a minute?
5      A.     No.   No.   Just having a piece of
6   pound cake.
7      Q.     Are you sure you don't want to
8   take a minute?  You're going to be eating.
9   You're going to be answering questions
10  too, though.
11     A.     I chew very quickly.
12     Q.     All right.  I've added another
13  document to the chat box and put it up on
14  share screen.  I'd like to mark this as
15  Exhibit 12.
16     A.     Okay.
17     Q.     So, Mr. Goldner, let me ask you
18  again:  Are you familiar -- I'll scroll
19  down this document.  Please let me know if
20  you're familiar with it.
21     A.     Same answer as before.  I've
22  never seen this specific document, but I
23  have filed a trademark for Webcomic Name
24  in this category.
25     Q.     I'm going to scroll up, and

1  we'll talk about the category.  This

2  category is Number 28, correct?

3      A.    Yes.

4      Q.    And have -- just directing your

5  attention to the top of Exhibit 12, do you

6  see where it states, service mark

7  statement of use?

8      A.    No -- yes.  Yes, I do.  Yes.

9  Yes.  Yes.

10     Q.    Okay.  Okay.  Do you recall

11  filing a service mark statement, statement

12  of use for Webcomic Name under class 28?

13     A.    I don't remember doing it, but

14  it says that I did.  So I did.  Just

15  because I don't remember filing the

16  document doesn't mean I didn't do it.  My

17  signature's on the page.

18     Q.    Scroll down.  Okay.  When you

19  say your "signature's on the page," you're

20  referring to declaration signature, and

21  then there's Marc Goldner between two

22  forward slashes, correct?

23     A.    Signature's principal of the

24  entity.  That's --

25     Q.    Okay.  Okay.  So again, we're

1  looking at a document that has blue

2  numbering up at the top caption just so

3  we're on the same page, and this is page 5

4  of 10 of Exhibit 12, correct?

5       A.    Okay.

6       Q.    Do you need me to -- I'm going

7  to -- okay.  And did you upload this

8  document in connection with the statement

9  of use -- or pardon me.  Let me strike

10  that and rephrase it.

11            Did you upload this picture in

12  conjunction with this statement of use?

13       A.    I don't recall, but if it's

14  there I must have.  I don't remember doing

15  it, but -- I'm not a designer so I didn't

16  make this file.  I'm not a graphic

17  designer, but if it's here it was

18  uploaded.  And if I signed it then I must

19  have uploaded it and don't remember.

20       Q.    Do you know if you were the

21  individual who obtained this photograph?

22       A.    This is not a photograph.

23       Q.    Okay.  What would you call it?

24  A picture?  How would you like to refer to

25  it?

1        A.      This is a graphic design file.

2   This is a --

3        Q.      Okay.

4        A.      -- graphic design file.

5        Q.      Do you know if you were the

6   individual that obtained this graphic

7   design file?

8        A.      What do you mean "obtained"?

9        Q.      Where did you get this from?

10       A.      Rachel deals with all the art

11  files so I probably got it from her.

12  Anything that is submitted to the USPTO or

13  really any type of thing Rachel handles.

14       Q.      Do you know what this graphic

15  design file shows?

16       A.      Yes.  It's a tag for a stuffed

17  animal.

18       Q.      And it's a tag for a Webcomic

19  Name stuffed animal, correct?

20       A.      That is correct.

21       Q.      Do you know if Mr. Norris

22  provided this?

23       A.      I have no idea.

24       Q.      Could you -- again, could you

25  tell me what Ms. Korsen's responsibility

1  is with respect to artwork that's

2  submitted to Golden Bell Entertainment for

3  purposes of uploading trademark

4  applications?

5      A.    So Rachel is the first and lead

6  artist of Golden Bell Entertainment.

7  She's -- her and I have been working on

8  everything from comics to games to toys,

9  design, graphic design, art, concept,

10  pitches since 2014 or possibly even

11  before.  She got her BFA at Ohio State.

12  She got her master's in arts management at

13  Carnegie Melon.  She's an artist, a

14  graphic designer.  She runs operations.

15  We exchanges hundreds of thousands of

16  messages over the years.  I don't remember

17  if she is the one that sent me this file.

18  Possibly.  I have no idea.

19      Q.    Do you know if Mr. Norris -- I'm

20  sorry -- strike that.

21          We'll move on to the next one.

22  Okay.  We're on page 6 of 10 of

23  Exhibit 12, correct?

24      A.    Okay.  We can be there.  Yep.

25      Q.    There is -- well, let me ask you

Page 150

1   this:  Do you -- can you describe for me
2   the -- I don't know if it's a picture.  I
3   don't know how you would like to describe
4   it.  First off, let's start with that.
5   How would you at define -- I'll call it a
6   picture -- that's on page 6 of 10 of this
7   exhibit?
8        A.    This is a concept pitch for what
9   could be a game box design for a front of
10  the box for the game for Webcomic Name.
11  It's a concept pitch that was not
12  approved.  We said it looks cool, but it's
13  far away from being a complete file.
14  There's no sides of the box, there's no
15  bottom of the box, but this was a sample,
16  a concept pitch -- which is often done in
17  entertainment -- to -- what the aesthetics
18  and the design look will be that will be
19  conveyed, and then there's often market
20  testing based on market research and data
21  analytics, if it tests well with an
22  audience and it resonates with the target
23  market to see if that will wind up being
24  the box art that is used -- which it turns
25  out it will not be.

1     Q.    Okay.  Do you know where this --
2   and I'm just -- for shorthand, I'm going
3   to refer to this as a picture.
4     A.    It would be better if it was a
5   concept box.
6     Q.    But what is -- what has actually
7   been or what has been uploaded with this
8   statement of use is a picture and so
9   that's simply what I'm going refer to it.
10  If there's something else that you think
11  is more accurate, I have no problem
12  calling it that.
13    A.    I just disagree that it's a
14  picture, but --
15    Q.    We can -- I can call it -- I'm
16  not trying to argue with you.  I can call
17  it the concept.  It really makes no
18  difference just so long as I know what I'm
19  actually referring to.  So again, same
20  question:  Do you know where this concept
21  was obtained from?
22    A.    I believe from WhatsApp from
23  Alex Norris, and it was also emailed
24  low-res, low resolution file, in email and
25  it was not layered and -- yeah, I believe

Page 152

```
 1   it was sent in email and in WhatsApp.
 2        Q.    Sent in email and in WhatsApp
 3   from Mr. Norris?
 4        A.    Correct.  To my memory.  I know
 5   he sent it in WhatsApp for sure in the
 6   group chat for Webcomic Name that Rachel,
 7   Rob and I were in with Alex, and I believe
 8   he sent it also on email.  I'm not
 9   100 percent sure, but I think he did.  And
10   if he did, it would be in discovery.
11        Q.    Okay.  And at any time was there
12   discussion with Mr. Norris about
13   submitting this concept with United States
14   Patent and Trademark Office?
15        A.    On a February 26, 2018, call
16   with Alex he was well aware that we were
17   filing and had the trademark to Webcomic
18   Name, the game and stuffed category, and
19   he replied, okay.  Sure.
20             He knew about it.  It was on a
21   call.  So yes, he did know that we had the
22   trademark to Webcomic Name.  This
23   shouldn't come as a surprise.
24        Q.    Okay.  Okay.  And moving down to
25   the next page, page 7 of 10, this is a
```

Page 153

1    picture, correct?

2        A.    This is the pink butt plush.  On

3    the back there is a butt.

4        Q.    Okay.  And this is -- this was

5    uploaded with the statement of use for

6    this particular application, correct?

7        A.    Yeah.  This is based on the

8    design concept art that Alex had submitted

9    to be made into a stuffed animal which we

10   had sampled and edited numerous times.

11       Q.    And did Alex send you this

12   picture?

13       A.    No.  No.

14       Q.    Where'd you get this picture?

15       A.    From one -- from Rachel because

16   she deals with all the actual, physical

17   design work.

18       Q.    Okay.  So then did Rachel create

19   this plushy?

20       A.    So Rachel did the overlays, the

21   design, the editorial.  She didn't hand

22   stitch it if that's what you're asking.

23   She's one of the co-creators, designers of

24   the toy.

25       Q.    Who hand stitched it?

1      A.    A factory in China.

2      Q.    How many of these did you get

3   from that factory in China?

4      A.    I believe there have been five

5   samples made which you all have the

6   pictures of in discovery.  There's the

7   pink blob butt plush, the sexy plush, the

8   orange blob with the hands down instead of

9   like the pink blob with the hands up,

10   there's the cat and the there's the double

11   sided speech bubble which has "oh no" on

12   one side and "okay" on the other side.

13   There may have been, like, two or three

14   bogus samples that were, like, designs

15   that we scrapped because the color wasn't

16   correct or the fabric wasn't good, but

17   those, even the ones that we wound up not

18   using as final designs, have been

19   submitted in discovery.

20      Q.    Was this -- was this a final

21   design, this picture on page seven?

22      A.    I can't say for sure.  Rachel

23   deals with that, but I think this is the

24   one that's final.  I'm not 100 percent

25   sure, though.  I'd have to ask her.

1      Q.     Okay.  And page eight, can you

2   describe me what this is a picture of?

3      A.     This is the double-sided speech

4   bubble that says "oh no" and on the other

5   side "okay."

6      Q.     And is this the final sample

7   that was created by a factory in China?

8      A.     I don't know if there was

9   further editorial on, like, the color or

10  the fabric but it looks like it was

11  embroidered.  If you can zoom in, usually

12  embroidery showed that something is final.

13  I'm not 100 percent sure, but it looks

14  like this is embroidered and not screen

15  printed because we try to have highest

16  quality products.  And we think embroidery

17  kind of signifies that because screen

18  printing can just wash away.

19      Q.     Okay.  Do you know if -- was it

20  Ms. -- oh, hold on.  Sorry.  Something

21  just popped up.  I'm going to go back.

22  Okay.  Mr. Goldner, we -- my -- I had to

23  turn my screen sharing off for a second,

24  but we're back.  We're back on page eight

25  of Exhibit 12.  Was it Ms. Korsen who sent

1  you this picture?

2      A.    Usually, she's the one that

3  sends me art files or design files, as I

4  said.

5      Q.    Okay.

6      A.    It could have been sent by the

7  factory too.  I don't remember what -- I

8  have -- literally have received tens of

9  thousands of files throughout the years.

10  I don't remember what individual person

11  sent me files back and forth.  The reason

12  I know about the Webcomic Name concept box

13  is because Alex drew it so he's the only

14  one that could have sent it.

15      Q.    We're on page nine now.

16      A.    Okay.  Okay.

17      Q.    Is this -- sorry.  Hold on.

18      A.    Same convention picture as

19  before.  Yep.

20      Q.    Yeah.  That was my only

21  question, if this is the same convention

22  picture as we looked at previously.

23      A.    It looks like it.  I mean, you'd

24  have to compare the two to see if they're

25  identical from different angles, but it

1   looks 99 percent the same.

2        Q.    Okay.  Let me -- okay.  I'm

3   going put Exhibit 7 back up and just ask

4   you if -- and I think 12 I have up as

5   well.  If I -- I'm going to tab over to 12

6   and then back to 7 and ask you to compare

7   and let me know if those are the same

8   pictures.

9        A.    They look like the same pictures

10  to me.  What's your question about it?

11       Q.    That was it.

12       A.    It looked like the same.

13       Q.    Okay.  Okay.  So I've added

14  another document to the chat box, and I

15  have -- we'll put up -- and to the extent

16  I did not do so, the exhibit we were

17  looking at previously, I've marked as --

18  I'd like to mark as Exhibit 12.

19       A.    Okay.

20       Q.    I'll mark this document as

21  Exhibit 13.  So, Mr. Goldner, is this --

22  you'll see that the top notes that this is

23  response to office action.

24       A.    Okay.

25       Q.    And this is for the literal

Page 158

1    element "oh no," correct?

2        A.    Okay.

3        Q.    And did you file an application

4    for the literal element "oh no" with the

5    USPTO?

6        A.    It says I did.  It's possible

7    that one of our attorneys at the time had

8    assisted with this because it's a little

9    bit later when Alex started to become

10   noncooperative and ignoring our emails.

11   So I don't know if I had handled all of it

12   or if one of our attorneys had helped us

13   at the time.

14       Q.    Okay.  And this was filed in

15   class 16, correct?

16       A.    If that's what it says.  The

17   document should speak for itself.  I don't

18   know where you're looking at but if the

19   document says it then that's the

20   classification.

21       Q.    Do you recall signing this

22   response to office action on or around

23   November 18, 2019?

24       A.    I don't specifically recall

25   signing it, no.

Page 159

1      Q.    Do you have any reason to doubt

2   that you signed this response to office

3   action?

4      A.    It's possible that one of our

5   attorneys signed it on my behalf.

6      Q.    Without giving me the content of

7   any communications between you and any

8   attorneys, which attorneys would have

9   signed for you on -- signed this on your

10  behalf?

11     A.    I know that Robert Garson.

12          THE WITNESS:   Jerry, am I

13     allowed to talk about attorneys?

14          MR. FOX:   You can name the party

15     that you think assisted you or filed

16     it.  You're not to discuss any advice

17     they gave you.

18          THE WITNESS:   Okay.

19     A.    Kevin Carlai and Robert Garson

20  who were two of the attorneys on this case

21  before were very involved with this and

22  they're the ones that sent the cease and

23  desist letter and who was dealing with

24  brand previously.

25     Q.    Okay.  So it may have been you,

1    it may have been Mr. Garson, it may have

2    been Mr. Carlai who signed this trademark

3    application, correct?

4        A.    It's possible.  I don't remember

5    who was it.  It very well could have been

6    me.  I'm not saying it wasn't.  I'm saying

7    I don't remember because there was so much

8    communication about this that I don't

9    remember who specifically signed it.  I'm

10   obviously aware of it if that's what

11   you're asking.

12       Q.    Okay.  Okay.  So again, we're

13   using the page numbering at the top

14   caption.  We're on page 5 of 16 of

15   Exhibit 13.

16       A.    Yep.

17       Q.    Can you tell me the -- what the

18   picture on page 5 of 16 is?

19       A.    This is one of the several pages

20   of our catalog that contained Webcomic

21   Name's products including the -- including

22   but not limited to the game, the plush

23   toys.  Does that answer your question?

24       Q.    Yeah.  You said it's -- it is a

25   part of your catalog; is that correct?

Page 161

1     A.     Yes.   Which  has  been  submitted

2   into  discovery.

3     Q.     And  who  created  that  page  --

4   this  page  of  the  catalog?

5     A.     Some  of  the  art  was  created  by

6   Alex  and  Rachel  handles  the,

7   quote/unquote,  master  catalog  file.   She's

8   the  main  designer  of  the  catalog.

9     Q.     Okay.   Do  you  know  if  Mr. Norris

10  provided  this  directly  to  Golden  Bell

11  Entertainment  for  use  in  this  application?

12    A.     I  have  no  idea.   Again,  not  that

13  this  would  matter;  he  assigned  the  rights.

14  He  knew  that  we  were  using  assets  for

15  Webcomic  Name  for  everything.   This  wasn't

16  a  secret.   We  had  phone  calls  about  this.

17  He  knew  we  were  using  the  comics  to  create

18  a  catalog.

19         MR.  FOX:   Yeah.   Marc,  again,

20      unless  that's  an  answer  to  a  question

21      it's  unnecessary.

22         THE  WITNESS:   Okay.

23         MR.  FOX:   It's  another  comment,

24      you  know,  affirmative  which  is  not

25      allowed  in  depositions.

1           THE WITNESS:   Sorry.

2       Q.     So the next page, page six is --

3   I believe it's the concept for the box of

4   the board game.   We've already discussed

5   this, correct?

6       A.     Yep, we discussed this.

7       Q.     And page seven, this is the

8   green plushy "oh no" on the front.   We've

9   already discussed this as well, correct?

10      A.     We've already discussed this,

11  yes, sir.

12      Q.     Okay.   Now can you tell me what

13  page eight is meant to convey?

14      A.     This is Alex infringing on some

15  of our rights and breaching the option by

16  selling a book on his website that we had

17  an option to.   That's what this image is.

18      Q.     Did you obtain this picture?

19      A.     From the website, yes.

20      Q.     And you obtained it by getting a

21  screenshot from the ohnoshop.com website?

22      A.     Yes.   Since Alex didn't transfer

23  the domain which he was supposed to in the

24  contract.

25      Q.     And so I guess that leads to my

Page 163

1   next question, that he refused to provide

2   this picture to you, correct?

3        A.    It's a -- this is public

4   information.  This is his website that we

5   acquired, that he failed to give us access

6   to.

7        Q.    Okay.  But he -- I'm sorry.  You

8   just answered.  Move on to the next one.

9              Do you recall the date on which

10  you took this screenshot?

11       A.    No, no clue.  It's definitely

12  before the date that it was filed.  That's

13  for sure.

14       Q.    Okay.  So the next -- pardon

15  me -- the next picture on page nine, can

16  you describe to me what this is meant to

17  convey?

18       A.    This is the banner from the

19  picture from the convention that we looked

20  at before.

21       Q.    Okay.  Did Mr. Norris have any

22  part in creating this?

23       A.    Absolutely.  He designed the

24  concept box.  He did the drawings,

25  InDesign concepts for the butt plush and

1   the sexy blob, the oh no pillow.  Yeah, I

2   mean, he was a very big person that was, I

3   guess, part of the creation of this

4   banner.

5        Q.    Page 10, is this another

6   screenshot that you took from the

7   ohnoshop.com?

8        A.    Yes, this is a screenshot of him

9   breaching our option.  Yes.

10       Q.    Okay.  This is a screenshot that

11  you took, correct?

12       A.    Yes, that's correct.

13       Q.    Mr. Norris had refused to

14  provide you the domain to this website,

15  correct?

16       A.    That's correct.

17       Q.    Okay.  Same questions about

18  Number 11:  This is a screenshot you took

19  of the ohnoshop.com, correct?

20       A.    Same answers as before.

21       Q.    And this is also a screenshot

22  you took of the ohnoshop.com, correct?

23       A.    And this is also a primary

24  illustration showing how we were never

25  trying to take away his livelihood as we

1  allowed him to continue to sell prints of

2  the comics that we obtained the copyright

3  to.

4      Q.    So let me ask you this:  When

5  did you take this screenshot?

6      A.    Before the date that says filed.

7  So before 8/6/20 -- or on that date, on or

8  before August 6, 2020.

9      Q.    Well, let me -- just so we're

10  clear, that's -- let me scroll up.  We're

11  on page 12.  I want to go back.  And just

12  so we're on the same page, do you see the

13  box, date signed, November 18, 2019?

14      A.    I see the date filed is

15  August 6, 2020, at the top of the page on

16  page 12.

17      Q.    Okay.  Well, I'm looking at date

18  signed.

19      A.    Then what is August 6, 2020?

20  Because that says filed.

21      Q.    Okay.  Let's -- so this is --

22  well, we won't get into this.  So let me

23  go back down to -- okay.  Did you obtain

24  Mr. Norris's permission before taking this

25  screenshot on page 12?

                                    Page 166

1      A.    I did not ask him to take a
2   screenshot of the website.
3      Q.    I'm sorry.  I missed that last
4   part.  You said you did not?
5      A.    I did not ask him, can I take a
6   screenshot of a website that is pubically
7   available, no.
8      Q.    Okay.
9      A.    It just shows that in use.
10     Q.    Again, this is a screenshot that
11  you took -- pardon me -- page 13 is a
12  picture of a screenshot that you took of
13  the ohnoshop.com website, correct?
14     A.    This is the same answers as
15  before.  It's the same --
16     Q.    I know, but you know I have to
17  go through this drill.  So just -- I'll
18  try to make it quick.  Did you obtain
19  permission from Mr. Norris before taking
20  the screenshot?
21     A.    I did not ask him to take a
22  screenshot of the website.
23     Q.    Okay.  Okay.  And page 14 is
24  also a screenshot you took of the
25  ohnoshop.com website, correct?

1      A.    Yes.  Same answer as before.

2      Q.    Same answer as before in that

3  Mr. -- you did not obtain Mr. Norris's

4  permission to take that screenshot,

5  correct?

6      A.    We didn't need to obtain his

7  permission to take a screenshot of a

8  website of a brand --

9      Q.    So that's yes or no.

10      A.    I just answered.  I do not have

11  to ask him.

12      Q.    Okay.  Page 15, this is another

13  screenshot you took of the ohnoshop.com

14  website, correct?

15      A.    Yes.  This is one of my

16  favorites.  This is where he's posting the

17  book that he told us we have an option to

18  and making it a sticker sheet and selling

19  it when he doesn't have the rights to it.

20  Yes, I remember this one.

21      Q.    And you didn't ask his

22  permission before taking the screenshot,

23  right?

24      A.    No, he didn't ask our permission

25  to post that on his website for sale.  You

Page 168

1   have it backwards.

2       Q.      And then page 16, this is a

3   screenshot you took of the ohnoshop.com

4   website, correct?

5       A.      Yes.  This is the same thing,

6   yes.  Same website.

7       Q.      And this is -- you did not

8   obtain Mr. Norris's permission before

9   taking this screenshot, correct?

10      A.      Again, Alex didn't have

11  permission to be posting this which is our

12  work so you have it backwards.

13      Q.      And you did not -- with respect

14  to any of the screenshots from the

15  ohnoshop.com website, you did not obtain

16  his permission prior to uploading these

17  pictures, correct?

18      A.      That's not true.  He knew that

19  we were uploading the box file that he

20  made.  That's why he sent us a concept

21  box.  He knew that we had the trademark as

22  per the February 26, 2018, recording that

23  we told him that we have the trademark and

24  copyright, and he said, sure, okay, or

25  something similar in that regard.  So he

Page 169

```
 1   knew -- I don't really know what you're
 2   asking.  He knew that we filed for --
 3        Q.    Let me make sure we're clear
 4   because I asked something a little bit
 5   different.  I'm only talking about the
 6   ohnoshop.com screenshots that you took.
 7   I'm not talking about the concept box.
 8        A.    I don't know if I asked him,
 9   hey, Alex -- there's no reason that I
10   would have ever asked, hey, Alex can I
11   screenshot the ohnoshop.com?  There's no
12   reason I would have ever asked him that.
13        Q.    But my question is a little
14   different.  It's about uploading the
15   pictures.
16        A.    What's the difference between
17   asking to take a screenshot and uploading
18   the pictures?
19        Q.    Well, perhaps there's none.  I
20   just want to make clear that you either
21   did or did not ask for permission to
22   upload the ohnoshop.com screenshots before
23   uploading?
24        A.    But if there's no difference and
25   I'm answering and then you're asking me to
```

1    answer in your way, it seems that we're

2    saying the same thing.

3        Q.    No, you're --

4            MR. FOX:  Marc.  Marc.  Marc.

5        Marc.  Marc.  Marc.  You cannot argue

6        with Counsel.  You're not allowed to

7        do that.  You're not the judge.

8        You're a witness, and the judge will

9        expect you to act like one.  When he

10       asks you a question, whether you think

11       you've -- you know, whether you think

12       that you answered it or that the same

13       answer would apply, just answer the

14       question again, and just answer it.

15       Because when you make these remarks,

16       the judge will be very offended.

17       You're not allowed to comment,

18       criticize, make editorial comments.

19           You know, Counsel asked a

20       question; you might think it's a

21       ridiculous question.  It doesn't

22       matter.  You have to answer it.

23           THE WITNESS:  Okay.

24       A.    Same answer applies then.

25       Q.    Okay.  Okay.

1           MR. KUNST:  So let me go back

2      through my notes and see how much more

3      I have.  Can we take -- can we go --

4      take 15 minutes.  We'll go to 3:00 and

5      we'll see how much more, if any, I

6      have.

7           Gerard, you're muted.  Yeah,

8      we're good.  All right.  Let's go off

9      the record.  We'll come back at 3.

10          MR. FOX:  Yeah, we'll come back

11     at 3.  Thanks.

12          THE VIDEOGRAPHER:  This

13     concludes media Number 3.  The time is

14     2:43.  We're off the record.

15          (Whereupon, a recess was taken.)

16          THE VIDEOGRAPHER:  This begins

17     media Number 4.  The time is 3:03.  We

18     are on the record.

19          MR. KUNST:  Okay.  I just --

20     back on the record just so everybody

21     knows I'm done with my line of

22     questioning.

23          MR. FOX:  Oh, great.  Well,

24     fantastic.  Well, thank you very much,

25     Counsel.  You're very efficient.

Page 172

```
 1              And, you know, look, I think
 2       Mr. Goldner has not had a lot of
 3       litigation experience, but he's
 4       learning as he goes along how this
 5       process works and how it doesn't.
 6              I really appreciate the court
 7       reporter and the videographer's
 8       patience.
 9              THE WITNESS:  Thank you,
10       everyone.
11              THE VIDEOGRAPHER:  This
12       concludes today's deposition given by
13       Marc Goldner.  The total number of
14       media units used was four and will be
15       retained by Veritext.  We are off the
16       record at 3:03.
17                  (Deposition concluded at
18                  3:03 p.m.)
19
20
21
22
23
24
25
```

Page 173

1        I have read the foregoing transcript

2        of my deposition, and find it to be

3        true and accurate to the best of my

4        knowledge and belief.

5

6

7    _____

8     MARC GOLDNER

9

10   Sworn and subscribed to before me,

11   On this _____ day

12   of _____, 2022.

13

14

15

16   Notary_____

17   My Commission Expires_____

18

19

20

21

22

23

24

25

Page 174

```
 1               I  N  D  E  X
 2
 3
 4   WITNESS              EXAMINATION BY        PAGE
 5
     MARC GOLDNER      MR. KUNST                  6
 6
 7
 8     E  X  H  I  B  I  T  S
 9   DEFENDANT'S       DESCRIPTION         PAGE
10   Exhibit 1         Contract              22
11   Exhibit 2         7/3/2017-7/11/2017    41
                       email chain
12
     Exhibit 3         Collaboration         62
13                     agreement
14   Exhibit 4         10/1/2018             76
                       email
15
     Exhibit 5         10/3/2018             78
16                     email
17   Exhibit 6         10/8/2018            102
18   Exhibit 7         Convention           107
                       photograph
19
     Exhibit 9         Trademark            116
20                     application
21   ???               Photograph           111
22   Exhibit 10        Trademark            126
                       application
23
     Exhibit 11        Trademark            130
24                     application
25   INDEX CONTINUED ON NEXT PAGE
```

Page 175

1                  I N D E X (cont'd)
2
3    Exhibit 12        Trademark            145
                       application
4
5    Exhibit 13        Response to office   158
                       action
6
7    Attorney Mr. Kunst from Gallet Dreyer &
     Berkey LLP has retained all exhibits.
8
9
                  INSERTIONS
10
             Page           Line
11
             None
12
13
                  RULINGS
14
             Page           Line
15
              96             6
16
17
                  REQUESTS
18
             Page           Line
19
             113            20
20           114             8
21
22
23
24
25

Page 176

CERTIFICATION

1

2

3     I, Garry J. Torres, a Notary Public

4  for and within the State of New York, do

5  hereby certify:

6     That, Marc Goldner, the witness whose

7  testimony as herein set forth, was duly

8  sworn by me; and that the within

9  transcript is a true record of the

10  testimony given by said witness.

11     I further certify that I am not

12  related to any of the parties to this

13  action by blood or marriage, and that I am

14  in no way interested in the outcome of

15  this matter.

16     IN WITNESS WHEREOF, I have hereunto

17  set my hand this 7th day of September,

18  2022.

19

20

21          GARRY J. TORRES

22               *      *      *

23

24

25

1              ERRATA SHEET
        VERITEXT/NEW YORK REPORTING, LLC
2

   CASE NAME: ALEXANDER NORRIS d/b/a
3  WEBCOMIC NAME -v- Marc Goldner et al.
   DATE OF DEPOSITION: AUGUST 24, 2022
4  WITNESS' NAME: MARC GOLDNER
5  PAGE/LINE(S)/    CHANGE          REASON
   ____/_____/_____/_____
6  ____/_____/_____/_____
   ____/_____/_____/_____
7  ____/_____/_____/_____
   ____/_____/_____/_____
8  ____/_____/_____/_____
   ____/_____/_____/_____
9  ____/_____/_____/_____
   ____/_____/_____/_____
10 ____/_____/_____/_____
   ____/_____/_____/_____
11 ____/_____/_____/_____
   ____/_____/_____/_____
12 ____/_____/_____/_____
   ____/_____/_____/_____
13 ____/_____/_____/_____
   ____/_____/_____/_____
14 ____/_____/_____/_____
   ____/_____/_____/_____
15 ____/_____/_____/_____
   ____/_____/_____/_____
16 ____/_____/_____/_____
   ____/_____/_____/_____
17 ____/_____/_____/_____
   ____/_____/_____/_____
18 ____/_____/_____/_____
   ____/_____/_____/_____
19

            _____
20
                MARC GOLDNER
21
   SUBSCRIBED AND SWORN TO
22 BEFORE ME THIS_____DAY
   OF_____, 2022.
23

   _____
24     NOTARY PUBLIC
25 MY COMMISSION EXPIRES_____

**[& - 212]**                                                                      Page 1

**&**

**&**   2:2 5:18 175:7

**0**

**05491**   1:3 4:23

**1**

**1**   4:14 22:22,24
  27:5,18 33:20
  37:4 45:14
  65:19 70:16
  73:16 76:14
  80:1,24 81:11
  82:8,13 111:1
  174:10
**1,000**   73:21
**10**   70:4,8 125:21
  147:4 149:22
  150:6 152:25
  164:5 174:22
**10,000**   37:25
**10/1/2018**
  174:14
**10/3/2018**
  174:15
**10/8/2018**
  174:17
**10/9/2018**   122:4
**100**   11:15 18:3
  19:19,24,25
  23:14 27:16
  31:8 32:15
  83:21 111:12,25
  122:15,16 152:9
  154:24 155:13
**100,000**   54:9
**10022**   2:4 5:21
**102**   174:17

**107**   174:18
**1099s**   25:12
**10:05**   1:14
**10:06**   4:3
**10th**   17:5 67:4
**11**   41:21 129:19
  130:17 131:12
  131:20 132:8
  133:10 134:24
  135:17 136:2
  137:9 138:17
  139:1,15,24
  142:6,14,25
  143:9 144:16
  164:18 174:23
**11/30/2017**
  126:17
**111**   174:21
**113**   175:19
**114**   175:20
**11576**   8:4
**116**   174:19
**11:25**   70:17
**11:35**   70:12
**11:43**   70:20
**11th**   41:13
**12**   145:15 146:5
  147:4 149:23
  155:25 157:4,5
  157:18 165:11
  165:16,25 175:3
**120**   11:16
**126**   174:22
**12:11**   90:22
**12:21**   91:2
**12:42**   110:18
**12:50**   110:23

**12:57**   115:22
  116:1
**13**   157:21 160:15
  166:11 175:4
**130**   174:23
**14**   166:23
**1410**   2:10
**145**   175:3
**14994**   176:20
**14th**   15:23
**15**   8:3 167:12
  171:4
**150**   88:12
**158**   175:4
**15th**   85:23
**16**   46:20 117:4
  158:15 160:14
  160:18 168:2
**18**   72:13 158:23
  165:13
**1880**   2:10
**18th**   16:21
**1:19**   1:3 4:23
**1:30**   115:1,20
**1:32**   116:3
**1a**   71:5,19,23,24
  72:6,7
**1f**   71:25,25
  72:20 73:10
**1g**   72:1 84:8,10
  92:8
**1h**   65:24 66:4
**1k**   65:24
**1l**   10:12

**2**

**2**   41:5,18 70:20
  110:17 174:11

**2,500**   84:3,17
  85:7
**20**   15:22 41:10
  90:6 95:10
  175:19
**200**   88:3
**2008**   9:4
**2014**   15:20 16:10
  149:10
**2015**   9:21,22
  16:19,22 46:20
**2016**   17:4
**2017**   19:4 24:3
  41:8,12,13,17,19
  41:21,24 58:4
  60:5,25 61:2
  67:4 126:23
**2018**   76:14 78:23
  79:7 80:24
  81:11 82:8,13
  102:17 127:6
  130:17 131:12
  131:20 132:8
  133:10 134:24
  135:17 136:2
  137:9 138:17
  139:1,15,24
  142:6,14,25
  143:9 144:16
  152:15 168:22
**2019**   10:5,9,23
  158:23 165:13
**2020**   165:8,15,19
**2022**   1:13 4:3
  173:12 176:18
  177:3,22
**212**   2:5

**22**  174:10
**230**  57:9
**24**  1:13 4:3
  177:3
**25**  73:20
**25th**  19:4
**26**  22:19,24
  127:6 152:15
  168:22
**27th**  19:4
**28**  127:12 129:8
  130:4,7 131:14
  146:2,12
**2:43**  171:14
**2a**  91:20
**2b**  38:25 50:20
  71:5,9,12,25

**3**

**3**  41:17,24 60:5
  61:21 62:17
  66:3 78:23
  83:22 84:6,8
  110:23 171:9,11
  171:13 174:12
**3,125**  83:12,19
  84:11,23 91:12
**3.97**  13:24
**30**  34:2 84:12
**30th**  126:22
**310**  2:11
**350**  88:7
**3:00**  171:4
**3:03**  171:17
  172:16,18
**3:27**  41:13
**3d**  30:25

**3rd**  41:8,12 58:4
  79:3,7 86:11,14

**4**

**4**  76:8,10 80:1
  81:6,7,10 88:5
  88:12 171:17
  174:14
**400**  88:4
**401**  82:25,25
  83:4,7,7
**41**  174:11
**441-0500**  2:11
**45**  88:11

**5**

**5**  77:25 78:19
  147:3 160:14,18
  174:15
**5,000**  10:17,18
  37:25
**500**  88:5,5
**5th**  2:4

**6**

**6**  22:19,24 102:5
  106:1 149:22
  150:6 165:8,15
  165:19 174:5,17
  175:15
**6,250**  34:1
**62**  174:12
**6b**  74:1,4,9

**7**

**7**  107:9 111:3
  152:25 157:3,6
  174:18
**7/11/2017**  66:25

**7/3/2017-7/11/...**
  174:11
**725**  74:10
**7500**  10:20
**76**  174:14
**78**  174:15
**7th**  176:17

**8**

**8**  102:16 175:20
**8/10/2017**  67:1,5
**8/6/20**  165:7
**81**  78:9
**845**  2:4 5:19
**8th**  17:5

**9**

**9**  116:7,11
  122:21 125:2
  174:19
**90067**  2:10
**935-3131**  2:5
**96**  175:15
**99**  157:1
**9th**  122:12

**a**

**a.m.**  1:14 4:3
**abcs**  30:7
**able**  26:8,17
  29:14 46:16,22
  47:3,7,8 56:21
  58:2 65:22 87:4
  123:24 131:5
  135:6
**absolutely**  26:10
  85:14 163:23
**academic**  14:2
**accepted**  12:8

**access**  10:13
  121:7,14 123:19
  123:21 125:11
  163:5
**account**  123:13
  123:20
**accountants**
  25:10
**accounting**
  25:11
**accurate**  27:5,6
  27:12 74:8,16
  93:2,6 128:14
  151:11 173:3
**accurately**  25:14
**accusing**  109:10
**acknowledges**
  73:4
**acquire**  32:2
  38:6 61:15
  121:9
**acquired**  18:8,22
  48:19 61:16,18
  121:12 137:18
  139:19 163:5
**acquiring**  36:5
  60:14
**act**  170:9
**acting**  49:15
**action**  1:18 5:8
  157:23 158:22
  159:3 175:5
  176:13
**actively**  131:1
  140:10
**actual**  16:2
  55:11 87:12
  153:16

**add** 116:4
**added** 40:3
  44:23 45:1,16
  46:1 47:1,19
  61:20 63:18
  75:21 77:14
  101:24 107:4
  111:4 125:16
  129:12 145:12
  157:13
**addendums**
  33:10
**adding** 129:15
**addition** 52:4
  65:19 66:12,14
**address** 106:12
  120:4
**administer** 5:7
**administration**
  11:20
**admiring** 45:7
**admission** 77:5
**admits** 82:3 88:9
**admitted** 77:11
  89:7
**admitting** 88:15
  88:17
**advance** 34:1
  49:6,8 52:11
  72:2 80:2,25
  83:1,8,11 84:3
  84:11 135:11
**advertising** 47:4
  56:7
**advice** 159:16
**advisor** 11:19
  12:4

**aesthetics**
  150:17
**affairs** 12:23
**affect** 7:12
**affiliations** 5:15
**affirmative** 79:9
  161:24
**afield** 104:4
  105:14 131:11
  137:20
**agent** 49:16 64:8
  64:9,25 65:5,8
  65:10,11
**ago** 23:13 24:1,5
  26:2 63:22
  107:19 122:19
**agree** 4:13 43:14
  43:21
**agreed** 3:2,7,11
  50:1 56:14
  103:12,13
**agreement** 22:4
  23:17 28:3,25
  29:1,19 30:23
  31:6 32:19,22
  33:8 34:8 35:8
  37:8 44:21,24
  45:16,17,23 49:4
  50:16,17 51:8
  52:2,17,22 53:13
  55:10,18 57:18
  58:18 62:10,14
  63:9 64:4,10
  65:14,16,21
  66:10,15,20 67:8
  67:10,15,17
  70:25 71:20
  72:9,11 73:1,19

74:2 80:3 81:1
  83:16,20,23
  84:25 89:24
  90:1,11 91:5,6
  92:12 93:5
  100:10,18
  121:18 174:13
**agreements**
  26:23 32:21
  45:2
**ahead** 44:17
  85:16 89:3 90:4
  116:21
**ai** 84:19
**air** 49:10 101:21
**airplane** 8:12
**airships** 18:18
  29:11 34:4
**ajn** 1:3
**al** 2:9 4:20 177:3
**alan** 100:6
**alex** 2:3 17:22
  18:6,9,9 19:3
  30:15 31:15,15
  31:18 32:8,20,25
  33:9 34:5,9,11
  34:15,24 35:8,12
  35:23,25 36:2
  37:2,8,18,20
  38:1,13,15,24
  39:3,8 41:7 45:4
  48:5,12,24 50:25
  62:11,15 67:23
  68:11 75:1
  78:12,23 89:8,10
  89:12 91:25
  92:4 102:12
  104:19,20,21

105:3,17,19
  108:16 121:6,13
  123:5 127:1
  131:3 136:24
  137:17 143:4
  144:24 151:23
  152:7,16 153:8
  153:11 156:13
  158:9 161:6
  162:14,22
  168:10 169:9,10
**alex's** 38:12
  48:25 49:8
**alexander** 1:5
  4:17 17:21,24
  18:23 177:2
**allan** 2:16 5:1
**allegation** 58:11
**allow** 46:2 47:2
**allowed** 25:2
  40:15 45:24
  52:20,22 53:18
  53:19,21,23 54:1
  56:2,3,24 57:2,4
  57:13 124:24
  145:1 159:13
  161:25 165:1
  170:6,17
**alumni** 14:3
**amazon** 139:5
  139:21
**amount** 83:14,17
  83:19,24 84:23
  84:24 85:7
**analytics** 56:15
  150:21
**ancillary** 39:2

**andrews** 30:24
**angeles** 2:10
**angles** 156:25
**animal** 18:25
  30:8 38:16,18
  44:10 50:19
  52:5,8,10 100:20
  103:7 104:16
  105:7 148:17,19
  153:9
**animals** 18:5
  30:15,17 38:22
  53:17 100:8,13
  100:17,25 101:6
  102:25 105:18
  114:19 127:4
  130:13,13 142:3
  142:5,11,14
**animated** 52:14
  101:17
**animation** 32:7
  39:1 50:21
  53:18 91:22
**answer** 7:2,19
  24:20 25:5
  28:10,12,13,22
  29:2 36:10,14,19
  47:17 49:25
  54:24 68:17
  69:4,20 85:8
  93:15,17 95:11
  95:23 96:3,3,23
  99:24 103:8
  106:11 109:21
  110:13 113:9
  114:10,21
  132:15 136:12
  137:12 138:13

138:14 140:21
140:23,24 141:9
141:13 142:20
142:21 143:13
143:15,23,24,25
144:2,4,6,10
145:21 160:23
161:20 167:1,2
170:1,13,13,14
170:22,24
**answered** 93:16
  94:18 163:8
  167:10 170:12
**answering** 57:25
  58:1 79:10
  124:13 141:19
  144:1 145:9
  169:25
**answers** 23:23
  55:4 98:16
  164:20 166:14
**anxiety** 29:25
  30:8
**anymore** 93:16
  94:17 97:2
**apologize** 24:6
  28:24 100:5
**appearance** 5:12
  5:14
**appearances** 2:1
**appeared** 46:19
**appearing** 2:15
  5:21 7:24
**appears** 76:15
  78:22 108:20
**apples** 49:18
**applicable** 91:23

**applicant** 116:23
**application** 12:7
  42:17 117:16,19
  117:21 118:5,10
  118:12,25 119:2
  119:9,19 120:16
  120:21 121:10
  122:14,15
  125:25 126:23
  127:12,16,18,21
  127:22 128:16
  129:1 139:10
  153:6 158:3
  160:3 161:11
  174:20,22,24
  175:3
**applications**
  116:13 122:16
  149:4
**applied** 10:10
  12:25 13:9
  129:4,7
**applies** 30:13
  170:24
**apply** 10:6 42:19
  126:2,9 170:13
**applying** 12:21
**appreciate** 172:6
**approaching**
  39:21
**appropriate**
  79:14
**approval** 77:4
  120:23
**approved** 150:12
**april** 16:19,21
**argue** 24:24
  43:17 59:24

93:25 95:9
97:11 99:19,23
99:24 115:7
151:16 170:5
**argues** 97:12
**arguing** 43:24
  59:23 94:3,15
  96:22,23 97:4
  98:11,14,15
  100:3 115:9
  141:1
**argument** 43:22
  94:17 110:4,9
**argumentative**
  44:4
**arm** 112:19,22
  131:23
**art** 33:6 74:22
  75:9 87:11,13,21
  92:22 136:6,25
  148:10 149:9
  150:24 153:8
  156:3 161:5
**artist** 18:9,10
  32:24 34:5
  35:17 37:22
  39:14 44:19
  45:14 67:25
  72:21 73:3
  84:10,15,18
  137:14 138:20
  143:3 149:6,13
**artists** 31:14
  32:4,22 38:8
**arts** 149:12
**artwork** 149:1
**aside** 6:19 11:18
  13:15 113:18

133:22,23
135:12
**asked** 22:9 48:5
48:12 62:25
64:7 68:16
96:18 97:8
103:12 127:6
136:8 138:14
169:4,8,10,12
170:19
**asking** 15:5 36:7
48:14 59:4,8,9
59:17 63:11
67:22 72:5
79:18 80:19
83:17,18 84:21
84:22 85:24
93:10,11 95:21
97:10,18 104:25
105:2 113:4,5
119:23 123:22
128:10 129:9
131:8,18 132:2,3
133:5 134:16
136:13,15 137:1
138:2 141:11,18
143:18,21,23
153:22 160:11
169:2,17,25
**asks** 43:18 69:8
109:20 110:6
170:10
**assertion** 49:23
**assets** 29:7,16,25
87:23 161:14
**assigned** 16:8
112:13 113:7,16
137:17 161:13

**assignment** 16:8
113:13,25
**assisted** 27:4,13
158:8 159:15
**associated** 34:9
35:13 36:1
**assume** 38:2
83:1,7 117:17
119:21
**assumed** 60:18
60:21
**assumption**
60:13
**attach** 76:16
118:4,6
**attached** 76:18
76:21 81:24
82:23 117:18,21
119:9,11,18
131:16
**attaches** 81:22
**attaching** 118:23
**attempted** 131:2
**attempting**
20:25
**attention** 102:9
102:21 146:5
**attorney** 5:16
32:18 33:17
44:16 175:7
**attorneys** 2:3,9
23:19 27:9
63:19 133:3
158:7,12 159:5,8
159:8,13,20
**audience** 56:16
56:18 61:6
150:22

**audio** 4:11
**august** 1:13 4:3
10:9 67:4 165:8
165:15,19 177:3
**authentic** 22:18
62:8
**authorized** 5:6
**auto** 118:9 128:9
128:21
**available** 166:7
**avenue** 2:4 5:20
**award** 10:11
**aware** 34:9
58:23 103:10,25
152:16 160:10

**b**

**b** 1:5 2:3 4:18
75:18,19,19
134:11,11 174:8
177:2
**baby** 51:2
**back** 15:21
16:10 22:2 43:4
59:24 66:16
69:20 70:11
73:16 76:8 81:6
81:8 84:6 86:18
87:19 91:1 92:7
100:10 115:1,7
116:2 121:25
128:22 130:1
131:10 144:6,9
153:3 155:21,24
155:24 156:11
157:3,6 165:11
165:23 171:1,9
171:10,20

**background**
8:16 126:7
**backside** 101:11
**backwards**
168:1,12
**banner** 54:12
108:19,22 109:3
114:3 163:18
164:4
**bar** 120:5,5,10
**base** 92:6
**based** 7:11 12:15
29:15 57:18
101:18 150:20
153:7
**bates** 78:1,10
**beat** 138:13
**began** 10:10
**beginning** 5:15
**begins** 4:14
70:19 110:22
171:16
**behalf** 5:21 6:1
62:10 67:2
117:12 159:5,10
**behemoth** 32:1
**belief** 173:4
**believe** 6:16 8:21
9:4 10:5,16,23
11:8 16:16 17:3
46:19 47:14,17
51:22 65:19,23
67:20 68:9 71:9
72:3 74:7 75:6
76:1 78:14 80:7
82:14 83:24
111:10,11 119:3
122:1 123:15

128:8 129:22,24
142:11 143:18
143:19,22 144:2
151:22,25 152:7
154:4 162:3
**believed** 86:8
**believes** 15:22
94:14
**bell** 1:8,9,9,10
4:20 10:2,3
14:22,25 15:3
16:14 17:1,8
24:10 25:19
37:5 42:15
44:25 45:18
56:23 58:17
62:11 64:1,18,21
67:3 71:2 79:5
103:5 104:14
105:5 112:6,8,11
112:12,14,18,20
112:24 113:6,8
113:15,18,20
114:8 116:24
130:18 131:14
131:19,22 132:9
133:10,24 134:6
134:21 135:4,5
135:15,19,22
136:2,19 137:9
138:18,24
139:13 140:1
142:3,12,23
143:7 144:16
149:2,6 161:10
**bell's** 18:22
**berkey** 2:2 5:18
175:7

**best** 8:24 58:2
99:12 106:11
108:13 173:3
**better** 106:23,24
115:15 151:4
**beyond** 54:23
**bfa** 149:11
**big** 31:25 63:25
137:3 164:2
**birthday** 16:21
**bit** 10:19 13:20
20:6 28:18
41:11 51:3
66:22 80:18
92:6 97:1
104:11 124:18
130:1 131:11
158:9 169:4
**bite** 43:4
**black** 77:2 79:20
79:20,25 80:6
86:7,9,19,22
87:5 89:2 92:24
**blah** 84:16,16,16
84:17
**blob** 56:11
100:23,23 101:3
101:8,8,8 103:19
103:19 154:7,8,9
164:1
**blobs** 56:17
**blocking** 87:14
**blood** 176:13
**blue** 39:19 118:2
120:5,10 128:1
147:1
**board** 30:9
130:10 131:21

132:10 133:12
133:25 134:7,23
135:14,17,21
162:4
**bogus** 154:14
**bond** 112:25
**book** 19:2 30:6
30:22 39:3,5,8
42:22 43:1
46:23 50:20
55:25 57:14,17
57:20,24 58:5,13
58:20 60:7,19,21
61:3 87:20
100:25 162:16
167:17
**books** 18:6 51:23
**booth** 111:13,23
112:4,8,9,11
**bored** 11:12
**bottle** 8:13
**bottom** 22:25
65:20 87:22
117:3 150:15
**box** 20:17 61:21
75:22 77:15
87:21,22 90:3
101:25 107:5
111:1,4 129:13
145:13 150:9,10
150:14,15,24
151:5 156:12
157:14 162:3
163:24 165:13
168:19,21 169:7
**bracelets** 18:5
**brand** 32:5 38:2
47:9,11 54:6,7

54:14 56:12,13
60:14 134:15
159:24 167:8
**branding** 18:25
47:13
**breach** 42:25
**breaching** 30:25
121:15,17
162:15 164:9
**break** 7:20 22:10
40:13 45:25
70:4 90:12
96:20,25 97:9
99:17 115:25
**breakdown**
102:19
**breaks** 7:16
**brief** 8:18
**briefly** 9:8
**brilliant** 26:7,16
89:12
**bring** 61:1 111:5
**bringing** 48:22
**broad** 25:2
42:19
**brought** 18:1
25:22
**bubble** 101:10
103:20 154:11
155:4
**build** 134:15
**built** 51:6
**bunch** 10:3
**business** 9:11,25
11:7,10 13:12,13
16:18,18 19:6
101:20 136:16

**businesses** 10:1
**butt** 101:9
    103:19 153:2,3
    154:7 163:25
**buy** 86:3,4
**buyers** 130:23

**c**

**c** 6:3 55:20,24
    75:18 120:11
**cake** 145:6
**california** 1:9,10
    2:10
**call** 46:7 57:15
    60:25 61:2
    113:12,25 127:2
    147:23 150:5
    151:15,16
    152:15,21
**called** 10:13
    18:11 19:8
    29:18 30:7
    107:12
**calling** 151:12
**calls** 22:1 50:24
    53:4 81:15
    161:16
**calm** 95:13
**camera** 4:7 8:7
**capital** 55:20
    117:7
**caption** 117:25
    128:1 147:2
    160:14
**car** 8:12
**card** 18:11,12
    33:1,5,6 130:10
    136:1,4,20

137:14,16
138:21 139:2,6,8
141:25 142:1
143:3
**cards** 77:3 87:17
    87:18,20 88:5,5
    88:8,11,12 91:16
    92:1 130:11
    137:8,11,13
    138:19,25 139:4
**care** 90:15 131:7
**carlai** 159:19
    160:2
**carnegie** 149:13
**case** 4:22 8:10
    24:13,15 55:21
    55:24 59:23
    94:1 96:22,24
    97:4,12,13 99:20
    100:4 103:9
    105:24 137:3
    141:15 159:20
    177:2
**cat** 100:22
    101:10 103:21
    154:10
**catalog** 130:25
    160:20,25 161:4
    161:7,8,18
**category** 145:24
    146:1,2 152:18
**cease** 159:22
**cell** 126:7
**center** 114:5
    130:7
**century** 2:10
**certain** 78:7

**certification** 3:5
    176:1
**certify** 176:5,11
**cetera** 84:19
**chain** 112:25
    174:11
**chance** 12:10
    99:22
**change** 23:22
    65:17 66:9
    135:4 177:5
**changed** 29:22
    79:22 91:17
    135:8
**changes** 23:16
    64:7,9,24 65:14
    67:9,16 68:8,9
**character**
    100:21
**characterization**
    64:5
**characterize**
    49:24 58:24
**characterizing**
    71:18
**characters** 42:16
    87:10 118:19
**chart** 10:15
**chat** 20:16 40:4
    61:21 75:22
    77:15 90:3
    101:25 103:18
    107:5 111:1,4
    116:5 125:17
    129:13 145:13
    152:6 157:14
**check** 10:21
    25:10 34:13

65:24 75:7
83:25 112:16
113:19,21
119:14
**checking** 83:22
**chew** 145:11
**children** 56:19
**children's** 30:6
**china** 154:1,3
    155:7
**chiykonski**
    18:19
**chocolate** 49:19
**choose** 29:15
**chris** 18:23 30:3
    31:15 34:16
**christopher**
    18:20 29:20
    35:17
**chronological**
    8:24
**chronology**
    11:25
**circumventing**
    31:4
**citation** 73:24
**city** 11:22,24
**civil** 1:22 10:24
**claim** 49:23
    118:19
**claimed** 18:2
    64:8 77:1
**claiming** 103:10
    103:25
**claims** 78:13
    79:9 80:9
**clarification**
    93:20

clarify  7:4 22:17
  50:14 128:11
class  14:2 117:3
  127:12 130:4,7
  131:14 146:12
  158:15
classes  14:8
classification
  56:1 127:14
  129:8 158:20
classifications
  37:17
classify  137:13
clause  35:16
  41:25 91:10
clauses  62:25
clear  23:23 26:9
  26:10,18,22 31:5
  41:5 42:14 54:2
  83:16 89:6
  96:11 114:11
  118:15,22 119:1
  120:13 165:10
  169:3,20
clearly  120:14
  120:20
clever  57:15
click  77:17
clicked  85:21
client  20:5 36:13
  65:9 88:20 95:8
  96:20 103:15
  114:21 133:21
  141:7
clip  124:15,23
clockwise  77:18
cloud  101:2

clue  163:11
coffee  7:13 8:14
  70:5
collaborate
  39:10 91:21
collaborating
  19:15
collaboration
  37:10 44:23
  45:17 52:1 55:9
  55:18 58:18
  62:9,14 64:4
  66:20 67:8,10,15
  67:16 70:24
  72:8 74:2 80:3
  81:1 83:15,20,23
  84:25 89:24
  90:1,11 91:5,6
  92:12 93:4
  100:9,18 174:12
colleague  5:19
collective  19:14
college  9:11
color  91:19
  118:20 154:15
  155:9
colorblind  126:6
colored  80:14
  87:4,16 91:17
  126:5
coloring  87:14
columbia  12:24
  14:19
columbia's
  12:22 14:5
column  116:17
  116:19

come  12:6 17:20
  30:6 39:10 43:4
  49:7,10 70:11
  75:10 97:22
  115:1,7 152:23
  171:9,10
comfortable
  33:16
comic  18:21 30:5
  44:19 45:15
  51:23 52:20
  53:20 55:11,17
  55:20,21,24,25
  56:2,22 57:11
  65:22 109:7
comical  102:11
comically  109:9
comics  30:4
  34:23 35:3,6,10
  35:14 38:9 46:3
  46:4,6,15,17
  47:20,24 56:10
  57:1,13 60:7
  63:7 123:6
  137:7 149:8
  161:17 165:2
coming  39:15
  101:14
comment  28:21
  36:21 124:15,24
  161:23 170:17
commenting
  36:17
comments  54:19
  54:25 55:4
  115:18 124:14
  124:22 170:18

commerce
  130:21 131:9
  134:14 140:9
  143:10 144:11
  144:21
commission
  173:17 177:25
communication
  88:21 102:20
  103:23 160:8
communications
  105:1 159:7
companies  61:15
  101:23
company  1:9,10
  17:10 23:13
  31:23 34:2,6
  39:17,17 50:22
  51:1,4,7 72:25
  73:2,7 84:12,18
  97:25 109:2
  117:13
compare  62:22
  156:24 157:6
comparing
  62:21
compensated
  37:18 143:5
complaint  48:9
complete  7:2,10
  52:15 88:8
  106:16 150:13
completed  50:20
  74:13 75:1
  87:21
completely
  24:16 49:13
  55:12 71:18

completing 14:4
complimentary
  73:18,23,25 74:5
  74:15
computer 53:2,3
con 107:24 109:7
  111:20,25 112:1
conceived 16:1
concept 149:9
  150:8,11,16
  151:5,17,20
  152:13 153:8
  156:12 162:3
  163:24 168:20
  169:7
concepts 163:25
conceptually
  15:6
concern 41:24
  42:2,6 58:15
concerned 42:9
concluded
  172:17
concludes 70:16
  110:17 171:13
  172:12
concurrently
  8:22 12:25
conducted 4:5
  4:25 6:20 23:2
conferred 13:4
  13:10
confirm 21:6
  79:18 80:19
  83:17 84:20,21
  84:23 129:11
confirms 72:22

conjunction 9:13
  147:12
connecticut 10:6
connection 4:7
  147:8
cons 53:20
consider 26:25
  74:23 132:15,23
consideration
  73:19
considered
  86:23 89:22
considers 132:24
consistency
  87:11 88:21
  91:20
consistent 35:19
consists 118:18
consumer 54:10
consumers 75:18
cont'd 175:1
contact 104:24
contain 43:2
contained
  160:20
contains 70:25
content 42:17
  159:6
context 44:20
  45:2,15 48:5
  49:13 50:16
  52:16,21 53:13
  56:20 65:21,23
  81:18
continue 4:12
  32:4 38:8,11
  45:9 46:17
  117:6 165:1

continued
  174:25
contract 21:20
  21:23 24:9,16
  25:9,17 26:12
  31:1,3,14 32:24
  33:6 37:15
  38:12,15 42:1,23
  42:25 43:4 44:8
  47:6 49:1,8 50:6
  53:15 62:18,20
  62:23,23 63:3,6
  63:16 64:3,19,25
  65:2,6 67:24,25
  68:6,10,12 73:1
  73:6,9 77:8
  80:20 82:20
  83:3 90:6 91:20
  97:18,21 98:3
  103:24 105:11
  108:16 121:7
  127:9 162:24
  174:10
contracts 26:4
conveniently
  48:4 102:19
convention 19:7
  107:12,13
  110:15 111:1
  112:5 114:9
  156:18,21
  163:19 174:18
conventions 45:9
  54:11 139:22
conversation
  15:11 28:18
  94:6,22 95:16
  98:22 104:6

106:10 137:22
  138:6
convey 52:3
  162:13 163:17
conveyed 150:19
cool 54:3 150:12
copies 74:10
  76:24
copy 20:12,19
  42:23 75:18
  77:20
copyright 33:5
  41:25 48:6,12,14
  48:20 50:1
  58:15 127:3
  165:2 168:24
copyrighted
  16:7
copyrights 33:7
coronavirus
  108:14
correct 6:15,18
  7:24,25 14:22,23
  15:1,2 17:18
  20:13 27:14,25
  28:1 29:5 34:10
  41:2,9,12,21,22
  42:1 43:6 44:11
  47:24 55:13
  58:6 60:8 64:15
  64:22 66:11,12
  66:20 67:4,6
  71:3,11,16 75:5
  79:21 80:3 81:1
  81:8,12,13,16,23
  82:2,8,13 83:12
  83:16,24 84:4,25
  92:2 100:13

112:5 116:25
117:4,16 118:16
119:2 121:1,2,16
125:12 126:20
128:6,24 130:4
132:21 133:17
146:2,22 147:4
148:19,20
149:23 152:4
153:1,6 154:16
158:1,15 160:3
160:25 162:5,9
163:2 164:11,12
164:15,16,19,22
166:13,25 167:5
167:14 168:4,9
168:17
**correction** 91:19
**correctly** 71:18
**corresponding**
116:19
**costs** 54:20,22
**counsel** 1:23 3:3
4:16 5:13 43:12
59:4 93:14,25
94:11,11,12
97:10,23 98:2,2
98:10,13 115:8
170:6,19 171:25
**count** 88:8
**counts** 132:13,25
**couple** 9:6 12:13
13:19 91:8
**course** 14:10,11
102:14
**court** 1:1 3:15
4:21 5:3 15:12
43:23 54:21

94:7,23 95:7,17
97:6 98:11,23
100:1 104:7
137:23 138:7
141:17 172:6
**covered** 73:6
**coy** 88:22 114:20
**coyne** 25:23
**craft** 93:1
**crazy** 54:15
**create** 16:3,14
17:1 38:4 55:10
56:21 63:2
103:6 104:15
105:6 136:5
137:3 153:18
161:17
**created** 15:4,6,7
16:10 24:9
29:20 34:4 36:1
36:4 63:5,15
74:18,20,21
87:18 88:1
100:17 101:20
103:16 133:11
133:13 136:3,19
136:21,23 137:5
137:10 155:7
161:3,5
**creating** 16:7
103:11 104:1
123:5 163:22
**creation** 16:9
87:13 137:1
164:3
**creative** 31:23
113:2

**creatively** 89:16
**creator** 33:25
**creators** 23:20
26:20 31:24
32:3 39:14,17,18
45:7 63:7
153:23
**criticize** 170:18
**crystal** 26:18
**culprit** 20:8
**cum** 9:22
**cup** 7:13
**curb** 32:3
**currently** 8:1,19
13:17 14:16
71:7
**cursor** 120:2
**customs** 112:25
**cut** 78:7,25 79:1
79:12,13 81:2
104:23
**cv** 1:3 4:23
**cyberpunk**
51:13

**d**

**d** 1:5 2:3 4:18
6:3 174:1 175:1
177:2
**daedalic** 111:24
**damage** 56:11
56:14
**data** 56:15
150:20
**date** 15:17 16:10
17:1 34:8 65:3
75:2 79:6
105:20 107:25

122:1,4 123:16
123:16 126:17
163:9,12 165:6,7
165:13,14,17
177:3
**dates** 16:9 66:19
122:18
**day** 15:17 28:22
29:19 36:17
47:14 51:6 75:8
75:8 79:3
173:11 176:17
177:22
**days** 34:2 84:12
86:14
**dc** 38:9
**deadline** 131:4,6
**deal** 48:7,13,18
48:21 50:3
63:25 75:10
96:5 141:3,8
**dealing** 159:23
**deals** 112:25
113:1 148:10
153:16 154:23
**dean** 12:3
**decades** 101:22
**december** 10:23
14:6 130:17
131:12,20 132:8
133:10 134:24
135:17 136:2
137:9 138:17
139:1,15,24
142:6,14,25
143:9 144:16
**decided** 10:5
11:2

declaration
146:20
defaming 79:4
defend 5:24
defendant 1:17
6:3
defendant's
174:9
defendants 1:11
2:9 6:1
define 91:7
150:5
defined 47:7
90:9 92:13 93:4
132:16
defines 71:19
definitely 23:15
26:5,23 33:14
118:6 163:11
definition 88:14
88:16 93:20
94:14 97:19
132:13 133:6
degree 11:2,4,5
12:19,19 13:2,11
13:16
degrees 8:19,23
13:15,17 14:15
deleted 78:12
85:19,23,24 86:1
delineate 34:24
35:12 55:19
delineated 35:5
46:22
delineation
55:21,23
deliverable
80:15

delivered 75:1
77:7 82:4 88:18
delivers 88:6
delivery 77:9
82:19 84:18
demanding
85:10
depends 4:6
deponent 98:10
deposition 1:16
3:5,12 4:4,15,24
5:25 6:14,23
7:23 25:1 36:12
53:2 59:3 94:16
96:2 97:2 98:6
136:14 141:4
172:12,17 173:2
177:3
depositions 6:19
161:25
derivative 51:15
describe 50:13
120:3 150:1,3
155:2 163:16
described
131:13
description
174:9
descriptions
130:9
design 13:6,6,7
75:9,9 87:20
118:10 128:8
148:1,4,7,15
149:9,9 150:9,18
153:8,17,21
154:21 156:3

designed 30:16
89:15 104:2
163:23
designer 89:12
147:15,17
149:14 161:8
designers 18:1
23:21 26:19
89:9,10 153:23
designs 30:17
101:7,12 103:17
105:11 154:14
154:18
desist 159:23
destroy 141:15
detail 26:17
determine 68:6
develop 52:14
developed 35:17
61:6 74:19
84:14
development
14:8 47:13
74:20,22,24
113:3
devices 134:10
difference 57:6
91:11 130:22
151:18 169:16
169:24
differences
62:22
different 9:16
12:16 45:12
61:10 62:24
71:15 80:18
104:12 119:17
128:13 138:15

156:25 169:5,14
differentiation
118:23
digital 35:10
46:14 47:12
50:21 57:1
dip 61:9
direct 68:16
directing 146:4
directly 161:10
director 11:9
12:2
dirty 89:19
disagree 97:17
151:13
discipline 53:11
53:11
discovery 19:22
31:11 69:2 89:6
105:1 139:5
152:10 154:6,19
161:2
discuss 73:17
103:3 104:13
159:16
discussed 21:19
65:18 127:8
162:4,6,9,10
discussing 58:14
discussion 90:24
105:3,17 110:20
115:24 152:12
disney 31:25
51:2,5 61:16
disparaging
79:4
disrupting 15:11
94:6,22 95:16

98:22 104:6
137:22 138:6
**distinction** 9:12
33:18 114:15
**distorting** 106:9
**distribution**
72:18,19 132:4
**distributor**
39:20
**distributors**
39:12
**district** 1:1,2
4:21,22
**division** 131:23
**docket** 10:14
**docs** 16:11,14,16
**document** 20:10
20:21 21:1,2,6,9
21:15 22:11,14
22:21 23:1,6,11
24:1 28:7 40:1,6
40:14,15 41:5,7
43:13,14,18,20
61:20 67:23
75:22 76:7
77:15 78:14,21
85:2 94:12 98:9
98:19 101:24
102:4,8 106:16
107:4 110:25
116:5,10 117:24
117:25 118:5,24
119:18 125:17
125:20,22 128:3
129:5,10,12,16
129:21 130:7
145:13,19,22
146:16 147:1,8

157:14,20
158:17,19
**documents** 8:9
22:7 40:11 59:5
59:6 99:21
**dog** 100:23
**doing** 8:22 20:11
20:17 32:8
56:12 59:6 98:8
99:12 115:8
146:13 147:14
**dolan** 2:13
**dollar** 51:7
**dollars** 54:12
**dolls** 130:12,12
140:2 142:3,5
**domain** 162:23
164:14
**dorris** 34:25
46:11,19,23 57:3
60:11,19,20,23
61:1,4
**dot** 83:7
**double** 61:9
154:10 155:3
**doubt** 159:1
**download** 21:1,8
75:22
**downloadable**
127:22
**downloaded**
21:7 41:11
85:20
**downloading**
20:23
**dozens** 49:14
**dr** 9:18

**draft** 23:5,10,15
62:17 63:2,3,5
63:15 64:3,6,15
64:18,21 66:10
**draftable.com**
62:21
**drafted** 23:7
62:25 63:13
97:25
**drafting** 25:18
26:4,25 27:4,14
**drafts** 21:25
22:1
**draw** 56:3 102:9
102:21
**drawing** 56:17
91:22
**drawings** 79:21
163:24
**drawn** 18:10
87:7,9
**drayage** 112:7
**dressed** 101:3
**drew** 128:9
156:13
**dreyer** 2:2 5:18
175:7
**drill** 166:17
**drinking** 19:10
**drive** 8:4
**dropbox** 86:5
**dropped** 106:22
**dual** 11:3 12:19
13:2
**due** 54:10 76:19
76:21 83:2,18
84:22 135:10
136:25,25

**duly** 6:4 176:7
**duty** 110:7

**e**

**e** 2:10 6:3 17:13
174:1,8 175:1
**earlier** 13:20
14:6 21:19
39:13 65:18
85:1 123:25
131:25
**early** 24:3
**earned** 73:4
**easier** 59:24 69:9
**east** 15:23 19:8
**easy** 18:20 29:23
29:24 30:1,10
**eating** 145:8
**economics** 13:14
14:11
**edited** 23:9
63:20 91:18
153:10
**editorial** 26:6,24
29:14 77:4
88:25 89:6
91:16 153:21
155:9 170:18
**editorialize**
36:21
**editorializing**
36:16 54:20
**education** 8:18
13:2,23 14:18
**effect** 3:14
**efficient** 171:25
**efforts** 14:3
54:10

ego 89:11
eight 122:20
  123:14 155:1,24
  162:13
either 11:2 23:12
  36:1 60:23
  91:25 100:3
  109:22 111:16
  169:20
elected 14:2
electronic 22:25
  117:15 127:17
element 116:18
  126:20 158:1,4
elements 42:13
  43:3
email 2:5,11
  22:1 34:12
  40:20 41:2,6,7
  41:17,23 43:7
  44:7,14 45:13
  47:22 49:12
  52:5 58:4 59:10
  60:5 65:17
  75:24 76:2,12,17
  76:19,23 77:5
  78:6,8,11,20,24
  79:1,12 81:2,5
  81:11,23,25
  82:23 86:11
  88:4,10,19
  102:10,12,15,24
  103:4 104:13
  105:4,17 106:4
  151:24 152:1,2,8
  174:11,14,16
emailed 30:20
  103:18 151:23

emails 19:22
  49:14 59:16
  64:24 77:23
  78:9,17,18 80:12
  89:5 90:2 102:8
  104:22 106:6
  158:10
emblazoned
  130:20
embroidered
  155:11,14
embroidery
  155:12,16
emoji 79:5
employee 24:15
  25:22
employees 24:9
  25:4,8,14
employment
  24:14
en 140:3
encompassing
  37:15
engineering 13:8
ensure 22:4
enter 37:7
entered 25:17
  45:18 55:17
entering 21:19
entertainment
  1:8,9 4:20 10:2
  14:22 15:4
  16:15 17:8
  24:10 25:19
  37:5 44:25
  45:19 56:23
  62:11 64:2,18
  67:3 71:2 103:5

104:15 105:5
112:12,21 113:6
113:16,21 114:8
116:25 130:18
131:14,19,22
132:9 133:11,24
134:6,21 135:5
135:16,20,22
136:3,19 137:10
138:18,24
139:13 140:1
142:4,12,23
143:7 144:17
149:2,6 150:17
161:11
entire 60:14 78:6
  79:1 81:19
  89:25 90:5
  91:15 117:24
  137:2
entirely 101:20
  135:3
entirety 78:15
  88:2 141:16
entities 112:20
entitled 1:18
  27:21 29:13,21
  72:10 86:10
  100:12,14
entity 16:3
  112:10,19,22
  113:17 146:24
entrepreneurship
  9:12 10:11
  13:23
entry 144:14
equity 60:15

erotica 56:11
errata 177:1
esq 2:6,12,13
essentially 11:4
  12:7 31:17 45:6
  51:1 56:12
  134:16 137:2
est 1:14
established
  87:12
estimate 25:5
  108:7,10,11,12
  108:13
et 2:9 4:20 84:19
  177:3
events 64:6 80:5
everybody
  115:15,20
  171:20
evil 89:20
evolution 62:19
exact 11:25
  25:20 44:22
  45:23
exactly 12:5 27:8
  30:13 42:3
  85:18 120:23
examination 6:7
  174:4
examined 6:5
excel 126:6
exchange 134:22
  135:2,21
exchanged 64:21
exchanges
  149:15
excited 30:19

**excuse** 54:16
**executive** 13:10
  13:25 14:5
**exhibit** 22:22,24
  27:5,18 33:20
  37:4 39:23 41:5
  41:18 44:17
  61:21 62:17
  66:3 73:16 76:8
  76:10 77:25
  78:18 79:15
  80:1 81:6,7,10
  83:22 84:6,8
  88:12 102:4
  106:1 107:9
  111:3 114:23
  116:7,11 121:20
  122:21 125:2,21
  129:19 145:15
  146:5 147:4
  149:23 150:7
  155:25 157:3,16
  157:18,21
  160:15 174:10
  174:11,12,14,15
  174:17,18,19,22
  174:23 175:3,4
**exhibits** 175:7
**exist** 90:12
**existed** 101:22
**existentialism**
  31:21
**existing** 46:21
**exists** 113:14,25
**expand** 47:8
**expect** 122:17
  170:9

**expected** 13:20
  14:7
**expensive** 36:18
  55:5 97:7 100:2
**experience** 172:3
**expires** 173:17
  177:25
**explain** 86:21
  140:22 141:1
**explained** 50:23
**explanation**
  140:25
**explanatory**
  92:17,21 129:10
**explore** 12:18
**exposure** 54:14
**extent** 111:2
  113:14,24
  157:15
**extra** 11:5
  115:17
**extremely** 31:22

     **f**

**fabric** 154:16
  155:10
**facebook** 57:8,9
  57:11 79:4
  119:21,22 120:2
  120:9 121:1,4,6
  121:19 125:5,7
  125:11
**fact** 95:23
  117:14
**factory** 154:1,3
  155:7 156:7
**factual** 59:22

**failed** 123:6
  163:5
**fair** 69:1
**false** 64:5
**familiar** 61:25
  111:8 125:23
  126:8 145:18,20
**families** 56:19
**fan** 19:9,9
**fantastic** 171:24
**far** 89:21 104:3
  105:14 108:13
  119:17 122:8
  131:11 137:20
  150:13
**fast** 53:7 114:16
**favorites** 167:16
**feature** 42:12
**featured** 139:4
**february** 24:3,3
  127:6 152:15
  168:22
**federal** 1:22
**feeds** 69:6
**feel** 33:16 115:15
**felt** 63:21
**fidget** 18:5 38:22
**field** 116:18
**fifth** 5:20
**figure** 86:2
**file** 85:22 86:4
  92:1,1 126:23
  127:12 136:25
  147:16 148:1,4,7
  148:15 149:17
  150:13 151:24
  158:3 161:7
  168:19

**filed** 4:20 16:14
  16:17,22 25:12
  119:13 122:17
  127:7,16,20,23
  145:23 158:14
  159:15 163:12
  165:6,14,20
  169:2
**files** 34:3 74:13
  75:2 76:24 77:6
  77:9,11 78:12
  79:17 80:10,12
  80:14,20 82:4,10
  82:16,19 84:13
  84:19,19 85:10
  85:19,21,24,25
  86:2,9,16,20,25
  87:4,6,16,24
  88:6,9,15,18
  91:7,9,11,12,14
  91:17 92:5,10,12
  92:16,17,21,24
  93:3,9,11,12,21
  136:7,24 148:11
  156:3,3,9,11
**filing** 3:4 17:1
  120:18,22
  126:17 146:11
  146:15 152:17
**filings** 16:2
**final** 22:4 29:14
  34:3 74:13 75:2
  77:9 79:19
  80:10,11,13,21
  82:4,19 84:13
  86:16,23 87:4,6
  87:15,16 88:9,15
  89:23 90:9 91:7

91:9,12 92:10,12
92:16,17,20,24
93:3,8,11,12,21
136:7,24,24
144:14 154:18
154:20,24 155:6
155:12
**financially** 5:9
**find** 37:14 63:24
121:25 136:18
173:2
**fine** 6:11 7:16
24:7 36:9 41:1
66:14 70:7 87:2
90:17 103:10
106:20
**finish** 138:12
**finished** 13:19
74:12 90:20
131:3
**finishing** 77:12
**firm** 68:18
**first** 6:4 7:19
10:1 15:4 19:11
20:10 23:10,14
24:2 25:21
27:18 30:21
33:24 37:14
46:7 48:10 62:1
63:3,6,8,15 64:2
64:14,20 71:8
72:13 81:15
83:1,8 86:12
92:8 95:12
96:14 97:20
102:22 109:19
149:5 150:4

**fish** 24:12
**fisher** 9:10,21
**five** 11:23 24:5
26:1 38:18
63:21 70:2
71:13 72:12
101:7 103:16
104:2 126:4
128:4,4,5,5
154:4
**flabbergasted**
28:19
**flip** 102:12
**floor** 2:4 5:20
**flopping** 102:12
**fly** 102:13
**flying** 101:4
**focused** 10:12
**follow** 55:7
**followers** 54:9
**follows** 6:6
**font** 118:20
**force** 3:14
**foregoing** 173:1
**form** 3:8 33:8
74:11 75:4,14
**format** 59:3
87:18 92:3
**formation** 16:6
16:11,16
**forth** 22:2 45:13
80:2 83:15,19
84:24 89:23
156:11 176:7
**forward** 9:1
36:24 96:8
146:22

**foundation**
16:13
**foundational**
76:3
**foundationally**
15:7,8,17
**founder** 14:21
14:25
**four** 8:23 14:7
72:2,14 122:19
172:14
**fourth** 102:23,23
**fox** 2:8,12 5:23
5:23,24 21:13
22:6 24:18,22
28:6,11,20 36:11
36:24 40:10,22
43:11 44:2
45:20 52:25
53:10 54:16
55:3 59:1,14,21
68:13,25 69:16
69:24 70:1,10,13
79:8 93:13 94:4
94:11 95:2,6,14
95:21 96:10,14
96:18 97:20
98:2,18 99:5,8
99:14 106:8,23
107:1 109:13,17
115:2,3,6,16
124:11,19,21
138:11 140:19
159:14 161:19
161:23 170:4
171:10,23
**francelina** 2:16
5:19

**free** 18:3 19:19
19:24,25 31:8
45:8 52:23
55:10 69:9
109:1
**friendly** 31:23
**front** 71:10 81:8
84:7 114:5
150:9 162:8
**fulfillment** 18:17
**full** 7:8,10 11:15
18:13 33:8
50:20 102:22
141:9
**fully** 22:10 69:15
69:17
**fun** 39:9
**function** 40:4
125:17
**funds** 135:13,15
135:18,20,23
**funny** 31:19,22
**further** 3:7,11
93:19 108:23
155:9 176:11
**future** 9:16
18:14 30:22
33:2 37:16 43:5
139:19
**futuristic** 9:17

**g**

**g** 2:6 6:3 17:18
**gallet** 2:2 5:18
175:7
**game** 18:1,19,24
27:25 28:4 29:4
29:12 30:1,10,14

32:7,15 34:4
35:17 37:9,25
38:14 42:12,18
42:21 43:1 44:9
50:2,18 51:9,14
51:15,19,21 52:4
52:7,9,12,12,15
53:17 69:12
71:21 72:24
73:5,11 74:11,12
74:17 75:3,11,14
75:15 76:25
77:1 84:14,14
87:3 88:1,3 89:9
89:10,14 92:20
93:18 112:14
114:15,18 127:4
130:11 131:3
132:25 134:23
135:21 136:5,20
136:23 137:4,7,8
137:11,13,16
138:19,25 139:2
139:5,6,8,16,17
142:1 143:2
150:9,10 152:18
160:22 162:4
**games**  18:2,4
19:10,12 37:19
38:4 51:9,16
52:18 88:22
130:10,11,11,14
131:21 132:10
133:12,13,15,19
135:14,17 136:1
136:4 139:13,14
142:23,24 149:8

**gaming**  50:22
**garry**  1:19 5:4
100:5 144:5
176:3,21
**garson**  159:11
159:19 160:1
**gateways**  46:14
**gathering**  51:11
**gbe**  112:20 113:1
135:10,11,13
**gbs**  135:10,11,13
**gdblaw.com**  2:5
**gen**  111:20,25
112:1
**general**  42:20
**generally**  144:21
**generate**  47:3
**generated**  128:9
128:18,21
**generates**  118:9
**gerard**  2:8,12
5:23,24 124:16
171:7
**gerardfoxlaw....**
2:11
**getting**  43:13
49:2,9 54:14
80:16 82:15
92:6 96:25
104:3 105:13
109:1,18 110:2
131:11 137:20
162:20
**gift**  89:18
**giraffe**  100:24
**give**  8:18 11:25
15:9 38:1 73:20
123:19,21

138:13 163:5
**given**  134:22
135:20 172:12
176:10
**gives**  95:23
**giving**  69:9
73:20 159:6
**glenn**  9:13
**global**  13:9,25
**go**  4:13 6:22
8:15 9:5 32:6
36:22,24 37:21
38:1 44:17
53:18,19,21 57:2
57:4,11,13,19
60:17 66:16,17
73:16 77:3 81:6
84:2 85:16 89:3
90:2,4,18 92:7
97:16 98:6
114:23 116:21
124:19,20
131:10 155:21
165:11,23
166:17 171:1,3,4
171:8
**god's**  89:18
**gods**  38:10
**goes**  38:9 54:24
80:8 172:4
**going**  4:2 6:22
6:25 8:15 9:8
11:12 20:9,17
28:6 31:3 32:5
32:10 37:4
39:22 41:4
42:23 43:11
45:3 54:4,5,5,10

56:5 60:16 61:9
61:24 70:2 76:6
77:13 81:18
82:10 84:17
92:22 93:14,15
93:18,23,24
97:13 99:3
100:10 108:9
111:5 116:4,5,9
117:22,23 120:2
121:24 122:2
123:3 124:17
145:8,9,25 147:6
151:2,9 155:21
157:3,5
**golden**  1:8,9,9
1:10 4:20 10:2,3
14:21,25 15:3
16:14 17:1,8
18:21 24:10
25:19 37:5
42:15 44:24
45:18 56:22
58:17 62:11
64:1,17,21 67:3
71:1 79:5 103:5
104:14 105:5
112:6,8,11,12,14
112:18,20,24
113:6,8,15,18,20
114:7 116:24
130:18 131:14
131:19,22 132:8
133:10,24 134:6
134:21 135:4,5
135:15,19,22
136:2,19 137:9
138:18,24

139:13,25 142:3
142:12,23 143:7
144:16 149:2,6
161:10
**goldman** 34:20
34:22
**goldner** 1:8,17
2:9 4:16,19 5:25
6:9 20:20 21:18
22:23 39:25
45:10 61:24
62:17 66:2
70:24 73:23
76:1,9 77:22
81:7 91:3 102:3
102:7 107:9
111:8 114:2
116:9 125:1,21
129:18,20
145:17 146:21
155:22 157:21
172:2,13 173:8
174:5 176:6
177:3,4,20
**good** 4:1 5:17
6:9 12:9 22:16
40:8 53:5 70:10
70:13 115:11,20
144:13 154:16
171:8
**googled** 92:22
**gotten** 10:8
**gpa** 13:24
**graduate** 13:1
**graduated** 9:3
9:22,22 13:20,24
13:25

**grady** 18:20
29:20 34:17
35:18
**grant** 10:16
121:6,14
**granted** 33:2
52:18
**graphic** 75:9
147:16 148:1,4,6
148:14 149:9,14
**great** 30:3 115:4
171:23
**green** 108:19
162:8
**greenish** 126:6
**gross** 17:16,17
26:14 76:13
**ground** 6:23
**group** 103:18
152:6
**grow** 54:6
**grownup** 18:8
18:17 29:8,9,10
33:1 68:1
137:14,17
138:22 139:3,6
139:17,20 143:1
143:3
**gsc** 13:3,21
**guess** 8:23 20:3
26:7 27:2 37:2
40:18 55:7
101:9 102:23,24
127:22 137:12
142:19 162:25
164:3
**guest** 18:9,10
32:23 33:1

67:25 137:14
138:20 143:2
**guidelines** 87:12
89:23 90:8,11
**guy** 26:15
**guy's** 59:6
**guys** 43:11 59:1
59:1,1,2,2 87:3
89:14 93:13

**h**

**h** 33:20 174:8
**half** 7:14 24:5
26:1 46:24 70:3
**hand** 78:21
108:18 116:17
153:21,25
176:17
**handled** 158:11
**handles** 148:13
161:6
**hands** 135:8
154:8,9
**happen** 65:7
73:24
**happened** 48:23
80:22
**happens** 110:4
**happy** 37:12
50:14
**hard** 97:8
111:24
**harming** 45:4
**harris** 9:18
**hartford** 11:22
11:23
**hasbro** 51:2

**hat** 101:3
**he'll** 115:17
**head** 7:3 112:23
**hear** 6:10,11
106:19,19,20
**heard** 4:9 99:2
107:2
**heated** 99:11
**heaven** 89:19
**heavily** 42:12
**hec** 13:13
**heck** 93:22
**heights** 9:3
**held** 1:18 90:24
110:20 115:24
**hell** 74:24
**hello** 35:1 46:10
57:2 60:23
**hellosign** 23:3
66:17 67:22
**help** 54:13
**helped** 75:10
108:22 158:12
**helping** 79:11
**hereto** 3:4
**hereunto** 176:16
**hey** 169:9,10
**high** 9:1,2
**highest** 155:15
**hilarious** 31:20
**hinkle** 10:11
**hire** 32:5 37:17
**history** 8:18
**hit** 108:15
**hold** 8:20 13:17
14:1,16 45:10,11
137:19 155:20
156:17

| | | | |
|---|---|---|---|
| **hollywood** 74:23 | **improper** 59:16 | **inked** 87:8 | 138:9 |
| **holo** 9:20 | 68:19 | **inking** 87:14 | **introduced** 18:6 |
| **holography** 9:19 | **improperly** 82:3 | **inks** 87:6 | 34:11 |
| **home** 15:22 | **improve** 23:22 | **innovation** | **introduction** |
| **honestly** 20:2 | **inadmissible** | 10:13 12:17 | 19:17 |
| 109:8 | 97:14 | **input** 26:6,24 | **introductory** |
| **hopefully** 107:1 | **includes** 78:8 | **insertions** 175:9 | 11:13 |
| **hot** 53:6 | 100:11 | **insight** 56:15 | **invoice** 82:15,18 |
| **hour** 70:3 | **including** 19:1 | **instance** 37:19 | 82:18,22,25 83:2 |
| **hours** 11:16 | 31:9 160:21,21 | **institutions** | 83:4,8 84:2 |
| 59:25 | **incorrectly** | 13:12 | 86:15,18 88:20 |
| **house** 8:3 | 76:19 | **instruct** 28:12 | **invoices** 76:17 |
| **huh** 7:3,3 | **increase** 54:13 | 93:15 | 76:18,20 77:11 |
| **humor** 31:21 | **increased** 54:8 | **insulting** 89:17 | 81:23,24 82:2,7 |
| **hundreds** 108:25 | **indesign** 84:19 | 92:25 95:7 | 82:23 |
| 149:15 | 87:19 163:25 | 109:10,16 | **involved** 25:24 |
| **hurting** 103:9 | **index** 174:25 | **intellectual** 9:15 | 26:3,11 37:23 |
| **i** | **indiana** 111:22 | 12:17 16:9 29:8 | 38:25 159:21 |
| **idea** 19:14 108:5 | **indianapolis** | 112:21 | **ip** 113:3 |
| 113:23 148:23 | 111:21,21,22 | **intelligent** 97:3 | **irrelevant** 24:17 |
| 149:18 161:12 | **indicates** 50:6 | **intent** 59:5 | 24:25 25:3 |
| **identical** 156:25 | **individual** 106:6 | 119:13 120:17 | **issue** 33:11 |
| **identified** 14:15 | 113:18 126:3 | 122:13 | 91:15 104:13 |
| 35:24 90:8 | 147:21 148:6 | **interest** 12:15 | **it'd** 59:23 |
| **identifies** 58:19 | 156:10 | 32:15 72:22 | **it'll** 28:22 97:14 |
| **identify** 26:8 | **individually** 1:8 | **interested** 5:9 | **items** 130:19 |
| **ignoring** 158:10 | 4:19 | 176:14 | 131:13,15 |
| **illustration** | **inform** 85:12 | **internally** | **j** |
| 91:22 164:24 | 86:8 88:24 | 104:18 109:9 | **j** 1:19 5:4 176:3 |
| **illustrator** 87:24 | **information** | **international** | 176:21 |
| **image** 107:7,10 | 8:16 24:13 69:7 | 12:23 14:9 | **jabbing** 69:19,19 |
| 119:11,12 | 69:10 116:23 | 117:3 | **jack** 38:8 |
| 120:13 121:24 | 117:7,8 118:24 | **internet** 4:7 | **january** 10:24 |
| 122:11 162:17 | 163:4 | **interpret** 43:21 | **jason** 17:24,25 |
| **images** 42:16 | **informed** 85:23 | **interruption** | 18:13,15,17,23 |
| **important** 35:12 | **infringing** | 15:14 94:9,25 | 19:6,7,14,17,23 |
| 36:12 63:21 | 162:14 | 95:19 98:25 | 21:25 23:7,21 |
| | | 104:9 137:25 | |

29:4 31:7 32:14
32:19,25 33:11
33:13,14 34:11
37:6 38:12,13,17
38:19 48:19
49:2,4,5,10 50:1
50:23 51:9 73:2
73:7 84:15 89:7
89:18,18 91:25
137:5 139:19
**jason's** 19:9,11
33:3 37:15
71:20 89:11
**jd** 14:19
**jeez** 14:10
**jennifer** 11:1
**jerry** 21:5,11
40:8 85:1 106:2
106:18 159:12
**jim** 25:21,21,23
25:24
**job** 69:8 134:12
**joe** 37:22
**joint** 11:2 19:13
**jointly** 13:4,10
**joke** 74:23
**joked** 16:20
**judge** 36:16 53:6
54:18,18 68:19
68:22 69:11
97:5 106:13
124:15,22 170:7
170:8,16
**july** 41:8,10,12
41:13,17,19,21
41:24 58:4 60:5
80:7

**june** 9:4 19:4,4
80:7 86:19
**jury** 36:15 54:18
68:15 97:4
99:20
**justice** 10:14

**k**

**k** 17:13
**kagan** 9:18
**keep** 55:16 62:5
**keeps** 84:17
**kevin** 159:19
**key** 29:12
**keys** 8:12
**keystone** 107:24
109:6
**kgk** 2:5
**kick** 32:2
**kind** 11:17 12:12
19:13,15,16
37:12 55:7
78:20 130:6
155:17
**kirby** 38:8
**knack** 26:17
**knew** 30:16,19
50:24 80:11
101:13 103:21
103:24 127:8
152:20 161:14
161:17 168:18
168:21 169:1,2
**know** 7:6,16,17
16:1,2 22:15
23:23 24:23,24
25:3,23 28:8
32:19 36:14

42:2 45:21
48:22,24 49:16
51:10 53:3,8
57:7 58:10
59:19 63:12,15
64:1,16 65:7,10
65:13 67:24
68:10 70:5
71:17 72:18
74:21 78:5 79:2
79:6,13 80:15
81:2,4 83:6 87:5
90:7,10,19 91:25
92:14,18,19 98:5
99:18 101:5
104:17,25 106:3
106:9,10,12,14
107:7,20 111:17
113:15 115:4,17
116:10,14,14
117:21 119:12
119:23 120:13
120:15,21
122:11 125:22
126:1,8,13
128:17,20 129:9
130:2 131:8,17
132:2,15,17,20
132:22 134:15
135:1 136:12,14
141:5,8,17
145:19 147:20
148:5,14,21
149:19 150:2,3
151:1,18,20
152:4,21 155:8
155:19 156:12
157:7 158:11,18

159:11 161:9,24
166:16,16 169:1
169:8 170:11,19
172:1
**knowledge** 75:13
173:4
**known** 17:23
127:1
**knows** 49:2,3
88:4 106:17
171:21
**korsen** 26:3
76:14 155:25
**korsen's** 148:25
**kunst** 2:6 5:17
5:18 6:8 22:20
36:25 55:6 59:8
59:17 60:2 70:7
70:11,22 90:18
94:2 95:4,12
96:6,12,16 97:17
97:25 98:17
99:2,6,9 106:18
106:25 113:12
113:24 114:25
115:5,13,19
124:16,20
138:16 144:5
171:1,19 174:5
175:7
**kyle** 2:6 5:17
20:2 40:24 44:4
114:17 141:23

**l**

**l** 6:3
**lab** 9:19,20

**lack**  87:10 88:20
  95:25
**laid**  96:24
**language**  44:9
  44:22,23 45:13
  45:24 52:6 66:4
  66:8
**large**  117:7
**larger**  61:6
**late**  68:12
**laude**  9:23
**laugh**  109:9
**laughable**  92:25
**launch**  110:8
**law**  2:8 5:24
  10:7 11:3,16
  14:19 110:7
**lawyer**  20:4 27:1
  63:18 97:22,24
  98:3,20 132:19
**layered**  151:25
**lead**  12:4 149:5
**leading**  8:19
  13:11 14:2
**leads**  69:5
  162:25
**learned**  32:13
**learning**  172:4
**left**  48:9,11
  116:17
**legal**  10:12,17
  16:17,18 26:7,16
  26:24 33:18
  74:21 132:12
**legalzoom**  63:18
**length**  50:20
**letter**  159:23

**lettering**  87:15
  87:15
**letters**  117:8
**liar**  103:16
**licenses**  72:23
**licensing**  61:13
  112:22 113:2
  135:3
**likes**  38:2 119:20
**limit**  101:5
**limited**  160:22
**limitless**  47:6
**limits**  100:19
**line**  18:25 24:2
  30:12 44:18
  88:12 101:17,18
  102:23 136:8
  171:21 175:10
  175:14,18 177:5
**lines**  87:7
**link**  34:14 85:21
**listed**  35:14
**listen**  36:19 55:4
  95:9
**listening**  54:25
  93:24
**lists**  19:24 27:21
**lit**  92:6
**literal**  116:18
  126:20 157:25
  158:4
**literally**  27:7
  49:14 56:3 86:1
  93:7 156:8
**litigant**  109:20
**litigation**  172:3
**little**  10:19 13:19
  20:6 28:18

41:11 45:11
  51:3 66:22
  80:18 96:25
  101:16 104:3,11
  105:14 119:17
  120:7 124:18
  130:1 131:11
  137:20 158:8
  169:4,13
**lived**  15:22
**livelihood**  45:5
  53:24 124:2
  164:25
**living**  45:6
**llc**  1:8,9,10,10
  14:22,25 16:12
  17:2,8 24:10
  25:19 116:25
  131:15,20,22
  132:9 133:11,24
  134:6,21 136:19
  137:10 138:18
  138:24 139:13
  140:1 142:4,13
  142:23 143:8
  144:17 177:1
**llp**  2:2 175:7
**located**  8:2
**logic**  30:12
**logistics**  113:1
**london**  13:14
**long**  7:17 22:8
  22:14 28:22
  30:11 36:17
  96:17 106:4,7
  115:12 151:18
**longer**  59:25

**look**  27:9 33:23
  44:18 45:22
  51:10,13,17
  78:21 90:4 93:7
  98:7,8,18 110:1
  115:3 117:24
  126:4 140:20
  150:18 157:9
  172:1
**looked**  156:22
  157:12 163:19
**looking**  49:22
  56:1 71:8 103:2
  111:23 130:24
  141:9 147:1
  157:17 158:18
  165:17
**looks**  21:14
  22:18 61:25
  62:8,13 78:6
  113:9 119:20
  125:9,25 150:12
  155:10,13
  156:23 157:1
**los**  2:10
**lost**  123:10
**lot**  12:12 14:3
  26:6 74:25
  89:15 93:22
  172:2
**lots**  101:14
**love**  31:18,18
  35:1 46:12 57:3
  60:24
**loved**  30:18
**low**  91:13 151:24
  151:24

**lower**  55:20
**lunarbaboon**
18:21 29:21,24
34:17 35:18
39:6,9
**lunarbaboon's**
29:22
**lunch**  114:25
115:14,25

**m**

**m**  6:3 14:13
120:11
**magic**  51:11
**magistrate**  98:7
**magna**  9:22
**mailed**  129:24
**mailly**  11:1
**main**  161:8
**maintain**  124:2
**major**  101:23
**majored**  9:11
**majority**  38:16
**making**  26:19
30:14,15 38:8,11
46:15,17 47:10
56:2 69:8,10,18
79:9 100:24
109:11 167:18
**management**
149:12
**managing**
113:20
**manufactured**
132:25 133:14
133:19,25 134:7
140:4,17 142:8,9
142:16 143:11

144:12,22
**manufacturer**
135:7
**manufacturing**
112:17,18
133:23 134:5
140:15
**marc**  1:8,16 2:9
4:16,18 5:25
36:13 43:16
45:20 52:25
54:16,17,17
59:24 68:13
79:8,8 106:20
109:13,13,13,14
109:14,14,14,14
109:15,17,17
110:7 115:7,16
119:22 120:1,6,9
124:11,21
138:11 140:19
140:19,19
146:21 161:19
170:4,4,4,5,5,5
172:13 173:8
174:5 176:6
177:3,4,20
**mark**  22:21 41:4
51:20 62:16
76:7 77:24 96:7
99:3,3 102:4
105:25 107:8
116:6,24 118:7,9
118:10,11,13,17
118:18 119:13
124:3 125:20
128:8,16,19
129:2,3,19

130:20 131:16
145:14 146:6,11
157:18,20
**marked**  111:3
157:17
**market**  150:19
150:20,23
**marketed**  54:7
75:16
**marketing**  34:18
34:19 54:12
56:15 109:1
130:23 133:1
134:13
**marriage**  176:13
**marvel**  32:1 38:5
61:18
**mass**  75:17
132:25 133:14
133:19,23 134:4
136:22 140:4,14
140:16 142:8,15
143:11 144:12
144:22
**masse**  140:3
**massive**  100:2
**master**  11:20
161:7
**master's**  149:12
**masters**  13:22
14:17
**matter**  4:17
57:23 161:13
170:22 176:15
**mba**  11:3,10,13
11:18 13:10,25
14:1,17

**mccomics**  34:25
46:11,19,23 57:3
60:11,19,21,23
61:2,4
**mcmeel**  30:24
57:16 92:5
**mean**  15:7 19:22
21:24 25:5,25
26:5 28:16
31:19 34:22
36:7 40:20,23
42:9 47:16
53:12 58:1 60:6
83:11 85:4
90:14 104:23
105:8 106:14
108:4 112:6,24
113:22 119:3
129:2,3 146:16
148:8 156:23
164:2
**means**  33:4
92:17
**meant**  50:7 52:3
80:10 162:13
163:16
**mechanics**  89:15
**mechanism**
34:19
**media**  4:14 32:9
47:4 50:22 51:1
52:17 53:15
56:4,6 70:16,20
101:15 110:17
110:23 171:13
171:17 172:14
**median**  47:13

**mediums** 71:15
**meet** 17:20
**meeting** 11:18
  17:24
**meets** 51:2
**melon** 149:13
**member** 14:21
  14:24 113:20
**members** 17:7
  17:10
**memory** 7:12
  46:12 152:4
**mentioned** 37:11
**merchandise**
  19:1 109:6,11,21
  109:24 110:6,14
  114:7,9,12,15,18
**message** 35:20
**messages** 149:16
**met** 11:7 12:2
  17:22 19:7
**middle** 78:20
  81:21
**mind** 26:7,8,16
  33:3 37:3 48:21
  61:9
**minds** 48:25
**mindset** 31:12
**minute** 40:19
  70:4 145:4,8
**minutes** 11:24
  70:2,8 90:6
  171:4
**mischaracteriz...**
  80:5
**mischaracteriz...**
  106:5

**misconstruing**
  32:16 43:9
**missed** 124:6
  131:6 166:3
**missing** 47:23
  88:11
**misspeak** 73:15
**misunderstand...**
  20:7
**misunderstood**
  15:25
**mode** 8:12
**model** 87:9
  101:20
**mom** 11:8
**moment** 42:18
**monday** 41:8
**monetary** 135:2
**money** 38:1,4
  45:8 46:13,15
  47:3,10 52:23,23
  53:18 54:4,5,6
  54:21,22 72:3
  73:4 76:20
  77:10 84:22
  123:24 124:1
  134:22 135:8,11
**month** 15:17
  64:11 65:1 67:1
  86:1
**months** 12:14
  18:7 19:5 68:12
  68:12 72:13
  86:13,13 120:18
  122:12
**moqs** 130:25
**morning** 4:1
  5:17 6:9

**mother** 86:4
**motion** 106:13
  110:5
**move** 24:23
  69:22 96:7,8
  98:16 99:7,13
  115:10 121:23
  136:1 137:8
  144:13 149:21
  163:8
**moved** 9:19
**movie** 51:19
**movies** 51:10,17
**moving** 12:18
  152:24
**mpa** 11:3,19
  12:14 14:5,19
**multimedia**
  72:23
**multiple** 101:13
  103:25 123:8
**multipronged**
  37:13
**mute** 21:12
  115:2
**muted** 171:7

**n**

**n** 6:3 17:13
  174:1 175:1
**name** 1:5 2:3
  4:18 5:1 17:12
  17:15,23 18:10
  18:24 19:20
  27:24 28:4 29:4
  29:11 30:13,14
  30:20 31:10,20
  32:6,15 34:5,10

34:14,16 35:4,6
35:13,24 36:3,6
37:6,9,24 38:21
42:13,20 44:20
45:15 46:18,20
49:4,6 50:8 52:3
52:21 53:20
54:11 55:11,16
56:22 57:5,14,20
58:6,13 60:7,10
60:11,17,20,23
61:8 65:7,10,12
68:1 69:3,12,21
72:24 73:5,11
74:11,17 75:3,13
76:25 84:14
100:13,16,21
108:20,23 109:6
110:14 112:14
113:8,17 114:3,7
114:8,12,14,18
114:19 116:19
118:14 119:1
121:3,5 122:25
123:4,5 125:5,7
126:20,25 128:6
128:9 129:4,8,24
130:20 131:16
131:21 132:10
133:12,25 134:7
134:23 135:14
135:17,21,25
136:3,20 137:4
137:11 138:3,4
138:19,21,25
139:4,14,16,25
140:2 141:25
142:4,13 143:2,8

144:18 145:23
146:12 148:19
150:10 152:6,18
152:22 156:12
159:14 161:15
177:2,3,4
**name's** 160:21
**names** 29:15
134:1,8
**narrow** 141:11
**natural** 70:9
**near** 8:10 47:5
120:11
**nearly** 11:11
52:19 67:1
73:21 78:7
**necessary** 37:7
73:9 96:13
**need** 7:15 40:21
55:19 60:1 62:1
70:6 72:3 81:19
87:4,8 88:16
95:13 96:21
99:4 102:1
105:9 117:19
129:11 130:1
145:4 147:6
167:6
**needed** 77:3
**needs** 96:22
**negotiated** 21:25
49:11
**negotiating**
31:13 38:19
49:5
**negotiator** 49:17
**neither** 110:3

**net** 34:1 71:1,14
71:19 72:9,12,15
84:11
**netflix** 51:12
**never** 37:3,23
64:19 68:11
74:13,17 85:19
85:20,25 103:23
105:19 109:12
126:14 145:22
164:24
**new** 1:2,21 2:4,4
4:22 5:2,20,21
8:4 9:20 12:24
13:12 38:10
44:8 52:6 60:12
60:16 88:11
101:20 176:4
177:1
**nice** 6:11
**nicely** 95:10,22
99:16
**nine** 117:11
118:2 119:6
121:1 122:3,21
123:14 125:2,2
156:15 163:15
**nintendo** 51:3
**noncooperative**
158:10
**nonlawyer** 98:10
**nonsensical**
61:11
**norris** 1:5 2:3
4:18 17:21,24
18:24 31:16
32:20,25 34:5,9
34:12,15,25

35:12,23,25 36:2
37:8 41:8,19
44:25 45:19
50:7 52:2 55:9
62:12 64:2,22
68:2 71:2,13
72:10 73:13
74:6,9 76:12,16
76:24 79:17,24
80:24 81:12
85:9,12 102:16
103:4 123:5,18
125:10 148:21
149:19 151:23
152:3,12 161:9
163:21 164:13
166:19 177:2
**norris's** 41:17,23
58:3 60:4
165:24 167:3
168:8
**nos** 103:20
**notary** 1:20 3:13
6:5 173:16
176:3 177:24
**note** 4:4 24:2
27:17 46:1
**noted** 34:3 59:20
81:11 84:13
116:24
**notes** 42:11
58:22 157:22
171:2
**notice** 1:22
127:25
**noticing** 5:16
**notoriety** 108:23

**november**
126:22 158:23
165:13
**nuances** 141:23
**number** 4:14,23
22:22 27:21
35:25 43:12
45:13 49:7 69:4
69:21 70:16,20
76:8,10 78:19
90:8 102:5,7
110:17,23 117:4
118:1,1 130:8
146:2 164:18
171:13,17
172:13
**numbering**
147:2 160:13
**numbers** 128:1
**numerous** 33:10
79:23 114:13
125:13 153:10

**o**

**o** 6:3 17:13,18
**oath** 5:7 143:25
**object** 28:6
43:12 93:14
100:22
**objection** 28:8
59:20
**objections** 3:8
5:10 28:13
**obligation**
134:13
**obtain** 123:1
162:18 165:23
166:18 167:3,6

168:8,15
**obtained** 126:1
147:21 148:6,8
151:21 162:20
165:2
**obtaining** 37:6
**obviously** 35:8
38:2 42:12 43:1
129:3 140:21
160:10
**occasions** 79:23
**occurred** 75:19
**october** 17:3,5
76:14 78:23
79:3,7 80:1,24
81:11 82:8,13
85:23 86:11,14
102:16 122:12
**offended** 170:16
**offered** 12:20
**office** 126:24
152:14 157:23
158:22 159:2
175:4
**officer** 1:8 4:19
**officially** 12:8
**oh** 14:10 15:24
57:15 101:10
102:11 103:20
124:10 154:11
155:4,20 158:1,4
162:8 164:1
171:23
**ohio** 9:9,20
13:16 15:21
149:11
**ohnoshop.com**
162:21 164:7,19

164:22 166:13
166:25 167:13
168:3,15 169:6
169:11,22
**okay** 6:10,22
7:15,21 14:14,14
14:20 16:13
20:9,19 21:16
22:17,19 23:5
27:12,17 28:2,15
29:2 36:23
39:22,24 40:5,18
41:4,14,23 42:5
42:11 43:11
44:6 46:4 47:21
50:10 55:3,15,23
56:20 58:8,23,25
61:19,20,23 62:5
62:7,9 64:13,20
65:13 66:7,14
67:2,7 69:22,23
69:25 70:10,22
71:12,22,24 73:8
74:8 75:3,12,21
76:5,22 77:16,21
77:22 78:16
79:24 81:7,9,10
81:22 82:1,6,12
82:21 83:10,10
83:11,14 84:6,20
85:6,9 86:24
88:24 89:21
90:17 93:2,10,13
93:13 96:6
97:20 99:5,10
100:4,7 101:11
103:17,20
105:13,23 107:8

107:9 108:17
109:19 111:3,7
112:3 113:11
114:2,22 115:5
115:18 116:8,20
116:21 117:5
118:21 119:4,8
119:16 120:25
121:23 122:22
123:1 124:14,25
125:1,15,16,19
126:12,19
127:11,15,24
129:14,17,18
130:6,16 132:18
133:8 136:17
138:15 139:8,12
140:8 141:14
142:2,22 144:13
144:25 145:16
146:10,10,18,25
146:25 147:5,7
147:23 148:3
149:22,24 151:1
152:11,19,24,24
153:4,18 154:12
155:1,5,19,22
156:5,16,16
157:2,2,13,13,19
157:24 158:2,14
159:18,25
160:12,12 161:9
161:22 162:12
163:7,14,21
164:10,17
165:17,21,23
166:8,23,23
167:12 168:24

170:23,25,25
171:19
**old** 90:2
**once** 6:16 74:12
82:10 91:17
**one's** 54:25 55:1
**ones** 26:12 78:2
154:17 159:22
**operations** 75:8
149:14
**opportunity**
91:4
**option** 19:1
30:20,21,22 31:2
50:19 53:16
57:17 100:25
101:1 162:15,17
164:9 167:17
**oral** 105:16
**orange** 100:23
101:8 103:19
154:8
**order** 37:17 46:2
134:11
**orders** 131:5
**original** 30:17
**originally** 30:2
38:3 137:6
**outcome** 5:9
176:14
**outlets** 139:21
**outrageous**
34:23
**outside** 11:24
12:19 37:19
44:20 45:2,15
50:15 52:21
53:12 65:21,23

133:20 134:2,4,5
**overlays** 153:20
**overnight** 51:7
**overtone** 111:24
**owed** 77:10
**owned** 31:16
33:4,14
**owner** 116:24
**ownership** 18:13
42:15

**p**

**p.c.** 2:8
**p.m.** 41:13 116:1
172:18
**page** 22:3,19,24
23:4 41:7 56:9
60:12 62:4 63:9
66:2,18,18
116:16 117:3,10
117:11 118:1,1
119:5 120:25
121:1,4,6,20
122:3,20,25
123:14 125:2,5,7
125:11,15
126:16 127:20
128:1,4,5 146:17
146:19 147:3,3
149:22 150:6
152:25,25
154:21 155:1,24
156:15 160:13
160:14,18 161:3
161:4 162:2,2,7
162:13 163:15
164:5 165:11,12
165:15,16,25

166:11,23
167:12 168:2
174:4,9,25
175:10,14,18
177:5
**pages** 47:5 62:6
126:3 160:19
**paid** 34:6 38:10
49:2 52:10,11
57:11,12 77:9
81:15 82:12,15
135:11
**paller** 2:16 5:1
**pandemic**
108:14
**panels** 32:7
**papers** 110:5
**paragraph** 27:18
33:20 48:10
66:4 71:9 73:10
74:1,4 81:20
84:8 92:8
102:22
**pardon** 77:23
139:25 144:18
147:9 163:14
166:11
**parenting** 18:19
29:10,17,17,18
29:22,23,24 30:1
30:2,7,10
**parents** 8:3
**paris** 13:14
**park** 2:10
**part** 22:15 23:15
25:18 30:1 32:9
42:13 46:11
48:7,13,21 50:3

53:14,15,15,16
60:10,19 81:15
83:1 106:7
109:2 115:9
124:7 137:3
141:3 160:25
163:22 164:3
166:4
**partially** 126:5
**participants** 4:8
**particular** 36:4
80:22 112:4
118:19 129:2
153:6
**parties** 3:4 4:13
20:12 65:16
67:11,18 68:7
91:21 176:12
**partly** 54:9
**partner** 19:6
**partners** 75:7
**parts** 40:16
**party** 5:8 66:19
130:11 139:12
139:14,17
159:14
**passionate** 37:24
**patent** 126:24
152:14
**patents** 9:15
10:17
**patience** 172:8
**patreon** 45:8
52:24 53:19
56:10 122:25
123:13,19,23,24
124:1

**patreon.com**
123:3
**patrons** 123:7,10
124:1
**pause** 36:19
138:12
**pax** 19:8
**pay** 37:22,24
38:13 57:22
**paying** 38:7
56:22
**payment** 46:13
80:25 81:14
82:2,7,11 85:13
85:25 86:10
**pdf** 83:7 91:13
107:11 111:4
**pdfs** 80:10
**peacemaker**
115:14
**peacock** 8:4
**pending** 7:18
**pennsylvania's**
13:1,21
**people** 11:14
27:8 46:14 54:9
70:4 108:24
**percent** 18:3
19:19,24,25
23:14 27:16
31:8 32:15
38:18,20 41:25
71:13 72:12,14
83:21 111:12,25
152:9 154:24
155:13 157:1
**percentage** 49:7
58:17 72:9

73:12
**percentages**
73:17
**perdomo** 2:16
5:19
**perfected** 101:23
**performed** 68:11
**period** 44:10,21
96:4 140:25
**permission**
105:10 165:24
166:19 167:4,7
167:22,24 168:8
168:11,16
169:21
**permit** 73:12
**permitted** 55:16
103:6 104:15
105:6,9,10
**person** 15:13
20:3 94:8,24
95:18 98:24
104:8 121:18
137:24 138:8
156:10 164:2
**personal** 112:9
**pertaining** 8:10
**pervis** 24:14
**peter** 18:19
31:15
**philadelphia**
107:24
**phone** 8:11 22:1
105:20 161:16
**photo** 107:13,13
107:14,20 109:7
111:1

**photograph**
111:9,15,18
114:4 147:21,22
174:18,21
**photos** 79:20
**phrase** 93:3
**physical** 47:11
57:14 74:10
131:24 132:24
153:16
**physically** 8:2
**picture** 107:16
107:19 108:1
119:8 120:7
121:9 122:24
123:2 125:4
147:11,24 150:2
150:6 151:3,8,14
153:1,12,14
154:21 155:2
156:1,18,22
160:18 162:18
163:2,15,19
166:12
**pictured** 108:20
**pictures** 122:9
139:22 154:6
157:8,9 168:17
169:15,18
**piece** 145:5
**pillow** 164:1
**pink** 100:23
101:3,7 103:19
108:19 153:2
154:7,9
**pins** 53:21
**pitch** 150:8,11
150:16

**pitches** 149:10
**place** 1:19 4:12
15:11 58:12
94:6,22 95:16
98:22 104:6
127:17 137:22
138:6
**placed** 117:15
**places** 91:9
**plaintiff** 1:6 2:3
4:17 5:22
**planned** 32:8
**planning** 20:11
**platform** 57:10
128:22
**play** 80:8 87:3
88:22 93:18
**played** 19:10
**playing** 92:20
**please** 4:3 5:11
7:1 8:25 32:17
33:24 48:1
58:10 62:3
67:12 85:16
98:16 117:20
125:22 134:2
145:19
**plural** 101:6
**plus** 10:17
**plush** 30:9 100:8
101:9 103:19
130:11,12,14,15
133:20 140:2,15
143:7,9 144:15
144:19 153:2
154:7,7 160:22
163:25

**plushy** 153:19
162:8
**point** 32:14,21
33:15 48:1 60:4
70:9 117:20
123:15 128:19
**pointed** 59:22
**policy** 9:14
12:16
**pony** 101:16
**pooh** 61:17
**popped** 155:21
**popular** 19:12
52:15
**porn** 56:17
**pornography**
56:13
**portion** 103:1
108:18 120:6,10
122:4 144:8
**portrayed** 31:22
**position** 141:5
**positions** 109:23
**possess** 32:14
**possible** 26:19
26:22 81:16
112:15 113:22
135:3 158:6
159:4 160:4
**possibly** 119:10
149:10,18
**post** 56:3,6
57:11,12 167:25
**posted** 79:3
103:17
**posting** 56:8,10
56:13 123:25
167:16 168:11

posts 56:11
pound 145:6
practice 53:5
pre 134:14
prefer 21:8
pregnancy 18:12
  137:15
preorders
  141:10
pretending 18:8
  18:17 29:7,9,10
  33:1 68:1
  137:14,17
  138:21 139:3,6
  139:17,20 142:1
  143:1,3
pretty 25:1
  28:16 31:5 45:1
  92:16 96:11
  98:5 108:24
prevent 121:18
previously 37:12
  55:8 103:12
  156:22 157:17
  159:24
primarily 63:12
primary 73:18
  164:23
principal 146:23
print 57:14 77:6
  80:14 88:18
  91:10 93:8,11
printed 74:11
  155:15
printing 155:18
prints 53:20
  165:1

prior 11:16 16:6
  17:24 19:8 31:7
  46:20 49:14
  61:5 76:23
  110:24 168:16
privately 89:8
probably 6:24
  148:11
problem 21:9
  53:9 96:5
  151:11
procedurally
  128:18,21
procedure 1:22
  10:25
proceeded 9:5
proceeding 5:11
process 87:13
  89:1,7 109:18
  110:10 129:1
  172:5
processed
  126:13
produce 114:17
  123:7 135:6
produced 19:21
  31:10 32:23,24
  34:12 46:8
  71:16 89:5
  131:24 136:7,22
  137:16
product 47:12
  130:9 131:24
production
  27:20 75:17
  100:11 113:13
  114:1

products 47:8
  131:24 135:6
  155:16 160:21
professors 11:1
profits 71:1,14
  72:19
program 11:4,10
  11:19 12:3 13:2
  13:5,22 14:5
programs 12:14
  12:19
progress 14:18
  74:25
project 63:8
prolonging
  141:4
promote 108:23
  134:12,14
promoting 54:11
  130:23
promotional
  103:13,22
promptly 81:16
pronounce 53:4
proper 11:22
  87:18
properly 87:8
properties 18:22
  27:20,22 31:9
  61:15 100:12
  101:15
property 9:15
  12:18 16:10
  29:8 32:2 55:12
  72:24 73:5
  112:22
prove 121:20

provide 7:2,10
  74:14 106:16
  125:14 163:1
  164:14
provided 29:16
  74:10 86:6
  125:11 148:22
  161:10
provides 71:12
  74:5,9
provision 32:9
  62:24 70:25
  72:17 73:25
  74:3,4 92:9
  121:17
provisions 23:9
  26:11 72:2
psd 84:18 91:14
  92:1
pseudonym 35:3
pubically 166:6
public 1:20 3:13
  6:5 9:13 11:20
  12:23,23 163:3
  176:3 177:24
publish 30:9
publisher 30:24
  31:4 35:9,10
  39:20 57:1,6,8
  57:16 60:18
publishers 39:12
  42:22 61:11
  73:20 89:20
publishing 30:4
  39:2 56:25
pull 48:16,16
  71:4,7 73:8,14
  114:16

pulled   49:1
punch   88:12
purchase   28:25
   29:1 31:6
   141:13
purchasing   29:4
   29:7 36:6 50:2
purification   9:7
purple   108:19
purpose   21:13
   28:3 96:1
purposes   25:1
   28:14 149:3
pursuant   1:21
   72:7,8 73:10
   100:17
pursue   11:2
   44:19 45:14
   46:22 52:20
   65:22
pushed   11:17
put   12:7 39:22
   39:25 52:5 57:4
   61:21 68:15
   87:17 92:1
   100:10 102:2
   107:5 116:5
   134:14 145:13
   157:3,15
puts   40:16
putting   59:14,15
   60:15 75:25
   125:18

**q**

quality   4:5,6
   155:16

query   42:4,8
querying   48:14
quest   19:11
question   3:9 7:1
   7:18,19 15:16,25
   16:4,25 23:24
   24:21 26:13
   35:22 36:20
   42:8,9 43:18
   45:11,12,21
   47:18 50:1
   54:24 57:25
   58:3 67:7,13
   69:7,21 79:11
   80:18,22,23 85:6
   91:5 92:7,11,15
   93:16 95:11
   96:3 104:11,12
   105:15,22
   109:20 114:6
   124:13 131:12
   132:7,12 133:6
   134:3 136:11
   138:12,14,15
   140:18 141:6
   143:20,22 144:7
   151:20 156:21
   157:10 160:23
   161:20 163:1
   169:13 170:10
   170:14,20,21
question's   22:8
   119:16 140:21
questioning   72:4
   136:8 171:22
questions   7:11
   28:21 36:15
   59:22 68:17

69:3,6 76:4
   94:19 96:21,23
   98:15 99:23
   106:15 141:12
   141:18 145:9
   164:17
quick   66:2
   166:18
quicker   115:10
quickly   145:11
quite   30:11
quote   10:18 12:9
   17:4 19:23 42:3
   42:11 43:5 48:6
   50:15 67:19
   77:6,7 80:9 82:5
   88:17 103:11,22
   161:7

**r**

r   6:3,3 14:13
   17:13,18 120:11
rachel   10:1
   15:21 16:5 17:9
   23:17 26:3,5
   64:17 76:13
   92:1 102:18
   107:18 111:16
   113:19 148:10
   148:13 149:5
   152:6 153:15,18
   153:20 154:22
   161:6
rachel's   17:11
   39:14
raise   99:4
range   103:11
   104:1

rank   69:3,21
rdolan   2:11
reach   19:14
   41:18
reaching   37:1
read   22:7,12
   33:24 40:14,15
   40:19 46:14
   54:19 58:10
   81:18,19 89:25
   90:5,16 144:9
   173:1
ready   77:6 80:14
   88:18 91:10
   93:8,11
real   66:1
realized   12:15
really   19:12 20:4
   31:19 36:11
   40:21 47:5
   49:18 77:12
   80:16,21 97:18
   105:14 106:19
   124:5 129:9
   131:7,8,17
   134:15 140:17
   148:13 151:17
   169:1 172:6
reason   7:9 126:7
   156:11 159:1
   169:9,12 177:5
reasonable   92:4
reasons   89:22
recall   10:20 25:7
   25:20 27:3,13
   37:1 41:2 63:4
   67:19 73:10
   102:20 107:25

108:6,8 109:5
111:14 119:10
128:24,25
139:11 146:10
147:13 158:21
158:24 163:9
**receive** 33:25
71:13 84:10
**received** 59:10
60:4 85:20 89:1
102:16 156:8
**receiving** 34:3
76:23 84:13
**recess** 70:18
90:25 110:21
171:15
**recognize** 7:22
76:9 77:23
78:18,24 102:10
129:20
**recollection** 6:21
67:21 122:8
**recommends**
11:11
**record** 4:2,13
5:15 7:8 15:12
17:12,15 22:20
40:13 70:17,21
77:24 90:19,22
90:23 91:2 94:7
94:23 95:17
98:23 104:7
110:18,19
114:24 115:22
115:23 116:3
120:4 137:23
138:7 144:9
171:9,14,18,20

172:16 176:9
**recorded** 1:16
4:10,15 7:7 46:7
50:24 60:25
**recording** 4:6,11
168:22
**records** 25:11
119:15
**refer** 147:24
151:3,9
**reference** 47:23
**referencing** 46:5
82:22,24
**referred** 34:15
34:16
**referring** 66:9
120:10 130:10
146:20 151:19
**reflects** 121:1
**refresh** 22:17
122:7
**refuel** 70:5
**refuse** 123:18
**refused** 121:6,13
123:21 163:1
164:13
**regard** 168:25
**regarding** 58:5
66:9 70:25
72:17 76:25
105:4,18 114:6
**regardless** 16:11
**regards** 16:25
**registered**
128:20 130:3
**registration**
120:22 129:23

**reign** 18:3 19:19
19:24 20:1 31:9
**reiterate** 37:13
**related** 5:7 24:14
176:12
**relating** 29:9
33:11 38:21
72:23 135:24
**relation** 42:21
71:14
**relations** 14:9
**relationship**
30:3
**relatively** 60:12
**relevant** 24:11
67:24
**remarks** 170:15
**remember** 6:24
8:17 12:4 25:25
26:12 27:8,11
40:20 63:6,13,22
63:25 75:23
102:11,14
107:16,19
111:11 120:19
122:13,18
123:16,22 135:9
141:19 146:13
146:15 147:14
147:19 149:16
156:7,10 160:4,7
160:9 167:20
**remembered**
76:2
**rep** 14:2
**repeat** 67:12
134:2

**repeatedly** 96:19
**repeating** 122:10
**rephrase** 100:9
147:10
**replied** 48:12
152:19
**reporter** 5:4
15:12 54:21
94:7,23 95:8,17
97:7 98:12,23
100:1 104:7
137:23 138:7
172:7
**reporting** 177:1
**representing** 5:2
**requested** 15:13
94:8,24 95:18
98:24 104:8
137:24 138:8
**requesting** 80:2
**requests** 125:14
175:17
**required** 14:10
24:20 87:23
**res** 91:13 151:24
**research** 9:12,14
12:13 150:20
**resending** 44:7
**reserved** 3:9
**resolution**
151:24
**resonates** 150:22
**respect** 26:13
27:19 28:4 85:7
92:8,10 100:7
131:13 135:13
135:16 139:12
142:2,10,22

143:6 149:1
168:13
**respective** 3:3
**respond** 104:22
**responded** 41:13
**responding**
32:11 104:21
**response** 41:18
44:6 157:23
158:22 159:2
175:4
**responses** 7:10
**responsibility**
148:25
**restate** 6:25
**restrooms** 70:6
**retailers** 75:19
**retain** 58:18
**retained** 172:15
175:7
**revenue** 47:4
56:7
**revert** 72:14
**review** 40:9
63:20 64:8,9,25
91:4 117:20
**reviewed** 65:6
**reviewing**
110:25
**ridiculous** 75:23
76:2 170:21
**riding** 18:18
29:11 34:4
**right** 20:22
21:17,18 22:6
35:16,22 36:22
40:7 43:25 44:1
44:19 45:14

46:15 49:16
50:12 65:25
69:19,19 70:8
78:21 79:2 91:3
108:18 115:19
115:21 116:16
145:12 167:23
171:8
**rights** 19:19
31:16 33:13,14
39:1,2,2 50:2,21
50:21,22 51:22
52:3,17 61:10
72:22 112:13,17
113:7,17 121:12
121:21 124:4,5
132:4,4 134:25
135:4 137:18
139:18,19
161:13 162:15
167:19
**risk** 106:14
**rob** 10:1 16:5
17:9 19:7 23:18
26:14,15 39:14
64:17 76:13
89:9 102:18
107:18 111:16
137:4 152:7
**rob's** 16:20
17:14
**robert** 159:11,19
**rocket** 63:18
**room** 8:5
**roslyn** 8:4 9:2,3
**rotate** 77:17
102:1

**roughly** 65:3
**round** 77:3
**royalties** 34:2
38:19 49:3,9
57:23 71:21
84:12
**royalty** 38:14
135:10
**rude** 7:6
**rule** 87:20
**rules** 1:22 6:23
**ruling** 96:8
**rulings** 175:13
**run** 75:8 115:12
**runs** 106:14
149:14
**ryan** 2:13

**s**

**s** 17:13,18,18
174:8 177:5
**sachs** 34:21,22
**salaried** 46:9
**salary** 46:16
**sale** 132:13,16
132:17,23,24
136:4,20 139:20
167:25
**sales** 34:1 71:20
72:10,13,15,18
73:11,12 84:11
112:17,19 113:1
131:23 132:4,21
134:11
**sample** 140:6
150:15 155:6
**sampled** 153:10

**samples** 105:12
133:20,22 134:5
134:9 154:5,14
**saving** 43:23
**saw** 80:1 139:23
**saying** 29:3 31:1
31:18 33:12,17
34:13 38:20
48:15 49:24
50:5,9,11,15
51:18 55:14
58:7 65:20 66:6
66:8 76:1 82:9
88:17 89:11
107:15 120:12
120:24 134:17
160:6,6 170:2
**says** 24:2 28:25
35:16 38:13,15
42:4 43:14
44:12 72:21
73:3 78:12 83:8
84:10 85:5
86:15 91:10
93:8 100:14
101:6 112:6
118:13,18
119:22 120:1,6,9
123:9 127:13
130:5 137:15
146:14 155:4
158:6,16,19
165:6,20
**scale** 87:8
**scholarship**
10:16
**school** 9:1,3,13
10:7 11:8,9,16

11:21 12:22
13:2,3,7,13,14
97:23
**schools** 13:5
14:4
**science** 13:22
14:18
**scrapped** 154:15
**screaming** 95:5
96:13
**screen** 4:10
20:18,21,25 21:2
21:23 22:23
33:21 39:23
40:1,7,17 41:6
61:22 77:20
84:7 100:11
102:3 107:6
108:18 111:6
116:6 125:18
129:15 145:14
155:14,17,23
**screenshot**
121:11 123:13
123:17 125:6
162:21 163:10
164:6,8,10,18,21
165:5,25 166:2,6
166:10,12,20,22
166:24 167:4,7
167:13,22 168:3
168:9 169:11,17
**screenshots**
106:4 168:14
169:6,22
**screenshotting**
121:19

**scroll** 22:3 40:11
41:16 62:1 65:2
66:1,21 73:22
76:6,8 116:9
117:2,6,22 119:4
121:24 125:21
129:25 145:18
145:25 146:18
165:10
**scrolled** 22:10
33:19 41:10
**scrolling** 62:5
127:24
**sculpture** 130:14
143:6,8
**sealing** 3:4
**sec** 45:11
**second** 11:5
27:18 45:10
48:10 102:9
155:23
**secret** 127:8
129:6 161:16
**section** 57:9
65:19
**security** 14:9
**see** 6:12 8:6
12:11 19:14
20:14,20 21:3
24:11 33:20
40:6 45:23 65:3
66:4,18 71:9,11
78:25 84:8 85:3
103:1 108:17,19
108:22 109:4
111:24 114:3
115:20 116:17
116:21 117:8,10

117:12,25 118:1
118:2 119:5
122:3,5 126:16
126:17,19,21
127:15 128:5
130:6,8 146:6
150:23 156:24
157:22 165:12
165:14 171:2,5
**seeking** 80:24
81:14 82:1,7
**seen** 4:8 126:14
127:20 133:21
145:22
**self** 92:17,21
129:10
**sell** 53:19 61:10
109:24 110:14
114:8,11 131:15
131:20 132:3,9
133:15 135:7
140:11,16
141:12 165:1
**selling** 45:9
61:14 132:24
162:16 167:18
**sells** 131:23
**semester** 15:20
**send** 42:23
153:11
**sending** 77:10
82:15 88:15,19
**sends** 156:3
**seniors** 16:23,24
**sent** 22:2,11
30:18 63:7 64:2
64:6,10,14,16,17
64:17,18,25

76:24 77:2
78:13,22 79:17
79:19,22,24 80:6
85:9,22 86:15,18
86:19 91:25
103:5 104:13
105:4,11,18
122:11 149:17
152:1,2,5,8
155:25 156:6,11
156:14 159:22
168:20
**sentence** 27:19
33:24 44:14
48:9,11 49:25
81:17,19 92:9
93:8 102:24
**separate** 16:3
43:2 71:6 83:2,2
**separated** 91:14
**september** 60:25
61:2 176:17
**serial** 69:4,21
**series** 55:11
64:23
**serve** 112:10
**service** 146:6,11
**services** 16:19
**set** 45:13 80:2
83:15,19 84:24
89:23 176:7,17
**seven** 119:5
120:25 154:21
162:7
**sexy** 101:8 154:7
164:1
**shaking** 7:3

**share** 20:18,21
  20:24 21:2 40:1
  40:7 102:2
  107:5 111:6
  116:6 125:18
  129:15 145:14
**sharing** 155:23
**sheet** 167:18
  177:1
**shepherds** 47:11
**shirts** 19:1
**shock** 86:24
**short** 97:1
**shorthand** 151:2
**show** 20:9 51:12
  51:12 52:14
  58:12 66:22
  101:18 117:22
  117:23 120:3
**showed** 86:12
  88:10,13 155:12
**showing** 80:13
  107:10 164:24
**shows** 73:16
  95:25 148:15
  166:9
**sic** 86:1
**side** 78:22 94:1
  97:11,12 100:4
  154:12,12 155:5
**sided** 154:11
  155:3
**sides** 79:2 99:19
  150:14
**sign** 64:12
**signature** 22:3
  22:25 62:3
  66:16 117:8,15

127:17,19
  146:20 176:20
**signature's**
  146:17,19,23
**signed** 3:12,14
  18:12 24:1
  26:20 30:23,25
  34:8 44:24 55:9
  62:10,14 64:11
  64:19 65:5,15
  66:15,19,25 67:3
  67:5,6,8,10,14
  67:17 68:7 73:1
  73:6 85:3
  108:15 122:2,4
  147:18 159:2,5,9
  159:9 160:2,9
  165:13,18
**significance** 79:6
**signifies** 155:17
**signing** 18:7
  25:9 26:21
  29:19 31:8
  42:24 43:3
  60:14 72:25
  117:12 137:5
  158:21,25
**silence** 86:13
**similar** 10:15
  168:25
**simple** 45:2
  47:17 133:7
**simply** 36:14
  42:20 43:19
  83:18 84:22
  151:9
**simultaneous**
  15:10 94:5,21

95:15 98:21
  104:5 137:21
  138:5
**single** 110:4
**singling** 89:17
**sipa** 12:22 14:5
**sir** 95:2,10 96:18
  96:18 162:11
**sit** 27:2 75:4,12
  90:14,15 92:23
**sitting** 10:24
**six** 19:5 23:13
  24:1 26:1,1
  118:1 120:18
  122:12 126:4
  162:2
**size** 92:3 118:20
**sketch** 77:2 87:6
  88:6 92:5
**sketches** 79:22
  79:25 80:6,10
  86:7,9,16,20,22
  87:5,24 88:2,3
  89:2 91:17,23
  92:24
**sketching** 87:13
  87:14
**slash** 62:22 79:5
  123:4
**slashes** 146:22
**slicker** 115:10
**sloppy** 87:7
**slow** 52:25,25
  53:1 138:13
**slowly** 20:23
  53:4
**small** 10:15

**snack** 145:1
**snap** 18:5
**sneaky** 114:20
**social** 47:4 56:4
  56:6
**soft** 130:14
  143:6,8
**software** 10:13
**sold** 72:8 75:5,14
  75:15,17,18 88:2
  109:6,21 110:6
  130:18,22 131:2
  133:12 138:18
  138:24 139:7,14
  140:1,3,5,8,13
  142:4,7,13,16,24
  143:4,8,12
  144:12,17,22
**solicitation**
  132:14 134:10
**solicitations**
  130:24
**solicited** 131:1
  133:4 140:7
  142:21 143:11
  144:11,21
**soliciting** 133:1
**something's**
  24:25
**soon** 98:5
**sorry** 36:7 44:4
  50:14 54:15
  63:24 69:14
  71:22 72:16
  78:3 85:16 86:3
  87:1 89:3 108:9
  124:6 149:20
  155:20 156:17

**[sorry - submitted]**

162:1 163:7
166:3
**sounds** 115:3,19
**southern** 1:2
4:22
**speak** 15:13 59:7
94:8,24 95:18
98:19,24 99:21
104:8 137:24
138:8 158:17
**speaking** 19:5
36:13
**speaks** 28:7
43:13 72:11
85:2 94:12
97:21 98:4,9
129:5
**specific** 35:2
72:5 78:3,17,18
119:11 141:24
145:22
**specifically** 48:3
80:13 130:9
158:24 160:9
**specified** 44:9
52:7 60:24
**specify** 105:16
**specifying** 45:5
**specimen** 139:9
**spectrum** 25:2
**speculate** 59:5
**speculating**
65:12
**speech** 101:10
103:20 109:22
154:11 155:3
**spell** 14:12 17:11
17:14

**spend** 93:24
**spending** 46:24
**spent** 54:13 86:1
**spin** 8:7 59:15
**spinners** 18:5
38:23
**split** 46:25 71:1
**spoke** 8:22 13:18
104:18 105:19
127:5
**spoken** 19:3
**spongebob** 61:13
**spot** 64:12
**spring** 15:19
**sprinkled** 51:2
**spun** 51:11,21
52:13
**stamped** 78:1,10
**standard** 82:17
118:18
**start** 8:25 72:6
78:19 132:7
150:4
**started** 10:2
158:9
**starting** 9:25
**starts** 27:19
102:25
**startup** 60:16
**state** 1:21 5:11
5:14 9:9,20
13:16 15:21
25:14 43:19
149:11 176:4
**stated** 71:16
**statement** 68:18
118:17 146:7,11
146:11 147:8,12

151:8 153:5
**statements** 69:10
**states** 1:1 126:24
146:6 152:13
**stenographer**
1:20
**step** 64:14
**stern** 13:13
**stick** 138:3
**sticker** 167:18
**stints** 9:6
**stipulated** 3:2,7
3:11
**stipulations** 1:23
3:1
**stitch** 153:22
**stitched** 153:25
**stop** 32:10 54:4
94:16 96:21,23
98:13,14,14
115:17
**stopped** 104:21
**stopping** 56:4,5
56:7,9 70:9
**story** 42:16
**straight** 36:20
**straightforward**
28:17
**street** 15:23
**streets** 37:23
**stretching** 124:5
124:5,9,14,24
**stricken** 97:14
**strict** 135:9
**strictly** 92:10
**strike** 37:2 85:11
128:12 147:9
149:20

**stroke** 89:11
**strong** 96:20
**struck** 106:15
**student** 12:10
**studios** 1:9,10
10:3 14:25 17:1
112:7,14,18,24
113:8,18 135:5
**studios's** 112:8
112:11
**study** 12:6
**stuff** 38:18
**stuffed** 18:4,25
30:8,15,17 38:16
38:22 44:10
50:18 52:4,7,10
53:17 100:13,16
100:20 101:6
102:25 103:6
104:16 105:6,18
114:19 127:4
130:12,13,14
142:3,5,10,13
144:15,17,18
148:16,19
152:18 153:9
**stuffy** 103:13,22
**style** 118:20
**subjective** 57:8
**submission** 90:9
**submissions**
141:17
**submit** 125:24
**submitted** 91:18
92:4 120:14,14
120:15,16,19,20
120:21 139:9
148:12 149:2

153:8 154:19
161:1
**submitting**
82:17 152:13
**subpoenaed**
25:13
**subscribed**
173:10 177:21
**suddenly** 86:14
**sued** 54:15
104:24
**suggest** 62:21
**suggestions**
23:18,19,20,22
**suggests** 38:23
**suing** 20:3
**summer** 14:8
80:7
**sunday** 63:7
137:6
**sunglasses** 8:13
**superhero** 101:4
**supply** 112:25
**supposed** 68:17
162:23
**sure** 6:24 8:16
8:21,21 9:2
20:13 22:5
26:18,19 27:7,9
27:16 37:11,11
37:18 42:7,24
44:16 46:21
49:23 66:1,23
67:14 71:7 72:6
77:12,14 78:2,4
83:23 84:1
86:25 87:2
107:14 111:12

112:1 118:22
128:23 134:4
141:23 145:3,7
152:5,9,19
154:22,25
155:13 163:13
168:24 169:3
**surprise** 101:14
127:10 152:23
**sweat** 60:15
**sworn** 3:14 6:4
173:10 176:8
177:21

**t**

**t** 14:13 19:1
174:8
**tab** 157:5
**table** 8:12
**tabletop** 42:18
42:21 43:1
130:13 142:22
142:24 143:2
**tag** 148:16,18
**taglines** 39:16
**take** 4:12 7:15
7:17,20 22:10
25:18 33:23
37:4 40:13
42:15 45:25
53:24 61:19
64:13 70:4,8
74:20 90:4,6,12
107:14 114:25
121:8 123:12
131:5 138:12
145:8 164:25
165:5 166:1,5,21

167:4,7 169:17
171:3,4
**taken** 1:19 4:16
6:14,16,19 7:12
9:24 14:7 70:18
90:25 107:21
108:1 109:7
110:21 111:18
116:1 171:15
**talk** 34:18 48:17
53:1,7,9 104:23
146:1 159:13
**talking** 10:25
42:3 54:23
60:18 71:5 81:3
81:4,5 89:8
104:17,19 109:3
169:5,7
**target** 56:18
150:22
**teach** 69:1
**technologies**
9:17
**technology** 5:1
12:17
**tel** 2:5,11
**tell** 15:3 20:4
28:2 32:17
63:24 68:14
85:16 92:23
107:10 108:4
122:23 125:3
140:20 148:25
160:17 162:12
**telling** 27:15
69:20 95:22
109:11 132:22

**tells** 58:4
**tens** 108:24
156:8
**tentatively** 27:20
29:13,21 100:12
100:14
**term** 74:21
92:21
**terminate** 94:15
98:6
**terms** 18:14 20:7
47:7,12 57:18
135:19
**testified** 6:6
143:25
**testimony** 32:13
176:7,10
**testing** 80:8
150:20
**tests** 150:21
**text** 118:7 120:5
128:5,15 130:2
**thank** 6:13 36:25
55:6 60:2 70:22
99:8 144:25
171:24 172:9
**thanks** 44:2
69:24 70:14
115:18 138:15
138:16 171:11
**thin** 49:10
101:21
**thing** 26:15 38:5
49:20 54:24
55:25 61:12,16
100:22 137:2
148:13 168:5
170:2

**things** 10:4 13:8
13:19 19:2,25
25:4 26:9,22
38:21 39:1
46:12 53:14
63:19,20 102:13
124:25 135:24
136:22 141:25
**think** 11:23 12:3
13:6 16:17,19,21
17:4 19:10
21:19 28:16
31:5,19,19,20
32:11,12 33:13
33:14 38:17
43:9 46:10
49:21 55:19
58:1 61:3,12
63:9 65:9 68:2
70:9 71:25,25
72:11 73:15,22
79:19 85:1 88:7
91:24 96:10,12
112:1,2,2 114:22
115:12 116:12
116:22 120:18
126:3 129:23
144:14 151:10
152:9 154:23
155:16 157:4
159:15 170:10
170:11,20 172:1
**thinking** 13:7
89:18 92:19
**thinks** 93:19
**third** 2:4 5:20
48:10

**thought** 43:10
47:18 61:8 80:9
86:15,17
**thousands**
108:25,25
149:15 156:9
**thread** 78:6,8,11
106:5,7
**threat** 82:16
**threatening** 82:9
**three** 13:11 14:3
16:23 65:4 72:1
117:11 122:3
154:13
**till** 9:21
**time** 1:19 3:10
5:12,13 8:22
11:15 15:13
17:25 18:15
19:16 24:8,23
25:8,15,17,20
30:11 33:15
40:12 43:15
46:25 55:5
60:10 64:14
70:16,20 80:23
83:3 86:8,12
88:25 93:24
94:8,24 95:9,18
96:3 97:15
98:24 100:3
104:8 109:19
110:23 116:3
127:5 131:4
137:24 138:8
152:11 158:7,13
171:13,17

**timeline** 8:23
**times** 60:9 89:4
95:10 114:13
123:8 153:10
**title** 107:11
**today** 7:10,14
27:3 68:14 75:4
75:6,12 123:25
133:16,18
136:18 140:24
**today's** 172:12
**token** 87:23
**tokens** 87:25
**told** 19:18 32:8
32:20 50:25
53:25 63:4
85:17,18 93:22
94:13 99:6
127:2 133:2
135:24 144:4,23
167:17 168:23
**ton** 18:2 47:10
**tons** 22:2
**top** 29:1 69:5
76:9 102:10
112:7,23 119:22
120:1,9,11
121:25 126:16
128:1 146:5
147:2 157:22
160:13 165:15
**torres** 1:20 5:4
176:3,21
**total** 172:13
**tough** 97:8 99:16
99:17 111:19
**toy** 101:17,18
130:13 142:10

142:13 153:24
**toys** 101:15
130:12,14,15
133:20 140:15
143:7,9 144:15
144:19 149:8
160:23
**trademark**
48:20 116:13
125:24 126:2,10
126:24 127:3
128:18 129:7,23
130:3 132:14
139:10 145:23
149:3 152:14,17
152:22 160:2
168:21,23
174:19,22,23
175:3
**trademarks**
122:15
**transcript** 36:18
98:8 173:1
176:9
**transfer** 33:16
135:15,18
162:22
**transferred** 33:6
33:7 72:25
121:21 135:1
139:18
**transfers** 135:12
**transparent**
69:15,17
**trap** 92:15
132:11
**trial** 3:10 24:24
53:6 96:5 99:19

106:13 110:5
**trick** 134:17
**tricky** 16:4
**tries** 56:11
**triggered** 82:19
**trillion** 51:7
**trium** 14:1,12
**trium's** 13:9,25
**troll** 29:25 30:8
**true** 63:14
133:16,18
168:18 173:3
176:9
**truthfully** 144:1
144:1
**try** 36:19 54:6
55:2 57:15
59:21 99:12
115:6 136:17
138:23 141:19
155:15 166:18
**trying** 7:6 24:12
31:2 44:3 49:19
53:24 68:5,24
69:15 86:2
88:22 92:15
93:25 98:17
102:12 105:21
114:16,20
132:11 134:17
140:10 151:16
164:25
**tumbler** 56:8
**turn** 155:23
**turned** 51:10,14
51:16,19 101:15
**turns** 150:24

**turtles** 18:18
29:11 34:4
**tv** 51:12
**two** 11:6 13:4
38:20 41:7
46:25 55:22
61:10 62:6 71:5
76:16,18,20
81:22,24 82:7
83:9,11 84:3,3
86:14 112:19
146:21 154:13
156:24 159:20
**type** 9:16,17
12:10 54:22
69:4 118:8,11
148:13
**typed** 118:15
119:1 128:15
**types** 9:16 12:16
51:21 130:19
**typing** 118:24

**u**

**u** 14:13
**u.s.** 4:21
**ubos** 17:9
**ucc** 132:17
**uconn** 11:3,10
11:22 12:20
14:19
**uh** 7:3,3
**un** 14:8
**uncharted** 51:17
51:18,23
**uncommon**
34:20

**undergrad** 9:5,9
13:16 16:23,24
**underneath**
120:4
**understand** 29:3
36:8,10 48:8
49:22 50:12
60:6 83:10
89:13 94:18
99:11 110:10,11
110:12 134:19
136:16 140:18
141:21
**understanding**
59:12 68:14
96:1
**understood**
26:20 47:14
59:10,18
**unexpected**
18:11 137:15
**unfortunately**
77:16
**unit** 4:14 110:17
**united** 1:1
126:24 152:13
**units** 73:18,23
73:25 74:5,15
172:14
**university** 9:9
10:6 12:24 13:1
13:21
**university's**
13:13
**unnecessary**
161:21
**unprofessional**
95:25

**unquote** 12:9
80:9 103:22
161:7
**unreasonable**
122:17
**untrue** 35:15
**unusual** 40:25
51:20 61:16,17
**upfront** 26:22
34:1 84:11
**uphold** 141:7
**upload** 82:10
86:2,4 123:11
147:7,11 169:22
**uploaded** 107:12
121:10 122:9,19
147:18,19 151:7
153:5
**uploading** 20:11
20:15,16 149:3
168:16,19
169:14,17,23
**upper** 55:24
117:25
**upset** 56:16
68:20,21 69:11
110:1,2
**upside** 77:16
**upsidedown**
102:1
**url** 123:4
**use** 18:14 33:2
37:16 56:21
70:5 93:21
119:13,14 120:2
120:17 121:21
122:14,14 124:3
131:1 140:10

146:7,12 147:9
147:12 151:8
153:5 161:11
166:9
**useless** 141:6
**uspto** 118:8
132:23 139:9
148:12 158:5
**uspto's** 133:5
**usually** 155:11
156:2

**v**

**v** 177:3
**verbatim** 11:11
**veritext** 5:2,5
172:15 177:1
**version** 78:11
**versus** 4:18
**video** 1:16 4:11
4:15 51:15,18
**videographer**
2:16 4:1 5:3
70:15,19 90:21
91:1 97:6 98:12
99:25 106:21
110:16,22
115:21 116:2
171:12,16
172:11
**videographer's**
172:7
**view** 77:17
**viewed** 65:1,3,4
66:22,24
**views** 56:9 61:7
**virtual** 4:25 7:23

**virtually** 4:5,25
**vision** 51:4
**visit** 11:9
**voices** 41:24
**volume** 106:21

**w**

**w2s** 25:12
**wahlberg** 51:20
**waived** 3:6
**walking** 15:21
**want** 7:17 11:25
15:25 16:1 22:8
23:14 31:25
37:21 40:19
42:14 43:3
49:17 54:3
68:20,25 69:3
73:15 83:21
87:3 90:5,7,10
90:15,16 93:21
94:17 99:15,18
103:8 111:19,20
111:24 118:21
118:25 134:18
140:22 141:23
145:7 165:11
169:20
**wanted** 12:5
18:4 19:21
26:21 31:22,24
32:3 33:9 34:24
37:17,20 38:24
39:3,7 46:21
47:2 57:19,21,21
82:12 109:25
123:23 128:11

**wants** 38:20
**wash** 155:18
**waste** 43:15
97:15 100:2
**wastes** 55:5
**wasting** 96:2
**watch** 90:16
**water** 8:13 9:7
**way** 21:12 34:17
42:15 54:23
58:2 61:7 70:1
82:14,17 126:10
128:13 135:18
143:24 170:1
176:14
**we've** 23:19,20
56:7 81:10
137:7 143:10
144:11 162:4,8
162:10
**wearing** 101:3
**webcomic** 1:5
2:3 4:18 17:23
18:10,24 19:20
27:24 28:4 29:4
29:11 30:13,14
30:20 31:10,20
32:6,15 34:5,10
34:14,16 35:4,5
35:13,24 36:3,6
37:6,9,24 38:21
42:13,19 44:20
45:15 46:18,20
49:4,5 50:8 52:3
52:20 53:20
54:11 55:11,16
56:22 57:4,14,20
58:5,13 60:7,10

60:11,17,20,22
61:7 67:25
72:24 73:5,11
74:11,17 75:3,13
76:25 84:14
100:13,16,21
108:20,23 109:5
110:14 112:14
113:7,17 114:3,7
114:8,11,14,18
114:19 116:19
118:13 119:1
121:3,5 122:25
123:4,5 125:5,7
126:20,25 128:6
129:4,7,24
130:19 131:15
131:21 132:9
133:11,25 134:7
134:23 135:14
135:16,21,25
136:3,20 137:4
137:10 138:2,3
138:19,21,25
139:3,14,16,25
140:1 141:25
142:4,13,24
143:2,8 144:18
145:23 146:12
148:18 150:10
152:6,17,22
156:12 160:20
161:15 177:3
**website** 128:19
133:4 162:16,19
162:21 163:4
164:14 166:2,6
166:13,22,25

**[website - york]**

167:8,14,25
168:4,6,15
**webtoon** 35:7,7
46:9,16 57:1,3,5
57:12 61:7
**week** 11:16 52:2
123:8,8
**weeks** 65:4
**weitzman** 13:6,6
**welcome** 99:9
**went** 9:2,10 10:8
10:9 11:8,21
31:13
**west** 11:23
**wharton** 13:3,22
**whatsapp**
103:18 151:22
152:1,2,5
**whatsoever**
24:12
**where'd** 153:14
**whereof** 176:16
**whichever** 112:4
**white** 77:2 79:20
79:20,25 80:6
86:7,9,19,22
87:5 89:2 92:24
**wildly** 25:3
**wind** 150:23
**winnie** 61:17
**wiseman** 17:25
17:25 19:7
21:20 29:5
32:20,23,25 37:7
49:15 62:23
68:2 73:2,7
84:15 137:18
144:23

**wiseman's** 73:9
**wish** 47:16
**withhold** 82:16
**witness** 4:9 21:5
21:11,16 22:13
28:9,15,24 36:23
40:8,18 44:1
53:8 55:2 68:23
69:14,23 100:5
106:2 107:3
110:12 141:21
159:12,18
161:22 162:1
170:8,23 172:9
174:4 176:6,10
176:16 177:4
**wizard** 101:3
**won** 10:11
**wondering** 36:2
**word** 49:16
54:22 55:20
63:22 93:21
103:23 118:7,9
118:11 137:1
**wording** 42:18
**words** 19:23
29:12 43:19
53:5 59:14
**work** 10:17 19:9
31:18,24 32:3
33:9 34:20,21
37:20 39:7 46:2
46:5 50:7 52:13
57:21,22 91:23
153:17 168:12
**worked** 9:7,18
25:19 30:11

**working** 9:6
11:14,15 16:6
18:15,16,18
19:15 42:22
57:16 58:5,13,19
60:7 61:4 149:7
**works** 16:7
35:25 36:4 46:9
47:8 50:8 51:16
71:14 72:7,13,15
134:12 172:5
**world** 35:1 46:10
47:12 57:2
60:24 108:15
121:19 131:7
**wound** 9:8 11:18
12:21 29:19
31:2 100:24
101:1 154:17
**write** 32:6 39:10
44:7
**writers** 39:15
**writing** 65:15
67:10,17 91:22
128:25
**written** 23:8
63:23
**wrong** 20:3
128:25
**wrote** 23:14 30:5
43:6,8,9 63:10
63:23 128:19,23

**x**

**x** 1:4,12 174:1,8
175:1

**y**

**yeah** 9:21 19:13
19:18 21:14
22:13 24:18,22
28:11,11 36:11
39:7 40:10,23
41:3 48:3 53:12
66:5,5,21,24
68:23 77:19
84:16 85:4 94:4
94:4 96:10 99:5
102:13,20 106:8
106:25 107:7
111:10,12
113:22 115:16
120:12 124:20
132:11 145:3
151:25 153:7
156:20 160:24
161:19 164:1
171:7,10
**year** 10:10 11:5
14:6 15:17
108:3
**years** 9:24 11:6
19:8 23:13,17
24:1,5 26:1 61:5
63:22 74:20,24
107:19 122:19
149:16 156:9
**yep** 27:23 122:6
125:9 128:2
149:24 156:19
160:16 162:6
**yo** 54:3
**york** 1:2,21 2:4,4
4:22 5:2,20,21
8:4 9:20 12:24

| | |
|---|---|
| 13:12 176:4 | |
| 177:1 | |
| **young**   51:5 | |

| **z** |
|---|

| | |
|---|---|
| **zero**   41:25 | |
| **zoom**   7:24 16:17 | |
| 20:12 117:23 | |
| 130:1 155:11 | |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.