**UNITED STATES DISTRICT COURT**
**SOURTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

    ALEXANDER NORRIS

                     *Plaintiff*,

        v.

    Marc Goldner, Individually and as Officer
    of GOLDEN BELL ENTERTAINMENT,
    LLC, a California company and GOLDEN
    BELL STUDIOS, LLC, GOLDEN BELL
    ENTERTAINMENT, LLC., a Nevada
    Company and GOLDEN BELL STUDIOS,
    LLC,

                  *Defendants*.

---------------------------------------------------------x

Case No.: 19-cv-05491-PAE-SN

**NOTICE OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

     **PLEASE TAKE NOTICE** that Plaintiff Alexander Norris, by and through his attorneys of record, in accordance with and pursuant to Federal Rule of Civil Procedure 56, Local Civil Rule 56.1, the Court's Individual Practice Rule III(A) and the Court's September 7, 2022 Order, ECF Doc. No. 104, and the Court's September 16, 2022 Order, ECF Doc. No. 110, Plaintiff will move the Court, Magistrate Judge Sarah Netburn, on the 6th day of January, 2023 at 9:00am or as soon thereafter as counsel may be heard, for an order pursuant to Rule 56 of the Federal Rules of Civil Procedure granting Plaintiff's motion for summary judgment or, alternatively, partial summary judgment (the "Motion").

The Motion shall be based on this notice, the Memorandum of Law, Plaintiff's Local Rule 56.1 Statement and all declarations in support and exhibits thereto, all documents on file with this Court and all argument the Court may here, and any further documents filed by Defendants in support thereof.


Dated: October 14, 2022
New York, New York                                  Respectfully submitted,

                                                    */s/ Francelina M. Perdomo*
                                                    Francelina M. Perdomo, Esq.
                                                    Kyle G. Kunst, Esq.
                                                    GALLET DREYER & BERKEY, LLP
                                                    845 Third Ave., 5th Floor
                                                    New York, NY 10022-6601
                                                    Phone: (212) 935-3131
                                                    Fax: (212) 935-4514
                                                    fmp@gdblaw.com
                                                    kgk@gdblaw.com

                                                    *Attorneys for Plaintiff*
                                                    *Alexander Norris*

**UNITED STATES DISTRICT COURT**
**SOURTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
:
ALEXANDER NORRIS                                           :
:
                   *Plaintiff*,          :     Case No.: 19-cv-05491-PAE-SN
:
      v.                                            :
:
Marc Goldner, Individually and as Officer                 :
of GOLDEN BELL ENTERTAINMENT,                             :
LLC, a California company and GOLDEN                       :
BELL STUDIOS, LLC, GOLDEN BELL                            :
ENTERTAINMENT, LLC., a Nevada                             :
Company and GOLDEN BELL STUDIOS,                          :
LLC,                                                      :
:
                *Defendants*.
-----------------------------------------------------------x

---

**PLAINTIFF'S MEMORANDUM OF POINTS**
**AND AUTHORITES IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**
**OR ALTERNATIVELY,**
**PARTIAL SUMMARY JUDGMENT**

---

<u>INTRODUCTION</u>

Plaintiff Alexander Norris ("Norris"), in accordance with and pursuant to Federal Rule of Civil Procedure 56, Local Civil Rule 56.1, the Court's Individual Practice Rule III(A), the Court's September 7, 2022 Order, ECF Doc. No. 104, and the Court's September 16, 2022 Order, ECF Doc. No. 110, hereby submits this memorandum of points and authorities in support of Plaintiff's motion for summary judgment or alternatively, partial summary judgment.

This is a matter where the Defendants, a group of companies run by Marc Goldner ("Goldner"), have completely overreached their entitlement to Norris's intellectual property: trademarks protecting goods and services arising from his popular works of authorship including his online comic strip "Webcomic Name" and underlying characters.

Based upon a "Collaboration Agreement," Defendants were given limited intellectual property rights solely to the "WORKS," which is only a not-yet-created tabletop game and a not-yet-created plush toy. Indeed, during the parties' negotiation of the Collaboration Agreement, Norris informed Goldner that Norris was working on a book deal for Webcomic Name, and Norris sought clarification of the Collaboration Agreement's limited reach. Goldner agreed that the Collaboration Agreement was limited to just a tabletop game and a plush toy and even added language to that effect.

Now, however, Goldner claims the Collaboration Agreement gives Defendants an unbridled ownership interest in nearly every facet of Webcomic Name. Goldner took admittedly unauthorized screenshots of Norris's websites – images that Norris owns the copyright for – and submitted those screenshots (without permission) to the United States Patent and Trademark Office. By submitting those unauthorized screenshots, Defendants' obtained a trademark

registration for "Webcomic Name," though for goods that Defendants have never used in commerce, requiring cancellation of that trademark.

Defendants filed the trademark application even when Defendants simply refused to pay Norris for the illustration work he performed under the Collaboration Agreement. Norris created the cards for the tabletop game demanded by Defendants, at which point he was entitled to one of two payments. Defendants unjustifiably refused, by claiming that the cards were not "final" based upon Defendants' then-created definition of "final."

By Defendants' own admissions, they have undisputedly infringed on Norris's copyright, falsely designated the origin of Norris's works and materially breached the Collaboration Agreement through their excessive overreach into Norris's intellectual property and refusal to make required payments.

<u>FACTUAL HISTORY</u>

1. **Norris Created Webcomic Name in 2015, Which Goes on to Obtain International Attention.**

Norris is a visual artist, comics illustrator, and an author of short stories, webcomics, comic books and strips. Among Norris's most notable works, is the viral "Webcomic Name" centered on the main character, the hapless "Blob," and its catchphrase "Oh No,"[1]



---

[1] Plaintiff's Rule 56.1 Statement [56.1], No.'s 1-5.

Norris launched Webcomic Name in 2015, and by 2016, Norris had acquired the domain name http://www.webcomicname.com to promote his comics, illustrations, short stories and workshops. Webcomic Name went on to be featured in various internet websites such as Comics Blog, Bored Panda, GoComics, It's Nice That and The Nib.[2]

After its launch, Webcomic Name soon grew to become the brand under which Norris popularized his visual and literary works, workshops and merchandise. Norris commercialized the Blob character and its "Oh No" punchline when he created the "Oh No" web store in 2016: www.theohnoshop.com. Since then, Norris used Webcomic Name as his trademark, alter ego and the umbrella under which Norris markets and promotes his illustrations, comics, books and merchandise items which can be purchased online on his "Oh No" webstore.[3]

In 2019, Norris registered several comic strip illustrations in the United States, such as, "Different", "Dog", "Imagination", "Impossible" and "Procrastination" under Registration No. VAu 1-337-956 (the "U.S. Copyrighted Works").[4]

To date, Webcomic Name has attracted more than half a million online followers across the various social media platforms that Norris runs.[5]

**2.  Norris is Recruited to Create a Table-Top Game.**

In early 2017, Norris agreed to join forces with Jason Wiseman ("Wiseman"), who Norris knew as a well-known table top game creator.  Wiseman approached Norris to collaborate on a table top card game (the "Game") based on the illustrations and characters of Webcomic Name. Since the Game would incorporate the style, concept and characters of Webcomic Name, Norris

---

[2] *Id.* at No.'s 3-7.
[3] *Id.* at No.'s 9-10.
[4] *Id.* at No. 11.
[5] *Id.* at No. 4.

3

and Wiseman used "Webcomic Name Game" as a placeholder reference. Together, they planned to jointly publish the Game via Kickstarter and commercialize it through Wiseman's distribution channels.[6]

In or around the spring of 2017, Wiseman informed Norris that Wiseman was considering Defendants to publish and distribute the Game through Defendants' distribution network. Wiseman and Norris further agreed that Defendants would publish and distribute the Game to avoid handling the logistics related to marketing, distribution and shipping costs.[7]

On February 11, 2017, Wiseman signed an agreement with defendant Golden Bell Entertainment, LLC ("GB Entertainment") pursuant to which Golden Bell agreed to purchase four table card games from Wiseman, three of which were either in their conceptual or in development phase.

### 3. After GB Entertainment Limits the Scope of the Collaboration Agreement Norris Agrees to Sign it

Goldner insisted that GB Entertainment formally engage Norris to illustrate the Game. Goldner explained he wanted to make and sell plush toys of the main character in the Game and wanted permission from Norris to do so. Goldner referred to the plush dolls as the "Webcomic Name Stuffed Animals." On July 3, 2017, Goldner sent Norris a proposed Collaboration Agreement, which GB Entertainment had drafted.[8]

During the preliminary discussions with GB Entertainment, Norris had begun work on a book project which would go on to contain his most popular Webcomic Name comics. Norris and his editor were in the process of negotiating a publishing agreement with Andrews McMeel Publishing, LLC, a division of Andrews McMeel Universal, a Kansas-based publisher of comic

---

[6] *Id.* at No.'s 12-14.
[7] *Id.* at No.'s 15-17.
[8] *Id.* at No.'s 22-24.

4

strips and producer of book collections including Calvin and Hobbes, Peanuts, the Far Side and other significantly popular comics ("McMeel").[9]

After receiving the first draft of the Collaboration Agreement, Norris informed Goldner of the pending publishing deal with McMeel and noted that the Collaboration Agreement must be clearly limited to just a table top game and a plush toy:

> "The main query I have about the contract is the part about 'the artist will retain 0% of the copyright" and similar clauses. Obviously the game will heavily feature elements that are part of Webcomic Name already, and I want to make it clear that in no way does Golden Bell take ownership of any of the characters, images or story content except in its application in a tabletop game. At the moment the wording is very broad and could apply to Webcomic Name in general, rather than simply in relation to a tabletop game. I will be working with publishers on a book and I am going to send them a copy of the contract before signing to make sure there is no breach of my contract with them. Obviously the book and tabletop game are very separate but will contain the same elements and I don't want signing this contract to come back to bite me in the future!"[10]

Goldner responded:

> "I am resending the contract with now with this new language and also specified its for game and stuffed animal.
>
> > A. ARTIST has the right to pursue his Comic 'Webcomic Name' outside of the context of this agreement.
>
> To answer your question about copyright, Jason had agreed to us purchasing the rights for the game already and that part of the deal was already done. If you have any questions please let me know and I hope to work on any issues that may crop up and solve them as much as possible. You are obviously in the free and clear to work on your property outside of the context of our contract."[11]

---

[9] Id. at No.'S 19-21.
[10] Id. at No. 25.
[11] Id. at No. 26.

The language provided by Goldner in response was added to the Collaboration Agreement. Relying on Goldner's statements, limiting the scope of the Collaboration Agreement, Norris signed it on August 10, 2017.[12]

The Collaboration Agreement was limited to the "WORKS,"

> "…with respect to the production of the properties tentatively entitled "Webcomic Name Game" and 'Webcomic Name Stuffed Animals' (the 'WORKS') to be created by ARTIST, and any tie-ins, spin offs, or other commercial development of the WORKS such as Sequels, Prequels, Reboots, Remakes, and Expansions."

Similarly, the intellectual property assigned by Norris to GB Entertainment was further limited to the "WORKS":

> "Percentage, ownership, registration and assignment of 'WORKS' with the United States Copyright Office and United States Patent and Trademark Office are defined and clarified as the joint work of the parties. Thus, ARTIST shall retain 0% of the copyright, 0% of the trademark, 0% of the patent and 5% of the net sales of WORKS for the first 18 months then it will revert to 4% of the net sales of the WORKS thereafter, and COMPANY shall retain 100% of the copyright, 100% of the trademark, 100% of the patent, and 95% of the net sales of WORKS for the first 18 months then it will revert to 96% of the net sales of the WORKS thereafter. ARTIST assigns to COMPANY their initial rights of the WORKS as stated above in this section 1A upon the signing of this AGREEMENT."[13]

The Collaboration Agreement contained another provision, setting forth how Norris would be paid for his development of the proposed table top game:

> "The ARTIST will receive a $3,125 upfront advance against net sales royalties within 30 days of the COMPANY receiving the final files noted above for 'Webcomic Name Game' for a game developed with Jason Wiseman and the ARTIST known as Alex Norris of Webcomic Name tentatively titled 'Webcomic Name Game' by the COMPANY. The COMPANY will then pay an additional $2,500 to the ARTIST upon delivery to the COMPANY of the final print-ready files, the PSD files, the AI files, the InDesign Files, and any other

---

[12] *Id.* at No. 27.
[13] *Id.* at No.'s 28-29.

files pertaining to the game created by the ARTIST and Jason Wiseman."[14]

The term "final" in the portion related to "final files" is not defined.[15]

**4. Norris Delivers Webcomic Name Game Cards to Defendants, Who then Refused to Pay.**

In early October 2018, Norris delivered 250 set up game cards and 150 punch cards and then requested payment of the first advance. Nonetheless, Goldner refused to pay, claiming that the files provided were not "final" and claiming a need to "editorialize" the files prior to providing Norris's payment. To date, Norris still has not been paid.[16]

**5. Defendants Submitted Knowingly False Statements of Use to the USPTO in an Attempt to Register Trademarks to Which Defendants Have No Right.**

Goldner, on behalf of GB Entertainment, began submitting numerous fraudulent trademark applications to the USPTO, in an attempt to take Norris's intellectual property.

     a.  *Webcomic Name, Registration No.5629281 ("Mark 281").*

Goldner filed an application with the USPTO to trademark the phrase "Webcomic Name" in international class 28: "Board games; Card games; Game cards; Party games; Plush dolls; Plush toys; Stuffed dolls and animals; Stuffed toy animals; Tabletop games; Soft sculpture plush toys; Stuffed and plush toys."[17]

In support of that application, Goldner represented to the USPTO that GB Entertainment had first used the Webcomic Name mark on July 26, 2016, and first used said mark "in commerce" on July 12, 2017 – nearly a month before the Collaboration Agreement had even been signed. But none

---

[14] *Id.* at No. 31.
[15] *Id.* at No. 32.
[16] *Id.* at No.'s 34-35.
[17] *Id.* at No. 36.

of the goods related to Mark 281 have even been created, much less sold, meaning that Mark 281 was *never* used in commerce.[18]

Goldner submitted several specimens in support of that application, meant to evidence the mark's "use in commerce." When confronted with each specimen, however, Goldner admitted that none of the goods that Mark 281 intended to protect had ever been created, much less sold.[19]

For example, Goldner submitted as a specimen one photo taken of a GB Entertainment booth at a convention, where a banner displaying Webcomic Name plush toys is visible on the far-right side of that photograph:



But Goldner admitted that no plush toys or board games were sold at that convention. Goldner even claimed to be "insulted" at the notion that any such products had even been created when asked if any such sales occurred at that convention:

> "Q. Do you recall if any Webcomic Name merchandise was sold at this Keystone Comic-Con at which this photo was taken?

---

[18] *Id*. at No. 36, 40-42.
[19] *Id*. at No. 38-42.

A. I honestly have to almost comically, internally laugh. This is insulting that you're accusing us of making merchandise and not telling him. No. He never --
MR. FOX: Marc. Marc. Marc. Marc. Marc. Marc. Marc. Marc. Marc --
A. This is insulting."[20]

Goldner also submitted photos of plush toys, which had never been sold, and photos taken of tags and a purported box that a table top game would be placed in, though again, no tabletop game or plush toy had been created or ever sold, either at the time the application was filed, when that application was granted on December 11, 2018, or on the date of Goldner's deposition on August 24, 2022, when Goldner testified that no sales of any of the products took place.[21]

The USPTO granted the application, and the mark was registered as Registration No. 5629281 ("Mark 281").[22]

  b. *Application Serial No. 88147369 (the "369 Application").*

On October 9, 2018, Goldner and GB Entertainment filed an application, Serial Number 88147369 ("369 Application") for the mark "Webcomic Name," in International Class 016 (Comic books; Comic strips; Comic strips' comic features; Comics; Newspaper comic strips), and International Class 025 (T-shirts).[23]

In support of Application 369, Goldner falsely stated that:

- GB Entertainment is the owner of the trademark sought to be registered;

- To the best of their "knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."

---

[20] *Id.* at No.'s 39-40.
[21] *Id.* at No.'s 43 and 45.
[22] *Id.* at No. 44.
[23] *Id.* at No. 46.

- GB Entertainment's first use the mark in commerce as early as June 26, 2016 in connection with Comic books; Comic strips; Comic strips' comic features; Comics; Newspaper comic strips and T-shirts on June 26, 2016;

- The mark was in use in commerce at the time of the application;

- All of the facts recited in the application were accurate.[24]

In his deposition, Goldner admitted he took screenshots, without Norris's permission, of Norris's social media accounts and websites, and submitted those screenshots to the USPTO as specimens, again to prove to the USPTO that the marks had been used in commerce. Below is just one such example of Goldner's admissions:

> Q. So did you also take a screenshot of this Patreon account that's on page eight of nine?
> A. I believe at some point I did. The date, I do not remember what date I took the screenshot.
> Q. And did Mr. Norris also refuse to give you access to this Patreon account?
> A. He refused to give us access to anything. I don't remember ever asking for Patreon because we wanted him to be able to make money on the Patreon like I said earlier today.[25]

c. *Application Serial No.* 88185795 *(the "795 Application")*.

On November 8, 2018, Goldner and GB Entertainment filed application serial number 88185795 (the "795 Application"). Defendants filed the 795 Application for the phrase "Oh No" in class 016 (Bookmarkers; Bookmarks; Comic books; Comic magazines; Comic strips; Comic strips' comic features; Comics; Stickers; Newspaper comic strips), and class 025 (T-shirts; Graphic T-shirts; Short-sleeved or long-sleeved t-shirt).[26]

---

[24] *Id.* at No. 47.
[25] *Id.* at No. 48-49.
[26] *Id.* at No. 50.

In support of the 795 Application, Goldner falsely stated that:

- GB Entertainment is the owner of the trademark sought to be registered;

- To the best of their "knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."

- GB Entertainment's first's use of the Mark was as early as June 26, 2016 and that its first used the mark in commerce in connection to Bookmarkers; Bookmarks; Comic books; Comic magazines; Comic strips; Comic strips' comic features; Comics; Stickers; Newspaper comic strips and T-shirts; Graphic T-shirts; Short-sleeved or long-sleeved t-shirts on June 26, 2016;

- The mark was in use in commerce at the time of the application;

- All of the facts recited in the application were accurate.

Goldner's statements in the 795 Application were false, as Norris never assigned his rights to his "Oh No" trademark to Defendants, and in fact, in fact the agreement does not even mention the "Oh No" mark. Additionally, Defendants have never used the mark in connection to the applied for goods. Finally, the specimens of use submitted by Defendants were screenshots of the U.S. Copyrighted Works, i.e., "Different," "Imagination," "Impossible," and "Procrastination," which were taken directly from plaintiff's website theohnoshop.com without his knowledge or authorization – a copy of that specimen is copied below:[27]

---

[27] *Id.* at 52-53 and 64.



During his deposition, Goldner once more admitted that he took screenshots of the U.S. Copyrighted Works without Norris's permission, which he then submitted to the USPTO:

> Q. Okay. Let's -- so this is -- well, we won't get into this. So let me go back down to -- okay. Did you obtain Mr. Norris's permission before taking this screenshot on page 12?
> A. I did not ask him to take a screenshot of the website.
> Q. I'm sorry. I missed that last part. You said you did not?
> A. I did not ask him, can I take a screenshot of a website that is [publicly] available, no.[28]

**6. Norris finds the Defendants' False Trademark Applications and Terminated the Collaboration Agreement.**

Norris applied to the USPTO to trademark the phrase "Webcomic Name" in connection with "Comic books; Comic strips and comic strip's comic features, appearing in print media, namely, comic books, books, newspapers, magazines" and its services as "Providing online non-downloadable webcomics and comic strips, books, reviews, periodicals and magazines." The

---

[28] *Id.* at 64.

USPTO denied that application due to the confusing similarity with Mark 281. On March 25, 2019, Norris filed a petition to cancel Mark 281, which has been stayed pending the outcome of this case.[29]

Just three days after Norris filed his petition to cancel Mark 281, on March 28, 2019, Defendants' then counsel, the GS2 Law Firm, sent a reactionary cease-and-desist letter to Norris's counsel, warning that Norris's publishing agreement with McMeel violated the Collaboration Agreement and infringed on Mark 281, despite Goldner's promise that agreement was limited to the tabletop game and plush toy and adding language to that effect. In that letter, Defendants falsely claimed that Golden Bell "is the exclusive owner of the copyrights to Webcomic and 'Oh No,'" despite the fact that that Collaboration Agreement is limited to the "WORKS," and in fact, the phrase "Oh No" is not found anywhere in the Collaboration Agreement. [30]

Norris responded through counsel on April 1, 2019, terminating the Collaboration Agreement given that Golden Bell was using "the Collaboration Agreement as a vehicle to misappropriate the intellectual property rights belonging to Mr. Norris."[31]

## Standard

Summary judgment shall be granted if the moving party shows there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The Court's function is not "to resolve questions of fact but solely to determine whether, as to any material fact, there is a genuine issue to be tried." *Fitzgerald v. Henderson*, 251 F.3d 345, 360 (2d Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, (1986)).

---

[29] *Id.* at No.'s 55-57.
[30] *Id.* at No.'s 66-67.
[31] *Id.* at No. 68.

13

For a fact to be material, it must affect the outcome of the suit. *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *Id.* "Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment." *Chandok v. Klessig,* 632 F.3d 803, 812 (2d Cir.2011); *see Selevan v. New York Thruway Auth.,* 711 F.3d 253, 256 (2d Cir.2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim"); *see also Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).

## Argument

## I. Given Defendants' Admitted, Unauthorized Copying of Norris's Copyrights, Norris is Entitled to Judgment on His Copyright Infringement and False Designation of Origin Causes of Action.

Norris seeks partial summary judgment on the issue of Defendants' liability for copyright infringement. "To make out a prima facie case of copyright infringement, a party must show (1) ownership of a valid copyright in the item and (2) unauthorized copying." *Strike 3 Holdings, LLC v. Doe*, 2018 WL 3756453, at *2 (S.D.N.Y. July 19, 2018). Copyright infringement is a strict liability offense, meaning "intent or knowledge is not an element of infringement." *Innovation Ventures, LLC v. Ultimate One Distrib. Corp*., 176 F. Supp. 3d 137, 156 (E.D.N.Y. 2016) (*citing Fitzgerald Publ'g. Co. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1113 (2d Cir.1986).

Norris can easily establish the first element. It is undisputed that Norris, solely, owns the copyright for the copyrighted works. Norris's "certificate of copyright registration is prima facie evidence of ownership of a valid copyright…" *Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 186 (2d Cir. 2012).

14

The second element, "copying," is established by showing "that the defendant had access to the copyrighted work and that there is a substantial similarity of protectable material between the two works." *Faulkner v. Nat'l Geographic Soc'y*, 576 F.Supp.2d 609, 613 (S.D.N.Y.2008) (*quoting Eastern America Trio Products, Inc. v. Tang Electronic Corp.*, 97 F.Supp.2d 395, 415 (S.D.N.Y.2000)). "Copying" cannot be disputed here – Goldner admitted that he took unauthorized screen shots of the copyrighted works and submitted them to the USPTO.

Further, Defendants' unauthorized copying of the copyrighted materials, then passing them off as their own, constitutes a false designation of origin. False designation occurs where "[i] goods or services are involved, [ii] interstate commerce is affected, and [iii] there is a false designation of origin or a false description or representation with respect to those goods or services in commerce." *Pulse Creations, Inc. v. Vesture Grp., Inc.*, 154 F. Supp. 3d 48, 56 (S.D.N.Y. 2015).

It cannot be disputed that Defendants are liable for the false designation of origin. A false designation of origin occurs from "the reproduction of a work with a false representation as to its creator." *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 781 (2d Cir. 1994). The undisputed evidence establishes that GB Entertainment reproduced Norris's work and passed it off as its own: Goldner took screenshots of Norris's works and submitted those screenshots to the USPTO, each times asserting that GB Entertainment was the "owner" of each mark.

## II.    Mark 281 Has Never Been Used in Commerce and Was Registered Based on a Knowingly Fraudulent Application, And Thus, It Must Be Cancelled.

Mark 281 has never been used in commerce, either at the time of registration, nor any time thereafter – it must be cancelled.  Goldner testified that not only has Mark 281 – the phrase "Webcomic Name" – never been placed on any of the products that have been sold for its international class number, but that Defendants have not even created those goods.

Where a mark is not used in commerce it must be cancelled. In *Chere Amie, Inc. v. Windstar Apparel, Corp.*, 2002 WL 31108187, at *2 (S.D.N.Y. Sept. 23, 2002) this Court cancelled a trademark where, like here, the owner of the purported mark conceded that virtually no sales occurred: "no commercial activity involving the mark transpired prior to registration and offering a concession by Obvious' president that virtually no sales of Girl Zone clothing occurred prior to the issuance of the Girl Zone trademark on June 11, 2000."

The Second Circuit has found that a mark was not used in commerce in circumstances nearly identical to this case.  In *Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 508 F. App'x 31, 33 (2d Cir. 2013), the Second Circuit held that the mark "BLING BLING," used in conjunction with board games, was not entitled to trademark protection, even though the owner had entered into a licensing agreement (that produced no sales), had done some promotional and marketing work and sold approximately 250 board games over several years. The Second Circuit held that "mere advertising or promotion of a mark ... is insufficient to constitute 'use' of the mark 'in commerce…" *Id.* (*citing Buti v. Perosa, S.R.L.*, 139 F.3d 98, 105 (2d Cir.1998)). Furthermore, "a meager trickle of business [does not] constitute the kind of bona fide use intended to afford a basis for trademark protection." *Id.* (*citing La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1272 (2d Cir.1974) (Internal quotations omitted).

Goldner's multiple, knowingly false material statements to the USPTO create an additional reason to cancel Mark 281. *MPC Franchise, LLC v. Tarntino*, 826 F.3d 653, 658 (2d Cir. 2016). First, Goldner admitted that Mark 281 was never used in commerce, but rather, the goods had not (and still have not) ever been used in commerce or even created. Second, Goldner submitted several specimens, meant to show Mark 281's use in commerce which showed no such thing.

16

Based on the fact that Mark 281 was never used in commerce as of the date of its registration, and the knowingly false statements made in support of Mark 281's application, Mark 281 must be cancelled.

### III.   Defendants Far Exceeded the Scope of the Collaboration Agreement, in a Manner that Competed with Norris's Core Business, and Refused to Pay Norris Undisputed Amounts. Norris Validly Terminated the Collaboration Agreement Due to These Material Breaches.

Norris seeks judgment declaring that he validly terminated the Collaboration Agreement on April 1, 2019. A license such as the Collaboration Agreement may be terminated when it has been materially breached. *ARP Films, Inc. v. Marvel Ent. Grp., Inc.*, 952 F.2d 643, 649 (2d Cir. 1991). A license is materially breached when the breaching party far exceeds its scope. *Muze, Inc. v. Digital On-Demand, Inc.*, 123 F. Supp. 2d 118, 130 (S.D.N.Y. 2000) ("*Muze*"); *Bowmar Instrument Corp. v. Cont'l Microsystems, Inc.*, 497 F. Supp. 947 (S.D.N.Y. 1980) ("*Bowmar*").

This is especially true where, as here, Defendants are using the Collaboration Agreement as false cover to compete directly with Norris's "core business," his webcomic and its commercialization. In *Muze*, this Court held that the plaintiff had established a strong likelihood of success that it had permissibly terminated a license where the defendant had well exceeded the scope of that license, in a manner which competed with that plaintiff's "core business." Likewise, in *Bowmar*, this Court agreed that the plaintiff validly terminated the license at issue, where the defendant used that license as an excuse to place trademarks on goods that fell outside the scope of that license.

Norris validly terminated the Collaboration Agreement on April 1, 2019 due to Defendants' excessive use of the Collaboration Agreement, well beyond its scope. In the months prior to the termination, Defendants attempted to trademark "Webcomic Name" and "Oh No" for "Comic books; Comic strips; Comic strips' comic features; Comics; Newspaper comic strips"

17

and "T-shirts." This attempted misappropriation has no basis in the Collaboration Agreement, given its limited scope, and justifies termination of that agreement.

An additional reason the Collaboration Agreement was validly terminated was due to Defendants' refusal to pay Norris for the delivered game files. *ARP Films, Inc.*, 952 F.2d at 649 ("…failure to tender payment is generally deemed a material breach of a contract."). In *ARP Films, Inc.*, the Second Circuit affirmed this Court's order finding that Marvel had validly terminated its license agreement when ARP (failed and refused) (looks like a word/connector is missing) to make undisputed contractual payments to Marvel.

The Court should find that Norris validly terminated the Collaboration Agreement. Defendants' multiple, material breaches of the Collaboration Agreement permitted Norris to terminate it, and Defendants have shown they cannot be trusted to act within its limited scope. Termination also puts the parties back into their pre-contract position – no games have been created and no money has changed hands.

18

**Conclusion**

For the aforementioned reasons, Norris is entitled to summary judgment, or alternatively, partial summary judgment.

Dated: October 14, 2022
New York, New York                                                Respectfully submitted,

                                                          */s/ Francelina M. Perdomo*
                                                          Francelina M. Perdomo, Esq.
                                                          Kyle G. Kunst, Esq.
                                                          GALLET DREYER & BERKEY, LLP
                                                          845 Third Ave., 5th Floor
                                                          New York, NY 10022-6601
                                                          Phone: (212) 935-3131
                                                          Fax: (212) 935-4514
                                                          fmp@gdblaw.com
                                                          kgk@gdblaw.com

                                                          *Attorneys for Plaintiff*
                                                          *Alexander Norris*

19