1  UNITED STATES DISTRICT COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  Co. 1:19-cv-05491-AJN

4   - - - - - - - - - - - - - - - - - - -x

5  ALEXANDER NORRIS d/b/a WEBCOMIC NAME,

6                    Plaintiff,

7       -against-

8  Marc Goldner, Individually and as Officer
   of GOLDEN BELL ENTERTAINMENT, LLC,

9  a California company and GOLDEN BELL
   STUDIOS, LLC, GOLDEN BELL ENTERTAINMENT,

10 LLC., a California Company and GOLDEN
   BELL STUDIOS, LLC.

11

                    Defendants.

12

    - - - - - - - - - - - - - - - - - - -x

13

                    August 24, 2022

14                  10:05 a.m. (EST)

15

16     Video recorded Deposition of Marc

17 Goldner, the Defendant in the

18 above-entitled action, held at the above

19 time and place, taken before Garry J.

20 Torres, a Stenographer and Notary Public

21 of the State of New York, pursuant to the

22 Federal Rules of Civil Procedure, Notice

23 and stipulations between Counsel.

24

25            *     *     *

Page 2

1   APPEARANCES:

2

    GALLET DREYER & BERKEY LLP
3        Attorneys for Plaintiff
         ALEX NORRIS d/b/a WEBCOMIC NAME
4        845 Third Avenue, 5th Floor
         New York, New York 10022
5        TEL: (212) 935-3131
         EMAIL: kgk@gdblaw.com

6

    BY:  KYLE G. KUNST, ESQ.
7

8

    GERARD FOX LAW P.C.
9        Attorneys for Defendants
         Marc Goldner et al.
10       1880 Century Park E #1410
         Los Angeles, California 90067
11       TEL: (310) 441-0500
         EMAIL: rdolan@gerardfoxlaw.com

12

    BY:  GERARD FOX, ESQ.
13       RYAN DOLAN, ESQ.

14

15  ALSO APPEARING:
16       FRANCELINA PERDOMO
         ALLAN PALLER, VIDEOGRAPHER

17
                 *      *      *

18

19

20

21

22

23

24

25

1        STIPULATIONS

2     IT IS HEREBY STIPULATED AND AGREED, by

3   and among counsel for the respective

4   parties hereto, that the filing, sealing

5   and certification of the within deposition

6   shall be and the same are hereby waived;

7     IT IS FURTHER STIPULATED AND AGREED

8   that all objections, except as to form of

9   the question, shall be reserved to the

10  time of the trial;

11    IT IS FURTHER STIPULATED AND AGREED

12  that the within deposition may be signed

13  before any Notary Public with the same

14  force and effect as if signed and sworn to

15  before the Court.

16              *     *     *

17

18

19

20

21

22

23

24

25

1            THE VIDEOGRAPHER:  Good morning.

2       We're going on the record at

3       10:06 a.m. on August 24, 2022.  Please

4       note that this deposition is being

5       conducted virtually.  The quality of

6       the recording depends on the quality

7       of the camera and internet connection

8       of the participants.  What is seen

9       from the witness and heard on the

10      screen is what will be recorded.

11      Audio and video recording will

12      continue to take place unless all

13      parties agree to go off the record.

14           This begins media unit Number 1

15      of the video recorded deposition of

16      Marc Goldner taken by counsel for the

17      plaintiff in the matter of Alexander

18      Norris d/b/a Webcomic Name versus Marc

19      Goldner individually and as officer of

20      Golden Bell Entertainment et al. filed

21      in the U.S. District Court for the

22      Southern District of New York Case

23      Number 1:19-CV-05491.

24           This deposition is being

25      conducted virtually using virtual

Page 5

1   technology.  My name is Allan Paller

2   representing Veritext New York.  I'm

3   the videographer and the court

4   reporter is Garry J. Torres also from

5   Veritext.

6        I am not authorized to

7   administer an oath, I am not related

8   to any party in this action nor am I

9   financially interested in the outcome.

10  If there are any objections to

11  proceeding please state them at the

12  time of your appearance.

13       And at this time counsel will

14  now state their appearance and

15  affiliations for the record beginning

16  with the noticing attorney.

17       MR. KUNST:  Good morning.  Kyle

18  Kunst of Gallet Dreyer & Berkey with

19  my colleague Francelina Perdomo, 845

20  Third Avenue, Fifth Floor, New York,

21  New York 10022 appearing on behalf of

22  plaintiff.

23       MR. FOX:  This is Gerard Fox,

24  Gerard Fox Law.  I'm here to defend

25  the deposition of Marc Goldner and I'm

1     here on behalf of the defendants.

2

3  M A R C   G O L D N E R, the Defendant

4  herein, having first been duly sworn by

5  the Notary Public, was examined and

6  testified as follows:

7  EXAMINATION

8  BY MR. KUNST:

9     Q.    Good morning, Mr. Goldner.  Can

10  you hear me okay?

11     A.    I hear you just fine.  Nice to

12  see you again.

13     Q.    Thank you.  You too.  And you

14  have had your deposition taken before,

15  correct?

16     A.    I believe you had taken it once

17  before.

18     Q.    Correct.  Have you had any --

19  have you taken any other depositions aside

20  from the one I conducted?

21     A.    No.  Not to my recollection, no.

22     Q.    Okay.  I'm going to go over just

23  some of the ground rules for a deposition.

24  I'm sure you probably remember them, but

25  I'm nonetheless going to restate them.

1           When I ask you a question please

2    provide me a whole complete answer.  No

3    shaking of the head uh-huh or huh-uh.  If

4    you do that I'll ask you to clarify or

5    I'll say is that a yes, is that a no.  I'm

6    not trying to be rude, but as you know

7    this is being recorded and we have to have

8    a full record.

9           Is there any reason you cannot

10   provide full and complete responses today

11   to questions based upon anything you may

12   have taken that would affect your memory?

13       A.    I've just had a cup of coffee

14   which is half done today.

15       Q.    Okay.  If you need to take any

16   breaks that's fine.  Let us know.  Let us

17   know how long you want to take.  If

18   there's a question pending you have to

19   answer the question first, but then we can

20   take a break.

21       A.    Okay.

22       Q.    And then again you recognize

23   that this is a virtual deposition and

24   we're all appearing via Zoom, correct?

25       A.    Correct, yes.  I would have --

Page 8

1       Q.    Where are you currently
2   physically located?
3       A.    I am at my parents' house, 15
4   Peacock Drive, Roslyn, New York 11576.
5       Q.    Is there anyone in the room with
6   you that we can't see?
7       A.    No.  I can spin the camera
8   around if you'd like.
9       Q.    No.  And are there any documents
10  near you pertaining to this case?
11      A.    No.  I have my phone on the
12  table which is on airplane mode, car keys,
13  my sunglasses, a bottle of water and a
14  coffee.
15      Q.    I'm just going to go over some
16  background information.  I'm sure you
17  remember this as well, but can you just
18  give me a brief history of your education
19  leading up to all degrees you currently
20  hold?
21      A.    Sure.  Sure.  So I believe last
22  time we spoke I was concurrently doing the
23  four degrees.  I guess is timeline
24  chronological best for you?
25      Q.    Yes, please.  Let's start with

1   high school on forward?

2       A.      Sure.  So I went to Roslyn High

3   School in Roslyn Heights.  I had graduated

4   I believe in May or June of 2008.  I then

5   proceeded to go to undergrad.  I had a

6   couple of working stints in between.  I

7   had worked in water purification very

8   briefly and then I had wound up going to

9   the Ohio State University in undergrad.

10              I had -- went to the Fisher

11  College of Business.  I had majored in a

12  research distinction in entrepreneurship

13  in conjunction Glenn School of Public

14  Policy where I had done research on

15  patents, intellectual property on

16  different types of future type --

17  futuristic type technologies.

18              I worked with Dr. Harris Kagan

19  at the holography lab which was moved from

20  New York to the Ohio State holo lab and,

21  yeah.  I was at Fisher till 2015.  I

22  graduated 2015 and graduated magna cum

23  laude.

24              And then I had taken a few years

25  off as I was starting the business, the

```
 1   businesses with Rachel and Rob, first
 2   started Golden Bell Entertainment and
 3   Golden Bell Studios and then a bunch of
 4   things in between and after and then I
 5   believe it was 2019 that I had decided to
 6   apply to the University of Connecticut
 7   School of Law.
 8             I had gotten in and I had went
 9   as of August 2019.  I had went for -- I
10   began one year.  I had applied to the
11   Hinkle Entrepreneurship Award.  I had won
12   that in my 1L and I had focused on legal
13   innovation software called Access to
14   Justice in my docket which is something
15   similar to My Chart.  There was a small
16   scholarship grant.  I believe it was
17   $5,000 plus legal work on patents.  Don't
18   quote me on the 5,000.  It could have been
19   a little bit more.  Maybe it could have
20   been 7500.  I don't recall.  I'd have to
21   check.
22             And then I was -- it was I
23   believe December of 2019 or it could have
24   been January.  I was sitting in civil
25   procedure talking with one of my
```

1   professors Jennifer Mailly and I had

2   decided to pursue a joint degree either an

3   MBA or an MPA because UConn Law had a dual

4   degree program where you can essentially

5   get a second degree for just an extra year

6   rather than two years.

7           I had met with the business

8   school.  I believe I went with my mom to

9   visit that school and the director of the

10  business program of the MBA at UConn said

11  nearly verbatim, he recommends me not

12  going because I would be very bored

13  because it was a very introductory MBA for

14  people that were not working.  I was

15  already working full time in between 100,

16  120 hours a week prior to law school.

17          From there I kind of pushed the

18  MBA aside and I wound up meeting with the

19  advisor of the MPA program which is the

20  master of public administration.  I had

21  then went to the school which was in

22  Hartford in the city proper where Uconn is

23  just like I think in West Hartford or five

24  minutes outside of the city and I had -- I

25  want to give you the exact chronology

1   here.

2              I had met with the director and

3   I think the dean of the program or maybe

4   it was the lead advisor.  I don't remember

5   exactly who it was, but they had wanted me

6   to come to study there.  They said just

7   put in an application.  You're essentially

8   not like officially accepted

9   quote/unquote, but you have a very good

10  chance and you're the type of student that

11  we like to see here.

12             I had then kind of done a lot

13  more research over the next couple of

14  months about the MPA programs and I had

15  realized that just based on my interest

16  with different types of policy,

17  technology, innovation, where intellectual

18  property is moving, to explore other

19  degree programs outside of the dual degree

20  offered at UConn.

21             From there I wound up applying

22  to Columbia's SIPA, The School of

23  International Public -- and Public Affairs

24  at Columbia University in New York.

25             I concurrently applied to the

University of Pennsylvania's graduate school of education dual degree program between GSC and the Wharton School which is jointly conferred between the two schools and has a program with the Weitzman Design. I think Weitzman Design School where it's like design thinking and things like that, not engineering and then I had also applied to TRIUM's global executive MBA which is a jointly conferred degree between three of the leading business institutions; New York University's Stern School of Business, HEC Paris and the London School of Economics.

Q. So what degrees -- then aside from your undergrad degree at Ohio State what degrees do you currently hold?

A. So since we last spoke I finished up a couple of things a little bit earlier than expected. I graduated the University of Pennsylvania's GSC Wharton program with a masters of science and education in entrepreneurship. I had graduated with a 3.97 GPA. I have also graduated TRIUM's Global Executive MBA so

1   I hold an MBA from TRIUM.  There I was the

2   elected academic class rep and I'm leading

3   a lot of alumni efforts between the three

4   schools and I should be completing

5   Columbia's SIPA, the executive MPA program

6   in December which is about a year earlier

7   than I expected because I had taken four

8   classes this summer in UN and development,

9   international relations, the security

10  course that's required and oh jeez, and

11  the economics course.  So I have --

12       Q.    How do you spell TRIUM?

13       A.    T-R-I-U-M.

14       Q.    Okay.  Okay.  Have you

15  identified for us all the degrees you

16  currently hold?

17       A.    Yes, the MBA and masters in

18  science and education and in progress is

19  the JD at UConn Law and MPA at Columbia.

20       Q.    Got you.  Okay.  And you are

21  also a member and co-founder of Golden

22  Bell Entertainment, LLC, correct?

23       A.    That is correct, yes.

24       Q.    And you are also a member and

25  co-founder of Golden Bell Studios, LLC,

Page 15

1  correct?

2       A.    Yes, that's correct.

3       Q.    Can you tell me when Golden Bell

4  Entertainment was first created?

5       A.    So are you asking when was it

6  created conceptually, was it

7  foundationally created?  I mean I --

8       Q.    Foundationally, if you can just

9  give me --

10            (Whereupon, simultaneous

11       conversation took place disrupting the

12       record, and the court reporter

13       requested one person speak at a time

14       without interruption from anyone

15       else.)

16       Q.    My question was just

17  foundationally, year, date, day, month if

18  he has it.

19       A.    So it was about the spring of

20  2014 towards the end of the semester at

21  Ohio State.  I was walking Rachel back

22  home.  I had lived on I believes it was 20

23  East 14th Street --

24       Q.    Oh, no no no no.  You've

25  misunderstood my question.  I don't want

1  to know when it was conceived.  I want to

2  know when the actual filings were made to

3  create it as its own separate entity?

4      A.    Well, that's a tricky question

5  because since Rachel, Rob and I were all

6  working together prior to the formation

7  and we were creating copyrighted works

8  which were later assigned, the assignment

9  dates for the creation of intellectual

10  property that we created date back to 2014

11  regardless of the formation docs of the

12  LLC so --

13      Q.    Okay.  When were the foundation

14  docs filed to create Golden Bell

15  Entertainment?

16      A.    I believe the formation docs

17  were filed I think with Legal Zoom or one

18  of those business -- the legal business

19  services.  I think it was in April of 2015

20  because we joked that it was on Rob's

21  birthday.  I think it was April 18th of

22  2015 is when it was filed.  We were

23  seniors in undergrad.  All three of us

24  were seniors in undergrad.

25      Q.    Same question regards to the

```
 1   filing date to create Golden Bell Studios,
 2   LLC?
 3       A.    I believe that was October of
 4   2016.  Don't quote me, but I think it was
 5   maybe, like, October 8th or 10th.  Around
 6   there.
 7       Q.    Who are the other members of
 8   Golden Bell Entertainment, LLC?
 9       A.    So Rachel and Rob are the UBOs,
10   the other members of the company.
11       Q.    And can you spell Rachel's last
12   name for the record?
13       A.    Yes.  K-O-R-S-E-N.
14       Q.    And can you spell Rob's last
15   name for the record?
16       A.    Gross like how something is
17   gross.
18       Q.    G-R-O-S-S, correct?
19       A.    Yes.
20       Q.    Now, when did you come to meet
21   Alexander Norris?
22       A.    So I had met Alex.  I had
23   actually not known Webcomic Name or
24   Alexander Norris prior to meeting Jason
25   Wiseman.  So Jason Wiseman was at the time
```

1  one of our game designers who brought in a

2  ton of games that he claimed he had

3  100 percent free reign over to do whatever

4  he wanted -- anything from games, stuffed

5  animals, fidget spinners, snap bracelets,

6  books -- and he had introduced us to Alex

7  months later after signing with him where

8  we had acquired Pretending to Grownup

9  where Alex was a guest artist where Alex

10  had drawn a Webcomic Name guest artist

11  card which was called "Unexpected

12  Pregnancy."  And that card, he had signed

13  full ownership to Jason to do anything in

14  terms of any future use.

15          In that time, Jason was working

16  on -- we were working together on the

17  Pretending to Grownup fulfillment.  Jason

18  was working on the Turtles Riding Airships

19  game with Peter Chiykonski; on Parenting

20  is Easy with Christopher Grady who has the

21  comic Lunarbaboon which is one of Golden

22  Bell's properties that we acquired from

23  Chris and from Jason; and with Alexander

24  Norris on a game for Webcomic Name and a

25  stuffed animal and branding line of

```
 1   merchandise including T-shirts, an option
 2   on a book and -- amongst other things.
 3            We had not spoken with Alex
 4   until June 25th or June 27th of 2017.  It
 5   was about six months or so after speaking
 6   with Jason; however, my business partner
 7   Rob had met Jason Wiseman at a convention
 8   called PAX East years prior and had always
 9   been a fan of Jason's work, as a fan, had
10   played I think one of his games, Drinking
11   Quest, which was one of Jason's first,
12   like, really popular games.  And then it
13   was -- yeah, it was kind a joint
14   collective idea to reach out to Jason, see
15   if we could kind of collaborating, working
16   together.  And in that time, that's kind
17   of -- Jason was the introduction to this
18   where, yeah, he had told us that he had
19   the rights 100 percent free reign on
20   Webcomic Name, that he can do whatever he
21   wanted with it, and this was all produced
22   in discovery.  I mean, these are emails
23   from Jason, from his words, quote,
24   100 percent free reign, and then he lists
25   the things that he has 100 percent free
```

1   reign on.

2           So honestly, Kyle, it seems like

3   you're suing the wrong person but I guess

4   I'm not a lawyer so I can't really tell

5   you and your client what to do.  But it

6   seems like there's a little bit of a

7   misunderstanding in terms of who actually

8   is, like, the culprit here.

9       Q.    Okay.  I'm going to show you a

10  document -- actually, first, what I'm

11  planning on doing is uploading these so

12  that all parties to this Zoom have a copy.

13  Let me make sure I have this correct.

14      A.    I don't see it.  Where are you

15  uploading it?

16      Q.    I'm uploading it to the chat

17  box, but I'm also going to be doing a

18  share screen as well so that everyone has

19  a copy.  Okay?

20          Mr. Goldner, can you see the

21  document that's up on the share screen

22  right now?

23      A.    It's downloading very slowly.

24      Q.    I have it up on the share

25  screen.  Rather than attempting to

Page 21

```
 1   download the document, I have the same
 2   document up on the share screen.  Can you
 3   see it?
 4        A.    Yes.
 5              THE WITNESS:  Jerry, can you
 6        confirm it's the same document that's
 7        downloaded?
 8        Q.    If you prefer to download the
 9   document, there's no problem.  You can do
10   that as well.
11              THE WITNESS:  Jerry, you're on
12        mute by the way.
13              MR. FOX:  I did that on purpose.
14              Yeah, it looks like it's the
15        same document.
16              THE WITNESS:  Okay.
17        A.    All right.
18        Q.    All right.  So, Mr. Goldner, you
19   had earlier discussed, I think, entering
20   into a contract with Mr. Wiseman?
21        A.    Yes.
22        Q.    Is this that -- is this that
23   contract that's up on the screen?
24        A.    Well, I mean, there were several
25   drafts we had negotiated with Jason,
```

Page 22

1   several drafts on email, on phone calls.
2   There were tons sent back and forth.  Can
3   we scroll down to the signature page to
4   ensure this is the final agreement?
5        Q.    Sure.
6             MR. FOX:  And you have the right
7        to read any of these documents for as
8        long as you want when a question's
9        asked about them and ask for them to
10       be fully scrolled or to take a break
11       and have the document sent to you and
12       read it.
13            THE WITNESS:  Yeah, this is a
14       long document.
15       A.    But for the most part I know
16  everything about this.  Always good to
17  refresh and clarify, though.  Okay.  That
18  looks authentic.
19       Q.    Okay.  We're on page 6 of 26.
20            MR. KUNST:  And for the record
21       I'd like to mark this document as
22       Exhibit Number 1.
23       Q.    Mr. Goldner, up on the screen,
24  page 6 of 26 of Exhibit 1, is that your
25  electronic signature at the bottom of this

1   document?

2       A.    Yes.  This was conducted on

3   HelloSign which should be on the last

4   page.  Yes.

5       Q.    Okay.  And did you draft this

6   document?

7       A.    Jason and I drafted it together

8   so it was -- we both had written

9   provisions and edited it together.

10      Q.    Who made the first draft of this

11  document?

12      A.    Either myself or someone at the

13  company.  This is six years ago so I don't

14  want to say I 100 percent wrote the first

15  draft.  I definitely was part of it.

16  There have been so many changes to this

17  agreement through the years that -- Rachel

18  can have suggestions.  Rob has had

19  suggestions.  We've had attorneys that

20  have had suggestions.  We've had creators,

21  designers like Jason that have had

22  suggestions to change, improve, make more

23  clear.  So I don't know if that answers

24  your question.

25      Q.    Well, you said that this

1   document was signed six years ago.  I

2   would note, the first line, it says it's

3   made February -- early February 2017 was

4   what I said.

5        A.    Five and a half years ago.  I

6   apologize.

7        Q.    That's fine.

8             Around the time that this

9   contract was created, how many employees

10  did Golden Bell Entertainment, LLC, have?

11       A.    I don't see how that's relevant

12  whatsoever.  Are you trying to fish for

13  information from the other case for

14  pervis?  This is not an employment related

15  case, and no one here is an employee in

16  this contract.  So that seems completely

17  irrelevant.

18            MR. FOX:  You actually -- yeah

19       you --

20       Q.    You're still required to answer

21  the question --

22            MR. FOX:  Yeah, we can -- just

23       so you know, we can move at the time

24       of trial to, you know, argue that

25       something's irrelevant but for

1    deposition purposes there's a pretty

2    broad spectrum that's allowed.  Not

3    wildly irrelevant but, you know, how

4    many employees and things like that, I

5    mean, you can answer that or estimate

6    it.

7        A.    I don't recall how many

8    employees that we had at the time of the

9    signing of this contract.  I'd have to

10   check with the accountants, and you should

11   have the accounting records, if there's

12   any 1099s or W2s that were filed which

13   you've already subpoenaed.  So I can't

14   state accurately how many employees we had

15   at that time.

16       Q.    Well, who other than you around

17   the time that this contract was entered in

18   to would take part in drafting it that

19   worked for Golden Bell Entertainment, LLC?

20       A.    I don't recall the exact time of

21   when someone like Jim -- Jim was our first

22   and -- employee that we had brought on,

23   Jim Coyne, who we also -- you know about

24   very well.  Jim could have been involved.

25   I just don't remember.  I mean, this is

Page 26

```
 1   five and a half, six, almost six years
 2   ago.
 3        Q.     Would Rachel Korsen be involved
 4   in drafting contracts like this?
 5        A.     I mean, Rachel definitely had a
 6   lot of editorial input.  She has a
 7   brilliant legal mind.  She has, I guess, a
 8   mind for being able to identify anything
 9   that's not clear to make things more
10   clear.  So she absolutely could have been
11   involved in some provisions of the
12   contract.  I don't remember which ones.
13        Q.     And same question with respect
14   to Rob Gross?
15        A.     Rob, same thing, another guy
16   that's -- brilliant legal mind.  He has a
17   knack for detail and being able to make
18   sure everything is as crystal clear as
19   possible in making sure that the designers
20   and creators we signed understood what
21   they were signing and wanted to make
22   things as clear and upfront as possible in
23   the agreements.  So he definitely had
24   editorial legal input.  Whether you
25   consider that drafting or not, I -- again,
```

                                        Page 27

1    I'm not a lawyer so --

2         Q.    So I guess, as you sit here

3    today other than yourself you don't recall

4    who, if anyone, assisted you in drafting

5    Exhibit 1; is that accurate?

6         A.    No, it's not accurate.  I

7    literally said that I'm sure that other

8    people did.  I don't remember exactly who.

9    I'm sure we had one of our attorneys look

10   it over as well, but again, I do not

11   remember who.

12        Q.    Okay.  So it's accurate that you

13   don't recall who else may have assisted

14   you in drafting this then, correct?

15        A.    Well, I'm telling you who likely

16   was.  I'm not 100 percent sure.

17        Q.    Okay.  So you'll note in the

18   first paragraph of Exhibit 1, the second

19   sentence starts, with respect to the

20   production of the properties tentatively

21   entitled, and then it lists a number of

22   properties --

23        A.    Yep.

24        Q.    -- among which are Webcomic Name

25   Game, correct?

1       A.      Yes, correct.

2       Q.      Okay.  Now, can you tell me what

3   the purpose of this agreement was with

4   respect to Webcomic Name Game?

5       A.      So --

6               MR. FOX:  I'm going to object.

7       The document speaks for itself, and,

8       you know, I'll make that objection.

9               THE WITNESS:  Should I still

10      answer?

11              MR. FOX:  Yeah.  Yeah, you have

12      to answer unless I instruct you not to

13      answer.  These are objections for

14      purposes of --

15              THE WITNESS:  Okay.

16      A.      I mean, I think it's pretty

17  straightforward in that we're having this

18  conversation.  I am a little bit

19  flabbergasted --

20              MR. FOX:  No.  No.  You can't

21      comment on questions.  You just have

22      to answer them.  It'll be a long day

23      if you do that.

24              THE WITNESS:  I apologize.

25      A.      It says purchase agreement at

```
 1   the top.  This is a purchase agreement.
 2        Q.    Okay.  So by your answer I
 3   understand you're saying you were
 4   purchasing Webcomic Name Game from Jason
 5   Wiseman, is that correct?
 6        A.    No.  No.  No.  We were
 7   purchasing the assets for Pretending to
 8   Grownup, all the intellectual property for
 9   Pretending to Grownup, anything relating
10   to Pretending to Grownup, Parenting,
11   Turtles Riding Airships, Webcomic Name
12   Game.  The key words there are
13   "tentatively entitled," and because we
14   have final editorial we are able to make
15   those names whatever we choose based on
16   the assets provided.
17              So in Parenting, Parenting is
18   not called Parenting at the end of the
19   day.  We had wound up signing an agreement
20   with Christopher Grady who created
21   Lunarbaboon and that tentatively entitled
22   Parenting has changed to Lunarbaboon's
23   Parenting is Easy, which we own
24   Lunarbaboon, we own Parenting is Easy, we
25   own the Anxiety Troll, all the assets that
```

1   are part of the game, Parenting is Easy,

2   that was originally Parenting, and we have

3   a great relationship with Chris.  We're

4   publishing one of his comics.  We're about

5   to do another comic.  We co-wrote a

6   children's book together that I had come

7   up with called ABCs of Parenting.  We had

8   made the Anxiety Troll stuffed animal

9   plush.  We are about to publish the board

10  game Parenting is Easy, which has been

11  worked on for quite a long time.

12          And that same line of logic

13  applies exactly to Webcomic Name where we

14  were making a game for Webcomic Name, we

15  were making stuffed animals which Alex

16  knew about because he designed the

17  original designs for the stuffed animals

18  that were sent and said he loved them and

19  was excited about them.  He knew we had an

20  option on Webcomic Name because he emailed

21  us first about the option and said that

22  you have an option on my future book.

23          He then signed another agreement

24  with a publisher, Andrews McMeel, after he

25  signed with us, breaching 3D of our

Page 31

```
 1   contract with him, saying that we have an
 2   option but that he wound up trying to get
 3   out of our contract, going and
 4   circumventing us to another publisher.
 5           So I think it's pretty clear
 6   that this was a purchase agreement and
 7   Jason had said that, again, prior to us
 8   signing this, that he had 100 percent free
 9   reign on these properties including
10   Webcomic Name which we produced in the
11   discovery.
12           So the mindset that we had was
13   that we went into this negotiating a
14   contract with some of these artists like
15   Chris, like Peter, like Alex -- Alex
16   Norris, that we had owned the rights
17   already and that we were just essentially
18   saying we love Alex, we love his work, we
19   think it's really funny.  I mean, I think
20   Webcomic Name is hilarious.  I think the
21   existentialism and the humor that is
22   portrayed is extremely funny so we wanted
23   to be a very creative, friendly company.
24   We wanted to work with the creators.  We
25   didn't want to be like a big Disney
```

1  behemoth where we -- or a Marvel where we

2  just acquire a property and then kick the

3  creators to the curb.  We wanted to work

4  with our artists so that they can continue

5  the brand rather than going to hire

6  someone else to go write Webcomic Name

7  panels for a game or for an animation that

8  we had planned on doing that we told Alex

9  was part of the media provision --

10      Q.    So it's -- I'm going stop you

11  because I don't think you're responding to

12  anything.  So when you -- I think your

13  testimony is that you learned at some

14  point that Jason did not possess

15  100 percent interest in Webcomic Name Game

16  or am I misconstruing that?  And if I am,

17  please tell me how.

18      A.    I am not an attorney.  I don't

19  know if there's an agreement between Jason

20  Wiseman and Alex Norris.  He told me that

21  at one point he had agreements with the

22  artists.  The only agreement that has been

23  produced to me from Wiseman was the guest

24  artist contract which we produced between

25  Jason Wiseman and Alex Norris for the

1   guest card for Pretending to Grownup which
2   granted any future use.
3           So maybe in Jason's mind that
4   means that he was -- that he owned the
5   copyright and that card was -- that
6   contract transferred the card art which
7   transferred the copyrights.  We had said
8   that this would be a full form agreement
9   with Alex and we wanted to work with him,
10   and there had been numerous addendums with
11   Jason relating to this issue.
12           So no, I'm not saying I don't
13   think Jason didn't own the rights.  I
14   think Jason definitely owned some rights
15   to something.  At what point in time did
16   they transfer?  I don't feel comfortable
17   saying.  I'm not an attorney and I can't
18   make that legal distinction.
19       Q.    So I scrolled down to
20   paragraph H of Exhibit 1.  Do you see that
21   up on your screen?
22       A.    Yes.
23       Q.    Can you take a look at the --
24   read the first sentence, please?
25       A.     The creator will receive a

1   $6,250 upfront advance against net sales

2   royalties within 30 days of the company

3   receiving the final files noted above for

4   Turtles Riding Airships for a game created

5   with artist Alex Norris of Webcomic Name

6   paid by the company.

7        Q.    So it seems like at least as of

8   the date this agreement was signed you

9   were aware that Alex Norris was associated

10  with Webcomic Name, correct?

11       A.    Jason introduced us to Alex

12  Norris in the email that we produced to

13  you saying that we should check out

14  Webcomic Name and here is the link to it.

15            So he referred to Alex Norris of

16  Webcomic Name.  He also referred to Chris

17  Grady of Lunarbaboon.  That's just a way

18  to talk.  It's a marketing -- it's a

19  mechanism for marketing.  It's not that

20  uncommon.  Like, if I work at Goldman

21  Sachs, like, I would say that I work at

22  Goldman Sachs.  I mean, it's not something

23  so outrageous.  He had other comics so we

24  wanted to delineate that this wasn't Alex

25  Norris of Dorris McComics or of How to

1   Love or of Hello World.

2           So he was being very specific

3   that this was his pseudonym of the comics

4   for Webcomic Name and that it was being

5   delineated that this is about Webcomic

6   Name, not about the other comics which

7   were already on WEBTOON.  And WEBTOON had

8   obviously had an agreement with Alex

9   because he's -- they're a publisher, a

10  digital comics publisher.

11      Q.    So let me ask you this:  Why was

12  it important to delineate Alex Norris as

13  associated with Webcomic Name rather than

14  the other comics you just listed?

15      A.    Well, that's untrue because in

16  the clause right below it it says, for a

17  game developed with artist Christopher

18  Grady of Lunarbaboon.

19           So this is a very consistent

20  message throughout.  You're taking

21  something --

22      Q.    Right.  But my question, again,

23  is about -- it's about Alex Norris of

24  Webcomic Name, and so you just identified

25  a number of other works that Alex Norris

```
 1   either created or maybe associated with
 2   and I'm wondering why Alex Norris of
 3   Webcomic Name was used rather than any of
 4   the other particular works he had created?
 5        A.    Because we were acquiring and
 6   purchasing Webcomic Name.  Is that what
 7   you're asking?  I mean, I'm sorry if I
 8   don't understand, but --
 9        Q.    No, that's fine.  If that's your
10   answer, I understand.
11            MR. FOX:  Yeah -- it's really
12        important to the deposition -- I'm
13        speaking to my client, Marc -- that
14        you know, that you simply answer the
15        questions.  There's no jury, there's
16        no judge here.  Editorializing,
17        commenting just makes it a long day,
18        makes the transcript more expensive.
19        So just try to listen, pause, answer
20        the question straight on.  Don't
21        editorialize, don't comment.
22            All right.  Let's go.
23            THE WITNESS:  Okay.
24            MR. FOX:  Let's go forward.
25            MR. KUNST:  Thank you.
```

Page 37

```
 1      Q.    So do you recall reaching out to
 2   Alex -- well, I guess -- actually, strike
 3   that.  Never mind.
 4            So I'm going to take Exhibit 1
 5   down.  So if Golden Bell Entertainment was
 6   obtaining Webcomic Name from Jason
 7   Wiseman, why was it necessary to enter
 8   into a later agreement with Alex Norris
 9   for Webcomic Name Game and the
10   collaboration?
11      A.    Sure.  Sure.  So I had mentioned
12   it previously, but I'm happy to kind of
13   reiterate.  So it's multipronged of why
14   that was done.  First, we didn't find
15   Jason's contract to be all-encompassing
16   where it said any future use, but we
17   wanted other classifications in order to
18   make sure Alex would still be compensated
19   outside of just games, for instance.  So
20   we had wanted to work with Alex, like I
21   said, where we didn't want to go hire
22   another artist.  And why would we pay Joe
23   on the streets who has never been involved
24   or passionate about Webcomic Name and pay
25   him $5,000, $10,000 to make a game when we
```

```
 1   can go give that money to Alex who,
 2   obviously, I would assume, likes the brand
 3   because he made it originally.  And we
 4   gave him that money to create the games.
 5   Same thing about how, like, on Marvel,
 6   they have -- they can acquire something,
 7   and then they're paying one of their
 8   artists like Jack Kirby to continue making
 9   comics or like how he goes to DC and makes
10   The New Gods, and then he's paid to
11   continue making those.
12            So Jason, in Alex's contract it
13   says that Jason is to pay Alex for the
14   royalty on the game, but in that same
15   contract it says that Alex is the one that
16   gets the majority of the stuffed animal
17   between Jason.  They might think it's,
18   like, five percent of the stuff animal
19   royalties, but then Jason is negotiating,
20   saying he wants two percent of the
21   Webcomic Name, all things relating to it
22   like the stuffed animals or the fidget
23   spinners that he suggests.
24            And then with Alex, we wanted
25   him involved, and that's why in 2B we have
```

Page 39

```
 1    things like animation rights, other
 2    ancillary rights like publishing rights,
 3    and we wanted to do a book with Alex.
 4              So we could have gone to do a
 5    book on our own.  Like, we could do that
 6    with Lunarbaboon, but why would we?  I'd
 7    rather -- but yeah.  We wanted to work
 8    with Alex on, like, a book like we did
 9    with Lunarbaboon.  It's more fun to
10    collaborate, write with someone else, come
11    up with something.  We're not just
12    publishers or distributors.
13              As I said earlier, we're also
14    creators.  Rachel's an artist.  Rob and I
15    are writers so this isn't something coming
16    out of nowhere.  Like, one of our taglines
17    for the company is "a company for creators
18    by creators."  So this is not, like,
19    something out of the blue where we're
20    just, like, a publisher/distributor
21    approaching them.  We're also --
22        Q.    Okay.  I'm going to put another
23    exhibit up on the screen.
24        A.    Okay.
25        Q.    Mr. Goldner, I've put another
```

```
                                              Page 40

 1   document up on the share screen --

 2        A.    Yes.

 3        Q.    -- and I've also added it to the

 4   chat function.

 5        A.    Okay.

 6        Q.    Do you see the document that's

 7   up on the share screen right now?

 8             THE WITNESS:  Jerry, am I good

 9        to review this?

10             MR. FOX:  Yeah, with all these

11        documents you can ask him to scroll it

12        for you or to have time off the

13        record.  We can take a break and you

14        can read the whole document.  You're

15        allowed to read the whole document,

16        not just the parts that he puts on the

17        screen.

18             THE WITNESS:  Okay.  I guess you

19        want me to read this for a minute.

20        A.    I mean, I remember this email so

21   I don't really need --

22             MR. FOX:  It's up to you.

23        A.    Yeah, I mean, that's up to you,

24   Kyle.  This is not something that's

25   unusual.
```

1      Q.    No, that's fine.  So you just

2   said you recall this email, correct?

3      A.    Yeah.

4      Q.    Okay.  I'm going to mark this

5   document as Exhibit 2, and I'll be clear,

6   the email that's up on the screen on this

7   two-page document is an email from Alex

8   Norris to you on Monday, July 3rd, 2017,

9   correct?

10      A.    July 20.  I was scrolled down a

11   little bit because I downloaded it.  Yes,

12   July 3rd, 2017, correct, and then I

13   responded on July 11th, 2017, at 3:27 p.m.

14      Q.    Okay.

15      A.    Yes.

16      Q.    So if we scroll up from

17   Mr. Norris's July 3, 2017, email on

18   Exhibit 2, we reach your response to

19   Mr. Norris on July 2017 --

20      A.    Yes.

21      Q.    -- July 11, 2017, correct?

22      A.    Correct.

23      Q.    Okay.  And in Mr. Norris's email

24   from July 3, 2017, he voices concern with

25   the zero percent copyright clause in the

1    contract, correct?

2        A.    I don't know if this is concern.

3    Can you quote exactly what you're talking

4    about?  He says it's a query --

5        Q.    Okay.  Well --

6        A.    -- concern.

7        Q.    Sure.

8        A.    It's a question.  "Query" is a

9    question.  Doesn't mean he's concerned

10   about it.

11       Q.    Okay.  So he notes, quote,

12   obviously the game will heavily feature

13   elements that are part of Webcomic Name

14   already and I want to make it clear that

15   in no way does Golden Bell take ownership

16   of any of the characters, images or story

17   content except in its application in a

18   tabletop game.  At the moment the wording

19   is very broad and could apply to Webcomic

20   Name in general rather than simply in

21   relation to a tabletop game.  I will be

22   working with publishers on a book and I am

23   going to send them a copy of the contract

24   before signing to make sure there is no

25   breach of my contract with them.

1    Obviously the book and tabletop game are

2    very separate, but will contain the same

3    elements and I don't want signing this

4    contract to come back and bite me in the

5    future, end quote.

6            Correct, that's what he wrote in

7    that email?

8        A.    That is what he wrote, and I

9    think you're misconstruing what he wrote

10   and what we had thought --

11           MR. FOX:  Okay.  Guys, I'm going

12       to object here.  Number one, Counsel,

13       document speaks for itself.  Getting

14       him to agree what the document says is

15       a waste of our time.

16           And, Marc, you're not here to

17       argue with him.  So you just -- if he

18       asks a question about a document, you

19       can simply state the words in the

20       document.  You're not there to

21       interpret them or to agree with his

22       argument about them which is -- he

23       should be saving that for court.  You

24       shouldn't be arguing with him, all

25       right?

Page 44

```
 1              THE WITNESS:  Right.
 2              MR. FOX:  Thanks.
 3      A.    I'm not trying to be
 4   argumentative, Kyle, so I'm sorry if
 5   you --
 6      Q.    Okay.  And so in response to
 7   this email you write, I am resending the
 8   contract with now -- with this new
 9   language and also specified it's for game
10   and stuffed animal, period.
11              Correct?
12      A.    That is what it says but there
13   is more to that.  There is more to that
14   email so you're taking that one sentence
15   out of --
16      Q.    Sure.  Like your attorney said,
17   it's an exhibit now.  So let's go ahead
18   and look at the next line.  It's, one,
19   artist has the right to pursue his comic,
20   Webcomic Name, outside the context of this
21   agreement, period.
22              And was language, was that exact
23   language later added to the collaboration
24   agreement that was signed between Golden
25   Bell Entertainment and Mr. Norris?
```

1     A.    So what was added was pretty

2  simple, outside the context of agreements,

3  is we weren't going -- like, we weren't

4  harming Alex or taking away his

5  livelihood.  So we were specifying that

6  we're essentially, like, living with our

7  creators.  We're admiring them.  He was

8  free to make money on Patreon or to

9  continue selling at conventions --

10     Q.    Hold on a second, Mr. Goldner.

11  Hold on a sec.  My question is a little

12  different.  My question is:  Was the

13  language set forth in this email -- Number

14  1, ARTIST has the right to pursue his

15  comic, Webcomic Name, outside the context

16  of this agreement -- added to the

17  collaboration agreement that was later

18  entered into between Golden Bell

19  Entertainment and Mr. Norris?

20          MR. FOX:  And, Marc, that's a

21      yes-or-no question, and, you know, if

22      you have to look at the other

23      agreement to see if that exact

24      language is in it, you're allowed to

25      take a break to do it.

1      A.    Just note that that was added

2  after in order to allow him to work on his

3  other comics.

4      Q.    Okay.  What other comics are you

5  referencing when you say, "work on his

6  other comics"?

7      A.    So in our first recorded call

8  that you -- we have produced, he also

9  works with WEBTOON and was salaried there

10 for Hello World and -- I think which is

11 part of Dorris McComics -- and How to

12 Love.  So from my memory, there are things

13 that he can make, like, money from payment

14 gateways for people to read his digital

15 comics, right, or for making money from

16 the salary from WEBTOON.  So he's able to

17 continue making those comics.

18           But since Webcomic Name had

19 appeared in Dorris McComics, I believe, in

20 2015 or '16 prior to Webcomic Name

21 existing, I wanted to make sure that that

22 was delineated, that he was able to pursue

23 a book for Dorris McComics.  And he said

24 that's how he was spending half of his

25 time because he was split between the two.

Page 47

```
 1              So that was added because we
 2    wanted to make -- allow him to still be
 3    able to generate money from, like,
 4    advertising revenue from the social media
 5    pages.  So it was really a near
 6    limitless -- was that the contract was
 7    defined in terms of us being able to make
 8    products or being able to expand the works
 9    or the brand where everyone would be
10    making a ton of money and we'd be the
11    brand shepherds on the physical and
12    digital world in terms of, like, product
13    development and, like, median branding
14    which, I believe, was understood from day
15    one.
16              So I mean I wish I could
17    answer -- I don't believe it's a simple
18    yes-or-no question.  There's a thought
19    behind why that was added.  This was about
20    his other comics.
21        Q.    Okay.  But you're -- there's
22    nowhere in this email -- and perhaps I'm
23    missing it -- where you reference other
24    comics, correct?
25        A.    Well, there is.  So --
```

```
                                        Page 48

 1      Q.     Well, can you please point me to
 2   that?
 3      A.     Yeah.  So I had specifically
 4   said -- which you're conveniently taking
 5   out of context -- that when Alex asked
 6   about the copyright, and I said, quote,
 7   that part of the deal is done.
 8           So I understand that in your
 9   complaint you left that sentence out in
10   the third paragraph, that first and second
11   sentence you had left out.  Because when
12   Alex asked about the copyright I replied
13   that part of the deal is done.  So he's
14   querying, asking about the copyright.
15           And I'm saying, well, we can
16   pull it up and we can -- like, we can pull
17   it up with him and talk with him.  But
18   it's -- like, this was already a done deal
19   with Jason.  We already acquired the
20   copyright and the trademark.  So in our
21   mind that part of the deal is done.  I
22   don't know why we're bringing up something
23   that already happened.
24           So, like, not only did Alex know
25   this in our minds, but in Alex's own
```

Page 49

1   contract which you pulled up before he
2   knows he's getting paid by Jason on
3   royalties and he knows that we have an
4   agreement with Jason about Webcomic Name
5   because Jason was negotiating for Webcomic
6   Name, everything from the advance to the
7   percentage.  So where did this number come
8   from in Alex's contract about the advance
9   that he's getting or the royalties?  It
10  didn't come out of thin air.  Jason
11  negotiated it for him.
12          So you are taking this email as
13  completely out of context because there
14  were literally dozens of emails prior to
15  this with Wiseman acting as his -- I don't
16  know if "agent" is the right word or
17  "negotiator," whatever you want to say --
18  but that is -- you're really taking apples
19  and chocolate here and trying to make them
20  the same thing.
21      Q.    So let me -- I don't think I
22  understand what you're looking at.  It's
23  your assertion, claim -- I'm not sure how
24  to characterize it -- but you're saying
25  that in the sentence, to answer your

1   question about copyright, Jason had agreed

2   to us purchasing the rights for the game

3   already and that part of the deal was

4   already done.

5          And you are saying that that

6   indicates that the contract with

7   Mr. Norris only meant he could work on

8   works that were not Webcomic Name?

9      A.    No, that's not what I'm saying.

10      Q.    Okay.

11      A.    I'm saying --

12      Q.    All right.  I don't understand

13   it so can you describe to me what --

14      A.    I'm sorry.  I'm happy to clarify

15   this.  So it's saying, quote, outside of

16   the context of this agreement.

17          So what is in this agreement?

18   We have the game.  We have the stuffed

19   animal.  We have the option on the next

20   full length completed book.  We have 2B

21   which is animation rights, digital rights,

22   gaming rights.  So we are a media company.

23          And I explained to this Jason --

24   he knew this -- on the recorded calls with

25   Alex, both of them.  We told him that we

```
 1   are a media company.  We are essentially
 2   like a baby Disney meets Hasbro sprinkled
 3   with a little bit of Nintendo, and that's
 4   our vision for the company.  But we're
 5   very young.  It's -- like, Disney wasn't
 6   built in a day.  They're not a
 7   trillion-dollar company overnight.
 8            So this agreement was about --
 9   with Jason, we had a game, but games, as
10   you know, are turned into movies.  Look at
11   Magic:  The Gathering.  It's being spun
12   off in a Netflix show as a TV show.  Or
13   you can look at something like Cyberpunk
14   which is a game, and then it's turned into
15   a video game because its other derivative
16   works.  So games are often turned into
17   movies.  Look at Uncharted -- all I was
18   saying was, like, Uncharted was a video
19   game that was turned into a movie with
20   Mark Wahlberg.  This is not unusual for a
21   game to be spun off into other types of
22   rights -- or there have been, I believe,
23   Uncharted comic books so --
24       Q.    Let me ask you this then --
25       A.    Yes.
```

```
 1      Q.      -- if the collaboration
 2  agreement and week with Mr. Norris was
 3  meant to convey rights in Webcomic Name in
 4  addition to the game and the stuffed
 5  animal why did you put in this email
 6  that -- this new language and also
 7  specified it's for game and stuffed
 8  animal?
 9      A.      Yes.  Because the game and the
10  stuffed animal were what he was being paid
11  for.  So he was being paid for an advance
12  for the game but that game could still be
13  spun off later.  He may not work on the
14  animated show that we develop after the
15  game is complete and becomes popular.
16              So he -- the context of this
17  agreement is about the media rights of
18  what is being granted because games can
19  become nearly anything, but he's still
20  allowed to pursue his comic, Webcomic
21  Name, outside of the context of this
22  agreement, where, as I said, he's allowed
23  to make money.  He's free to make money on
24  Patreon --
25              MR. FOX:  Marc, slow down.  Slow
```

1       down.  Slow down.  You have to talk in
2       a deposition almost like a computer.
3       You know, like on those computer
4       calls.  You have to slowly pronounce
5       your words.  It's good practice for
6       trial.  The judge would get hot if you
7       talk this fast.
8               THE WITNESS:  You know it's such
9       a problem.  I talk so much and so --
10              MR. FOX:  It's just a
11      discipline.  Just a discipline.
12      A.      So yeah, I mean, outside the
13  context of this agreement is that he could
14  do other things that are not part of the
15  media part of the contract, not part of
16  the, like, the option or not part of the
17  game or the stuffed animals or the
18  animation.  He's allowed to go make money
19  on Patreon.  He's allowed to go sell
20  Webcomic Name prints at comic cons.  He's
21  allowed to go make pins which he has made
22  before.  Like, this is not something that
23  he's not allowed to do.  We were not
24  trying to take away his livelihood, nor
25  have we ever told him you can't do this.

1   You're not allowed to do this.

2            We were very, very clear that,

3   yo, we're cool.  Like, if you want to make

4   some money we're not going to stop you.

5   You're going to make money.  We're going

6   to try to make money, grow the brand.  We

7   marketed this brand.

8            And he has increased his

9   followers by over 100,000 people partly

10  due to our efforts going to consumer

11  conventions, promoting Webcomic Name with

12  our banner.  That is marketing dollars

13  that have been spent to help increase his

14  brand exposure, and we're here getting

15  sued.  I'm sorry.  This is crazy to me.

16           MR. FOX:  Excuse me.  Marc.

17      Marc.  Marc, I got you.  There is no

18      jury and no judge here, and the judge

19      won't even read these comments.  So

20      all of your editorializing, A, costs

21      money because the court reporter,

22      every word they type costs money, and

23      you're talking beyond -- the way the

24      whole thing goes is question, answer;

25      no comments.  No one's listening to

```
 1      you.  No one's --
 2              THE WITNESS:  I will try.
 3              MR. FOX:  Okay.  So they'll just
 4      listen to your answers.  The comments
 5      are expensive wastes of time.
 6              MR. KUNST:  Thank you.
 7      Q.    So I guess to kind of follow up
 8  on what you previously said, so even after
 9  Mr. Norris signed the collaboration
10  agreement he was still free to create the
11  actual comic series, Webcomic Name, and
12  that was completely his own property; is
13  that correct?
14      A.    That is not what I'm saying, no.
15      Q.    Okay.  So why then was he not
16  permitted to keep Webcomic Name, the
17  comic, after he entered into the
18  collaboration agreement?
19      A.    So I think we need to delineate
20  the word capital C with comic with lower
21  case comic because there is a delineation
22  between those two.
23      Q.    Okay.  What is that delineation?
24      A.    So comic, upper case C, is the
25  same thing as comic book.  It's a
```

1  classification.  So we are looking at --

2  he's allowed to be making the comic.  He's

3  allowed to literally draw it, post it on

4  his social media, and we're not stopping

5  him.  We're not stopping him from going to

6  post that on social media, make

7  advertising revenue.  We've not stopping

8  him from posting it on his Tumbler to get

9  page views.  We're not stopping him from

10 posting his comics on Patreon where he

11 posts Blob Erotica and tries to damage the

12 brand by doing -- where he's essentially

13 posting pornography of the brand where he

14 agreed not to damage it without having any

15 data analytics or marketing insight if

16 this would upset his audience.  What if

17 he's drawing porn of these blobs -- which

18 he is -- and the target audience is

19 families or children?  So we --

20     Q.    Okay.  So in what context would

21 he not be able to use his or create his

22 Webcomic Name comic without paying Golden

23 Bell Entertainment something?

24     A.    He's not allowed to be

25 publishing it where there's -- like, to a

1   digital comics publisher like WEBTOON.  So

2   he was allowed to go do Hello World,

3   Dorris McComics, How to Love on WEBTOON,

4   but he wasn't allowed to go put Webcomic

5   Name on WEBTOON because that's another

6   publisher.  So there is a difference.

7              And I know that this is very

8   subjective.  Is Facebook a publisher

9   because it's section 230?  But Facebook is

10  a platform.  There are just -- he's not

11  being paid by Facebook to go post a comic,

12  but he's being paid by WEBTOON to post his

13  other comics.  So he's not allowed to go

14  print a Webcomic Name physical book and

15  try to get clever and call it Oh No by

16  working with another publisher, McMeel,

17  when we have an option on that next book

18  based on the terms of the agreement.

19              So if we wanted to go make a

20  Webcomic Name book, we could.  If we

21  wanted to work with him and he wanted to

22  work with us, we'd pay him, but he would

23  still get royalties no matter what on that

24  book, whether we made it or he made it.

25              Is this answering your question?

1      Q.     I mean, I think you're answering

2   it the way you're best able to.  My

3   question though is:  In Mr. Norris's

4   July 3rd, 2017, email, he tells you that

5   he's working on a book regarding Webcomic

6   Name, correct?

7      A.     He is not saying that.

8      Q.     Okay.  Well --

9      A.     Where does he say -- can you

10  please read to me -- I know that's been

11  your allegation but where did he ever

12  say -- show me one place where he said, I

13  am working on a Webcomic Name book.

14     Q.     Well, he's discussing his

15  concern with the copyright --

16     A.     Because --

17     Q.     -- percentage that Golden Bell

18  will retain in the collaboration agreement

19  and he identifies that he is working on

20  the book --

21     A.     No, he --

22     Q.     -- and he notes that it is --

23            Okay.  So you're not aware --

24     A.     -- characterize --

25     Q.     Okay.  Well --

```
 1              MR. FOX:  Guys.  Guys.  Guys.
 2      Guys.  Guys.  Both of you, we're not
 3      in a deposition format.
 4              Counsel, you're asking him to
 5      speculate about documents and intent
 6      and what a guy's doing.  Documents all
 7      speak for themselves --
 8              MR. KUNST:  No, I'm asking him
 9      what he -- I'm asking him what he
10      understood when he received an email,
11      and if he doesn't -- if that wasn't
12      his understanding, he can say that
13      wasn't his --
14              MR. FOX:  You're putting words
15      in -- you're putting your own spin on
16      these emails, and that's improper --
17              MR. KUNST:  I'm asking him if
18      that's what he understood, and he
19      doesn't know it.
20              So your objection is noted.
21              MR. FOX:  Try to ask just
22      pointed, factual questions instead of
23      arguing your case, and it'd make it
24      easier for Marc not to argue back and
25      for us all to be here hours longer
```

1      than we need to.

2              MR. KUNST:  Thank you.

3      Q.    So let me ask you this then:  At

4  the point that you received Mr. Norris's

5  July 3, 2017, email, you did not

6  understand that to mean that he was

7  working on a book of Webcomic Name comics;

8  is that correct?

9      A.    I've said several times now

10 Webcomic Name was part, at one time, of

11 Dorris McComics.  Webcomic Name as its own

12 page was relatively new.  So this was

13 under the assumption that if we are

14 signing and acquiring an entire brand that

15 we are putting our sweat equity into as a

16 new startup, that yes, he's not going to

17 go make Webcomic Name with another

18 publisher.  We assumed he's talking about

19 a book that's part of Dorris McComics --

20 which Webcomic Name was in Dorris

21 McComics -- and we assumed another book --

22 since he didn't say it was Webcomic

23 Name -- was either Dorris McComics, Hello

24 World or How to Love which I specified on

25 the September 2017 recorded call with him.

1   Because why would I bring up Dorris
2   McComics on that call on September 2017 if
3   I didn't think that's what the book he was
4   working on is?  Because Dorris McComics
5   had been around for years prior, it had
6   already developed a larger audience with
7   way more views on WEBTOON than Webcomic
8   Name.  So it wasn't even a thought in my
9   mind that he is going to double-dip and
10  sell the rights to two different
11  publishers.  It's nonsensical.  I wouldn't
12  even think that's a thing because it's not
13  like he's SpongeBob.  He's not licensing
14  something.  He's selling something.
15  Companies acquire properties.  This is not
16  the most unusual thing.  Disney acquired
17  Winnie-the-Pooh.  It's not unusual.  They
18  acquired Marvel.
19       Q.    Okay.  Let me take this down.
20  Okay.  I've added another document to the
21  chat box.  This is Exhibit 3.  I put it up
22  on the screen.
23       A.    Okay.
24       Q.    Mr. Goldner, I'm going to ask
25  you if this looks familiar to you, but

Page 62

1    first, do you need me to scroll down

2    through it?

3         A.    Yes, please, to the signature

4    page.

5         Q.    Okay.  I can keep scrolling

6    down.  There's two more pages.

7         A.    Well, there's a -- no.  Okay.

8    Yes, this looks authentic.

9         Q.    Okay.  Is this the collaboration

10   agreement that you signed on behalf of

11   Golden Bell Entertainment with Alex

12   Norris?

13        A.    This looks like the

14   collaboration agreement that I had signed

15   with Alex, yes.

16        Q.    I'd like to mark this as

17   Exhibit 3.  Mr. Goldner, did you draft

18   this contract?

19        A.    Again, this is an evolution of

20   our contract.  Same as I said before, I

21   would suggest comparing on draftable.com,

22   slash, compare of the differences between

23   this contract and the Wiseman contract.  I

24   cannot say what provision is different and

25   who drafted what clauses.  You asked this

Page 63

1  before.

2      Q.    Did you draft -- did you create

3  the first draft of this contract?

4      A.    I told you I don't recall who

5  created what draft.  There was -- I do

6  remember that our first contract that was

7  sent to creators for the Sunday Comics --

8  which was our first project -- was, like,

9  a one-page agreement that I think we all

10  wrote together --

11     Q.    I'm only asking about this one.

12     A.    I don't know who primarily

13  drafted this.  I don't remember.

14     Q.    And is it also true you do not

15  know who created the first draft of this

16  contract?

17     A.    It could have been from

18  LegalZoom or Rocket Lawyer, and we added

19  things on there.  And we had attorneys

20  review it, or we edited things that we

21  felt were important.  This is over five

22  years ago.  I don't remember every word

23  that was written and who wrote what.  I'm

24  sorry.  I would tell you.  I don't find it

25  to be a big deal so I just don't remember.

1      Q.    So do you know if Golden Bell
2   Entertainment sent Mr. Norris the first
3   draft of the contract that became this
4   collaboration agreement?
5      A.    That is false characterization
6   of events.  We sent him a draft and then
7   he asked for changes after having his
8   agent review it -- which he claimed he had
9   his agent review it.  We made changes to
10  that agreement and then we sent it.  And
11  he signed it a month later.  He didn't
12  sign it on the spot.
13     Q.    Okay.  So let's take that one
14  step at a time.  You sent him the first
15  draft; is that correct?
16     A.    I don't know if I sent it or
17  Rachel sent it or Rob sent it.  Golden
18  Bell Entertainment had sent him a draft of
19  a contract which was never signed.
20     Q.    Okay.  And that was the first
21  draft exchanged between Golden Bell and
22  Mr. Norris; is that correct?
23     A.    Yes.  And there was a series of
24  emails, there were changes made, they were
25  sent, he had his agent review the contract

```
 1   over that month that he viewed the
 2   contract.  So if we scroll down to when he
 3   viewed it we'll see the date is roughly
 4   three weeks from when he viewed it to when
 5   he signed because he said an agent
 6   reviewed that contract.
 7        Q.    Do you happen to know the name
 8   of that agent?
 9        A.    I would think your client does.
10   I do not know the name of the agent
11   because he just said "agent."  So I would
12   be speculating if I said a name.
13        Q.    Okay.  Now, do you know if there
14   were any changes to this agreement that
15   were made in writing signed by both
16   parties to this agreement?
17        A.    The same change from the email
18   that we just discussed earlier.  There was
19   an addition to, I believe, section 1 at
20   the bottom where it was saying that,
21   outside of the context of this agreement,
22   that he would be able to pursue the comic
23   outside of the context.  I believe it was
24   1H or 1K.  You'd have to check.  It's
25   right there.
```

1      Q.    Sure.  Let's scroll up real

2  quick.  So, Mr. Goldner, we're on page one

3  of Exhibit 3, and before us is

4  paragraph 1H.  Do you see that language?

5      A.    Yeah.  Yeah.  That's what I was

6  just saying.

7      Q.    Okay.  Yes, that's what I was

8  saying.  That's the language you were just

9  referring to regarding a change that was

10  made to the draft of this agreement,

11  correct?

12      A.    Correct.  It was an addition,

13  yes.

14      Q.    Okay.  Addition.  Fine.  Now,

15  after this agreement was signed -- and

16  I'll go back down to the signature --

17  well, let's go down to this HelloSign

18  page.  So we can see on this page the

19  dates upon which each party signed the

20  collaboration agreement, correct?

21      A.    Yeah.  But you should scroll up

22  a little bit to show when it was viewed.

23      Q.    Sure.

24      A.    Yeah.  So he viewed it on

25  7/11/2017, and then he signed it on

1   8/10/2017, nearly a month later.

2       Q.    Okay.  And then you, on behalf

3   of Golden Bell Entertainment, signed on

4   August 10th, 2017, correct?

5       A.    I -- yes, I signed on 8/10/2017

6   after he signed.  Correct.

7       Q.    Okay.  So my question is:  After

8   you signed the collaboration agreement was

9   there any changes made to the

10  collaboration agreement in writing signed

11  by both parties?

12      A.    Can you please repeat the

13  question?

14      Q.    Sure.  After you signed the

15  collaboration agreement were there any

16  changes made to the collaboration

17  agreement in writing signed by both

18  parties?

19      A.    Not that I recall.  Don't quote

20  me.  I'm not -- I don't believe there was.

21  Not to my recollection.  There's no -- are

22  you asking:  Is there's another HelloSign

23  document with Alex?  The only other

24  contract that I know that's relevant is

25  the guest ARTIST contract for Webcomic

```
                                       Page 68
 1   Name and Pretending to Grownup with
 2   Wiseman and Norris.  I don't think there's
 3   another one unless you have it and I
 4   don't.
 5        Q.    No.  I'm just trying to
 6   determine if after this contract was
 7   signed by both parties whether or not any
 8   changes were made to it.  That's it.
 9        A.    I just don't believe any changes
10   were made to this contract.  I know that
11   Alex just never performed under the
12   contract and was late months and months.
13             MR. FOX:  Marc, you're not
14        understanding today.  You can tell
15        that to a jury.  We can put together
16        your direct, but he asked -- you're
17        just supposed to answer his questions
18        and not make a firm statement like
19        that.  It's improper.  The judge will
20        get upset at you.  Why would you want
21        to do something that would upset a
22        judge?
23             THE WITNESS:  Yeah, I'm not
24        trying to --
25             MR. FOX:  But I want to --
```

1    because it's fair.  I like to teach.

2    This is discovery where they ask

3    questions.  You want name, rank,

4    serial number type answer.  Everything

5    that you say on top of it leads them

6    to ask other questions and feeds them

7    more information than they're question

8    asks for.  You're making their job

9    easier and giving them free

10   information by making these statements

11   and a judge would get upset at you

12   which is not the name of the game

13   here.

14          THE WITNESS:  I'm sorry.  I was

15   just trying to be fully transparent --

16          MR. FOX:  No.  No.  No.  No.

17   No.  No.  It's not fully transparent.

18   You're actually making -- like, you're

19   right jabbing.  You're right jabbing

20   back.  And I'm telling you:  Answer

21   the question name, rank, serial number

22   and move on.  That's it.  Okay?

23          THE WITNESS:  Okay.

24          MR. FOX:  Thanks.

25   Q.    Okay.  So --

Page 70

```
 1              MR. FOX:  By the way, in about
 2        five minutes, we would have been going
 3        for an hour and a half.  We should
 4        take a 10-minute break so people can,
 5        you know, get coffee or refuel or use
 6        restrooms or do what they need to --
 7              MR. KUNST:  I'm fine with that.
 8        We can take 10 minutes right now.  I
 9        think it's a natural stopping point.
10              MR. FOX:  Okay.  Very good.
11              MR. KUNST:  So we'll come back
12        at 11:35.
13              MR. FOX:  Yes.  Very good.
14        Thanks.
15              THE VIDEOGRAPHER:  This
16        concludes media Number 1.  The time is
17        11:25.  We are off the record.
18              (Whereupon, a recess was taken.)
19              THE VIDEOGRAPHER:  This begins
20        media Number 2.  The time is 11:43.
21        We are on the record.
22              MR. KUNST:  Okay.  Thank you
23        very much.
24        Q.    Mr. Goldner, the collaboration
25   agreement contains a provision regarding
```

Page 71

```
 1   how net profits are split between Golden

 2   Bell Entertainment and Mr. Norris,

 3   correct?

 4        A.    Can we pull it up?  Are you

 5   talking about 2B or 1A?  There's two

 6   separate --

 7        Q.    Currently -- sure.  Let's pull

 8   it up.  So the first I'm looking at, I

 9   believe this is paragraph 2B.  Do you see

10   that in front of you?

11        A.    Correct.  Yes, I do see it.

12        Q.    Okay.  And 2B provides that

13   Mr. Norris will receive five percent of

14   the net profits from the works in relation

15   to the different mediums it will be

16   produced in as stated above, correct?

17        A.    That's -- I don't know if you're

18   completely characterizing it correctly

19   because there's also 1A which defines net

20   sales and then Jason's agreement which is

21   about the royalties for the game.

22        Q.    Okay.  So let's -- I'm sorry --

23   you said 1A?

24        A.    There's 1A, okay, and then there

25   is, I think, 1F.  I think 1F and then 2B.
```

```
 1   There's three -- and then 1G is the
 2   advance.  So there's four provisions, I
 3   believe, about money.  So we need -- if --
 4   you're questioning you have to be very
 5   specific about what you're asking.
 6       Q.    Sure.  So let's start with 1A.
 7   Pursuant to 1A, if any of the works were
 8   sold pursuant to the collaboration
 9   agreement, what percentage of the net
10   sales would Mr. Norris be entitled to?
11       A.    I think the agreement speaks for
12   itself.  It's five percent of the net
13   sales of the works for the first 18 months
14   and then it will revert to four percent of
15   the net sales of the works thereafter.
16       Q.    And then the -- I'm sorry -- the
17   next provision regarding, perhaps -- I
18   don't know -- distribution of sales,
19   distribution of profits, perhaps, did you
20   say that was 1F?
21       A.    Where it says, the ARTIST hereby
22   confirms that all rights, interest and
23   licenses relating to the multimedia
24   property, Webcomic Name Game, has been
25   transferred to the company upon signing of
```

1   this agreement and the contract signed

2   between Jason Wiseman and the company.

3           Then it says, the ARTIST

4   acknowledges that any money earned on the

5   property, Webcomic Name Game, will be

6   covered by the contract signed between the

7   company and Jason Wiseman.

8       Q.    Okay.  Now, we can pull up

9   Mr. Wiseman's contract if necessary, but

10  do you recall, pursuant to paragraph 1F,

11  what sales of Webcomic Name Game would

12  permit, what percentage of those sales to

13  Mr. Norris?

14      A.    I would have to pull it up.  I

15  don't want to misspeak.  I think we can

16  just go back to Exhibit 1 which shows the

17  percentages, and we can also discuss the

18  complimentary units which were a primary

19  consideration of the agreement as most

20  publishers only give 25 and we were giving

21  nearly 1,000 between both of them.

22      Q.    Let's scroll down, and I think

23  the complimentary units is -- Mr. Goldner,

24  do you happen to have the citation to the

25  complimentary units provision?  Here it

1   is.  We're on paragraph 6B of the

2   collaboration agreement, and there is a

3   provision in here that -- well, let me ask

4   you this:  Is paragraph 6B the provision

5   that provides for complimentary units to

6   Mr. Norris?

7        A.     Yes, I believe so.

8        Q.     Okay.  And is it accurate that

9   6B provides that Mr. Norris will be

10  provided with at least 725 physical copies

11  of the Webcomic Name Game in printed form?

12       A.     Once the game would be finished

13  with final files which he never completed

14  so there's nothing to provide him

15  complimentary units of.

16       Q.     So is it then accurate to say

17  that the Webcomic Name Game was never

18  created?

19       A.     It has been developed.

20  Development can take years.  So created --

21  created, I don't know, that's a legal term

22  of art, but it's been in development.

23  What I would consider the Hollywood joke

24  is "development hell" for years.  There

25  has been a lot of progress, but it is not

1  completed as Alex has not delivered the

2  final files to this date.

3      Q.    Okay.  So the Webcomic Name Game

4  as you sit here today is not in a form in

5  which it can be sold; is that correct?

6      A.    As of today I don't believe so.

7  I would have to check with my partners as

8  they run the day-to-day operations and the

9  art and design.  The graphic design, I

10 don't deal with that.  I just helped come

11 up with the game itself.

12     Q.    Okay.  So as you sit here today

13 to your knowledge has the Webcomic Name

14 Game ever been sold in any form?

15     A.    No, the game has not been sold.

16 It has been marketed, but it has not been

17 sold.  We have not done a mass production

18 copy and sold it to consumers or B-to-C or

19 B-to-B retailers.  That has not occurred

20 yet.

21     Q.    Okay.  I've added another

22 document to the chat box for download.

23     A.    Yes, I remember this ridiculous

24 email.  Yes.

25     Q.    I will be putting up what

1   Mr. Goldner, I believe to saying he

2   remembered this ridiculous email, but I'll

3   nonetheless ask you some foundational

4   questions about it.

5        A.    Okay.

6        Q.    I'm going to scroll down through

7   the document and I'd like to mark this as

8   Exhibit Number 4.  Scroll back up to the

9   top.  Now, Mr. Goldner, do you recognize

10  Exhibit Number 4?

11       A.    Yes, I do.

12       Q.    Is this an email from Mr. Norris

13  to yourself and Rob Gross and Rachel

14  Korsen on October 1, 2018?

15       A.    That's what it appears to be.

16       Q.    And did Mr. Norris attach two

17  invoices to that email?

18       A.    He attached two invoices

19  incorrectly to the email.  He wasn't due

20  any money, but yes, there are two invoices

21  attached that are not due.

22       Q.    Okay.  So let me ask you this:

23  Prior to receiving this email had

24  Mr. Norris sent you any copies or files

25  regarding Webcomic Name Game that he

1   claimed were the game?

2        A.     He sent sketch black-and-white

3   cards which needed to go through a round

4   of approval and editorial and as by his

5   own admission in this email not all --

6   quote, not all of the print ready files

7   have been delivered yet, end quote.

8             And in our contract with him, he

9   is paid upon delivery of the final files.

10  He is not owed any money and he's sending

11  us invoices for files he admitted to not

12  finishing.  So I'm not really sure where

13  this is going.

14       Q.    Sure.  I've added another

15  document to the chat box, and this is

16  unfortunately upside down.  Okay.

17       A.     You can click rotate view

18  clockwise.

19       Q.    Yeah.  I've done that on the

20  copy up on my screen.

21       A.     Okay.

22       Q.    Okay.  Now, Mr. Goldner, do you

23  recognize these emails that are -- pardon

24  me -- for the record, I'd like to mark

25  this as Exhibit 5.

1        A.      These are not the Bates stamped
2    ones so I'm not sure.
3        Q.      Sorry.  Can you be more specific
4    what you're not sure about?
5        A.      I don't know if this is the
6    entire email thread.  It looks like it's
7    cut off.  Actually, I'm nearly certain
8    that this is an email thread that includes
9    about 81 emails -- maybe less, maybe
10   more -- and it's not the Bates stamped
11   version because this email thread also
12   says that Alex deleted any files that he
13   claims to have sent to us.  So I do not
14   believe that what is -- this document is
15   in its entirety.
16       Q.      Okay.  Can I ask you about
17   specific emails?  And perhaps you'll
18   recognize specific emails in this Exhibit
19   Number 5.  Let's start with -- there's an
20   email kind of at the middle of the
21   document.  If you look at the right-hand
22   side, it appears to have been sent
23   October 3, 2018, from you to Alex.
24            Do you recognize that email?
25       A.      It's cut off so I can't even see

1   that entire email.  It's cut off on the

2   sides on the right.  I just know that

3   October 3rd is the day that he posted on

4   Facebook defaming and disparaging us with

5   the Golden Bell slash emoji.  That's the

6   significance I know of this date of

7   October 3rd, 2018, but --

8           MR. FOX:  Marc.  Marc, again,

9       you're making affirmative claims

10      and -- instead of just answering the

11      question which is not helping.

12      A.    The email is cut off.  So I

13  don't know how much of it is cut off, but

14  this doesn't seem to be an appropriate

15  exhibit.

16      Q.    Well, let me ask you this:  When

17  Mr. Norris sent the files -- and I'm not

18  asking you to confirm that those are

19  final -- but he sent, I think you said,

20  black-and-white photos or black-and-white

21  drawings; is that correct?

22      A.    He sent sketches that changed on

23  numerous occasions.

24      Q.    Okay.  And Mr. Norris had sent

25  black-and-white sketches, and then as of

1   October 1, as we saw in Exhibit 4, he was

2   requesting the advance set forth in the

3   collaboration agreement, correct?

4        A.    No, this is a

5   mischaracterization of events.  He had

6   sent black-and-white sketches over the

7   summer, I believe, in June or July for

8   play testing, and then he goes around and

9   claims that I thought, quote/unquote,

10  final files meant PDFs of sketches.

11            He knew those weren't final

12  files because in the emails that you're

13  not showing I specifically say that final

14  files have to be colored, print ready,

15  deliverable.  Like, these -- I don't know,

16  really, what you're getting at, but --

17       Q.    Let me ask you this -- my

18  question is a little bit different.

19  Again, I'm not asking you to confirm under

20  the contract whether those files were

21  final or not.  It's really just more a

22  question of what happened at a particular

23  time.  And my question is:  As of

24  October 1, 2018, Mr. Norris was seeking

25  payment of the advance under the

Page 81

1   collaboration agreement, correct?

2       A.    I don't know.  The email is cut

3   off.  So are you talking about -- I don't

4   know what you're talking about?  Are you

5   talking about this email --

6       Q.    Let's go back to Exhibit 4.

7   Okay.  So, Mr. Goldner, I have Exhibit 4

8   back in front of you, correct?

9       A.    Okay.

10      Q.    Okay.  And Exhibit 4, as we've

11  noted, is an October 1, 2018, email from

12  Mr. Norris, correct?

13      A.    Correct.

14      Q.    And he was seeking payment, what

15  he calls, first part being paid as

16  promptly as possible, correct?

17      A.    No.  You're taking a sentence

18  out of context.  So if we're going to read

19  the sentence we need to read the entire

20  paragraph, not something that's in the

21  middle.

22      Q.    Okay.  Well he attaches two

23  invoices to this email, correct?

24      A.    There are two invoices attached

25  to this email, yes.

1      Q.     Okay.  And he was seeking

2   payment of those invoices, correct?

3      A.     Improperly, when he admits that

4   the final files have not been delivered

5   yet, quote.

6      Q.     Okay.  But he nonetheless was

7   seeking payment of those two invoices as

8   of October 1, 2018, correct?

9      A.     No.  He's threatening us saying

10   he's only going to upload the files once

11   the payment has gone through.

12      Q.     Okay.  So he wanted to be paid

13   as of October 1, 2018, correct?

14      A.     I don't believe that is a way of

15   someone sending an invoice, getting paid.

16   That is a threat to withhold files and

17   that is not a standard way of submitting

18   an invoice.  So that invoice is only

19   triggered upon delivery of the final files

20   as per our contract.

21      Q.     Okay.  When you say "that

22   invoice," are you referencing both of the

23   invoices attached to this email or are you

24   referencing one?

25      A.     One.  The 401 invoice, 401 which

1    I assume is the first part of the advance,

2    is a separate invoice due at a separate

3    time as per the contract.

4        Q.    So you said "the 401 invoice"?

5        A.    That's what it --

6        Q.    I don't know --

7        A.    I assume 401, dot -- the 401 PDF

8    is the first invoice which says advance

9    one of two.

10       Q.    Okay.  Okay.  I understand what

11   you mean.  Okay.  So advance one of two is

12   for $3,125, correct?

13       A.    Yes.

14       Q.    Okay.  And that is an amount

15   that is set forth in the collaboration

16   agreement, correct?  And let me be clear,

17   I'm not asking you to confirm that amount

18   was due; I'm simply asking whether or not

19   the amount of $3,125 is set forth in the

20   collaboration agreement?

21       A.    I don't want to say 100 percent

22   without checking Exhibit 3 which is the

23   collaboration agreement to make sure that

24   is the correct amount.  I believe it is,

25   but we can check.

1      Q.    Sure.   Let's -- before we do

2   that, let's go down to the next invoice.

3   And this is advance two of two for $2,500,

4   correct?

5      A.    Yes.

6      Q.    Okay.   Exhibit 3 is back up on

7   the screen, and in front of us is

8   paragraph 1G of Exhibit 3, do you see

9   that?

10     A.    1G says, the ARTIST will receive

11  $3,125 upfront advance against net sales

12  royalties within 30 days of the company

13  receiving the final files noted above for

14  Webcomic Name Game for a game developed

15  with Jason Wiseman, the ARTIST.

16            Yeah.   It's blah, blah, blah,

17  blah.   It keeps going, then the 2,500 to

18  ARTIST upon delivery of the company, PSD

19  files, AI, et cetera, InDesign files.

20     Q.    Okay.   So we can confirm then --

21  and again, I'm not asking you to confirm

22  that the money was due; I'm simply asking

23  you to confirm that the amount of $3,125

24  is an amount set forth in the

25  collaboration agreement; is that correct?

```
                                       Page 85
 1      A.    As Jerry said earlier, I think
 2  the document speaks for itself.  That is
 3  what I see, that is what I signed and
 4  that's -- yeah, I mean, that's what it
 5  says.
 6      Q.    Okay.  And same question with
 7  respect to the amount of $2,500?
 8      A.    Again, same answer.
 9      Q.    Okay.  Now, Mr. Norris had sent
10  files and was then demanding -- well, let
11  me strike that.
12            Did you inform Mr. Norris as to
13  why no payment would be made to him?
14      A.    Absolutely --
15      Q.    -- after he made that -- I'm
16  sorry.  Please go ahead and tell me what
17  you told him.
18      A.    Exactly what I told you before.
19  The files were deleted.  We never
20  downloaded anything.  We never received
21  any files.  When I clicked the link that
22  he sent, it said the file has been
23  deleted.  He was informed on October 15th
24  that the files were deleted.  He's asking
25  for payment for files he never
```

1    deleted (sic).  He spent literally a month

2    trying to figure out how to upload files.

3    I don't buy that.  I'm sorry.  Like, I

4    don't buy it.  My mother can upload a file

5    to Dropbox.

6         Q.    So he had provided the

7    black-and-white sketches.  And did he at

8    any time inform you that he believed those

9    black-and-white sketches were files that

10   entitled him to payment?

11        A.    Only on October 3rd in the email

12   you showed, that was the first time.

13   Months and months of silence and then

14   suddenly on October 3rd, two days after he

15   sent the invoice he says, I thought the

16   sketches were final files.

17             But if he thought that,

18   shouldn't he have sent the invoice back in

19   June when he sent this -- black-and-white

20   sketches files?

21        Q.    So can you explain to me why

22   those files, the black-and-white sketches

23   were not considered final?

24        A.    I'm almost in shock.  Okay.

25   Sure.

Page 87

1      Q.      I'm sorry.

2      A.      Sure.  No.  No.  It's fine.  We

3   can play this game that you guys want to.

4   Final files need to be able to be colored,

5   you know, not black-and-white sketches

6   that aren't final inks, not sketch files

7   that have sloppy lines and aren't drawn to

8   scale.  They need to be properly inked and

9   drawn where they're actually on-model with

10   the characters so there isn't a lack of

11   consistency for the art.  That's why

12   there's actual, established guidelines in

13   the art creation process of sketching --

14   of blocking, sketching, inking, coloring,

15   lettering.  There was no final lettering.

16   There was no final colored files.  There

17   was no -- the cards weren't put into a

18   proper format.  The cards weren't created

19   for InDesign.  There was no back of the

20   cards.  There was no rule book design,

21   there was no box art that was completed.

22   There was no bottom of the box.  There was

23   no token assets that are required in

24   illustrator files or even sketches of the

25   tokens.

1          The game could not be created or
2     sold in entirety with sketches because the
3     game is not just 200 sketches where, in
4     the email, he knows that there's 400
5     cards -- or 500 cards -- 4 to 500, but he
6     only delivers sketch files of about, I
7     think, 350.  So he doesn't even have a
8     complete count of all the cards.  So you
9     can't have final files when he admits in
10    the email you just showed that he is
11    missing the 45 new cards to make up the
12    punch line cards to 150 in the Exhibit 4
13    that you showed.
14          By his own definition he's
15    admitting to not sending the final files.
16    You don't need my definition.  He's
17    admitting it.  He's saying, quote, not all
18    the print-ready files have been delivered
19    yet, in the same email he's sending an
20    invoice.  Your client has a lack of
21    consistency in his communication because
22    he's trying to play games or be coy with
23    us.
24       Q.    Okay.  Did you inform him at any
25    time that there would be an editorial

Page 89

```
 1   process after you received those
 2   black-and-white sketches and that --
 3   sorry.  Go ahead.
 4        A.    Yes, many times.  There was many
 5   emails that have all been produced in
 6   discovery where there's a clear editorial
 7   process, where they admitted -- Jason and
 8   Alex -- to talking privately, when I'm one
 9   of the designers of the game, Rob is one
10   of the designers of the game and all Alex
11   does is just stroke Jason's ego, saying
12   what a brilliant designer he is when Alex
13   doesn't understand that we are one of the
14   guys that came up with the game and
15   designed a lot of the mechanics.
16             So it's actually creatively
17   insulting for him to be singling out
18   Jason, thinking that Jason is God's gift
19   from heaven, and we're just the dirty,
20   evil publishers.
21        Q.    Okay.  And far as those -- the
22   reasons why you considered them not to be
23   final, are those guidelines set forth
24   anywhere in the collaboration agreement?
25        A.    I'd have to read that entire
```

1   collaboration agreement, and we'd have to

2   go through old emails.

3       Q.    It's in your chat box.  Why

4   don't you go ahead and take a look?

5       A.    You want me to read the entire

6   contract now?  It will take me 20 minutes.

7       Q.    Well, I want to know -- you've

8   identified a number of guidelines which

9   defined what is a final submission, and I

10  want to know where, if anywhere, in the

11  collaboration agreement those guidelines

12  exist.  Would you like to take a break

13  while you do that?

14      A.    I mean, we can sit here if you

15  want to sit here.  I don't care if you

16  want to watch me read.

17      Q.    Okay.  No that's fine.

18          MR. KUNST:  Let's go off the

19      record, and you can let us know when

20      you've finished.

21          THE VIDEOGRAPHER:  Off the

22      record at 12:11.

23          (Whereupon, an off-the-record

24      discussion was held.)

25          (Whereupon, a recess was taken.)

Page 91

1          THE VIDEOGRAPHER:  We are back

2     on the record at 12:21.

3     Q.    All right.  Mr. Goldner, you've

4  had the opportunity to review the

5  collaboration agreement and my question

6  is:  Where in the collaboration agreement

7  does it define what final files are?

8     A.    So there's actually a couple

9  places where it is.  So final files are in

10  that same clause where it says print-ready

11  files, and the only difference between the

12  3,125 is the final files, whether they

13  would be in low-res or a PDF and not

14  separated into PSD files.

15          But the entire issue here is

16  since there was editorial as cards have

17  changed from sketches, once colored files

18  would be submitted, those would be edited

19  as well, whether it's for color correction

20  or consistency as per 2A in the contract

21  where the parties shall collaborate in the

22  writing, drawing, illustration, animation

23  if applicable and sketches of the work.

24          So I don't think that -- well, I

25  know that Alex was sent by either Jason or

1   Rachel a file, a PSD file to put the cards

2   in so that they would be in the correct

3   format and size, and it's not

4   reasonable -- it's not like Alex submitted

5   to McMeel sketch files --

6       Q.    We're getting a lit bit off base

7   so let's go back.  And my question is:

8   With respect to paragraph 1G, the first

9   sentence, there's a provision in there

10  strictly with respect to final files.

11          And my question is:  Where in

12  the collaboration agreement is final files

13  defined?

14      A.    I don't know if you're just

15  trying to, like, trap me into a question

16  here, but final files is pretty

17  self-explanatory.  It means final files.

18  I don't know if -- like, what you're

19  thinking, but I don't know.  These -- this

20  is a game that you're playing.  Final

21  files is self-explanatory.  It's a term of

22  art that can be googled.  If you're going

23  to sit here and tell me that

24  black-and-white sketches are final files,

25  it's laughable and actually insulting to

Page 93

```
 1   the craft.
 2        Q.    Okay.  So is it accurate to say
 3   that the phrase "final files" is not
 4   defined anywhere within the collaboration
 5   agreement?
 6        A.    No, it's not accurate to say.  I
 7   literally just said, if you look at the
 8   next sentence, it says, final print-ready
 9   files.  He is not --
10        Q.    Okay.  Well, I'm not asking
11   about final print-ready files.  I'm asking
12   about final files.
13             MR. FOX:  Okay.  Guys.  Okay.
14        Counsel, I'm going to object, and I'm
15        going to instruct him not to answer
16        anymore.  He answered your question.
17        You don't like the answer.  We're not
18        going to play this game.  He gave you
19        what he thinks is a further
20        clarification, definition, whatever
21        word you want to use on final files.
22        He's told you a heck of a lot more.
23             And I'm not going, and I'm not
24        going to spend my time listening to
25        you, Counsel, just trying to argue
```

Page 94

```
 1        your side of the case or --
 2              MR. KUNST:  Well, I'm not
 3        arguing --
 4              MR. FOX:  Yeah.  Yeah --
 5              (Whereupon, simultaneous
 6        conversation took place disrupting the
 7        record, and the court reporter
 8        requested one person speak at a time
 9        without interruption from anyone
10        else.)
11              MR. FOX:  Counsel.  Counsel.
12        Counsel, the document speaks for
13        itself.  He has told you where he
14        believes the definition is, and you're
15        arguing with him.  I'll terminate the
16        deposition if you don't stop this.  I
17        don't want your argument anymore.  Do
18        you understand it?  He answered your
19        questions.  It's there.  It's there.
20        It's in --
21              (Whereupon, simultaneous
22        conversation took place disrupting the
23        record, and the court reporter
24        requested one person speak at a time
25        without interruption from anyone
```

                                                      Page 95

1        else.)

2               MR. FOX:  No.  No.  Sir, it's

3        there.  It's in --

4               MR. KUNST:  Why are you

5        screaming?

6               MR. FOX:  Because you are being

7        insulting to everyone here; the court

8        reporter, me, my client.  I don't have

9        the time to listen to you argue.  I've

10       said it nicely 20 times, sir.  There

11       is a question and an answer.

12              MR. KUNST:  So first off, you

13       need to calm down.

14              MR. FOX:  No, I don't --

15              (Whereupon, simultaneous

16       conversation took place disrupting the

17       record, and the court reporter

18       requested one person speak at a time

19       without interruption from anyone

20       else.)

21              MR. FOX:  I'm asking you as

22       nicely as I can, and I'm telling you:

23       When he gives you an answer, the fact

24       you don't like it -- it is

25       unprofessional, it is -- shows a lack

1      of an understanding of the purpose of

2      a deposition and you're wasting all of

3      our time.  Question, answer; answer,

4      period.  You don't like it, that's

5      your problem.  Deal with it at trial.

6           MR. KUNST:  Okay.  Well, we'll

7      move on, and I'll just mark it for a

8      ruling.  And we'll move forward,

9      but --

10          MR. FOX:  Yeah, I think it's

11     pretty clear.

12          MR. KUNST:  -- I don't think

13     screaming is necessary.

14          MR. FOX:  No.  No.  First of

15     all --

16          MR. KUNST:  We haven't even been

17     here that long.

18          MR. FOX:  Sir.  Sir, I asked you

19     repeatedly -- and I've been very

20     strong with my client on the break --

21     you need to ask questions and stop

22     arguing your case, and he needs to

23     answer questions and stop arguing his

24     case.  So I laid into him on the

25     break, and now I'm getting a little

```
 1       bit short with you because this is not
 2       a deposition anymore.  It is you and
 3       him -- and he's intelligent -- just
 4       arguing your case, but there's no jury
 5       here, there's no judge here.  And we
 6       have a videographer and a court
 7       reporter.  It is very expensive.  I've
 8       asked him as hard as I could, be tough
 9       with him on a break.
10            And I'm asking you now, Counsel,
11       the more you argue your side of the
12       case, the more he argues his side of
13       the case, it's all going to be
14       inadmissible, it'll all be stricken,
15       it's all a waste of time.
16            So there you go.
17            MR. KUNST:  I disagree.  I'm
18       really just asking for a contract
19       definition --
20            MR. FOX:  Okay.  First of all,
21       the contract speaks for itself.  He's
22       not a lawyer and -- so come on,
23       Counsel.  I could just school you on
24       this.  He's not a lawyer --
25            MR. KUNST:  His company drafted
```

Page 98

```
 1      it.
 2            MR. FOX:  Counsel.  Counsel,
 3      he's not a lawyer, and the contract
 4      speaks for itself.
 5            So, you know, I will pretty soon
 6      terminate this deposition and go to
 7      our magistrate and say, look at this
 8      transcript, look what he's doing.  The
 9      document speaks for itself.  It's a
10      nonlawyer deponent and Counsel is
11      arguing with him.  And we have a court
12      reporter and a videographer.  And I
13      can't get Counsel to stop.
14            So stop arguing with me, stop
15      arguing with him.  Just ask questions,
16      get answers and move on, please.
17            MR. KUNST:  I'm trying to.
18            MR. FOX:  No.  No.  No.  Look,
19      the document speak for itself.  He's
20      not a lawyer --
21            (Whereupon, simultaneous
22      conversation took place disrupting the
23      record, and the court reporter
24      requested one person speak at a time
25      without interruption from anyone
```

Page 99

```
 1       else.)
 2            MR. KUNST:  I've heard it.
 3       We're going to mark.  We'll mark it.
 4       We'll raise it if we need to.
 5            MR. FOX:  Yeah.  Okay.
 6            MR. KUNST:  I told you we'll
 7       move on.
 8            MR. FOX:  Thank you very much.
 9            MR. KUNST:  You're welcome.
10       Okay.
11       A.    I understand it gets heated.
12  I'm doing my best here so let's just try
13  to move on.
14            MR. FOX:  No.  No.  No.  For
15       both of you -- and I want to say this
16       very nicely, and I got tough with you
17       on a break; I got tough with him.
18            I know you both want to get it
19       on at trial and argue your sides of
20       the case, but there's no jury here and
21       the documents all speak for
22       themselves.  This is his chance to ask
23       you questions, not argue with you, and
24       for you to answer and not argue with
25       him.  And when you have a videographer
```

Page 100

```
 1      and a court reporter, it's very
 2      expensive.  So it's a massive waste of
 3      time when either of you are arguing
 4      your side of the case, okay?
 5              THE WITNESS:  Apologize to Garry
 6      and Alan for that so --
 7      Q.      Okay.  So with respect to the
 8  plush animals -- or actually, let me
 9  rephrase this.  The collaboration
10  agreement -- and I'm going to put it back
11  up on the screen -- includes production of
12  the properties tentatively entitled
13  Webcomic Name stuffed animals, correct?
14      A.      It says tentatively entitled,
15  yes.
16      Q.      How many Webcomic Name stuffed
17  animals were to be created pursuant to the
18  collaboration agreement?
19      A.      There was no limits on what we
20  could do.  We could make a stuffed animal
21  from every Webcomic Name character or
22  thing or object whether it was the cat,
23  the dog, the orange blob, the pink blob,
24  the giraffe that he wound up making on the
25  animals book that we had the option to or
```

```
 1   whatever we wound up having the option to.
 2   We could make a cloud.  We could make a
 3   dressed up pink blob wearing a wizard hat.
 4   We could have one flying like a superhero.
 5   I don't know.  There's no limit here.  It
 6   says stuffed animals, plural, and he did
 7   designs for five of them, for the pink
 8   blob, the orange blob, the sexy blob, the
 9   -- I guess that was the butt plush -- the
10   cat and the speech bubble that said "oh
11   no" with a backside that said "okay."
12            So he did those designs.  He
13   knew that they were multiple.  This is not
14   coming as a surprise, and there's lots of
15   toys that turned into media properties.
16   Something like a My Little Pony which is a
17   toy line that then becomes an animated
18   show based on the toy line.  It's not --
19   this is not something that, like, we
20   created an entirely new business model out
21   of the thin air.  This is something that's
22   existed for decades that has been
23   perfected by major companies.
24       Q.    So I've added another document
25   to the chat box, and again, it's
```

```
 1   upsidedown so you'll need to rotate it.
 2   But I will also put it up on the share
 3   screen -- Mr. Goldner, I've got -- and I'd
 4   like to mark this document as Exhibit
 5   Number 6.
 6        A.   Yes.
 7        Q.   Mr. Goldner, there's a number of
 8   emails on this document, but I'd like to
 9   draw your attention to the second one from
10   the top.  Do you recognize that email?
11        A.   Oh, I remember this comical
12   email of Alex flip-flopping and trying to
13   make things up on the fly.  Yeah, of
14   course, I remember.
15        Q.   Is this an email that you
16   received from Mr. Norris on October 8,
17   2018?
18        A.   As did Rachel and Rob,
19   conveniently, after the breakdown of
20   communication.  Yeah, I do recall.
21        Q.   I'd like to draw your attention
22   to -- it's the first full paragraph -- I
23   guess the fourth line or the fourth
24   sentence, I guess, it is in the email.  It
25   starts, about the stuffed animals.
```

Page 103

1          Do you see that portion?

2     A.     I'm looking at it.

3     Q.     Did you ever discuss with

4   Mr. Norris the -- after this email was

5   sent that Golden Bell Entertainment was

6   permitted to create more than one stuffed

7   animal?

8     A.     You want me to answer that?

9   You're just hurting your own case.  That's

10  fine.  So him claiming I wasn't aware you

11  were creating a range, quote, that was not

12  agreed, you previously asked for a

13  promotional stuffy, so we agreed to only

14  do one.

15          So not only is your client a

16  liar because he actually created five

17  designs, okay, that he posted in the

18  WhatsApp group chat and emailed us for the

19  pink blob, the orange blob, the butt plush

20  the oh nos and okay speech bubble and the

21  cat.  So he knew it wasn't some,

22  quote/unquote, promotional stuffy.  I

23  never used that word in communication with

24  him or in a contract.  He knew it was for

25  multiple.  Him claiming he wasn't aware we

```
 1   were creating a range when he himself
 2   designed five --
 3        Q.    Well, we're getting a little far
 4   afield again --
 5              (Whereupon, simultaneous
 6        conversation took place disrupting the
 7        record, and the court reporter
 8        requested one person speak at a time
 9        without interruption from anyone
10        else.)
11        Q.    My question was a little bit
12   different.  My question was:  After he
13   sent this email, did you discuss the issue
14   of whether or not Golden Bell
15   Entertainment was permitted to create more
16   than one stuffed animal?
17        A.    I don't know.  Are you talking
18   internally, what we spoke about?  Are you
19   talking about with Alex --
20        Q.    No.  With Alex.
21        A.    Alex stopped responding to
22   emails.  He didn't respond.  So what do
23   you mean did we talk to him?  He cut off
24   contact and then sued us.  Like, I don't
25   know what you're asking.  You have all the
```

1   communications in discovery.

2         Q.     I'm asking whether there was a

3   discussion you have had with Alex after

4   this email was sent regarding whether or

5   not Golden Bell Entertainment was

6   permitted to create more than one stuffed

7   animal?

8         A.     What do you mean were we

9   permitted?  I didn't need to ask him

10  permission.  We were permitted to as per

11  the contract.  He sent the designs.  We

12  made the samples.  He said --

13        Q.     Okay.  So again, we're getting a

14  little far afield again, and really, this

15  a yes-or-no question, whether or not --

16  and I'll specify -- you had an oral

17  discussion with Alex after this email was

18  sent regarding the stuffed animals.

19        A.     We never spoke with Alex on the

20  phone after this date, if that's what

21  you're trying to get at.

22        Q.     That's my only question.

23        A.     Okay.  What?

24        Q.     And in case I haven't done it

25  before, I'd like to mark that as

1    Exhibit 6.

2            THE WITNESS:  And, Jerry, just

3        so you know, they're taking

4        screenshots of a very long email

5        thread and mischaracterizing them as

6        individual emails when this is all

7        part of a very long thread.

8            MR. FOX:  Yeah, but just so you

9        know, if he's distorting a

10       conversation, you know, you can only

11       answer as best you can, and then we

12       will, you know, address that with the

13       judge on a motion or at trial.  I

14       mean, you know, he runs the risk of

15       having his questions struck if he

16       doesn't provide a complete document to

17       you.  He knows that.

18           MR. KUNST:  Jerry, I can't

19       really hear you that well.  I can hear

20       Marc fine but I can't hear you.

21           THE VIDEOGRAPHER:  Your volume

22       dropped down.

23           MR. FOX:  Is it better now?  Is

24       it better?

25           MR. KUNST:  Yeah, that's it.

Page 107

1          MR. FOX:  Anyhow, hopefully

2     everyone heard.

3          THE WITNESS:  I did.

4     Q.    So I've added another document

5     to the chat box.  I'll put it up on share

6     screen.

7     A.    Yeah, I know this image.

8     Q.    Okay.  And I'd like to mark this

9     as Exhibit 7.  Okay.  So, Mr. Goldner, can

10    you tell me what this image is showing?

11    A.    As per the title of the PDF you

12    just uploaded it's called a convention

13    photo.  This is a convention photo.

14    Q.    Sure.  Did you take this photo?

15    A.    I -- all I was saying is I don't

16    remember who took the picture.  It could

17    have been myself.  It could have been

18    Rachel.  Could have been Rob.  I don't

19    remember who took a picture years ago.

20    Q.    Do you know where this photo was

21    taken?

22    A.    Yes.

23    Q.    Where was this --

24    A.    Keystone Con in Philadelphia.

25    Q.    Do you recall the date that this

1  picture was taken?

2      A.    No.

3      Q.    What about the year?

4      A.    I couldn't tell you.  I mean, I

5  have no idea.

6      Q.    Do you recall --

7      A.    -- estimate -- what?  Do I

8  recall what?

9      Q.    Sorry.  You said you were going

10  to estimate?

11      A.    No, I said we could estimate.

12      Q.    What is your estimate -- your

13  best estimate as far as --

14      A.    Before the coronavirus pandemic

15  hit the world and after we signed the

16  contract with Alex.

17      Q.    Okay.  You see -- in the

18  right-hand portion of the screen, do you

19  see the banner?  It's pink, green, purple.

20  It appears to have Webcomic Name pictured

21  on it.

22      A.    I see the banner that helped

23  promote Webcomic Name to further notoriety

24  and pretty much had people in the tens of

25  thousands, hundreds of thousands through

1   free marketing that he was getting for

2   being part of our company.  That's the

3   banner you're talking about.  That's the

4   one I see.

5       Q.    Do you recall if any Webcomic

6   Name merchandise was sold at this Keystone

7   Comic-Con at which this photo was taken?

8       A.    I honestly have to almost

9   comically, internally laugh.  This is

10  insulting that you're accusing us of

11  making merchandise and not telling him.

12  No.  He never --

13          MR. FOX:  Marc.  Marc.  Marc.

14      Marc.  Marc.  Marc.  Marc.  Marc.

15      Marc --

16      A.    This is insulting.

17          MR. FOX:  Marc.  Marc.  You're

18      not getting the process -- and it's

19      okay; you're just a first-time

20      litigant.  When he asks a question:

21      Was any merchandise sold?  The answer

22      is either yes or no, and not a speech

23      about your positions about why you

24      could sell the merchandise if you

25      wanted to.  You're not here -- just

1        like, look, I got upset with him, and

2        I'm getting upset with you now.

3              Neither of you are here to make

4        a single argument.  That happens in

5        motion papers and in trial.  So if he

6        asks you:  Was merchandise sold?  Your

7        duty, under the law, Marc, is to say

8        yes or no, not launch into your

9        argument about why you can do it.  You

10       understand the process?  Do you

11       understand it?

12             THE WITNESS:  I understand.

13       A.    So the answer is:  No, we did

14   not sell any Webcomic Name merchandise at

15   this convention.

16             THE VIDEOGRAPHER:  This

17       concludes media unit Number 2 at

18       12:42.  We are off the record.

19             (Whereupon, an off-the-record

20       discussion was held.)

21             (Whereupon, a recess was taken.)

22             THE VIDEOGRAPHER:  This begins

23       media Number 3.  The time is 12:50.

24       Q.    I'd like to -- the prior

25   document we're reviewing -- and it's in

Page 111

1    the chat box -- is convention photo 1.  To
2    the extent I haven't done it, so I'd like
3    to have it marked as Exhibit 7.  Okay.
4    I've added another PDF to the chat box,
5    and I'm also going to bring it up on my
6    share screen.
7        A.    Okay.
8        Q.    Mr. Goldner, are you familiar
9    with this photograph?
10       A.    I believe this -- yeah, I
11   believe I remember it.  I'm not
12   100 percent sure, but yeah, this is our
13   booth.
14       Q.    Do you recall who took this
15   photograph?
16       A.    Either Rachel, Rob or myself.
17       Q.    And do you know where this
18   photograph was taken?
19       A.    It's tough.  I want to say -- I
20   want to say it was Gen Con in
21   Indianapolis -- not Indianapolis.  Is it
22   Indianapolis?  It's in Indiana -- because
23   I'm looking at the booth next to us.  It's
24   hard to see.  Overtone.  Daedalic.  I want
25   to say Gen Con, but I'm not 100 percent

```
 1   sure.  I think it was Gen Con, though.  I
 2   think it was.  I think.
 3       Q.    Okay.  And this, you said, was
 4   your booth at whichever particular
 5   convention this was, correct?
 6       A.    I mean, it says Golden Bell
 7   Studios at the top of the drayage so, yes,
 8   it's Golden Bell Studios's booth.  It's
 9   not my personal booth.  Everything is an
10   off serve of the entity.  So yes, this is
11   Golden Bell Studios's booth.
12       Q.    Has Golden Bell Entertainment
13   ever assigned any of the rights to the
14   Webcomic Name Game to Golden Bell Studios?
15       A.    It's very possible.  I'd have to
16   check.  Most likely it would have been
17   sales or manufacturing rights because
18   Golden Bell Studios is the manufacturing
19   sales arm of the entity -- of the two
20   entities, and GBE, Golden Bell
21   Entertainment, is the intellectual
22   property entity and the licensing arm.  I
23   don't have it off the top of my head, but
24   yes, I mean, Golden Bell Studios has the
25   customs bond, deals with the supply chain
```

1   logistics, deals with the sales.  And GBE

2   is more on the creative and licensing and

3   IP development.  Is that what you're

4   asking?

5        Q.    No.  I was just asking whether

6   or not Golden Bell Entertainment had

7   assigned any of the rights to Webcomic

8   Name to Golden Bell Studios?

9        A.    The answer looks like, yes.

10   That's -- I don't --

11        Q.    Okay.

12             MR. KUNST:  Well, I'll call for

13        the production of that assignment to

14        the extent it exists.

15        Q.    Do you know if Golden Bell

16   Entertainment had assigned any other

17   rights to Webcomic Name to any entity or

18   individual aside from Golden Bell Studios?

19        A.    I'd have to check because Rachel

20   is the managing member of Golden Bell

21   Entertainment.  I'd have to check with

22   her.  I mean, it's very possible.  Yeah.

23   I have no idea.

24             MR. KUNST:  To the extent any

25        such assignment exists, I'll call for

1      its production.

2      Q.     Okay.  So, Mr. Goldner, do you

3  see the Webcomic Name banner in the

4  photograph?

5      A.     Yes, I do.  Front and center.

6      Q.     And same question regarding the

7  Webcomic Name merchandise:  Did Golden

8  Bell Entertainment sell any Webcomic Name

9  merchandise at this convention.

10     A.     The answer is still no, and to

11  be clear, we did not sell any Webcomic

12  Name merchandise which I have said

13  numerous times.

14     Q.     And what about Webcomic Name

15  Game merchandise?  Is there a distinction?

16     A.     I'm not trying to pull a fast

17  one on you, Kyle.  We didn't produce any

18  Webcomic Name Game merchandise, any

19  Webcomic Name stuffed animals.  I'm not

20  trying to be sneaky and coy like your

21  client.  The answer is, no.

22     Q.     Okay.  I think that's all I have

23  for this exhibit so why don't we go off

24  the record?

25              MR. KUNST:  And we'll take lunch

Page 115

1     and how about we come back at 1:30?

2           Mr. Fox, you're on mute.

3           MR. FOX:  Look, that sounds

4     great, and, you know --

5           MR. KUNST:  Okay.

6           MR. FOX:  -- we will try to have

7     Marc argue less when we come back and

8     it seems like Counsel is doing his

9     part.  He's not arguing.  So maybe

10    we'll just move slicker and quicker.

11    And it will be good for everyone I

12    think in the long run.

13          MR. KUNST:  Well, I'm nothing if

14    not a peacemaker, and lunch will make

15    everybody feel better.

16          MR. FOX:  Yeah.  So Marc is --

17    you know, he'll stop with his extra

18    comments, okay?  Thanks.

19          MR. KUNST:  All right.  Sounds

20    good.  See everybody at 1:30 then.

21          THE VIDEOGRAPHER:  All right.

22    Off the record at 12:57.

23          (Whereupon, an off-the-record

24    discussion was held.)

25          (Whereupon, a lunch break was

```
 1        taken at 12:57 p.m.)
 2              THE VIDEOGRAPHER:  We are back
 3        on the record.  The time is 1:32.
 4        Q.    So I'm going to add another
 5   document to the chat, and I'm going to put
 6   it up on share screen.  And I'll mark this
 7   as Exhibit 9.
 8        A.    Okay.
 9        Q.    Mr. Goldner, I'm going to scroll
10   down this document and ask if you know
11   what this is, Exhibit 9.
12        A.    I think this is the -- one of
13   the trademark applications, but I don't
14   know which one it is.  I don't know if
15   it's ours or --
16        Q.    All right.  Well, on page one,
17   you'll see, in the left-hand column,
18   there's a field, literal element, and then
19   the corresponding column is Webcomic Name?
20        A.    Okay.
21        Q.    You see that?  Okay.  Go ahead.
22        A.    I don't think I said anything.
23        Q.    Below applicant information
24   owner of mark is noted as Golden Bell
25   Entertainment, LLC, correct?
```

Page 117

1          A.     Yes.

2          Q.     And if we scroll down to the

3     bottom of page one, international class is

4     Number 16, correct?

5          A.     Okay.

6          Q.     If we continue to scroll down

7     there's information, in large capital

8     letters, signature information, do you see

9     that?

10          A.     I see -- what page is this?

11          Q.     This is page three of nine.

12          A.     I see that I'm signing on behalf

13     of a company, yes.

14          Q.     So that is, in fact, the

15     electronic signature you placed on this

16     application, correct?

17          A.     I would assume so.

18          Q.     And attached to this

19     application -- and if you need at any

20     point to review this, please let me

21     know -- attached to this application --

22     and I'm going to scroll down and show you

23     the -- I'm going to zoom out and show you

24     this entire document.  If you look at the

25     upper caption of this document, we see

Page 118

```
 1   page number, and we see page number six of
 2   nine in blue, do you see that?
 3        A.    Yes.
 4        Q.    Now, did you attach this
 5   document to this application?
 6        A.    I definitely did not attach.
 7   This is a text word mark that, when you
 8   type something into the USPTO, it
 9   auto-generates a word mark.  This is not a
10   design mark application.
11        Q.    Did you type this word mark into
12   the application?
13        A.    Yes, the mark says Webcomic
14   Name.
15        Q.    And to be clear you typed this
16   in, correct?
17        A.    So the mark statement on one
18   says, this, the mark, consists of standard
19   characters without claim to any particular
20   font style, size or color.
21        Q.    Okay.  My -- I just want to make
22   sure I'm clear because there's a
23   differentiation you made between attaching
24   a document and typing information into the
25   application, and so I just want to be
```

```
                                            Page 119
 1    clear that you typed Webcomic Name into
 2    the application, correct?
 3          A.    Yes, I believe so.  I mean --
 4          Q.    Okay.  So if we scroll down, do
 5    you see that we're now on page seven of
 6    nine?
 7          A.    Yes.
 8          Q.    Okay.  Now, is this a picture
 9    that you attached to this application?
10          A.    Possibly.  I don't recall a
11    specific image that was attached or if it
12    was an image.  I don't know if this was an
13    intent to use mark that was filed or if it
14    was already in use.  I'd have to check my
15    records.
16          Q.    Okay.  My question's just a
17    little different.  It's as far as whether
18    or not you attached this document to this
19    application, not how it was used.
20          A.    It looks likes I did because
21    it's my Facebook, I would assume since it
22    says Marc at the top of the Facebook.  So
23    I don't know.  Are you asking when I did
24    it or --
25          Q.    Well, let me ask you this:  You
```

```
                                        Page 120
 1    said it says Marc at the top of this
 2    Facebook.  And I'm going to use my cursor
 3    and show it to you but also describe it
 4    for the record.  Underneath the address
 5    bar there's a blue bar that has text on it
 6    and there's a portion that says Marc.  And
 7    then there's a little picture next to it.
 8              When you say this is your
 9    Facebook, it says Marc at the top, are you
10    referring to that portion on the blue bar
11    near the top that has M-A-R-C on it?
12       A.    Yeah.  I'm saying something very
13    clear.  I don't know when this image was
14    submitted.  Clearly I submitted it.  I
15    don't know if it was submitted upon the
16    application or if it was submitted later
17    on after a -- after the intent to use.  I
18    think it's six months after filing.  I
19    don't remember when this was submitted.
20    It was clearly submitted.  I just don't
21    know if it was submitted upon application
22    filing or if it was upon registration
23    approval or when exactly.  That's all I'm
24    saying.
25       Q.    Okay.  Now, this, page seven of
```

Page 121

1  nine, reflects a Facebook page, correct?

2      A.    Correct.

3      Q.    Is this the Webcomic Name

4  Facebook page?

5      A.    This is the Webcomic Name

6  Facebook page that Alex refused to grant

7  us access to as per the contract.

8      Q.    So how then did you take -- how

9  then did you acquire this picture to be

10  uploaded with this application?

11      A.    It's a screenshot because we

12  acquired the rights.

13      Q.    But you said that Alex refused

14  to grant you access to it --

15      A.    So him breaching --

16      Q.    Is that correct?

17      A.    Him breaching a provision of the

18  agreement does not prevent any person in

19  the world from screenshotting a Facebook

20  page as an exhibit to prove that something

21  is in use when the rights were transferred

22  to us.

23      Q.    Okay.  Let me -- before we move

24  on to the next image, I'm going to scroll

25  back up to the top and find the -- what I

1  believe to be the date upon which this was

2  at least signed.  I'm going to -- we're

3  now on page three of nine, and you'll see

4  there's a portion, date signed, 10/9/2018,

5  you see that?

6       A.    Yep.

7       Q.    Does that refresh your

8  recollection at all as far as when these

9  pictures were uploaded?

10      A.    No.  I'm repeating what I said.

11  I don't know if that image was sent on

12  October 9th or six months after because I

13  don't remember if this was an intent to

14  use application or if it was an in-use

15  application.  We have over 100 trademarks

16  and over 100 applications that have been

17  filed.  It is unreasonable to expect me to

18  remember the dates of when something was

19  uploaded four years ago.

20      Q.    So we're now on page eight of

21  nine of Exhibit 9.

22      A.    Okay.

23      Q.    Can you tell me what this

24  picture is?

25      A.    The Webcomic Name Patreon page.

Page 123

1      Q.     Okay.  And how did you obtain
2  this picture?
3      A.     By going to patreon.com,
4  slash, the URL which has Webcomic Name.
5  Alex Norris is creating Webcomic Name and
6  other comics which he has failed to
7  actually produce for his patrons every
8  week or multiple times a week which he
9  says he would have done.  So this is why
10  he's actually lost patrons because he
11  doesn't upload.
12      Q.     So did you also take a
13  screenshot of this Patreon account that's
14  on page eight of nine?
15      A.     I believe at some point I did.
16  The date, I do not remember what date I
17  took the screenshot.
18      Q.     And did Mr. Norris also refuse
19  to give you access to this Patreon
20  account?
21      A.     He refused to give us access to
22  anything.  I don't remember ever asking
23  for Patreon because we wanted him to be
24  able to make money on the Patreon like I
25  said earlier today.  Him posting on

1    Patreon to make money from patrons for him

2    to maintain his livelihood has nothing to

3    do with whether the mark is in use and

4    whether we have the rights or he has the

5    rights.   Stretching.   Really stretching.

6         Q.    I'm sorry.  I missed that last

7    part.

8         A.    Nothing.  I just said you're

9    stretching.  That's all.

10        Q.    Oh.

11             MR. FOX:  And, Marc, I just will

12        ask you again:  If you're not

13        answering a question don't make

14        comments, okay?  Like, the stretching

15        comment, a judge would clip you on.

16             MR. KUNST:  Gerard, you're

17        still -- you're going in and out a

18        little bit.

19             MR. FOX:  There you go.

20             MR. KUNST:  Yeah, there you go.

21             MR. FOX:  But anyhow, Marc, you

22        can't make those comments.  The judge

23        will clip you on that.  You're not

24        allowed to comment on stretching,

25        things like that, okay?

1      Q.    Okay.  Mr. Goldner, we're on

2   page nine of nine of Exhibit 9, and

3   this -- well, can you tell me what this

4   picture is?

5      A.    The Webcomic Name Facebook page.

6      Q.    And is this another screenshot

7   of the Webcomic Name Facebook page that

8   you took?

9      A.    Looks like it, yep.

10     Q.    And again, Mr. Norris had not

11  provided you access to that Facebook page,

12  correct?

13     A.    No, he has not.  Upon numerous

14  requests, he did not provide it.

15     Q.    Okay.  I'm done with this page.

16          Okay.  I've added another

17  document to the chat function, and I'll be

18  putting it up on the share screen as well.

19     A.    Okay.

20     Q.    I'd like to mark this document

21  as Exhibit 10.  Mr. Goldner, I'll scroll

22  down this document and please let me know

23  if it's familiar to you.

24     A.    Again, when I submit a trademark

25  application this is not how it looks.  So

1    I don't know if this is how you obtained

2    this but when you apply for a trademark

3    there are individual pages -- I think,

4    like, five or six -- and it doesn't look

5    like this colored -- I'm partially

6    colorblind -- but, like, a greenish Excel

7    cell background.  So I don't -- the reason

8    why I don't know why this is familiar is

9    because this is not how you apply for a

10   trademark for -- the way I've done it.

11   Maybe this is --

12        Q.    Okay.

13        A.    -- processed.  I don't know.

14   I've never seen this.

15        Q.    Well, let me ask you this then:

16   You see the -- at the top of page one, you

17   see the filing date, 11/30/2017?

18        A.    Yes.

19        Q.    Okay.  And then you see the

20   literal element is Webcomic Name, correct?

21        A.    Yes, I see that.

22        Q.    So on or around November 30th of

23   2017, did you file an application with the

24   United States Patent and Trademark Office

25   for Webcomic Name?

1      A.     Yes.   And Alex had known about

2   it because we told him on a call that we

3   have the trademark and the copyright to

4   the game and the stuffed animals at that

5   time because we spoke to him on

6   February 26, 2018, when he asked about it

7   and this was filed before.   This is not a

8   secret.   He knew about it.   We discussed

9   it.   It's in the contract.   It's not a

10  surprise.

11     Q.     Okay.   And this is in -- did you

12  file this application in class 28?

13     A.     If that's what it says then

14  that's classification that it is.

15     Q.     And we see the -- okay.   When

16  you filed for this application, did you

17  place an electronic signature on the

18  application?

19     A.     Again, this is not the signature

20  page that I had seen when I filed the

21  application, but if this is what is, I

22  guess, downloadable after the application

23  is filed, then that's what it is.

24     Q.     Okay.   So I'm scrolling down

25  again, and again you'll notice there's

Page 128

1   page numbers in blue in the top caption --
2       A.     Yep.
3       Q.     -- of this document -- and I'm
4   on page five of five now -- and you can
5   see that on page five of five is the text
6   Webcomic Name, correct?
7       A.     Yes.  Again, this is not a
8   design mark so this, I believe, is
9   auto-generated.  None of us drew that name
10  if that's what you're asking.
11      Q.     No.  I just wanted to clarify --
12  well, let me strike that and just ask this
13  a different way.
14             Is it then accurate that,
15  because this is just text, you typed it
16  into the application for this mark?
17      A.     Again, I don't know what is
18  procedurally generated from the trademark
19  website.  I wrote at one point what mark
20  is being registered.  I don't know if this
21  is procedurally auto-generated from their
22  back-end platform.
23      Q.     Sure.  You said you wrote it in.
24  Do you recall -- and correct me if I'm
25  wrong -- do you recall writing it in

Page 129

1   during that application process for this
2   particular mark, I mean?
3       A.    I mean, obviously the mark is
4   for Webcomic Name that we applied for.
5   This is not -- the document speaks for
6   itself.  This is not, like, a secret.  We
7   applied for the trademark, the Webcomic
8   Name, in classification 28.  I don't
9   really know what you're asking.  The
10  document is very -- it's self-explanatory.
11  You don't need me to confirm that.
12      Q.    So I've added another document
13  to the chat box.
14      A.    Okay.
15      Q.    I'm adding on share screen
16  another document.
17      A.    Okay.
18      Q.    Okay.  Mr. Goldner, do you --
19  and let me mark this as Exhibit 11.
20  Mr. Goldner, do you recognize this
21  document?
22      A.    This, I believe, is the
23  trademark registration.  I think it was
24  mailed to us for Webcomic Name, I believe.
25      Q.    And this is -- I will scroll out

1    a little bit.  If you need me to zoom back

2    in on a text let me know, but this is the

3    trademark that was registered under

4    class 28, correct?

5         A.    Yes, that's what it says.

6         Q.    Okay.  And so you'll see kind of

7    in the center of the document class 28 and

8    then you'll see a number of, perhaps,

9    product descriptions.  And specifically

10   what I'm referring to is board games, card

11   games, game cards, party games, plush

12   dolls, plush toys, stuffed dolls and

13   animals, stuffed toy animals, tabletop

14   games, soft sculpture plush toys, stuffed

15   and plush toys.

16        A.    Okay.

17        Q.    So as of December 11, 2018, had

18   Golden Bell Entertainment sold any of

19   those types of items with the Webcomic

20   Name mark emblazoned on them?

21        A.    It was in commerce.  None have

22   been sold.  There's a difference.  When

23   you are marketing, promoting to buyers,

24   looking to get solicitations, whether it's

25   MOQs -- which is in our catalog -- it is

Page 131

```
 1   in use.  It is being actively solicited
 2   and attempted to be sold so that when
 3   Alex, if he would have finished the game
 4   on time, by the deadline, then we would
 5   have been able to actually take orders.
 6   But instead he missed the deadline without
 7   even really a care in the world.  So I
 8   don't really know what you're asking me.
 9   It's in commerce but it wasn't --
10        Q.    Let me go back because we're
11   getting a little bit far afield again.  My
12   question is:  As of December 11, 2018,
13   with respect to the items described under
14   class 28, did Golden Bell Entertainment,
15   LLC, sell any such items with the Webcomic
16   Name mark attached to it?
17        A.    I don't really know what you're
18   asking.
19        Q.    Did Golden Bell Entertainment,
20   LLC, as of December 11, 2018, sell any
21   Webcomic Name board games?
22        A.    Golden Bell Entertainment, LLC,
23   is not a sales arm or division that sells
24   product -- physical, produced products.  I
25   said this earlier.
```

1      Q.     Is that a yes or a no?

2      A.     I don't know what you're asking.

3   Are you asking:  Did we sell the

4   distribution rights, the sales rights

5   where we --

6      Q.     No.  No.  No.  No.  No.  No.  So

7   let's -- we'll start over.  My question

8   is:  As of December 11, 2018, did Golden

9   Bell Entertainment, LLC, sell any Webcomic

10  Name board games?

11     A.     So yeah, you're trying to trap

12  me into a question.  This is a legal

13  definition of what counts as a sale or

14  solicitation to get a trademark.  So the

15  answer is:  I don't know what you consider

16  a sale and what is defined as -- under the

17  UCC as a sale.  I don't know.

18     Q.     Okay.

19     A.     I'm not a lawyer.

20     Q.     So you don't know whether or not

21  any sales were made, correct?

22     A.     I am telling you I don't know if

23  you consider a sale or what the USPTO

24  considers a sale as selling a physical

25  mass manufactured game or if it counts as

1    if you're soliciting and marketing

2    something which we were told by our

3    attorneys that if something is on a

4    website being solicited --

5         Q.    I'm not asking about the USPTO's

6    definition.  My question is much more

7    simple.

8         A.    Okay.

9         Q.    So let me ask you this:  As of

10   December 11, 2018, had Golden Bell

11   Entertainment, LLC, created any Webcomic

12   Name board games to be sold?

13        A.    We have created games, but we

14   have not manufactured any mass -- any

15   games to sell.

16        Q.    And that's true as of today,

17   correct?

18        A.    That is true as of today.  We

19   have not mass manufactured any games or

20   plush toys outside of any samples which

21   your client has seen.

22        Q.    Has -- aside from those samples

23   and aside from mass manufacturing has

24   Golden Bell Entertainment, LLC,

25   manufactured any Webcomic Name board

1   names?

2       A.    Outside -- can you please repeat

3   the question?

4       Q.    Sure.  Outside of mass

5   manufacturing and outside of samples has

6   Golden Bell Entertainment, LLC,

7   manufactured any Webcomic Name board

8   names?

9       A.    No.  We have made the samples

10  which were used as solicitation devices in

11  order to get sales for B-to-B and to

12  promote the works.  It is our job and

13  obligation to be marketing, to

14  pre-promote, to put into commerce, to

15  build the brand.  I really don't know what

16  you're asking.  You're essentially just

17  trying to trick me into saying something

18  you want me to say.  Like, I don't

19  understand --

20      Q.    So let's -- let me ask you this:

21  Has Golden Bell Entertainment, LLC, been

22  given any money in exchange for any

23  Webcomic Name board game as of

24  December 11, 2018?

25      A.    There may have been rights that

Page 135

1  have been transferred.  I don't know if
2  there was any monetary exchange.  So it is
3  entirely possible that in the licensing
4  change of rights from Golden Bell
5  Entertainment to Golden Bell Studios being
6  able to produce the products and
7  manufacturer them and sell them, that
8  there was money that changed hands, but I
9  don't remember if it was just a strict
10  royalty that GBS is due to GBE or if there
11  was money paid in advance from GBS to GBE.
12      Q.    So aside from any transfers of
13  funds between GBS and GBE with respect to
14  Webcomic Name board games was there any
15  other transfer of funds to Golden Bell
16  Entertainment with respect to Webcomic
17  Name board games as of December 11, 2018?
18      A.    Transfer of funds in which way?
19      Q.    In terms of Golden Bell
20  Entertainment being given funds in
21  exchange for a Webcomic Name board game?
22      A.    Golden Bell Entertainment did
23  not have any other funds except from the
24  things I just told you relating to
25  Webcomic Name.

1     Q.    Let's move on to card games.  So

2  as of December 11, 2018, had Golden Bell

3  Entertainment created any Webcomic Name

4  card games for sale?

5     A.    Again, we did create the game,

6  but the art is not done because there was

7  no final files produced.  This is the same

8  line of questioning of what you asked

9  before.

10    Q.    So it's just a yes-or-no

11  question.

12    A.    The answer is I don't know what

13  you're asking.  You did this in the last

14  deposition.  I don't know what you're

15  asking because it doesn't seem like you

16  understand our business.

17    Q.    Okay.  Well, let's just try to

18  find this out then.  As of today has

19  Golden Bell Entertainment, LLC, created a

20  Webcomic Name card game for sale?

21    A.    We have created.  We have not

22  mass produced.  There are things that have

23  been created to make a game.  We do not

24  have the final files from Alex, the final

25  art file that he is due -- that is due to

1  us.  You're asking -- the word "creation"

2  is essentially the entire thing of this

3  case.  We did create a big part of the

4  game for Webcomic Name because Rob and I

5  created it before even signing with Jason

6  because it was originally the Sunday

7  Comics game which we've said this.

8      Q.    So let's move on to game cards.

9  As of December 11, 2018, has Golden Bell

10  Entertainment, LLC, created any Webcomic

11  Name game cards?

12      A.    It's the same answer.  I guess

13  game cards, we can classify as the

14  Pretending to Grownup guest artist card

15  that says Unexpected Pregnancy so that is

16  a game card that has been produced in

17  Pretending to Grownup which Alex assigned

18  the rights to Wiseman which we acquired --

19      Q.    Well, hold on again.  We're

20  getting a little far afield --

21          (Whereupon, simultaneous

22      conversation took place disrupting the

23      record, and the court reporter

24      requested one person speak at a time

25      without interruption from anyone

Page 138

```
 1      else.)
 2      Q.    I'm only asking about Webcomic
 3   Name.  So let's just stick with Webcomic
 4   Name.
 5            (Whereupon, simultaneous
 6        conversation took place disrupting the
 7        record, and the court reporter
 8        requested one person speak at a time
 9        without interruption from anyone
10        else.)
11            MR. FOX:  Marc, you have to let
12        him finish his question.  Take a pause
13        and a beat and give a slow answer.
14        Answer only the question asked, not a
15        different question, okay?  Thanks.
16            MR. KUNST:  Thanks.
17      Q.    So as of December 11, 2018, has
18   Golden Bell Entertainment, LLC, sold any
19   Webcomic Name game cards?
20      A.    Again, there is a guest ARTIST
21   card of Webcomic Name in Pretending to
22   Grownup.
23      Q.    So let's try this again.  Has
24   Golden Bell Entertainment, LLC, sold any
25   Webcomic Name game cards as of
```

1    December 11, 2018?

2        A.    There is a game card in

3    Pretending to Grownup that is of Webcomic

4    Name which is one of the featured cards on

5    Amazon which is in discovery.  That game

6    card is in a game, Pretending to Grownup,

7    that has been sold.

8        Q.    Okay.  And was that game card

9    submitted to the USPTO as any specimen for

10   the application of this trademark?

11       A.    I don't recall.

12       Q.    Okay.  With respect to party

13   games, has Golden Bell Entertainment, LLC,

14   sold any Webcomic Name party games as of

15   December 11, 2018?

16       A.    Again, the Webcomic Name Game is

17   in the party game, Pretending to Grownup,

18   which transferred the rights for any

19   future rights to Jason which we acquired

20   Pretending to Grownup which is for sale on

21   Amazon and on other outlets which is in

22   the pictures of the conventions that you

23   saw.

24       Q.    As of December 11, 2018, has

25   Webcomic Name -- pardon me -- has Golden

1   Bell Entertainment, LLC, sold any Webcomic

2   Name plush dolls?

3        A.    We have not sold any en masse or

4   mass manufactured.  We have made --

5        Q.    Have you sold any?

6        A.    We have only made the sample and

7   have solicited.

8        Q.    Okay.  So have you sold any?

9        A.    No.  It is in commerce.  It is

10  in use because we are actively trying to

11  sell.

12       Q.    So is that a yes or no?  Have

13  you sold any?

14       A.    Any -- there have been no mass

15  manufacturing of the plush toys.  So how

16  can you sell something you haven't mass

17  manufactured?  I don't -- I really don't

18  understand this question.  This is --

19            MR. FOX:  Marc.  Marc.  Marc.

20       Look, I got to tell you something.

21       The answer to the question's obviously

22       no, and you want to explain why not in

23       your answer.  That's not what we're

24       here to do today.  The answer is no,

25       period.  The explanation and your

1        arguing with him to explain that you

2        couldn't do it because he didn't do

3        this part of the deal is just

4        prolonging the deposition.  We all

5        know what our position is.  He can ask

6        a question.  Might be useless because

7        his client didn't uphold his end of

8        the deal or that, you know, the more

9        full answer is that you were looking

10       for preorders or whatever.

11            But he's asking very narrow

12       questions, did you sell, did someone

13       actually purchase.  And if the answer

14       is no, it's okay to say no.  It

15       doesn't destroy your case.  This is

16       not the entirety of your whole, you

17       know, submissions to the court.  It's

18       just him asking questions and you

19       answering them.  So try to remember

20       that.

21            THE WITNESS:  I understand that.

22       A.    It's just that there are

23   nuances, Kyle, that I want to make sure

24   I'm very specific with you about how there

25   is things like a Webcomic Name card in

Page 142

1   Pretending and that is a game card.

2       Q.    Okay.  So with respect to

3   stuffed dolls and animals, has Golden Bell

4   Entertainment, LLC, sold any Webcomic Name

5   stuffed dolls and animals as of

6   December 11, 2018?

7       A.    No, we have not sold because we

8   haven't manufactured them or mass

9   manufactured.

10      Q.    With respect to stuffed toy

11  animals -- which I believe we have not got

12  to yet -- has Golden Bell Entertainment,

13  LLC, sold any Webcomic Name stuffed toy

14  animals as of December 11, 2018?

15      A.    Again, we have not mass

16  manufactured so we could not have sold

17  them.

18      Q.    Is that a no?

19      A.    I guess it's a no.  As I said,

20  it's the same answer as before.  We

21  solicited.  The answer is no.

22      Q.    Okay.  With respect to tabletop

23  games, has Golden Bell Entertainment, LLC,

24  sold any Webcomic tabletop games as of

25  December 11, 2018?

Page 143

1      A.    Pretending to Grownup is a
2  tabletop game, and the Webcomic Name Guest
3  Artist Card is in Pretending to Grownup
4  which has been sold and Alex was
5  compensated for it.
6      Q.    With respect to soft sculpture
7  plush toys, has Golden Bell Entertainment,
8  LLC, sold any Webcomic Name soft sculpture
9  plush toys as of December 11, 2018?
10      A.    Again, it's in commerce.  We've
11  solicited.  We have not mass manufactured
12  or sold.
13      Q.    So is that -- is your answer,
14  no?
15      A.    It's the answer that I just
16  said.
17      Q.    So --
18      A.    I don't believe -- you're asking
19  for a yes or no.  I don't believe this is
20  a yes-or-no question.  Just because you're
21  asking for it to be yes or no, I don't
22  believe it's a yes-or-no question.  So
23  you're asking me to answer something not
24  it in a way that I would answer, and I
25  testified to -- under oath to answer

Page 144

1  truthfully.  I'm answering truthfully.

2  That is how -- what I believe the answer

3  is.  It is not a yes or no.  It is the

4  answer I just told you.

5           MR. KUNST:  So, Garry, can I

6      have his answer back to the last

7      question?

8           (Whereupon, a portion of the

9      record was read back.)

10          "ANSWER:  Again, it's in

11     commerce.  We've solicited.  We have

12     not mass manufactured or sold."

13     Q.   Okay.  That's good.  I'll move

14 on to the -- I think the final entry is

15 stuffed and plush toys.  As of

16 December 11, 2018, has Golden Bell

17 Entertainment, LLC, sold any stuffed --

18 pardon me -- any Webcomic Name stuffed and

19 plush toys?

20     A.   Again, we have had it in

21 commerce.  We have generally solicited.

22 We have not mass manufactured or sold,

23 even though Wiseman told us that we could,

24 and so did Alex.

25     Q.   Okay.  Thank you.

```
 1        A.     Am I allowed to have a snack or
 2    no?
 3        Q.     Yeah, sure.
 4               Do you need a minute?
 5        A.     No.  No.  Just having a piece of
 6    pound cake.
 7        Q.     Are you sure you don't want to
 8    take a minute?  You're going to be eating.
 9    You're going to be answering questions
10    too, though.
11        A.     I chew very quickly.
12        Q.     All right.  I've added another
13    document to the chat box and put it up on
14    share screen.  I'd like to mark this as
15    Exhibit 12.
16        A.     Okay.
17        Q.     So, Mr. Goldner, let me ask you
18    again:  Are you familiar -- I'll scroll
19    down this document.  Please let me know if
20    you're familiar with it.
21        A.     Same answer as before.  I've
22    never seen this specific document, but I
23    have filed a trademark for Webcomic Name
24    in this category.
25        Q.     I'm going to scroll up, and
```

1    we'll talk about the category.  This

2    category is Number 28, correct?

3        A.    Yes.

4        Q.    And have -- just directing your

5    attention to the top of Exhibit 12, do you

6    see where it states, service mark

7    statement of use?

8        A.    No -- yes.  Yes, I do.  Yes.

9    Yes.  Yes.

10       Q.    Okay.  Okay.  Do you recall

11   filing a service mark statement, statement

12   of use for Webcomic Name under class 28?

13       A.    I don't remember doing it, but

14   it says that I did.  So I did.  Just

15   because I don't remember filing the

16   document doesn't mean I didn't do it.  My

17   signature's on the page.

18       Q.    Scroll down.  Okay.  When you

19   say your "signature's on the page," you're

20   referring to declaration signature, and

21   then there's Marc Goldner between two

22   forward slashes, correct?

23       A.    Signature's principal of the

24   entity.  That's --

25       Q.    Okay.  Okay.  So again, we're

1  looking at a document that has blue

2  numbering up at the top caption just so

3  we're on the same page, and this is page 5

4  of 10 of Exhibit 12, correct?

5      A.    Okay.

6      Q.    Do you need me to -- I'm going

7  to -- okay.  And did you upload this

8  document in connection with the statement

9  of use -- or pardon me.  Let me strike

10  that and rephrase it.

11          Did you upload this picture in

12  conjunction with this statement of use?

13      A.    I don't recall, but if it's

14  there I must have.  I don't remember doing

15  it, but -- I'm not a designer so I didn't

16  make this file.  I'm not a graphic

17  designer, but if it's here it was

18  uploaded.  And if I signed it then I must

19  have uploaded it and don't remember.

20      Q.    Do you know if you were the

21  individual who obtained this photograph?

22      A.    This is not a photograph.

23      Q.    Okay.  What would you call it?

24  A picture?  How would you like to refer to

25  it?

Page 148

1      A.    This is a graphic design file.
2   This is a --
3      Q.    Okay.
4      A.    -- graphic design file.
5      Q.    Do you know if you were the
6   individual that obtained this graphic
7   design file?
8      A.    What do you mean "obtained"?
9      Q.    Where did you get this from?
10     A.    Rachel deals with all the art
11  files so I probably got it from her.
12  Anything that is submitted to the USPTO or
13  really any type of thing Rachel handles.
14     Q.    Do you know what this graphic
15  design file shows?
16     A.    Yes.  It's a tag for a stuffed
17  animal.
18     Q.    And it's a tag for a Webcomic
19  Name stuffed animal, correct?
20     A.    That is correct.
21     Q.    Do you know if Mr. Norris
22  provided this?
23     A.    I have no idea.
24     Q.    Could you -- again, could you
25  tell me what Ms. Korsen's responsibility

1    is with respect to artwork that's

2    submitted to Golden Bell Entertainment for

3    purposes of uploading trademark

4    applications?

5        A.    So Rachel is the first and lead

6    artist of Golden Bell Entertainment.

7    She's -- her and I have been working on

8    everything from comics to games to toys,

9    design, graphic design, art, concept,

10   pitches since 2014 or possibly even

11   before.  She got her BFA at Ohio State.

12   She got her master's in arts management at

13   Carnegie Melon.  She's an artist, a

14   graphic designer.  She runs operations.

15   We exchanges hundreds of thousands of

16   messages over the years.  I don't remember

17   if she is the one that sent me this file.

18   Possibly.  I have no idea.

19       Q.    Do you know if Mr. Norris -- I'm

20   sorry -- strike that.

21             We'll move on to the next one.

22   Okay.  We're on page 6 of 10 of

23   Exhibit 12, correct?

24       A.    Okay.  We can be there.  Yep.

25       Q.    There is -- well, let me ask you

1   this:  Do you -- can you describe for me

2   the -- I don't know if it's a picture.  I

3   don't know how you would like to describe

4   it.  First off, let's start with that.

5   How would you at define -- I'll call it a

6   picture -- that's on page 6 of 10 of this

7   exhibit?

8       A.    This is a concept pitch for what

9   could be a game box design for a front of

10  the box for the game for Webcomic Name.

11  It's a concept pitch that was not

12  approved.  We said it looks cool, but it's

13  far away from being a complete file.

14  There's no sides of the box, there's no

15  bottom of the box, but this was a sample,

16  a concept pitch -- which is often done in

17  entertainment -- to -- what the aesthetics

18  and the design look will be that will be

19  conveyed, and then there's often market

20  testing based on market research and data

21  analytics, if it tests well with an

22  audience and it resonates with the target

23  market to see if that will wind up being

24  the box art that is used -- which it turns

25  out it will not be.

Page 151

1    Q.    Okay.  Do you know where this --
2  and I'm just -- for shorthand, I'm going
3  to refer to this as a picture.
4    A.    It would be better if it was a
5  concept box.
6    Q.    But what is -- what has actually
7  been or what has been uploaded with this
8  statement of use is a picture and so
9  that's simply what I'm going refer to it.
10  If there's something else that you think
11  is more accurate, I have no problem
12  calling it that.
13    A.    I just disagree that it's a
14  picture, but --
15    Q.    We can -- I can call it -- I'm
16  not trying to argue with you.  I can call
17  it the concept.  It really makes no
18  difference just so long as I know what I'm
19  actually referring to.  So again, same
20  question:  Do you know where this concept
21  was obtained from?
22    A.    I believe from WhatsApp from
23  Alex Norris, and it was also emailed
24  low-res, low resolution file, in email and
25  it was not layered and -- yeah, I believe

1    it was sent in email and in WhatsApp.

2         Q.    Sent in email and in WhatsApp

3    from Mr. Norris?

4         A.    Correct.  To my memory.  I know

5    he sent it in WhatsApp for sure in the

6    group chat for Webcomic Name that Rachel,

7    Rob and I were in with Alex, and I believe

8    he sent it also on email.  I'm not

9    100 percent sure, but I think he did.  And

10   if he did, it would be in discovery.

11        Q.    Okay.  And at any time was there

12   discussion with Mr. Norris about

13   submitting this concept with United States

14   Patent and Trademark Office?

15        A.    On a February 26, 2018, call

16   with Alex he was well aware that we were

17   filing and had the trademark to Webcomic

18   Name, the game and stuffed category, and

19   he replied, okay.  Sure.

20              He knew about it.  It was on a

21   call.  So yes, he did know that we had the

22   trademark to Webcomic Name.  This

23   shouldn't come as a surprise.

24        Q.    Okay.  Okay.  And moving down to

25   the next page, page 7 of 10, this is a

```
 1  picture, correct?
 2       A.    This is the pink butt plush.  On
 3  the back there is a butt.
 4       Q.    Okay.  And this is -- this was
 5  uploaded with the statement of use for
 6  this particular application, correct?
 7       A.    Yeah.  This is based on the
 8  design concept art that Alex had submitted
 9  to be made into a stuffed animal which we
10  had sampled and edited numerous times.
11       Q.    And did Alex send you this
12  picture?
13       A.    No.  No.
14       Q.    Where'd you get this picture?
15       A.    From one -- from Rachel because
16  she deals with all the actual, physical
17  design work.
18       Q.    Okay.  So then did Rachel create
19  this plushy?
20       A.    So Rachel did the overlays, the
21  design, the editorial.  She didn't hand
22  stitch it if that's what you're asking.
23  She's one of the co-creators, designers of
24  the toy.
25       Q.    Who hand stitched it?
```

1       A.      A factory in China.

2       Q.      How many of these did you get

3    from that factory in China?

4       A.      I believe there have been five

5    samples made which you all have the

6    pictures of in discovery.  There's the

7    pink blob butt plush, the sexy plush, the

8    orange blob with the hands down instead of

9    like the pink blob with the hands up,

10   there's the cat and the there's the double

11   sided speech bubble which has "oh no" on

12   one side and "okay" on the other side.

13   There may have been, like, two or three

14   bogus samples that were, like, designs

15   that we scrapped because the color wasn't

16   correct or the fabric wasn't good, but

17   those, even the ones that we wound up not

18   using as final designs, have been

19   submitted in discovery.

20      Q.      Was this -- was this a final

21   design, this picture on page seven?

22      A.      I can't say for sure.  Rachel

23   deals with that, but I think this is the

24   one that's final.  I'm not 100 percent

25   sure, though.  I'd have to ask her.

1      Q.    Okay.  And page eight, can you
2   describe me what this is a picture of?
3      A.    This is the double-sided speech
4   bubble that says "oh no" and on the other
5   side "okay."
6      Q.    And is this the final sample
7   that was created by a factory in China?
8      A.    I don't know if there was
9   further editorial on, like, the color or
10  the fabric but it looks like it was
11  embroidered.  If you can zoom in, usually
12  embroidery showed that something is final.
13  I'm not 100 percent sure, but it looks
14  like this is embroidered and not screen
15  printed because we try to have highest
16  quality products.  And we think embroidery
17  kind of signifies that because screen
18  printing can just wash away.
19     Q.    Okay.  Do you know if -- was it
20  Ms. -- oh, hold on.  Sorry.  Something
21  just popped up.  I'm going to go back.
22  Okay.  Mr. Goldner, we -- my -- I had to
23  turn my screen sharing off for a second,
24  but we're back.  We're back on page eight
25  of Exhibit 12.  Was it Ms. Korsen who sent

1  you this picture?

2       A.    Usually, she's the one that

3  sends me art files or design files, as I

4  said.

5       Q.    Okay.

6       A.    It could have been sent by the

7  factory too.  I don't remember what -- I

8  have -- literally have received tens of

9  thousands of files throughout the years.

10  I don't remember what individual person

11  sent me files back and forth.  The reason

12  I know about the Webcomic Name concept box

13  is because Alex drew it so he's the only

14  one that could have sent it.

15       Q.    We're on page nine now.

16       A.    Okay.  Okay.

17       Q.    Is this -- sorry.  Hold on.

18       A.    Same convention picture as

19  before.  Yep.

20       Q.    Yeah.  That was my only

21  question, if this is the same convention

22  picture as we looked at previously.

23       A.    It looks like it.  I mean, you'd

24  have to compare the two to see if they're

25  identical from different angles, but it

1    looks 99 percent the same.

2         Q.    Okay.  Let me -- okay.  I'm

3    going put Exhibit 7 back up and just ask

4    you if -- and I think 12 I have up as

5    well.  If I -- I'm going to tab over to 12

6    and then back to 7 and ask you to compare

7    and let me know if those are the same

8    pictures.

9         A.    They look like the same pictures

10   to me.  What's your question about it?

11        Q.    That was it.

12        A.    It looked like the same.

13        Q.    Okay.  Okay.  So I've added

14   another document to the chat box, and I

15   have -- we'll put up -- and to the extent

16   I did not do so, the exhibit we were

17   looking at previously, I've marked as --

18   I'd like to mark as Exhibit 12.

19        A.    Okay.

20        Q.    I'll mark this document as

21   Exhibit 13.  So, Mr. Goldner, is this --

22   you'll see that the top notes that this is

23   response to office action.

24        A.    Okay.

25        Q.    And this is for the literal

Page 158

1   element "oh no," correct?

2       A.    Okay.

3       Q.    And did you file an application

4   for the literal element "oh no" with the

5   USPTO?

6       A.    It says I did.  It's possible

7   that one of our attorneys at the time had

8   assisted with this because it's a little

9   bit later when Alex started to become

10  noncooperative and ignoring our emails.

11  So I don't know if I had handled all of it

12  or if one of our attorneys had helped us

13  at the time.

14      Q.    Okay.  And this was filed in

15  class 16, correct?

16      A.    If that's what it says.  The

17  document should speak for itself.  I don't

18  know where you're looking at but if the

19  document says it then that's the

20  classification.

21      Q.    Do you recall signing this

22  response to office action on or around

23  November 18, 2019?

24      A.    I don't specifically recall

25  signing it, no.

Page 159

1    Q.    Do you have any reason to doubt

2  that you signed this response to office

3  action?

4    A.    It's possible that one of our

5  attorneys signed it on my behalf.

6    Q.    Without giving me the content of

7  any communications between you and any

8  attorneys, which attorneys would have

9  signed for you on -- signed this on your

10  behalf?

11    A.    I know that Robert Garson.

12          THE WITNESS:  Jerry, am I

13      allowed to talk about attorneys?

14          MR. FOX:  You can name the party

15      that you think assisted you or filed

16      it.  You're not to discuss any advice

17      they gave you.

18          THE WITNESS:  Okay.

19    A.    Kevin Carlai and Robert Garson

20  who were two of the attorneys on this case

21  before were very involved with this and

22  they're the ones that sent the cease and

23  desist letter and who was dealing with

24  brand previously.

25    Q.    Okay.  So it may have been you,

1  it may have been Mr. Garson, it may have

2  been Mr. Carlai who signed this trademark

3  application, correct?

4      A.   It's possible.  I don't remember

5  who was it.  It very well could have been

6  me.  I'm not saying it wasn't.  I'm saying

7  I don't remember because there was so much

8  communication about this that I don't

9  remember who specifically signed it.  I'm

10  obviously aware of it if that's what

11  you're asking.

12      Q.   Okay.  Okay.  So again, we're

13  using the page numbering at the top

14  caption.  We're on page 5 of 16 of

15  Exhibit 13.

16      A.   Yep.

17      Q.   Can you tell me the -- what the

18  picture on page 5 of 16 is?

19      A.   This is one of the several pages

20  of our catalog that contained Webcomic

21  Name's products including the -- including

22  but not limited to the game, the plush

23  toys.  Does that answer your question?

24      Q.   Yeah.  You said it's -- it is a

25  part of your catalog; is that correct?

Page 161

```
 1      A.    Yes.  Which has been submitted
 2   into discovery.
 3      Q.    And who created that page --
 4   this page of the catalog?
 5      A.    Some of the art was created by
 6   Alex and Rachel handles the,
 7   quote/unquote, master catalog file.  She's
 8   the main designer of the catalog.
 9      Q.    Okay.  Do you know if Mr. Norris
10   provided this directly to Golden Bell
11   Entertainment for use in this application?
12      A.    I have no idea.  Again, not that
13   this would matter; he assigned the rights.
14   He knew that we were using assets for
15   Webcomic Name for everything.  This wasn't
16   a secret.  We had phone calls about this.
17   He knew we were using the comics to create
18   a catalog.
19            MR. FOX:  Yeah.  Marc, again,
20        unless that's an answer to a question
21        it's unnecessary.
22            THE WITNESS:  Okay.
23            MR. FOX:  It's another comment,
24        you know, affirmative which is not
25        allowed in depositions.
```

Page 162

```
 1              THE WITNESS:  Sorry.
 2       Q.    So the next page, page six is --
 3  I believe it's the concept for the box of
 4  the board game.  We've already discussed
 5  this, correct?
 6       A.    Yep, we discussed this.
 7       Q.    And page seven, this is the
 8  green plushy "oh no" on the front.  We've
 9  already discussed this as well, correct?
10       A.    We've already discussed this,
11  yes, sir.
12       Q.    Okay.  Now can you tell me what
13  page eight is meant to convey?
14       A.    This is Alex infringing on some
15  of our rights and breaching the option by
16  selling a book on his website that we had
17  an option to.  That's what this image is.
18       Q.    Did you obtain this picture?
19       A.    From the website, yes.
20       Q.    And you obtained it by getting a
21  screenshot from the ohnoshop.com website?
22       A.    Yes.  Since Alex didn't transfer
23  the domain which he was supposed to in the
24  contract.
25       Q.    And so I guess that leads to my
```

Page 163

1    next question, that he refused to provide

2    this picture to you, correct?

3         A.    It's a -- this is public

4    information.  This is his website that we

5    acquired, that he failed to give us access

6    to.

7         Q.    Okay.  But he -- I'm sorry.  You

8    just answered.  Move on to the next one.

9              Do you recall the date on which

10   you took this screenshot?

11        A.    No, no clue.  It's definitely

12   before the date that it was filed.  That's

13   for sure.

14        Q.    Okay.  So the next -- pardon

15   me -- the next picture on page nine, can

16   you describe to me what this is meant to

17   convey?

18        A.    This is the banner from the

19   picture from the convention that we looked

20   at before.

21        Q.    Okay.  Did Mr. Norris have any

22   part in creating this?

23        A.    Absolutely.  He designed the

24   concept box.  He did the drawings,

25   InDesign concepts for the butt plush and

1  the sexy blob, the oh no pillow.  Yeah, I

2  mean, he was a very big person that was, I

3  guess, part of the creation of this

4  banner.

5      Q.    Page 10, is this another

6  screenshot that you took from the

7  ohnoshop.com?

8      A.    Yes, this is a screenshot of him

9  breaching our option.  Yes.

10      Q.    Okay.  This is a screenshot that

11  you took, correct?

12      A.    Yes, that's correct.

13      Q.    Mr. Norris had refused to

14  provide you the domain to this website,

15  correct?

16      A.    That's correct.

17      Q.    Okay.  Same questions about

18  Number 11:  This is a screenshot you took

19  of the ohnoshop.com, correct?

20      A.    Same answers as before.

21      Q.    And this is also a screenshot

22  you took of the ohnoshop.com, correct?

23      A.    And this is also a primary

24  illustration showing how we were never

25  trying to take away his livelihood as we

Page 165

1    allowed him to continue to sell prints of

2    the comics that we obtained the copyright

3    to.

4        Q.    So let me ask you this:  When

5    did you take this screenshot?

6        A.    Before the date that says filed.

7    So before 8/6/20 -- or on that date, on or

8    before August 6, 2020.

9        Q.    Well, let me -- just so we're

10   clear, that's -- let me scroll up.  We're

11   on page 12.  I want to go back.  And just

12   so we're on the same page, do you see the

13   box, date signed, November 18, 2019?

14       A.    I see the date filed is

15   August 6, 2020, at the top of the page on

16   page 12.

17       Q.    Okay.  Well, I'm looking at date

18   signed.

19       A.    Then what is August 6, 2020?

20   Because that says filed.

21       Q.    Okay.  Let's -- so this is --

22   well, we won't get into this.  So let me

23   go back down to -- okay.  Did you obtain

24   Mr. Norris's permission before taking this

25   screenshot on page 12?

1    A.    I did not ask him to take a
2    screenshot of the website.
3    Q.    I'm sorry.  I missed that last
4    part.  You said you did not?
5    A.    I did not ask him, can I take a
6    screenshot of a website that is pubically
7    available, no.
8    Q.    Okay.
9    A.    It just shows that in use.
10   Q.    Again, this is a screenshot that
11   you took -- pardon me -- page 13 is a
12   picture of a screenshot that you took of
13   the ohnoshop.com website, correct?
14   A.    This is the same answers as
15   before.  It's the same --
16   Q.    I know, but you know I have to
17   go through this drill.  So just -- I'll
18   try to make it quick.  Did you obtain
19   permission from Mr. Norris before taking
20   the screenshot?
21   A.    I did not ask him to take a
22   screenshot of the website.
23   Q.    Okay.  Okay.  And page 14 is
24   also a screenshot you took of the
25   ohnoshop.com website, correct?

1      A.     Yes.   Same answer as before.

2      Q.     Same answer as before in that

3   Mr. -- you did not obtain Mr. Norris's

4   permission to take that screenshot,

5   correct?

6      A.     We didn't need to obtain his

7   permission to take a screenshot of a

8   website of a brand --

9      Q.     So that's yes or no.

10      A.     I just answered.  I do not have

11   to ask him.

12      Q.     Okay.  Page 15, this is another

13   screenshot you took of the ohnoshop.com

14   website, correct?

15      A.     Yes.  This is one of my

16   favorites.  This is where he's posting the

17   book that he told us we have an option to

18   and making it a sticker sheet and selling

19   it when he doesn't have the rights to it.

20   Yes, I remember this one.

21      Q.     And you didn't ask his

22   permission before taking the screenshot,

23   right?

24      A.     No, he didn't ask our permission

25   to post that on his website for sale.  You

1    have it backwards.

2        Q.    And then page 16, this is a

3    screenshot you took of the ohnoshop.com

4    website, correct?

5        A.    Yes.  This is the same thing,

6    yes.  Same website.

7        Q.    And this is -- you did not

8    obtain Mr. Norris's permission before

9    taking this screenshot, correct?

10       A.    Again, Alex didn't have

11   permission to be posting this which is our

12   work so you have it backwards.

13       Q.    And you did not -- with respect

14   to any of the screenshots from the

15   ohnoshop.com website, you did not obtain

16   his permission prior to uploading these

17   pictures, correct?

18       A.    That's not true.  He knew that

19   we were uploading the box file that he

20   made.  That's why he sent us a concept

21   box.  He knew that we had the trademark as

22   per the February 26, 2018, recording that

23   we told him that we have the trademark and

24   copyright, and he said, sure, okay, or

25   something similar in that regard.  So he

Page 169

1   knew -- I don't really know what you're

2   asking.  He knew that we filed for --

3       Q.    Let me make sure we're clear

4   because I asked something a little bit

5   different.  I'm only talking about the

6   ohnoshop.com screenshots that you took.

7   I'm not talking about the concept box.

8       A.    I don't know if I asked him,

9   hey, Alex -- there's no reason that I

10  would have ever asked, hey, Alex can I

11  screenshot the ohnoshop.com?  There's no

12  reason I would have ever asked him that.

13      Q.    But my question is a little

14  different.  It's about uploading the

15  pictures.

16      A.    What's the difference between

17  asking to take a screenshot and uploading

18  the pictures?

19      Q.    Well, perhaps there's none.  I

20  just want to make clear that you either

21  did or did not ask for permission to

22  upload the ohnoshop.com screenshots before

23  uploading?

24      A.    But if there's no difference and

25  I'm answering and then you're asking me to

Page 170

```
 1   answer in your way, it seems that we're
 2   saying the same thing.
 3        Q.    No, you're --
 4             MR. FOX:  Marc.  Marc.  Marc.
 5        Marc.  Marc.  Marc.  You cannot argue
 6        with Counsel.  You're not allowed to
 7        do that.  You're not the judge.
 8        You're a witness, and the judge will
 9        expect you to act like one.  When he
10        asks you a question, whether you think
11        you've -- you know, whether you think
12        that you answered it or that the same
13        answer would apply, just answer the
14        question again, and just answer it.
15        Because when you make these remarks,
16        the judge will be very offended.
17        You're not allowed to comment,
18        criticize, make editorial comments.
19             You know, Counsel asked a
20        question; you might think it's a
21        ridiculous question.  It doesn't
22        matter.  You have to answer it.
23             THE WITNESS:  Okay.
24        A.    Same answer applies then.
25        Q.    Okay.  Okay.
```

1            MR. KUNST:  So let me go back

2      through my notes and see how much more

3      I have.  Can we take -- can we go --

4      take 15 minutes.  We'll go to 3:00 and

5      we'll see how much more, if any, I

6      have.

7            Gerard, you're muted.  Yeah,

8      we're good.  All right.  Let's go off

9      the record.  We'll come back at 3.

10            MR. FOX:  Yeah, we'll come back

11      at 3.  Thanks.

12            THE VIDEOGRAPHER:  This

13      concludes media Number 3.  The time is

14      2:43.  We're off the record.

15            (Whereupon, a recess was taken.)

16            THE VIDEOGRAPHER:  This begins

17      media Number 4.  The time is 3:03.  We

18      are on the record.

19            MR. KUNST:  Okay.  I just --

20      back on the record just so everybody

21      knows I'm done with my line of

22      questioning.

23            MR. FOX:  Oh, great.  Well,

24      fantastic.  Well, thank you very much,

25      Counsel.  You're very efficient.

```
 1              And, you know, look, I think
 2       Mr. Goldner has not had a lot of
 3       litigation experience, but he's
 4       learning as he goes along how this
 5       process works and how it doesn't.
 6              I really appreciate the court
 7       reporter and the videographer's
 8       patience.
 9              THE WITNESS:  Thank you,
10       everyone.
11              THE VIDEOGRAPHER:  This
12       concludes today's deposition given by
13       Marc Goldner.  The total number of
14       media units used was four and will be
15       retained by Veritext.  We are off the
16       record at 3:03.
17                  (Deposition concluded at
18                   3:03 p.m.)
19
20
21
22
23
24
25
```

Page 173

1       I have read the foregoing transcript

2       of my deposition, and find it to be

3       true and accurate to the best of my

4       knowledge and belief.

5

6

7   _____

8   MARC GOLDNER

9

10  Sworn and subscribed to before me,

11  On this _____ day

12  of _____, 2022.

13

14

15

16  Notary_____

17  My Commission Expires_____

18

19

20

21

22

23

24

25

Page 174

1            I N D E X
2
3
4    WITNESS              EXAMINATION BY          PAGE
5
     MARC GOLDNER     MR. KUNST                    6
6
7
8      E X H I B I T S
9    DEFENDANT'S          DESCRIPTION           PAGE
10   Exhibit 1            Contract               22
11   Exhibit 2            7/3/2017-7/11/2017     41
                          email chain
12
     Exhibit 3            Collaboration          62
13                        agreement
14   Exhibit 4            10/1/2018              76
                          email
15
     Exhibit 5            10/3/2018              78
16                        email
17   Exhibit 6            10/8/2018             102
18   Exhibit 7            Convention            107
                          photograph
19
     Exhibit 9            Trademark             116
20                        application
21   ???                  Photograph            111
22   Exhibit 10           Trademark             126
                          application
23
     Exhibit 11           Trademark             130
24                        application
25   INDEX CONTINUED ON NEXT PAGE

Page 175

1                   I N D E X (cont'd)
2
3    Exhibit 12        Trademark              145
                       application
4
     Exhibit 13        Response to office     158
5                      action
6
7    Attorney Mr. Kunst from Gallet Dreyer &
     Berkey LLP has retained all exhibits.
8
9
                   INSERTIONS
10
             Page             Line
11
             None
12
13
                   RULINGS
14
             Page             Line
15
              96               6
16
17
                   REQUESTS
18
             Page             Line
19
             113              20
20           114               8
21
22
23
24
25

Page 176

1                       CERTIFICATION

2

3       I, Garry J. Torres, a Notary Public

4    for and within the State of New York, do

5    hereby certify:

6       That, Marc Goldner, the witness whose

7    testimony as herein set forth, was duly

8    sworn by me; and that the within

9    transcript is a true record of the

10   testimony given by said witness.

11      I further certify that I am not

12   related to any of the parties to this

13   action by blood or marriage, and that I am

14   in no way interested in the outcome of

15   this matter.

16      IN WITNESS WHEREOF, I have hereunto

17   set my hand this 7th day of September,

18   2022.

19

20

21           GARRY J. TORRES

22                 *       *       *

23

24

25

1                    ERRATA SHEET
         VERITEXT/NEW YORK REPORTING, LLC
2

     CASE NAME: ALEXANDER NORRIS d/b/a
3    WEBCOMIC NAME -v- Marc Goldner et al.
     DATE OF DEPOSITION: AUGUST 24, 2022
4    WITNESS' NAME: MARC GOLDNER
5    PAGE/LINE(S)/    CHANGE          REASON
     ____/_____/_____/_____
6    ____/_____/_____/_____
     ____/_____/_____/_____
7    ____/_____/_____/_____
     ____/_____/_____/_____
8    ____/_____/_____/_____
     ____/_____/_____/_____
9    ____/_____/_____/_____
     ____/_____/_____/_____
10   ____/_____/_____/_____
     ____/_____/_____/_____
11   ____/_____/_____/_____
     ____/_____/_____/_____
12   ____/_____/_____/_____
     ____/_____/_____/_____
13   ____/_____/_____/_____
     ____/_____/_____/_____
14   ____/_____/_____/_____
     ____/_____/_____/_____
15   ____/_____/_____/_____
     ____/_____/_____/_____
16   ____/_____/_____/_____
     ____/_____/_____/_____
17   ____/_____/_____/_____
     ____/_____/_____/_____
18   ____/_____/_____/_____
     ____/_____/_____/_____
19

                 _____
20
                     MARC GOLDNER
21
     SUBSCRIBED AND SWORN TO
22   BEFORE ME THIS_____DAY
     OF_____, 2022.
23

     _____
24       NOTARY PUBLIC
25   MY COMMISSION EXPIRES_____

**[& - 212]**                                                                 Page 1

| **&** |
| --- |
| **&** 2:2 5:18 175:7 |

| **0** |
| --- |
| **05491** 1:3 4:23 |

| **1** |
| --- |

**1** 4:14 22:22,24
27:5,18 33:20
37:4 45:14
65:19 70:16
73:16 76:14
80:1,24 81:11
82:8,13 111:1
174:10
**1,000** 73:21
**10** 70:4,8 125:21
147:4 149:22
150:6 152:25
164:5 174:22
**10,000** 37:25
**10/1/2018**
174:14
**10/3/2018**
174:15
**10/8/2018**
174:17
**10/9/2018** 122:4
**100** 11:15 18:3
19:19,24,25
23:14 27:16
31:8 32:15
83:21 111:12,25
122:15,16 152:9
154:24 155:13
**100,000** 54:9
**10022** 2:4 5:21
**102** 174:17

**107** 174:18
**1099s** 25:12
**10:05** 1:14
**10:06** 4:3
**10th** 17:5 67:4
**11** 41:21 129:19
130:17 131:12
131:20 132:8
133:10 134:24
135:17 136:2
137:9 138:17
139:1,15,24
142:6,14,25
143:9 144:16
164:18 174:23
**11/30/2017**
126:17
**111** 174:21
**113** 175:19
**114** 175:20
**11576** 8:4
**116** 174:19
**11:25** 70:17
**11:35** 70:12
**11:43** 70:20
**11th** 41:13
**12** 145:15 146:5
147:4 149:23
155:25 157:4,5
157:18 165:11
165:16,25 175:3
**120** 11:16
**126** 174:22
**12:11** 90:22
**12:21** 91:2
**12:42** 110:18
**12:50** 110:23

**12:57** 115:22
116:1
**13** 157:21 160:15
166:11 175:4
**130** 174:23
**14** 166:23
**1410** 2:10
**145** 175:3
**14994** 176:20
**14th** 15:23
**15** 8:3 167:12
171:4
**150** 88:12
**158** 175:4
**15th** 85:23
**16** 46:20 117:4
158:15 160:14
160:18 168:2
**18** 72:13 158:23
165:13
**1880** 2:10
**18th** 16:21
**1:19** 1:3 4:23
**1:30** 115:1,20
**1:32** 116:3
**1a** 71:5,19,23,24
72:6,7
**1f** 71:25,25
72:20 73:10
**1g** 72:1 84:8,10
92:8
**1h** 65:24 66:4
**1k** 65:24
**1l** 10:12

| **2** |
| --- |

**2** 41:5,18 70:20
110:17 174:11

**2,500** 84:3,17
85:7
**20** 15:22 41:10
90:6 95:10
175:19
**200** 88:3
**2008** 9:4
**2014** 15:20 16:10
149:10
**2015** 9:21,22
16:19,22 46:20
**2016** 17:4
**2017** 19:4 24:3
41:8,12,13,17,19
41:21,24 58:4
60:5,25 61:2
67:4 126:23
**2018** 76:14 78:23
79:7 80:24
81:11 82:8,13
102:17 127:6
130:17 131:12
131:20 132:8
133:10 134:24
135:17 136:2
137:9 138:17
139:1,15,24
142:6,14,25
143:9 144:16
152:15 168:22
**2019** 10:5,9,23
158:23 165:13
**2020** 165:8,15,19
**2022** 1:13 4:3
173:12 176:18
177:3,22
**212** 2:5

**22**  174:10
**230**  57:9
**24**  1:13 4:3
  177:3
**25**  73:20
**25th**  19:4
**26**  22:19,24
  127:6 152:15
  168:22
**27th**  19:4
**28**  127:12 129:8
  130:4,7 131:14
  146:2,12
**2:43**  171:14
**2a**  91:20
**2b**  38:25 50:20
  71:5,9,12,25

**3**

**3**  41:17,24 60:5
  61:21 62:17
  66:3 78:23
  83:22 84:6,8
  110:23 171:9,11
  171:13 174:12
**3,125**  83:12,19
  84:11,23 91:12
**3.97**  13:24
**30**  34:2 84:12
**30th**  126:22
**310**  2:11
**350**  88:7
**3:00**  171:4
**3:03**  171:17
  172:16,18
**3:27**  41:13
**3d**  30:25

**3rd**  41:8,12 58:4
  79:3,7 86:11,14

**4**

**4**  76:8,10 80:1
  81:6,7,10 88:5
  88:12 171:17
  174:14
**400**  88:4
**401**  82:25,25
  83:4,7,7
**41**  174:11
**441-0500**  2:11
**45**  88:11

**5**

**5**  77:25 78:19
  147:3 160:14,18
  174:15
**5,000**  10:17,18
  37:25
**500**  88:5,5
**5th**  2:4

**6**

**6**  22:19,24 102:5
  106:1 149:22
  150:6 165:8,15
  165:19 174:5,17
  175:15
**6,250**  34:1
**62**  174:12
**6b**  74:1,4,9

**7**

**7**  107:9 111:3
  152:25 157:3,6
  174:18
**7/11/2017**  66:25

**7/3/2017-7/11/...**
  174:11
**725**  74:10
**7500**  10:20
**76**  174:14
**78**  174:15
**7th**  176:17

**8**

**8**  102:16 175:20
**8/10/2017**  67:1,5
**8/6/20**  165:7
**81**  78:9
**845**  2:4 5:19
**8th**  17:5

**9**

**9**  116:7,11
  122:21 125:2
  174:19
**90067**  2:10
**935-3131**  2:5
**96**  175:15
**99**  157:1
**9th**  122:12

**a**

**a.m.**  1:14 4:3
**abcs**  30:7
**able**  26:8,17
  29:14 46:16,22
  47:3,7,8 56:21
  58:2 65:22 87:4
  123:24 131:5
  135:6
**absolutely**  26:10
  85:14 163:23
**academic**  14:2
**accepted**  12:8

**access**  10:13
  121:7,14 123:19
  123:21 125:11
  163:5
**account**  123:13
  123:20
**accountants**
  25:10
**accounting**
  25:11
**accurate**  27:5,6
  27:12 74:8,16
  93:2,6 128:14
  151:11 173:3
**accurately**  25:14
**accusing**  109:10
**acknowledges**
  73:4
**acquire**  32:2
  38:6 61:15
  121:9
**acquired**  18:8,22
  48:19 61:16,18
  121:12 137:18
  139:19 163:5
**acquiring**  36:5
  60:14
**act**  170:9
**acting**  49:15
**action**  1:18 5:8
  157:23 158:22
  159:3 175:5
  176:13
**actively**  131:1
  140:10
**actual**  16:2
  55:11 87:12
  153:16

**add** 116:4
**added** 40:3
  44:23 45:1,16
  46:1 47:1,19
  61:20 63:18
  75:21 77:14
  101:24 107:4
  111:4 125:16
  129:12 145:12
  157:13
**addendums**
  33:10
**adding** 129:15
**addition** 52:4
  65:19 66:12,14
**address** 106:12
  120:4
**administer** 5:7
**administration**
  11:20
**admiring** 45:7
**admission** 77:5
**admits** 82:3 88:9
**admitted** 77:11
  89:7
**admitting** 88:15
  88:17
**advance** 34:1
  49:6,8 52:11
  72:2 80:2,25
  83:1,8,11 84:3
  84:11 135:11
**advertising** 47:4
  56:7
**advice** 159:16
**advisor** 11:19
  12:4

**aesthetics**
  150:17
**affairs** 12:23
**affect** 7:12
**affiliations** 5:15
**affirmative** 79:9
  161:24
**afield** 104:4
  105:14 131:11
  137:20
**agent** 49:16 64:8
  64:9,25 65:5,8
  65:10,11
**ago** 23:13 24:1,5
  26:2 63:22
  107:19 122:19
**agree** 4:13 43:14
  43:21
**agreed** 3:2,7,11
  50:1 56:14
  103:12,13
**agreement** 22:4
  23:17 28:3,25
  29:1,19 30:23
  31:6 32:19,22
  33:8 34:8 35:8
  37:8 44:21,24
  45:16,17,23 49:4
  50:16,17 51:8
  52:2,17,22 53:13
  55:10,18 57:18
  58:18 62:10,14
  63:9 64:4,10
  65:14,16,21
  66:10,15,20 67:8
  67:10,15,17
  70:25 71:20
  72:9,11 73:1,19

74:2 80:3 81:1
  83:16,20,23
  84:25 89:24
  90:1,11 91:5,6
  92:12 93:5
  100:10,18
  121:18 174:13
**agreements**
  26:23 32:21
  45:2
**ahead** 44:17
  85:16 89:3 90:4
  116:21
**ai** 84:19
**air** 49:10 101:21
**airplane** 8:12
**airships** 18:18
  29:11 34:4
**ajn** 1:3
**al** 2:9 4:20 177:3
**alan** 100:6
**alex** 2:3 17:22
  18:6,9,9 19:3
  30:15 31:15,15
  31:18 32:8,20,25
  33:9 34:5,9,11
  34:15,24 35:8,12
  35:23,25 36:2
  37:2,8,18,20
  38:1,13,15,24
  39:3,8 41:7 45:4
  48:5,12,24 50:25
  62:11,15 67:23
  68:11 75:1
  78:12,23 89:8,10
  89:12 91:25
  92:4 102:12
  104:19,20,21

105:3,17,19
  108:16 121:6,13
  123:5 127:1
  131:3 136:24
  137:17 143:4
  144:24 151:23
  152:7,16 153:8
  153:11 156:13
  158:9 161:6
  162:14,22
  168:10 169:9,10
**alex's** 38:12
  48:25 49:8
**alexander** 1:5
  4:17 17:21,24
  18:23 177:2
**allan** 2:16 5:1
**allegation** 58:11
**allow** 46:2 47:2
**allowed** 25:2
  40:15 45:24
  52:20,22 53:18
  53:19,21,23 54:1
  56:2,3,24 57:2,4
  57:13 124:24
  145:1 159:13
  161:25 165:1
  170:6,17
**alumni** 14:3
**amazon** 139:5
  139:21
**amount** 83:14,17
  83:19,24 84:23
  84:24 85:7
**analytics** 56:15
  150:21
**ancillary** 39:2

**andrews** 30:24
**angeles** 2:10
**angles** 156:25
**animal** 18:25
  30:8 38:16,18
  44:10 50:19
  52:5,8,10 100:20
  103:7 104:16
  105:7 148:17,19
  153:9
**animals** 18:5
  30:15,17 38:22
  53:17 100:8,13
  100:17,25 101:6
  102:25 105:18
  114:19 127:4
  130:13,13 142:3
  142:5,11,14
**animated** 52:14
  101:17
**animation** 32:7
  39:1 50:21
  53:18 91:22
**answer** 7:2,19
  24:20 25:5
  28:10,12,13,22
  29:2 36:10,14,19
  47:17 49:25
  54:24 68:17
  69:4,20 85:8
  93:15,17 95:11
  95:23 96:3,23
  99:24 103:8
  106:11 109:21
  110:13 113:9
  114:10,21
  132:15 136:12
  137:12 138:13

138:14 140:21
  140:23,24 141:9
  141:13 142:20
  142:21 143:13
  143:15,23,24,25
  144:2,4,6,10
  145:21 160:23
  161:20 167:1,2
  170:1,13,13,14
  170:22,24
**answered** 93:16
  94:18 163:8
  167:10 170:12
**answering** 57:25
  58:1 79:10
  124:13 141:19
  144:1 145:9
  169:25
**answers** 23:23
  55:4 98:16
  164:20 166:14
**anxiety** 29:25
  30:8
**anymore** 93:16
  94:17 97:2
**apologize** 24:6
  28:24 100:5
**appearance** 5:12
  5:14
**appearances** 2:1
**appeared** 46:19
**appearing** 2:15
  5:21 7:24
**appears** 76:15
  78:22 108:20
**apples** 49:18
**applicable** 91:23

**applicant** 116:23
**application** 12:7
  42:17 117:16,19
  117:21 118:5,10
  118:12,25 119:2
  119:9,19 120:16
  120:21 121:10
  122:14,15
  125:25 126:23
  127:12,16,18,21
  127:22 128:16
  129:1 139:10
  153:6 158:3
  160:3 161:11
  174:20,22,24
  175:3
**applications**
  116:13 122:16
  149:4
**applied** 10:10
  12:25 13:9
  129:4,7
**applies** 30:13
  170:24
**apply** 10:6 42:19
  126:2,9 170:13
**applying** 12:21
**appreciate** 172:6
**approaching**
  39:21
**appropriate**
  79:14
**approval** 77:4
  120:23
**approved** 150:12
**april** 16:19,21
**argue** 24:24
  43:17 59:24

93:25 95:9
  97:11 99:19,23
  99:24 115:7
  151:16 170:5
**argues** 97:12
**arguing** 43:24
  59:23 94:3,15
  96:22,23 97:4
  98:11,14,15
  100:3 115:9
  141:1
**argument** 43:22
  94:17 110:4,9
**argumentative**
  44:4
**arm** 112:19,22
  131:23
**art** 33:6 74:22
  75:9 87:11,13,21
  92:22 136:6,25
  148:10 149:9
  150:24 153:8
  156:3 161:5
**artist** 18:9,10
  32:24 34:5
  35:17 37:22
  39:14 44:19
  45:14 67:25
  72:21 73:3
  84:10,15,18
  137:14 138:20
  143:3 149:6,13
**artists** 31:14
  32:4,22 38:8
**arts** 149:12
**artwork** 149:1
**aside** 6:19 11:18
  13:15 113:18

133:22,23
135:12
**asked** 22:9 48:5
48:12 62:25
64:7 68:16
96:18 97:8
103:12 127:6
136:8 138:14
169:4,8,10,12
170:19
**asking** 15:5 36:7
48:14 59:4,8,9
59:17 63:11
67:22 72:5
79:18 80:19
83:17,18 84:21
84:22 85:24
93:10,11 95:21
97:10,18 104:25
105:2 113:4,5
119:23 123:22
128:10 129:9
131:8,18 132:2,3
133:5 134:16
136:13,15 137:1
138:2 141:11,18
143:18,21,23
153:22 160:11
169:2,17,25
**asks** 43:18 69:8
109:20 110:6
170:10
**assertion** 49:23
**assets** 29:7,16,25
87:23 161:14
**assigned** 16:8
112:13 113:7,16
137:17 161:13

**assignment** 16:8
113:13,25
**assisted** 27:4,13
158:8 159:15
**associated** 34:9
35:13 36:1
**assume** 38:2
83:1,7 117:17
119:21
**assumed** 60:18
60:21
**assumption**
60:13
**attach** 76:16
118:4,6
**attached** 76:18
76:21 81:24
82:23 117:18,21
119:9,11,18
131:16
**attaches** 81:22
**attaching** 118:23
**attempted** 131:2
**attempting**
20:25
**attention** 102:9
102:21 146:5
**attorney** 5:16
32:18 33:17
44:16 175:7
**attorneys** 2:3,9
23:19 27:9
63:19 133:3
158:7,12 159:5,8
159:8,13,20
**audience** 56:16
56:18 61:6
150:22

**audio** 4:11
**august** 1:13 4:3
10:9 67:4 165:8
165:15,19 177:3
**authentic** 22:18
62:8
**authorized** 5:6
**auto** 118:9 128:9
128:21
**available** 166:7
**avenue** 2:4 5:20
**award** 10:11
**aware** 34:9
58:23 103:10,25
152:16 160:10

**b**

**b** 1:5 2:3 4:18
75:18,19,19
134:11,11 174:8
177:2
**baby** 51:2
**back** 15:21
16:10 22:2 43:4
59:24 66:16
69:20 70:11
73:16 76:8 81:6
81:8 84:6 86:18
87:19 91:1 92:7
100:10 115:1,7
116:2 121:25
128:22 130:1
131:10 144:6,9
153:3 155:21,24
155:24 156:11
157:3,6 165:11
165:23 171:1,9
171:10,20

**background**
8:16 126:7
**backside** 101:11
**backwards**
168:1,12
**banner** 54:12
108:19,22 109:3
114:3 163:18
164:4
**bar** 120:5,5,10
**base** 92:6
**based** 7:11 12:15
29:15 57:18
101:18 150:20
153:7
**bates** 78:1,10
**beat** 138:13
**began** 10:10
**beginning** 5:15
**begins** 4:14
70:19 110:22
171:16
**behalf** 5:21 6:1
62:10 67:2
117:12 159:5,10
**behemoth** 32:1
**belief** 173:4
**believe** 6:16 8:21
9:4 10:5,16,23
11:8 16:16 17:3
46:19 47:14,17
51:22 65:19,23
67:20 68:9 71:9
72:3 74:7 75:6
76:1 78:14 80:7
82:14 83:24
111:10,11 119:3
122:1 123:15

128:8 129:22,24
142:11 143:18
143:19,22 144:2
151:22,25 152:7
154:4 162:3
**believed** 86:8
**believes** 15:22
94:14
**bell** 1:8,9,9,10
4:20 10:2,3
14:22,25 15:3
16:14 17:1,8
24:10 25:19
37:5 42:15
44:25 45:18
56:23 58:17
62:11 64:1,18,21
67:3 71:2 79:5
103:5 104:14
105:5 112:6,8,11
112:12,14,18,20
112:24 113:6,8
113:15,18,20
114:8 116:24
130:18 131:14
131:19,22 132:9
133:10,24 134:6
134:21 135:4,5
135:15,19,22
136:2,19 137:9
138:18,24
139:13 140:1
142:3,12,23
143:7 144:16
149:2,6 161:10
**bell's** 18:22
**berkey** 2:2 5:18
175:7

**best** 8:24 58:2
99:12 106:11
108:13 173:3
**better** 106:23,24
115:15 151:4
**beyond** 54:23
**bfa** 149:11
**big** 31:25 63:25
137:3 164:2
**birthday** 16:21
**bit** 10:19 13:20
20:6 28:18
41:11 51:3
66:22 80:18
92:6 97:1
104:11 124:18
130:1 131:11
158:9 169:4
**bite** 43:4
**black** 77:2 79:20
79:20,25 80:6
86:7,9,19,22
87:5 89:2 92:24
**blah** 84:16,16,16
84:17
**blob** 56:11
100:23,23 101:3
101:8,8,8 103:19
103:19 154:7,8,9
164:1
**blobs** 56:17
**blocking** 87:14
**blood** 176:13
**blue** 39:19 118:2
120:5,10 128:1
147:1
**board** 30:9
130:10 131:21

132:10 133:12
133:25 134:7,23
135:14,17,21
162:4
**bogus** 154:14
**bond** 112:25
**book** 19:2 30:6
30:22 39:3,5,8
42:22 43:1
46:23 50:20
55:25 57:14,17
57:20,24 58:5,13
58:20 60:7,19,21
61:3 87:20
100:25 162:16
167:17
**books** 18:6 51:23
**booth** 111:13,23
112:4,8,9,11
**bored** 11:12
**bottle** 8:13
**bottom** 22:25
65:20 87:22
117:3 150:15
**box** 20:17 61:21
75:22 77:15
87:21,22 90:3
101:25 107:5
111:1,4 129:13
145:13 150:9,10
150:14,15,24
151:5 156:12
157:14 162:3
163:24 165:13
168:19,21 169:7
**bracelets** 18:5
**brand** 32:5 38:2
47:9,11 54:6,7

54:14 56:12,13
60:14 134:15
159:24 167:8
**branding** 18:25
47:13
**breach** 42:25
**breaching** 30:25
121:15,17
162:15 164:9
**break** 7:20 22:10
40:13 45:25
70:4 90:12
96:20,25 97:9
99:17 115:25
**breakdown**
102:19
**breaks** 7:16
**brief** 8:18
**briefly** 9:8
**brilliant** 26:7,16
89:12
**bring** 61:1 111:5
**bringing** 48:22
**broad** 25:2
42:19
**brought** 18:1
25:22
**bubble** 101:10
103:20 154:11
155:4
**build** 134:15
**built** 51:6
**bunch** 10:3
**business** 9:11,25
11:7,10 13:12,13
16:18,18 19:6
101:20 136:16

businesses  10:1
butt  101:9
  103:19 153:2,3
  154:7 163:25
buy  86:3,4
buyers  130:23

**c**

c  6:3 55:20,24
  75:18 120:11
cake  145:6
california  1:9,10
  2:10
call  46:7 57:15
  60:25 61:2
  113:12,25 127:2
  147:23 150:5
  151:15,16
  152:15,21
called  10:13
  18:11 19:8
  29:18 30:7
  107:12
calling  151:12
calls  22:1 50:24
  53:4 81:15
  161:16
calm  95:13
camera  4:7 8:7
capital  55:20
  117:7
caption  117:25
  128:1 147:2
  160:14
car  8:12
card  18:11,12
  33:1,5,6 130:10
  136:1,4,20

137:14,16
138:21 139:2,6,8
141:25 142:1
143:3
cards  77:3 87:17
  87:18,20 88:5,5
  88:8,11,12 91:16
  92:1 130:11
  137:8,11,13
  138:19,25 139:4
care  90:15 131:7
carlai  159:19
  160:2
carnegie  149:13
case  4:22 8:10
  24:13,15 55:21
  55:24 59:23
  94:1 96:22,24
  97:4,12,13 99:20
  100:4 103:9
  105:24 137:3
  141:15 159:20
  177:2
cat  100:22
  101:10 103:21
  154:10
catalog  130:25
  160:20,25 161:4
  161:7,8,18
category  145:24
  146:1,2 152:18
cease  159:22
cell  126:7
center  114:5
  130:7
century  2:10
certain  78:7

certification  3:5
  176:1
certify  176:5,11
cetera  84:19
chain  112:25
  174:11
chance  12:10
  99:22
change  23:22
  65:17 66:9
  135:4 177:5
changed  29:22
  79:22 91:17
  135:8
changes  23:16
  64:7,9,24 65:14
  67:9,16 68:8,9
character
  100:21
characterization
  64:5
characterize
  49:24 58:24
characterizing
  71:18
characters  42:16
  87:10 118:19
chart  10:15
chat  20:16 40:4
  61:21 75:22
  77:15 90:3
  101:25 103:18
  107:5 111:1,4
  116:5 125:17
  129:13 145:13
  152:6 157:14
check  10:21
  25:10 34:13

65:24 75:7
83:25 112:16
113:19,21
119:14
checking  83:22
chew  145:11
children  56:19
children's  30:6
china  154:1,3
  155:7
chiykonski
  18:19
chocolate  49:19
choose  29:15
chris  18:23 30:3
  31:15 34:16
christopher
  18:20 29:20
  35:17
chronological
  8:24
chronology
  11:25
circumventing
  31:4
citation  73:24
city  11:22,24
civil  1:22 10:24
claim  49:23
  118:19
claimed  18:2
  64:8 77:1
claiming  103:10
  103:25
claims  78:13
  79:9 80:9
clarification
  93:20

**[clarify - completely]**

clarify   7:4 22:17
  50:14 128:11
class   14:2 117:3
  127:12 130:4,7
  131:14 146:12
  158:15
classes   14:8
classification
  56:1 127:14
  129:8 158:20
classifications
  37:17
classify   137:13
clause   35:16
  41:25 91:10
clauses   62:25
clear   23:23 26:9
  26:10,18,22 31:5
  41:5 42:14 54:2
  83:16 89:6
  96:11 114:11
  118:15,22 119:1
  120:13 165:10
  169:3,20
clearly   120:14
  120:20
clever   57:15
click   77:17
clicked   85:21
client   20:5 36:13
  65:9 88:20 95:8
  96:20 103:15
  114:21 133:21
  141:7
clip   124:15,23
clockwise   77:18
cloud   101:2

clue   163:11
coffee   7:13 8:14
  70:5
collaborate
  39:10 91:21
collaborating
  19:15
collaboration
  37:10 44:23
  45:17 52:1 55:9
  55:18 58:18
  62:9,14 64:4
  66:20 67:8,10,15
  67:16 70:24
  72:8 74:2 80:3
  81:1 83:15,20,23
  84:25 89:24
  90:1,11 91:5,6
  92:12 93:4
  100:9,18 174:12
colleague   5:19
collective   19:14
college   9:11
color   91:19
  118:20 154:15
  155:9
colorblind   126:6
colored   80:14
  87:4,16 91:17
  126:5
coloring   87:14
columbia   12:24
  14:19
columbia's
  12:22 14:5
column   116:17
  116:19

come   12:6 17:20
  30:6 39:10 43:4
  49:7,10 70:11
  75:10 97:22
  115:1,7 152:23
  171:9,10
comfortable
  33:16
comic   18:21 30:5
  44:19 45:15
  51:23 52:20
  53:20 55:11,17
  55:20,21,24,25
  56:2,22 57:11
  65:22 109:7
comical   102:11
comically   109:9
comics   30:4
  34:23 35:3,6,10
  35:14 38:9 46:3
  46:4,6,15,17
  47:20,24 56:10
  57:1,13 60:7
  63:7 123:6
  137:7 149:8
  161:17 165:2
coming   39:15
  101:14
comment   28:21
  36:21 124:15,24
  161:23 170:17
commenting
  36:17
comments   54:19
  54:25 55:4
  115:18 124:14
  124:22 170:18

commerce
  130:21 131:9
  134:14 140:9
  143:10 144:11
  144:21
commission
  173:17 177:25
communication
  88:21 102:20
  103:23 160:8
communications
  105:1 159:7
companies   61:15
  101:23
company   1:9,10
  17:10 23:13
  31:23 34:2,6
  39:17,17 50:22
  51:1,4,7 72:25
  73:2,7 84:12,18
  97:25 109:2
  117:13
compare   62:22
  156:24 157:6
comparing
  62:21
compensated
  37:18 143:5
complaint   48:9
complete   7:2,10
  52:15 88:8
  106:16 150:13
completed   50:20
  74:13 75:1
  87:21
completely
  24:16 49:13
  55:12 71:18

completing  14:4
complimentary
  73:18,23,25 74:5
  74:15
computer  53:2,3
con  107:24 109:7
  111:20,25 112:1
conceived  16:1
concept  149:9
  150:8,11,16
  151:5,17,20
  152:13 153:8
  156:12 162:3
  163:24 168:20
  169:7
concepts  163:25
conceptually
  15:6
concern  41:24
  42:2,6 58:15
concerned  42:9
concluded
  172:17
concludes  70:16
  110:17 171:13
  172:12
concurrently
  8:22 12:25
conducted  4:5
  4:25 6:20 23:2
conferred  13:4
  13:10
confirm  21:6
  79:18 80:19
  83:17 84:20,21
  84:23 129:11
confirms  72:22

conjunction  9:13
  147:12
connecticut  10:6
connection  4:7
  147:8
cons  53:20
consider  26:25
  74:23 132:15,23
consideration
  73:19
considered
  86:23 89:22
considers  132:24
consistency
  87:11 88:21
  91:20
consistent  35:19
consists  118:18
consumer  54:10
consumers  75:18
cont'd  175:1
contact  104:24
contain  43:2
contained
  160:20
contains  70:25
content  42:17
  159:6
context  44:20
  45:2,15 48:5
  49:13 50:16
  52:16,21 53:13
  56:20 65:21,23
  81:18
continue  4:12
  32:4 38:8,11
  45:9 46:17
  117:6 165:1

continued
  174:25
contract  21:20
  21:23 24:9,16
  25:9,17 26:12
  31:1,3,14 32:24
  33:6 37:15
  38:12,15 42:1,23
  42:25 43:4 44:8
  47:6 49:1,8 50:6
  53:15 62:18,20
  62:23,23 63:3,6
  63:16 64:3,19,25
  65:2,6 67:24,25
  68:6,10,12 73:1
  73:6,9 77:8
  80:20 82:20
  83:3 90:6 91:20
  97:18,21 98:3
  103:24 105:11
  108:16 121:7
  127:9 162:24
  174:10
contracts  26:4
conveniently
  48:4 102:19
convention  19:7
  107:12,13
  110:15 111:1
  112:5 114:9
  156:18,21
  163:19 174:18
conventions  45:9
  54:11 139:22
conversation
  15:11 28:18
  94:6,22 95:16
  98:22 104:6

106:10 137:22
  138:6
convey  52:3
  162:13 163:17
conveyed  150:19
cool  54:3 150:12
copies  74:10
  76:24
copy  20:12,19
  42:23 75:18
  77:20
copyright  33:5
  41:25 48:6,12,14
  48:20 50:1
  58:15 127:3
  165:2 168:24
copyrighted
  16:7
copyrights  33:7
coronavirus
  108:14
correct  6:15,18
  7:24,25 14:22,23
  15:1,2 17:18
  20:13 27:14,25
  28:1 29:5 34:10
  41:2,9,12,21,22
  42:1 43:6 44:11
  47:24 55:13
  58:6 60:8 64:15
  64:22 66:11,12
  66:20 67:4,6
  71:3,11,16 75:5
  79:21 80:3 81:1
  81:8,12,13,16,23
  82:2,8,13 83:12
  83:16,24 84:4,25
  92:2 100:13

112:5 116:25
117:4,16 118:16
119:2 121:1,2,16
125:12 126:20
128:6,24 130:4
132:21 133:17
146:2,22 147:4
148:19,20
149:23 152:4
153:1,6 154:16
158:1,15 160:3
160:25 162:5,9
163:2 164:11,12
164:15,16,19,22
166:13,25 167:5
167:14 168:4,9
168:17
**correction** 91:19
**correctly** 71:18
**corresponding**
116:19
**costs** 54:20,22
**counsel** 1:23 3:3
4:16 5:13 43:12
59:4 93:14,25
94:11,11,12
97:10,23 98:2,2
98:10,13 115:8
170:6,19 171:25
**count** 88:8
**counts** 132:13,25
**couple** 9:6 12:13
13:19 91:8
**course** 14:10,11
102:14
**court** 1:1 3:15
4:21 5:3 15:12
43:23 54:21

94:7,23 95:7,17
97:6 98:11,23
100:1 104:7
137:23 138:7
141:17 172:6
**covered** 73:6
**coy** 88:22 114:20
**coyne** 25:23
**craft** 93:1
**crazy** 54:15
**create** 16:3,14
17:1 38:4 55:10
56:21 63:2
103:6 104:15
105:6 136:5
137:3 153:18
161:17
**created** 15:4,6,7
16:10 24:9
29:20 34:4 36:1
36:4 63:5,15
74:18,20,21
87:18 88:1
100:17 101:20
103:16 133:11
133:13 136:3,19
136:21,23 137:5
137:10 155:7
161:3,5
**creating** 16:7
103:11 104:1
123:5 163:22
**creation** 16:9
87:13 137:1
164:3
**creative** 31:23
113:2

**creatively** 89:16
**creator** 33:25
**creators** 23:20
26:20 31:24
32:3 39:14,17,18
45:7 63:7
153:23
**criticize** 170:18
**crystal** 26:18
**culprit** 20:8
**cum** 9:22
**cup** 7:13
**curb** 32:3
**currently** 8:1,19
13:17 14:16
71:7
**cursor** 120:2
**customs** 112:25
**cut** 78:7,25 79:1
79:12,13 81:2
104:23
**cv** 1:3 4:23
**cyberpunk**
51:13

**d**

**d** 1:5 2:3 4:18
6:3 174:1 175:1
177:2
**daedalic** 111:24
**damage** 56:11
56:14
**data** 56:15
150:20
**date** 15:17 16:10
17:1 34:8 65:3
75:2 79:6
105:20 107:25

122:1,4 123:16
123:16 126:17
163:9,12 165:6,7
165:13,14,17
177:3
**dates** 16:9 66:19
122:18
**day** 15:17 28:22
29:19 36:17
47:14 51:6 75:8
75:8 79:3
173:11 176:17
177:22
**days** 34:2 84:12
86:14
**dc** 38:9
**deadline** 131:4,6
**deal** 48:7,13,18
48:21 50:3
63:25 75:10
96:5 141:3,8
**dealing** 159:23
**deals** 112:25
113:1 148:10
153:16 154:23
**dean** 12:3
**decades** 101:22
**december** 10:23
14:6 130:17
131:12,20 132:8
133:10 134:24
135:17 136:2
137:9 138:17
139:1,15,24
142:6,14,25
143:9 144:16
**decided** 10:5
11:2

**declaration** 146:20
**defaming** 79:4
**defend** 5:24
**defendant** 1:17 6:3
**defendant's** 174:9
**defendants** 1:11 2:9 6:1
**define** 91:7 150:5
**defined** 47:7 90:9 92:13 93:4 132:16
**defines** 71:19
**definitely** 23:15 26:5,23 33:14 118:6 163:11
**definition** 88:14 88:16 93:20 94:14 97:19 132:13 133:6
**degree** 11:2,4,5 12:19,19 13:2,11 13:16
**degrees** 8:19,23 13:15,17 14:15
**deleted** 78:12 85:19,23,24 86:1
**delineate** 34:24 35:12 55:19
**delineated** 35:5 46:22
**delineation** 55:21,23
**deliverable** 80:15

**delivered** 75:1 77:7 82:4 88:18
**delivers** 88:6
**delivery** 77:9 82:19 84:18
**demanding** 85:10
**depends** 4:6
**deponent** 98:10
**deposition** 1:16 3:5,12 4:4,15,24 5:25 6:14,23 7:23 25:1 36:12 53:2 59:3 94:16 96:2 97:2 98:6 136:14 141:4 172:12,17 173:2 177:3
**depositions** 6:19 161:25
**derivative** 51:15
**describe** 50:13 120:3 150:1,3 155:2 163:16
**described** 131:13
**description** 174:9
**descriptions** 130:9
**design** 13:6,6,7 75:9,9 87:20 118:10 128:8 148:1,4,7,15 149:9,9 150:9,18 153:8,17,21 154:21 156:3

**designed** 30:16 89:15 104:2 163:23
**designer** 89:12 147:15,17 149:14 161:8
**designers** 18:1 23:21 26:19 89:9,10 153:23
**designs** 30:17 101:7,12 103:17 105:11 154:14 154:18
**desist** 159:23
**destroy** 141:15
**detail** 26:17
**determine** 68:6
**develop** 52:14
**developed** 35:17 61:6 74:19 84:14
**development** 14:8 47:13 74:20,22,24 113:3
**devices** 134:10
**difference** 57:6 91:11 130:22 151:18 169:16 169:24
**differences** 62:22
**different** 9:16 12:16 45:12 61:10 62:24 71:15 80:18 104:12 119:17 128:13 138:15

156:25 169:5,14
**differentiation** 118:23
**digital** 35:10 46:14 47:12 50:21 57:1
**dip** 61:9
**direct** 68:16
**directing** 146:4
**directly** 161:10
**director** 11:9 12:2
**dirty** 89:19
**disagree** 97:17 151:13
**discipline** 53:11 53:11
**discovery** 19:22 31:11 69:2 89:6 105:1 139:5 152:10 154:6,19 161:2
**discuss** 73:17 103:3 104:13 159:16
**discussed** 21:19 65:18 127:8 162:4,6,9,10
**discussing** 58:14
**discussion** 90:24 105:3,17 110:20 115:24 152:12
**disney** 31:25 51:2,5 61:16
**disparaging** 79:4
**disrupting** 15:11 94:6,22 95:16

98:22 104:6
137:22 138:6
**distinction** 9:12
33:18 114:15
**distorting** 106:9
**distribution**
72:18,19 132:4
**distributor**
39:20
**distributors**
39:12
**district** 1:1,2
4:21,22
**division** 131:23
**docket** 10:14
**docs** 16:11,14,16
**document** 20:10
20:21 21:1,2,6,9
21:15 22:11,14
22:21 23:1,6,11
24:1 28:7 40:1,6
40:14,15 41:5,7
43:13,14,18,20
61:20 67:23
75:22 76:7
77:15 78:14,21
85:2 94:12 98:9
98:19 101:24
102:4,8 106:16
107:4 110:25
116:5,10 117:24
117:25 118:5,24
119:18 125:17
125:20,22 128:3
129:5,10,12,16
129:21 130:7
145:13,19,22
146:16 147:1,8

157:14,20
158:17,19
**documents** 8:9
22:7 40:11 59:5
59:6 99:21
**dog** 100:23
**doing** 8:22 20:11
20:17 32:8
56:12 59:6 98:8
99:12 115:8
146:13 147:14
**dolan** 2:13
**dollar** 51:7
**dollars** 54:12
**dolls** 130:12,12
140:2 142:3,5
**domain** 162:23
164:14
**dorris** 34:25
46:11,19,23 57:3
60:11,19,20,23
61:1,4
**dot** 83:7
**double** 61:9
154:10 155:3
**doubt** 159:1
**download** 21:1,8
75:22
**downloadable**
127:22
**downloaded**
21:7 41:11
85:20
**downloading**
20:23
**dozens** 49:14
**dr** 9:18

**draft** 23:5,10,15
62:17 63:2,3,5
63:15 64:3,6,15
64:18,21 66:10
**draftable.com**
62:21
**drafted** 23:7
62:25 63:13
97:25
**drafting** 25:18
26:4,25 27:4,14
**drafts** 21:25
22:1
**draw** 56:3 102:9
102:21
**drawing** 56:17
91:22
**drawings** 79:21
163:24
**drawn** 18:10
87:7,9
**drayage** 112:7
**dressed** 101:3
**drew** 128:9
156:13
**dreyer** 2:2 5:18
175:7
**drill** 166:17
**drinking** 19:10
**drive** 8:4
**dropbox** 86:5
**dropped** 106:22
**dual** 11:3 12:19
13:2
**due** 54:10 76:19
76:21 83:2,18
84:22 135:10
136:25,25

**duly** 6:4 176:7
**duty** 110:7

**e**

**e** 2:10 6:3 17:13
174:1,8 175:1
**earlier** 13:20
14:6 21:19
39:13 65:18
85:1 123:25
131:25
**early** 24:3
**earned** 73:4
**easier** 59:24 69:9
**east** 15:23 19:8
**easy** 18:20 29:23
29:24 30:1,10
**eating** 145:8
**economics** 13:14
14:11
**edited** 23:9
63:20 91:18
153:10
**editorial** 26:6,24
29:14 77:4
88:25 89:6
91:16 153:21
155:9 170:18
**editorialize**
36:21
**editorializing**
36:16 54:20
**education** 8:18
13:2,23 14:18
**effect** 3:14
**efficient** 171:25
**efforts** 14:3
54:10

ego 89:11
eight 122:20
  123:14 155:1,24
  162:13
either 11:2 23:12
  36:1 60:23
  91:25 100:3
  109:22 111:16
  169:20
elected 14:2
electronic 22:25
  117:15 127:17
element 116:18
  126:20 158:1,4
elements 42:13
  43:3
email 2:5,11
  22:1 34:12
  40:20 41:2,6,7
  41:17,23 43:7
  44:7,14 45:13
  47:22 49:12
  52:5 58:4 59:10
  60:5 65:17
  75:24 76:2,12,17
  76:19,23 77:5
  78:6,8,11,20,24
  79:1,12 81:2,5
  81:11,23,25
  82:23 86:11
  88:4,10,19
  102:10,12,15,24
  103:4 104:13
  105:4,17 106:4
  151:24 152:1,2,8
  174:11,14,16
emailed 30:20
  103:18 151:23

emails 19:22
  49:14 59:16
  64:24 77:23
  78:9,17,18 80:12
  89:5 90:2 102:8
  104:22 106:6
  158:10
emblazoned
  130:20
embroidered
  155:11,14
embroidery
  155:12,16
emoji 79:5
employee 24:15
  25:22
employees 24:9
  25:4,8,14
employment
  24:14
en 140:3
encompassing
  37:15
engineering 13:8
ensure 22:4
enter 37:7
entered 25:17
  45:18 55:17
entering 21:19
entertainment
  1:8,9 4:20 10:2
  14:22 15:4
  16:15 17:8
  24:10 25:19
  37:5 44:25
  45:19 56:23
  62:11 64:2,18
  67:3 71:2 103:5

104:15 105:5
  112:12,21 113:6
  113:16,21 114:8
  116:25 130:18
  131:14,19,22
  132:9 133:11,24
  134:6,21 135:5
  135:16,20,22
  136:3,19 137:10
  138:18,24
  139:13 140:1
  142:4,12,23
  143:7 144:17
  149:2,6 150:17
  161:11
entire 60:14 78:6
  79:1 81:19
  89:25 90:5
  91:15 117:24
  137:2
entirely 101:20
  135:3
entirety 78:15
  88:2 141:16
entities 112:20
entitled 1:18
  27:21 29:13,21
  72:10 86:10
  100:12,14
entity 16:3
  112:10,19,22
  113:17 146:24
entrepreneurship
  9:12 10:11
  13:23
entry 144:14
equity 60:15

erotica 56:11
errata 177:1
esq 2:6,12,13
essentially 11:4
  12:7 31:17 45:6
  51:1 56:12
  134:16 137:2
est 1:14
established
  87:12
estimate 25:5
  108:7,10,11,12
  108:13
et 2:9 4:20 84:19
  177:3
events 64:6 80:5
everybody
  115:15,20
  171:20
evil 89:20
evolution 62:19
exact 11:25
  25:20 44:22
  45:23
exactly 12:5 27:8
  30:13 42:3
  85:18 120:23
examination 6:7
  174:4
examined 6:5
excel 126:6
exchange 134:22
  135:2,21
exchanged 64:21
exchanges
  149:15
excited 30:19

excuse 54:16
executive 13:10
  13:25 14:5
exhibit 22:22,24
  27:5,18 33:20
  37:4 39:23 41:5
  41:18 44:17
  61:21 62:17
  66:3 73:16 76:8
  76:10 77:25
  78:18 79:15
  80:1 81:6,7,10
  83:22 84:6,8
  88:12 102:4
  106:1 107:9
  111:3 114:23
  116:7,11 121:20
  122:21 125:2,21
  129:19 145:15
  146:5 147:4
  149:23 150:7
  155:25 157:3,16
  157:18,21
  160:15 174:10
  174:11,12,14,15
  174:17,18,19,22
  174:23 175:3,4
exhibits 175:7
exist 90:12
existed 101:22
existentialism
  31:21
existing 46:21
exists 113:14,25
expand 47:8
expect 122:17
  170:9

expected 13:20
  14:7
expensive 36:18
  55:5 97:7 100:2
experience 172:3
expires 173:17
  177:25
explain 86:21
  140:22 141:1
explained 50:23
explanation
  140:25
explanatory
  92:17,21 129:10
explore 12:18
exposure 54:14
extent 111:2
  113:14,24
  157:15
extra 11:5
  115:17
extremely 31:22

**f**

fabric 154:16
  155:10
facebook 57:8,9
  57:11 79:4
  119:21,22 120:2
  120:9 121:1,4,6
  121:19 125:5,7
  125:11
fact 95:23
  117:14
factory 154:1,3
  155:7 156:7
factual 59:22

failed 123:6
  163:5
fair 69:1
false 64:5
familiar 61:25
  111:8 125:23
  126:8 145:18,20
families 56:19
fan 19:9,9
fantastic 171:24
far 89:21 104:3
  105:14 108:13
  119:17 122:8
  131:11 137:20
  150:13
fast 53:7 114:16
favorites 167:16
feature 42:12
featured 139:4
february 24:3,3
  127:6 152:15
  168:22
federal 1:22
feeds 69:6
feel 33:16 115:15
felt 63:21
fidget 18:5 38:22
field 116:18
fifth 5:20
figure 86:2
file 85:22 86:4
  92:1,1 126:23
  127:12 136:25
  147:16 148:1,4,7
  148:15 149:17
  150:13 151:24
  158:3 161:7
  168:19

filed 4:20 16:14
  16:17,22 25:12
  119:13 122:17
  127:7,16,20,23
  145:23 158:14
  159:15 163:12
  165:6,14,20
  169:2
files 34:3 74:13
  75:2 76:24 77:6
  77:9,11 78:12
  79:17 80:10,12
  80:14,20 82:4,10
  82:16,19 84:13
  84:19,19 85:10
  85:19,21,24,25
  86:2,9,16,20,22
  87:4,6,16,24
  88:6,9,15,18
  91:7,9,11,12,14
  91:17 92:5,10,12
  92:16,17,21,24
  93:3,9,11,12,21
  136:7,24 148:11
  156:3,3,9,11
filing 3:4 17:1
  120:18,22
  126:17 146:11
  146:15 152:17
filings 16:2
final 22:4 29:14
  34:3 74:13 75:2
  77:9 79:19
  80:10,11,13,21
  82:4,19 84:13
  86:16,23 87:4,6
  87:15,16 88:9,15
  89:23 90:9 91:7

91:9,12 92:10,12
92:16,17,20,24
93:3,8,11,12,21
136:7,24,24
144:14 154:18
154:20,24 155:6
155:12
**financially**   5:9
**find**   37:14 63:24
121:25 136:18
173:2
**fine**   6:11 7:16
24:7 36:9 41:1
66:14 70:7 87:2
90:17 103:10
106:20
**finish**   138:12
**finished**   13:19
74:12 90:20
131:3
**finishing**   77:12
**firm**   68:18
**first**   6:4 7:19
10:1 15:4 19:11
20:10 23:10,14
24:2 25:21
27:18 30:21
33:24 37:14
46:7 48:10 62:1
63:3,6,8,15 64:2
64:14,20 71:8
72:13 81:15
83:1,8 86:12
92:8 95:12
96:14 97:20
102:22 109:19
149:5 150:4

**fish**   24:12
**fisher**   9:10,21
**five**   11:23 24:5
26:1 38:18
63:21 70:2
71:13 72:12
101:7 103:16
104:2 126:4
128:4,4,5,5
154:4
**flabbergasted**
28:19
**flip**   102:12
**floor**   2:4 5:20
**flopping**   102:12
**fly**   102:13
**flying**   101:4
**focused**   10:12
**follow**   55:7
**followers**   54:9
**follows**   6:6
**font**   118:20
**force**   3:14
**foregoing**   173:1
**form**   3:8 33:8
74:11 75:4,14
**format**   59:3
87:18 92:3
**formation**   16:6
16:11,16
**forth**   22:2 45:13
80:2 83:15,19
84:24 89:23
156:11 176:7
**forward**   9:1
36:24 96:8
146:22

**foundation**
16:13
**foundational**
76:3
**foundationally**
15:7,8,17
**founder**   14:21
14:25
**four**   8:23 14:7
72:2,14 122:19
172:14
**fourth**   102:23,23
**fox**   2:8,12 5:23
5:23,24 21:13
22:6 24:18,22
28:6,11,20 36:11
36:24 40:10,22
43:11 44:2
45:20 52:25
53:10 54:16
55:3 59:1,14,21
68:13,25 69:16
69:24 70:1,10,13
79:8 93:13 94:4
94:11 95:2,6,14
95:21 96:10,14
96:18 97:20
98:2,18 99:5,8
99:14 106:8,23
107:1 109:13,17
115:2,3,6,16
124:11,19,21
138:11 140:19
159:14 161:19
161:23 170:4
171:10,23
**francelina**   2:16
5:19

**free**   18:3 19:19
19:24,25 31:8
45:8 52:23
55:10 69:9
109:1
**friendly**   31:23
**front**   71:10 81:8
84:7 114:5
150:9 162:8
**fulfillment**   18:17
**full**   7:8,10 11:15
18:13 33:8
50:20 102:22
141:9
**fully**   22:10 69:15
69:17
**fun**   39:9
**function**   40:4
125:17
**funds**   135:13,15
135:18,20,23
**funny**   31:19,22
**further**   3:7,11
93:19 108:23
155:9 176:11
**future**   9:16
18:14 30:22
33:2 37:16 43:5
139:19
**futuristic**   9:17

**g**

**g**   2:6 6:3 17:18
**gallet**   2:2 5:18
175:7
**game**   18:1,19,24
27:25 28:4 29:4
29:12 30:1,10,14

32:7,15 34:4
35:17 37:9,25
38:14 42:12,18
42:21 43:1 44:9
50:2,18 51:9,14
51:15,19,21 52:4
52:7,9,12,12,15
53:17 69:12
71:21 72:24
73:5,11 74:11,12
74:17 75:3,11,14
75:15 76:25
77:1 84:14,14
87:3 88:1,3 89:9
89:10,14 92:20
93:18 112:14
114:15,18 127:4
130:11 131:3
132:25 134:23
135:21 136:5,20
136:23 137:4,7,8
137:11,13,16
138:19,25 139:2
139:5,6,8,16,17
142:1 143:2
150:9,10 152:18
160:22 162:4
**games** 18:2,4
19:10,12 37:19
38:4 51:9,16
52:18 88:22
130:10,11,11,14
131:21 132:10
133:12,13,15,19
135:14,17 136:1
136:4 139:13,14
142:23,24 149:8

**gaming** 50:22
**garry** 1:19 5:4
100:5 144:5
176:3,21
**garson** 159:11
159:19 160:1
**gateways** 46:14
**gathering** 51:11
**gbe** 112:20 113:1
135:10,11,13
**gbs** 135:10,11,13
**gdblaw.com** 2:5
**gen** 111:20,25
112:1
**general** 42:20
**generally** 144:21
**generate** 47:3
**generated** 128:9
128:18,21
**generates** 118:9
**gerard** 2:8,12
5:23,24 124:16
171:7
**gerardfoxlaw....**
2:11
**getting** 43:13
49:2,9 54:14
80:16 82:15
92:6 96:25
104:3 105:13
109:1,18 110:2
131:11 137:20
162:20
**gift** 89:18
**giraffe** 100:24
**give** 8:18 11:25
15:9 38:1 73:20
123:19,21

138:13 163:5
**given** 134:22
135:20 172:12
176:10
**gives** 95:23
**giving** 69:9
73:20 159:6
**glenn** 9:13
**global** 13:9,25
**go** 4:13 6:22
8:15 9:5 32:6
36:22,24 37:21
38:1 44:17
53:18,19,21 57:2
57:4,11,13,19
60:17 66:16,17
73:16 77:3 81:6
84:2 85:16 89:3
90:2,4,18 92:7
97:16 98:6
114:23 116:21
124:19,20
131:10 155:21
165:11,23
166:17 171:1,3,4
171:8
**god's** 89:18
**gods** 38:10
**goes** 38:9 54:24
80:8 172:4
**going** 4:2 6:22
6:25 8:15 9:8
11:12 20:9,17
28:6 31:3 32:5
32:10 37:4
39:22 41:4
42:23 43:11
45:3 54:4,5,5,10

56:5 60:16 61:9
61:24 70:2 76:6
77:13 81:18
82:10 84:17
92:22 93:14,15
93:18,23,24
97:13 99:3
100:10 108:9
111:5 116:4,5,9
117:22,23 120:2
121:24 122:2
123:3 124:17
145:8,9,25 147:6
151:2,9 155:21
157:3,5
**golden** 1:8,9,9
1:10 4:20 10:2,3
14:21,25 15:3
16:14 17:1,8
18:21 24:10
25:19 37:5
42:15 44:24
45:18 56:22
58:17 62:11
64:1,17,21 67:3
71:1 79:5 103:5
104:14 105:5
112:6,8,11,12,14
112:18,20,24
113:6,8,15,18,20
114:7 116:24
130:18 131:14
131:19,22 132:8
133:10,24 134:6
134:21 135:4,5
135:15,19,22
136:2,19 137:9
138:18,24

139:13,25 142:3
142:12,23 143:7
144:16 149:2,6
161:10
**goldman** 34:20
34:22
**goldner** 1:8,17
2:9 4:16,19 5:25
6:9 20:20 21:18
22:23 39:25
45:10 61:24
62:17 66:2
70:24 73:23
76:1,9 77:22
81:7 91:3 102:3
102:7 107:9
111:8 114:2
116:9 125:1,21
129:18,20
145:17 146:21
155:22 157:21
172:2,13 173:8
174:5 176:6
177:3,4,20
**good** 4:1 5:17
6:9 12:9 22:16
40:8 53:5 70:10
70:13 115:11,20
144:13 154:16
171:8
**googled** 92:22
**gotten** 10:8
**gpa** 13:24
**graduate** 13:1
**graduated** 9:3
9:22,22 13:20,24
13:25

**grady** 18:20
29:20 34:17
35:18
**grant** 10:16
121:6,14
**granted** 33:2
52:18
**graphic** 75:9
147:16 148:1,4,6
148:14 149:9,14
**great** 30:3 115:4
171:23
**green** 108:19
162:8
**greenish** 126:6
**gross** 17:16,17
26:14 76:13
**ground** 6:23
**group** 103:18
152:6
**grow** 54:6
**grownup** 18:8
18:17 29:8,9,10
33:1 68:1
137:14,17
138:22 139:3,6
139:17,20 143:1
143:3
**gsc** 13:3,21
**guess** 8:23 20:3
26:7 27:2 37:2
40:18 55:7
101:9 102:23,24
127:22 137:12
142:19 162:25
164:3
**guest** 18:9,10
32:23 33:1

67:25 137:14
138:20 143:2
**guidelines** 87:12
89:23 90:8,11
**guy** 26:15
**guy's** 59:6
**guys** 43:11 59:1
59:1,1,2,2 87:3
89:14 93:13

**h**

**h** 33:20 174:8
**half** 7:14 24:5
26:1 46:24 70:3
**hand** 78:21
108:18 116:17
153:21,25
176:17
**handled** 158:11
**handles** 148:13
161:6
**hands** 135:8
154:8,9
**happen** 65:7
73:24
**happened** 48:23
80:22
**happens** 110:4
**happy** 37:12
50:14
**hard** 97:8
111:24
**harming** 45:4
**harris** 9:18
**hartford** 11:22
11:23
**hasbro** 51:2

**hat** 101:3
**he'll** 115:17
**head** 7:3 112:23
**hear** 6:10,11
106:19,19,20
**heard** 4:9 99:2
107:2
**heated** 99:11
**heaven** 89:19
**heavily** 42:12
**hec** 13:13
**heck** 93:22
**heights** 9:3
**held** 1:18 90:24
110:20 115:24
**hell** 74:24
**hello** 35:1 46:10
57:2 60:23
**hellosign** 23:3
66:17 67:22
**help** 54:13
**helped** 75:10
108:22 158:12
**helping** 79:11
**hereto** 3:4
**hereunto** 176:16
**hey** 169:9,10
**high** 9:1,2
**highest** 155:15
**hilarious** 31:20
**hinkle** 10:11
**hire** 32:5 37:7
**history** 8:18
**hit** 108:15
**hold** 8:20 13:17
14:1,16 45:10,11
137:19 155:20
156:17

| | | | |
|---|---|---|---|
| **hollywood** 74:23 | **improper** 59:16 | **inked** 87:8 | 138:9 |
| **holo** 9:20 | 68:19 | **inking** 87:14 | **introduced** 18:6 |
| **holography** 9:19 | **improperly** 82:3 | **inks** 87:6 | 34:11 |
| **home** 15:22 | **improve** 23:22 | **innovation** | **introduction** |
| **honestly** 20:2 | **inadmissible** | 10:13 12:17 | 19:17 |
| 109:8 | 97:14 | **input** 26:6,24 | **introductory** |
| **hopefully** 107:1 | **includes** 78:8 | **insertions** 175:9 | 11:13 |
| **hot** 53:6 | 100:11 | **insight** 56:15 | **invoice** 82:15,18 |
| **hour** 70:3 | **including** 19:1 | **instance** 37:19 | 82:18,22,25 83:2 |
| **hours** 11:16 | 31:9 160:21,21 | **institutions** | 83:4,8 84:2 |
| 59:25 | **incorrectly** | 13:12 | 86:15,18 88:20 |
| **house** 8:3 | 76:19 | **instruct** 28:12 | **invoices** 76:17 |
| **huh** 7:3,3 | **increase** 54:13 | 93:15 | 76:18,20 77:11 |
| **humor** 31:21 | **increased** 54:8 | **insulting** 89:17 | 81:23,24 82:2,7 |
| **hundreds** 108:25 | **indesign** 84:19 | 92:25 95:7 | 82:23 |
| 149:15 | 87:19 163:25 | 109:10,16 | **involved** 25:24 |
| **hurting** 103:9 | **index** 174:25 | **intellectual** 9:15 | 26:3,11 37:23 |
| **i** | **indiana** 111:22 | 12:17 16:9 29:8 | 38:25 159:21 |
| **idea** 19:14 108:5 | **indianapolis** | 112:21 | **ip** 113:3 |
| 113:23 148:23 | 111:21,21,22 | **intelligent** 97:3 | **irrelevant** 24:17 |
| 149:18 161:12 | **indicates** 50:6 | **intent** 59:5 | 24:25 25:3 |
| **identical** 156:25 | **individual** 106:6 | 119:13 120:17 | **issue** 33:11 |
| **identified** 14:15 | 113:18 126:3 | 122:13 | 91:15 104:13 |
| 35:24 90:8 | 147:21 148:6 | **interest** 12:15 | **it'd** 59:23 |
| **identifies** 58:19 | 156:10 | 32:15 72:22 | **it'll** 28:22 97:14 |
| **identify** 26:8 | **individually** 1:8 | **interested** 5:9 | **items** 130:19 |
| **ignoring** 158:10 | 4:19 | 176:14 | 131:13,15 |
| **illustration** | **inform** 85:12 | **internally** | **j** |
| 91:22 164:24 | 86:8 88:24 | 104:18 109:9 | **j** 1:19 5:4 176:3 |
| **illustrator** 87:24 | **information** | **international** | 176:21 |
| **image** 107:7,10 | 8:16 24:13 69:7 | 12:23 14:9 | **jabbing** 69:19,19 |
| 119:11,12 | 69:10 116:23 | 117:3 | **jack** 38:8 |
| 120:13 121:24 | 117:7,8 118:24 | **internet** 4:7 | **january** 10:24 |
| 122:11 162:17 | 163:4 | **interpret** 43:21 | **jason** 17:24,25 |
| **images** 42:16 | **informed** 85:23 | **interruption** | 18:13,15,17,23 |
| **important** 35:12 | **infringing** | 15:14 94:9,25 | 19:6,7,14,17,23 |
| 36:12 63:21 | 162:14 | 95:19 98:25 | 21:25 23:7,21 |
| | | 104:9 137:25 | |

29:4 31:7 32:14
32:19,25 33:11
33:13,14 34:11
37:6 38:12,13,17
38:19 48:19
49:2,4,5,10 50:1
50:23 51:9 73:2
73:7 84:15 89:7
89:18,18 91:25
137:5 139:19
**jason's** 19:9,11
33:3 37:15
71:20 89:11
**jd** 14:19
**jeez** 14:10
**jennifer** 11:1
**jerry** 21:5,11
40:8 85:1 106:2
106:18 159:12
**jim** 25:21,21,23
25:24
**job** 69:8 134:12
**joe** 37:22
**joint** 11:2 19:13
**jointly** 13:4,10
**joke** 74:23
**joked** 16:20
**judge** 36:16 53:6
54:18,18 68:19
68:22 69:11
97:5 106:13
124:15,22 170:7
170:8,16
**july** 41:8,10,12
41:13,17,19,21
41:24 58:4 60:5
80:7

**june** 9:4 19:4,4
80:7 86:19
**jury** 36:15 54:18
68:15 97:4
99:20
**justice** 10:14

**k**

**k** 17:13
**kagan** 9:18
**keep** 55:16 62:5
**keeps** 84:17
**kevin** 159:19
**key** 29:12
**keys** 8:12
**keystone** 107:24
109:6
**kgk** 2:5
**kick** 32:2
**kind** 11:17 12:12
19:13,15,16
37:12 55:7
78:20 130:6
155:17
**kirby** 38:8
**knack** 26:17
**knew** 30:16,19
50:24 80:11
101:13 103:21
103:24 127:8
152:20 161:14
161:17 168:18
168:21 169:1,2
**know** 7:6,16,17
16:1,2 22:15
23:23 24:23,24
25:3,23 28:8
32:19 36:14

42:2 45:21
48:22,24 49:16
51:10 53:3,8
57:7 58:10
59:19 63:12,15
64:1,16 65:7,10
65:13 67:24
68:10 70:5
71:17 72:18
74:21 78:5 79:2
79:6,13 80:15
81:2,4 83:6 87:5
90:7,10,19 91:25
92:14,18,19 98:5
99:18 101:5
104:17,25 106:3
106:9,10,12,14
107:7,20 111:17
113:15 115:4,17
116:10,14,14
117:21 119:12
119:23 120:13
120:15,21
122:11 125:22
126:1,8,13
128:17,20 129:9
130:2 131:8,17
132:2,15,17,20
132:22 134:15
135:1 136:12,14
141:5,8,17
145:19 147:20
148:5,14,21
149:19 150:2,3
151:1,18,20
152:4,21 155:8
155:19 156:12
157:7 158:11,18

159:11 161:9,24
166:16,16 169:1
169:8 170:11,19
172:1
**knowledge** 75:13
173:4
**known** 17:23
127:1
**knows** 49:2,3
88:4 106:17
171:21
**korsen** 26:3
76:14 155:25
**korsen's** 148:25
**kunst** 2:6 5:17
5:18 6:8 22:20
36:25 55:6 59:8
59:17 60:2 70:7
70:11,22 90:18
94:2 95:4,12
96:6,12,16 97:17
97:25 98:17
99:2,6,9 106:18
106:25 113:12
113:24 114:25
115:5,13,19
124:16,20
138:16 144:5
171:1,19 174:5
175:7
**kyle** 2:6 5:17
20:2 40:24 44:4
114:17 141:23

**l**

**l** 6:3
**lab** 9:19,20

**lack** 87:10 88:20
  95:25
**laid** 96:24
**language** 44:9
  44:22,23 45:13
  45:24 52:6 66:4
  66:8
**large** 117:7
**larger** 61:6
**late** 68:12
**laude** 9:23
**laugh** 109:9
**laughable** 92:25
**launch** 110:8
**law** 2:8 5:24
  10:7 11:3,16
  14:19 110:7
**lawyer** 20:4 27:1
  63:18 97:22,24
  98:3,20 132:19
**layered** 151:25
**lead** 12:4 149:5
**leading** 8:19
  13:11 14:2
**leads** 69:5
  162:25
**learned** 32:13
**learning** 172:4
**left** 48:9,11
  116:17
**legal** 10:12,17
  16:17,18 26:7,16
  26:24 33:18
  74:21 132:12
**legalzoom** 63:18
**length** 50:20
**letter** 159:23

**lettering** 87:15
  87:15
**letters** 117:8
**liar** 103:16
**licenses** 72:23
**licensing** 61:13
  112:22 113:2
  135:3
**likes** 38:2 119:20
**limit** 101:5
**limited** 160:22
**limitless** 47:6
**limits** 100:19
**line** 18:25 24:2
  30:12 44:18
  88:12 101:17,18
  102:23 136:8
  171:21 175:10
  175:14,18 177:5
**lines** 87:7
**link** 34:14 85:21
**listed** 35:14
**listen** 36:19 55:4
  95:9
**listening** 54:25
  93:24
**lists** 19:24 27:21
**lit** 92:6
**literal** 116:18
  126:20 157:25
  158:4
**literally** 27:7
  49:14 56:3 86:1
  93:7 156:8
**litigant** 109:20
**litigation** 172:3
**little** 10:19 13:19
  20:6 28:18

41:11 45:11
  51:3 66:22
  80:18 96:25
  101:16 104:3,11
  105:14 119:17
  120:7 124:18
  130:1 131:11
  137:20 158:8
  169:4,13
**lived** 15:22
**livelihood** 45:5
  53:24 124:2
  164:25
**living** 45:6
**llc** 1:8,9,10,10
  14:22,25 16:12
  17:2,8 24:10
  25:19 116:25
  131:15,20,22
  132:9 133:11,24
  134:6,21 136:19
  137:10 138:18
  138:24 139:13
  140:1 142:4,13
  142:23 143:8
  144:17 177:1
**llp** 2:2 175:7
**located** 8:2
**logic** 30:12
**logistics** 113:1
**london** 13:14
**long** 7:17 22:8
  22:14 28:22
  30:11 36:17
  96:17 106:4,7
  115:12 151:18
**longer** 59:25

**look** 27:9 33:23
  44:18 45:22
  51:10,13,17
  78:21 90:4 93:7
  98:7,8,18 110:1
  115:3 117:24
  126:4 140:20
  150:18 157:9
  172:1
**looked** 156:22
  157:12 163:19
**looking** 49:22
  56:1 71:8 103:2
  111:23 130:24
  141:9 147:1
  157:17 158:18
  165:17
**looks** 21:14
  22:18 61:25
  62:8,13 78:6
  113:9 119:20
  125:9,25 150:12
  155:10,13
  156:23 157:1
**los** 2:10
**lost** 123:10
**lot** 12:12 14:3
  26:6 74:25
  89:15 93:22
  172:2
**lots** 101:14
**love** 31:18,18
  35:1 46:12 57:3
  60:24
**loved** 30:18
**low** 91:13 151:24
  151:24

**lower**   55:20
**lunarbaboon**
  18:21 29:21,24
  34:17 35:18
  39:6,9
**lunarbaboon's**
  29:22
**lunch**   114:25
  115:14,25

**m**

**m**   6:3 14:13
  120:11
**magic**   51:11
**magistrate**   98:7
**magna**   9:22
**mailed**   129:24
**mailly**   11:1
**main**   161:8
**maintain**   124:2
**major**   101:23
**majored**   9:11
**majority**   38:16
**making**   26:19
  30:14,15 38:8,11
  46:15,17 47:10
  56:2 69:8,10,18
  79:9 100:24
  109:11 167:18
**management**
  149:12
**managing**
  113:20
**manufactured**
  132:25 133:14
  133:19,25 134:7
  140:4,17 142:8,9
  142:16 143:11

144:12,22
**manufacturer**
  135:7
**manufacturing**
  112:17,18
  133:23 134:5
  140:15
**marc**   1:8,16 2:9
  4:16,18 5:25
  36:13 43:16
  45:20 52:25
  54:16,17,17
  59:24 68:13
  79:8,8 106:20
  109:13,13,13,14
  109:14,14,14,14
  109:15,17,17
  110:7 115:7,16
  119:22 120:1,6,9
  124:11,21
  138:11 140:19
  140:19,19
  146:21 161:19
  170:4,4,4,5,5,5
  172:13 173:8
  174:5 176:6
  177:3,4,20
**mark**   22:21 41:4
  51:20 62:16
  76:7 77:24 96:7
  99:3,3 102:4
  105:25 107:8
  116:6,24 118:7,9
  118:10,11,13,17
  118:18 119:13
  124:3 125:20
  128:8,16,19
  129:2,3,19

130:20 131:16
  145:14 146:6,11
  157:18,20
**marked**   111:3
  157:17
**market**   150:19
  150:20,23
**marketed**   54:7
  75:16
**marketing**   34:18
  34:19 54:12
  56:15 109:1
  130:23 133:1
  134:13
**marriage**   176:13
**marvel**   32:1 38:5
  61:18
**mass**   75:17
  132:25 133:14
  133:19,23 134:4
  136:22 140:4,14
  140:16 142:8,15
  143:11 144:12
  144:22
**masse**   140:3
**massive**   100:2
**master**   11:20
  161:7
**master's**   149:12
**masters**   13:22
  14:17
**matter**   4:17
  57:23 161:13
  170:22 176:15
**mba**   11:3,10,13
  11:18 13:10,25
  14:1,17

**mccomics**   34:25
  46:11,19,23 57:3
  60:11,19,21,23
  61:2,4
**mcmeel**   30:24
  57:16 92:5
**mean**   15:7 19:22
  21:24 25:5,25
  26:5 28:16
  31:19 34:22
  36:7 40:20,23
  42:9 47:16
  53:12 58:1 60:6
  83:11 85:4
  90:14 104:23
  105:8 106:14
  108:4 112:6,24
  113:22 119:3
  129:2,3 146:16
  148:8 156:23
  164:2
**means**   33:4
  92:17
**meant**   50:7 52:3
  80:10 162:13
  163:16
**mechanics**   89:15
**mechanism**
  34:19
**media**   4:14 32:9
  47:4 50:22 51:1
  52:17 53:15
  56:4,6 70:16,20
  101:15 110:17
  110:23 171:13
  171:17 172:14
**median**   47:13

mediums 71:15
meet 17:20
meeting 11:18
  17:24
meets 51:2
melon 149:13
member 14:21
  14:24 113:20
members 17:7
  17:10
memory 7:12
  46:12 152:4
mentioned 37:11
merchandise
  19:1 109:6,11,21
  109:24 110:6,14
  114:7,9,12,15,18
message 35:20
messages 149:16
met 11:7 12:2
  17:22 19:7
middle 78:20
  81:21
mind 26:7,8,16
  33:3 37:3 48:21
  61:9
minds 48:25
mindset 31:12
minute 40:19
  70:4 145:4,8
minutes 11:24
  70:2,8 90:6
  171:4
mischaracteriz...
  80:5
mischaracteriz...
  106:5

misconstruing
  32:16 43:9
missed 124:6
  131:6 166:3
missing 47:23
  88:11
misspeak 73:15
misunderstand...
  20:7
misunderstood
  15:25
mode 8:12
model 87:9
  101:20
mom 11:8
moment 42:18
monday 41:8
monetary 135:2
money 38:1,4
  45:8 46:13,15
  47:3,10 52:23,23
  53:18 54:4,5,6
  54:21,22 72:3
  73:4 76:20
  77:10 84:22
  123:24 124:1
  134:22 135:8,11
month 15:17
  64:11 65:1 67:1
  86:1
months 12:14
  18:7 19:5 68:12
  68:12 72:13
  86:13,13 120:18
  122:12
moqs 130:25
morning 4:1
  5:17 6:9

mother 86:4
motion 106:13
  110:5
move 24:23
  69:22 96:7,8
  98:16 99:7,13
  115:10 121:23
  136:1 137:8
  144:13 149:21
  163:8
moved 9:19
movie 51:19
movies 51:10,17
moving 12:18
  152:24
mpa 11:3,19
  12:14 14:5,19
multimedia
  72:23
multiple 101:13
  103:25 123:8
multipronged
  37:13
mute 21:12
  115:2
muted 171:7

**n**

n 6:3 17:13
  174:1 175:1
name 1:5 2:3
  4:18 5:1 17:12
  17:15,23 18:10
  18:24 19:20
  27:24 28:4 29:4
  29:11 30:13,14
  30:20 31:10,20
  32:6,15 34:5,10

34:14,16 35:4,6
35:13,24 36:3,6
37:6,9,24 38:21
42:13,20 44:20
45:15 46:18,20
49:4,6 50:8 52:3
52:21 53:20
54:11 55:11,16
56:22 57:5,14,20
58:6,13 60:7,10
60:11,17,20,23
61:8 65:7,10,12
68:1 69:3,12,21
72:24 73:5,11
74:11,17 75:3,13
76:25 84:14
100:13,16,21
108:20,23 109:6
110:14 112:14
113:8,17 114:3,7
114:8,12,14,18
114:19 116:19
118:14 119:1
121:3,5 122:25
123:4,5 125:5,7
126:20,25 128:6
128:9 129:4,8,24
130:20 131:16
131:21 132:10
133:12,25 134:7
134:23 135:14
135:17,21,25
136:3,20 137:4
137:11 138:3,4
138:19,21,25
139:4,14,16,25
140:2 141:25
142:4,13 143:2,8

144:18 145:23
146:12 148:19
150:10 152:6,18
152:22 156:12
159:14 161:15
177:2,3,4
**name's** 160:21
**names** 29:15
134:1,8
**narrow** 141:11
**natural** 70:9
**near** 8:10 47:5
120:11
**nearly** 11:11
52:19 67:1
73:21 78:7
**necessary** 37:7
73:9 96:13
**need** 7:15 40:21
55:19 60:1 62:1
70:6 72:3 81:19
87:4,8 88:16
95:13 96:21
99:4 102:1
105:9 117:19
129:11 130:1
145:4 147:6
167:6
**needed** 77:3
**needs** 96:22
**negotiated** 21:25
49:11
**negotiating**
31:13 38:19
49:5
**negotiator** 49:17
**neither** 110:3

**net** 34:1 71:1,14
71:19 72:9,12,15
84:11
**netflix** 51:12
**never** 37:3,23
64:19 68:11
74:13,17 85:19
85:20,25 103:23
105:19 109:12
126:14 145:22
164:24
**new** 1:2,21 2:4,4
4:22 5:2,20,21
8:4 9:20 12:24
13:12 38:10
44:8 52:6 60:12
60:16 88:11
101:20 176:4
177:1
**nice** 6:11
**nicely** 95:10,22
99:16
**nine** 117:11
118:2 119:6
121:1 122:3,21
123:14 125:2,2
156:15 163:15
**nintendo** 51:3
**noncooperative**
158:10
**nonlawyer** 98:10
**nonsensical**
61:11
**norris** 1:5 2:3
4:18 17:21,24
18:24 31:16
32:20,25 34:5,9
34:12,15,25

35:12,23,25 36:2
37:8 41:8,19
44:25 45:19
50:7 52:2 55:9
62:12 64:2,22
68:2 71:2,13
72:10 73:13
74:6,9 76:12,16
76:24 79:17,24
80:24 81:12
85:9,12 102:16
103:4 123:5,18
125:10 148:21
149:19 151:23
152:3,12 161:9
163:21 164:13
166:19 177:2
**norris's** 41:17,23
58:3 60:4
165:24 167:3
168:8
**nos** 103:20
**notary** 1:20 3:13
6:5 173:16
176:3 177:24
**note** 4:4 24:2
27:17 46:1
**noted** 34:3 59:20
81:11 84:13
116:24
**notes** 42:11
58:22 157:22
171:2
**notice** 1:22
127:25
**noticing** 5:16
**notoriety** 108:23

**november**
126:22 158:23
165:13
**nuances** 141:23
**number** 4:14,23
22:22 27:21
35:25 43:12
45:13 49:7 69:4
69:21 70:16,20
76:8,10 78:19
90:8 102:5,7
110:17,23 117:4
118:1,1 130:8
146:2 164:18
171:13,17
172:13
**numbering**
147:2 160:13
**numbers** 128:1
**numerous** 33:10
79:23 114:13
125:13 153:10

**o**

**o** 6:3 17:13,18
**oath** 5:7 143:25
**object** 28:6
43:12 93:14
100:22
**objection** 28:8
59:20
**objections** 3:8
5:10 28:13
**obligation**
134:13
**obtain** 123:1
162:18 165:23
166:18 167:3,6

168:8,15
**obtained**   126:1
  147:21 148:6,8
  151:21 162:20
  165:2
**obtaining**   37:6
**obviously**   35:8
  38:2 42:12 43:1
  129:3 140:21
  160:10
**occasions**   79:23
**occurred**   75:19
**october**   17:3,5
  76:14 78:23
  79:3,7 80:1,24
  81:11 82:8,13
  85:23 86:11,14
  102:16 122:12
**offended**   170:16
**offered**   12:20
**office**   126:24
  152:14 157:23
  158:22 159:2
  175:4
**officer**   1:8 4:19
**officially**   12:8
**oh**   14:10 15:24
  57:15 101:10
  102:11 103:20
  124:10 154:11
  155:4,20 158:1,4
  162:8 164:1
  171:23
**ohio**   9:9,20
  13:16 15:21
  149:11
**ohnoshop.com**
  162:21 164:7,19

164:22 166:13
166:25 167:13
168:3,15 169:6
169:11,22
**okay**   6:10,22
  7:15,21 14:14,14
  14:20 16:13
  20:9,19 21:16
  22:17,19 23:5
  27:12,17 28:2,15
  29:2 36:23
  39:22,24 40:5,18
  41:4,14,23 42:5
  42:11 43:11
  44:6 46:4 47:21
  50:10 55:3,15,23
  56:20 58:8,23,25
  61:19,20,23 62:5
  62:7,9 64:13,20
  65:13 66:7,14
  67:2,7 69:22,23
  69:25 70:10,22
  71:12,22,24 73:8
  74:8 75:3,12,21
  76:5,22 77:16,21
  77:22 78:16
  79:24 81:7,9,10
  81:22 82:1,6,12
  82:21 83:10,10
  83:11,14 84:6,20
  85:6,9 86:24
  88:24 89:21
  90:17 93:2,10,13
  93:13 96:6
  97:20 99:5,10
  100:4,7 101:11
  103:17,20
  105:13,23 107:8

107:9 108:17
109:19 111:3,7
112:3 113:11
114:2,22 115:5
115:18 116:8,20
116:21 117:5
118:21 119:4,8
119:16 120:25
121:23 122:22
123:1 124:14,25
125:1,15,16,19
126:12,19
127:11,15,24
129:14,17,18
130:6,16 132:18
133:8 136:17
138:15 139:8,12
140:8 141:14
142:2,22 144:13
144:25 145:16
146:10,10,18,25
146:25 147:5,7
147:23 148:3
149:22,24 151:1
152:11,19,24,24
153:4,18 154:12
155:1,5,19,22
156:5,16,16
157:2,2,13,13,19
157:24 158:2,14
159:18,25
160:12,12 161:9
161:22 162:12
163:7,14,21
164:10,17
165:17,21,23
166:8,23,23
167:12 168:24

170:23,25,25
171:19
**old**   90:2
**once**   6:16 74:12
  82:10 91:17
**one's**   54:25 55:1
**ones**   26:12 78:2
  154:17 159:22
**operations**   75:8
  149:14
**opportunity**
  91:4
**option**   19:1
  30:20,21,22 31:2
  50:19 53:16
  57:17 100:25
  101:1 162:15,17
  164:9 167:17
**oral**   105:16
**orange**   100:23
  101:8 103:19
  154:8
**order**   37:17 46:2
  134:11
**orders**   131:5
**original**   30:17
**originally**   30:2
  38:3 137:6
**outcome**   5:9
  176:14
**outlets**   139:21
**outrageous**
  34:23
**outside**   11:24
  12:19 37:19
  44:20 45:2,15
  50:15 52:21
  53:12 65:21,23

133:20 134:2,4,5
**overlays** 153:20
**overnight** 51:7
**overtone** 111:24
**owed** 77:10
**owned** 31:16
33:4,14
**owner** 116:24
**ownership** 18:13
42:15

**p**

**p.c.** 2:8
**p.m.** 41:13 116:1
172:18
**page** 22:3,19,24
23:4 41:7 56:9
60:12 62:4 63:9
66:2,18,18
116:16 117:3,10
117:11 118:1,1
119:5 120:25
121:1,4,6,20
122:3,20,25
123:14 125:2,5,7
125:11,15
126:16 127:20
128:1,4,5 146:17
146:19 147:3,3
149:22 150:6
152:25,25
154:21 155:1,24
156:15 160:13
160:14,18 161:3
161:4 162:2,2,7
162:13 163:15
164:5 165:11,12
165:15,16,25

166:11,23
167:12 168:2
174:4,9,25
175:10,14,18
177:5
**pages** 47:5 62:6
126:3 160:19
**paid** 34:6 38:10
49:2 52:10,11
57:11,12 77:9
81:15 82:12,15
135:11
**paller** 2:16 5:1
**pandemic**
108:14
**panels** 32:7
**papers** 110:5
**paragraph** 27:18
33:20 48:10
66:4 71:9 73:10
74:1,4 81:20
84:8 92:8
102:22
**pardon** 77:23
139:25 144:18
147:9 163:14
166:11
**parenting** 18:19
29:10,17,17,18
29:22,23,24 30:1
30:2,7,10
**parents** 8:3
**paris** 13:14
**park** 2:10
**part** 22:15 23:15
25:18 30:1 32:9
42:13 46:11
48:7,13,21 50:3

53:14,15,15,16
60:10,19 81:15
83:1 106:7
109:2 115:9
124:7 137:3
141:3 160:25
163:22 164:3
166:4
**partially** 126:5
**participants** 4:8
**particular** 36:4
80:22 112:4
118:19 129:2
153:6
**parties** 3:4 4:13
20:12 65:16
67:11,18 68:7
91:21 176:12
**partly** 54:9
**partner** 19:6
**partners** 75:7
**parts** 40:16
**party** 5:8 66:19
130:11 139:12
139:14,17
159:14
**passionate** 37:24
**patent** 126:24
152:14
**patents** 9:15
10:17
**patience** 172:8
**patreon** 45:8
52:24 53:19
56:10 122:25
123:13,19,23,24
124:1

**patreon.com**
123:3
**patrons** 123:7,10
124:1
**pause** 36:19
138:12
**pax** 19:8
**pay** 37:22,24
38:13 57:22
**paying** 38:7
56:22
**payment** 46:13
80:25 81:14
82:2,7,11 85:13
85:25 86:10
**pdf** 83:7 91:13
107:11 111:4
**pdfs** 80:10
**peacemaker**
115:14
**peacock** 8:4
**pending** 7:18
**pennsylvania's**
13:1,21
**people** 11:14
27:8 46:14 54:9
70:4 108:24
**percent** 18:3
19:19,24,25
23:14 27:16
31:8 32:15
38:18,20 41:25
71:13 72:12,14
83:21 111:12,25
152:9 154:24
155:13 157:1
**percentage** 49:7
58:17 72:9

73:12

**percentages** 73:17

**perdomo** 2:16 5:19

**perfected** 101:23

**performed** 68:11

**period** 44:10,21 96:4 140:25

**permission** 105:10 165:24 166:19 167:4,7 167:22,24 168:8 168:11,16 169:21

**permit** 73:12

**permitted** 55:16 103:6 104:15 105:6,9,10

**person** 15:13 20:3 94:8,24 95:18 98:24 104:8 121:18 137:24 138:8 156:10 164:2

**personal** 112:9

**pertaining** 8:10

**pervis** 24:14

**peter** 18:19 31:15

**philadelphia** 107:24

**phone** 8:11 22:1 105:20 161:16

**photo** 107:13,13 107:14,20 109:7 111:1

**photograph** 111:9,15,18 114:4 147:21,22 174:18,21

**photos** 79:20

**phrase** 93:3

**physical** 47:11 57:14 74:10 131:24 132:24 153:16

**physically** 8:2

**picture** 107:16 107:19 108:1 119:8 120:7 121:9 122:24 123:2 125:4 147:11,24 150:2 150:6 151:3,8,14 153:1,12,14 154:21 155:2 156:1,18,22 160:18 162:18 163:2,15,19 166:12

**pictured** 108:20

**pictures** 122:9 139:22 154:6 157:8,9 168:17 169:15,18

**piece** 145:5

**pillow** 164:1

**pink** 100:23 101:3,7 103:19 108:19 153:2 154:7,9

**pins** 53:21

**pitch** 150:8,11 150:16

**pitches** 149:10

**place** 1:19 4:12 15:11 58:12 94:6,22 95:16 98:22 104:6 127:17 137:22 138:6

**placed** 117:15

**places** 91:9

**plaintiff** 1:6 2:3 4:17 5:22

**planned** 32:8

**planning** 20:11

**platform** 57:10 128:22

**play** 80:8 87:3 88:22 93:18

**played** 19:10

**playing** 92:20

**please** 4:3 5:11 7:1 8:25 32:17 33:24 48:1 58:10 62:3 67:12 85:16 98:16 117:20 125:22 134:2 145:19

**plural** 101:6

**plus** 10:17

**plush** 30:9 100:8 101:9 103:19 130:11,12,14,15 133:20 140:2,15 143:7,9 144:15 144:19 153:2 154:7,7 160:22 163:25

**plushy** 153:19 162:8

**point** 32:14,21 33:15 48:1 60:4 70:9 117:20 123:15 128:19

**pointed** 59:22

**policy** 9:14 12:16

**pony** 101:16

**pooh** 61:17

**popped** 155:21

**popular** 19:12 52:15

**porn** 56:17

**pornography** 56:13

**portion** 103:1 108:18 120:6,10 122:4 144:8

**portrayed** 31:22

**position** 141:5

**positions** 109:23

**possess** 32:14

**possible** 26:19 26:22 81:16 112:15 113:22 135:3 158:6 159:4 160:4

**possibly** 119:10 149:10,18

**post** 56:3,6 57:11,12 167:25

**posted** 79:3 103:17

**posting** 56:8,10 56:13 123:25 167:16 168:11

posts 56:11
pound 145:6
practice 53:5
pre 134:14
prefer 21:8
pregnancy 18:12
  137:15
preorders
  141:10
pretending 18:8
  18:17 29:7,9,10
  33:1 68:1
  137:14,17
  138:21 139:3,6
  139:17,20 142:1
  143:1,3
pretty 25:1
  28:16 31:5 45:1
  92:16 96:11
  98:5 108:24
prevent 121:18
previously 37:12
  55:8 103:12
  156:22 157:17
  159:24
primarily 63:12
primary 73:18
  164:23
principal 146:23
print 57:14 77:6
  80:14 88:18
  91:10 93:8,11
printed 74:11
  155:15
printing 155:18
prints 53:20
  165:1

prior 11:16 16:6
  17:24 19:8 31:7
  46:20 49:14
  61:5 76:23
  110:24 168:16
privately 89:8
probably 6:24
  148:11
problem 21:9
  53:9 96:5
  151:11
procedurally
  128:18,21
procedure 1:22
  10:25
proceeded 9:5
proceeding 5:11
process 87:13
  89:1,7 109:18
  110:10 129:1
  172:5
processed
  126:13
produce 114:17
  123:7 135:6
produced 19:21
  31:10 32:23,24
  34:12 46:8
  71:16 89:5
  131:24 136:7,22
  137:16
product 47:12
  130:9 131:24
production
  27:20 75:17
  100:11 113:13
  114:1

products 47:8
  131:24 135:6
  155:16 160:21
professors 11:1
profits 71:1,14
  72:19
program 11:4,10
  11:19 12:3 13:2
  13:5,22 14:5
programs 12:14
  12:19
progress 14:18
  74:25
project 63:8
prolonging
  141:4
promote 108:23
  134:12,14
promoting 54:11
  130:23
promotional
  103:13,22
promptly 81:16
pronounce 53:4
proper 11:22
  87:18
properly 87:8
properties 18:22
  27:20,22 31:9
  61:15 100:12
  101:15
property 9:15
  12:18 16:10
  29:8 32:2 55:12
  72:24 73:5
  112:22
prove 121:20

provide 7:2,10
  74:14 106:16
  125:14 163:1
  164:14
provided 29:16
  74:10 86:6
  125:11 148:22
  161:10
provides 71:12
  74:5,9
provision 32:9
  62:24 70:25
  72:17 73:25
  74:3,4 92:9
  121:17
provisions 23:9
  26:11 72:2
psd 84:18 91:14
  92:1
pseudonym 35:3
pubically 166:6
public 1:20 3:13
  6:5 9:13 11:20
  12:23,23 163:3
  176:3 177:24
publish 30:9
publisher 30:24
  31:4 35:9,10
  39:20 57:1,6,8
  57:16 60:18
publishers 39:12
  42:22 61:11
  73:20 89:20
publishing 30:4
  39:2 56:25
pull 48:16,16
  71:4,7 73:8,14
  114:16

**[pulled - recall]** Page 28

pulled 49:1
punch 88:12
purchase 28:25
29:1 31:6
141:13
purchasing 29:4
29:7 36:6 50:2
purification 9:7
purple 108:19
purpose 21:13
28:3 96:1
purposes 25:1
28:14 149:3
pursuant 1:21
72:7,8 73:10
100:17
pursue 11:2
44:19 45:14
46:22 52:20
65:22
pushed 11:17
put 12:7 39:22
39:25 52:5 57:4
61:21 68:15
87:17 92:1
100:10 102:2
107:5 116:5
134:14 145:13
157:3,15
puts 40:16
putting 59:14,15
60:15 75:25
125:18

**q**

quality 4:5,6
155:16

query 42:4,8
querying 48:14
quest 19:11
question 3:9 7:1
7:18,19 15:16,25
16:4,25 23:24
24:21 26:13
35:22 36:20
42:8,9 43:18
45:11,12,21
47:18 50:1
54:24 57:25
58:3 67:7,13
69:7,21 79:11
80:18,22,23 85:6
91:5 92:7,11,15
93:16 95:11
96:3 104:11,12
105:15,22
109:20 114:6
124:13 131:12
132:7,12 133:6
134:3 136:11
138:12,14,15
140:18 141:6
143:20,22 144:7
151:20 156:21
157:10 160:23
161:20 163:1
169:13 170:10
170:14,20,21
question's 22:8
119:16 140:21
questioning 72:4
136:8 171:22
questions 7:11
28:21 36:15
59:22 68:17

69:3,6 76:4
94:19 96:21,23
98:15 99:23
106:15 141:12
141:18 145:9
164:17
quick 66:2
166:18
quicker 115:10
quickly 145:11
quite 30:11
quote 10:18 12:9
17:4 19:23 42:3
42:11 43:5 48:6
50:15 67:19
77:6,7 80:9 82:5
88:17 103:11,22
161:7

**r**

r 6:3,3 14:13
17:13,18 120:11
rachel 10:1
15:21 16:5 17:9
23:17 26:3,5
64:17 76:13
92:1 102:18
107:18 111:16
113:19 148:10
148:13 149:5
152:6 153:15,18
153:20 154:22
161:6
rachel's 17:11
39:14
raise 99:4
range 103:11
104:1

rank 69:3,21
rdolan 2:11
reach 19:14
41:18
reaching 37:1
read 22:7,12
33:24 40:14,15
40:19 46:14
54:19 58:10
81:18,19 89:25
90:5,16 144:9
173:1
ready 77:6 80:14
88:18 91:10
93:8,11
real 66:1
realized 12:15
really 19:12 20:4
31:19 36:11
40:21 47:5
49:18 77:12
80:16,21 97:18
105:14 106:19
124:5 129:9
131:7,8,17
134:15 140:17
148:13 151:17
169:1 172:6
reason 7:9 126:7
156:11 159:1
169:9,12 177:5
reasonable 92:4
reasons 89:22
recall 10:20 25:7
25:20 27:3,13
37:1 41:2 63:4
67:19 73:10
102:20 107:25

108:6,8 109:5
111:14 119:10
128:24,25
139:11 146:10
147:13 158:21
158:24 163:9
**receive** 33:25
71:13 84:10
**received** 59:10
60:4 85:20 89:1
102:16 156:8
**receiving** 34:3
76:23 84:13
**recess** 70:18
90:25 110:21
171:15
**recognize** 7:22
76:9 77:23
78:18,24 102:10
129:20
**recollection** 6:21
67:21 122:8
**recommends**
11:11
**record** 4:2,13
5:15 7:8 15:12
17:12,15 22:20
40:13 70:17,21
77:24 90:19,22
90:23 91:2 94:7
94:23 95:17
98:23 104:7
110:18,19
114:24 115:22
115:23 116:3
120:4 137:23
138:7 144:9
171:9,14,18,20

172:16 176:9
**recorded** 1:16
4:10,15 7:7 46:7
50:24 60:25
**recording** 4:6,11
168:22
**records** 25:11
119:15
**refer** 147:24
151:3,9
**reference** 47:23
**referencing** 46:5
82:22,24
**referred** 34:15
34:16
**referring** 66:9
120:10 130:10
146:20 151:19
**reflects** 121:1
**refresh** 22:17
122:7
**refuel** 70:5
**refuse** 123:18
**refused** 121:6,13
123:21 163:1
164:13
**regard** 168:25
**regarding** 58:5
66:9 70:25
72:17 76:25
105:4,18 114:6
**regardless** 16:11
**regards** 16:25
**registered**
128:20 130:3
**registration**
120:22 129:23

**reign** 18:3 19:19
19:24 20:1 31:9
**reiterate** 37:13
**related** 5:7 24:14
176:12
**relating** 29:9
33:11 38:21
72:23 135:24
**relation** 42:21
71:14
**relations** 14:9
**relationship**
30:3
**relatively** 60:12
**relevant** 24:11
67:24
**remarks** 170:15
**remember** 6:24
8:17 12:4 25:25
26:12 27:8,11
40:20 63:6,13,22
63:25 75:23
102:11,14
107:16,19
111:11 120:19
122:13,18
123:16,22 135:9
141:19 146:13
146:15 147:14
147:19 149:16
156:7,10 160:4,7
160:9 167:20
**remembered**
76:2
**rep** 14:2
**repeat** 67:12
134:2

**repeatedly** 96:19
**repeating** 122:10
**rephrase** 100:9
147:10
**replied** 48:12
152:19
**reporter** 5:4
15:12 54:21
94:7,23 95:8,17
97:7 98:12,23
100:1 104:7
137:23 138:7
172:7
**reporting** 177:1
**representing** 5:2
**requested** 15:13
94:8,24 95:18
98:24 104:8
137:24 138:8
**requesting** 80:2
**requests** 125:14
175:17
**required** 14:10
24:20 87:23
**res** 91:13 151:24
**research** 9:12,14
12:13 150:20
**resending** 44:7
**reserved** 3:9
**resolution**
151:24
**resonates** 150:22
**respect** 26:13
27:19 28:4 85:7
92:8,10 100:7
131:13 135:13
135:16 139:12
142:2,10,22

143:6 149:1
168:13
**respective**   3:3
**respond**   104:22
**responded**   41:13
**responding**
32:11 104:21
**response**   41:18
44:6 157:23
158:22 159:2
175:4
**responses**   7:10
**responsibility**
148:25
**restate**   6:25
**restrooms**   70:6
**retailers**   75:19
**retain**   58:18
**retained**   172:15
175:7
**revenue**   47:4
56:7
**revert**   72:14
**review**   40:9
63:20 64:8,9,25
91:4 117:20
**reviewed**   65:6
**reviewing**
110:25
**ridiculous**   75:23
76:2 170:21
**riding**   18:18
29:11 34:4
**right**   20:22
21:17,18 22:6
35:16,22 36:22
40:7 43:25 44:1
44:19 45:14

46:15 49:16
50:12 65:25
69:19,19 70:8
78:21 79:2 91:3
108:18 115:19
115:21 116:16
145:12 167:23
171:8
**rights**   19:19
31:16 33:13,14
39:1,2,2 50:2,21
50:21,22 51:22
52:3,17 61:10
72:22 112:13,17
113:7,17 121:12
121:21 124:4,5
132:4,4 134:25
135:4 137:18
139:18,19
161:13 162:15
167:19
**risk**   106:14
**rob**   10:1 16:5
17:9 19:7 23:18
26:14,15 39:14
64:17 76:13
89:9 102:18
107:18 111:16
137:4 152:7
**rob's**   16:20
17:14
**robert**   159:11,19
**rocket**   63:18
**room**   8:5
**roslyn**   8:4 9:2,3
**rotate**   77:17
102:1

**roughly**   65:3
**round**   77:3
**royalties**   34:2
38:19 49:3,9
57:23 71:21
84:12
**royalty**   38:14
135:10
**rude**   7:6
**rule**   87:20
**rules**   1:22 6:23
**ruling**   96:8
**rulings**   175:13
**run**   75:8 115:12
**runs**   106:14
149:14
**ryan**   2:13

**s**

**s**   17:13,18,18
174:8 177:5
**sachs**   34:21,22
**salaried**   46:9
**salary**   46:16
**sale**   132:13,16
132:17,23,24
136:4,20 139:20
167:25
**sales**   34:1 71:20
72:10,13,15,18
73:11,12 84:11
112:17,19 113:1
131:23 132:4,21
134:11
**sample**   140:6
150:15 155:6
**sampled**   153:10

**samples**   105:12
133:20,22 134:5
134:9 154:5,14
**saving**   43:23
**saw**   80:1 139:23
**saying**   29:3 31:1
31:18 33:12,17
34:13 38:20
48:15 49:24
50:5,9,11,15
51:18 55:14
58:7 65:20 66:6
66:8 76:1 82:9
88:17 89:11
107:15 120:12
120:24 134:17
160:6,6 170:2
**says**   24:2 28:25
35:16 38:13,15
42:4 43:14
44:12 72:21
73:3 78:12 83:8
84:10 85:5
86:15 91:10
93:8 100:14
101:6 112:6
118:13,18
119:22 120:1,6,9
123:9 127:13
130:5 137:15
146:14 155:4
158:6,16,19
165:6,20
**scale**   87:8
**scholarship**
10:16
**school**   9:1,3,13
10:7 11:8,9,16

11:21 12:22
13:2,3,7,13,14
97:23
**schools** 13:5
14:4
**science** 13:22
14:18
**scrapped** 154:15
**screaming** 95:5
96:13
**screen** 4:10
20:18,21,25 21:2
21:23 22:23
33:21 39:23
40:1,7,17 41:6
61:22 77:20
84:7 100:11
102:3 107:6
108:18 111:6
116:6 125:18
129:15 145:14
155:14,17,23
**screenshot**
121:11 123:13
123:17 125:6
162:21 163:10
164:6,8,10,18,21
165:5,25 166:2,6
166:10,12,20,22
166:24 167:4,7
167:13,22 168:3
168:9 169:11,17
**screenshots**
106:4 168:14
169:6,22
**screenshotting**
121:19

**scroll** 22:3 40:11
41:16 62:1 65:2
66:1,21 73:22
76:6,8 116:9
117:2,6,22 119:4
121:24 125:21
129:25 145:18
145:25 146:18
165:10
**scrolled** 22:10
33:19 41:10
**scrolling** 62:5
127:24
**sculpture** 130:14
143:6,8
**sealing** 3:4
**sec** 45:11
**second** 11:5
27:18 45:10
48:10 102:9
155:23
**secret** 127:8
129:6 161:16
**section** 57:9
65:19
**security** 14:9
**see** 6:12 8:6
12:11 19:14
20:14,20 21:3
24:11 33:20
40:6 45:23 65:3
66:4,18 71:9,11
78:25 84:8 85:3
103:1 108:17,19
108:22 109:4
111:24 114:3
115:20 116:17
116:21 117:8,10

117:12,25 118:1
118:2 119:5
122:3,5 126:16
126:17,19,21
127:15 128:5
130:6,8 146:6
150:23 156:24
157:22 165:12
165:14 171:2,5
**seeking** 80:24
81:14 82:1,7
**seen** 4:8 126:14
127:20 133:21
145:22
**self** 92:17,21
129:10
**sell** 53:19 61:10
109:24 110:14
114:8,11 131:15
131:20 132:3,9
133:15 135:7
140:11,16
141:12 165:1
**selling** 45:9
61:14 132:24
162:16 167:18
**sells** 131:23
**semester** 15:20
**send** 42:23
153:11
**sending** 77:10
82:15 88:15,19
**sends** 156:3
**seniors** 16:23,24
**sent** 22:2,11
30:18 63:7 64:2
64:6,10,14,16,17
64:17,18,25

76:24 77:2
78:13,22 79:17
79:19,22,24 80:6
85:9,22 86:15,18
86:19 91:25
103:5 104:13
105:4,11,18
122:11 149:17
152:1,2,5,8
155:25 156:6,11
156:14 159:22
168:20
**sentence** 27:19
33:24 44:14
48:9,11 49:25
81:17,19 92:9
93:8 102:24
**separate** 16:3
43:2 71:6 83:2,2
**separated** 91:14
**september** 60:25
61:2 176:17
**serial** 69:4,21
**series** 55:11
64:23
**serve** 112:10
**service** 146:6,11
**services** 16:19
**set** 45:13 80:2
83:15,19 84:24
89:23 176:7,17
**seven** 119:5
120:25 154:21
162:7
**sexy** 101:8 154:7
164:1
**shaking** 7:3

**share** 20:18,21
20:24 21:2 40:1
40:7 102:2
107:5 111:6
116:6 125:18
129:15 145:14
**sharing** 155:23
**sheet** 167:18
177:1
**shepherds** 47:11
**shirts** 19:1
**shock** 86:24
**short** 97:1
**shorthand** 151:2
**show** 20:9 51:12
51:12 52:14
58:12 66:22
101:18 117:22
117:23 120:3
**showed** 86:12
88:10,13 155:12
**showing** 80:13
107:10 164:24
**shows** 73:16
95:25 148:15
166:9
**sic** 86:1
**side** 78:22 94:1
97:11,12 100:4
154:12,12 155:5
**sided** 154:11
155:3
**sides** 79:2 99:19
150:14
**sign** 64:12
**signature** 22:3
22:25 62:3
66:16 117:8,15

127:17,19
146:20 176:20
**signature's**
146:17,19,23
**signed** 3:12,14
18:12 24:1
26:20 30:23,25
34:8 44:24 55:9
62:10,14 64:11
64:19 65:5,15
66:15,19,25 67:3
67:5,6,8,10,14
67:17 68:7 73:1
73:6 85:3
108:15 122:2,4
147:18 159:2,5,9
159:9 160:2,9
165:13,18
**significance** 79:6
**signifies** 155:17
**signing** 18:7
25:9 26:21
29:19 31:8
42:24 43:3
60:14 72:25
117:12 137:5
158:21,25
**silence** 86:13
**similar** 10:15
168:25
**simple** 45:2
47:17 133:7
**simply** 36:14
42:20 43:19
83:18 84:22
151:9
**simultaneous**
15:10 94:5,21

95:15 98:21
104:5 137:21
138:5
**single** 110:4
**singling** 89:17
**sipa** 12:22 14:5
**sir** 95:2,10 96:18
96:18 162:11
**sit** 27:2 75:4,12
90:14,15 92:23
**sitting** 10:24
**six** 19:5 23:13
24:1 26:1,1
118:1 120:18
122:12 126:4
162:2
**size** 92:3 118:20
**sketch** 77:2 87:6
88:6 92:5
**sketches** 79:22
79:25 80:6,10
86:7,9,16,20,22
87:5,24 88:2,3
89:2 91:17,23
92:24
**sketching** 87:13
87:14
**slash** 62:22 79:5
123:4
**slashes** 146:22
**slicker** 115:10
**sloppy** 87:7
**slow** 52:25,25
53:1 138:13
**slowly** 20:23
53:4
**small** 10:15

**snack** 145:1
**snap** 18:5
**sneaky** 114:20
**social** 47:4 56:4
56:6
**soft** 130:14
143:6,8
**software** 10:13
**sold** 72:8 75:5,14
75:15,17,18 88:2
109:6,21 110:6
130:18,22 131:2
133:12 138:18
138:24 139:7,14
140:1,3,5,8,13
142:4,7,13,16,24
143:4,8,12
144:12,17,22
**solicitation**
132:14 134:10
**solicitations**
130:24
**solicited** 131:1
133:4 140:7
142:21 143:11
144:11,21
**soliciting** 133:1
**something's**
24:25
**soon** 98:5
**sorry** 36:7 44:4
50:14 54:15
63:24 69:14
71:22 72:16
78:3 85:16 86:3
87:1 89:3 108:9
124:6 149:20
155:20 156:17

162:1 163:7
166:3
sounds 115:3,19
southern 1:2
4:22
speak 15:13 59:7
94:8,24 95:18
98:19,24 99:21
104:8 137:24
138:8 158:17
speaking 19:5
36:13
speaks 28:7
43:13 72:11
85:2 94:12
97:21 98:4,9
129:5
specific 35:2
72:5 78:3,17,18
119:11 141:24
145:22
specifically 48:3
80:13 130:9
158:24 160:9
specified 44:9
52:7 60:24
specify 105:16
specifying 45:5
specimen 139:9
spectrum 25:2
speculate 59:5
speculating
65:12
speech 101:10
103:20 109:22
154:11 155:3
spell 14:12 17:11
17:14

spend 93:24
spending 46:24
spent 54:13 86:1
spin 8:7 59:15
spinners 18:5
38:23
split 46:25 71:1
spoke 8:22 13:18
104:18 105:19
127:5
spoken 19:3
spongebob 61:13
spot 64:12
spring 15:19
sprinkled 51:2
spun 51:11,21
52:13
stamped 78:1,10
standard 82:17
118:18
start 8:25 72:6
78:19 132:7
150:4
started 10:2
158:9
starting 9:25
starts 27:19
102:25
startup 60:16
state 1:21 5:11
5:14 9:9,20
13:16 15:21
25:14 43:19
149:11 176:4
stated 71:16
statement 68:18
118:17 146:7,11
146:11 147:8,12

151:8 153:5
statements 69:10
states 1:1 126:24
146:6 152:13
stenographer
1:20
step 64:14
stern 13:13
stick 138:3
sticker 167:18
stints 9:6
stipulated 3:2,7
3:11
stipulations 1:23
3:1
stitch 153:22
stitched 153:25
stop 32:10 54:4
94:16 96:21,23
98:13,14,14
115:17
stopped 104:21
stopping 56:4,5
56:7,9 70:9
story 42:16
straight 36:20
straightforward
28:17
street 15:23
streets 37:23
stretching 124:5
124:5,9,14,24
stricken 97:14
strict 135:9
strictly 92:10
strike 37:2 85:11
128:12 147:9
149:20

stroke 89:11
strong 96:20
struck 106:15
student 12:10
studios 1:9,10
10:3 14:25 17:1
112:7,14,18,24
113:8,18 135:5
studios's 112:8
112:11
study 12:6
stuff 38:18
stuffed 18:4,25
30:8,15,17 38:16
38:22 44:10
50:18 52:4,7,10
53:17 100:13,16
100:20 101:6
102:25 103:6
104:16 105:6,18
114:19 127:4
130:12,13,14
142:3,5,10,13
144:15,17,18
148:16,19
152:18 153:9
stuffy 103:13,22
style 118:20
subjective 57:8
submission 90:9
submissions
141:17
submit 125:24
submitted 91:18
92:4 120:14,14
120:15,16,19,20
120:21 139:9
148:12 149:2

153:8 154:19
161:1
**submitting**
82:17 152:13
**subpoenaed**
25:13
**subscribed**
173:10 177:21
**suddenly** 86:14
**sued** 54:15
104:24
**suggest** 62:21
**suggestions**
23:18,19,20,22
**suggests** 38:23
**suing** 20:3
**summer** 14:8
80:7
**sunday** 63:7
137:6
**sunglasses** 8:13
**superhero** 101:4
**supply** 112:25
**supposed** 68:17
162:23
**sure** 6:24 8:16
8:21,21 9:2
20:13 22:5
26:18,19 27:7,9
27:16 37:11,11
37:18 42:7,24
44:16 46:21
49:23 66:1,23
67:14 71:7 72:6
77:12,14 78:2,4
83:23 84:1
86:25 87:2
107:14 111:12

112:1 118:22
128:23 134:4
141:23 145:3,7
152:5,9,19
154:22,25
155:13 163:13
168:24 169:3
**surprise** 101:14
127:10 152:23
**sweat** 60:15
**sworn** 3:14 6:4
173:10 176:8
177:21

**t**

**t** 14:13 19:1
174:8
**tab** 157:5
**table** 8:12
**tabletop** 42:18
42:21 43:1
130:13 142:22
142:24 143:2
**tag** 148:16,18
**taglines** 39:16
**take** 4:12 7:15
7:17,20 22:10
25:18 33:23
37:4 40:13
42:15 45:25
53:24 61:19
64:13 70:4,8
74:20 90:4,6,12
107:14 114:25
121:8 123:12
131:5 138:12
145:8 164:25
165:5 166:1,5,21

167:4,7 169:17
171:3,4
**taken** 1:19 4:16
6:14,16,19 7:12
9:24 14:7 70:18
90:25 107:21
108:1 109:7
110:21 111:18
116:1 171:15
**talk** 34:18 48:17
53:1,7,9 104:23
146:1 159:13
**talking** 10:25
42:3 54:23
60:18 71:5 81:3
81:4,5 89:8
104:17,19 109:3
169:5,7
**target** 56:18
150:22
**teach** 69:1
**technologies**
9:17
**technology** 5:1
12:17
**tel** 2:5,11
**tell** 15:3 20:4
28:2 32:17
63:24 68:14
85:16 92:23
107:10 108:4
122:23 125:3
140:20 148:25
160:17 162:12
**telling** 27:15
69:20 95:22
109:11 132:22

**tells** 58:4
**tens** 108:24
156:8
**tentatively** 27:20
29:13,21 100:12
100:14
**term** 74:21
92:21
**terminate** 94:15
98:6
**terms** 18:14 20:7
47:7,12 57:18
135:19
**testified** 6:6
143:25
**testimony** 32:13
176:7,10
**testing** 80:8
150:20
**tests** 150:21
**text** 118:7 120:5
128:5,15 130:2
**thank** 6:13 36:25
55:6 60:2 70:22
99:8 144:25
171:24 172:9
**thanks** 44:2
69:24 70:14
115:18 138:15
138:16 171:11
**thin** 49:10
101:21
**thing** 26:15 38:5
49:20 54:24
55:25 61:12,16
100:22 137:2
148:13 168:5
170:2

**[things - trial]**

**things** 10:4 13:8
  13:19 19:2,25
  25:4 26:9,22
  38:21 39:1
  46:12 53:14
  63:19,20 102:13
  124:25 135:24
  136:22 141:25
**think** 11:23 12:3
  13:6 16:17,19,21
  17:4 19:10
  21:19 28:16
  31:5,19,19,20
  32:11,12 33:13
  33:14 38:17
  43:9 46:10
  49:21 55:19
  58:1 61:3,12
  63:9 65:9 68:2
  70:9 71:25,25
  72:11 73:15,22
  79:19 85:1 88:7
  91:24 96:10,12
  112:1,2,2 114:22
  115:12 116:12
  116:22 120:18
  126:3 129:23
  144:14 151:10
  152:9 154:23
  155:16 157:4
  159:15 170:10
  170:11,20 172:1
**thinking** 13:7
  89:18 92:19
**thinks** 93:19
**third** 2:4 5:20
  48:10

**thought** 43:10
  47:18 61:8 80:9
  86:15,17
**thousands**
  108:25,25
  149:15 156:9
**thread** 78:6,8,11
  106:5,7
**threat** 82:16
**threatening** 82:9
**three** 13:11 14:3
  16:23 65:4 72:1
  117:11 122:3
  154:13
**till** 9:21
**time** 1:19 3:10
  5:12,13 8:22
  11:15 15:13
  17:25 18:15
  19:16 24:8,23
  25:8,15,17,20
  30:11 33:15
  40:12 43:15
  46:25 55:5
  60:10 64:14
  70:16,20 80:23
  83:3 86:8,12
  88:25 93:24
  94:8,24 95:9,18
  96:3 97:15
  98:24 100:3
  104:8 109:19
  110:23 116:3
  127:5 131:4
  137:24 138:8
  152:11 158:7,13
  171:13,17

**timeline** 8:23
**times** 60:9 89:4
  95:10 114:13
  123:8 153:10
**title** 107:11
**today** 7:10,14
  27:3 68:14 75:4
  75:6,12 123:25
  133:16,18
  136:18 140:24
**today's** 172:12
**token** 87:23
**tokens** 87:25
**told** 19:18 32:8
  32:20 50:25
  53:25 63:4
  85:17,18 93:22
  94:13 99:6
  127:2 133:2
  135:24 144:4,23
  167:17 168:23
**ton** 18:2 47:10
**tons** 22:2
**top** 29:1 69:5
  76:9 102:10
  112:7,23 119:22
  120:1,9,11
  121:25 126:16
  128:1 146:5
  147:2 157:22
  160:13 165:15
**torres** 1:20 5:4
  176:3,21
**total** 172:13
**tough** 97:8 99:16
  99:17 111:19
**toy** 101:17,18
  130:13 142:10

  142:13 153:24
**toys** 101:15
  130:12,14,15
  133:20 140:15
  143:7,9 144:15
  144:19 149:8
  160:23
**trademark**
  48:20 116:13
  125:24 126:2,10
  126:24 127:3
  128:18 129:7,23
  130:3 132:14
  139:10 145:23
  149:3 152:14,17
  152:22 160:2
  168:21,23
  174:19,22,23
  175:3
**trademarks**
  122:15
**transcript** 36:18
  98:8 173:1
  176:9
**transfer** 33:16
  135:15,18
  162:22
**transferred** 33:6
  33:7 72:25
  121:21 135:1
  139:18
**transfers** 135:12
**transparent**
  69:15,17
**trap** 92:15
  132:11
**trial** 3:10 24:24
  53:6 96:5 99:19

106:13 110:5
**trick**   134:17
**tricky**   16:4
**tries**   56:11
**triggered**   82:19
**trillion**   51:7
**trium**   14:1,12
**trium's**   13:9,25
**troll**   29:25 30:8
**true**   63:14
   133:16,18
   168:18 173:3
   176:9
**truthfully**   144:1
   144:1
**try**   36:19 54:6
   55:2 57:15
   59:21 99:12
   115:6 136:17
   138:23 141:19
   155:15 166:18
**trying**   7:6 24:12
   31:2 44:3 49:19
   53:24 68:5,24
   69:15 86:2
   88:22 92:15
   93:25 98:17
   102:12 105:21
   114:16,20
   132:11 134:17
   140:10 151:16
   164:25
**tumbler**   56:8
**turn**   155:23
**turned**   51:10,14
   51:16,19 101:15
**turns**   150:24

**turtles**   18:18
   29:11 34:4
**tv**   51:12
**two**   11:6 13:4
   38:20 41:7
   46:25 55:22
   61:10 62:6 71:5
   76:16,18,20
   81:22,24 82:7
   83:9,11 84:3,3
   86:14 112:19
   146:21 154:13
   156:24 159:20
**type**   9:16,17
   12:10 54:22
   69:4 118:8,11
   148:13
**typed**   118:15
   119:1 128:15
**types**   9:16 12:16
   51:21 130:19
**typing**   118:24

**u**

**u**   14:13
**u.s.**   4:21
**ubos**   17:9
**ucc**   132:17
**uconn**   11:3,10
   11:22 12:20
   14:19
**uh**   7:3,3
**un**   14:8
**uncharted**   51:17
   51:18,23
**uncommon**
   34:20

**undergrad**   9:5,9
   13:16 16:23,24
**underneath**
   120:4
**understand**   29:3
   36:8,10 48:8
   49:22 50:12
   60:6 83:10
   89:13 94:18
   99:11 110:10,11
   110:12 134:19
   136:16 140:18
   141:21
**understanding**
   59:12 68:14
   96:1
**understood**
   26:20 47:14
   59:10,18
**unexpected**
   18:11 137:15
**unfortunately**
   77:16
**unit**   4:14 110:17
**united**   1:1
   126:24 152:13
**units**   73:18,23
   73:25 74:5,15
   172:14
**university**   9:9
   10:6 12:24 13:1
   13:21
**university's**
   13:13
**unnecessary**
   161:21
**unprofessional**
   95:25

**unquote**   12:9
   80:9 103:22
   161:7
**unreasonable**
   122:17
**untrue**   35:15
**unusual**   40:25
   51:20 61:16,17
**upfront**   26:22
   34:1 84:11
**uphold**   141:7
**upload**   82:10
   86:2,4 123:11
   147:7,11 169:22
**uploaded**   107:12
   121:10 122:9,19
   147:18,19 151:7
   153:5
**uploading**   20:11
   20:15,16 149:3
   168:16,19
   169:14,17,23
**upper**   55:24
   117:25
**upset**   56:16
   68:20,21 69:11
   110:1,2
**upside**   77:16
**upsidedown**
   102:1
**url**   123:4
**use**   18:14 33:2
   37:16 56:21
   70:5 93:21
   119:13,14 120:2
   120:17 121:21
   122:14,14 124:3
   131:1 140:10

146:7,12 147:9
147:12 151:8
153:5 161:11
166:9
**useless** 141:6
**uspto** 118:8
132:23 139:9
148:12 158:5
**uspto's** 133:5
**usually** 155:11
156:2

**v**

**v** 177:3
**verbatim** 11:11
**veritext** 5:2,5
172:15 177:1
**version** 78:11
**versus** 4:18
**video** 1:16 4:11
4:15 51:15,18
**videographer**
2:16 4:1 5:3
70:15,19 90:21
91:1 97:6 98:12
99:25 106:21
110:16,22
115:21 116:2
171:12,16
172:11
**videographer's**
172:7
**view** 77:17
**viewed** 65:1,3,4
66:22,24
**views** 56:9 61:7
**virtual** 4:25 7:23

**virtually** 4:5,25
**vision** 51:4
**visit** 11:9
**voices** 41:24
**volume** 106:21

**w**

**w2s** 25:12
**wahlberg** 51:20
**waived** 3:6
**walking** 15:21
**want** 7:17 11:25
15:25 16:1 22:8
23:14 31:25
37:21 40:19
42:14 43:3
49:17 54:3
68:20,25 69:3
73:15 83:21
87:3 90:5,7,10
90:15,16 93:21
94:17 99:15,18
103:8 111:19,20
111:24 118:21
118:25 134:18
140:22 141:23
145:7 165:11
169:20
**wanted** 12:5
18:4 19:21
26:21 31:22,24
32:3 33:9 34:24
37:17,20 38:24
39:3,7 46:21
47:2 57:19,21,21
82:12 109:25
123:23 128:11

**wants** 38:20
**wash** 155:18
**waste** 43:15
97:15 100:2
**wastes** 55:5
**wasting** 96:2
**watch** 90:16
**water** 8:13 9:7
**way** 21:12 34:17
42:15 54:23
58:2 61:7 70:1
82:14,17 126:10
128:13 135:18
143:24 170:1
176:14
**we've** 23:19,20
56:7 81:10
137:7 143:10
144:11 162:4,8
162:10
**wearing** 101:3
**webcomic** 1:5
2:3 4:18 17:23
18:10,24 19:20
27:24 28:4 29:4
29:11 30:13,14
30:20 31:10,20
32:6,15 34:5,10
34:14,16 35:4,5
35:13,24 36:3,6
37:6,9,24 38:21
42:13,19 44:20
45:15 46:18,20
49:4,5 50:8 52:3
52:20 53:20
54:11 55:11,16
56:22 57:4,14,20
58:5,13 60:7,10

60:11,17,20,22
61:7 67:25
72:24 73:5,11
74:11,17 75:3,13
76:25 84:14
100:13,16,21
108:20,23 109:5
110:14 112:14
113:7,17 114:3,7
114:8,11,14,18
114:19 116:19
118:13 119:1
121:3,5 122:25
123:4,5 125:5,7
126:20,25 128:6
129:4,7,24
130:19 131:15
131:21 132:9
133:11,25 134:7
134:23 135:14
135:16,21,25
136:3,20 137:4
137:10 138:2,3
138:19,21,25
139:3,14,16,25
140:1 141:25
142:4,13,24
143:2,8 144:18
145:23 146:12
148:18 150:10
152:6,17,22
156:12 160:20
161:15 177:3
**website** 128:19
133:4 162:16,19
162:21 163:4
164:14 166:2,6
166:13,22,25

| | | | y |
|---|---|---|---|
| 167:8,14,25 168:4,6,15 | **wiseman's** 73:9 **wish** 47:16 | **working** 9:6 11:14,15 16:6 | |
| **webtoon** 35:7,7 46:9,16 57:1,3,5 57:12 61:7 | **withhold** 82:16 **witness** 4:9 21:5 21:11,16 22:13 | 18:15,16,18 19:15 42:22 57:16 58:5,13,19 | **yeah** 9:21 19:13 19:18 21:14 22:13 24:18,22 |

**webtoon** 35:7,7
46:9,16 57:1,3,5
57:12 61:7
**week** 11:16 52:2
123:8,8
**weeks** 65:4
**weitzman** 13:6,6
**welcome** 99:9
**went** 9:2,10 10:8
10:9 11:8,21
31:13
**west** 11:23
**wharton** 13:3,22
**whatsapp**
103:18 151:22
152:1,2,5
**whatsoever**
24:12
**where'd** 153:14
**whereof** 176:16
**whichever** 112:4
**white** 77:2 79:20
79:20,25 80:6
86:7,9,19,22
87:5 89:2 92:24
**wildly** 25:3
**wind** 150:23
**winnie** 61:17
**wiseman** 17:25
17:25 19:7
21:20 29:5
32:20,23,25 37:7
49:15 62:23
68:2 73:2,7
84:15 137:18
144:23

**wiseman's** 73:9
**wish** 47:16
**withhold** 82:16
**witness** 4:9 21:5
21:11,16 22:13
28:9,15,24 36:23
40:8,18 44:1
53:8 55:2 68:23
69:14,23 100:5
106:2 107:3
110:12 141:21
159:12,18
161:22 162:1
170:8,23 172:9
174:4 176:6,10
176:16 177:4
**wizard** 101:3
**won** 10:11
**wondering** 36:2
**word** 49:16
54:22 55:20
63:22 93:21
103:23 118:7,9
118:11 137:1
**wording** 42:18
**words** 19:23
29:12 43:19
53:5 59:14
**work** 10:17 19:9
31:18,24 32:3
33:9 34:20,21
37:20 39:7 46:2
46:5 50:7 52:13
57:21,22 91:23
153:17 168:12
**worked** 9:7,18
25:19 30:11

**working** 9:6
11:14,15 16:6
18:15,16,18
19:15 42:22
57:16 58:5,13,19
60:7 61:4 149:7
**works** 16:7
35:25 36:4 46:9
47:8 50:8 51:16
71:14 72:7,13,15
134:12 172:5
**world** 35:1 46:10
47:12 57:2
60:24 108:15
121:19 131:7
**wound** 9:8 11:18
12:21 29:19
31:2 100:24
101:1 154:17
**write** 32:6 39:10
44:7
**writers** 39:15
**writing** 65:15
67:10,17 91:22
128:25
**written** 23:8
63:23
**wrong** 20:3
128:25
**wrote** 23:14 30:5
43:6,8,9 63:10
63:23 128:19,23

| x |
|---|
| **x** 1:4,12 174:1,8 175:1 |

**yeah** 9:21 19:13
19:18 21:14
22:13 24:18,22
28:11,11 36:11
39:7 40:10,23
41:3 48:3 53:12
66:5,5,21,24
68:23 77:19
84:16 85:4 94:4
94:4 96:10 99:5
102:13,20 106:8
106:25 107:7
111:10,12
113:22 115:16
120:12 124:20
132:11 145:3
151:25 153:7
156:20 160:24
161:19 164:1
171:7,10
**year** 10:10 11:5
14:6 15:17
108:3
**years** 9:24 11:6
19:8 23:13,17
24:1,5 26:1 61:5
63:22 74:20,24
107:19 122:19
149:16 156:9
**yep** 27:23 122:6
125:9 128:2
149:24 156:19
160:16 162:6
**yo** 54:3
**york** 1:2,21 2:4,4
4:22 5:2,20,21
8:4 9:20 12:24

13:12 176:4
177:1
**young** 51:5

**z**

**zero** 41:25
**zoom** 7:24 16:17
20:12 117:23
130:1 155:11

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.