UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXANDER NORRIS, | : <br> : |
| Plaintiffs, | : <br> : |
| v. | :     Civil Action No.  1:19-CV-05491 – PAE <br> : |
| Marc Goldner, Individually and as Officer of GOLDEN BELL ENTERTAINMENT, LLC, a California company and GOLDEN BELL STUDIOS, LLC, GOLDEN BELL ENTERTAINMENT, LLC., a California Company and GOLDEN BELL STUDIOS, LLC., | : <br> : <br> : <br> : <br> : <br> : <br> : |
| Defendants, | : <br> : <br> : |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................................1

FACTUAL BACKGROUND ..............................................................................................................2

ARGUMENT .......................................................................................................................................6

    I.    Legal Standard ..................................................................................................................6

    II.   Plaintiff is not Entitled to Judgment on Copyright Infringement and False Designation of Origin Causes of Action ................................................................................7

    III.  Plaintiff Does Not Have Standing to Request Cancellation of Mark 281 ..........................10

    IV.  There are No Grounds for Terminating the Collaboration Agreement as Defendants Have Not Breached the Contract ....................................................................11

CONCLUSION .................................................................................................................................16

**TABLE OF AUTHORITIES**

Cases

*Bowmar Instrument Corp. v. Cont'l Microsystems, Inc.*,
  497 F. Supp. 947 (S.D.N.Y. 1980) .................................................................................. 14

*Cunningham v. Laser Golf Corp.*,
  222 F.3d 943 (Fed. Cir. 2000) ......................................................................................... 10

*DR Distributors, LLC v. 21 Century Smoking, Inc.*,
  2014 WL 12963045 (N.D. Ill. June 16, 2014) ................................................................. 12

*Jorgensen v. Epic/Sony Records*,
  351 F.3d 46 (2d Cir. 2003) ................................................................................................ 7

*McLee v. Chrysler Corp.*,
  109 F.3d 130 (2d Cir.1997) ............................................................................................... 6

*Muze, Inc. v. Digital On-Demand, Inc.*,
  123 F. Supp. 2d 118 (S.D.N.Y. 2000) ............................................................................. 13

*Palmer/Kane LLC v. Rosen Book Works LLC*,
  204 F. Supp. 3d 565 (S.D.N.Y. 2016) ............................................................................... 7

*Pulse Creations, Inc. v. Vesture Grp., Inc.*,
  154 F. Supp. 3d 48 (S.D.N.Y. 2015) ................................................................................. 9

*Scheiber v. Dolby Labs., Inc.*,
  293 F.3d 1014 (7th Cir. 2002) ........................................................................................ 12

*Topps Co. v. Cadbury Stani S.A.I.C.*,
  526 F.3d 63 (2d Cir.2008) .............................................................................................. 11

*Waldman Pub. Corp. v. Landoll, Inc.*,
  43 F.3d 775 (2d Cir. 1994) ............................................................................................... 9

Rules

Fed. R. Civ. P. 56 .......................................................................................................... 1, 6

S.D.N.Y. L.R. 56.1 ............................................................................................................ 1

Defendants Marc Goldner ("Goldner"), Golden Bell Entertainment, LLC, and Golden Bell Studios ("Golden Bell") (collectively "Defendants"), in accordance with and pursuant to Federal Rule of Civil Procedure 56, Local Civil Rule 56.1, the Court's individual Practice Rule III(A), the Court's September 7, 2022 Order, ECF Doc. No. 104, and the Court's September 16, 2022 Order, ECF Doc. No. 110, hereby submit this Memorandum of Law in Opposition to Plaintiff's motion for summary judgment, and in support of Defendants' Cross-Motion for Summary Judgment.

## **INTRODUCTION**

Plaintiff Alexander Norris ("Plaintiff") has brought this action with the hope that the Court would overlook his obvious mis-telling of the facts and dissolve the Collaboration Agreement ("Agreement") he entered into with Defendants.

Plaintiff and Defendants entered into the Agreement, which called for the creation of plush toys and a board game based upon Plaintiff's webcomic series "Webcomic Name." The Agreement also granted Defendants full intellectual property rights over the plush toys and the board game, as well as any derivative works or sequels which would contain the characters set to appear in the toys or board games, and an option on the Plaintiff's next manuscript length, book length, *and* game-length works.

Throughout the entire history of the Agreement, Plaintiff has repeatedly failed to hold up his end of the bargain, with repeated failures to provide required content in a timely manner, making of public disparaging comments, the publication of materials containing intellectual property covered within the Agreement, and blatant disregard for the option provision granting Defendants publishing rights to Plaintiff's next book-length work. In contrast, while patiently attempting to work with Plaintiff within the confines of the agreement, Defendants also took steps to protect the intellectual property rights granted to them by the Agreement and Plaintiff.

1

Defendants never once tried to profit off the brand without the inclusion of the Plaintiff, whereas Plaintiff deprived the Defendants of revenue generated using the characters and brand that they acquired.

Rather than abide by the terms of the Agreement, Plaintiff decided to cut off communication with Defendants altogether, instead opting to file the instant matter with the hopes that the Court will dissolve a legally valid agreement while overlooking his breaches.

## FACTUAL BACKGROUND

In February of 2017, Golden Bell purchased the rights to a multi-media property called Pretending to Grownup from a third-party Jason Wiseman ("Wiseman"). Pretending to Grownup started as a card game which had thirty-two (32) guest artist cards. One (1) of those guest artist cards was created by Norris using the Webcomic Name characters. The use of the characters was assigned to Wiseman and included "any future use" of the guest artist card. Golden Bell acquired Pretending to Grownup including the guest artist card drawn by Norris. (See Goldner Decl. ¶ 1). Prior to signing with Golden Bell, Wiseman represented that he had "100% free reign" over numerous properties, including Webcomic Name. (*Id*).

In June of 2017, Golden Bell connected with Norris and began negotiating the Collaboration Agreement. (See Goldner Decl. ¶ 3). Rather than creating the art in-house, Golden Bell wanted to keep the game true to the spirit of the comics and its characters, and true to Golden Bell's mission, vision, and values of the company. The founding partners objective of the company is to work hand in hand with writers, artists, designers, and other creators to make new products come to life in an oversaturated industry by building and creating new and unique brands. Thus, Golden Bell reached out to the original artist of Webcomic Name to collaborate on the game, stuffed animals, and any other mediums the brand might be applied to, ensuring Norris was

2

involved in the future development of growing the Webcomic Name brand. In Golden Bell's first communication with Norris on June 26, 2017, the company explained that there are "potentials for a stand alone [sic] comic, a children's book, or something else" and Golden Bell explained that there would be "derivative merchandise [that] will accompany the game[.]" (See Goldner Decl. *Id*.). Golden Bell was straightforward from the beginning of their plans to work on the Webcomic Name brand and not just a game for it.

After emailing a draft of a Collaboration Agreement to Norris, Norris responded to Marc Goldner ("Goldner"), one of Golden Bell's Members, on July 3, 2017, stating "[t]he main query I have about the contract is the part about 'the artist will retain 0% of the copyright….'". (See Goldner Decl. ¶ 4). Goldner responded to Norris via email, noting "[t]o answer your question about copyright, Jason had agreed to us purchasing the rights for the game already and that part of the deal was already done." (*Id*).

On August 10, 2017, the parties entered into a Collaboration. The Agreement called for the creation, production, and distribution of a game and stuffed animals, as well as any tie-ins, spinoffs, or other commercial development based on Webcomic Name and its characters, which the Agreement referred to as "the WORKS." Additionally, the Agreement states that "the proceeds from the sale or any and all other disposition of the WORKS and the rights, interest, and licensed therein with respect thereto, including but not limited to the following: Comic Book Rights, Motion Picture Rights, Animation Rights, Graphic Rights, Sequel Rights, Remake Rights, Television Rights, Gaming Rights, Film Rights, Stage Rights, Radio Rights, Publication Rights, Interactive Rights, Music Rights, Merchandising Rights, and Digital Rights." (See Goldner Decl ¶ 8.). Further, Section 3(D) of the Agreement granted Golden Bell options on Norris' next game-length work, book-length work, and manuscript-length work, which Norris later acknowledged via

3

email. (*Id*.) According to the Agreement, Norris was required to create final files for a game designed by Golden Bell and Wiseman. (See Goldner Decl. ¶ 7).

Shortly after the Agreement was executed sometime in September of 2017, Goldner and Norris had a telephone conference wherein the parties discussed plans related to building the multimedia brand of Webcomic Name. Both Goldner, Norris, and Rachel Korsen, another Golden Bell Founding Partner, expressed their excitement to collaborate. Further, Goldner reinforced the idea that the company viewed Webcomic Name as a brand that it would continue to build and wanted Norris to be a part of that vision. (See Goldner Decl. ¶ 9).

On the call the parties discussed utilizing Webcomic Name and its characters in other mediums. Norris, Goldner, and Korsen, discussed a daily calendar of Webcomic Name comics. There was mutual excitement over the idea, though Goldner noted that Golden Bell would need additional comics from Norris because Norris had not published enough Webcomic Name comics to cover a whole year (365 Days), and Golden Bell and Norris agreed they'd be using the comics Norris published via his social media accounts for Webcomic Name. (*Id*).

The Agreement explicitly states in Section 1(A) that "ARTIST shall retain 0% of the copyright, 0% of the trademark, 0% of the patent and 5% of the net sales of WORKS for the first 18 months then it will revert to 4% of the net sales of the WORKS thereafter, and COMPANY shall retain 100% of the copyright, 100% of the trademark, 100% of the patent and 95% of the net sales of the WORKS for the first 18 months then it will revert to 96% of the net sales of the WORKS thereafter." The Agreement further states that "[i]f ARTIST creates a new work with a character or storyline that infringes on any of COMPANY's copyrighted properties, ARTIST agrees to transfer any copyright he may have in that new work to COMPANY." (See Goldner Decl. ¶ 10).

4

Pursuant to these provisions, on November 30, 2017, Golden Bell filed a trademark application Serial No. 87703934 with the USPTO on an intent to use basis for the mark "Webcomic Name" in class 028. The USPTO approved that application, with Registration No. 5629281 on December 11, 2018. (See Goldner Decl. ¶ 13).

The Agreement also reflects the parties desire to expand the Webcomic Name brand. Section 2(B) of the Agreement states that the parties shall share the proceeds, rights, interest, and licenses to the WORKS and its characters in a number of different mediums, such as motion pictures, animation, gaming, television, sequels, comic books, and more.. Section 3(C) of the Agreement, states "ARTIST shall submit to COMPANY all sequels to the WORKS or other works using characters that appear in the WORKS…." (See Goldner Decl. ¶ 14).

Despite the inconsistent communications, slight progress on the WORKS was made in the beginning. Norris and Golden Bell agreed to produce five plush stuffed animal toys: a pink blob, an orange blob, a sexy pink blob, a cat, and a word bubble featuring the characters' catch phrase "Oh No" on one side, and "O kay" on the other. Norris drew the initial sketches of the toys, and provided them to Golden Bell, which made prototypes with numerous revisions and draw overs, providing editorial taking into account how to best bring to life the Webcomic Name characters. (See Goldner Decl. ¶ 16).

On April 5, 2018, Norris finally stated that he would draw the cards in black and white sketches to allow for creation of a test game, "and then finalise [sic] them." (See Goldner Decl. ¶ 18). On May 14, 2018, Norris stated that he could "get the sketched cards ready for testing in two weeks…." (*Id*).

Norris eventually delivered 377 sketch black and white cards to Golden Bell on June 21, 2018 when the final files, which are *not* sketch black and white cards, were supposed to be

delivered by February 17, 2018. )See Goldner Decl. ¶ 19). As Norris previously acknowledged, black and white sketches were not "final" cards. In order to produce the game, the cards would have to be colored and properly lined before being converted into a format that was suitable for mass printing. Of the 377 black and white cards, Norris subsequently claimed to have provided 400 cards via Dropbox that contained colored sketches and demanded immediate payment from Golden Bell. The game was supposed to include at least 500 cards. Goldner responded that the files would need to be accessed, reviewed, and edited by Golden Bell, a process that was explained to Norris as necessary to the process numerous times, before any payment was made within the 30-day period outlined in the agreement. (See Goldner Decl. ¶ 20). When Golden Bell attempted to access the Dropbox folder, none of the cards Norris claimed to have provided were there. Norris refused to upload *any* color files for Golden Bell to access or review until payment was made, which is contrary to Section 1(G) of the Agreement stating, that Norris would receive his "advance against net sales royalties within 30 days of the COMPANY receiving the final files…". Golden Bell never received the final files or any colored files to be reviewed. (See Goldner Decl. ¶ 23).

## ARGUMENT

### I. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir.1997). The burden of showing absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." *Id*.

6

## II.   Plaintiff is not Entitled to Judgment on Copyright Infringement and False Designation of Origin Causes of Action

The elements of a copyright infringement claim are "(i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003). The existence of a license is treated as an affirmative defense, and when the contested issue is the scope of the license, rather than the existence of one, the copyright owner bears the burden of proving that the defendant's copying was unauthorized under the license. *Palmer/Kane LLC v. Rosen Book Works LLC*, 204 F. Supp. 3d 565, 569 (S.D.N.Y. 2016).

Plaintiff's request for summary judgment for Defendants' liability for copyright infringement falls short, both as a matter of fact and a matter of law. First, Goldner at no point admitted that the screen shots submitted to the USPTO were unauthorized, as Plaintiff alleges. Rather, as Plaintiff points out in their own motion, Goldner stated that he did not ask Plaintiff directly for permission. This does not, in and of itself, make the screenshots an unauthorized copying. Pursuant to the Agreement between the parties, Defendants retained "100% of the copyright [and] 100% of the trademark" rights to the WORKS, as well as any sequels, prequels, reboots, remakes, and expansions, pursuant to Section 1(A) of the Agreement. Goldner did not "ask" because the Agreement conferred the rights to the trademark to Defendants. Plaintiff attempting to twist Goldner's testimony to say that the use of the images was unauthorized is yet another attempt by the Plaintiff to mischaracterize the facts. Section 2(B) further clarified that those rights included "Comic Book Rights, Motion Picture Rights, Animation Rights, Graphic Rights, Sequel Rights, Remake Rights, Television Rights, Gaming Rights, Film Rights, Stage Rights, Radio Rights, Publication Rights, Interactive Rights, Music Rights, Merchandising Rights, and Digital Rights." This was further spelled out in Section 3(C), which required Plaintiff to submit

to Defendants "all sequels to the WORKS or other works using characters that appear in the WORKS…."

Thus, the copyright is not limited in scope as Plaintiff suggests. Rather, it is a valid assignment from the Plaintiff to Defendants of the copyright to the WORKS and the characters appearing therein. While Plaintiff failed to deliver the "final" files constituting payment under the Agreement, files that were delivered contained several characters seen in the screenshots used by Goldner in submission to the USPTO, most notably the Pink Blob, the Cat, and the signature catchphrase "Oh No." The delivery of these files to Defendants is sufficient to create a valid copyright by means of fixing original works of authorship to a tangible medium. Further, that copyright was validly assigned to Defendants. An "Oh No" image was even used as the sole art exhibit in the Agreement signed by the parties next to both of their signatures. Further, use of these images cannot come as a shock to Plaintiff, as the parties discussed creating a daily calendar utilizing comics posted by Plaintiff to their social media. Therefore, Defendants cannot be said to have infringed upon copyright that was validly assigned to them.

Additionally, Section 2(Q) of the Agreement states that Defendants "will hereby take due diligence in protecting the WORKS." Thus, Defendants had a contractual duty to take every legal step available to them to ensure that the intellectual property assigned to them by Plaintiff, including the WORKS and any subsequent work containing the characters set to appear in the WORKS, were protected. This includes registration with the USPTO.

Because the alleged "copying" of material actually involves materials lawfully licensed to Defendants under the Agreement, Defendants are entitled to summary judgment on this cause of action.

Plaintiff's argument that they are entitled to summary judgment for false designation of

8

origin similarly fall short. First, as stated above, nothing in the representation to the USPTO was false. Golder asserting that Defendants were the owner of the mark was a true and accurate statement, pursuant to the Agreement between the parties.

Further, Plaintiff fails to accurately depict the holdings of the authorities they cite. For instance, both the *Pulse* and *Waldman* courts makes clear that false designation of origin claims under section 43(a) provides for two distinct causes of action: false designation of origin or source, known as 'product infringement,' and false description or representation, known as 'false advertising.'" *Pulse Creations, Inc. v. Vesture Grp., Inc.*, 154 F. Supp. 3d 48, 56 (S.D.N.Y. 2015)."False advertising requires that a defendant make a false or deceptive statement misrepresenting an inherent quality or characteristic of the product" while "product infringement occurs when a defendant attempts to sell its product with a false designation that suggests the product originated from the plaintiff." *Id*. Section 43(a) "has been interpreted as prohibiting misrepresentations as to the source of a product in primarily two types of activities: (1) false advertising and (2) passing off…in which 'A' sells its product under 'B's' name…or 'A' sells 'B's product under 'A's name." *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 780 (2d Cir. 1994).

Neither of those instances is the case here. The application for a trademark with the USPTO did not consist of advertising or selling of a product. It was a legal action taken by Defendants to protect intellectual property which they acquired from Plaintiff, not a commercial action of advertising or selling a product. This is of course in line with the elements of a cause of action for false designation of origin, which as Plaintiff themselves noted, requires that "interstate commerce is affected." Indeed, Plaintiff does not even bother to allege that this element is met in their brief. Because Plaintiff has failed to satisfy an element for false designation of origin, summary judgment must be granted in favor of Defendants.

### III. Plaintiff Does Not Have Standing to Request Cancellation of Mark 281

"The party seeking cancellation must prove two elements: (1) that it has standing; and (2) that there are valid grounds for cancelling the registration. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 945 (Fed. Cir. 2000). The party seeking cancellation must believe that it is likely to be damaged by the registration. *Id*. Here, Plaintiff has failed to even assert that he has standing to request cancellation of Mark 281, much less establish standing. That is likely because Plaintiff is not likely to be damaged by Mark 281, but would rather benefit from it by way of production and sale of products which fall within the Agreement. As Section 1(D) of the Agreement states "[a]ll future derivative works created by the parties will be defined by the percentages of the copyright and of the net profits defined in Section 1a of this Agreement listed above. (See Goldner Decl. ¶ 11). Due to Plaintiff's lack of standing, summary judgment must be granted in favor of Defendants.

Further, Plaintiff's allegations that the mark has not been used in commerce are untrue. The characters the "pink blob" and "orange blob," who also appear in artwork meant for both the game and stuffed animals, are seen uttering the phrase "Oh No" alongside a tag "artwork courtesy of Webcomic Name" on a card contained in the game Pretending to Grownup. (Goldner Decl. ¶ 31). This card is featured in promotional products used by Golden Bell Studios to promote the Pretending to Grownup game, such as being displayed on Amazon.com alongside the game. Pretending to Grownup has sold no less than 7,940 units to date with a gross revenue of $204,474.75 and is still available for purchase from a number of different outlets, such as goldenbelldirect.com, amazon.com, walmart.com, and physical retail stores such as Hot Topic. (*Id*.).

Further, this use shows that Defendants' did not exceed the scope of the Agreement as Plaintiff alleges. As discussed below, trademarking "Webcomic Name" and "Oh No" were

contractually required per the Agreement. Additionally, the mark was used in a manner that was valid. The game was purchased from Wiseman, after Plaintiff had assigned the rights to the card at issue to him. (See Goldner Decl. ¶ 2). Thus, Defendants' use of the mark in commerce and subsequent trademarking of the mark cannot be said to exceed the scope of the Agreement.

### IV.  There are No Grounds for Terminating the Collaboration Agreement as Defendants Have Not Breached the Contract

"A motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning. *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir.2008).

As is often the case with Plaintiff, their request for seeking judgment stating that Norris validly terminated the Agreement fails both as a matter of fact and a matter of law. Neither of the alleged breaches by Defendants amount to such. First, addressing the alleged breach for lack of payment, Section 1(G) states that Plaintiff "will receive a $3,125 upfront advance against net sales royalties **within 30 days** of the COMPANY receiving **final files** noted above for 'Webcomic Name Game…." (See Goldner Decl. ¶ 21)(emphasis added). Despite Plaintiff's claim that Defendants "refused" to pay Plaintiff, the truth is actually the opposite. In response to Plaintiff's demand for payment, Goldner responded "We MUST receive the final files before paying as required in the contract allowing us to review and have 30 days to submit payment….Please upload the files today…[t]hen we will review and have it paid within 30 days as per the contract once approved." (See Goldner Decl. ¶ 20). At no point did Goldner refuse to pay Plaintiff, but rather informs them that they will abide by the terms of the contract. This could not have come as a shock to Plaintiff. Not only are the terms of the Agreement clear, but the parties had engaged in the

editorial process before. An email exchange in June of 2018 between the parties, with the addition of Jason Wiseman, shows the parties exchanging notes and ideas for improvement upon the cards and playing mechanics of the game which resulted in Norris changing dozens of sketch cards from the excel that the parties worked on collaboratively. (See Goldner Decl. ¶ 24).

Further, Plaintiff's breach of contract claim is barred by the doctrine of unclean hands, as Defendants noted in their answer to Plaintiff's Second Amended Complaint. "[U]nclean hands really just means in equity as in law the plaintiff's fault, like the defendant's, is relevant to the question of what if any remedy the plaintiff is entitled to." *Scheiber v. Dolby Labs., Inc.*, 293 F.3d 1014, 1021 (7th Cir. 2002). The Federal Circuit has held that unclean hands is an acceptable defense in a cancellation proceeding. *DR Distributors, LLC v. 21 Century Smoking, Inc.,* No. 12 C 50324, 2014 WL 12963045, at *5 (N.D. Ill. June 16, 2014).

Rather than work with Defendants to finalize the cards, Plaintiff chose to delete the files the Dropbox folder, leaving Defendants with no files to review. In reality, Plaintiff has not been paid simply out of his own refusal to work with Defendants within the confines of the Agreement. Indeed, it is Plaintiff who is in breach in this regard, not Defendants. Neither Goldner nor Defendants "refused" to pay Plaintiff. They simply requested that Plaintiff fulfill his contractual obligations.

Plaintiff's other allegation of material breach, that being "far exceeding the scope of the Collaboration Agreement," also fails. Plaintiff claims that Defendants attempt to trademark "Webcomic Name" and "Oh No" in the "Comic books; Comic strips; Comic strips' comic features; Comics; Newspaper comic strips" and "T-shirts" has no basis in the Agreement. This allegation is in direct contrast to Section 2(B) of the Agreement, which explicitly states the Agreement includes "the rights, interest, and licenses therein and with respect thereto, including but not limited to the

following: **Comic Book Rights**, Motion Picture Rights, Animation Rights, Graphic Rights, Sequel Rights, Remake Rights, Television Rights, Gaming Rights, Film Rights, Stage Rights, Radio Rights, Publication Rights, Interactive Rights, Music Rights, **Merchandising Rights**, and Digital Rights." (See Goldner Decl. ¶ 8)(emphasis added).

Further, Plaintiff's cited authorities do nothing to further their argument. For instance, Plaintiff cites *Muze, Inc. v. Digital On-Demand, Inc.*, for the proposition that this Court "held that the plaintiff had established a strong likelihood of success that it had permissibly terminated a license where the defendant had well exceed the scope of that license, in a manner which competed with that plaintiff's 'core business.'" *Muze, Inc. v. Digital On-Demand, Inc.*, 123 F. Supp. 2d 118, 130 (S.D.N.Y. 2000). First, the Court in *Muze* was not deciding a motion for summary judgment, but rather a preliminary injunction. *Id*. This is clear from the "strong likelihood" language, which is a far less stringent standard than what is required for summary judgment. Second, and not even mentioned by Plaintiff, none of Defendants' alleged actions "competed with Plaintiff's core business." Defendants filing for a trademark in the applicable categories, despite Plaintiff's allegations, were actions taken not only within the scope of the Agreement, but rather required by the Agreement as a form of protecting the intellectual property being assigned to them.

Further none of these actions "compete with Plaintiff's core business," especially since Plaintiff is a beneficiary of anything produced and sold under the Agreement. Plaintiff has simply failed to produce or offer any evidence that any of Defendants' actions have competed with Plaintiff's core business. In fact, when asked during his deposition how Defendants' actions have affected his revenue, Plaintiff referenced this lawsuit as having "taken a huge toll on my mental health and my energy and what time I can put into Webcomic Name…." Defendants' Rule 56.1 Statement at 24. When asked if Plaintiff has seen a loss in revenue other than his lack of energy

13

related to his involvement in this case, Plaintiff testified that his [m]y page has been growing despite all of those things….." *Id* at 24. Thus, by Plaintiff's own admission, none of Defendants' actions have led to a reduction in revenue from his core business. Only the toll of their mental health and energy from this lawsuit, which they filed, has affected his core business.

Likewise, Plaintiff overreaches to apply the Court's holding in *Bowmar* to their own situation. The Court in *Bowmar* specifically found that Defendants had breached the licensing agreement by way of trademark infringement, specifically using Plaintiff's mark without consent in connection with the sale of goods. *Bowmar Instrument Corp. v. Cont'l Microsystems, Inc.*, 497 F. Supp. 947, 955 (S.D.N.Y. 1980). The Defendant in that matter applied Plaintiff's marks to television games and smoke detectors, where the licensing agreement was explicitly limited to watches and calculators. No such action occurred here. As Plaintiff concedes, the closest Defendants come to this is filing for a trademark with the USPTO, an action well within their contractual right pursuant to the Agreement. The mark was not applied to any goods or products that were not covered by the Agreement.

Simply put, Plaintiffs allegations for breach of contract can fall into two categories. The first is an alleged failure of payment. The Agreement between the parties cannot be disputed, in that it says in Section 1(G) that Plaintiff "will receive a $3,125 upfront advance against net sales royalties within 30 days of the COMPANY receiving the final files noted above for 'Webcomic Name Game.'" See (Goldner Decl. ¶ 21). As mentioned, Goldner never refused to pay Plaintiff, but stated that payment would be provided within 30 days of receiving the files after they were reviewed and approved. When attempting to access the Dropbox folder where Plaintiff had allegedly delivered the files, it was empty, showing that Plaintiff either never delivered the files or deleted them before they could be accessed. (See Goldner Decl. ¶ 23). Even assuming that Plaintiff

14

did indeed deliver the "final files" under any definition, Defendants had 30 days to disperse payment to Plaintiff. Plaintiff chose not to wait for the contractual period, opting to deny Defendants' access to the files altogether. Therefore, Defendants cannot be in breach of the contract, even if Plaintiff's recitation of the facts is correct.

Second, Plaintiff alleges Defendants exceeded the scope of the Agreement. This again is clearly contradicted by the clear language of the Agreement. The Agreement explicitly stated in Section 1(A) that "ARTIST shall retain 0% of the copyright, 0% of the trademark, 0% of the patent and 5% of the net sales of WORKS for the first 18 months then it will revert to 4% of the net sales of the WORKS thereafter, and COMPANY shall retain 100% of the copyright, 100% of the trademark, 100% of the patent and 95% of the net sales of the WORKS for the first 18 months then it will revert to 96% of the net sales of the WORKS thereafter." (See Goldner Decl. ¶ 10). The Agreement further stated that "[i]f ARTIST creates a new work with a character or storyline that infringes on any of COMPANY's copyrighted properties, ARTIST agrees to transfer any copyright he may have in that new work to COMPANY." (*Id*). Section 2(B) of the Agreement explicitly states the Agreement includes "the rights, interest, and licenses therein and with respect thereto, including but not limited to the following: **Comic Book Rights**, Motion Picture Rights, Animation Rights, Graphic Rights, Sequel Rights, Remake Rights, Television Rights, Gaming Rights, Film Rights, Stage Rights, Radio Rights, Publication Rights, Interactive Rights, Music Rights, **Merchandising Rights**, and Digital Rights." (See Goldner Decl. ¶ 8). Section 2(Q) further requires Defendants to "take due diligence in protecting the WORKS." (See Goldner Decl. ¶ 12). Thus, despite Plaintiff's allegations, Defendants' actions of pursuing trademark protection was contractually required as Defendants promised to take due diligence in protecting the intellectual property assigned to them.

Even assuming Plaintiff is correct that the termination of the contract was correct, Defendants are entitled to a declaratory judgment declaring that all the intellectual property covered by the Agreement is the sole property of Defendants. This of course is made clear by the Agreement, which states in Section 2(I) that "[i]f, prior to the completion of the WORKS, any of the Parties shall voluntarily withdraw from the collaboration, then the other Party or Parties shall have the right to complete the WORKS alone or in conjunction with another collaborator(s), and ownership of the WORKS will revert solely to that Party or Parties." (See Goldner Decl. ¶ 29).

Because all actions taken by Defendants fall within the scope of the Agreement, Plaintiff has failed to sufficiently show a cause of action for Breach of Contract. As a result, the Defendants are entitled to summary judgment as a matter of law, as well as a declaratory judgment that Plaintiff's termination of the contract was invalid.

## CONCLUSION

For the above stated reasons, Plaintiff's motion for summary judgment should be denied in its entirety.

Dated: November 16, 2022  
New York, New York

GERARD FOX LAW P.C.

/s/ Ryan P. Dolan
Ryan P. Dolan  
Gerard P. Fox  
1880 Century Park East, Suite 1410  
Los Angeles, CA 90067  
Telephone: (310) 441-0500  
Facsimile: (310) 441-4447  
gfox@gerardfoxlaw.com  
blehman@gerardfoxlaw.com  
rdolan@gerardfoxlaw.com  

*Attorneys for Defendants*