UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ALEXANDER NORRIS, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No.  1:19-CV-05491 – PAE |
| | : | |
| Marc Goldner, Individually and as Officer of GOLDEN BELL ENTERTAINMENT, LLC, a California company and GOLDEN BELL STUDIOS, LLC, GOLDEN BELL ENTERTAINMENT, LLC., a California Company and GOLDEN BELL STUDIOS, LLC., | : : : : : : : | **DECLARATION OF MARC GOLDNER** |
| | : | |
| Defendants, | : | |
| | : | |
| | : | |

1

I, MARC GOLDNER, declare as follows:

1.       I am a Member of both Golden Bell Entertainment, LLC, and Golden Bell Studios, LLC.

2.       In February of 2017, Golden Bell Entertainment, LLC ("Golden Bell") purchased the intellectual property rights to four properties, including "Webcomic Name" and a game called Pretending to Grownup from Jason Wiseman which he claimed to have 100% "free reign" over. Pretending to Grownup contained thirty-two (32) guest artist cards, one of which was from Alex Norris ("Norris") containing the "disappointed blob" character uttering the phrase "Oh No." Underneath, the card contained an assignment from Norris to Wiseman for "any future use." See Exhibit 1.

3.       After purchasing the property from Wiseman, I reached out to Norris to ensure that any properties created under the Webcomic Name brand remained true to its original content. I explained that Golden Bell viewed Webcomic Name as a brand with potential for "stand alone [sic] comic, a children's book, or something else." See Exhibit 3.

4.       On July 3, 2017, Norris emailed me regarding the proposed contract, stating "[t]he main query I have about the contract is the part about 'the artist will retain 0% of the copyright….'". See Exhibit 4. In that same email, Norris noted that he had an existing publishing deal, saying "I will be working with publishers on a book and I am going to send them a copy of the contract before signing to make sure there is no breach of my contract with them." Id.

5.       I responded to Norris via email, noting "[t]o answer your question about copyright, Jason had agreed to us purchasing the rights for the game already and that part of the deal was already done." Id.

6. On August 9, 2017, Norris messaged me via Facebook and stated "[h]ey Marc! My agent just told me go ahead because it looks fine- should be able to sign tomorrow when I'm at my desk etc.!" See Exhibit 5.

7. On August 10, 2017, both Norris and Golden Bell entered into the Collaboration Agreement ("Agreement"). Section 3(B) of the Agreement called for Norris to create the files for the Game. See Exhibit 6.

8. The Agreement called for the creation, production, and distribution of a game and stuffed animals, as well as any tie-ins, spinoffs, or other commercial development based on Webcomic Name and its characters, which the Agreement referred to as "the WORKS." Additionally, the Agreement states that "the proceeds from the sale or any and all other disposition of the WORKS and the rights, interest, and licensed therein with respect thereto, including but not limited to the following: Comic Book Rights, Motion Picture Rights, Animation Rights, Graphic Rights, Sequel Rights, Remake Rights, Television Rights, Gaming Rights, Film Rights, Stage Rights, Radio Rights, Publication Rights, Interactive Rights, Music Rights, Merchandising Rights, and Digital Rights." Further, Section 3(D) of the Agreement granted Golden Bell options on Norris' next game-length work, book-length work, and manuscript-length work, which Norris later acknowledged. See Exhibit 7.

9. Shortly after the Agreement was executed sometime in early September of 2017, Golden Bell and Norris had a telephone conference wherein the parties had discussed plans related to building the multimedia brand of Webcomic Name. On the call the parties discussed utilizing Webcomic Name and its characters in other mediums. Myself, Norris, and Rachel Korsen, another Golden Bell Founding Member, discussed a daily calendar of Webcomic Name comics. There was mutual excitement over the idea, though Goldner noted that Golden Bell would need additional

comics from Norris because Norris had not published enough Webcomic Name comics to cover a whole year (365 Days), and Golden Bell and Norris agreed they'd be using the comics Norris published via his social media accounts for Webcomic Name. This was just one example of other commercial development of the WORKS. On that same call, Goldner explained that Golden Bell was a media company and not simply a game or toy company, reinforcing Golden Bell's first email to Norris that the company was planning on a 'sky is the limit' type of approach such as children's books, stand-alone comics, and other products including but not limited to animated content and digital derivatives. A common go-to-market strategy that Golden Bell uses as their business model.

10. The Agreement explicitly states in Section 1(A) that "ARTIST shall retain 0% of the copyright, 0% of the trademark, 0% of the patent and 5% of the net sales of WORKS for the first 18 months then it will revert to 4% of the net sales of the WORKS thereafter, and COMPANY shall retain 100% of the copyright, 100% of the trademark, 100% of the patent and 95% of the net sales of the WORKS for the first 18 months then it will revert to 96% of the net sales of the WORKS thereafter." See Exhibit 7. The Agreement further states that "[i]f ARTIST creates a new work with a character or storyline that infringes on any of COMPANY's copyrighted properties, ARTIST agrees to transfer any copyright he may have in that new work to COMPANY." See Exhibit 7.

11. Section 1(D) of the Agreement states "[a]ll future derivative works created by the parties will be defined by the percentages of the copyright and of the net profits defined in Section 1a of this Agreement listed above." Id.

12. Section 2(Q) of the Agreement states "COMPANY may protect, enforce, and pursue any legal action on behalf of the parties in relation to and in any aspect of the WORKS

such as the titles, licenses, and rights of WORKS. The COMPANY will hereby take due diligence in protecting the WORKS." Id.

13. Pursuant to these provisions, on November 30, 2017, Golden Bell filed a trademark application Serial No. 87703934 with the USPTO on an intent to use basis for the mark "Webcomic Name" in class 028. The USPTO approved that application, with Registration No. 5629281 on December 11, 2018.

14. The Agreement also reflects the parties desire to expand the Webcomic Name brand. Section 2(B) of the Agreement states that the parties shall share the proceeds, rights, interest, and licenses to the WORKS and its characters in a number of different mediums, such as motion pictures, animation, gaming, television, sequels, comic books, and more.. Section 3(C) of the Agreement, states "ARTIST shall submit to COMPANY all sequels to the WORKS or other works using characters that appear in the WORKS….". See Exhibit 7.

15. In addition to the WORKS and any subsequent work done by Norris which contains the characters from the WORKS, Section 3(D) of the Agreement also gave Golden Bell the option to publish Norris' next "game-length," "book-length," and "manuscript-length" works. See Exhibit 7.

16. Norris and Golden Bell agreed to produce five plush stuffed animal toys: a pink blob, an orange blob, a sexy pink blob, a cat, and a word bubble featuring the characters' catch phrase "Oh No" on one side, and "O kay" on the other See Exhibit 8. Norris drew the initial sketches of the toys, and provided them to Golden Bell, which made prototypes with numerous revisions and editorial taking into account how to best bring to life the Webcomic Name characters. See Exhibit 9.

17. However, progress on the game files was slow. in a December 11, 2017 email, just two months before the deadline for completion of the game, Norris admitted to not working on the game at all. See Exhibit 10.

18. On April 5, 2018, Norris finally stated that he would draw the cards in black and white sketches to allow for creation of a test game, "and then finalise [sic] them." See Exhibit 11. On May 14, 2018, Norris stated that he could "get the sketched cards ready for testing in two weeks…." See Exhibit 12.

19. Norris eventually delivered 377 sketch black and white cards to Golden Bell on June 21, 2018 when the final files, which are *not* sketch black and white cards, were supposed to be delivered by February 17, 2018. As Norris previously acknowledged, black and white sketches were not "final" cards. In order to produce the game, the cards would have to be colored and properly lined before being converted into a format that was suitable for mass printing.

20. On October 1, 2018, Norris emailed Defendants with two attached invoices for advances contained within the contract. To my knowledge, no files had been uploaded, or they had been deleted prior to our ability to access them. I responded, explaining to Norris that Defendants "MUST receive the final files before paying as required in the contract allowing us to review and have 30 days to submit payment. We've been told numerous times the files were done and uploaded. Please upload the files today as this was the final deadline that you said it would be. Then we will review and have it paid within 30 days as per the contract once approved." See Exhibit 13.

21. Section 1(G) of the Agreement provides that Norris "will receive a $3,125 upfront advance against net sales royalties within 30 days of the COMPANY receiving the final files noted above for 'Webcomic Name Game.'" See Exhibit 7.

6

22. Norris admitted that the files allegedly uploaded were not the complete final files, stating "[t]hese are the cards that were in the last draft, and not all cards are completed yet due to a rewrite." Id.

23. Despite repeated insistences from Norris that the files were uploaded, the dropbox link that had been used to deliver files between Norris and Defendants did not contain any such files. To date, Defendants have not received the alleged 400 files. Further, the parties had agreed the game would contain 500 cards total.

24. The requirement for review and approval of any files associated with the game was not new and could not have come as a shock to Norris. Just several months prior to Norris demanding payment, on June 27, 2018, I emailed Norris and Wiseman an email with extensive notes on the game and how it functions. See Exhibit 14. This review and editorializing was standard process in the development of any properties associated with the brand, including stuffed animals and the game.

25. In addition to failure to provide final files for the cards for the game, Norris has failed to deliver final files necessary to complete the game, such as art for a rule book, art for game tokens, art for the back of two different sets of cards, final logo, final font with punctuations, and incomplete sketches of a box, which is missing art for the sides and back of the box, with only a rough sketch for the front of the box.

26. Further, of the files that were provided by Norris, Golden Bell retained sole ownership of the artwork created for those files pursuant to Section 2(C) of the Agreement. See Exhibit 7.

27. On April 2, 2019, Andrews McMeel Publishing published Norris' book titled "Oh No," which featured characters and themes set to appear in the game, stuffed animals, calendar,

and other properties. During discovery, it was discovered that Norris had not entered into a publishing agreement with Andrews McMeel until October 31, 2017, more than two months after executing his Agreement with us. See Exhibit 15. This is in direct contrast to what Norris initially told us, when he stated that he already had a contract with a publisher and was a violation of Section 3(D) of the contract, among other sections. See Exhibit 7.

28. Indeed, despite entering into a publishing agreement after entering into the Agreement with us, Norris was aware of the provision of the contract requiring him to provide us with an option to publish his next book-length work. On October 4, 2018, Norris emailed Golden Bell stating "I am currently self-publishing a book called 'Animals' which is a 40-page book of comics about animals. The contract says you require an option on my next work, so here it is." See Exhibit 16. Despite my response that we would be exercising the option to publish the book, Norris never provided the any files related to the book. Approximately seven months later, Norris and Andrews McMeel published "Oh No."

29. Section 2(I) of the Agreement states "[i]f, prior to the completion of the WORKS, any of the Parties shall voluntarily withdraw from the collaboration, then the other Party or Parties shall have the right to complete the WORKS alone or in conjunction with another collaborator(s), and ownership of the WORKS will revert solely to that Party or Parties." See Exhibit 7.

30. Aside from a cease and desist letter to Andrews McMeel regarding publication of "Oh No," which contained intellectual property assigned to us via the Agreement as well as being granted to McMeel in violation of our option under Section 3(D) of the Agreement, at no point did Golden Bell seek to compete with or prevent Norris from deriving revenue from Webcomic Name in categories unrelated 2(B) and 1(A) of the Agreement, the ohnoshop.com, or his Patreon accounts.

31. The marks "Oh No" and "Webcomic Name" appear in a guest artist card for the game Pretending to Grownup, a property acquired by Golden Bell from Wiseman and has continually been sold for years. The card, which was assigned to Wiseman by Norris and then sold to Golden Bell, features the "pink blob" and "orange blob," who also appear in artwork meant for both the game and stuffed animals, are seen uttering the phrase "Oh No" alongside a tag "artwork courtesy of Webcomic Name." To date, Pretending to Grownup has sold no less than 7,940 units with a gross revenue of approximately $204,747.75 and has been sold and is still available for purchase from a number of different outlets, such as goldenbelldirect.com, amazon.com, and walmart.com. Pretending to Grownup has also been sold at stores such as Hot Topic, by Alliance Game Distributors which sells to many friendly local game stores around the United States, at major consumer conventions such as New York Comic Con, PAX East, PAX Unplugged, and PAX South, business-to-business tradeshows such as New York Toy Fair, and has also been sold both domestically and internationally to thousands of customers around the world.

I declare the following statements are true to the best of my recollection under the penalty of perjury under the laws of the United States of America.

Dated: November 16, 2022  
New York, New York

*Marc Goldner*  
Marc Goldner