UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ALEXANDER NORRIS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No.  1:19-CV-05491 - PAE |
| | : | |
| Marc Goldner, Individually and as Officer of GOLDEN BELL ENTERTAINMENT, LLC, a California company and GOLDEN BELL STUDIOS, LLC, GOLDEN BELL ENTERTAINMENT, LLC., a California Company and GOLDEN BELL STUDIOS, LLC., | : | |
| | : | |
| Defendants, | : | |
| | : | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56.1(b) of the Local Rules of the United States Courts for the Southern District of New York, Defendants MARC GOLDNER, GOLDEN BELL ENTERTAINMENT, LLC, AND GOLDEN BELL STUDIOS, LLC, hereby respond as follows to each statement numbered 1 through 69, in Plaintiff's Statement of Undisputed Material Facts In Support of it's Motion for Summary Judgment in the above captioned action:

1. Norris is a resident of the United Kingdom. Declaration of Alexander Norris, ("Norris Decl."), at ¶2.
   **Response No. 1: Undisputed.**

2. Norris is a visual artist and a comics illustrator that has authored short stories, webcomics, comic books and strips. Norris was initially known as the creator of *Dorris McComics*, a pseudonym under which Norris would share entertaining and funny comics through social

media. Norris Decl. at ¶3.

     **Response No. 2: Undisputed.**

3.   Norris is the creator of the viral webcomic "*Webcomic Name*." Norris Decl. at p. 4.
     **Response No. 3: Undisputed.**

4.   Norris maintains social media accounts for *Webcomic Name*, and those social media accounts have more than half a million followers. Norris Decl. at ¶4.
     **Response No. 4: Undisputed.**

5.   For the first time in 2015, Norris drew the character, the often-disappointed Blob, which consistently uses the phrase "Oh No" through a series of comic strips, which is recreated below. Norris Decl. at ¶5; *see also* Ex. 1 at pg. 2.



     **Response No. 5: Undisputed.**

6.   In 2016, Norris formally launched his *Webcomic Name* comic strip. Norris Decl., at ¶6; *see also* Ex. 2.
     **Response No. 6: Undisputed.**

7.   Shortly after its creation, *Webcomic Name* was featured in various internet websites such as *Comics Blog*, *Bored Panda*, *GoComics, It's Nice That* and *The Nib*. Norris Decl. at ¶6.
     **Response No. 7: Defendants' lack sufficient information to form a belief as to the truth of this statement.**

8.   *Webcomic Name* started as a weekly comic strip, which soon grew to become the brand under which Norris popularized his illustrations, literary works and workshops. Norris Decl. at ¶6.
     **Response No. 8: Undisputed.**

9.   In 2016 Norris created the "Oh No" online shop, a marketplace for "Webcomic Name" related merchandise with items such as pins, stickers, hats, posters, books and others. Norris Decl. at ¶5.

**Response No. 9: Undisputed.**

10. In 2016, Norris acquired the domain name "webcomicname.com" to promote his works and related workshops, and since that point, Norris has promoted his works under "*Webcomic Name*." Norris Decl. at ¶7.
    **Response No. 10: Defendants' lack sufficient information to form a belief as to the truth of this statement.**

11. In 2018, Norris copyrighted some of the Webcomic Name comic strips and illustrations under registration No. VAu 1-337-956. Norris Decl. at ¶7; *see also* Ex. 3. Those copyrighted works included the comic strips Different, Dog, Imagination, Impossible and Procrastination, which are recreated below:











**Response No. 11: Undisputed with the clarification that the images copyrighted by Plaintiff rightfully belong to Defendants'.**

12. In early 2017, Norris agreed to collaborate with Jason Wiseman ("Wiseman"), who Norris recognized as a well-known card and table game creator, to create a table top card game

(the "Game") based on the illustrations and characters of Norris' webcomic, "*Webcomic Name*". Norris Decl. at ¶8.

**Response No. 12: Defendants' lack sufficient information to form a belief as to the truth of this statement as no communications between Norris and Wiseman were produced in discovery.**

13. Since the Game would incorporate the style, concept and characters of "Webcomic name," Norris and Wiseman used "Webcomic Name Game" as a placeholder reference. Norris Decl. at ¶8.

    **Response No. 13: Defendants' lack sufficient information to form a belief as to the truth of this statement as no communications between Norris and Wiseman were produced in discovery.**

14. Norris and Wiseman planned to jointly publish the Game via Kickstarter and commercialize it through Wiseman's distribution channels. Norris Decl. at ¶9.

    **Response No. 14: Defendants' lack sufficient information to form a belief as to the truth of this statement as no communications between Norris and Wiseman were produced in discovery.**

15. Subsequently, Wiseman informed Norris that Wiseman was considering Defendants to publish and distribute the Game. Norris Decl. at ¶9.

    **Response No. 15: Defendants' lack sufficient information to form a belief as to the truth of this statement as no communications between Norris and Wiseman were produced in discovery.**

16. On or around February 11, 2017, Wiseman signed an agreement with defendant Golden Bell Entertainment, LLC ("GB Entertainment") pursuant to which Golden Bell agreed to purchase four table card games from Wiseman, three of which were either in their conceptual or in development phase. Norris Decl. at ¶11.

    **Response No. 16: Undisputed, with clarification that Wiseman informed Golden Bell that he had "100% free reign" over Webcomic Name.**

17. Wiseman recruited Norris to develop the Game and deliver it to GB Entertainment and in return GB Entertainment would, handle the publishing, printing and sales of the Game. Norris Decl. at ¶11.

    **Response No. 17: Undisputed with the clarification that Golden Bell reached out to Norris to collaborate on the game as well as develop other properties under the "Webcomic Name" brand, as seen in the Collaboration agreement signed between the parties.**

18. Wiseman and Norris were given the freedom to create the Game and receive the benefit of a small advance and future royalties from GB Entertainment with a $500,000 cap in revenue. Norris Decl. at ¶11

**Response No. 18: Disputed. Wiseman and Norris were tasked with creating the game, though the creation was to be a collaboration between all parties, with Golden Bell providing edits, comments, and input as to the creation and play of the game.**

19. In the summer of 2017, Norris began work on a book project which would go on to contain his most popular *Webcomic Name* comics. Norris Decl. at ¶12.

**Response No. 19: Defendants' lack sufficient information to form a belief as to the truth of this statement.**

20. In the summer of 2017, Norris and his editor negotiated a publishing agreement with Andrews McMeel Publishing, LLC, a division of Andrews McMeel Universal, a Kansas based renowned publisher of comic strips and producer of book collections including *Calvin and Hobbes*, *Peanuts*, the *Far Side* and other significantly popular comics ("McMeel"). Norris Decl. at ¶12.

**Response No. 20: Defendants' lack sufficient information to form a belief as to the truth of this statement as no discovery concerning these negotiations was produced.**

21. Following the negotiations, Norris signed a publishing agreement with McMeel, and his book, entitled "Oh No" was published on April 2, 2019. Norris Decl. at ¶12.

**Response No. 21: Undisputed, with clarification that the publishing agreement with McMeel was not signed until October 31, 2017, over two months after entering into the Collaboration Agreement.**

22. On June 26, 2017, defendant Marc Goldner insisted that Norris execute a separate Collaboration Agreement with GB Entertainment to formally engage Norris to illustrate the Game. Norris Decl. at ¶13.

**Response No. 22: Undisputed, with clarification that Goldner did not "insist" Norris execute a separate Collaboration Agreement. Goldner reached out to Norris to express his excitement and the potential he saw for Webcomic Name, and wanted to work with Norris directly.**

23. Goldner explained he wanted to make and sell plush toys of the main character in the Game and wanted permission from Norris to do so. Goldner referred to the plush dolls as *the "Webcomic Name Stuffed Animals."* Norris Decl. at ¶13.

**Response No. 23: Disputed. Golden Bell had planned to make multiple plush toys, as evidenced by the reference being to "Animals" rather than the singular Animal. At no point did Golden Bell agree that the plush dolls would be limited to one single character for production or distribution. The plan, as communicated to Norris, was**

**always for multiple characters to appear in the form of plush dolls. They were not simply promotional. They did not reach out to Norris for his "permission" to do so.**

24. On July 3, 2017, Goldner sent Norris the proposed Collaboration Agreement. Norris Decl. at ¶14.
    **Response No. 24: Undisputed.**

25. After reviewing it, Norris informed Goldner that Norris did not want the proposed Collaboration Agreement to jeopardize Norris's existing negotiations with McMeel for the publication of his book. Norris Decl. at ¶14; *see also* Ex. 4 at pg. 1. Norris's email to Goldner is set forth below:

    > "The main query I have about the contract is the part about 'the artist will retain 0% of the copyright" and similar clauses. Obviously the game will heavily feature elements that are part of Webcomic Name already, and I want to make it clear that in no way does Golden Bell take ownership of any of the characters, images or story content except in its application in a tabletop game. At the moment the wording is very broad and could apply to Webcomic Name in general, rather than simply in relation to a tabletop game. I will be working with publishers on a book and I am going to send them a copy of the contract before signing to make sure there is no breach of my contract with them. Obviously the book and tabletop game are very separate but will contain the same elements and I don't want signing this contract to come back to bite me in the future!"

    **Response No. 25: Undisputed, with clarification that this email does not indicate that Norris "did not want the proposed Collaboration Agreement to jeopardize Norris's existing negotiations with McMeel for the publication of his book." Rather, Norris very clearly states that he already has a publication contract executed, saying "I will be working with publishers on a book and I am going to send them a copy of the contract before signing to make sure there is no breach of my contract with them."**

26. Goldner responded to Norris's July 3, 3017 inquiry via email on July 11, 2017, in which Goldner stated Norris was "in the free to and clear to work on your property outside of the context of our contract" and explained that the contract is specifically for the Game and stuffed animal. Goldner further informed Norris that Goldner had included the following language in the Collaboration Agreement, "Artist has the right to pursue his Comic "Webcomic Name" outside of the context of this agreement". Norris Decl. at ¶15; *see also* Ex. 4 at pg. 1. Goldner's email to Norris is set forth below:

    > "I am resending the contract with now with this new language and also specified its for game and stuffed animal.

    A.  ARTIST has the right to pursue his Comic 'Webcomic Name' outside of the context of this agreement.

To answer your question about copyright, Jason had agreed to us purchasing the rights for the game already and that part of the deal was already done. If you have any questions please let me know and I hope to work on any issues that may crop up and solve them as much as possible. You are obviously in the free and clear to work" "on your property outside of the context of our contract."

**Response No. 26: Undisputed, with the clarification that the email speaks for itself and should be read in its entirety.**

27. Relying on Goldner's assurances that he was "free and clear" to exploit his property outside the context of the Collaboration Agreement, which was limited to the game and the stuffed animals, Norris executed the Collaboration Agreement on August 10, 2017. Norris Decl. at ¶16; *see also* Ex. 5.
**Response No. 27: Disputed. The Agreement, which is clear, is not limited to the game and stuffed animals.**

28. The Collaboration Agreement defined the "WORKS" as follows:

"…with respect to the production of the properties tentatively entitled "Webcomic Name Game" and 'Webcomic Name Stuffed Animals' (the 'WORKS') to be created by ARTIST, and any tie-ins, spin offs, or other commercial development of the WORKS such as Sequels, Prequels, Reboots, Remakes, and Expansions."

Ex. 5 at pg. 1.

**Response No. 28: Undisputed.**

29. The Collaboration Agreement set forth the rights that Norris assigned to GB Entertainment as follows:

"Percentage, ownership, registration and assignment of 'WORKS' with the United States Copyright Office and United States Patent and Trademark Office are defined and clarified as the joint work of the parties. Thus, ARTIST shall retain 0% of the copyright, 0% of the trademark, 0% of the patent and 5% of the net sales of WORKS

for the first 18 months then it will revert to 4% of the net sales of the WORKS thereafter, and COMPANY shall retain 100% of the copyright, 100% of the trademark, 100% of the patent, and 95% of the net sales of WORKS for the first 18 months then it will revert to 96% of the net sales of the WORKS thereafter. ARTIST assigns to COMPANY their initial rights of the WORKS as stated above in this section 1A upon the signing of this AGREEMENT."

Ex. 5 at pg. 1, section 1.A..

**Response No. 29: Undisputed, with clarification that this is not the only provision of the Collaboration Agreement in which rights are assigned to GB Entertainment. This only represents a portion of the rights conferred and is not an exhaustive list.**

30. The Collaboration Agreement was drafted by GB Entertainment. Declaration of Kyle G. Kunst ("KGK Decl."), Ex. 21 at 64:13-19.
    **Response No. 30: Undisputed, with the clarification that Norris informed Defendants that both a publisher and his agent would or had reviewed the Agreement.**

31. The Collaboration Agreement required GB Entertainment to pay Norris for his work on the Game, as follows:

    "The ARTIST will receive a $3,125 upfront advance against net sales royalties within 30 days of the COMPANY receiving the final files noted above for 'Webcomic Name Game' for a game developed with Jason Wiseman and the ARTIST known as Alex Norris of Webcomic Name tentatively titled 'Webcomic Name Game' by the COMPANY. The COMPANY will then pay an additional $2,500 to the ARTIST upon delivery to the COMPANY of the final print-ready files, the PSD files, the AI files, the InDesign Files, and any other files pertaining to the game created by the ARTIST and Jason Wiseman."

    Ex. 5 at pg. 1, section 1.G.

    **Response No. 31: Undisputed.**

32. "Final" in section 1.G of the Collaboration Agreement is not defined. See Ex. 5 at pg. 1, section 1.G.
    **Response No. 32: Undisputed.**

33. Complimentary copies of the Game were to be provided to Norris as follows:

The ARTIST will be given a reasonable number of items of each product produced free of charge courtesy of the COMPANY at the time of the WORKS release. This will range from at least 725 physical copies of each of the game "Webcomic Name Game" in printed form, as well as the ARTIST will receive only 10 free copies of a licensed property relating to the WORKS and not any free copies of other properties produced by COMPANY that are not related to the WORKS.

Ex. 5 at pg. 5, section 6.B.

**Response No. 33: Undisputed.**

34. On October 2, 2018, Norris provided Goldner with the final files of the Game, which included 400 "panels." Norris Decl. at ¶19; *see also* Ex. 6.
**Response No. 34: Disputed. Norris never provided these files. When Golden Bell attempted to access the Dropbox link to which these files were allegedly contained, the link led only to an empty folder. Norris additionally admitted that not all the files were provided in the folder. Further, the files were never alleged to contain additional files required such as files for the box, rulebook, token art, etc.**

35. Although Norris provided GB Entertainment with all 400 illustration panels on or about October 2, 2018, Norris was never paid for his work due to Goldner's claim those files were not "final." Norris Decl. at ¶20; KGK Decl., Ex. 21 at 82:1-5.
**Response No. 35: Disputed. Norris never provided the alleged files. Further, Goldner never claimed that the files were not final. Goldner responded to Norris via email that "we MUST receive the final files before paying as required in the contract allowing us to review and have 30 days to submit payment. We've been told numerous times the files were done and uploaded. Please upload the files today as this was the final deadline that you said it would be. Then we will review and have it paid within 30 days as per the contract once approved."**

36. Without Norris's knowledge or permission, on November 30, 2017, GB Entertainment applied for the registration of the trademark "Webcomic Name" in international class 028 for Board games; Card games; Game cards; Party games; Plush dolls; Plush toys; Stuffed dolls and animals; Stuffed toy animals; Tabletop games; Soft sculpture plush toys; Stuffed and plush toys ("Mark 281"), and that Mark 281 had been first been used "in commerce" on July 12, 2017. Norris Decl. at ¶22; *see also* Ex. 7 at pg.'s 1-2; KGK Decl., Ex. 7B at pg. 1.
**Response No. 36: Disputed. Norris had knowledge and provided permission when assigning "100% of the copyright" to Golden Bell.**

37. In support of the application for Mark 281, Goldner stated that GB Entertainment is the owner of the trademark sought to be registered. Norris Decl. at ¶22; *see also* Ex. 7 at pg.'s 1-2.and Ex. 7-B at pg. 1.

**Response No. 37: Undisputed.**

38. In support of the application for Mark 281, Goldner filed specimens meant to show that mark's use "in commerce." KGK Aff., Ex. 7B at pg.'s 5-9.
**Response No. 38: Undisputed.**

39. Among the specimens filed in support of the application for Mark 281 was a photograph taken of a GB Entertainment booth at the *Keystone Comic-con* convention, copied and pasted below:



KGK Decl., Ex. 21 at 107:22-109:12; Ex. 7B at pg. 9.

**Response No. 39: Undisputed.**

40. Goldner testified that no sales occurred at that conference:

"Q. Do you recall if any Webcomic Name merchandise was sold at this Keystone Comic-Con at which this photo was taken?

A. I honestly have to almost comically, internally laugh. This is insulting that you're accusing us of making merchandise and not telling him. No. He never --

MR. FOX: Marc. Marc. Marc. Marc. Marc. Marc. Marc. Marc. Marc --

A. This is insulting."

KGK Decl., Ex. 21 at 109:5-16; *see also* Ex. 7B at pg. 9.

**Response No. 40: Disputed. This misstates Goldner's testimony.**

41. Goldner testified that no sales of the purported "Webcomic Name Game" have ever occurred:

Q. Okay. So the Webcomic Name Game as you sit here today is not in a form in which it can be sold; is that correct?
A. As of today I don't believe so. I would have to check with my partners as they run the day-to-day operations and the art and design. The graphic design, I don't deal with that. I just helped come up with the game itself.
Q. Okay. So as you sit here today to your knowledge has the Webcomic Name Game ever been sold in any form?
A. No, the game has not been sold. It has been marketed, but it has not been sold. We have not done a mass production copy and sold it to consumers or B-to-C or B-to-B retailers. That has not occurred yet.

KGK Decl., Ex. 21 at 75:3-20; *see also Id.* at 74:8-15:

Q. Okay. And is it accurate that 6B provides that Mr. Norris will be provided with at least 725 physical copies of the Webcomic Name Game in printed form?
A. Once the game would be finished with final files which he never completed so there's nothing to provide him complimentary units of.

**Response No. 41: Undisputed, with clarification that Norris' failure to deliver complete files is the reason as to why the game has not been produced and Norris has not received physical copies of the game.**

42. Goldner testified that no sales of any Webcomic Name plush toys have occurred:

Q. Okay. So with respect to stuffed dolls and animals, has Golden Bell Entertainment, LLC, sold any Webcomic Name stuffed dolls and animals as of December 11, 2018?
A. No, we have not sold because we haven't manufactured them or mass manufactured.
Q. With respect to stuffed toy animals -- which I believe we have not got to yet -- has Golden Bell Entertainment, LLC, sold any Webcomic Name stuffed toy animals as of December 11, 2018?
A. Again, we have not mass manufactured so we could not have sold them.
Q. Is that a no?
A. I guess it's a no. As I said, it's the same answer as before. We solicited. The answer is no.

KGK Decl., Ex. 21 at 142:2-21.

> **Response No. 42: Undisputed, with the clarification that Golden Bell Entertainment, LLC does not have a sales operation.**

43. In support of the application for Mark 281, Goldner submitted photos of plush toys, and photos taken of tags and a purported box that a table top game would be placed in.
KGK Decl., Ex. 7B at pg.'s 5-10.

> **Response No. 43: Undisputed.**

44. The USPTO issued a registration for *Webcomic Name* on December 11, 2018, Reg. No. 5629281, in favor of GB Entertainment, in international class 028 for Board games; Card games; Game cards; Party games; Plush dolls; Plush toys; Stuffed dolls and animals; Stuffed toy animals; Tabletop games; Soft sculpture plush toys; Stuffed and plush toys. Norris Decl. at ¶24; *see also* Ex. 8.

> **Response No. 44: Undisputed.**

45. As of December 11, 2018 until the present, GB Entertainment never created, nor sold, a board games, card games, game card, party games, plush doll, plush toys, stuffed doll and/or animals, stuffed toy animal, tabletop game, soft sculpture plush toy, or stuffed and plush toys with the *Webcomic Name* mark. KGK Decl., Ex. 21 at 129:18-144:25.

> **Response No. 45: Disputed. The Webcomic Name mark is contained in the Pretending to Grownup card game, which has been sold and is still available in the marketplace.**

46. On October 9, 2018, Goldner, on behalf of GB Entertainment filed Application Serial. No. 88147369 (the "369 Application") with the USPTO, for the mark "Webcomic Name" for Comic books; Comic strips; Comic strips' comic features; Comics; Newspaper comic strips in class 016 and T-shirts in class 025. In that application, Goldner claimed "first use in commerce" as of July 26, 2017. Norris Decl. at ¶25; *see also* Ex. 9 at pg.'s 1-2.

> **Response No. 46: Undisputed.**

47. In support of Application 369, Goldner stated that GB Entertainment is the owner of the trademark sought to be registered;

> To the best of their "knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."
>
> GB Entertainment's first use the mark in commerce as early as June 26, 2016 in connection with Comic books; Comic strips; Comic strips'

comic features; Comics; Newspaper comic strips and T-shirts on June 26, 2016;

The mark was in use in commerce at the time of the application;

All of the facts recited in the application were accurate.

KGK Decl., Ex. 22 at ¶59; *see also* Ex. 23 at ¶59.

**Response No. 47: Undisputed.**

48. In support of the application for the 369 Application, Goldner filed screenshots of Norris's Facebook page and Patreon account as a specimen of GB Entertainment's use. Norris Decl. at ¶25; *see also* Ex. 9 at pg.'s 7-9.

**Response No. 48: Undisputed.**

49. Goldner did not have permission to take the screenshots submitted in support of the 369 Application. KGK Decl. Ex. 21 at 116:9-124:9; *see also Id.* at 123:12-25.

> Q. So did you also take a screenshot of this Patreon account that's on page eight of nine?
> A. I believe at some point I did. The date, I do not remember what date I took the screenshot.
> Q. And did Mr. Norris also refuse to give you access to this Patreon account?
> A. He refused to give us access to anything. I don't remember ever asking for Patreon because we wanted him to be able to make money on the Patreon like I said earlier today.

**Response No. 49: Disputed. Goldner did not receive express permission from Norris. Goldner did have permission from Norris through property assigned to Golden Bell via the Collaboration Agreement. This is further evidenced by a recorded phone call in which the parties discuss creating a daily calendar using comics created by Norris and published via his social media.**

50. On November 8, 2018 GB Entertainment filed Application Serial No. 88975215 (the "215 Application"), this time for the phrase "OH NO" in International Classes 16 and 28, for "Bookmarkers; Bookmarks; Comic books; Comic magazines; Comic strips; Comic strips' comic features; Comics; Stickers; Newspaper comic strips, T-shirts; Graphic T-shirts; Short-sleeved or long-sleeved t-shirts. Plush toys; Stuffed toy animals; Stuffed and plush toys; Toy stuffed animals." Norris Decl. at ¶26-27; see also Ex. 10 at pg.'s 1-2.

**Response No. 50: Undisputed.**

51. In support of the 795 Application, Goldner stated that

GB Entertainment is the owner of the trademark sought to be registered;

To the best of their "knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."

GB Entertainment's first's use of the Mark was as early as June 26,2016 and that its first used the mark in commerce in connection to Bookmarkers; Bookmarks; Comic books; Comic   magazines; Comic strips; Comic strips' comic features; Comics; Stickers; Newspaper comic strips and T-shirts; Graphic T-shirts; Short-sleeved or longsleeved t-shirts on June 26, 2016;

The mark was in use in commerce at the time of the application;

All of the facts recited in the application were accurate.

KGK Decl., Ex. 22 at ¶65; *see also* Ex. 23 at ¶65.

**Response No. 51: Undisputed.**

52. In the 215 Application, GB Entertainment again filed screenshots of Norris's Facebook page and website as purported specimens of GB Entertainment's use. Norris Decl. at ¶26-27; *see also* Ex. 10 at pg.'s 8-12.

**Response No. 52: Undisputed.**

53. Defendants did not obtain permission to take the screenshots submitted in support of the 215 Application. KGK Decl., Ex. 21 at 169:3-170:24.

**Response No. 53: Disputed. Goldner did not receive express permission from Norris. Goldner did have permission from Norris through property assigned to Golden Bell via the Collaboration Agreement. This is further evidenced by a recorded phone call in which the parties discuss creating a daily calendar using comics created by Norris and published via his social media.**

54. Norris learned of GB Entertainment's trademark applications for the first time in November 2018. Norris Decl. at ¶28.

**Response No. 54: Disputed. On a recorded call on February 26, 2018 Norris discussed Golden Bell's trademark application with Goldner.**

55. After learning of those applications, Norris applied to the USPTO to trademark the phrase "Webcomic Name" for the services of "providing online non-downloadable webcomics and comic strips, books, reviews, periodicals and magazines in international class 041 and for comic books; comic strips and comic strip's comic features, appearing in print

media, namely, comic books, books, newspapers, magazines" in international class 016, Application Serial No. 88216127 (the "127 Mark"). Norris Decl. at ¶28; *see also* Ex. 11 at pg. 1.

**Response No. 55: Undisputed, with clarification that Norris knew of the trademark application no later than February 26, 2018.**

56. The USPTO has rejected Norris's application for the 127 Mark because of the likelihood of confusion with GB Entertainment's Mark 281. The office action is currently pending. Norris Decl. at ¶29; *see also* Ex. 11 at pg. 4.

**Response No. 56: Undisputed.**

57. On March 25, 2019, Norris commenced a cancellation proceeding before the Trademark Trial and Appeal Board, which Golden Bell moved to dismiss, which has been stayed pending the outcome of this lawsuit. Norris Decl. at ¶39; *see also* Ex. 13 at pg. 1; Ex. 14.

**Response No. 57: Undisputed.**

58. Norris created several additional images. See Norris Decl. ¶31, Ex. 15:



**ILLUSTRATION 1.**

**Unpublished Illustration.  Facebook "banner" for Webcomic Name.**



**ILLUSTRATION 2**

**Unpublished Illustration.  Webcomic Name Facebook Profile.**



**ILLUSTRATION #3**
**Published Illustration. Copyrighted in the US in 2018.**



**ILLUSTRATION # 4. "INVASIVE"**
**Unpublished webcomic strip.**



**ILLUSTRATION #5**
**Unpublished Illustration./ Banner for plaintiff's Patreon page.**



**ILLUSTRATION # 6 "NEW LIFE"**
**Unpublished**.

Norris Decl. at ¶31; *see also* Ex. 15, pg.'s 1-3.

   **Response No. 58: Undisputed.**

59. Norris made Illustration #1 exclusively for the "Webcomic Name" Facebook profile banner Illustration #2 was made exclusively for use as the "Webcomic Name" Facebook profile image. I have never used these two illustrations anywhere else. Norris Decl. at ¶32.

   **Response No. 59: Disputed. A sketch of the pink blob character in the exact pose was provided to Golden Bell for creation of a "sexy blob" plush doll. The "pink blob" character stating the phrase "Oh No" regularly appears in draft files of game cards and the game box provided to Defendants by Plaintiff.**

60. GB Entertainment submitted Illustration #1 and Illustration #2 to the USPTO, without Norris's permission, in support of the 369 Application. Compare Illustration #1 and Illustration #2 in Ex. 15 with Ex. 9, pg. 7.

   **Response No. 60: Undisputed, with respect to Golden Bell submitting the images to the USPTO. Disputed as to the permission, as the Agreement between the parties assigned the property to Golden Bell.**

61. Norris have never sold, licensed or offered for download the webcomics "Invasive" and "New Life", Illustration #3 and #6 respectively. Norris Decl. at ¶33.

**Response No. 61: Disputed, as those properties are covered by the Agreement.**

62. Illustration #4 featuring the Blog character with the hearts and stars is a banner Norris created exclusively for the Webcomic Name Patreon page. Norris have never sold, licensed or offered for download this illustration. Norris Decl. at ¶32.

**Response No. 62: Disputed as those properties' are covered by the agreement.**

63. Illustration #4 and Illustration #5 were submitted by Defendants with the 369 Application. See Ex. 10 at pg.'s 11 and 12; *see also* Ex. 15 at pg.'s 2-3.

**Response No. 63: Undisputed.**

64. The specimens that GB Entertainment filed in Mark 281 included screenshots of Norris's ohnoshop.com website, which contained the Webcomic Name comics Different, Imagination, Impossible and Procrastination, that had been copyrighted by the United States Copyright Office under registration No. VAu 1-337-956. *See* Ex. 3; *see also* KGK Decl. at 21 at 165:21-166:2.

> Q. Okay. Let's -- so this is -- well, we won't get into this. So let me go back down to -- okay. Did you obtain Mr. Norris's permission before taking this screenshot on page 12?
> A. I did not ask him to take a screenshot of the website.
> Q. I'm sorry. I missed that last part. You said you did not?
> A. I did not ask him, can I take a screenshot of a website that is pubically [sic] available, no.

*See also* Ex. 23, pg. 12:

**Response No. 64: Undisputed, with clarification that it is unclear why testimony from Goldner's deposition is included here.**



65. GB Studios also used Illustration #1 and used Norris's trademarks "Oh No" and "Webcomic Name" to promote merchandize on its website http://www.goldenbellstudios.com and at conventions (for instance at the PAX East Convention) without my knowledge or consent. Norris Decl. at ¶36; *see also* Ex. 16.

**Response No. 65: Disputed. Norris does not have any trademarks to "Oh No" or "Webcomic Name." As Plaintiff noted, their trademark application was denied by the USPTO. Any promotion on Golden Bell's website was for merchandise covered by Agreement.**

66. A few days after Norris filed the application to cancel Mark 281, on March 28, 2019, Andrea Timpone of Garson, Segal, Steinmetz, Fladgate LLP., as counsel for Defendants, sent a letter to McMeel demanding that McMeel refrains from publishing my book and claiming that the book infringes on Defendants trademark "Webcomic Name." Norris Decl. at ¶37; *see also* Ex. 17.

**Response No. 66: Undisputed.**

67. On March 29, 2019, Ms. Timpone sent a letter to Norris's attorneys claiming that Golden Bell was the rightful owner of the "Webcomic Name," that Golden Bell had acquired trademark rights over the mark "Oh No," and that the copyright registration of Norris's webcomic strips compilation was invalid. Norris Decl. at ¶37; *see also* Ex. 17.

**Response No. 67: Undisputed.**

68. On April 1, 2019, Norris's counsel responded to Timpone and informed her that, among other things:

> "This letter also serves as a notice that our client hereby terminates the Collaboration Agreement with Golden Bell Entertainment, LLC ("Golden Bell") for cause, to the extent it ever qualified as an actual agreement between the parties. Golden Bell is improperly attempting to use the Collaboration Agreement as a vehicle to misappropriate the intellectual property rights belonging to Mr. Norris."

Norris Decl. at ¶38; *see also* Ex. 20.

**Response No. 68: Undisputed, with clarification that Defendants' disagree with the legal conclusions contained therein.**

69. On April 4, 2019, Timpone sent yet another letter to McMeel threatening legal action if McMeel moved forward with the publication of my "Oh No" book. Norris Decl. at ¶40; *see also* Ex. 19.

**Response No. 69: Undisputed.**

Dated: November 16, 2022          GERARD FOX LAW P.C.
New York, New York

                                 */s/ Ryan P. Dolan*
                                 Ryan P. Dolan
                                 Gerard P. Fox
                                 1880 Century Park East, Suite 1410
                                 Los Angeles, CA 90067
                                 Telephone: (310) 441-0500
                                 Facsimile: (310) 441-4447
                                 gfox@gerardfoxlaw.com
                                 rdolan@gerardfoxlaw.com

                                 *Attorneys for Defendants*