**UNITED STATES DISTRICT COURT**
**SOURTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x
                                        **:**

ALEXANDER NORRIS                     **:**
                                        **:**

                    *Plaintiff*,      **:**      Case No.: 19-cv-05491-PAE-SN
                                          **:**

         v.                               **:**
                                          **:**

Marc Goldner, Individually and as Officer   **:**
of GOLDEN BELL ENTERTAINMENT,     **:**
LLC, a California company and GOLDEN   **:**
BELL STUDIOS, LLC, GOLDEN BELL     **:**
ENTERTAINMENT, LLC., a Nevada       **:**
Company and GOLDEN BELL STUDIOS,   **:**
LLC,                                    **:**

                  *Defendants*.
--------------------------------------------------------x

---

**PLAINTIFF'S MEMORANDUM OF POINTS**
**AND AUTHORITES IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**
**AND IN REPLY TO PLAINTIFF'S MOTION**
**FOR SUMMARY JUDGMENT OR ALTERNATIVELY,**
**PARTIAL SUMMARY JUDGMENT**

---

<u>INTRODUCTION</u>

Plaintiff Alexander Norris ("Alex"), in accordance with and pursuant to Federal Rule of Civil Procedure 56, Local Civil Rule 56.1, the Court's Individual Practice Rule III(A), the Court's September 7, 2022, Order, ECF Doc. No. 104, and the Court's September 16, 2022 Order, ECF Doc. No. 110, hereby submits this memorandum of points and authorities in opposition to Defendant's motion for summary judgment and in further reply of Plaintiff's motion for summary judgment or alternatively, partial summary judgment.

This is a case in which plaintiff Alexander Norris, the creator of the webcomic "Webcomic Name", entered into the Collaboration Agreement with Defendants for the creation of a board game and toy plush based upon that webcomic. Norris would create a game for Defendants, who would use their "expertise" to manufacture, market and sell the game.

Defendants immediately, intentionally exceeded the scope of the Collaboration Agreement. Defendants took screenshots of several copyrighted images from his Webcomic Name comic strips, created prior to the Collaboration Agreement, and submitted those screenshots to the United States Patent and Trademark Office as specimens of Defendants' own use of the mark Webcomic Name. Defendants also took screenshots of several images appearing in Alex's Webcomic Name social media sites, in support of their own use of the Webcomic Name mark as well.

Defendants did all this without Norris's permission. Rather, Defendants claim that the Collaboration Agreement granted them an unfettered license to use Alex's Webcomic Name in the intellectual property. Their defense hinges on this Court broadly interpreting the Collaboration Agreement. But that agreement is limited to the "WORKS," which are a board

game and a plush toy. As much as Defendants try, there is simply no contractual basis to justify their acts.

Under the Collaboration Agreement, Norris was entitled to advance payments once he provided "final" files – a term that is undefined in the Collaboration Agreement and yet a term which Defendants cling to. Though Norris delivered the files, Defendants refused to pay him.

Since Defendants' wildly exceeded the scope of the Collaboration Agreement, and refused to pay Norris undisputed sums, Norris effectively terminated the Collaboration Agreement.

<u>ARGUMENT</u>

## I.   NORRIS'S MATERIAL FACTS MUST BE DEEMED ADMITTED.

The material facts set forth in Norris's 56.1 statement must be deemed admitted. Defendants' responses to Alex's 56.1 statement fall into three categories:

- Facts which Defendants do not dispute;[1]

- Facts which Defendants claim they lack knowledge to contest;[2]

- Facts which Defendants purportedly dispute but cite no evidence upon which they base that dispute.[3]

   "Notwithstanding the basic principle that the facts must be construed in favor of the opponent to a summary judgment motion, Local Civil Rule 56.1 provides that unless a party responding to a statement of undisputed facts cites evidence as to those statements that she denies, the statements will be deemed admitted if they are supported by citations to evidence in the record."

*Green v. Rochdale Vill. Soc. Servs., Inc.*, 2016 WL 4148322, at *1 (E.D.N.Y. Aug. 4, 2016)

(*citing* Local Civil Rule 56.1(c); *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003)).

---

[1] Fact No.'s 1-6, 8-9, 11, 16, 21-22, 24-26, 28-33, 37-39, 41-44, 46-48, 50-52, 55-58, 60, 63-64, and 66-69.
[2] Fact No.'s 7, 10, 12-15, 19-20.
[3] Fact No.'s 18, 23, 27, 34-36, 40, 45, 49, 53-54, 59, 61-62, 65.

2

Defendants' response that they lack knowledge sufficient to respond to certain facts requires that those facts be deemed admitted, as well. *Diarra v. City of New York*, 2018 WL 4538903, at *4 (S.D.N.Y. Sept. 20, 2018), *aff'd*, 771 F. App'x 69 (2d Cir. 2019) (Deeming defendant's facts admitted when opposing party merely stated, without citation to evidence, "that he cannot confirm or deny certain facts").

Additionally, Defendants' purported disputes are also insufficient to create a dispute of material fact, since Defendants do not cite to a single piece of evidence in response to Alex's 56.1 statement. As a result, Local Rule 56.1 requires those facts be deemed admitted.

As such, the entirety of Alex's 56.1 statement must be deemed admitted.

## II. DEFENDANTS EXCEEDED THE SCOPE OF THEIR LICENSE AND COMMITTED COPYRIGHT INFRINGEMENT.

It is undisputed that Defendants took screenshots of the U.S. Copyrighted Works, without Alex's permission, and submitted those screenshots as their own to the USPTO. Defendants' sole defense to Alex's copyright infringement claim is that the Collaboration Agreement is a license which granted Defendants the right to use Alex's Webcomic Name comic strips. Defendants' defense fails as a matter of law.

A party that exceeds the scope of an intellectual property license, such as Defendants, commits copyright infringement. *Fioranelli v. CBS Broad. Inc.*, 232 F. Supp. 3d 531, 537 (S.D.N.Y. Jan. 19, 2017). Here, Defendants knowingly exceeded the scope of the Collaboration Agreement and committed copyright infringement.

First and foremost, the Collaboration Agreement is limited to the "WORKS" – defined as "the properties tentatively entitled 'Webcomic Name Game' and 'Webcomic Name Stuffed

3

Animals,'" as well as "any tie-ins, spin offs, or other commercial development of the WORKS such as Sequels, Prequels, Reboots, Remakes, and Expansions."[4]

The "WORKS" do *not* include the Webcomic Name comic strip or the comic strip's characters.[5] Rather, it is undisputed that prior to executing the Collaboration Agreement, Alex clarified that his characters remained his:

> "The main query I have about the contract is the part about 'the artist will retain 0% of the copyright' and similar clauses. Obviously the game will heavily feature elements that are part of Webcomic Name already, and ***I want to make it clear that in no way does Golden Bell take ownership of any of the characters, images or story content except in its application in a tabletop game***. At the moment the wording is very broad and could apply to Webcomic Name in general, rather than simply in relation to a tabletop game. I will be working with publishers on a book and I am going to send them a copy of the contract before signing to make sure there is no breach of my contract with them. Obviously the book and tabletop game are very separate but will contain the same elements and I don't want signing this contract to come back to bite me in the future!"[6]

It is undisputed that Defendants confirmed Alex's characterization – that the Collaboration Agreement was limited to a board game and plush toy:

> "I am resending the contract with now with this new language and also specified its for game and stuffed animal."[7]

It is undisputed that Defendants *added* a provision to further exclude Webcomic Name from the scope of the Collaboration Agreement:

> "Artist has the right to pursue his Comic 'Webcomic Name' outside of the context of this agreement".[8]

---

[4] ECF Doc. No. 129, ¶28.
[5] ECF Doc. No. 129, ¶28.
[6] ECF Doc. No. 129, ¶25 (Emphasis added). To the extent the Court finds the scope of the Collaboration Agreement ambiguous, it can consider this evidence. *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 69 (2d Cir. 2008). Further, any ambiguities must be construed against Defendants, as the drafters. ECF Doc. No. 129, ¶30; *Judd Burstein, P.C. v. Long*, 180 F. Supp. 3d 308, 315 (S.D.N.Y. April 18, 2016).
[7] ECF Doc. No. 129, ¶26.
[8] ECF Doc. No. 129, ¶26.

Defendants broadly claim that the Collaboration Agreement gives them unfettered ownership of all Webcomic Name characters, despite Defendants' clarification that was not the case, and despite the clear limitation in that agreement to the "WORKS." Defendants select a few portions of the Collaboration Agreement to support their characterization of their agreement, one of which is paragraph 2(B):

> "It is understood and agreed that the Parties shall share hereunder, without limit to, unless otherwise herein stated, the proceeds from the sale or any and all other disposition of *the WORKS and the rights, interest, and licenses therein and with respect thereto*, including but not limited to the following: Comic Book Rights, Motion Picture Rights, Animation Rights, Graphic Rights, Sequel Rights, Remake Rights, Television Rights, Gaming Rights, Film Rights, Stage Rights, Radio Rights, Publication Rights, Interactive Rights, Music Rights, Merchandising Rights, and Digital Rights."

But as is clear from the emphasized language of paragraph 2(B), those rights are limited to the WORKS.

Defendants make the contention that they are broadly entitled to use Alex's characters, which somehow permits them to infringe on the U.S. Copyrighted Works which are comic strips. This argument is a red herring because use of characters is limited to those appearing in the WORKS, and Defendants' purported copyright license is limited to the WORKS. Defendants admit as much in their brief: "Pursuant to the Agreement between the parties, Defendants retained "100% of the copyright [and] 100% of the trademark" rights to the WORKS, as well as any sequels, prequels, reboots, remakes, and expansions, pursuant to Section 1(A) of the Agreement."[9] Because comic strips are not included in the WORKS, Defendants have no right to them, at all.

In a similar vein, Defendants grasp on to paragraph 3(C), claiming it provides Defendants with unfettered access to the Webcomic Name characters. But that paragraph must be read in

---

[9] ECF Doc. No. 125, at pg. 7.

context with the entire Collaboration Agreement. *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993). Paragraph 3(C) appears in the portion of the Collaboration Agreement which deals with "SAMPLES AND COMPLETION OF FUTURE WORKS." Paragraph 3(C) sets forth the parties' obligations with respect to future works and sequels to the WORKS. Nor does paragraph 3(C) change the supposed copyright license set forth in paragraph 1(A), in which Defendants' copyright license is limited to the WORKS.

Further provisions of the Collaboration Agreement illustrate that Defendants did not own a license to the Webcomic Name characters outright. In paragraph 2(L), Defendants carved out for themselves permission to use the characters which appeared in the WORKS for "cameo appearances":

> "Characters in the WORKS may make cameo appearances in COMPANY properties that are owned exclusively by COMPANY such as in promotional material to increase awareness of the WORKS. Characters appearing in WORKS may be used in other properties of COMPANY with no financial obligations to or expectations by ARTIST."

If Defendants truly owned access to the Webcomic Name characters, there would be no need for Defendants to bargain for the permission to use those characters as set forth in paragraph 2(L). Defendants' unduly broad reading of the Collaboration Agreement would render paragraph 2(L) superfluous. *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) (Courts must "safeguard against adopting an interpretation that would render any individual provision superfluous") (Internal citations omitted).

Alex's construction of the Collaboration Agreement is consistent with its clear terms, the parties' understanding of the Collaboration Agreement, which they expressed during the negotiations, and the law governing these types of works.

6

First, the parties expressed their own understanding that the Collaboration Agreement, and the Defendants' intellectual property license, was limited to a board game and plush toy. To extinguish all doubt, when Alex asked Defendants to assure that the Collaboration Agreement did not extend to Alex's characters, Goldner agreed it was limited to a board game and plush toy and added the provision that Alex "has the right to pursue his Comic 'Webcomic Name' outside of the context of this agreement."

Second, this construction is also consistent with the type of "collective work" that the Collaboration Agreement describes. A collective work is "compilation in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." 17 U.S.C. § 101. Undoubtedly the Collaboration Agreement describes a collective work, since it claims that the WORKS "are defined and clarified as the joint work of the parties."[10]

Each "component" of a collective work is independent from the collective work itself, which means that if a creator contributes a copyrighted component to a collective work, the creator maintains their copyright in that component, even if the collective work is licensed to a third party:

> "In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series."

17 U.S.C. § 201(c).

"Under this statutory framework, the author of an individual contribution to a collective work owns the copyright to that contribution, absent an express agreement setting

---

[10] ECF Doc. No. 129, ¶26.

other terms." *Tasini v. New York Times Co.*, 206 F.3d 161, 166 (2d Cir. 2000), *aff'd*, 533 U.S. 483, 121 S. Ct. 2381, 150 L. Ed. 2d 500 (2001).

This concept is reflected in the U.S. Copyright Office's Third Compendium:

> "A registration for a visual art work, a literary work, or a work of the performing arts that depicts or describes a character covers the expression set forth in the deposit copy(ies), but it does not cover the character per se. In other words, the copyright in the registered work protects the author's expression of the character, but it does not protect the mere concept of the character. The copyright in the character itself is limited to the artistic rendition of the character in visual form or the literary delineation of the character's specific attributes in textual form."

If Defendants wanted a copyright to Webcomic Name and its characters, rather than in just a prospective board game and plush toy, they were required to provide for the express license of that intellectual property. They did not do so. In fact, Defendants confirmed that the Collaboration Agreement does not extend to Webcomic Name or its characters.

Having exceeded the scope of that agreement, Defendants are liable for copyright infringement.

## III.   DEFENDANTS' UNDULY NARROW DEFINITION OF "INTERSTATE COMMERCE" UNDER THE LANHAM ACT IS SIMPLY INSUFFICIENT TO DEFEAT ALEX'S FALSE DESIGNATION OF ORIGIN CLAIM.

Defendants' explanation of the difference between false advertising and false designation of origin claims is confusing and unnecessary. Alex's claim is for false designation of origin, not false advertising. Defendants argument that their "application for a trademark with the USPTO did not consist of advertising or selling of a product" is simply irrelevant.

Getting to Defendants' opposition to Alex's false designation of origin claim, Defendants claim that Alex fails to establish the "in commerce" element of the that claim. *See Pulse Creations, Inc. v. Vesture Grp., Inc.*, 154 F. Supp. 3d 48, 56 (S.D.N.Y. 2015) (Elements of false designation of origin are that "[i] goods or services are involved, [ii] interstate commerce is affected, and [iii]

8

there is a false designation of origin or a false description or representation with respect to those goods or services in commerce.").

Defendants claim their false application to the USPTO "was a legal action taken by Defendants to protect intellectual property which they acquired from Plaintiff, not a commercial action of advertising or selling a product." On this basis, Defendants seemingly claim their improper act did not "affect interstate commerce."

But Defendants' argument has been squarely rejected as a matter of law by the Second Circuit: "It appears that 'use in commerce' denotes Congress's authority under the Commerce Clause rather than an intent to limit the Act's application to profitmaking activity. *United We Stand Am., Inc. v. United We Stand, Am. New York, Inc.*, 128 F.3d 86, 92–93 (2d Cir. 1997) ("*United We Stand*"). In fact, in *United We Stand*, the Second Circuit cited this Court's precedent in support of its holding, noting:

> "Notwithstanding its jurisdictional 'in commerce' requirement, Section 1114 contains no commercial activity requirement; rather, it prohibits any person from, without consent of the registrant of a mark, using the mark 'in connection with the sale, offering for sale, distribution, or advertising of any good or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.'"

*Planned Parenthood Fed'n of Am., Inc. v. Bucci*, 1997 WL 133313, at *4 (S.D.N.Y. Mar. 24, 1997), *aff'd*, 152 F.3d 920 (2d Cir. 1998). Thus, no "sales" or other commercial activity are required to establish a an "affect on interstate commerce." For instance, a defendant that makes false statements to the USPTO in a bad faith attempt to "sit" on a mark is liable for trademark infringement. *Tuccillo v. Geisha NYC, LLC*, 635 F. Supp. 2d 227, 232 (E.D.N.Y. 2009). Because the elements of trademark infringement are identical to false designation claims, cases apply to

each claim with equal force. *Krasnyi Oktyabr, Inc. v. Trilini Imports*, 578 F. Supp. 2d 455, 467 (E.D.N.Y. 2008).

Here, Defendants' meager attempt to oppose Alex's false designation of origin claim on "interstate commerce" grounds reflect their inability to defeat that claim. Having easily surpassed that low threshold, Alex is entitled to judgment that Defendants are liable on that claim.

## IV.   CANCELLATION OF TRADEMARK REGISTRATION NO. 5629281 ("MARK 281").

The following undisputed facts require the cancellation of Mark 281:

- Mark 281 is registered in international class 028 for "Board games; Card games; Game cards; Party games; Plush dolls; Plush toys; Stuffed dolls and animals; Stuffed toy animals; Tabletop games; Soft sculpture plush toys; Stuffed and plush toys"; [11]

- In support of Mark 281, Goldner stated that GB Entertainment was the owner of the trademark sought to be registered;[12]

- Goldner filed specimens meant to show Mark 281 used "in commerce";[13]

- Goldner submitted a photo take at a conference as a specimen to illustrate Mark 281's use in commerce, but no sales of any Webcomic Name products occurred at that conference;[14]

- No sales of the "Webcomic Name Game" have ever been sold;[15]

- No Webcomic Name plush toys have ever been sold.[16]

Thus, Mark 281 should be cancelled because it was never used "in commerce" and Defendants obtained it by fraud.

---

[11] ECF Doc. No. 129, 36.
[12] ECF Doc. No. 129, 37.
[13] ECF Doc. No. 129, 38.
[14] ECF Doc. No. 129, 39-40.
[15] ECF Doc. No. 129, 41.
[16] ECF Doc. No. 129, 42.

Defendants claim that Alex lacks standing to bring this cause of action. The issue of standing raises a relatively low bar: "Standing ... requires only that the party seeking cancellation believe that it is likely to be damaged by the registration." *Quality Serv. Grp. v. LJMJR Corp.*, 831 F. Supp. 2d 705, 712 (S.D.N.Y. 2011).

That relatively low bar is easily surpassed in this case. It is undisputed that Alex's application for WEBCOMIC NAME (the "127 Mark") was denied due to the existence of Mark 281 – a fact which Defendants simply ignore.[17] *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 247 F. Supp. 3d 76, 98 (D.D.C. 2017) ("In light of the competing, confusing marks at issue and the fact that PLM and PROLACTO are direct competitors, PROLACTO has a 'direct and personal stake' in the outcome of the cancellation and a 'reasonable basis in fact' that it could be damaged."); *see also Royal Palm Properties, LLC v. Pink Palm Properties, LLC,* 950 F.3d 776, 788 (11th Cir. 2020) ("We think it's clear that Pink Palm Properties has the requisite direct, personal interest in the outcome of this litigation. Were the 'Royal Palm Properties' trademark cancelled, Pink Palm Properties would be free to use the mark in its promotional materials, without fear of another lawsuit.").

The 127 Mark was filed in:

> "for the services of "providing online non-downloadable webcomics and comic strips, books, reviews, periodicals and magazines in international class 041 and for comic books; comic strips and comic strip's comic features, appearing in print media, namely, comic books, books, newspapers, magazines" in international class 016…"[18]

Thus, Alex has been unable to trademark "Webcomic Name" as a comic strip, despite Goldner's promise that the Collaboration Agreement did not extend that far, simply by the

---

[17] ECF Doc. No. 129, 55-57.
[18] ECF Doc. No. 129, 55-57.

existence of Mark 281. Alex clearly "has a direct and personal stake" in the cancellation of Mark 281.

As the owner of several Webcomic Name marks, Alex obviously has a direct interest in Mark 281, which is the phrase "WEBCOMIC NAME." A party that produces and sells products bearing the mark has standing to seek its cancellation. *Int'l Ord. of Job's Daughters v. Lindeburg & Co.*, 727 F.2d 1087, 1092 (Fed. Cir. 1984). It is undisputed that Alex has used the "Webcomic Name" mark in commerce since 2016 and has commercialized that mark through his website and social media. On this basis alone, Alex has standing to seek cancellation of Mark 281.

Alex also has a definite interest in protecting his and Webcomic Name's reputation from Defendants' deceptive, fraudulent conduct before the USPTO – a further consideration which provides Alex with standing to seek Mark 281's cancellation. *Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 715 (4th Cir. 2016).

Alex has also cancelled the Collaboration Agreement, and it is that agreement that the Defendants claim provides them with the authority register Mark 281: "Defendants' use of the mark in commerce and subsequent trademarking of the mark cannot be said to exceed the scope of the Agreement."[19] Defendants make the curious argument that Alex will not be damaged by the registration of Mark 281 because the Collaboration Agreement allows Alex to a share in Defendants' profits.[20] This is meritless, to say the least, given that Alex has already cancelled the Collaboration Agreement and, as illustrated above, Alex has been damaged by Mark 281's registration.

---

[19] ECF Doc. No. 125, pg. 11.

[20] "Plaintiff is not likely to be damaged by Mark 281, but would rather benefit from it by way of production and sale of products which fall within the Agreement. As Section 1(D) of the Agreement states "[a]ll future derivative works created by the parties will be defined by the percentages of the copyright and of the net profits defined in Section 1a of this Agreement listed above." ECF Doc. No. 125, pg. 10.

Defendants next turn to the question as to whether any of the goods associated with Mark 281 were used in commerce.  Since Goldner admitted that Defendants never created nor sold any of those goods, Defendants come up with a ludicrous argument: that Defendants sold units of a *different* game, Pretending to Grownup, which contain a card reflecting the WebComic Name characters accompanied by the phrase "artwork courtesy of Webcomic Name," and thus the mark was "used in commerce."

This argument is completely baseless. Tellingly, Defendants do not cite to a single case in support.

"A mark is used in commerce when it is employed to identify ... goods or services sold to consumers in a given market." *ITC Ltd. v. Punchgini, Inc.,* 482 F.3d 135, 147 (2d Cir.), *cert. denied,* 552 U.S. 827, 128 S.Ct. 288, 169 L.Ed.2d 38 (2007). To be used in commerce, the mark must "differentiate or identify the origin of [the holder's] goods or services." *Am. Express Co. v. Goetz*, 515 F.3d 156, 161 (2d Cir. 2008).

Clearly, Defendants did not use the phrase "Webcomic Name" to identify the origin of the goods. Mark 281 is registered with Golden Bell Entertainment as the owner.[21] But the phrase "Webcomic Name" in Pretending to Grownup identifies Alex's company and pseudonym, "Webcomic Name" to identify the origin of the artwork, not the Defendants: "artwork courtesy of Webcomic Name."

Additionally, Defendants did not use the phrase "Webcomic Name" to differentiate the goods sold, because the goods sold were a completely different product, the tabletop game Pretending to Grownup.[22] Defendants do not claim that the phrase "Webcomic Name" was

---

[21] ECF Doc. No. 129, 44.
[22] Defendants claim that "Pretending to Grownup has sold no less than 7,940 units with a gross revenue of approximately $204,747.75." ECF Doc. No. 127, 31. Defendants did not produce any sales records related to Pretending to Grownup, nor identify those sales records in their initial disclosures, and cannot rely on those sales

13

emblazoned on a tabletop game, nor do Defendants claim that they separately sold board game cards with that phrase. This is simply insufficient to show use of the phrase as a trademark because the phrase itself must be used in conjunction with the product:

> "Silberstein distributed items emblazoned with the Sqrat logo, but her avowed purpose in doing so was to generate interest in Sqrat, not to differentiate or identify the origin of the goods, which were merely vehicles for the logo."

*Silberstein v. Fox Ent. Grp., Inc.*, 424 F. Supp. 2d 616, 633 (S.D.N.Y. 2004), *aff'd sub nom.*

*Silberstein v. John Does 1-10*, 242 F. App'x 720 (2d Cir. 2007). Because the only product sold is, supposedly, Pretending to Grownup, Defendants have failed to raise a triable issue of fact that they have used Mark 281 in commerce.

Defendants do not even brief the question of their fraudulent USPTO application for Mark 281, though, as shown above, Defendants submitted specimens meant to reflect Mark 281's use in commerce that showed no such sales, because no such sales ever took place. For this additional reason, Mark 281 should be cancelled.

## V.    ALEX VALIDLY TERMINATED THE COLLABORATION AGREEMENT.

Defendants claim that Alex was not entitled to payment because he did not send "final" files pursuant to the Collaboration Agreement. But Defendants intentionally conflate "final" files with "final, print-ready files" in an attempt to excuse their nonpayment. "Final files" is not defined anywhere in the Collaboration Agreement.

Defendants' unclean hands defense also fails. This defense is predicated on Defendants' claim that Alex deleted the files Alex sent to a Dropbox folder. But Defendants do not cite to any evidence that Alex deleted any files. Amazingly, Defendants predicate this defense on Goldner's

---

now. Nonetheless, if this is accurate, the use of Webcomic Name characters to sell Pretending to Grownup entitles Alex to a share of those sales.

2004589.0098/177164099.5

*guess* that Alex had deleted those files: "To my knowledge, no files had been uploaded, or they had been deleted prior to our ability to access them." It is staggering that Defendants would claim to this Court that Alex intentionally deleted files when Defendants themselves have no idea what happened.

Defendants claim that they refused to pay Alex because, by October 1, 2018, Alex had not provided the files:

> "On October 1, 2018, Norris emailed Defendants with two attached invoices for advances contained within the contract. To my knowledge, no files had been uploaded, or they had been deleted prior to our ability to access them. I responded, explaining to Norris that Defendants 'MUST receive the final files before paying as required in the contract allowing us to review and have 30 days to submit payment. We've been told numerous times the files were done and uploaded. Please upload the files today as this was the final deadline that you said it would be. Then we will review and have it paid within 30 days as per the contract once approved.'" (cite)

But Defendants confirmed that they had received the files on October 3, 2018, asking that they be sent as pdf's because the version sent by Alex were "clip files" that Goldner and company could not review at that time because they were attending New York Comic-Con:

> "Please export them as a batch PDF for comment reviews on Adobe Acrobat. They are all clip files and we are at NYCC (a show we invited you to at all expenses paid by us and ignored) and unable to provide feedback entirely."

Defendants also added several new conditions before they would pay Alex:

> "There are other things we must clear up first prior to any advances being paid such as determining promotion, having shared access to social media accounts, all situations that shouldn't come as a surprise at all."

These brand-new obligations appear nowhere in paragraph 1(G) of the Collaboration Agreement but were simply concocted by Defendants to delay their obligations to pay Alex.

Defendants' post hoc rationalization for refusing payment is completely insufficient – and illustrates that Alex validly cancelled the Collaboration Agreement.

Alex has also set forth an additional reason why he validly cancelled the Collaboration Agreement – that Defendants wildly exceeded the scope of that agreement by claiming ownership of nearly every facet of Webcomic Name. Defendants do not claim that excessive overreach is not a legal basis to cancel a license such as the Collaboration Agreement, but rather, Defendants merely argue that they did not overreach.

But as already illustrated above, despite the fact that it is limited to a board game and plush toy, Defendants used the Collaboration Agreement to claim ownership to the entirety of Alex's intellectual property. The bulk of Defendants' opposition is based upon their claim that they did not compete with Alex's "core business," i.e., his comic strips.

But this is false. It is undisputed that Defendants filed trademarks for marks that belong solely to Alex and Webcomic Name.

It is undisputed that Defendants applied for the mark "Webcomic Name" in international class 16: "Comic books; Comic strips; Comic strips' comic features; Comics; Newspaper comic strips."[23]

It is also undisputed that Defendants applied for the mark "Oh No" (the Blob character's known catchphrase) in international class 16 as well: "Bookmarkers; Bookmarks; Comic books; Comic magazines; Comic strips; Comic strips' comic features; Comics; Stickers; Newspaper comic strips."[24] It is undisputed that Defendants filed for, and obtained, Mark 281, which caused the USPTO to deny Alex's trademark application for the use of "Webcomic Name" in international class 16, as well.

---

[23] ECF Doc. No. 129, 46.
[24] ECF Doc. No. 129, 50.

Defendants claimed all of these actions were completely permissible under the Collaboration Agreement. Given Defendants' stunning overreach, Alex validly terminated the Collaboration Agreement.

<u>CONCLUSION</u>

For the aforementioned reasons, Defendants' motion for summary judgment should be denied, and Norris's motion for summary judgment, or alternatively, partial summary judgment should be granted.

Dated: December 16, 2022
New York, New York                                         Respectfully submitted,

                                                    */s/ Francelina M. Perdomo*
                                                    Francelina M. Perdomo, Esq.
                                                    Kyle G. Kunst, Esq.
                                                    GALLET DREYER & BERKEY, LLP
                                                    845 Third Ave., 5th Floor
                                                    New York, NY 10022-6601
                                                    Phone: (212) 935-3131
                                                    Fax: (212) 935-4514
                                                    fmp@gdblaw.com
                                                    kgk@gdblaw.com

                                                    *Attorneys for Plaintiff*
                                                    *Alexander Norris*

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 16th day of December 2022, I caused to be served a copy of

the foregoing via the Court's ECF filing system, on the following:

Gerard Patrick Fox
Gerard Fox Law, P.C.
1880 Century Park East
Suite 1410
Los Angeles, CA 90067
310-441-0500
Email: gfox@gerardfoxlaw.com

Ryan Dolan
Gerard Fox Law P.C.
1345 Sixth Avenue
33rd Floor
10105
New York, NY 10006
661-364-7254
Email: rdolan@gerardfoxlaw.com

*Attorneys for Defendants*

*/s/ Kyle G. Kunst*
Kyle G. Kunst

18