**UNITED STATES DISTRICT COURT**
**SOURTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
                                                               :

ALEXANDER NORRIS                       :

                     *Plaintiff*,          :    Case No.: 19-cv-05491-PAE-SN

        v.                                :

Marc Goldner, Individually and as Officer :
of GOLDEN BELL ENTERTAINMENT,   :
LLC, a California company and GOLDEN :
BELL STUDIOS, LLC, GOLDEN BELL   :
ENTERTAINMENT, LLC., a Nevada       :
Company and GOLDEN BELL STUDIOS, :
LLC,                                     :

                  *Defendants*.
---------------------------------------------------------x

**PLAINTIFF'S RESPONSE TO DEFENDANTS' RULE 56.1**
**STATEMENT OF UNDISPUTED FACTS**

Plaintiff Alexander Norris, in accordance with Local Civil Rule 56.1 and in opposition to Defendants' Cross-Motion for Summary Judgment, submits this Response to Defendants'' Statement of Material Facts, dated November 16, 2022:

1. In February of 2017, pursuant to assurances that he had "100%" free reign over the property, Golden Bell purchased intellectual property rights from Jason Wiseman, including those related to "Webcomic Name." Goldner Decl. at 2.

**RESPONSE**: Disputed. The email that Goldner relies on does not claim that Wiseman has "'100%' free reign" over the "Webcomic Name" intellectual property rights. Rather, Wiseman's claim was limited to "a 'Joking Hazard' type *game* with Webcomic Name…" Goldner Decl. at 2; Exhibit 1 (ECF Doc. No. 127-1) (Emphasis added).

Furthermore, Defendants deceptive claim that they purchased "intellectual property rights from Jason Wiseman, including those related to 'Webcomic Name'" is an overbroad mischaracterization. That contract is limited to a prospective board game only, like the Collaboration Agreement. Defendants attempt to characterize that contract as a purchase of all the Webcomic Name intellectual property rights is flat wrong. *See Declaration of Alexander Norris in Opposition to Defendants' Motion for Summary Judgment* ("Norris Opp. Decl.") at ¶2, Exhibit 23. Defendants did not attached Wiseman's contract to their 56.1 statement to hide limited nature of that contract.

2. On June 2016, 2017, Marc Goldner reached out to Alex Norris via email to introduce himself to Norris. Goldner stated in the email:

> "I think the big things we should think about the next few months is what derivative merchandise will accompany the game; our first

>instinct from Rachel is obviously to make the cutest Stuffed Plush ever and it can potentially be voice activated as you squeeze it with dozens of catch phrases we all mutually agree represent the brand that we're building here together. Depending on the route of the final humor and writing there are potentials for a stand alone[sic] comic, a children's book, or something else."

Goldner Decl. at 3.

**RESPONSE**: Undisputed.

3. On July 3, 2017, Norris emailed Goldner indicating that he had an existing publishing agreement, stating:

>"The main query I have about the contract is the part about 'the artist will retain 0% of the copyright" and similar clauses. Obviously the game will heavily feature elements that are part of Webcomic Name already, and I want to make it clear that in no way does Golden Bell take ownership of any of the characters, images or story content except in its application in a tabletop game. At the moment the wording is very broad and could apply to Webcomic Name in general, rather than simply in relation to a tabletop game. I will be working with publishers on a book and I am going to send them a copy of the contract before signing to make sure there is no breach of my contract with them. Obviously the book and tabletop game are very separate but will contain the same elements and I don't want signing this contract to come back to bite me in the future!"

Goldner Decl. at 4.

**RESPONSE**: Undisputed.

4. That same day, Goldner responded that the copyright was already purchased, stating:

>"I am resending the contract with now with this new language and
>also specified its for game and stuffed animal.
>A. ARTIST has the right to pursue his Comic
>'Webcomic Name' outside of the context of this
>agreement.
>To answer your question about copyright, Jason had agreed to us
>purchasing the rights for the game already and that part of the deal

> was already done. If you have any questions please let me know
> and I hope to work on any issues that may crop up and solve them
> as much as possible. You are obviously in the free and clear to
> work" "on your property outside of the context of our contract."

Goldner Decl. at 5.

**RESPONSE**: Undisputed that Goldner sent the email quoted above. Disputed to the extent that Defendants claim they purchased any intellectual property rights to Webcomic Name other than to a prospective game. Wiseman emailed Goldner and informed Goldner that Wiseman only had "'100%' free reign" over "a 'Joking Hazard' type *game* with Webcomic Name…" Goldner Decl. at 2; Exhibit 1 (ECF Doc. No. 127-1) (Emphasis added). Furthermore, Wiseman's contract with Defendants is limited to a prospective board game only, like the Collaboration Agreement. Norris Opp. Decl. at ¶2, Exhibit 23.

5. On August 10, 2017, the parties entered into the Collaboration Agreement. Goldner Decl. at 7.

**RESPONSE**: Undisputed.

6. The collaboration agreement stated the parties were entering into it "with respect to the production of the properties tentatively entitled "Webcomic Name Game" and "Webcomic Name Stuffed Animals" (the 'WORKS') to be created by ARTIST, and any tie-ins, spinoffs, or other commercial developments of the WORKS such as Sequels, Prequels, Reboots, Remakes, and Expansions." Goldner Decl at 8; see also Exh. 7.

**RESPONSE**: Undisputed.

7. Section 1(A) of the Agreement states:

> "Percentage, ownership, registration and assignment of 'WORKS' with the United States Copyright Office and United States Patent and Trademark Office are defined and clarified as the joint work of the parties. Thus, ARTIST shall retain 0% of the copyright, 0% of the trademark, 0% of the patent and 5% of the net sales of WORKS for the first 18 months then it will revert to 4% of the net sales of the WORKS thereafter, and COMPANY shall retain 100% of the copyright, 100% of the trademark, 100% of the patent, and 95% of the net sales of WORKS for the first 18 months then it will revert to 96% of the net sales of the WORKS thereafter. ARTIST assigns to COMPANY their initial rights of the WORKS as stated above in this section 1A upon the signing of this AGREEMENT."

Exhibit 7 at pg. 1, section 1(A).

**RESPONSE**: Undisputed.


8. Section 1(C) of the Agreement states: "If ARTIST creates a new work with a character or storyline that infringes on any of COMPANY's copyrighted properties, ARTIST agrees to transfer any copyright he may have in that new work to COMPANY." Exhibit 7 at pg. 1 Section 1(C).

**RESPONSE**: Undisputed.


9. Section 1(G) of the Agreement states:

> "The ARTIST will receive a $3,125 upfront advance against net sales royalties within 30 days of the COMPANY receiving the final files noted above for 'Webcomic Name Game' for a game developed with Jason Wiseman and the ARTIST known as Alex Norris of Webcomic Name tentatively titled 'Webcomic Name Game' by the COMPANY. The COMPANY will then pay an additional $2,500 to the ARTIST upon delivery to the COMPANY of the final print-ready files, the PSD files, the AI files, the InDesign Files, and any other files pertaining to the game created by the ARTIST and Jason Wiseman."

Exhibit 7, pg. 1 Section 1(G).

    **RESPONSE**: Undisputed.

10. Section 2(B) of the Agreement States:

> It is understood and agreed that the Parties shall share hereunder, without limit to, unless otherwise herein stated, the proceeds from the sale or any and all other disposition of the WORKS and the rights, interest, and licenses therein and with respect thereto, including but not limited to the following: Comic Book Rights, Motion Picture Rights, Animation Rights, Graphic Rights, Sequel Rights, Remake Rights, Television Rights, Gaming Rights, Film Rights, Stage Rights, Radio Rights, Publication Rights, Interactive Rights, Merchandising Rights, and Digital Rights. ARTIST shall receive 5% of the net profits from the WORKS in relation to the different mediums it will be produced in as stated above4. Additionally, COMPANY will also receive 95% net profits from the WORKS in relation to any mediums produced.

Exhibit 7, pg. 2 Section 2(B).

    **RESPONSE**: Undisputed.

11. Section 2(C) of the Agreement States "COMPANY shall have sole ownership of the original artwork used and created for the WORKS by either ARTIST or by COMPNAY."

Exhibit 7 at pg. 2, Section 2(C).

    **RESPONSE**: Undisputed.

12. Section 2(D) states "COMPANY and ARTIST shall share access to all Social Media accounts with administrative privileges and COMPNAY [*sic*] shall be the Domain Registrant and Administrator of any domains." Id at Section 2(D).

    **RESPONSE**: Undisputed.

13. Section 2(H) of the Agreement states "ARTIST grants the exclusive license to COMPANY in perpetuity of the WORKS." Id at Section 2(H).

**RESPONSE**: Undisputed.

14. Section 2(I) of the Agreement states "If, prior to completion f [*sic*] the WORKS, any of the Parties shall voluntarily withdraw from the collaboration, then the other Party or Parties shall have the right to complete the WORKS alone or in conjunction with another collaborator(s), and ownership of the WORKS will revert solely to that Party or Parties." Id at Section 2(I).

**RESPONSE**: Undisputed

15. Section 2(Q) of the Agreement states "COMPANY may protect, enforce, and pursue any legal action on behalf of the parties in relation to and in any aspect of the WORKS such as the titles, interest, licenses, and rights of WORKS. The COMPANY will hereby take due diligence in protecting the WORKS." Id at pg. 3, Section 2(Q).

**RESPONSE**: Undisputed.

16. Section 3(C) of the Agreement states:

> ARTIST shall submit to COMPANY all sequels to the WORKS or other works using characters that appear in the WORKS and any unrelated characters. COMPANY will take due diligence to copyright all said WORKS with the same percentages and profit splits discussed above for future works relating to the WORKS above. If COMPANY acquires the NEW WORK, the provisions of this Agreement shall apply to the NEW WORKS.

Exhibit 7 at pg. 3, Section 3(C).

**RESPONSE**: Undisputed.

    17. Section 3(D) of the Agreement states:

> The ARTIST agrees to give the COMPANY a 365-Day option on the ARTIST's next game-length work and book-length work and manuscript-length work on the same terms as this agreement, which option period shall begin on the day the completed manuscript for such work is received by the publisher or 1-Year after the publication of the WORKS covered by the entirety of this agreement.

Id at Section 3(D).

    **RESPONSE**: Undisputed.

    18. On November 13, 2017, Norris reached out to Golden Bell via the messaging app WhatsApp, confirming that five characters were to be made into plush dolls: pink blob, orange blob, sexy pink blob, cat, and Oh No. Goldner Decl. at 16.

    **RESPONSE**: Disputed: this "fact" is a mischaracterization of the cited evidence – there is no statement by either Norris or "Golden Bell" "*confirming* that five characters were to be made into plush dolls…" The cited evidence is Goldner's declaration in which Golnder states: "Norris and Golden Bell agreed to produce five plush stuffed animal toys: a pink blob, an orange blob, a sexy pink blob, a cat, and a word bubble featuring the characters' catch phrase "Oh No" on one side, and "O kay" on the other See Exhibit 8. Norris drew the initial sketches of the toys, and provided them to Golden Bell, which made prototypes with numerous revisions and editorial taking into account how to best bring to life the Webcomic Name characters. See Exhibit 9." *See* ECF Doc. No. 127 at ¶16.

    Exhibit 8 [*See* ECF Doc. No. 120-8] is a screenshot of a WHATSAPP conversation between Norris, Rachel Korsen and Goldner – which Defendants claim contains the supposed "confirmation." In that conversation, Norris states:

> Hey all!
>
> So the past couple of months have been a bit rough- basically some things happened and I took on too much and became a big ball of bad anxiety. I'm trying to get out of it by stopping some projects and focusing on a select few, so that my time is more manageable. Sorry for falling off the face of the earth a while but I feel a bit better now. just trying to take it easy.
>
> Attached are some concept things! For ages I tried to do proper turnarounds but I am really bad at design. Instead here are some concept images to get the idea across. I *gave* some of the blobs bums because I think people will like that and give the plush a fun look. Let me know what you think!
>
> Alex

The attachment referenced in Norris's email is copied below:



In response, Korsen states:

> Okay sounds great!
>
> Thanks,
> Rachel

Goldner responded to Korsen's response, stating that only ***one*** prototype would be produced:

> This is really so awesome like I can't i love it so much!!! Rachel please send this to Fanny ASAP!
>
> Let's get this prototype made.
>
> Excited to see progress on the game, Alex! Let me know if you have anything brewing!

> We were thinking to start with a box design first so we can start promoting the game way early!!!
>
> Best,
> Marc Goldner
> Founder & C.E.O.

Exhibit 9 [*See* ECF Doc. No. 120-9] is an email exchange between Norris and Rachel Korsen, in which Norris states:

> Hello!
>
> I've spoken to Jason and I'm not sure if he has been in touch with you guys re the game!
>
> Basically I shut myself away for a while because I took on too many projects and was feeling very overwhelmed. I know I should have been more up front with you about it at the time but my brain wasn't doing things logically! The original plan was that I was supposed to be working on a book with a publisher over the summer, and when that finished I could start work on the game. Instead, the book stuff took months and months to get started and I've only been working on it for the past couple of months, with a final deadline for March. I thought I could do both at once but I didn't want either the book or the game to feel rushed! So ideally I would love to work on the game properly with Jason once the book is over with, although I know this leaves you guys in the lurch and Jason has a lot on with deadlines for other projects in the future. I'm sorry for messing up the timing and being so uncommunicative recently, I hope you understand. I'm still really keen on the project and want to do it at a time when I can focus on it properly! Please let me know your thoughts and any suggestions of where to go from here.
>
> Alex

In response, Korsen states:

> These are so funny, I literally cried when I saw the butts drawn on the back haha.
>
> I've sent them to the factory, waiting for their first go at the sample!
>
> Thanks and talk soon!

Rachel

19. On November 29, 2017, Norris emailed Golden Bell the rough sketches for four of the plush dolls. This included sketches of the Oh No Pillow, the sexy pink blob, pink blob, and orange blob. Id.

**RESPONSE**: Undisputed that Norris emailed sketches but disputed to the extent that Defendants claim that parties agreed to the production of five plush toys. Plaintiff incorporates by reference his response to Undisputed Fact No. 18.

20. On October 31, 2017, more than two months after entering into the Agreement with Golden Bell, Plaintiff entered into a publishing agreement with Andrews McMeel. Goldner Decl. at 28.

**RESPONSE**: Undisputed.

21. On October 4, 2018, Norris emailed Golden Bell stating "I am currently self-publishing a book called 'Animals' which is a 40-page book of comics about animals. The contract says you require an option on my next work, so here it is." Goldner Decl. at 29.

**RESPONSE**:  Undisputed.

22. On October 1, 2018, Norris emailed two invoices to Defendants demanding payment of advances identified in the agreement. Goldner Decl. at 20.

**RESPONSE**: Undisputed.

23. That same day Goldner Responded stating "We MUST receive the final files before paying as required in the contract allowing us to review and have 30 days to submit payment. We've been told numerous times the files were done and uploaded. Please upload the files today as this was the final deadline that you said it would be. Then we will review and have it paid within 30 days as per the contract once approved." Id.

**RESPONSE**: Undisputed to the extent that Defendants sent the email copied above, disputed to the extent Defendants claim they never received any files. Defendants confirmed that they had received the files on October 3, 2018, asking that they be sent as pdf's because the version sent by Alex were "clip files" that Goldner and company could not review at that time because they were attending New York Comic-Con:

> "Please export them as a batch PDF for comment reviews on Adobe Acrobat. They are all clip files and we are at NYCC (a show we invited you to at all expenses paid by us and ignored) and unable to provide feedback entirely."

Having received the files, Defendants added several new conditions that do not exist in the Collaboration Agreement before they would pay Alex:

> "There are other things we must clear up first prior to any advances being paid such as determining promotion, having shared access to social media accounts, all situations that shouldn't come as a surprise at all."

*Norris Opp. Decl.* at ¶3, Exhibit 24.

24. Plaintiff himself testified that the only loss of revenue he has experienced was due to the toll this lawsuit has taken on his mental health and energy, not the any actions of Defendants:

> Q. Can you identify the sales revenue that you've lost?
> A. As I've outlined before, this ahs [*sic*] taken a huge toll on my mental health and my energy and what time I can put into Webcomic Name and other things I'm doing. So I'm being very, you know,

> careful with that sort of thing in terms of my mental health and stuff; so – yeah.
> Q. Other than you not being able to produce these comics, have you noticed a loss in sales revenue?
> A. Despite not being able to grow the brand and my not being able to do more work for those reasons we've been talking about, the – things have been very up and down. My page has been growing despite all of those things, but I – you know it would be a lot more if thi at s wasn't happening.

Exhibit 16 at 23-24.

**RESPONSE**: Disputed. First, the cited evidence itself reflects that, but for Defendants' actions, Norris's brand would have grown. Second, Defendants omit several instances in which Norris testified to the revenue lost due to Defendants' actions:

> Q. How would you be making a lot more if this hasn't happened? How would your page be growing more?
> A. I would be able to put a lot more energy into growing my page, into making new work --- that would --- and I would be able to be more productive, make more things. I already know things I do right now work, and if I were to do more of them, then that would be better."
> Q. But there is something specific that you can point to? Like, there's no specific project that you haven't been able to complete as a result of this case?
> A. I am currently working on this book that's completely separate to Webcomic Name. And my mental health has been really difficult and it's been taking a long time to complete, and I could have done a lot more things like that if this hasn't been happening. I would also like to say I haven't been to any conventions or making public appearances for the last couple of years for that reason as well, post-COVID, obviously, for the same reasons; so that would also be a lot of revenue.
> Q. Well Mr. Norris, you mentioned that you are working on a book that's unrelated to Webcomic Name. Can you give us more information about that book?
> A. Yes.
> Q. And so what is this book about?
> A. It's called "How to Love." It is a book of love advice for teenagers all in comic form.
> Q. So, Mr. Norris, how much revenue have you generated or do you intend to generate from that book deal?
> A. I am not entirely sure of the exact numbers. Approximately

> 50,000 pounds in advance, but obviously there would be sales after that.

*Norris Opp. Decl.* at ¶3, Exhibit 25 (pg.'s 24-27.)

Dated: December 16, 2022
New York, New York                              Respectfully submitted,

                                                */s/ Francelina M. Perdomo*
                                                Francelina M. Perdomo, Esq.
                                                Kyle G. Kunst, Esq.
                                                GALLET DREYER & BERKEY, LLP
                                                845 Third Ave., 5th Floor
                                                New York, NY 10022-6601
                                                Phone: (212) 935-3131
                                                Fax: (212) 935-4514
                                                fmp@gdblaw.com
                                                kgk@gdblaw.com

                                                *Attorneys for Plaintiff*
                                                *Alexander Norris*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 16th day of December 2022, I caused to be served a copy of the foregoing via the Court's ECF filing system, on the following:

Gerard Patrick Fox
Gerard Fox Law, P.C.
1880 Century Park East
Suite 1410
Los Angeles, CA 90067
310-441-0500
Email: gfox@gerardfoxlaw.com

Ryan Dolan
Gerard Fox Law P.C.
1345 Sixth Avenue
33rd Floor
10105
New York, NY 10006
661-364-7254
Email: rdolan@gerardfoxlaw.com

*Attorneys for Defendants*

                                            */s/ Kyle G. Kunst*_____
                                            Kyle G. Kunst