UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ALEXANDER NORRIS, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No.  1:19-CV-05491 – PAE |
| | : | |
| Marc Goldner, Individually and as Officer of GOLDEN BELL ENTERTAINMENT, LLC, a California company and GOLDEN BELL STUDIOS, LLC, GOLDEN BELL ENTERTAINMENT, LLC., a California Company and GOLDEN BELL STUDIOS, LLC., | : : : : : : : | **DECLARATION OF MARC GOLDNER** |
| | : | |
| Defendants, | : | |
| | : | |
| | : | |

1

I, MARC GOLDNER, declare as follows:

1. I am a Member of both Golden Bell Entertainment, LLC, and Golden Bell Studios, LLC.

2. In February of 2017, Golden Bell Entertainment, LLC ("Golden Bell") purchased the intellectual property rights to four properties, including "Webcomic Name" and a game called Pretending to Grownup from Jason Wiseman which he claimed to have 100% "free reign" over. Pretending to Grownup contained thirty-two (32) guest artist cards, one of which was from Alex Norris ("Norris") containing the "disappointed blob" character uttering the phrase "Oh No." Underneath, the art used for the game card contained an assignment from Norris to Wiseman for "any future use." See Exhibit 1.

3. After purchasing the property from Wiseman, I reached out to Norris to ensure that any properties created under the Webcomic Name brand remained true to its original content. I explained that Golden Bell viewed Webcomic Name as a brand with potential for "stand alone [sic] comic, a children's book, or something else." See Exhibit 2.

4. On July 3, 2017, Norris emailed me regarding the proposed contract, stating "[t]he main query I have about the contract is the part about 'the artist will retain 0% of the copyright….'". See Exhibit 4. In that same email, Norris noted that he had an existing publishing deal, saying "I will be working with publishers on a book and I am going to send them a copy of the contract before signing to make sure there is no breach of my contract with them." *Id*.

5. I responded to Norris via email, noting "[t]o answer your question about copyright, Jason had agreed to us purchasing the rights for the game already and that part of the deal was already done." *Id.*

6. On August 10, 2017, both Norris and Golden Bell entered into the Collaboration Agreement ("Agreement"). Section 3(B) of the Agreement called for Norris to create the files for the Game. See Exhibit 3.

7. The Agreement called for the creation, production, and distribution of a game and stuffed animals, as well as any tie-ins, spinoffs, or other commercial development based on Webcomic Name and its characters, which the Agreement referred to as "the WORKS." Additionally, the Agreement states that "the proceeds from the sale or any and all other disposition of the WORKS and the rights, interest, and licensed therein with respect thereto, including but not limited to the following: Comic Book Rights, Motion Picture Rights, Animation Rights, Graphic Rights, Sequel Rights, Remake Rights, Television Rights, Gaming Rights, Film Rights, Stage Rights, Radio Rights, Publication Rights, Interactive Rights, Music Rights, Merchandising Rights, and Digital Rights." Further, Section 3(D) of the Agreement granted Golden Bell options on Norris' next game-length work, book-length work, and manuscript-length work, which Norris later acknowledged. See Exhibit 3.

8. Shortly after the Agreement was executed sometime in early September of 2017, Golden Bell and Norris had a recorded telephone conference wherein the parties had discussed plans related to building the multimedia brand of Webcomic Name. On the call the parties discussed utilizing Webcomic Name and its characters in other mediums. Myself, Norris, and Rachel Korsen, another Golden Bell Founding Member, discussed a daily calendar of Webcomic Name comics. There was mutual excitement over the idea, though Goldner noted that Golden Bell would need additional comics from Norris because Norris had not published enough Webcomic Name comics to cover a whole year (365 Days), and Golden Bell and Norris agreed they'd be using the comics Norris published via his social media accounts for Webcomic Name. This was

just one example of other commercial development of the WORKS. On that same call, Goldner explained that Golden Bell was a media company and not simply a game or toy company, reinforcing Golden Bell's first email to Norris that the company was planning on a 'sky is the limit' type of approach such as children's books, stand-alone comics, and other products including but not limited to animated content and digital derivatives. A common go-to-market strategy that Golden Bell uses as their business model.

9. The Agreement explicitly states in Section 1(A) that "ARTIST shall retain 0% of the copyright, 0% of the trademark, 0% of the patent and 5% of the net sales of WORKS for the first 18 months then it will revert to 4% of the net sales of the WORKS thereafter, and COMPANY shall retain 100% of the copyright, 100% of the trademark, 100% of the patent and 95% of the net sales of the WORKS for the first 18 months then it will revert to 96% of the net sales of the WORKS thereafter." See Exhibit 3. The Agreement further states that "[i]f ARTIST creates a new work with a character or storyline that infringes on any of COMPANY's copyrighted properties, ARTIST agrees to transfer any copyright he may have in that new work to COMPANY." *Id.*

10. Section 1(D) of the Agreement states "[a]ll future derivative works created by the parties will be defined by the percentages of the copyright and of the net profits defined in Section 1a of this Agreement listed above." *Id*.

11. Section 2(Q) of the Agreement states "COMPANY may protect, enforce, and pursue any legal action on behalf of the parties in relation to and in any aspect of the WORKS such as the titles, licenses, and rights of WORKS. The COMPANY will hereby take due diligence in protecting the WORKS." *Id*.

12. Pursuant to these provisions, on November 30, 2017, Golden Bell filed a trademark application Serial No. 87703934 with the USPTO on an intent to use basis for the mark "Webcomic

4

Name" in class 028. The USPTO approved that application, with Registration No. 5629281 on December 11, 2018.

13. The Agreement also reflects the parties desire to expand the Webcomic Name brand. Section 2(B) of the Agreement states that the parties shall share the proceeds, rights, interest, and licenses to the WORKS and its characters in a number of different mediums, such as motion pictures, animation, gaming, television, sequels, comic books, and more.. Section 3(C) of the Agreement, states "ARTIST shall submit to COMPANY all sequels to the WORKS or other works using characters that appear in the WORKS….". *Id*.

14. In addition to the WORKS and any subsequent work done by Norris which contains the characters from the WORKS, Section 3(D) of the Agreement also gave Golden Bell the option to publish Norris' next "game-length," "book-length," and "manuscript-length" works. *Id*.

15. Further, of the files that were provided by Norris, Golden Bell retained sole ownership of the artwork created for those files pursuant to Section 2(C) of the Agreement. *Id*.

16. On April 2, 2019, Andrews McMeel Publishing published Norris' book titled "Oh No," which featured characters and themes set to appear in the game, stuffed animals, calendar, and other properties. During discovery, it was discovered that Norris had not entered into a publishing agreement with Andrews McMeel until October 31, 2017, more than two months after executing his Agreement with us. See Exhibit 4. This is in direct contrast to what Norris initially told us, when he stated that he already had a contract with a publisher and was a violation of Section 3(D) of the contract, among other sections. See Exhibit 3.

17. Section 2(I) of the Agreement states "[i]f, prior to the completion of the WORKS, any of the Parties shall voluntarily withdraw from the collaboration, then the other Party or Parties

shall have the right to complete the WORKS alone or in conjunction with another collaborator(s), and ownership of the WORKS will revert solely to that Party or Parties." *Id*.

18.     The marks "Oh No" and "Webcomic Name" appear in a guest artist card for the game Pretending to Grownup, which is sold by Golden Bell Studios, LLC after acquiring the property from Wiseman. The card, which was assigned to Wiseman by Norris and then sold to Golden Bell, features the "pink blob" and "orange blob," who also appear in artwork meant for both the game and stuffed animals, are seen uttering the phrase "Oh No" alongside a tag "artwork courtesy of Webcomic Name." To date, Pretending to Grownup has sold no less than 7,940 units with a gross revenue of approximately $204,747.75 and has been sold and is still available for purchase from a number of different outlets, such as goldenbelldirect.com, amazon.com, walmart.com, and was once sold at physical retail stores such as Hot Topic.

19.     On or about November 8, 2022, I discovered that Norris had started a fundraiser on GoFundMe.com to raise money for his legal fees. This GoFundMe campaign is a wrongful campaign and breaches the terms of use on GoFundMe. In the description of the fundraiser, Norris falsely accused us of trying to "take *all* [his] intellectual property" See Exhibit 5.

20.     As a result of the false statements published by Norris, Golden Bell has received thousands of negative and hateful messages via email, social media, the company's websites, and other mediums, as well as appearing in reposts of the GoFundMe, third party social media posts, and the GoFundMe page itself. See Exhibit 6. Golden Bell's reputation and business continue to suffer and have been irreparably harmed by Norris' actions and false, defamatory statements.

I declare the following statements are true to the best of my recollection under the penalty of perjury under the laws of the United States of America.

Dated: December 16, 2022  *Marc Goldner*
New York, New York        Marc Goldner