

Ryan Dolan
rdolan@gerardfoxlaw.com

April 18, 2023

<u>**VIA NYSCEF**</u>

Hon. Sarah Netburn
United States Courthouse
40 Foley Square
New York, NY 10007

**Re:** *Norris v. Goldner et al.*

Dear Judge Netburn,

    I am writing to you regarding your April 14, 2023 Order surrounding the hearing on the parties' cross-motions for summary judgment to be held Wednesday, April 19.

*How the Language of the August 10, 2017 Collaboration Agreement May Be Read by the Court*

    The language in the Collaboration Agreement ("Agreement") is a clear, unambiguous assignment of rights to the WORKS, as well as any sequels, prequels, remakes, reboots, expansions, tie-ins, spinoffs, or other commercial developments. Section 1(A) of the agreement states that, unequivocally, 100% of the copyright, trademark, and patent are transferred to Defendants as a result of execution of the Agreement. Section 1(C) further restricts Norris from creating any character or storyline infringing on the works, and that if he does, he agrees to transfer the copyright in that new work to Defendants, while section 1(D) contemplates compensation for any derivative works. Such derivative works are further contemplated in Section 2(C), which provides for a grant of rights to the company to produce derivative works in a number of mediums. This assignment is further enforced by Section 3(C), which requires Norris to submit all sequels to the works or "other works using characters that appear in the WORKS…" to Defendants.

    With respect to the Defendants protection of the property via applications with the USPTO, the Agreement clearly authorizes such. First, it is clear that there is an assignment of 100% of the copyright and the trademark to Defendants. Second, multiple provisions in the Agreement place the duty of protection on Defendants. Section 2(Q) of the Agreement states that Defendants "will hereby take due diligence in protecting the WORKS," including pursuing or enforcing protections via legal action. That same due diligence requirement is again mentioned in section 3(C), which grants Defendants the rights to other works which contain characters covered by the agreement.

    Finally, Section 1(G) of the Agreement makes clear the payment structure for Norris. It states that Norris is entitled to a $3,125 upfront advance "**within 30 days** of the COMPANY



receiving the final files…." Even assuming Norris' alleged timeline is correct, and that the files were delivered on October 3, 2018, they were no longer within the link provided by Norris as of October 15, 2018.

*Interpretation of the Agreement*

Summary judgment is only proper in a contract dispute if the language of the contract is wholly unambiguous, and the question of whether the language of a contract is clear or ambiguous is a question of law. *Mellon Bank v. United Bank Corp.*, 31 F.3d 113, 115 (2d Cir.1994). Language in a contract is ambiguous when it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir.1993). When contract language is deemed ambiguous, it's interpretation is a question of fact to be resolved by the factfinder, unless "the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide to the contrary." *3Com Corp. v. Banco do Brasil*, S.A., 171 F.3d 739, 746–47 (2d Cir.1999).

*Defendants Use of the Materials in their Application to the U.S. Patent and Trademark Office*

Assuming, *in arguendo*, that Defendants and Plaintiff had not entered into this agreement which assigned 100% of the copyright and 100% of the trademark to Defendants and authorized Defendants to submit applications to the U.S. Patent and Trademark Office, such submissions could, in that hypothetical instance, satisfy the "unauthorized copying" element of a copyright infringement claim.

However, a trademark application seeks merely to reserve a right in a mark, and does not involve goods or services sold or rendered in commerce, and thus, an application does not give rise to a claim of trademark infringement or false designation of origin. *Unicorn Crowdfunding, Inc. v. New St. Enter.*, Inc., 507 F. Supp. 3d 547, 565 (S.D.N.Y. 2020).

*Use of the "Pink Blob" In Commerce*

15 U.S.C. § 1127 States that a mark shall be deemed to be in use in commerce (1) on goods when (A) it is placed in any manner on the goods or their containers or the displays associated therewith…and (B) the goods are sold or transported in commerce…. 15 U.S.C § 1127. This standard requires that the "bona fide" commercial use be followed by "activities proving a continuous effort or intent to use the mark." Chere Amie, Inc. v. Windstar Apparel, Corp., No. 01 CIV. 0040 (WHP), 2002 WL 31108187, at *2 (S.D.N.Y. Sept. 23, 2002).

Defendants have met the standard for bona fide use in commerce. The Pink Blob, the Orange Blob, and Webcomic Name are not only featured as a prominent card in the game "Pretending to Grownup," but they also feature prominently in the promotional material of the game, both in the digital advertisements posted on line, as well being featured on the physical displays where the games are sold. The game has generated over $200,000 in revenue and is there



is a continuous use of the mark, as the game is still available for purchase from a number of outlets to this day.

### *Defendants Receipt of Incomplete Game Files*

It is clear from the evidence that the files delivered were not the final product in terms of being ready to print and publish a game. On October 2, 2018, Alex Norris emailed defendants a link indicating that he was providing 250 set-up cards and 150 punchline cards. Goldner Decl, Exh.1. An email exchange over the next several days makes clear where the parties stood regarding the delivery of files. First, Marc Goldner explains to Norris that the game files need to be edited before being finalized, and that Defendants had provided Norris notes of changes they wanted made to previously provided files. Goldner further stated that "files can't be considered final until we have editable assets for the box (front, back, sides), the rulebook, [and] the back of the cards." Norris assented to this editorial process on October 8, 2018, noting that "Please send over notes and I will read them….I also have some notes if you would listen to them in return!" Norris further stated "[o]kay, the game box will be the final file to send over and will do so once the final form of the game is finished. Look forward to hearing your notes." Goldner Decl., Exh. 2. Finally, on October 15, 2018, after attempting to review the files via the link provided by Norris, Goldner informed Norris that "[t]he link to the files are not working and says it has been deleted. Let me know." Goldner Decl, Exh.1. Norris did not provide any files to defendants after this email exchange, nor did he respond to Goldner's email or his subsequent follow-up on October 31, 2018.

Best Regards,

Ryan Dolan