```
                UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
------------------------------:

ALEXANDER NORRIS d/b/a        : Case No.: 19-cv-5491

WEBCOMIC NAME,                :

                  Plaintiff, :

     v.                       :

MARC GOLDNER, et al.,         : New York, New York

                  Defendants.: April 19, 2023

------------------------------:




              TRANSCRIPT OF PROCEEDINGS

        BEFORE THE HONORABLE SARAH NETBURN

          UNITED STATES MAGISTRATE JUDGE




APPEARANCES:

For Plaintiff:          SAUL EWING LLP
                        BY:  Francelina M. Perdomo
                             Christie R. McGuinness
                        1270 Avenue of the Americas
                        New York, New York 10020

For Defendant:          GERARD FOX LAW P.C.
                        BY:  Ryan Dolan
                        1345 Sixth Avenue
                        New York, New York 10006




Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.


    AMM TRANSCRIPTION SERVICE - 631.334.1445
```

PROCEEDINGS

1              MS. PERDOMO:  Francelina Perdomo, Saul
2     Ewing LLP for the plaintiff, Alexander Norris.
3              THE COURT:  Thank you.
4              MS. McGUINESS:  Good morning, your Honor.
5     Christie McGuiness, also Saul Ewing LLP for the
6     plaintiff.
7              THE COURT:  Thank you.
8              MR. DOLAN:  Good morning, your Honor.
9     Ryan Dolan, Gerard Fox Law, for defendant.
10             THE COURT:  Thank you.
11             Okay.  Thank you all for being here.  I
12    appreciate everybody coming in on slightly short
13    notice.  We have been studying the parties' motions
14    and I must confess, have a fair amount of confusion
15    about what is being alleged and what the parties are
16    asking the Court to do.  And so rather than stumble
17    through it, we thought we would give you all an
18    opportunity to try and clarify some of the points.
19    Thank you for your letters.  That helped in part,
20    though we still have some confusions.
21             So why don't I just jump right in.  Let
22    me first begin by asking a question of plaintiff's
23    counsel with respect to a case from the district --
24    same district judge who is the district judge in
25    this case.  This is with respect to counts one and

PROCEEDINGS

1  two, which I understand are an unauthorized copying

2  claim and a false designation claim.  Both of those

3  are in connection with an application that remains

4  pending, as I understand it, to the PTO.

5          And my question for plaintiff's counsel

6  is how to establish use in commerce in order to

7  bring those claims, particularly in consideration of

8  the Unicorn case, that's Unicorn Crowdfunding versus

9  New Street Enterprise.  The citation is 507

10  F.Supp.3d 547.  It's a 2020 decision from District

11  Judge Engelmayer, and in it, he interprets the

12  statute and concludes that an application to the PTO

13  does not constitute use in commerce.

14          So my question for Ms. Perdomo is, do you

15  have any authority to the contrary?  And if not, how

16  do you believe you can establish the elements of

17  those two claims?

18          MS. PERDOMO:  Thank you, your Honor.

19  Just as a clarification, so that I understand what

20  argument the Court wants me to make, this case,

21  Unicorn, I believe the defendants are citing to this

22  case because --

23          THE COURT:  Correct.

24          MS. PERDOMO:  Okay, great.  And is this

25  case related to copyright infringement or to using

PROCEEDINGS

1    commerce of the Webcomic Name mark vis-a-vis the

2    guest card?

3              THE COURT:  This is your case.  So my

4    understanding of what you're alleging, and tell me

5    if I'm wrong, my understanding of counts one and two

6    are that the defendant violated your client's

7    copyright by applying to the PTO for use of the

8    Webcomic Name and "Oh No" in various classes.  And

9    that you argue that by screenshotting pages and the

10   like in those applications, that there was a false

11   designation of origin and an unauthorized copying.

12             And my question to you is, are you aware

13   of any authority that authorizes those two claims

14   based on the filing of an application to the PTO?

15             MS. PERDOMO:  Your Honor, our position is

16   that --

17             THE COURT:  Sorry, can you just answer

18   the question?  Are you aware of any cases that allow

19   you to bring a copyright infringement or a false

20   designation claim based exclusively on the

21   application?

22             MS. PERDOMO:  Yes, your Honor.  We cite

23   United We Stand.  United We Stand versus United We

24   Stand.  The citation is 128 F --

25             THE COURT:  Is that in your letter?

AMM TRANSCRIPTION SERVICE - 631.334.1445

PROCEEDINGS

1              MS. PERDOMO:  That is in our brief.

2              THE COURT:  In your brief.  Okay.

3              MS. PERDOMO:  The reason that is not in

4    our letter is because I have a completely different

5    approach regarding the copyright infringement.  And

6    if you wanted to go into it, but this particular

7    case, in this case, the Court held that

8    notwithstanding jurisdictional "in commerce

9    requirement," Section 114 contains no commercial

10   activity requirement.  Rather, it prohibits any

11   person from, without consent of the registrant of a

12   mark, using the mark in connection with the sale,

13   offering for sale, distribution or advertising of

14   any good or services, or in connection with such use

15   is likely to cause confusion or cause a mistake or

16   to deceive.

17             THE COURT:  Okay.  I don't have the case

18   in front of me, so it sounds like that case stands

19   for the proposition that if you are using the

20   copyrighted material in commerce or offering

21   something for sale, that that would be a violation.

22             Is that what that case stands for?

23             MS. PERDOMO:  Yes.  Yes, your Honor.

24             THE COURT:  Okay.  So I think the

25   question is whether or not applying to the PTO

PROCEEDINGS

1   constitutes in commerce.  That's the question that

2   I'm asking.

3          MS. PERDOMO:  Our position is that it

4   does not have to constitute in commerce because

5   copyright infringement is a strict liability

6   offense.  So the mere fact that defendants copied

7   these protected materials and submitted it to the

8   USPTO, essentially -- essentially, the fact that

9   they copied those materials and submitted it to the

10  USPTO constitutes infringement per se because it's a

11  straight liability offense.

12          And in support of this case, we have

13  Strike 3 Holdings versus Doe.  And it says that the

14  only two aspects that a party must show is ownership

15  of a valid copyright and unauthorized copy.  And we

16  believe that in this case, we have those two

17  elements.  And the using commerce element, it's a

18  trademark concept, not a copyright infringement

19  concept.

20          So in other words, when we discussed the

21  use in commerce issue, we talked about whether

22  plaintiff, defendants ever used any of these items

23  in commerce in order to satisfy the requirement from

24  the USPTO requirement that the mark be in commerce

25  in order for it to be registered.

PROCEEDINGS

1          So, in our view, there are two completely

2    different approaches and arguments.  One is the

3    copyright infringement argument, which is copyright

4    is a strict liability offense.  Intent is not taken

5    into consideration, use is not taken into

6    consideration.  The only two requirements for this

7    claim to exist is ownership of a valid copyright and

8    copy.  And based on the evidence on the record,

9    those two are met in this case.

10          THE COURT:  Okay.  Okay.  I think I

11   understand your position.  And so those two claims

12   relate, just so I'm clear, exclusively to the

13   application to the PTO; is that correct?

14          MS. PERDOMO:  Right.  The copyright

15   infringement claim relates to defendants' actions in

16   connection to their application to the USPTO.  What

17   they did is a strict liability offense, which taking

18   our client -- our client's content, copying without

19   authorization and then submitting them to the USPTO.

20          The false designation of origin claim

21   comes with that action as well, because they went to

22   the USPTO and they claimed to the USPTO that those

23   products, which defendants clearly admit,

24   specifically Mr. Goldner, in his deposition, that

25   the company never commercialized these items.

PROCEEDINGS

```
 1            The defendants went to the USPTO and
 2   alleged to the USPTO that they were commercializing
 3   these items and screenshot copies of -- screenshot
 4   images of T-shirts and other items that our client
 5   had in commerce.  And then claimed to the USPTO that
 6   those items belong to them, to the defendants.
 7            And, you know, as a result of those
 8   actions, we believe that plaintiff meets the
 9   requirements of the false designation of origin
10   because it is well established that false
11   designation of origin occurs where goods or services
12   are involved and there is a false designation of
13   origin or a false description or representation with
14   respect to those goods or services -- or services.
15            And in support of this argument, we cite
16   Pulse Creations versus Vesture Group.  And this is
17   Southern District of New York, decided in 2015.  So
18   we believe that --
19            THE COURT:  And what does Pulse Creations
20   stand for?
21            MS. PERDOMO:  It stands for the
22   proposition that there's false designation of origin
23   when the party falsely represents the origin of
24   those boxes.  So in other words --
25            THE COURT:  And it can be abstractly.  It
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

PROCEEDINGS

```
1    doesn't need to be in commerce.  That's your
2    position?
3              MS. PERDOMO:  No, your Honor, it needs to
4    be in commerce.  So that I do agree, it needs to be
5    in commerce.
6              THE COURT:  Okay.  So then let's circle
7    back to the Unicorn case, which is a false
8    designation case, and goes through this specific
9    issue and discusses the need to have use in commerce
10   and what that means, and concludes that the
11   defendant's trademark application -- I'm quoting
12   now, "falls outside the scope of a use in commerce
13   as defined by Section 1227.  Such an application
14   seeks merely to reserve a right in a mark and does
15   not involve goods or services sold or rendered in
16   commerce."
17             So I think a strict application of
18   Unicorn Crowdfunding, which, of course, is not
19   binding on this Court, so if you want to argue that
20   Judge Engelmayer got it wrong, I'm happy to hear
21   from you.
22             MS. PERDOMO:  Yes, your Honor, you are
23   correct as to your interpretation of that case.  Our
24   case, however, denotes commerce authority under the
25   commerce laws rather than an intent to limit the
```

PROCEEDINGS

1  act's application to profit-making activity.  So our

2  position is that this particular case that we cite

3  does not require --

4           THE COURT:  Pulse Creations?

5           MS. PERDOMO:  No, this is going back

6  to -- Pulse Creations -- we are citing Pulse

7  Creations for the elements -- for the elements of

8  this false designation of origin.

9           With regards to distinguish Unicorn,

10  we're citing in our brief to United We Stand.  And

11  yes, your Honor, you're right, we did not cite that

12  in our letter.  But this particular case, in this

13  case, denotes commerce authority under the commerce

14  laws rather than an intent to limit the act's

15  application to profit median activity.

16           So our position is that, yes, your Honor,

17  you're correct.  In this case, there was not using

18  commerce.  But there's an exception to that

19  requirement, and that exception is in this

20  particular case that I just mentioned to you.

21           THE COURT:  Okay.  Does defendant want to

22  respond on counts one and two?

23           MR. DOLAN:  Yes, your Honor.  I do

24  believe that your interpretation of the Unicorn

25  Crowdfunding case is right.  Mr. Engelmayer -- Judge

PROCEEDINGS

1  Engelmayer makes it pretty clear that an application

2  does not meet the use in commerce.  And I think even

3  under plaintiff's argument, they still fail to

4  ascertain how defendants used this mark in their

5  application with respect to goods and services,

6  right.  There's no allegation that they produced any

7  goods or services in connection with this

8  application that would cause confusion within the

9  commercial market.  It's simply a trademark

10  application, which Judge Engelmayer clearly denotes

11  is outside the scope of use in commerce.

12           THE COURT:  Are you familiar with any of

13  the cases that plaintiff cites?  And do you have any

14  comments about them, if so?

15           MR. DOLAN:  Your Honor, I am familiar

16  with them to the extent that I did counter them and

17  denote why plaintiff was mistaken in the way that

18  they cited those in our briefs.  But I don't have

19  those in front of me, so I can't make that argument

20  here.  But they are in the briefs as to why we

21  believe that those cases are not on point the way

22  the plaintiff believes.

23           THE COURT:  Okay.  All right.  Let me

24  actually go back to you, Mr. Dolan, if I may, and

25  let's move on.  I think I want to, just for a

PROCEEDINGS

```
 1   second, move to the breach of contract claim, which
 2   is count four.  And I want to now focus on
 3   defendant's position, because I'm having a hard time
 4   understanding what your position is and how you land
 5   on it.
 6            In your letter of April 18th, you say,
 7   sort of, generally section 1A of the agreement
 8   states that, unequivocally, 100% of the copyright,
 9   trademark and patent are transferred to defendants
10   as a result of the execution of the agreement.  And
11   you repeat that.
12            In the next paragraph, first, it is clear
13   that there is an assignment of 100% of the copyright
14   and the trademark to defendants.  You continue in
15   that same paragraph, saying that in Section 3C,
16   grants defendants the rights to other works which
17   contain characters covered by the agreement.
18            So can you tell me what you believe your
19   clients' rights are as a result of this agreement?
20   And if you could speak with as much specificity as
21   possible, both as to the scope of what you believe
22   this agreement covers as well as the provisions in
23   the agreement.
24            MR. DOLAN:  Yes, your Honor.  Your Honor,
25   you know, I think the contract does speak for
```

PROCEEDINGS

1    itself.

2            THE COURT:  The contract is terrible.

3    It's impossible to read.  So I'm not sure it speaks

4    for itself at all.  Sorry to interrupt you.

5            MR. DOLAN:  That's okay, your Honor.

6            So section 1A does state that there is

7    100% of the trademark and 100% of the copyright

8    related to the works, which are then conveyed from

9    Mr. Norris to defendants.

10           THE COURT:  Okay.  So what do you believe

11   the works are?

12           MR. DOLAN:  So, your Honor, I think the

13   works state that here, right, and if you read the

14   opening paragraph, it does define the works as

15   Webcomic Name Game and Webcomic Name stuffed

16   animals.

17           THE COURT:  Okay.  So the works are the

18   game and the animals?

19           MR. DOLAN:  Yes, your Honor.  But I

20   believe, you know, if we also look at the contract

21   in its entirety, which the case law does dictate us

22   to do, right, in the summary judgment phase, we have

23   to look at it within the entire context of the

24   agreement.  There are also multiple provisions and

25   clauses that expand that out, right?

PROCEEDINGS

```
 1              So if we look at section 1F, it states in
 2     the first sentence here, that the artist confirms
 3     that all rights, interests and licenses related to
 4     the multimedia property, Webcomic Name Game, have
 5     been transferred to the company upon signing of the
 6     agreement, and the contract signed between Jason
 7     Wiseman and company.
 8              Clearly, here the defendants are
 9     indicating what they've indicated both in this
10     contract and in their discussion with Mr. Norris,
11     that they view this property as a brand, a
12     multimedia brand expanded beyond the game and the
13     plush animals.
14              And, your Honor, if we look at section --
15              THE COURT:  Sorry, where do you see that
16     here?
17              MR. DOLAN:  Yes, your Honor, that's
18     section 1F, the very first sentence of that clause.
19              THE COURT:  Okay.  "The artist hereby
20     confirms that all rights, interests and licenses
21     relating to the multimedia property, Webcomic Name
22     Game, has been transferred to the company upon the
23     signing of the agreement."
24              So you read that as transferring
25     something more than rights in the game and the
```

PROCEEDINGS

1    animals?

2              MR. DOLAN:  Yes, your Honor.  And if we

3    look to -- specifically to clause -- if we look

4    specifically to clause 2B, that point is further

5    enforced, right, because it states that it is

6    understood and agreed that parties shall share,

7    hereunder, without limit, unless otherwise herein

8    stated, the proceeds from the sale or any and all

9    other disposition of the works and the rights,

10   interests and licenses therein with respect to,

11   including, but not limited to the following, and it

12   lists a number of multimedia properties, you know,

13   from comic book rights, from film rights, from

14   animation rights, et cetera.  And that further lays

15   out that should these properties be made, the artist

16   is entitled to the same case structure that he would

17   be for the game or the plush dolls.

18              So this is clearly another furthering of

19   defendants' intention and Mr. Norris' intention that

20   this is not limited to a game or plush, that they

21   view this as a larger whole brand that can be

22   expanded into a number of mediums.

23              THE COURT:  And so it's your

24   interpretation of paragraph 1F and 2B that,

25   collectively, it essentially gives the defendants

PROCEEDINGS

1   all rights in Webcomic Name and the expression "Oh
2   No," and all of the artist's intellectual property?
3   Is that your interpretation?
4        MR. DOLAN:  Your Honor, there is another
5   clause in here that I think, if we look at section
6   2C, also expands into that right that we're
7   discussing, where it says that, "Companies shall
8   have sole ownership of the original artwork used and
9   created for the works by either artist or the
10  company."
11       So once Mr. Norris takes these sketches
12  of plush dolls or sketches of game cards, including
13  this pink blob, the cat, "Oh No," Webcomic Name,
14  whatever have you is on these sketches that were
15  delivered to defendants for the purposes of this
16  game and the plush dolls, that becomes ownership of
17  defendants.
18       THE COURT:  To all of his intellectual
19  property rights?
20       MR. DOLAN:  Whatever is contained within
21  those plush dolls and sketch cards for the game,
22  which includes the pink blob, which includes
23  Webcomic Name, which includes "Oh No," which
24  includes the cat drawing that he has, he delivers a
25  number of sketches saying, hey, here's an idea for

PROCEEDINGS

```
1    the plush doll, here's what I'm thinking.  It's an
2    "Oh No" bubble pillow.
3             And then additionally, whatever is
4    involved in the test game cards that he originally
5    sent, under this contract becomes ownership of
6    defendants, sole ownership, including that 100%
7    copyright and 100% trademark.
8             THE COURT:  So let me ask you a
9    hypothetical question, if I can.
10            MR. DOLAN:  Absolutely.
11            THE COURT:  Let's say the defendants were
12   fortunate enough to enter into this agreement with
13   the Simpsons, and there was going to be a Homer
14   Simpson board game.  And in this agreement, in the
15   preliminary paragraph, it said that this is
16   agreement for the production of the properties,
17   tentatively entitled The Homer Simpson Game, herein
18   after -- and The Homer Simpson stuffed animals, the
19   works, all right, everything else is now the same in
20   this agreement.  Would that entitle your client to
21   the rest of The Simpsons, all of the recreations,
22   T-shirts, episodes, movies?  Under your reading of
23   this agreement, would that be the rights that your
24   client would have obtained?
25            MR. DOLAN:  I think it would entitle them
```

PROCEEDINGS

1   to whatever The Simpsons then provided as sketches

2   for that board game.

3            THE COURT:  Well, presumably it would

4   include, for instance, a sketch of Homer Simpson.

5            MR. DOLAN:  Presumably, your Honor.

6            THE COURT:  Okay.  And so then would your

7   client own the intellectual rights to the Homer

8   Simpson image, which is the same every time it's

9   recreated?

10           MR. DOLAN:  Yes, your Honor.  I believe

11  so.  I wouldn't advise The Simpsons to enter into

12  that contract and sign away those rights, but I do

13  believe that that's what is transferred in this

14  contract.  And if that contract were signed by The

15  Simpsons, then, yes, that is what I believe this

16  contract says.

17           THE COURT:  Okay.  And so I understand

18  your arguments, you believe that 1F expands beyond

19  the game and the animals, and that 2B and 2C do the

20  same?

21           MR. DOLAN:  Yes, your Honor, I think when

22  read in conjunction, that is what it is.

23           THE COURT:  Is there any limiting factor

24  in your interpretation?

25           MR. DOLAN:  Your Honor, I would say in

AMM TRANSCRIPTION SERVICE - 631.334.1445

PROCEEDINGS

1    terms of that, it doesn't expand to all of Mr.

2    Norris' intellectual property.  It expands to

3    whatever he created for -- the artwork that he

4    created for this game and the plush.  So, for

5    instance, if he goes out and draws another comic

6    tomorrow that doesn't include any of the characters

7    he provided for this game, this plush, this

8    multimedia brand, then, you know, it doesn't expand

9    his entire universe or anything he creates in the

10   future, just whatever he created for this game that

11   has now been transferred to the defendants.

12              THE COURT:  Okay.  But we agree that the

13   Webcomic Name image doesn't vary.  So the image that

14   was given to your client for the purposes of

15   creating the works would, under your theory, entitle

16   your client to the rest of this artist's character

17   in perpetuity?

18              MR. DOLAN:  For the Webcomic Name

19   specifically, yes, your Honor, because I do believe

20   that Mr. Norris has different comics under other

21   names, Dorris McComics, things like that, that are

22   substantially different than the Webcomic Name

23   brand.

24              THE COURT:  Okay.  And what did he

25   receive?  He received 4% of any royalties; is that

PROCEEDINGS

1   right?

2           MR. DOLAN:  Your Honor, I believe it's 5%

3   initially for the first 18 months and then 4%

4   thereafter.  And, your Honor, I believe he does get

5   complimentary units of the game, plush dolls, were

6   they to be created, had defendant -- had Mr. Norris

7   provided the final files.

8           THE COURT:  I'm looking for another

9   provision that I wanted to ask you about.  Can you

10  tell me how you interpret paragraph -- the second

11  paragraph, 2A.  So there's 2A, and then it goes

12  through the alphabet, and then you get to M, and

13  then you get to A again.  "Creator may not create

14  any unaffiliated work that has the potential to

15  damage the works."  What does that mean?

16          MR. DOLAN:  So, your Honor, what that's

17  saying is, in this contract, the defendants are

18  investing in the Webcomic Name brand as well as Mr.

19  Norris as an artist, right?

20          Because Mr. Norris is supposed to play a

21  role in promoting this brand and building it up

22  beyond the simple, you know, web comic, viral web

23  comic that it is, into the global brand that

24  defendants envision.  What this is saying, this is

25  essentially a good-cause provision.  For instance,

PROCEEDINGS

1    there's, like, one brand of the comics that Mr.

2    Norris created subsequent to entering this provision

3    that is best described as blob erotica, where it has

4    blobs engaging in sexual acts or making sexual

5    comments, things like that.  That would be something

6    that, should defendants determine is harmful to the

7    brand that they see as kind of a PG version that

8    they can market to kids, would be a violation of

9    this provision.

10            THE COURT:  Okay.  What about

11    paragraph -- I found what I actually wanted to ask

12    you about -- paragraph 3C.  How do you interpret

13    that paragraph?

14            MR. DOLAN:  So, your Honor, this is

15    another paragraph that is speaking to the rights of

16    the client.  This is, if artists should create any

17    sequel works containing the characters that he

18    provided in the sketches and that were set to appear

19    in the games and the plushes, that if he were to do

20    that, that, (A), defendants will take the due

21    diligence in protecting those works because that is

22    required by this contract, such as the trademark and

23    copyright protections; and, (B), that he will

24    receive the same pay structure as this contract.

25            THE COURT:  Well, it's more than that,

PROCEEDINGS

 1   right?  "Artists shall submit to company all sequels
 2   to the works," which, again, we agree is games and
 3   animals, "or other works using characters that
 4   appear in the works and any other unrelated
 5   characters."  What does that mean?
 6                MR. DOLAN:  Your Honor, so I think the
 7   interpretation there is that -- so, your Honor, that
 8   idea is so if the characters that are set to appear
 9   in the works, say, make an appearance in any other
10   non-Webcomic Name games or Webcomic Name comics,
11   right, so say, for instance, his Dorris McComics,
12   where his comics appear in human form and not the
13   blob form, but the blob all of a sudden makes a
14   cameo appearance, then that would be similar to what
15   should be submitted to defendants, because that is
16   not their property.
17                THE COURT:  Can you guys say that over
18   again?  I didn't follow that at all.
19                MR. DOLAN:  I didn't say that very well.
20   I apologize, your Honor.
21                So, for instance, should this blob
22   character, right, let's use the pink blob, for
23   example, should he make an appearance in Mr. Norris'
24   other comics, right, so we talked about how he has
25   Dorris McComics, which is a completely different

PROCEEDINGS

1   brand drafted artwork, it's a different style.  It's

2   a human comic.  If the blob all of a sudden shows up

3   in that comic as a recurring character, then those

4   comics would need to be submitted to the defendants.

5             THE COURT:  It seems like, as I

6   understand what you're trying to say, this would

7   give you rights to everything he does.  I don't

8   understand.  This says -- so sequels to the works.

9   I get that.

10             MR. DOLAN:  Yeah.

11             THE COURT:  So if he wants to make a

12   second game, you guys are saying this contract gives

13   you the rights to that, or other works.  So we don't

14   know what the other works are.  So if he wants to

15   make, I don't know, a coloring book using characters

16   that appear in the works, so Webcomic Name appears

17   in the works, the game and the plushie, and any

18   other unrelated characters.  So that could be a

19   character about Judge Netburn.  So that seems to me

20   to suggest that if the artist were to create any

21   other work, a coloring book that uses any other

22   unrelated characters, Judge Netburn, that your

23   client would own that.

24             MR. DOLAN:  Your Honor, I do understand

25   your interpretation there.  I think that, you know,

PROCEEDINGS

1    the way that defendants and I interpret it is in

2    correlation with using the characters that appear in

3    the works.  So if they were to appear in

4    conjunction, right, so if the character, Judge

5    Netburn, were to appear alongside the blobs, then

6    that piece of work would fall within this provision.

7    But if Mr. Norris were to create a comic around

8    Judge Netburn and none of the characters that he

9    provided appear, then that work would fall outside

10   the scope of this provision.

11          THE COURT:  Okay.  So you would have the

12   Court excise certain provisions of this provision?

13          MR. DOLAN:  No, Your Honor, that's just

14   merely my interpretation of it.

15          THE COURT:  Well, that's what we're here

16   to do.  So, you know, you have a wildly expansive

17   interpretation of this contract.  And so, you know,

18   the words here say, "And any other unrelated

19   characters."  It doesn't seem to be tied to the

20   works because it also is tied to other works.  And

21   so I guess if you don't think this contract would

22   entitle your client to the artist's entire oeuvre

23   for the rest of their life, then I'm curious how you

24   interpret this provision.

25          Anything further?

PROCEEDINGS

1          MR. DOLAN:  No, your Honor.

2          THE COURT:  Okay.  All right.  Why don't

3    I turn to plaintiff's counsel.  And let me begin by

4    saying in your pleading, in your briefs, I should

5    say, you, as I understand it, claim two arguments

6    about supporting your breach of contract claim.

7          The first you describe as exceeding the

8    scope of the license, and the term "license" appears

9    a lot.  I assume you're using that word

10   interchangeably with the agreement, which I don't

11   read to be a license, but maybe you can illuminate

12   if you think there's a license that's at issue here,

13   or what it is that you're referring to when you talk

14   about exceeding the scope of the license.

15         MS. PERDOMO:  Your Honor, thank you.  We

16   believe that the rights granted in this agreement

17   are extremely narrow.  And because our client has a

18   business and a -- not only a business, but his

19   entire livelihood is around Webcomic Name Game, the

20   intention in entering into this agreement was to

21   grant a limited right to a specific portion of that

22   suite of IP that the client -- that our client owns,

23   which is the Webcomic Name Game brand and related

24   characters and merch, et cetera.

25         THE COURT:  Sorry, you're confusing me a

PROCEEDINGS

1    little bit.  Is game part of your client's whole

2    suite of IP or is it just Webcomic and then --

3                MS. PERDOMO:  Webcomic is the part of my

4    client's suite of intellectual property.  We call it

5    a license because in this agreement, our client was

6    recruited and essentially accepted a very limited

7    scope of work in which he licensed those properties.

8                In other words, all of the underlying --

9    not the underlying, but his entire brand, he

10   licensed it for the limited purpose of creating the

11   game and the plush.  So in that sense, we call it a

12   license because in our view, it's a very limited

13   permission to use Webcomic Name for those particular

14   works, which, in our view, we agree with your Honor,

15   that the agreement is ambiguous, but we believe that

16   the definition of the term "works," is clear.  So

17   that's our position.

18               THE COURT:  Is there anything in the

19   agreement that supports the idea of this being a

20   license other than your interpretation of it being a

21   narrow grant of rights?

22               MS. PERDOMO:  I believe that because it

23   is a narrow assignment of right, a narrow permission

24   to use Webcomic Name.  That's why I believe it's a

25   license.

PROCEEDINGS

1          THE COURT:  Okay.  And how do you

2     reconcile that concept with paragraph -- I think

3     it's 1A?

4          MS. PERDOMO:  Paragraph 1A discusses --

5     uses the term "assignment."  I agree with that.

6          THE COURT:  Plus, "Artist shall retain 0%

7     of the copyright, 0% of the trademark, 0% of the

8     patent, and a percentage of sales of the works".

9          MS. PERDOMO:  Only of the works.

10          THE COURT:  Okay.  But you call that an

11     assignment because he has other IP rights that you

12     believe he's held onto?

13          MS. PERDOMO:  Well, the agreement calls

14     it an assignment, but I call it a license.  We

15     believe that, if we read the agreement in the

16     entirety, the intent of the party was simply to

17     grant permission to use Webcomic only for the game

18     and the plush.  So, in that sense, it's a permission

19     to use -- limited permission, limited scope to use

20     Webcomic for those two works that are defined

21     throughout the agreement.  And any rights that

22     defendants receive or were meant to receive under

23     the agreement stem only from the game and the plush.

24          THE COURT:  Okay.  Do you want to address

25     any of these other paragraphs that we've been

PROCEEDINGS

1    talking about?

2            MS. PERDOMO:  Yes, your Honor.  With your

3    permission, I would love to address that.

4            THE COURT:  Okay.

5            MS. PERDOMO:  First, in your question,

6    your Honor, you asked how the language of the

7    agreement supports our motion.  And I think that the

8    agreement supports our motion in three very

9    important provisions.  The first one, of course, is

10   the definition of works.  That is the first

11   provision.

12            And I think -- and I believe that just by

13   reading the contract, as you mentioned earlier, it

14   is clear that the agreement deals with a not yet

15   developed tabletop game and a not yet developed

16   plush story.  And that is in the preamble.  And it's

17   also cited throughout the agreement, first, in

18   paragraph 1A, when it relates to the assignment --

19   when it relates to the assignment of rights that we

20   just discussed, any rights that plaintiff was meant

21   to receive under this contract is limited to those

22   two specific properties.

23            So we believe that paragraph 1A supports

24   our position.  We also believe that paragraph 2L, as

25   in lion, supports our position as well, because

PROCEEDINGS

1   defendants --

2           THE COURT:  Sorry, which paragraph is

3   that?

4           MS. PERDOMO:  2L, as a lion.  Defendants

5   are arguing that the works also include the

6   underlying characters.  And we believe that

7   paragraph 2L supports our position and not theirs.

8   Because here in this paragraph, this paragraph seems

9   to seek a limited permission to use those characters

10  for cameo appearances, for promotional and marketing

11  purposes only.

12          So if defendants had the rights of all

13  those characters in the first place, why did we have

14  a clause in the agreement that specifically limits

15  the use of those characters for promotional

16  purposes?  And so if that was the case in the first

17  place, then why even include this?  This paragraph

18  would be unnecessary and redundant, in our view.

19          THE COURT:  But doesn't the second

20  sentence sort of speak a little bit to that?  As I

21  read paragraph 2L, first it says that "characters in

22  the works, characters in the board game that make a

23  cameo appearance."  So the Judge Netburn character

24  makes a cameo appearance in the game, "then the

25  company can use that cameo appearance to increase

PROCEEDINGS

1    awareness of the work."

2           So that's saying, okay, if Judge Netburn

3    appears in the game, then the company has the right

4    to use Judge Netburn to promote the game.  But then

5    it continues and says "characters appearing in

6    works," Judge Netburn, "may be used in other

7    properties of company with no financial obligation

8    to or expectations by the artist."

9           So that seems to suggest that the mere

10    fact that this cameo appearance happened in the

11    works, now all rights are transferred to the company

12    without any need to compensate the artist.

13           MS. PERDOMO:  Right, but I -- I agree

14    with that interpretation.  I think that this

15    agreement includes characters like the Judge Netburn

16    character, but also because it does not specify, it

17    also includes characters that appear in the works,

18    namely the characters, the Webcomic Name Game

19    characters, too.  And there's no distinction as to

20    whether these are other characters or the characters

21    that are in the work.

22           But in addition to this particular

23    paragraph, there's another paragraph that also talks

24    about future works and future characters.  I think

25    that the paragraph that discusses the Judge Netburn

PROCEEDINGS

1  type of characters is Section 3C, which you

2  discussed earlier with defendants.

3          And I think that that one in particular

4  is the one that talks about, well, if other

5  characters come into play, then they will be

6  included, as long as they explain what their

7  interpretation means, as long as they also appear

8  with the other characters, that those will be also

9  included.

10          I have something to say about this

11  particular clause, is that this clause, to us, has

12  absolutely -- at this stage, has absolutely no undue

13  effect because it deals with future works.  And, you

14  know, there's no game, nothing has been approved.

15  You know, there's nothing, really.  So this

16  particular paragraph deals with future works that

17  don't exist.  And assume that if those works are

18  ever developed, then that our client is supposed to

19  submit those works and then the paragraph will

20  apply.  But none of that has happened yet.  So --

21  but to us, that is the paragraph that deals with

22  other characters.

23          In our view, 2L relates to all characters

24  and is seeking limited clearance to use those

25  characters in -- to use those characters, period.

PROCEEDINGS

1           Also, I think this is the right moment to
2    mention the evidence on the record regarding intent,
3    because everything ties up together.  I mean, we
4    have to take into consideration the language of the
5    contract, but we also have to take into
6    consideration the intent.
7           And as you're probably familiar with a
8    document that is on the record and is undisputed, is
9    the July 11 email from our client to defendants.
10   And this email -- and I just want to remind the
11   Court what this email says.  It says, "I want" --
12   this email comes from our client to the defendants.
13   "I want to make it clear that in no way does Golden
14   Bell take ownership of any of the characters, images
15   or story content except in its application in the
16   game."
17           So recognizing plaintiff's concern in
18   this email, Mr. Goldner sent another email to our
19   client and said pretty much, I'll take care of this.
20   You can use the work outside the scope of the
21   agreement.  I have changed the language.  I quote,
22   "I am resending the contract now with new language,
23   and also specified it is for game and stuffed
24   animals."  And all of this is on the record.  It is
25   undisputed.  And I think all of these clauses should

PROCEEDINGS

1    be read also in conjunction with these factual

2    considerations that we have on the record,

3    specifically --

4              THE COURT:  But the Court can't consider

5    any of this at this stage, right?  Do you think that

6    I can look at that at this stage?

7              MS. PERDOMO:  I think, your Honor, it's

8    important to take everything into consideration as a

9    whole.  But I understand your point.

10             THE COURT:  Okay.  And so on the

11   specifics of your breach of contract claim, I

12   understand you to have two points about that.  The

13   first is that the defendants breached the contract

14   by exceeding the scope of the license, as you put

15   it, which I believe is with respect to the two

16   pending applications to the PTO for comic books and

17   T-shirts and things like that.  That's one element

18   of breach of contract.  And the second is with

19   respect to whether your client -- this -- disputed

20   facts about whether or not the final files were

21   transferred, and if so, whether or not payment was

22   due.

23             So can you speak to me with specificity

24   about what the basis is for your breach of contract

25   claim?

PROCEEDINGS

1           MS. PERDOMO:  Your Honor, let's start by
2     our breach of contract claim with regard to over
3     exceeding the scope of the agreement, of the
4     assignment, of the license, of the permissions that
5     were granted under the agreement.
6           This agreement was signed only for -- the
7     purpose of this agreement was only for defendants to
8     develop a game based on Webcomic Name and to create
9     some mark -- some merchandise, some plush toys, to
10    market the game.  The agreement did not give
11    authorization to plaintiff to -- I'm sorry, to
12    defendant to apply for products and services under
13    multiple classes.  Class 16, for example, which is
14    the comics international classification under
15    merch -- I'm sorry, under comics, and in particular
16    under comics.
17          We also believe that at this stage of the
18    application where plaintiff -- where defendants went
19    and applied for these trademarks, the game was
20    not -- it didn't exist.  So we believe that it was a
21    bad faith move to try to misappropriate the Webcomic
22    Name -- the Webcomic Name brand from plaintiff.
23    And, you know, it was done in bad faith and it was
24    done against the provisions of the contract, which,
25    in our view, are very limited to only the game and

PROCEEDINGS

1  the plush toys.  So we believe that by filing those

2  trademarks, defendants breached the agreement.

3          THE COURT:  Okay.  Why don't I have you

4  just continue and talk to me about the second basis.

5          MS. PERDOMO:  Right.  The second basis,

6  your Honor, the plaintiff, in October 2018 submitted

7  over 400 game cards to the defendants.  The evidence

8  on the record shows that plaintiff continued to

9  provide as much content as he could.  It was a

10  continuing production.  But at that point where he

11  produced more than 400 game cards and he received

12  feedback from the defendants, multiple feedback and

13  changes, he believed he deserved to get paid because

14  he had worked tremendously on these items.  And when

15  he requested payment, he was denied payment.

16          And I think to the extent that this

17  agreement is clear as to what the bargain for

18  exchange here is, Mr. Norris was hired to illustrate

19  these cards.  Mr. Norris illustrated the cards,

20  illustrated more than 400 cards, delivered them to

21  defendants and defendants acknowledged receipt.

22          In his deposition, Mr. Goldner

23  acknowledges that he received the cards, although

24  they were not final, and that's another argument.

25  Defendants are arguing that the cards needed to have

PROCEEDINGS

1    certain editorial -- editorial aspects of the cards

2    were not ready.  At that point in time, we believe

3    our client was entitled to receive payment.  He

4    didn't receive payment, and then that's where the

5    dispute started.  So in other words --

6                THE COURT:  Is it your position that you

7    submitted final files, or is it your position that

8    your client had worked really hard and responded to

9    a lot of editorial comments and deserved to be paid?

10               MS. PERDOMO:  The files were final.  They

11   needed tweaks because it's an ongoing process.  But,

12   yes, my client believes that his submission, the

13   submission that he made to defendants constitute the

14   final files, yes.

15               THE COURT:  Okay.  So you interpret the

16   word "final files" as something that still is

17   subject to some tweaks?

18               MS. PERDOMO:  In this case, your Honor,

19   yes, because the creative process is a long process.

20   And if, for example, defendants wanted to release

21   the game at that stage, they could.  As a matter of

22   fact, they said that many, many times, the files,

23   all the parts were there.  Mr. Goldner kept asking

24   for different type of changes.  But if defendants

25   wanted to release the game at that point in time,

PROCEEDINGS

1    they could with the files that they had.

2              THE COURT:  Okay.  And you said, in

3    October of 2018, that he gave about 400 game cards.

4    There came a time, as I understand it in the record,

5    that access to those files was denied by your

6    client; is that correct?

7              MS. PERDOMO:  No, your Honor.  Let me

8    explain.  Our client sent the files through

9    electronic means.  I believe it was Dropbox or -- I

10   don't remember exactly what it was.  Several days

11   after he submitted the files through that electronic

12   transfer platform, Mr. Goldner said that he couldn't

13   open the files.  But then, thereafter, that was

14   resolved, because during his deposition -- there's

15   two points to make.  During his deposition, Mr.

16   Golder acknowledged that he was able to access those

17   files at a later time.  And when we received

18   discovery from defendants, all of those files were

19   in their discovery.  So if he didn't receive them,

20   how can they bounce them back in discovery?

21              So there's two facts that support the

22   contention that they did receive the files.

23              THE COURT:  Okay.  And that's cited to in

24   your 56.1 statement, citing to the evidence?

25              MS. PERDOMO:  Yes.

PROCEEDINGS

1              THE COURT:  Both the actual documents, as

2    proof that they were received, as well as the

3    deposition testimony?

4              MS. PERDOMO:  I believe so, your Honor.

5              THE COURT:  All right.  Anything further

6    on this point?

7              MS. PERDOMO:  I think that's it, your

8    Honor.

9              THE COURT:  Thank you.

10             MR. DOLAN:  Your Honor, may I respond?

11             THE COURT:  Of course, Mr. Dolan.

12             MR. DOLAN:  Your Honor, first, going back

13    to plaintiff's interpretation of the contract, you

14    are correct that you're not allowed to consider

15    extrinsic evidence at this point for summary

16    judgment.  I think the case law makes clear in

17    Mellon Bank v. United Bank Corp., that's 31 F.3d

18    113, quoting that case says, "As a general matter,

19    we have held that when a contract is ambiguous, its

20    interpretation becomes a question of fact, and

21    summary judgment is inappropriate.  Rather, in order

22    for the parties' intent to become an issue of fact

23    barring summary judgment, there must also exist

24    relevant extrinsic evidence of the parties' actual

25    intent."

PROCEEDINGS

```
 1              So under plaintiff's view of the
 2     contract, she herself said this contract is
 3     ambiguous.  So under her view of an interpretation
 4     of the contract, they're not entitled to summary
 5     judgment at this stage on the contract, on that
 6     point.  Because if it's ambiguous, it now becomes a
 7     question of fact.
 8              THE COURT:  But you've cross-moved on the
 9     contract, haven't you?
10              MR. DOLAN:  Yes, your Honor.  Our
11     interpretation of the contract is that it's not
12     ambiguous and that it speaks for itself.  She's
13     attempting to bring in the parties' intent, namely
14     the emails, which we believe are mischaracterized,
15     but namely the emails to narrow the scope of the
16     agreement.  Specifically, the email that she noted
17     from Mr. Goldner, which she paraphrased Mr.
18     Goldner's response and conveniently left out the
19     point where Mr. Goldner follows that by saying,
20     "with respect to the copyright transfers, that
21     portion of the agreement is already done with
22     Jason."  So he's indicating that we've already
23     received the copyright, because they had believed
24     that Mr. Wiseman had already purchased the copyright
25     from Mr. Norris in a complex set of transactions.
```

PROCEEDINGS

1    And they believe that they had already purchased the

2    copyright from Mr. Wiseman, who had purchased it

3    from Mr. Norris.

4            THE COURT:  Okay.  All right.  Talk to me

5    about exceeding the scope of the agreement by filing

6    for copyright interests in classes that are beyond

7    the scope of the works as defined by the agreement.

8            MR. DOLAN:  Yes, your Honor.  Again, you

9    know, our interpretation of the contract is that

10   this is a multimedia property, right?  There are

11   multiple instances of the contract which state that.

12   Plaintiff has claimed that the game needed to be

13   finished and that the plush dolls need to be created

14   and finalized before any of those copyrights kicked

15   in.  That's not necessarily the case, right?

16   Copyright exists as soon as a work of art is placed

17   on a tangible medium of expression.  So as soon as

18   Mr. Norris creates that artwork and sends it to

19   defendants, that copyright protection exists.

20           There are multiple provisions within this

21   contract, within this agreement that require the

22   defendants to take due diligence in protecting their

23   intellectual property, which is (audio distortion).

24           THE COURT:  And so your argument, as I

25   understand it, is because this agreement entitles

PROCEEDINGS

1    your client to all of Mr. Norris' intellectual

2    property, that it even obligates you to file

3    protections with the PTO.  Is that accurate?

4              MR. DOLAN:  Not all of his intellectual

5    property, your Honor, but whatever the intellectual

6    property relating to this game and the plush dolls,

7    the artwork, the characters, the "Oh No" word

8    bubbles that repeatedly appear in the sketches,

9    that's our position, yes.  They had an obligation to

10   protect that work.

11             THE COURT:  Right.  To be clear, your

12   view is that it's well beyond that, and that's how

13   you interpret this contract.  We've just gone over

14   just a few moments ago, all the different ways in

15   which you interpret the contract to be quite

16   expansive.

17             MR. DOLAN:  Yes.

18             THE COURT:  Okay.

19             MR. DOLAN:  To not rehash that.

20             THE COURT:  Okay.

21             MR. DOLAN:  And, your Honor, I do want to

22   clarify the way that 2L was characterized.  So I

23   believe the way that your hypothetical read was that

24   if you were to make a cameo appearance in Webcomic

25   Name Game, then this provision would apply.  It's

PROCEEDINGS

1   actually the opposite.  So say the pink blob who was

2   to appear in Webcomic Name Game were to make a cameo

3   appearance in a Judge Netburn game that defendants

4   were developing, right, then that cameo appearance

5   has no financial obligation to Mr. Norris.

6            Does that make sense?

7            THE COURT:  Not in the slightest.

8   "Characters in the works," which we all agree "the

9   works" means the game and the plushies.

10           MR. DOLAN:  Correct.

11           THE COURT:  "May make cameo appearances

12  in company properties that are owned exclusively by

13  the company, such as in promotional material, to

14  increase awareness of the works."  So that seems to

15  suggest that if additional characters, like a Judge

16  Netburn character, should appear in the board game,

17  that the company then has the right to use the Judge

18  Netburn character in promotional materials to

19  promote the game.

20           And then it says, "Characters appearing

21  in works" -- the Judge Netburn character that has a

22  cameo in the board game -- "Characters appearing in

23  works may be used in other properties of company

24  with no financial obligation to or expectations by

25  the artist".

PROCEEDINGS

1          So I think your reading of that would

2    mean that because Judge Netburn appeared as a cameo

3    in the works, now the company would own Judge

4    Netburn, that intellectual property, and would not

5    need to pay the artist.

6          MR. DOLAN:  Your Honor, I'm reading it

7    the opposite.  So the way that I'm reading it is

8    "characters in the works," the pink blob, "may make

9    cameo appearances in other company properties".

10          THE COURT:  Okay.  But that -- isn't that

11   other company properties to increase awareness of

12   the works?

13          MR. DOLAN:  Yes.  So defendants own a

14   number of different intellectual properties,

15   different games, things like that, right.  So if

16   defendants were to create a new game centered around

17   Judge Netburn, who does not appear in the works,

18   Judge Netburn has never made an appearance in the

19   board -- in the Webcomic Name Game, she's a complete

20   independent character, and defendants decide to

21   develop a game around that character.

22          Now the characters who appear in the

23   work, the pink blob, the orange blob, all of a

24   sudden appear on a game card of Judge Netburn's

25   character.  Then Mr. Norris is not entitled to any

AMM TRANSCRIPTION SERVICE - 631.334.1445

PROCEEDINGS

 1   financial obligation of Judge Netburn's game,
 2   because those characters are now implanted in that
 3   game to raise awareness of the Webcomic Name brand
 4   and increase that brand's awareness.
 5            THE COURT:  Okay.  Do you want to talk
 6   about the game files?
 7            MR. DOLAN:  Yeah, sure.  So, first off,
 8   the files that were delivered to defendants were
 9   black and white sketches.  The ones that are in
10   discovery, they're black and white sketches.  They
11   didn't have color.  They didn't have a back.  They
12   didn't have things necessary to actually print and
13   finalize and publish a game.  So I think that
14   plaintiff's assertion that if defendants wanted to
15   make a game, they could have.
16            Well, that's not necessarily how this
17   agreement was supposed to work.  The parties were
18   supposed to work together to finish the game and
19   publish it.  Plaintiff herself admitted that there
20   were tweaks that were needed to these files, even as
21   delivered.  So I think that that, in and of itself,
22   contradicts the word "final" in the plainest general
23   meaning.
24            Additionally, as plaintiff admitted, the
25   files were delivered October of 2018.  Now, just

PROCEEDINGS

1    after that, defendants attempted to access the

2    Dropbox link.  And as we cited in our brief, and as

3    is the record, after Mr. Norris explained it, once

4    again, that there's an editorial process to this,

5    that they need to be reviewed and finalized, and

6    that there are multiple notes, Mr. Norris attempted

7    to review the links via the link provided, the

8    Dropbox link by Mr. Norris.  And he explained the

9    link to the files are not working and if access has

10   been deleted, please let me know.  Mr. Norris never

11   responded to that email, never followed up, never

12   said, my apologies, here's a new link.  We never

13   received those files, those specific reported

14   October 2018 files.

15           Now, even if we had, your Honor, assuming

16   arguendo that those were filed files, which they

17   were not, and that we had received them, plaintiffs

18   had 30 days to review and issue payment of those

19   files.

20           THE COURT:  Defendants.

21           MR. DOLAN:  Defendants, yes, your Honor.

22           So by restricting access within those 30

23   days, defendants had an opportunity -- still had an

24   opportunity to deliver payment within 30 days of

25   that delivery.  They were never afforded that

PROCEEDINGS

1    opportunity because they were actually --

2              THE COURT:  Can you respond to Ms.

3    Perdomo's comment that, in discovery these files

4    were produced by you to suggest that they were

5    received?

6              MR. DOLAN:  Yes, your Honor.  My

7    understanding is that those were an initial rough

8    draft of the files which were provided in June of

9    2018, which were further editorialized, which is

10   what the parties are discussing in those October

11   emails that you see in the record, where they note

12   that there are multiple notes and edits that needed

13   to be made.  So those files were initially a rough

14   draft of the game, not the final files.

15             THE COURT:  And so I don't have the

16   deposition transcript in front of me, but Ms.

17   Perdomo tells me that Mr. Goldner testified at his

18   deposition that he did receive these files in

19   October.  Is that a false statement?

20             MR. DOLAN:  I don't believe that he said

21   he received -- I don't have the deposition in front

22   of me either, your Honor.  I don't believe he said

23   he received them in October.  I do believe he did,

24   at one point, say that he received files from Mr.

25   Norris.  However, those files were not final, and I

PROCEEDINGS

1    believe they were black and white sketches.

2              THE COURT:  Okay.  Can I bother you one

3    more time about this contract and see if you can

4    help me understand it?

5              MR. DOLAN:  Absolutely, your Honor.

6              THE COURT:  What do you think paragraph

7    1H does?

8              MR. DOLAN:  So, your Honor, this clause

9    was entered into because -- or entered into the

10   agreement because during the initial negotiations of

11   the parties, Mr. Norris had indicated that he had

12   already had a signed contract with a book publisher.

13   Not wanting to prevent Mr. Norris of that

14   livelihood, this clause was placed into the

15   contract.  It was later revealed to defendants that

16   there was actually no contract in place for that

17   book.

18             THE COURT:  But this isn't limited to a

19   book.  This says, "Artist has the right to pursue

20   his comic Webcomic Name outside the context of this

21   agreement."  This would seem to suggest that he can

22   continue to develop his comic strip and use the

23   Webcomic Name without issue.  Though, as I

24   understand it, you filed an application with the PTO

25   in the class of comics.

PROCEEDINGS

```
 1              So how do you reconcile paragraph 1H with
 2    your conduct?  Any response?
 3              MR. DOLAN:  Your Honor, I do see where
 4    your interpretation of that clause, on its face,
 5    would support your statements.  I would say that
 6    there is extrinsic evidence there relating to the
 7    intent behind that clause, which obviously, at this
 8    phase, is not appropriate for summary judgment,
 9    because that would make the clause ambiguous.
10              I will say, your Honor, it --
11              THE COURT:  It seems pretty unambiguous
12    to me.  What part of this is ambiguous?
13              MR. DOLAN:  Well, your Honor, just the
14    intent behind that clause being extrinsic evidence.
15              THE COURT:  Okay.  And if the Court were
16    to conclude that paragraph 1H is unambiguous and
17    allows the artist to retain all of his rights in the
18    comic, Webcomic Name, would you concede that you
19    breached this agreement by filing a trademark
20    application in the class of comics?
21              MR. DOLAN:  No, your Honor.  No, your
22    Honor, I would not -- I would not say that that
23    exceeds the scope of this agreement.  Because if we
24    turn to Section 3D of this agreement, this does
25    provide the defendants with an option on the
```

PROCEEDINGS

 1   defendants -- on Mr. Norris' next book or manuscript
 2   latent work, which he indicated to defendants that
 3   he was producing.
 4              THE COURT:  And they had exercised that
 5   option?
 6              MR. DOLAN:  Yes.  And, your Honor, in
 7   that testimony Mr. Norris provided during his
 8   deposition, he admitted that defendants did exercise
 9   that option, but he didn't understand what an option
10   meant, and he chose never to deliver those files.
11              THE COURT:  Was your client represented
12   in the execution of this agreement, represented by
13   counsel?
14              MR. DOLAN:  We're not sure, your Honor.
15   Not by me.
16              THE COURT:  Okay.  Do you know who
17   drafted this agreement?
18              MR. DOLAN:  I do not, your Honor.
19              THE COURT:  Ms. Perdomo, do you have any
20   explanation as to who drafted this agreement?  It's
21   too old for it to be ChatGPT, but that would be one
22   explanation.
23              MS. PERDOMO:  Mr. Goldner drafted this
24   agreement.  But he's here, so he can tell you if he
25   did or if he did -- or if he didn't.

PROCEEDINGS

```
 1              I wanted to make a quick point, your
 2     Honor, before we leave that just to make sure that
 3     we're on the same page.  We believe that some of the
 4     provisions of the agreement are unambiguous, for
 5     example, the definition of "works".
 6              When I said that other provisions are
 7     ambiguous, that -- I agree with you.  But in our
 8     view, the provisions that support our motion are
 9     unambiguous.  So, to us, the definition of "work" is
10     clear, and that could be decided as a matter of law.
11     I just wanted to clarify that for the record for
12     you, because we're not on the record.
13              THE COURT:  We are on the record.  We're
14     recording this, and I'm going to direct that you all
15     order a transcript when we're done.
16              MS. PERDOMO:  Perfect.  Okay.
17              And I think that's all I wanted to say.
18     But yes, with regards to who drafted the agreement,
19     I am not sure.
20              THE COURT:  Was your client represented
21     by counsel when he signed this agreement?
22              MS. PERDOMO:  No, your Honor, he was not.
23              THE COURT:  Okay.
24              MR. DOLAN:  Your Honor, I will say that
25     there is evidence in the record indicating that Mr.
```

PROCEEDINGS

1    Norris had this agreement reviewed both by the

2    publishing -- the publishing company that he

3    indicated he had a contract with, the upcoming book

4    for and by his agent.  He does say that to

5    defendants, that I'm having my agent review this

6    agreement, and I'm also having the publishing

7    company review this agreement so that it doesn't

8    breach my contract with them.

9              MS. PERDOMO:  The agent and the

10   publishing company are not attorneys, and Mr. Norris

11   testified that he had no one to ask.  And he did

12   send it to them, but they did not provide any legal

13   feedback.

14             THE COURT:  All right.  Let's move on to

15   what I think is the last issue, which is with

16   respect to plaintiff's claim for cancellation of the

17   281 mark.

18             So, Ms. Perdomo, why don't I ask you to

19   explain this claim for me.

20             MS. PERDOMO:  Your Honor, if a trademark

21   has never been used in commerce, ever, a trademark

22   is subject to cancellation.  Mr. Goldner testified

23   clearly that he's never commercialized with any of

24   the properties.  As a matter of fact, the properties

25   have never been created.  So when he did apply --

PROCEEDINGS

1          THE COURT:  Which properties are you

2     referring to?

3          MS. PERDOMO:  The game has not been ever

4     created.  He did create a plush toy, but he never

5     sold any of them.

6          So in order for an applicant to satisfy

7     the use in commerce requirement, the mark has to be

8     in commerce at one point in time, right?  And that

9     satisfies the first pillar.  But then the mark has

10    to continue to be in commerce throughout a certain

11    amount of period of time.  For this proposition, we

12    have a case.  It is <u>Silberstein v. Fox Entertainment</u>

13    <u>Group</u>, and I'm going to quote a portion of this

14    case.  "Common law trademark rights develop when

15    goods" --

16          THE COURT:  Can speak more slowly,

17    please.

18          MS. PERDOMO:  Sorry.  I apologize.

19          "Trademark rights develop -- and I quote,

20    "Trademark rights develop when goods bearing the

21    mark are placed in the market and followed by

22    continuous commercial utilization."  So if a mark is

23    not being used in commerce, and using commerce is

24    not merely advertising the goods in commerce, there

25    has to be actual transactions and sales of the goods

PROCEEDINGS

1   and services.

2                Mr. Goldner, in his deposition, clearly

3   said he's never, ever sold any of these goods.  And

4   so that's the reason why the trademark is subject to

5   cancellation.  It's a very basic trademark concept.

6                THE COURT:  And so if Nike were to design

7   a new sneaker, it could not file for trademark

8   protection until after it had sold some sneakers?

9                MS. PERDOMO:  No, your Honor, they could

10  file initially on an intent-to-use basis.  But if

11  Nike files on an intent-to-use basis, Nike has three

12  years, based on the trademark statute, to submit

13  evidence of use.

14                And what happened in the Webcomic Name

15  trademark that defendants filed was that they

16  submitted proof within those three years, quote,

17  unquote, proof-of-use.  But that proof-of-use was

18  false because they never used the goods in commerce

19  per the definition of the Trademark Act.  The only

20  action or the only step that they took towards

21  commercializing those goods was to post -- to take a

22  photograph of the plush toy at one point in time,

23  submitted that as a specimen of use.  But then

24  because they never sold it, then that requirement of

25  continuing using commerce is not met, so the

PROCEEDINGS

1    trademark must be canceled.  That is with regards to

2    class 28.  The only preliminary proof of use that

3    they had was that photograph of the plush, but then

4    that failed later on because they never sold the

5    plush toy and never continued to commercialize with

6    it.

7              In terms of all the other items that are

8    described under class 28, none of those have been

9    created, so never used in commerce.

10             THE COURT:  Thank you.

11             Mr. Dolan?

12             MR. DOLAN:  Yes.  Your Honor, first, I

13   would like to say that the marks -- the trademarks

14   in class 28 have been used in commerce.  There's a

15   Pretending to Grownup card drafted by Mr. Norris

16   which indicates the pink blob, the orange blob and

17   the "Oh No" worry blob.

18             THE COURT:  And so is it your view that

19   that card, in a different game, is sufficient to

20   validate the 281 mark?

21             MR. DOLAN:  Your Honor, I don't have the

22   application in front of me.  Is the 281 mark the

23   comic book section or --

24             THE COURT:  It's the only one that you

25   have, as I understand it.

PROCEEDINGS

1          MR. DOLAN:  Yes, your Honor, because you

2    can trademark individual game cards under that

3    trademark category, which is a part of what

4    defendants selected when applying for the trademark

5    under that category.

6          THE COURT:  Sorry.  As I understand it,

7    the trademark that you received, the 281, authorizes

8    the use of the Webcomic IP in the game and the

9    plush.  And plaintiff's counsel is saying, well,

10   that is subject to cancellation because you never

11   used those things in commerce, because you never --

12   sir, it's important, at least, that your lawyer

13   understands what I'm saying before you talk to him,

14   so if you can just give us a moment.  If you -- now

15   I've lost my train of thought.

16          If your mark is filed, as I'm suspecting,

17   and plaintiff is suspecting, on an intent-to-use

18   basis, but then you never made that game and you

19   never sold that plushie, why are you still entitled

20   to that mark?  Why shouldn't it be canceled?

21          MR. DOLAN:  Well, first, your Honor, I

22   would point to the defense of unclean hands.  The

23   reason that this game was never created, the reason

24   that the plushie was never created is because within

25   that three-year period --

PROCEEDINGS

1          THE COURT:  Is that a defense to the
2     cancellation?
3          MR. DOLAN:  Your Honor, I don't have any
4     authority to cite that directly.  You know, I can go
5     back and look at that, but I will say that, you
6     know, plaintiff never delivered the files.
7     Plaintiff initiated the suit within that three-year
8     period, preventing defendants from publishing that
9     game and placing it into commerce.
10          THE COURT:  Okay.  Let's set aside that
11     defense, which may or may not be even available.
12          MR. DOLAN:  Yes.  And yes, your Honor, I
13     do believe that that specific game card, which
14     defendants do have the rights to via a contract with
15     Jason Wiseman, who's not a party to this suit,
16     obviously, they do have the rights to that card.
17     That card is placed in commerce.  That card is used
18     in promotional identifying factors of the game,
19     Pretending to Grownup.  That game is still available
20     commercially through a number of different outlets.
21     It sold over $200,000 in revenue.  It sold thousands
22     of units.
23          THE COURT:  But was Pretending to Grownup
24     what you got the mark in, the 281 mark?
25          MR. DOLAN:  No, Webcomic Name is.

PROCEEDINGS

1          THE COURT:  So explain to me, and if you

2     have any cases, that would be helpful, that entitle

3     your client to continue to hold the 281 mark based

4     on a game card from a different game.

5          MR. DOLAN:  So, your Honor, again, I

6     don't have any case law that is directly on point to

7     this issue, but I will say you are allowed to

8     trademark individual game cards of a game under

9     category 28.  The game card that we're referencing

10    here in Pretending to Grownup is a game card drafted

11    by Mr. Norris.  It has the pink blob, the orange

12    blob, "Oh No," and it has the Webcomic Name on it.

13          So defendants are entitled to trademark

14    that card and that brand because it is an

15    individual, unique identifying card within that

16    package.  Because it's a, quote, unquote, guest

17    card.  It's the only card within that game that is

18    produced by Mr. Norris.

19          THE COURT:  And so 281 is not an

20    application to trademark that card, correct?  Isn't

21    it to trademark the Webcomic game?

22          MR. DOLAN:  Your Honor, I believe 281 is

23    an application to trademark Webcomic Name as a

24    whole.

25          MS. PERDOMO:  Your Honor, if I may,

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    quickly, 281 is a registration.  281 is a
2    registration, and it's a registration under class
3    28.  Class 28 -- if done properly, class 28 will
4    allow the registration of expansions and individual
5    cards.
6            The problem that defendants have is that
7    they never affixed or commercialized this card, just
8    for purposes of illustration, as a Webcomic Name
9    Game card.  So this card alone did not have the
10   graft for Webcomic Name.  So I would love to see
11   this argued to one of the examiners in the USPTO,
12   saying, like, hey, here's my specimen of use for the
13   Webcomic Name Game card.  And how can they reconcile
14   that?  This was one single card in a different game
15   under a different brand that has nothing to do with
16   the Webcomic Name trademark.
17           Also, your Honor, my experience with
18   trademark prosecution is that if you file, as a
19   specimen of use, one item only -- for example, if I
20   wrote a book, if I write a book, the Fran Story, and
21   I apply to register my book before the USPTO, I will
22   do it on intent-to-use.  But if I want to just file
23   that single book that I publish on Amazon, the first
24   office action I'm going to receive is, where are the
25   other books?  Where is the other series?

PROCEEDINGS

1          So one card alone, even if they were,
2     like, assuming arguendo, is that they commercialized
3     this card alone under the Webcomic Name Game brand,
4     and that was the only card they commercialized with,
5     they're going to have a problem with that, too,
6     because it's not part of a series of products under
7     that particular brand.
8          So that's why the registration must be
9     canceled, because none of those items that are
10    described in the application have been ever used in
11    commerce.
12         THE COURT:  Thank you.
13         MR. DOLAN:  Your Honor, my understanding
14    of the series requirement is it applies to books, it
15    doesn't necessarily apply to game cards.  And I will
16    say that the image that plaintiff's counsel held up
17    is an image of what is on the card, but it's not a
18    complete image of the card.  The card itself does
19    contain the name Webcomic Name on it.
20         THE COURT:  And can you point to me where
21    that card is.
22         MR. DOLAN:  Your Honor, I would have to
23    double check to see if we submitted it as an exhibit
24    to our summary judgment brief.  I do believe it's in
25    discovery somewhere.

PROCEEDINGS

```
1              MS. PERDOMO:  Excuse me, your Honor, if I
2     may.  Even if, assuming -- I don't believe it says
3     Webcomic Name.  But even if, assuming that was an
4     oversight on my end, it was not sold as a Webcomic
5     Name product.  It was part of a game called
6     Pretending to Grownup.  So that's not branding.
7     Actually, that's a principle of branding 101.  It
8     cannot be considered a trademark product.
9              THE COURT:  Can you draw my attention, in
10    the voluminous filings, of where the trademark
11    application is?
12             MS. PERDOMO:  Sure.  The application or
13    registration?  Because I have the certificate here.
14    I can give it to you.
15             THE COURT:  I'd like it in what's filed
16    with the Court.
17             MS. PERDOMO:  Right.  I think -- yes.
18             Okay.  So, your Honor, you can file it --
19    you can find it -- the application is under Docket
20    Number 119-7.  It's attached to Mr. Norris'
21    declaration.  The application is attached to Mr.
22    Norris' declaration under that docket number, and
23    the registration is also attached under Docket
24    119-8.  And that trademark registration ends in 581.
25             THE COURT:  Unfortunately, the courtesy
```

PROCEEDINGS

 1    copy is -- the ECF headers are all blurred, so I

 2    can't follow that, but I guess I will just find it

 3    on my own.

 4              Okay.  Anything further, Ms. Perdomo,

 5    that you'd like to present?

 6              MS. PERDOMO:  May I have a second,

 7    please?

 8              THE COURT:  Sure.

 9              MS. PERDOMO:  Your Honor?

10              THE COURT:  Yes.

11              MS. PERDOMO:  Nothing further.

12              THE COURT:  Okay.  Anything further from

13    Mr. Dolan?

14              MR. DOLAN:  No, your Honor.

15              THE COURT:  Okay.  I'm going to order

16    that the parties get a copy of this transcript,

17    needs to be transcribed.  So I'll have my courtroom

18    deputy explain to you how to do that, how to make an

19    application to order it.  I'd like you to order it

20    for expedited production so that we can review it as

21    quickly as possible, and the parties should split

22    the cost of that.  And then we will get our decision

23    out shortly.

24              I think it's highly unlikely that this

25    case is going to end as a result of these summary

PROCEEDINGS

1   judgment motions.  And I know that the parties once

2   were engaged in settlement discussions.  I certainly

3   think it's in everybody's interest to continue those

4   settlement discussions.  And if anything should

5   change, you should let me know right away.

6   Otherwise, the Court will issue its opinion in due

7   course.

8              Thank you, everybody.  We're adjourned.

9              MR. DOLAN:  Thank you, your Honor.

10

11                        0o0

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E
2
3        I, Adrienne M. Mignano, certify that the
4    foregoing transcript of proceedings in the case of
5    Alexander Norris d/b/a Webcomic Name v. Marc Goldner,
6    et al., Docket #19cv5491 was prepared using digital
7    transcription software and is a true and accurate
8    record of the proceedings.
9
10
11   Signature   _____
                    *Adrienne M. Mignano*
12                  ADRIENNE M. MIGNANO, RPR
13
14   Date:      April 28, 2023
15
16
17
18
19
20
21
22
23
24
25
```