**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

ALEXANDER NORRIS,

                                        Plaintiff,

                    -against-

MARC GOLDNER, et al.,

                                        Defendants.

-------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 5/22/2023 __

19-CV-05491 (PAE)(SN)

**REPORT AND**
**RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE PAUL A. ENGELMAYER:**

Alexander Norris ("Plaintiff") sues Marc Goldner, Golden Bell Entertainment, LLC ("GB Entertainment"), and Golden Bell Studios, LLC ("GB Studios," and collectively, "Defendants") for five causes of action arising out of a contract executed by the parties and various related trademark registrations. These claims include copyright infringement, false designation of origin, breach of contract, cancellation of GB Entertainment's U.S. Patent and Trademark Office ("USPTO") Registration No. 5629281, and declaratory judgment regarding the scope and content of the agreement executed by the parties. Plaintiff moved for summary judgment, and Defendants cross-moved for summary judgment on all claims.

I recommend that Plaintiff's motion for summary judgment be GRANTED in part, and Defendants' cross-motion for summary judgment be DENIED.

**BACKGROUND**

I.     **Factual Background**

Plaintiff, a British citizen and resident, is a comics illustrator and the creator of the webcomic and associated brand "Webcomic Name," whose main character "Blob" utters the signature phrase "Oh No" in each comic's final panel. ECF No.129 Pl. 56.1 ¶¶ 2-5.[1] Plaintiff created Blob in 2015 and formally launched Webcomic Name in 2016. Id. ¶¶ 5-6. That same year, Plaintiff created an online marketplace selling merchandise related to Webcomic Name. Id. ¶ 9.



Pl. 56.1 ¶ 58.

In early 2017, Plaintiff and non-party Jason Wiseman agreed to collaborate and create a tabletop card game (the "Game") based on Webcomic Name. Id. ¶ 12. The duo initially planned to self-publish using Kickstarter, id. ¶ 14, but Wiseman later proposed using Defendants to publish and distribute the Game. Id. ¶ 15. On February 11, 2017, Wiseman executed an

---

[1] Citations to "Pl. 56.1" refer to ECF No. 129, which collates Plaintiff's initial Rule 56.1 Statement in support of its motion for summary judgment and Defendants' responses to each statement. Citations to "Def. 56.1" refer to ECF No. 132, which collates Defendants' counterstatement of facts and Plaintiff's responses to each statement.

agreement with GB Entertainment in which they agreed to purchase four games from Wiseman, including the Game. Id. ¶ 16.

On June 26, 2017, Goldner contacted Plaintiff directly about an agreement (the "Agreement") between Plaintiff and GB Entertainment. Id. ¶ 22. After some negotiation, the Agreement was executed on August 10, 2017. Id. ¶ 27. Under the Agreement, Plaintiff agreed to illustrate the Game and assigned certain rights in their creations relating to it to Defendants. In return, Plaintiff would receive a percentage of the net sales of the Game and related products. See Agreement, ECF No. 116-8.

Plaintiff was also entitled to a "$3,125 upfront advance against net sales royalties within 30 days of [GB Entertainment] receiving the final files noted above for [the Game.]" Agreement § 1(G). The parties dispute whether these files were ever sent, but do not dispute that the advance was never paid to Plaintiff. Pl. 56.1 ¶ 35.

On November 30, 2017, GB Entertainment filed application No. 87703934 to register the trademark "Webcomic Name" in international class 028 ("Board games; Card games; Game cards; Party games; Plush dolls; Plush toys; Stuffed dolls and animals; Stuffed toy animals; Tabletop games; Soft sculpture plush toys; Stuffed and plush toys"). Pl. 56.1 ¶ 36; ECF No. 119-7. On December 11, 2018, the USPTO approved GB Entertainment's application and issued registration No. 5629281 (the "'281 Mark"). Pl. 56.1 ¶ 44; ECF No. 1-10.

On October 9, 2018, GB Entertainment filed application No. 88147369 to register the trademark "Webcomic Name" in international class 016 ("Comic books; Comic strips; Comic strips' comic features; Comics; Newspaper comic strips") (the "'369 Application"). Pl. 56.1 ¶ 46; ECF No. 1-11. On November 8, 2018, GB Entertainment filed application No. 88185795 to register the trademark "Oh No" in international classes 016 ("Bookmarkers; Bookmarks; Comic

books; Comic magazines; Comic strips; Comic strips' comic features; Comics; Stickers; Newspaper comic strips"), 025 ("T-shirts; Graphic T-shirts; Short-sleeved or long-sleeved t-shirts"), and 028 ("Plush toys; Stuffed toy animals; Stuffed and plush toys; Toy stuffed animals") (the "'795 Application"). Pl. 56.1 ¶ 50; ECF No. 1-12.

The parties dispute when Plaintiff first learned of these applications, Pl. 56.1 ¶ 54, but at some point Plaintiff filed application No. 88216127 to register the trademark "Webcomic Name" in international class 016 ("Comic books; Comic strips and comic strip's [sic] comic features, appearing in print media, namely, comic books, books, newspapers, magazines"). Pl. 56.1 ¶ 55; ECF No. 1-13. On March 6, 2019, the USPTO rejected Plaintiff's application because of the likelihood of confusion with the '281 Mark, held by GB Entertainment. Pl. 56.1 ¶ 56; ECF No. 1-14.

On March 25, 2019, Plaintiff filed a petition with the USPTO Trademark Trial and Appeal Board to cancel the '281 Mark. Pl. 56.1 ¶ 57; ECF No. 1-15. That proceeding is stayed pending the outcome of this action. Pl. 56.1 ¶ 57. On March 29, 2019, Defendants' then-counsel wrote to Plaintiff's counsel "claiming that Golden Bell was the rightful owner of the 'Webcomic Name,' that Golden Bell had acquired trademark rights over the mark 'Oh No,' and that the copyright registration of Norris's webcomic strips compilation was invalid." Pl. 56.1 ¶ 67. On April 1, 2019, Plaintiff's counsel responded that Plaintiff was terminating the Agreement for cause, as "Golden Bell is improperly attempting to use the Collaboration Agreement as a vehicle to misappropriate the intellectual property rights belonging to Mr. Norris." Pl. 56.1 ¶ 68.

## II.    Procedural Background

Plaintiff filed this action on June 12, 2019. On August 26, 2021, then-presiding Judge Alison J. Nathan referred the case to me for general pretrial supervision. ECF No. 57. On

October 6, 2022, Defendants moved for leave to amend their answer to add counterclaims, and

on October 17, 2022, Plaintiff moved for summary judgment. ECF Nos. 111, 117. Judge

Engelmayer referred both motions to me, and on March 7, 2023, I denied Defendants' motion for

leave to amend. ECF Nos. 115, 121, 138. On April 19, 2023, the Court held oral argument on the

parties' cross-motions. See ECF No. 144 ("Tr.").

## DISCUSSION

The Agreement is the genesis of the parties' dispute, and its interpretation is fundamental

to resolving their current motions. Thus, it is worth noting at the outset that the Agreement's

drafting is profoundly poor. It is replete with typographical errors,[2] internal inconsistencies,[3]

erroneous cross-references,[4] inane legalese,[5] unnecessary repetition,[6] absurdly broad language,[7]

and seemingly meaningless clauses.[8] It is undisputed that GB Entertainment drafted the

---

[2] E.g., section 1(D)'s reference to the nonexistent section 1(a), which presumably is meant to refer to section 1(A); section 2 contains a second subsection 2(A) in between 2(M) and 2(N); font sizing is inconsistent throughout.

[3] E.g., the term "CREATOR" appears only once, in (the second) section 2(A), and appears to refer to Plaintiff, who is otherwise referred to as "ARTIST"; some capitalized terms (e.g., "WORKS" and "INFORMATION") are expressly defined, while others ("CREATOR" and "NEW WORKS") are not; serial commas are used inconsistently throughout.

[4] E.g., section 1(G) refers to "the final files noted above" but no such files are mentioned above (or below).

[5] E.g., section 2(I) contains the following sentence: "However, if both parties agree to have an agreement to terminate this agreement, both parties have to be in mutual agreement."

[6] E.g., section 2(G) is a non-disclosure provision that is seemingly duplicative of the various confidentiality provisions in sections 4(C)-(G); sections 2(O) and 2(Q) are also seemingly duplicative; sections 5(B) and 5(D) both contain severability clauses; sections 2(K) and 5(D) both require that any modification of the Agreement be made in writing and signed by the parties.

[7] E.g., section 2(D) baldly states that "COMPANY and ARTIST shall share access to all Social Media accounts with administrative privileges and COMPANY shall be the Domain Registrant and Administrator of any domains." Section 4(E) states, with no clear limitation, that "Any posts made public or private by ARTIST must be submitted for approval by COMPANY."

[8] E.g., section 2(B) references "[c]opyright maintained by the ARTIST in the WORKS" despite section 1(A)'s statement that "ARTIST shall retain 0% of the copyright . . . of WORKS[.]" Section 2(H) similarly states that "ARTIST grants the exclusive license to COMPANY in perpetuity of the WORKS." Section 2(O) states that "COMPANY has the right to enforce WORKS . . . ."

Agreement, Pl. 56.1 ¶ 30, but when asked at oral argument, Defendants were unable to answer whether a lawyer had been involved. Tr., 49:11-18.

## I.     Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of establishing that no genuine issue of material fact exists. Id. at 256-57; see Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (citing Celotex, 477 U.S. at 322-23).

To defeat summary judgment, the non-moving party must produce more than a "scintilla of evidence," Anderson, 477 U.S. at 252, and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible . . . ." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); Flores v. United States, 885 F.3d 119, 122 (2d Cir. 2018) ("[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." (quoting Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996))). The non-moving party "must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (internal quotation marks omitted).

In ruling on a motion for summary judgment, the Court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004). When both sides have moved for summary judgment, the district court is "required to assess each motion on its own merits and to view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party." Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 171 (2d Cir. 2011).

## II.    Plaintiff's Claims

The preamble to the Agreement states that it is "with respect to the production of the properties tentatively titled 'Webcomic Name Game' and 'Webcomic Name Stuffed Animals' (the 'WORKS') to be created by [Plaintiff], and any tie-ins, spinoffs, or other commercial development of the WORKS such as Sequels, Prequels, Reboots, Remakes, and Expansions." Plaintiff maintains that the Agreement thus grants Defendants rights to only a narrow portion of their intellectual property relating to the yet-to-be-developed tabletop game, plush toys, and future derivations thereof. Defendants argue that various provisions of the Agreement, read in concert, work to grant them broad intellectual property rights over the Webcomic Name brand. Tr., 14:8-13, 15:18-22[9]; ECF No. 125 at 6.

Both parties allude to extrinsic evidence in support of their respective readings, but the threshold issue of ambiguity was not adequately briefed by either. In any event, at least as it relates to the issues presented here, the Agreement is unambiguous, and therefore extrinsic

---

[9] For example, at oral argument, defense counsel took the position that, if this same agreement instead concerned the creation of a board game starring the fictional character Homer Simpson, its terms would grant Defendants all intellectual property rights in that character, name, and likeness. Tr., 18:6-10.

evidence cannot be considered. See World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 184 (2d. Cir. 2003) ("[A]mbiguity is detected claim by claim. . . . Once a court finds that a contract is ambiguous, it may look to extrinsic evidence to determine the parties' intended meaning." (internal quotation marks and citation omitted)).

### A.      Copyright Infringement

Count One alleges copyright infringement in connection with the '369 Application and the '795 Application, Defendants' pending registration applications for the marks "Webcomic Name" and "Oh No." Specifically, Plaintiff alleges that Defendants copied their copyrighted work without authorization when filing their registration applications with the USPTO. Defendants contend that they acquired these intellectual property rights through the Agreement.

### 1.      Legal Standard

A work is "created" when it is fixed in a copy or phonorecord for the first time; where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time, and where the work has been prepared in different versions, each version constitutes a separate work.

A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted.

17 U.S.C. § 101.

The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.

17 U.S.C. § 103(b).

"Pursuant to the Copyright Act, holders of copyrights in 'United States works' may not institute a copyright infringement suit 'until preregistration or registration has been made.'"

DigitAlb, Sh.a v. Setplex, LLC, 284 F. Supp. 3d 547, 554 (S.D.N.Y. 2018) (quoting 17 U.S.C. § 411(a)). "On the other hand, non–United States works—generally, works first published outside the United States in a foreign country that is a signatory to the Berne Convention—are exempt from registration." Id. at 555. An unpublished work is a non-United States work if the author is not a national, domiciliary, or habitual resident of the United States. 17 U.S.C. § 101.

"To prevail on a copyright infringement claim, a plaintiff must demonstrate: '(i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work.'" Spin Master Ltd. v. 158, 463 F. Supp. 3d 348, 369 (S.D.N.Y. 2020) (quoting Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003)); see also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340 (1991). "The word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights described in [17 U.S.C.] § 106." Arista Recs., LLC v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010) (internal quotation marks and citation omitted). The relevant right enumerated in section 106 is "the exclusive right[] . . . (1) to reproduce the copyrighted work in copies . . . ." 17 U.S.C. § 106.

"Copyright infringement is a strict liability offense in the sense that a plaintiff is not required to prove unlawful intent or culpability, and a user does not have to share copyrighted works in order to infringe a copyright." EMI Christian Music Grp., Inc. v. MP3tunes, LLC, 844 F.3d 79, 89 (2d Cir. 2016) (internal citations omitted).

## 2.    Discussion

Because Plaintiff is a British citizen and resident, they are entitled to copyright protection of their work that is either unpublished or was first published outside of the United States.[10]

---

[10] On December 4, 2018, Plaintiff obtained United States copyright registration No. VAu 1-337-956 for "Webcomic Name Collection Volume 1," which included five three-panel comic strips. Id. ¶ 11; see ECF No. 119-3.

Plaintiff argues that they are entitled to summary judgment on Count One because it is undisputed that Defendants submitted screenshots of Plaintiff's Facebook page, Patreon account, and website—all of which included artwork created by Plaintiff—to the USPTO as "specimens of use" in support of the '369 Application and the '795 Application. Pl. 56.1 ¶¶ 48, 52. Defendants argue that they are entitled to summary judgment because the materials submitted were "lawfully licensed" to them under the Agreement, and therefore their copying was not unauthorized.[11] Defendants simultaneously claim that, pursuant to the Agreement, they own the copyright to all the materials they submitted. Tr., 16:11-25, 17:1-7; ECF No. 125 at 7-8. Thus, the issue is whether Defendants were authorized to copy (screenshot) Plaintiff's materials under the terms of the Agreement.

The materials submitted in support of the '369 Application include screenshots of: (1) Plaintiff's Facebook page, @webcomicname, which displays two variations on the Pink Blob as well as a stylized Webcomic Name logo; (2) Plaintiff's Patreon page, including a 3-panel comic featuring the Pink Blob titled "Help Me Patreon," and a banner featuring the Pink Blob along with a stylized Webcomic Name logo; and (3) a "shop" page on Plaintiff's Facebook, which, along two variations on the Pink Blob in the profile picture and banner, includes images of two t-shirts featuring a yellow cat and a third variation of the Pink Blob. See ECF No. 39-11 at 7-9.

The materials submitted in support of the '795 Application include screenshots of: (1) a product page on Plaintiff's Facebook shop for a t-shirt featuring the Pink Blob and a speech

---

[11] To the Court's frustration, both parties have made a habit of conflating license (where a copyright owner retains their rights while conveying to another party a limited ability to exercise some of those rights), with assignment (where a copyright owner conveys actual ownership of some or all of their rights to another). See LICENSE, Black's Law Dictionary (11th ed. 2019) ("A permission, usually revocable, to commit some act that would otherwise be unlawful."); ASSIGNMENT, Black's Law Dictionary (11th ed. 2019) ("The transfer of rights or property.").

bubble with the phrase "oh no"; (2) the same Facebook shop page mentioned above; (3) a portion of Plaintiff's website, webcomicname.com, displaying a 3-panel comic titled "Invasive" which features the Pink Blob and a purple character, as well as a partial view of another 3-panel comic; and (4) a different portion of Plaintiff's website featuring the same banner as the Patreon page as well as the entirety of the aforementioned partial 3-panel comic, which features the Pink Blob and is titled "New Life." See ECF No. 39-12 at 8-12. Finally, the application contains a photo of a speech-bubble-shaped plush toy upon which the phrase "oh no" is embroidered. See id. at 13.[12]

Defendants argue that Sections 1(A), 1(C), 2(B), 2(C), and 3(C) of the Agreement collectively work to provide them with copyright to all of the materials submitted in support of these two applications. See ECF No. 125 at 7-8. The relevant portions of those sections read as follows:

1.  COPYRIGHT ASSIGNMENT

    A.  ARTIST shall retain 0% of the copyright . . . of WORKS . . . and COMPANY shall retain 100% . . . . ARTIST assigns to COMPANY their initial rights of the WORKS . . . .

    C.  If ARTIST creates a new work with a character or storyline that infringes on any of COMPANY's copyrighted properties, ARTIST agrees to transfer any copyright he may have in that new work to COMPANY.

2.  RIGHTS ASSIGNED, CREDITS, AND SERVICES

    B.  [T]he Parties shall share . . . the proceeds from . . . the WORKS and the rights, interest, and license therein and with respect thereto, including but not limited to the following: Comic Book Rights, Motion Picture Rights, Animation Rights, Graphic Rights, Sequel Rights, Remake Rights, Television Rights, Gaming Rights, Film Rights, Stage Rights, Radio Rights, Publication Rights, Interactive Rights, Music Rights, Merchandising Rights, and Digital Rights. . . .

    C.  COMPANY shall have sole ownership of the original artwork used and created for the WORKS by either ARTIST or by COMPANY. . . .

---

[12] Plaintiff's argument for summary judgment on Count One relates only to the screenshots.

3.  SAMPLES AND COMPLETION OF WORKS AND FUTURE WORKS

C.  ARTIST shall submit to COMPANY all sequels to the WORKS or other works using characters that appear in the WORKS and any other unrelated characters. COMPANY will take due diligence to copyright all said WORKS with the same percentages and profit splits as discussed above for future works relating to the WORKS above. If COMPANY acquires the NEW WORK, the provisions of this Agreement shall apply to the NEW WORKS.

<u>See</u> Agreement at 1-3.

Section 1(A) is explicitly limited to the WORKS, which the Agreement defines as "the properties tentatively titled 'Webcomic Name Game' and 'Webcomic Name Stuffed Animals' . . . and any tie-ins, spinoffs, or other commercial development of the WORKS such as Sequels, Prequels, Reboots, Remakes, and Expansions." The screenshots at issue are unrelated to the WORKS, as they involve Plaintiff's existing brand and artwork, not the game and plush toys the parties intended to create.

Section 1(C) obligates Plaintiff to transfer to Defendants any potential new work that infringes on any of Defendants' copyrighted properties. This section does not effectuate any assignment of rights from Plaintiff to Defendants. It is also limited to "new work" created by Plaintiff, and it is not alleged that any of the material in the screenshots was created after the Agreement's execution.

Section 2(B) states that the parties will share the proceeds from the WORKS and the rights, interests, and license "therein and with respect thereto." It then lists a non-exhaustive series of rights that this includes, such as "Comic Book Rights." This section is plainly limited to the WORKS and the rights "therein and with respect thereto" and could, for example, cover the

12

sharing of proceeds and rights to a hypothetical Webcomic Name Game themed comic book.[13]
By its terms it would not cover a more generic Webcomic Name comic book. Thus, as with
Section 1(A), this section has no relation to the screenshots of Plaintiff's existing branding and
artwork.

Section 2(C) grants Defendants ownership of "original artwork used and created for the
WORKS," and while it is not disputed that *some* artwork was created for that purpose, it is not
alleged that any of the copyrighted material in the screenshots fits that description. Defendants
have merely asserted[14] that some of the files delivered to them by Plaintiff "contained several
characters seen in the screenshots," and have failed to explain how this would entitle them to
ownership of the characters themselves as opposed to the specific depictions of the characters
they received. See ECF No. 125 at 11; ECF No. 136 at 8.

Section 3(C)'s first sentence provides that "ARTIST shall submit to COMPANY all
sequels to the WORKS or other works using characters that appear in the WORKS and any other
unrelated characters." This sentence cries out for a comma, because what is to be submitted by
Plaintiff could be read in a number of ways depending on how the sentence is parsed. However,
in any possible reading the verb "submit" does not convey any rights from Plaintiff to
Defendants. It instead contemplates a scenario wherein Plaintiff creates either a sequel to the
WORKS or an entirely different work involving the same characters as the WORKS and requires
them to "submit" that work to Defendants. The section's final sentence confirms the lack of any

---

[13] A twice-derivative product like this may seem esoteric but is not unheard of, see e.g., THE LEGO
BATMAN MOVIE (Warner Bros. Ent. Inc. 2017), and Defendants' argument that a narrow reading of
section 2(B) would render it "meaningless" is without merit.

[14] While Defendants' brief does not cite to record evidence of these files, an exhibit to their supporting
declaration contains an email exchange in which Plaintiff sent Defendants four images, none of which
was submitted in support of the trademark applications. See ECF No. 127-8.

conveyance by providing that *if* the Defendants *were to acquire* such a submitted work, the provisions of the Agreement would also apply to it.

Defendants argue in their opposition brief that "Plaintiff provided artwork for the WORKS which contains at least the characters of the pink blob, orange blob, the cat, and the catchphrase Oh No. These characters became copyright property of Defendants once Plaintiff delivered them." Def. Opp. at 5. But it is unclear how any portion of the Agreement, read in isolation or in context, would work to convey to Defendants Plaintiff's copyright in unrelated preexisting work, much less the characters themselves. Moreover, the WORKS are by their nature "derivative works" as defined in 17 U.S.C. § 101, and section 103(b) makes clear that the copyrights to derivative works are distinct from those in preexisting materials. See Conan Properties Int'l LLC v. Sanchez, No. 17-cv-00162 (FB), 2018 WL 4522099, at *6 (June 8, 2018), adopted, 2018 WL 3869894 (E.D.N.Y. Aug. 15, 2018) (citing section 103(b) for the proposition that a party's "ownership of the derivative works that subsequently portrayed the characters does not establish ownership over the preexisting characters."). Thus, Defendants' argument that they are the rightful owners of the copyright in any character that happened to appear in any materials Plaintiff sent them is unsupported both by the Agreement and by law.[15]

It is undisputed that in submitting the '369 Application and the '795 Application, Defendants copied Plaintiff's copyrighted work. Defendants' arguments in opposition are based not on fact but on a fantastical and incorrect reading of the Agreement. The terms of the Agreement that Defendants rely upon are unambiguous and no reasonable jury could interpret

---

[15] At oral argument, Defendants also could not reconcile their reading of the Agreement with section 1(H), which provides, "ARTIST has the right to pursue his Comic 'Webcomic Name' outside of the context of this agreement." Tr., 47:6-48:23.

them in the way Defendants seek to do. Accordingly, the Court should grant summary judgment on Count One in favor of Plaintiff.

### B.    False Designation of Origin

Count Two also relates to the '369 Application and the '795 Application. Plaintiff argues that Defendants falsely represented in their trademark registration applications that they owned Plaintiff's copyrighted material.

### 1.    Legal Standard

False designation of origin occurs when:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any . . . false designation of origin . . . which—

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

15 U.S.C. § 1125.

"A plaintiff must, as a threshold burden, show use in commerce as an element of [a trademark] infringement claim." Unicorn Crowdfunding, Inc. v. New St. Enters., Inc., 507 F. Supp. 3d 547, 563 (S.D.N.Y. 2020) (Engelmayer, J.) (internal quotation marks omitted) (citing Kelly-Brown v. Winfrey, 717 F.3d 295, 305-06 (2d Cir. 2013)). "[A] complaint fails to state a claim under the Lanham Act unless it alleges that the defendant has made 'use in commerce' of the plaintiff's trademark as the term 'use in commerce' is defined in 15 U.S.C. § 1127." Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir. 2009).

Section 1127 provides that a mark is used in commerce when "it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on

documents associated with the goods or their sale . . . ." 15 U.S.C. § 1127. "The term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." Id.

A "trademark application falls outside the scope of a 'use in commerce' as defined in § 1227. Such an application seeks 'merely to reserve a right in a mark,' and does not involve goods or services sold or rendered in commerce." Unicorn, 507 F. Supp. 3d at 564-65.

### 2.     Discussion

Plaintiff argues that they are entitled to summary judgment on Count Two because it is undisputed that Defendants submitted screenshots of Plaintiff's copyrighted material in support of their applications to the USPTO, and in so doing passed the material off as their own. Defendants argue that they are entitled to summary judgment because the materials submitted were "lawfully licensed"[16] to them under the Agreement and therefore their statements to the USPTO were not false.

Although it is undisputed that Defendants submitted Plaintiff's copyrighted material in their trademark applications, Plaintiff has not demonstrated the threshold requirement of "use in commerce." See Unicorn, 507 F. Supp. 3d at 563, 564-65. At oral argument, Plaintiff was given the opportunity to reconcile their position with Unicorn's explicit holding that a trademark application cannot by itself serve as the basis for a false designation of origin claim. See Tr. 3-10. In response, Plaintiff conceded that Defendants' trademark application did not constitute "use in commerce," id. 10:16-20, but argued that an "exception to that requirement" exists pursuant to United We Stand America, Inc. v. United We Stand, America New York, Inc. See 128 F.3d 86 (2d Cir. 1997) ("United We Stand"). There, the Court of Appeals held that a political

---

[16] See n.11, supra.

organization's activities were "services," and that its mark was used "in commerce" within the meaning of § 1114(1)(a) of the Lanham Act. Plaintiff relies on the court's observation that it "appears that 'use in commerce' denotes Congress's authority under the Commerce Clause rather than an intent to limit the Act's application to profitmaking activity." Id. at 92-3.

Here, Plaintiff seeks relief under an entirely different section, 15 U.S.C. § 1125(a)(1), and the Court is not aware of any cases extending United We Stand's language to expand the scope of the Lanham Act.[17] Moreover, "use in commerce" is expressly defined in the Act, 15 U.S.C. § 1127, and it is unclear how that may be reconciled with Plaintiff's implication that the phrase is essentially meaningless. Thus, Plaintiff is not entitled to summary judgment on Count Two as a matter of law.

However, Defendants are also not entitled to summary judgment. Defendants' briefing merely rebuts Plaintiff's arguments and cites to no facts demonstrating that they have *not* used Plaintiff's marks or passed them off as their own in other contexts.[18] While Defendants need not prove a negative to oppose Plaintiff's motion, they must cite to specific facts in the record or an absence of evidence to support an essential element of Plaintiff's claim if they are to prevail on their own. Accordingly, both parties' motions for summary judgment on Count Two should be denied.

---

[17] To the contrary, Unicorn cites to multiple post-United We Stand cases in this Circuit clearly stating that a trademark application alone cannot give rise to a claim under section 1125. See Unicorn, 507 F. Supp. 3d at 564-65 (citing Omega S.A. v. Omega Eng'g, Inc., 396 F. Supp. 2d 166, 174 (D. Conn. 2005) and Macia v. Microsoft Corp., 152 F. Supp. 2d 535, 539 (D. Vt. 2001)).

[18] While Plaintiff's moving papers discuss only the USPTO applications, the Complaint alleges broader misappropriation of their marks, including Defendants' use of "Oh No," a mark which appears nowhere in the text of the Agreement.

### C.      Cancellation of the '281 Mark

Count Three seeks cancellation of the '281 Mark on the ground that the mark has not been used in commerce. Specifically, Plaintiff alleges that the "Webcomic Name" mark has never been used in international class 028, which includes board games and plush toys.

### 1.      Legal Standard

"A petition to cancel a registration of a mark may be filed by any person who believes that he is or will be damaged by the registration of a mark." 15 U.S.C. § 1064 (cleaned up). "In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part . . . and otherwise rectify the register with respect to the registrations of any party to the action." 15 U.S.C. § 1119.

> For a court to grant cancellation of the registration, the petitioning party must demonstrate that it has standing and that valid grounds for cancellation exist. A party seeking cancellation must satisfy two judicially-created requirements: the petitioner must show (1) a "real interest" in the proceeding and (2) a reasonable basis for the belief that the challenged mark has caused or will cause damage. To show a real interest, the petitioner must have a direct and personal stake in the outcome of the cancellation.

Quality Serv. Grp. v. LJMJR Corp., 831 F. Supp. 2d 705, 712 (S.D.N.Y. 2011) (cleaned up). "If a party has standing, it may move for cancellation of a trademark within five years of its issuance on any grounds that would have been valid for the PTO to have denied registration in the first instance." Id. "A [trade]mark qualifies for registration only if its owner uses it in commerce." Gameologist Grp., LLC v. Sci. Games Int'l, Inc., 508 F. App'x 31, 32 (2d Cir. 2013).

A trademark is any "word, name, symbol, or device, or any combination thereof used by a person to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127 (cleaned up). "A [trade]mark is used in commerce when it is employed 'to identify . . . goods or services' sold to consumers 'in a given market.'" Cross Com. Media, Inc. v. Collective, Inc., 841

F.3d 155, 167 (2d Cir. 2016) (quoting ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 147 (2d Cir. 2007)).

> ### 2.     Discussion

Defendants currently hold the '281 Mark for "Webcomic Name" in international class 028 ("Board games; Card games; Game cards; Party games; Plush dolls; Plush toys; Stuffed dolls and animals; Stuffed toy animals; Tabletop games; Soft sculpture plush toys; Stuffed and plush toys"). Plaintiff argues that this mark should be cancelled because it has never been used in commerce by Defendants.

Defendants respond on two fronts. First, by claiming that Plaintiff lacks standing to bring this claim because they have not shown they will be damaged by Defendants' registration of the mark "but would rather benefit from it by way of production and sale of products which fall within the Agreement." Def. Br. at 10.

Given the broader context of this case—in which Plaintiff accuses Defendants of using the Agreement as a vehicle for the wholesale misappropriation of Plaintiff's brand—this argument seems disingenuous. Plaintiff has easily cleared the low bar to standing by citing to the undisputed fact that their own application to register the trademark "Webcomic Name" in international class 016 ("Comic books; Comic strips and comic strip's comic features, appearing in print media, namely, comic books, books, newspapers, magazines") was rejected due to Defendants' registration. Plaintiff's principal creation under the Webcomic Name brand is a comic and depriving them of the ability to use their mark in connection with comic books or strips is a serious injury.

Second, although it is undisputed that no units of the WORKS were ever sold, Pl. 56.1 ¶¶ 41-42, Defendants claim that they have nonetheless used the mark Webcomic Name in

commerce. One of the other games Defendants purportedly acquired from Wiseman at the same time as Webcomic Name Game was "Pretending to Grownup." That game included 32 "guest artist cards," one of which was illustrated by Plaintiff and features three variations on the Blob character as well as the phrase "oh no." See ECF No. 127-2. Defendants assert that alongside the illustration on the card is text reading "artwork courtesy of Webcomic Name," and that this constitutes use in commerce by them of the Webcomic Name mark.

As an initial matter, the image cited by Defendants appears in a letter assigning the illustration to Wiseman. See id. Webcomic Name does not appear in the illustration, and Defendants have not cited to the card itself. As such, Defendants have failed to produce more than a "scintilla of evidence" to defeat Plaintiff's motion on this Count, and in fact have produced *no* evidence of their use of the mark in commerce. Anderson, 477 U.S. at 252; see Tr., 59:11-25.

Assuming, *in arguendo*, that Defendants had produced the card and that it did in fact read "artwork courtesy of Webcomic Name," such text would still not constitute use of a mark in commerce that would validate Defendants' registration of the mark. This is because Defendants' alleged use of the Webcomic Name merely identified the illustration's origin and did not distinguish the goods being sold—the game Pretending to Grownup—from those sold by others. See 15 U.S.C. § 1127. Put another way, Defendants may have used the words Webcomic Name, but they did not make use of the *mark*.[19]

---

[19] This distinction is supported by the concepts of fair use and nominative use—two common defenses to trademark infringement. "Classic fair use is use of a mark not in a trademark sense, but in a descriptive sense, and in good faith." Merck & Co. v. Mediplan Health Consulting, Inc., 425 F. Supp. 2d 402, 412 (S.D.N.Y. 2006). "Fair use permits others to use a protected mark to describe aspects of their own goods." Id. (quoting Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc., 166 F.3d 65, 73 (2d Cir. 1999)). "Nominative use is a use of another's trademark to identify, not the defendant's goods or services, but the plaintiff's goods or services. It is called nominative use because it names the real owner of the mark."

Although not explicitly raised by Plaintiff, a more fundamental issue is presented by Defendants' registration of the Webcomic Name mark. As discussed *supra*, the Agreement is limited to the WORKS and derivative products. Section 1(A) states that Defendants shall retain "100% of the trademark . . . of WORKS" which is defined as, a "propert[y] tentatively entitled 'Webcomic Name Game' and 'Webcomic Name Stuffed Animals."

The Agreement's definition of the WORKS could ostensibly entitle Defendants to registration of "Webcomic Name *Game*" in certain categories, but it does not convey ownership of the more general "Webcomic Name" mark in any category except stuffed animals. Accordingly, Defendants are not the rightful owners of the Webcomic Name mark in many of the categories in which they obtained and have sought registration.

Plaintiff has cited to undisputed facts establishing that Defendants have never used the Webcomic Name mark in commerce. Defendants are also not the owners of the Webcomic Name mark in any category beyond stuffed animals, and thus were not entitled to registration in other categories. Accordingly, Plaintiff is entitled to summary judgment on Count Three, and the Court should order cancellation of the '281 Mark.

### D.   Breach of Contract and Declaratory Judgment

Count Four is for breach of contract. Plaintiff argues that Defendants breached the Agreement by (1) refusing to pay Plaintiff the advance mentioned in section 1(G) upon delivery of "the final files," and (2) by exceeding the scope of the license granted to them under the Agreement. In Count Five, Plaintiff also seeks declaratory judgment that they validly terminated the Agreement.

---

Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC, 823 F.3d 153, 165 (2d Cir. 2016) (internal quotation marks and citation omitted).

As to the first alleged breach, the parties dispute both the meaning of the word "final"—which is not defined in the Agreement—and whether the files were delivered at all.[20] See Pl. 56.1 ¶¶ 34-35; D. 56.1 ¶ 23. Given that delivery of the files was a condition precedent to payment of the advance under the Agreement,[21] a dispute of material fact exists that precludes summary judgment.

Plaintiff also argues that Defendants' attempts to trademark both "Webcomic Name" and "Oh No" were an "excessive use of the Collaboration Agreement, well beyond its scope" that constitutes material breach.

Defendants respond that their actions were within the scope of the Agreement—specifically section 2(B). This argument presumes the same flawed reading of that section addressed by the Court in the copyright infringement context and is likewise meritless here.

Plaintiff correctly notes that "Defendants do not claim that excessive overreach is not a legal basis to cancel a license such as the Collaboration Agreement, but rather, Defendants merely argue that they did not overreach." However, the cases cited in support of the idea that Defendants' applications to the USPTO constitute material breach of the Agreement all deal with licenses, rather than assignments. The Agreement does not grant Defendants a license to use Plaintiff's property, but instead assigned certain rights to Defendants.[22] While the parties use these terms interchangeably, the distinction between them is significant, and Plaintiff has

---

[20] It has also been suggested that Plaintiff uploaded the files to a hosting service but deleted them before Defendants were able to access them. Tr., 45:1-2, 6-14.

[21] The relevant portion of section 1(G) reads: "The ARTIST will receive a $3,125 upfront advance against net sales royalties within 30 days of the COMPANY receiving the final files noted above for 'Webcomic Name Game' for a game developed with Jason Wiseman and the ARTIST known as Alex Norris of Webcomic Name tentatively titled 'Webcomic Name Game' by the COMPANY."

[22] Section 2(H) purports to grant "the exclusive license to [Defendants] in perpetuity of the WORKS." However, because section 1(A) already granted Defendants "100% of the copyright, 100% of the trademark, [and] 100% of the patent" in the WORKS, it is unclear what further effect 2(H) could possibly have.

provided no authority stating that the misappropriation of a contractual counterpart's trademark can constitute a breach of the parties' contract.

A license is inherently limited in scope. Those limitations are implicitly contemplated in any agreement that grants one, and exceeding those limitations is therefore a breach of the agreement.[23] In contrast, an assignment may stand alone, and infringement on un-assigned marks is unrelated to the contract containing the assignment. Consider the following examples:

If A grants B a license to use A's trademark in country X, but B then also uses the mark—without further authorization—in country Y, B may be liable for trademark infringement *and* breach of contract for exceeding the scope of their license.[24]

In contrast, if A owns trademarks A1 and A2, and assigns A1 to B in a written agreement that makes no mention of A2, B's subsequent infringement of the A2 mark is entirely unrelated to the conveyance of the A1 mark, and therefore would not constitute a breach of that contract.

Had Defendants trespassed on an entirely unrelated property right of Plaintiff's, e.g., by copying a comic from a series other than Webcomic Name, that would certainly not constitute a breach of the Agreement. And while Defendants' infringing actions are in proximity to the Agreement and its limited assignment of rights, the Court is unable to discern a principled distinction that would qualify this infringement, but not other forms of trespass, as a breach of contract. Accordingly, Plaintiff is not entitled to summary judgment on Count Four.

---

[23] This is the proposition that Plaintiff's cited cases support. See e.g., Bowmar Instrument Corp. v. Cont'l Microsystems, Inc., 497 F. Supp. 947, 959 (S.D.N.Y. 1980); Muze, Inc. v. Digital On-Demand, Inc., 123 F. Supp. 2d 118, 129 (S.D.N.Y. 2000). See also, Murjani Int'l, Ltd. v. Sun Apparel, Inc., No. 87-cv-04628 (PKL), 1987 WL 15110, at *10 (S.D.N.Y. July 31, 1987) (citing 15 U.S.C. § 1114(1)) ("The continued use . . . of a licensed trademark after the licensing agreement ha[s] been terminated constitutes . . . trademark infringement as well as a breach of contract.").

[24] See generally, Omri Ben-Shahar, Damages for Unlicensed Use, 78 U. CHI. L. REV. 7, 9 (2011) (discussing the overlap between breach of contract and infringement where a licensee infringes on a licensor's intellectual property).

Defendants conclude their cross-motion by claiming that because "because all actions taken by Defendants fall within the scope of the Agreement, Plaintiff has failed to sufficiently show a cause of action for Breach of Contract," and that therefore "Defendants are entitled to summary judgment as a matter of law, as well as a declaratory judgment that Plaintiff's termination of the contract was invalid." ECF No. 125 at 19.

Defendants, in moving against the party who will carry the ultimate burden of proof at trial, have technically satisfied their burden on breach of contract, but the legal basis on which the Court recommends denying Plaintiff's motion—the license/assignment distinction—was not briefed by either party. Also, in seeking declaratory judgment, Defendants seem to confuse the standards for defeating a summary judgment motion and prevailing on one; they merely rebut Plaintiff's arguments and make no attempt to cite to undisputed facts demonstrating that Plaintiff's termination was without basis. See also Def. 56.1. This is particularly concerning because Defendants' actions thus far, which they attempt to justify with a plainly erroneous reading of the Agreement, call in to question their good faith, leaving open the possibility that Plaintiff's termination was valid. Therefore, I recommend that both parties' motions as they pertain to breach of contract and declaratory judgment be denied.

## CONCLUSION

I recommend that Plaintiff's motion for summary judgment be GRANTED in part, and Defendants' cross-motion for summary judgment be DENIED.

SARAH NETBURN
United States Magistrate Judge

DATED:      May 22, 2023
            New York, New York

\*          \*          \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS
TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Engelmayer at the United States Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Engelmayer. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).