UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ALEXANDER NORRIS, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No.  1:19-CV-05491 – PAE |
| | : | |
| Marc Goldner, Individually and as Officer of GOLDEN BELL ENTERTAINMENT, LLC, a California company and GOLDEN BELL STUDIOS, LLC, GOLDEN BELL ENTERTAINMENT, LLC., a California Company and GOLDEN BELL STUDIOS, LLC., | : | |
| | : | |
| Defendants, | : | |
| | : | |
| | : | |

**DEFENDANTS' RULE 72(b) OBJECTIONS TO THE MAGISTRATE'S MAY 22, 2023 REPORT AND RECCOMENDATION REGARDING THE PARTIES MOTIONS FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................... 1
FACTUAL BACKGROUND .................................................................................................... 2
ARGUMENT .............................................................................................................................. 7
    I.    Legal Standard ............................................................................................................ 7
    II.   A Genuine Issue of Material Fact Exists as to Whether or Not the Use of Images in Defendants' Trademark Application was Authorized. ........................................... 7
    III.  Defendants are Entitled to Summary Judgment on Count Three, False Designation of Origin ..................................................................................................................... 13
    IV.  Mark 281 Was Used In Commerce and Should Not Be Cancelled ......................... 14
    V.   Defendants are Entitled to Summary Judgment for Breach of Contract ................. 15
CONCLUSION ........................................................................................................................ 17

# TABLE OF AUTHORITIES

Cases

*Int'l Healthcare Exch., Inc. v. Global Healthcare Exch.*, LLC, 470 F.Supp.2d 365, 371
    (S.D.N.Y.2007)……………………………………………………………………………14

*Jorgensen v. Epic/Sony Records*,
    351 F.3d 46 (2d Cir. 2003) ................................................................................................ 7

*Topps Co. v. Cadbury Stani S.A.I.C.*,
    526 F.3d 63 (2d Cir.2008) ............................................................................................... 11

*Unicorn Crowdfunding, Inc. v. New St. Enter., Inc.,.*,
    507 F. Supp. 3d 547, 565 (S.D.N.Y. 2020) ............................................................... 12,13

Rules

Fed. R. Civ. P. 72 ..................................................................................................................... 7

**INTRODUCTION**

Plaintiff Alexander Norris ("Plaintiff") has brought this action with the hope that the Court would overlook his obvious mis-telling of the facts and dissolve the Collaboration Agreement ("Agreement") he entered into with Defendants.

Plaintiff and Defendants entered into the Agreement, which called for the creation of plush toys, a  and a board game, other derivative merchandise such as a calendar and other commercial development  based upon Plaintiff's webcomic series "Webcomic Name." The Agreement also granted Defendants full intellectual property rights over the characters, the plush toys, and the board game, as well as any derivative works including but not limited to sequels, prequels, reboots, expansions, tie-ins, spinoffs, and other commercial development which would contain the characters set to appear in the toys or board games, and an option on the Plaintiff's next manuscript length, book length, *and* game-length works.

Throughout the entire history of the Agreement, Plaintiff has repeatedly failed to hold up his end of the bargain, with repeated failures to provide required content in a timely manner, making of public disparaging and defamatory comments, the publication of materials containing intellectual property covered within the Agreement, and blatant disregard for the option provision granting Defendants publishing rights to Plaintiff's next book-length work. In contrast, while patiently attempting to work with Plaintiff within the confines of the agreement, Defendants also took steps to protect the intellectual property rights granted to them by the Agreement and Plaintiff. Defendants never once tried to profit off the brand without the inclusion of the Plaintiff, whereas Plaintiff deprived the Defendants of revenue generated using the characters and brand that they acquired.

1

Rather than abide by the terms of the Agreement, Plaintiff decided to cut off communication with Defendants altogether, instead opting to file the instant matter with the hopes that the Court will dissolve a legally valid agreement while overlooking his breaches.

## FACTUAL BACKGROUND

In February of 2017, Golden Bell purchased the rights to a multi-media property called Pretending to Grownup from a third-party Jason Wiseman ("Wiseman"). Pretending to Grownup started as a card game which had thirty-two (32) guest artist cards. One (1) of those guest artist cards was created by Norris using the Webcomic Name characters. The use of the characters was assigned to Wiseman and included "any future use" of the guest artist card. Golden Bell acquired Pretending to Grownup including the guest artist card drawn by Norris. (See Dkt 127 ¶ 1). Prior to signing with Golden Bell, Wiseman materially represented to Defendants that he had "100% free reign" over numerous properties, including Webcomic Name. (*Id*).

In June of 2017, Golden Bell connected with Norris and began negotiating the Collaboration Agreement. (See Dkt.127 ¶ 3). Rather than creating the art in-house, Golden Bell wanted to keep the game true to the spirit of the comics and its characters, and in line with Golden Bell's mission, vision, and values of the company. The founding partners objective of the company is to work hand in hand with writers, artists, designers, and other creators to make new products come to life in an oversaturated industry by building and creating new and unique brands. Thus, Golden Bell reached out to the original artist of Webcomic Name to collaborate on the game, stuffed animals, and any other mediums the brand might be applied to, ensuring Norris was involved in the future development of growing the Webcomic Name brand. In Golden Bell's first communication with Norris on June 26, 2017, the company explained that there are "potentials for a stand alone [sic] comic, a children's book, or something else" and Golden Bell explained that

there would be "derivative merchandise [that] will accompany the game[.]" (See Dkt. 127. *Id*.). Golden Bell was straightforward from the beginning of their plans to work on the Webcomic Name brand and not just a game for it.

After emailing a draft of a Collaboration Agreement to Norris, Norris responded to Marc Goldner ("Goldner"), one of Golden Bell's Members, on July 3, 2017, stating "[t]he main query I have about the contract is the part about 'the artist will retain 0% of the copyright….'". (See Dkt. 127. ¶ 4). Goldner responded to Norris via email, noting "[t]o answer your question about copyright, Jason had agreed to us purchasing the rights for the game already and that part of the deal was already done." (*Id*). Goldner was under the impression that Wiseman and Norris already had a separate agreement in which Norris authorized Wiseman to negotiate for him and to sell.

On August 10, 2017, the parties entered into a Collaboration. The Agreement called for the creation, production, and distribution of a game and stuffed animals, as well as any tie-ins, spinoffs, or other commercial development based on Webcomic Name and its characters, which the Agreement referred to as "the WORKS." Additionally, the Agreement states that "the proceeds from the sale or any and all other disposition of the WORKS and the rights, interest, and licensed therein with respect thereto, including but not limited to the following: Comic Book Rights, Motion Picture Rights, Animation Rights, Graphic Rights, Sequel Rights, Remake Rights, Television Rights, Gaming Rights, Film Rights, Stage Rights, Radio Rights, Publication Rights, Interactive Rights, Music Rights, Merchandising Rights, and Digital Rights." (See Dkt. 127 ¶ 8.). Further, Section 3(D) of the Agreement granted Golden Bell options on Norris' next game-length work, book-length work, and manuscript-length work, which Norris later acknowledged via email. (*Id*.) According to the Agreement, Norris was required to create final files for a game designed by Golden Bell and Wiseman – which Norris never did. (See Dkt. 127. ¶ 7).

3

Shortly after the Agreement was executed sometime in September of 2017, Goldner and Norris had a recorded telephone conference wherein the parties discussed plans related to building the multimedia brand of Webcomic Name. Both Goldner, Norris, and Rachel Korsen, another Golden Bell Founding Partner, expressed their excitement to collaborate. Further, Goldner reinforced the idea that the company viewed Webcomic Name as a brand that it would continue to build and wanted Norris to be a part of that vision. (See Dkt. 127. ¶ 9).

On the call the parties discussed utilizing Webcomic Name and its characters in other mediums. Norris, Goldner, and Korsen, discussed a daily calendar of already published Webcomic Name comics which would include future comics created by Norris and posted to their jointly owned Social Media account. There was mutual excitement over the idea, though Goldner noted that Golden Bell would need additional comics from Norris because Norris had not published enough Webcomic Name comics to cover a whole year (365 Days), and Golden Bell and Norris agreed they'd be using the comics Norris published via his social media accounts for Webcomic Name. (*Id*).

The Agreement explicitly states in Section 1(A) that "ARTIST shall retain 0% of the copyright, 0% of the trademark, 0% of the patent and 5% of the net sales of WORKS for the first 18 months then it will revert to 4% of the net sales of the WORKS thereafter, and COMPANY shall retain 100% of the copyright, 100% of the trademark, 100% of the patent and 95% of the net sales of the WORKS for the first 18 months then it will revert to 96% of the net sales of the WORKS thereafter." The Agreement further states that "[i]f ARTIST creates a new work with a character or storyline that infringes on any of COMPANY's copyrighted properties, ARTIST agrees to transfer any copyright he may have in that new work to COMPANY." (See Dkt. 127. ¶ 10).

4

Pursuant to these provisions, on November 30, 2017, Golden Bell filed a trademark application Serial No. 87703934 with the USPTO on an intent to use basis for the mark "Webcomic Name" in class 028. The USPTO approved that application, with Registration No. 5629281 on December 11, 2018 which utilized their rightfully owned Webcomic Name copyrighted images – this was never contested by the Plaintiffs. (See Dkt. 127. ¶ 13).

The Agreement also reflects the parties desire to expand the Webcomic Name brand. Section 2(B) of the Agreement states that the parties shall share the proceeds, rights, interest, and licenses to the WORKS and its characters in a number of different mediums, such as motion pictures, animation, gaming, television, sequels, comic books, and more. Section 3(C) of the Agreement, states "ARTIST shall submit to COMPANY all sequels to the WORKS or other works using characters that appear in the WORKS…." (See Dkt. 127. ¶ 14).

Despite the inconsistent communications, slight progress on the WORKS was made in the beginning. Norris and Golden Bell agreed to produce five plush stuffed animal toys: a pink blob, an orange blob, a sexy pink blob, a cat, and a word bubble featuring the characters' catch phrase "Oh No" on one side, and "O kay" on the other. Norris drew the initial sketches of the toys, and provided them to Golden Bell, which made prototypes with numerous revisions and draw overs, providing editorial taking into account how to best bring to life the Webcomic Name characters. (See Dkt. 127. ¶ 16).

On April 5, 2018, Norris finally stated that he would draw the cards in black and white sketches to allow for creation of a test game, "and then finalise [sic] them." (See Dkt. 127. ¶ 18). On May 14, 2018, Norris stated that he could "get the sketched cards ready for testing in two weeks…." (*Id*).

5

Norris eventually delivered 377 sketch black and white cards to Golden Bell on June 21, 2018 when the final files, which are *not* sketch black and white cards, were supposed to be delivered by February 17, 2018. (See Dkt. 127. ¶ 19). As Norris previously acknowledged, black and white sketches were not "final" cards. These 'sketch' cards are the only ones currently in discovery. Norris states on July 1, 2018, over a week after delivering the sketch cards, that he would be in touch to "work out a timeline" – this never happened formally. Norris admitted these sketch cards were not finished as he discussed how they would later be colored – which they never were. The only files in discovery are the black and white sketch cards delivered prior to this email. In order to produce the game, the cards would have to be finalized, which means the cards would have to be colored and properly lined before being converted into a format that was suitable for mass printing. Of the 377 black and white cards, Norris subsequently claimed to have provided 400 cards via Dropbox that contained colored sketches and demanded immediate payment from Golden Bell. The game was supposed to include at least 500 cards. Goldner responded that the files would need to be accessed, reviewed, and edited by Golden Bell, a process that was explained to Norris as necessary to the process numerous times, before any payment was made within the 30-day period outlined in the agreement. (See Dkt. 127. ¶ 20). When Golden Bell attempted to access the Dropbox folder, none of the cards Norris claimed to have provided were there. Norris refused to upload *any* color files for Golden Bell to access or review until payment was made, which is contrary to Section 1(G) of the Agreement stating, that Norris would receive his "advance against net sales royalties within 30 days of the COMPANY receiving the final files…". Golden Bell never received the final files or any colored files to be reviewed. (See Dkt. 127. ¶ 23).

# ARGUMENT

## I. Legal Standard

Federal Rule of Civil Procedure Rule 72(b)(2) allows for a party to serve and file specific written objections to proposed findings and recommendations issued by a magistrate with respect to dispositive motions. Fed. R. Civ. P. 72(b)(2). Rule 72(b)(3) provides that "the district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed R. Civ P. 72(b)(3).

## II. A Genuine Issue of Material Fact Exists as to Whether or Not the Use of Images in Defendants' Trademark Application was Authorized.

The elements of a copyright infringement claim are "(i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003).[1]

In her discussion surrounding Copyright Infringement, the Magistrate's Report and Recommendation widely misconstrues the Agreement between the parties, and the rights assigned therein. The submissions of both the '369 Application and the '795 Application can be broken down into three categories: 1) Screenshots from Plaintiff's social media accounts, i.e. Facebook or Patreon, 2) Screenshots from Plaintiff's website, and 3) a photo of a speech-bubble-shaped plush toy produced by Defendants and authorized, co-designed, and consented to by Plaintiff. However, as the Magistrate indicates, the screenshots are the only images at issue.

---

[1] While the Magistrate indicates that Plaintiff's work is subject to U.S. copyright protections as foreign works, there appears to be no apparent authority indicating that works first published on the internet constitute foreign works. Indeed, the publication on the internet, specifically on American sites such as facebook.com, may constitute U.S. publication, and thus require registration prior to initiating a cause of action for copyright infringement. In fact, the authority cited by the Magistrate seems to indicate the opposite, noting that a work is a United States work if it is "first published…simultaneously in the United States and another treaty party whose law gratns copyright protection for at least the term provided in the United States." *DigitAlb, Sh.a v. Setplex*, LLC, 284 F. Supp. 3d 547, 554 (S.D.N.Y. 2018). The United States and the United Kingdom provide the same length of copyright protection.

7

The Magistrate relies on her interpretation of the contract, and the rights therein, to determine whether or not a genuine issue of material fact exists with respect to whether or not the use of these materials was authorized. In discussing whether or not specific sections of the Agreement are applicable to whether or not the use of these materials was authorized, the magistrate repeatedly uses language such as "this section has no relation to the screenshots of Plaintiff's *existing* branding and artwork" or "it is unclear how any portion of the Agreement, read in isolation or in context, would work to convey Defendants Plaintiff's copyright in unrelated *preexisting* work…." (emphasis added). However, at no point in the record has a date of publication of any of the disputed materials been established. Thus, the Magistrate's line of reasoning as it relates to "preexisting work" is in and of itself a disputed fact. Because the dates of publication of the works have not been established, the magistrate has improperly concluded that provisions of the Agreement do not apply. For instance, if it can be shown that the materials were published after the agreement had been entered into on August 10, 2017, then Section 1(C) of the agreement would effectuate a transfer of that right to Defendants, as that section reads "if ARTIST creates a new work with a character or storyline that infringes on any of COMPANY's copyrighted properties, ARTIST agrees to transfer any copyright he may have in that new work to COMPANY." [2] And while the Magistrate denotes that this section does not effectuate any assignment of rights from Plaintiff to Defendants, it is clear by the language of the section that Plaintiff agrees to the transfer of the copyright of such work.

---

[2] In discussing this section of the agreement, the Magistrate notes "it is not alleged that any of the material in the screenshots was created after the Agreement's execution." However, it is additionally not alleged that the screenshots were created prior to the Agreement's execution either. "The court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir.1997). Here, the magistrate has impermissible drawn a factual inference in favor of the Plaintiff's despite clearly established case law.

8

The Magistrate's discussion of Section 3(C) fails for a similar reason. Because the date of publication of these images has not been established, the court is required to draw all factual inferences in favor of Defendants. Thus, if these screenshots were indeed works that were created *after* the Parties had entered into the Agreement, these works would have been required to be submitted to Defendants. The Magistrate also omits a crucial sentence of this provision in her analysis. The provision in whole states "ARTIST shall submit to COMPANY all sequels to the WORKS or other works using the characters that appear in the WORKS and any other unrelated characters. COMPANY will take due diligence to copyright all said WORKS with the same percentages and profit splits as discussed above for future works relating to the WORKS above. If COMPANY acquires the NEW WORK, the provisions of this Agreement shall apply to the NEW WORKS." This provision makes clear that any work created by Plaintiff which uses characters that appear in the WORKS will be submitted to the company pursuant to the percentages discussed in Section 1(A), with the company retaining 100% of the copyright. Despite Magistrate's notion that they involve "Plaintiff's copyright in unrelated preexisting work...," there is no indication that these publications were existing at the time the parties entered into the agreement, nor are they unrelated to the WORKS, as the characters which appear in the images at issue contain the very core intellectual property being discussed throughout the agreement.

In addition, when read in conjunction with each other, a reasonable jury could conclude that the Agreement authorized Defendants to utilize the images in the USPTO applications. First, the Agreement makes clear from the beginning that it not only encompasses a game and stuffed animals, but "any tie-ins, spinoffs, or other commercial development of the WORKS such as Sequels, Prequels, Reboots, Remakes, and Expansions." The development of the WORKS as a multi-media brand development strategy is evident throughout the Agreement, including Section

2(B) which grants various additional rights to the Defendants. Contrary to the Magistrate's reasoning that the parties intended to create just a game and plush toys, Defendants made clear that the intention for the intellectual property at issue was much larger from the very beginning.

The Magistrate's decision also ignores a crucial provision providing rights to the Defendants. Section 2(D) of the Agreement, which is previously noted by the Magistrate but not discussed in the copyright infringement analysis, notes that "COMPANY will exclusively handle all worldwide distribution, production, marketing, reprinting, sales, logistics, warehousing, social media, and publication of the WORKS. COMPANY and ARTIST shall share access to **all** Social Media accounts with administrative privileges and COMPANY shall be the Domain Registrant and Administrator of any domains." (emphasis added). This section is crucial to the analysis of copyright infringement, because as mentioned above, the only images at issue were posted to either Plaintiff's social media or Plaintiff's website, both of which he agreed to provide access *and* administrative authority to Defendants. Thus, it is clear that Plaintiff authorized Defendants to use his Social Media and website.

While the Magistrate believes that the interpretation is based upon "a fantastical and incorrect reading of the Agreement," her assumption in doing so infers facts in favor of the Plaintiff, such as the date these images were published. The mere lack of knowledge of when these images were published, in and of itself constitutes a genuine issue of material fact warranting denial of summary judgment. Further, when read in whole, a reasonable jury could interpret the Agreement as a whole to allow for Defendants to seek trademark protection utilizing the images submitted to the USPTO.

Additionally, Defendants use of these images was no surprise, and even assented to by Plaintiff. For instance, shortly after the Agreement was executed, the parties discussed creating a

daily calendar utilizing Webcomic Name Comics which had been published to date, and the forthcoming comics since Plaintiff had not yet published 365 comics to cover the full year. Plaintiff assented to that idea and the use of the comics, specifically the ones that were published on social media and the ones he would publish in the future. (See Dkt. 127. ¶ 8). This not only recognizes utilization of Plaintiff's future comics, but also relates to his authorization of use of past comics and his social media, assuming the publications at issue were published prior to the execution of the Agreement. While this agreement would constitute extrinsic evidence and may not be permissible within the confines of a breach of contract analysis at the summary judgment phase, it is extremely relevant here, where copyright infringement is in play, and the analysis of whether or not there is a dispute of material fact can extend beyond the interpretation of the contract. Indeed, the parties had numerous discussions regarding the utilization of Webcomic Name as a brand, and not just stuffed animals and board games. See Dkt. 127. ¶ 3, 5, 7,8). Thus, the Magistrate's limitation of this analysis to the interpretation of the contract rather than record of evidence as a whole is improper, as the record clearly indicates, at a minimum, a genuine issue of material fact as to whether or not the Defendants were authorized to utilize the screenshots in their USPTO application.

  Plaintiff knew of and approved further uses of several of the images, specifically the "banner" image, which depicts the pink blob lying down under the words "webcomic name" and an image of the pink blob uttering the words "oh no," as those images appeared on promotional materials at comic book conventions to generate interest in the upcoming game and stuffed animals including but not limited to a catalog page and physically printed banner. (See Dkt. 118 at ¶ 39). A similar image, of the pink blob laying down in the exact pose, was provided to Defendants on November 29, 2017, as well as a sketch of the "oh no" word bubble. (See Dkt 127, Ex. 8). Pursuant

11

to Section 2(C) of the Agreement, which states "COMPANY shall have sole ownership of the original artwork used and created for the WORKS by either ARTIST or by COMPANY[,]" therefore, those images are the property of Defendants. At no point did Plaintiff allege use of these images for the promotional materials was unauthorized during their utilization at comic book and game conventions, nor during solicitation of Webcomic Name branded products to retailers, consumers, and other potential customers in both the Business-To-Business sector, and the Business-To-Consumer segments, but then purports that their use is unauthorized in the context of a USPTO application. By way of even the Magistrate's reasoning, if this artwork was submitted for purposes of the WORKS, even in promotional materials, then the Agreement would apply to such images, and the Defendants would retain *all* of the intellectual property of such images. Lastly, the Magistrate herself admits that, "[u]nder the Agreement, Plaintiff agreed to illustrate the Game and assigned certain rights in [his] creations relating to it to Defendants." In addition, the Magistrate points to an "image cited by Defendants [that] appears in a letter assigning the illustration to Wiseman" which was later sold by Wiseman and assigned to Defendants. Thus, a reasonable jury could determine that that this copyright image which provided for "any future use" would bar summary judgement. Most importantly, the Magistrate herself admits that, "[t]he Agreement does ***not*** grant Defendants a ***license*** to use Plaintiff's property, but instead ***assigned*** certain ***rights*** to Defendants." Therefore, it would be impossible for Defendants to infringe on their own Copyrights which were assigned

Because of that, the Magistrate's recommendation that summary judgment be granted in favor of the Plaintiff is erroneous, in both fact and law, as a reasonable jury could find that Defendants were authorized in utilizing the screenshots for their USPTO application. At a

minimum, there is sufficient dispute of genuine material fact to warrant denial of Plaintiff's motion for summary judgment.

### III. Defendants are Entitled to Summary Judgment on Count Three, False Designation of Origin

In *Unicorn Crowdfunding, Inc. v. New St. Enter., Inc.,* 507 F. Supp. 3d 547, 565 (S.D.N.Y. 2020), this Court made clear that trademark applications do not involve goods or services sold or rendered in commerce, and thus, cannot be identified as use in commerce for the purposes of a false designation of origin claim. Additionally, the Court in that matter noted that the Plaintiff's motion was the only motion filed with the Court, but because of a lack of evidence provided by the Plaintiff showing use in commerce, Defendants in that matter would have succeeded on a summary judgment motion had they filed one. *Id*. at 565. This rings true because the burden of showing use in commerce belongs to the Plaintiff.

Here, we see the exact situation, with the only difference being Defendants have indeed filed their own summary judgment motion. Plaintiff has failed to meet even their minimum threshold burden of showing use in commerce as an element of the infringement claim. Nonetheless, the Magistrate improperly attempts to shift that burden upon Defendants, requiring them rather to prove a negative. Plaintiff does not dispute this Court's holding, but rather attempts to direct the court to other authority in attempt to circumvent the Use in Commerce requirement. However, there is no dispute of material fact that Plaintiff's only allegation of use in commerce has been directed to Defendants USPTO applications. While Defendants admit to sending those applications, such applications do not constitute a use in commerce. As such, Defendants are entitled to summary judgment on Count Three, false designation of origin.

13

### IV.     Mark 281 Was Used In Commerce and Should Not Be Cancelled

Further, Plaintiff's allegations that the mark has not been used in commerce are untrue. The characters the "pink blob" and "orange blob," who also appear in artwork meant for both the game and stuffed animals, are seen uttering the phrase "Oh No" alongside a 'Unique Selling Proposition' identifier and title stating "artwork courtesy of Webcomic Name" on a card contained in the game Pretending to Grownup. (Dkt. 127. ¶ 31). This card is heavily and primarily featured in promotional products used by Golden Bell Studios to promote the Pretending to Grownup game, such as being displayed on Amazon.com alongside the game. Pretending to Grownup has sold no less than 7,940 units to date with a gross revenue of $204,474.75 and is still available for purchase from a number of different outlets, such as goldenbelldirect.com, amazon.com, walmart.com, and physical retail stores, but is currently out of stock at specialty retailers such as Hot Topic. (*Id.*).

"The talismanic test is whether or not the mark was used in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch.*, LLC, 470 F.Supp.2d 365, 371 (S.D.N.Y.2007). The use of the mark in the Pretending to Grownup game is sufficient to meet this test. Not only is the mark utilized in a 'game card', which is trademarkable in its own right at the USPTO, appearing in the game, but it is specifically utilized in advertising and promotional materials of the game. The purpose of utilizing the mark, Webcomic Name, in promoting the Pretending to Grownup game, is to market the game to the Webcomic Name audience, so that the members of the public associate the game with the brand. Thus, utilization of the mark not only as a card in the game, but as a promotional aspect of the game, in conjunction with the amount of units sold, constitutes a bona fide use in commerce under 15 U.S.C. § 1127. Because the Magistrate overlooked the promotional aspect of the card, and the importance of such

14

promotion within the eyes of the public and its association with the game, Mark 281 should not be cancelled.

Additionally, the Magistrate adds in an argument not raised by Plaintiff, that Defendants registration of the mark "Webcomic Name" is inappropriate in any category except stuffed animals, and that they are not the rightful owners of Webcomic Name in "many of the categories in which they obtained and have sought registration." The only category in which Defendants have obtained registration of the Webcomic name is category 28, and while that category includes stuffed animals, the USPTO does not part and parcel registrations of trademarks within the categories, but rather grants them within the category as a whole. Thus, it is inappropriate to say that Defendants are the lawful owners of the mark within category 28 with respect to stuffed animals, but not the other categories contained within category 28, which include board games; card games; game cards; party games; plush dolls' plush toys; stuffed dolls and animals; stuffed toy animals; tabletop games; soft sculpture plush toys; and stuffed and plush toys. Said another way, the categories listed by the USPTO are holistic, and cannot be part and parceled within themselves.

Because Mark 281 was used in commerce, Plaintiff is not entitled to cancellation of the mark.

**V.      Defendants are Entitled to Summary Judgment for Breach of Contract**

"A motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning. *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir.2008).

In the reasoning for denial of Summary Judgment for Breach of Contract, the Magistrate ignores Section 1(G) in its entirety after identifying it as one of the arguments Plaintiff makes as to how Defendants breached the contract. Indeed, Section 1(G) notes that Plaintiff is entitled to an advance payment against royalties within 30 days of providing Defendants with the final files for the game mentioned within the agreement. While Plaintiff contends that the final files were delivered during pleadings, at oral arguments, Plaintiff defined the files as final despite needing tweaks to an ongoing process, and were final because Defendants could release the game at that stage if they wanted to. Tr., 36: 10-11, 20-21. Indeed, it is unclear how Plaintiff can reconcile the assertion that the files were still subject to tweaks with any reasonable definition of the word "final." Indeed, the Merriam-Webster dictionary defines "final" as "not to be altered or undone." Indeed, if the files needed tweaks, they could not be "final." While there may be a dispute as to whether or not files were delivered at all, by Plaintiff's own admission, they were not "final" within any meaning of the word. Instead, Plaintiff notes "the evidence on the record shows that plaintiff continued to provide as much content as he could. It was a continuing production. But at that point where he produced more than 400 game cards and he received feedback from the defendants, multiple feedback and changes, he believed he deserved to get paid because he had worked tremendously on these items." Tr., 35: 7-14. Despite Plaintiff's assertions, "work[ing] tremendously" on the cards does not entitle Plaintiff to payment under the contract, and thus does not constitute a breach on the part of Defendants.

Defendants are further entitled to summary judgment regarding breach of contract by the Magistrates own admission, that Defendants "have technically satisfied their burden on breach of contract" when discussing whether or not Defendants exceed the scope of the "license," as presented by the Plaintiffs. As the Court makes clear, the Defendants could not exceed the scope

16

of the license, as alleged by Plaintiff, because the Agreement was not a licensing agreement at all, but rather an assignment of rights. Thus, Defendants are entitled to summary judgment on Count Four for breach of contract.

## **CONCLUSION**

Defendants object to the errors of fact and the recommendations that are contrary to fact and law in the Magistrate's Report, and hereby request that the Court find that Plaintiff's are not entitled to summary judgment on the basis of count one, copyright infringement, and count three, cancellation of Mark 281, and that Defendants are entitled to summary judgment on count 2, false designation of origin, and count 4, breach of contract.

| | |
|---|---|
| Dated: June 5, 2023<br>New York, New York | GERARD FOX LAW P.C.<br><br>  /s/ Ryan P. Dolan<br>Ryan P. Dolan<br>Gerard P. Fox<br>1880 Century Park East, Suite 1410<br>Los Angeles, CA 90067<br>Telephone: (310) 441-0500<br>Facsimile: (310) 441-4447<br>gfox@gerardfoxlaw.com<br>blehman@gerardfoxlaw.com<br>rdolan@gerardfoxlaw.com<br><br>*Attorneys for Defendants* |