# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Alexander Norris,<br><br>            Plaintiff,<br><br>  - against –<br><br>Marc Goldner, Individually and as Officer of Golden Bell Entertainment, LLC, a California Company and Golden Bell Studios, LLC, Golden Bell Entertainment, LLC, a California Company and Golden Bell Studios, LLC,<br><br>            Defendants. | Civil Action No.: 1:19-cv-05491-PAE-SN |

**Plaintiff Alexander Norris' Memorandum of Law in Opposition to Defendants' Objections to Judge Netburn's Report and Recommendation**

SAUL EWING LLP
Francelina M. Perdomo Klukosky
Christie R. McGuinness
1270 Avenue of the Americas, Suite 2005
New York, New York 10020
T: (212) 980-7200
Francelina.Perdomoklukosky@saul.com
Christie.McGuinness@saul.com


*Attorneys for Plaintiff*
*Alexander Norris*

## TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT: ............................................................... 1

II.  STATEMENT OF RELEVANT FACTS: ................................................ 4

    A.  Plaintiff Builds A Successful Brand: ........................................... 4

    B.  Plaintiff Enters Into the Agreement: ........................................... 4

    C.  GB Entertainment Files For Trademark Protection: ................... 5

    D.  Plaintiff Delivers Game Files: ................................................... 7

III.  ARGUMENT: ................................................................................... 7

    A.  Legal Standard: ........................................................................ 7

    B.  This Court Must Review Judge Netburn's Report and Recommendation For Clear Error As Defendants Raise No New Arguments As To Their Interpretation of the Agreement: ................................................ 8

        1.  Defendants' Identical Arguments Regarding Section 1(A) of the Agreement: ............................................................... 8

        2.  Defendants' Identical Arguments Regarding Section 1(C) of the Agreement: ............................................................... 9

        3.  Defendants' Identical Arguments Regarding Section 2(B) of the Agreement: ............................................................... 10

        4.  Defendants' Identical Arguments Regarding Section 3(C) of the Agreement: ............................................................... 11

    C.  Defendants Waived Any Objections As To Judge Netburn's Interpretation of the WORKS: ................................................... 11

    D.  Judge Netburn Correctly Concluded That Defendants Infringed on Plaintiff's Copyrighted Work: ................................................... 12

        1.  The Agreement Did Not Provide Defendants With Rights to Plaintiff's Preexisting Copyrighted Work: ......................... 13

        2.  Defendants Did Not Raise The Issue Of The Date of Publication Before Jude Netburn: ................................................... 14

    (a)  There Can Be No Genuine Dispute As to the Date of Publication: ...................... 15

3.    Defendants Did Not Raise the Issue of the Foreign Works Before
Judge Netburn: .................................................................................... 16

(a)   There Can Be No Genuine Dispute That Plaintiff Had a Protectable Interest in
Their Preexisting Work: ................................................................................ 16

E.    Judge Netburn Correctly Concluded That The '281 Mark is Properly
Subject to Cancellation: ............................................................. 17

1.    Defendants' Advanced No New Arguments: ........................................... 18

2.    The '281 Mark Was Never Used in Commerce: ...................................... 18

(a)   The WORKS Were Never Created: ...................................................... 19

(b)   The Pretending to Grownup Game Does Not Constitute Use in Commerce: ....... 19

(c)   Defendants Had No Rights to Register the '369 Application (Among Others) In
Any Category: .............................................................................................. 21

F.    Judge Netburn Correctly Concluded That Defendants Are Not Entitled to
Summary Judgment on Their Claim For False Designation Of Origin: ............... 21

G.    Judge Netburn Correctly Concluded That Neither Party Is Entitled to
Summary Judgment On Their Breach of Contract Claim: .................................. 22

1.    Defendants Are Not Entitled To Summary Judgment: ............................ 22

IV.    CONCLUSION: ................................................................................................ 24

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*Am. Express Co. v. Goetz*, 515 F.3d 156 (2d Cir. 2008)...............................................................17

*BWP Media USA Inc. v. Hollywood Fan Sites LLC*, 115 F.Supp.3d 397 (S.D.N.Y. 2015) ..........22

*Charlot v. Ecolab, Inc.*, 97 F.Supp.3d 40 (E.D.N.Y. 2015)............................................................14

*Cross Com. Media Inc. v. Collective, Inc.*, 841 F.3d 155 (2d Cir. 2016) .....................................19

*Donohue v. Hochul*, 32 F.4th 200 (2d. Cir. 2022) ........................................................................23

*Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 508 F. App'x 31 (2d Cir. 2013).......................17

*Greer v. Fox Corporation*, No. 20-cv-5484, 2022 WL 4093155 (S.D.N.Y. Sept. 7, 2022)..........13

*Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F.Supp.2d 365 (S.D.N.Y. 2007) ............................................................................................................................................20

*Llanos v. Goord*, 555 F.Supp.2d 454 (S.D.N.Y. 2008) ..................................................................8

*Mechanical Plastics Corp. v. Titan Technologies, Inc.*, 823 F.Supp. 1137 (S.D.N.Y. 1993) ......................................................................................................................................................20

*Piligian v. Icahn School of Medicine at Mount Sinai*, 490 F.Supp.3d 707 (S.D.N.Y. 2020) ........16

*Process America, Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125 (2d Cir. 2016) .........................23

*Securities and Exchange Commission v. Norstra Energy Inc.*, 202 F.Supp.3d 391 (S.D.N.Y. 2016) ............................................................................................................................................15

*Silva v. Peninsula Hotel*, 509 F.Supp.2d 364,366 (S.D.N.Y. 2007)............................................13

*Steadman v. Citigroup Global Markets Holdings Inc.*, 592 F.Supp.3d 230 (S.D.N.Y. 2022) ......................................................................................................................................................12

*Thomas v. Astrue*, 674 F.Supp.2d 507 (S.D.N.Y. 2009)...............................................................7

*United States v. Gladden*, 394 F.Supp.3d 465 (S.D.N.Y. 2019)..................................................18

**FEDERAL STATUTES**

17 U.S.C. § 101................................................................................................................................17

Fed. R. Civ. P. 72 ..............................................................................................................................2

I.    **PRELIMINARY STATEMENT**:

Plaintiff Alex Norris ("Plaintiff") is a visual artist who successfully launched Webcomic Name in 2015 centered on the main character, the hapless "Blob," and its catchphrase "Oh No." (Doc. No. 118 at ¶¶s 1-5). At its core, Webcomic Name is centered around gender positivity, love, equality, inclusion, and humor. (Doc. No. 118 at ¶¶s 1-5). Plaintiff, who self identifies as queer, utilizes the: they/them/their pronouns, and Plaintiff's gender fluidity is encapsulated in the genderless "Blob." (Doc. No. 118 at ¶¶s 1-5). Recognizing Plaintiff's success and social media following, Defendants Marc Goldner and his company Golden Bell Entertainment (collectively, "Defendants") enticed Plaintiff into entering into a Collaboration Agreement (the "Agreement"). (Doc. No. 118 at ¶¶s 12-14). While Plaintiff entered into the Collaboration Agreement with the understanding that Plaintiff and Defendants would be collaborating on two discrete items: a table top game, and a plush toy, Defendants entered into the Agreement with the express intention of gaining complete rights to Plaintiff's intellectual property suite. (Doc. No. 118 at ¶ 27).

Emboldened by the purposely poor drafting of the Agreement, Defendants scoured Plaintiff's social media, took screenshots of Plaintiff's intellectual property suite and fraudulently passed off those screenshots to the United States Patent and Trademark Office ("USPTO") as Defendants' own intellectual property. (Doc. No. 39-12 at ¶¶s 8-12). What's more, when Plaintiff substantially performed under the Agreement and provided game files to Defendants, Defendants refused to pay Plaintiff the modest sum of monies called for under the Agreement. (Doc. No. 118 at ¶ 31).

Following *years* of litigation, Plaintiff finally has their rights vindicated. (Doc. No. 146). Judge Netburn, in a thorough Report and Recommendation concludes that Defendants infringed on Plaintiff's copyright when they submitted Plaintiff's preexisting copyrighted work to the

USPTO, and that Defendants' trademark should be cancelled because Defendants never used their trademark in commerce because Defendants ***never*** created the table top game and plush toy. (Doc. No. 146).

Hanging on to the misguided notion that the Agreement provided Defendants with complete, total rights to Plaintiff's intellectual property, Defendants oppose Judge Netburn's Report and Recommendation by repeating the same exact arguments previously presented to Judge Netburn, presenting conclusory arguments as to why Judge Netburn purportedly erred in her Report and Recommendation and by improperly presenting new arguments to this Court. Because Fed. R. Civ. P. 72 does not provide litigants with a second bite at the apple to present new arguments to this Court, it requires litigants to specifically detail their position as to why they believe the Magistrate Judge erred. Defendants have failed to abide by Fed. R. Civ. P. 72's clear mandate, and this Court should review Defendants' Objections to Judge Netburn's Report and Recommendation for clear error as opposed to reviewing Judge Netburn's Report and Recommendation *de novo*.

 For the foregoing three overarching reasons, Defendants' Objections to Judge Netburn's Report and Recommendation are without merit and fail to address the procedural requirements that are necessary to show clear error pursuant to Fed. R. Civ. P. 72. As a result, this Court should affirm Judge Netburn's Report and Recommendation in its entirety.

***First***, Defendants waived all objections to Judge Netburn's interpretation of the definition of WORKS, the provision which defines Defendants' purported rights to Plaintiff's intellectual property, and ultimately, agreed the agreement is limited to the Webcomic Name Game and the plush toy. Therefore, Defendants conceded that they infringed upon Plaintiff's preexisting intellectual property by submitting Plaintiff's artwork to the USPTO and passing it off as their own

without Plaintiff's authorization.

**Second,** at **no point** in Defendants' Objections to Judge Netburn's Report and Recommendation do Defendants argue why Judge Netburn erred in concluding: (1) that the Agreement did not provide Defendants with rights to Plaintiffs' preexisting intellectual properly, (2) that the trademark Defendants registered for Webcomic Name, Registration No. 5629281 (the "281 Mark") was not used in commerce, (3) that Defendants did not meet their affirmative burden on seeking dismissal of Plaintiff's claim for false designation of origin, and (4) that neither party is entitled to summary judgment on their cross-motions for breach of contract. Therefore, by merely parroting their prior arguments, Defendants have failed to effectively address **any** of the analysis contained in Judge Netburn's Report and Recommendation and therefore, Defendants' objections are without merit.

**Third,** even if this Court were to review Judge Netburn's Report and Recommendation *de novo*, Defendants' Objections to Judge Netburn's Report and Recommendation are still without merit because Defendants haphazardly submitted several new arguments, based on purported issues of facts, in support of their position that Judge Netburn erred in concluding that Defendants infringed on Plaintiff's copyrighted work and that the 281 Mark was used in commerce. However, because Defendants did not submit these new facts and arguments to Judge Netburn in their initial briefs, Defendants are procedurally barred from raising new arguments to this Court. Ironically, even if this Court were to consider Defendants' new facts and arguments, Defendants **still** failed to demonstrate that their purported genuine issues of material fact exist because Defendants previously deemed those disputed facts as undisputed. Therefore, even under *de novo* review, Defendants' Objections to Judge Netburn's Report and Recommendation are without merit.

For these reasons, this Court should affirm Judge Netburn's Report and Recommendation in its entirety.

II.    <u>**STATEMENT OF RELEVANT FACTS**</u>:

A.    <u>**Plaintiff Builds A Successful Brand**</u>:

Plaintiff is a visual artist, comics illustrator, and an author of short stories, webcomics, comic books and strips. (Doc. No. 118 at ¶¶s 1-5). Among Plaintiff's most notable works, is the viral "Webcomic Name" centered on the main character, the hapless "Blob," and its catchphrase "Oh No." (Doc. No. 118 at ¶¶s 1-5). Plaintiff launched Webcomic Name in 2015, and by 2016, Plaintiff had acquired the domain name http://webcomincname.com to promote their comics, illustrations, short stories and workshops. (Doc. No. 118 at ¶¶s 3-7).

After its launch, Webcomic Name soon grew to become the brand under which Plaintiff popularized their visual and literary works, workshops, and merchandise. (Doc. No. 118 at ¶¶s 3-7). Since then, Plaintiff used Webcomic Name as their trademark, alter ego and the umbrella under which Plaintiff markets and promotes their illustrations, comics, books and merchandise items which can be purchased online on their "Oh No" webstore. (Doc. No. 118 at ¶¶s 3-7).

In early 2017, Plaintiff agreed to join forces with Jason Wiseman ("Wiseman"), who Plaintiff knew as a well-known table top game creator. (Doc. No. 118 at ¶ 4). Wiseman approached Plaintiff to collaborate on a table top card game (the "Game") based on the illustrations and characters of Webcomic Name. Since the Game would incorporate the style, concept and characters of Webcomic Name, Plaintiff and Wiseman used "Webcomic Name Game" as a placeholder reference. (Doc. No. 118 at ¶¶s 12-14).

B.    <u>**Plaintiff Enters Into the Agreement**</u>:

On February 11, 2017, Wiseman signed an agreement with Defendant Golden Bell Entertainment, LLC ("GB Entertainment") pursuant to which GB Entertainment agreed to purchase four table card games from Wiseman, three of which were either in their conceptual or in development phase. (Doc. No. 118 at ¶¶s 12-14).

Marc Goldner ("Goldner") insisted that GB Entertainment formally engage Plaintiff to illustrate the Game. (Doc. No. 118 at ¶¶s 15-17). Goldner explained that he wanted to make and sell push toys of the main character in the Game and wanted permission from Plaintiff to do so. (Doc. No. 118 at ¶¶s 15-17). On July 3, 2017, Goldner sent Plaintiff a proposed Collaboration Agreement, which GB Entertainment had drafted.

Following some negotiation, Plaintiff signed the Agreement. (Doc. No. 118 at ¶ 27).

The Agreement was limited to the "WORKS,"

> "… with respect to the production of the properties tentatively entitled "Webcomic Name Game" and 'Webcomic Name Stuffed Animals' (the 'WORKS') to be created by ARTIST, and any tie-ins, spin offs, or other commercial development of the WORKS such as Sequels, Prequels, Reboots, Remakes, and Expansions."

(Doc. No. 118 at ¶ 27).

Similarly, the Agreement contained another provision, setting forth how Plaintiff would be paid for their development of the Webcomic Name Game:

> The ARTIST will receive a $3,125 upfront advance against net sales royalties within 30 days of the COMPANY receiving the final files noted above for 'Webcomic Name Game' for a game developed with [Wiseman] and the ARTIST known as [Plaintiff] of Webcomic Name tentatively titled 'Webcomic Name Game' by the COMPANY. The COMPANY will then pay an additional $2,500 to the ARTIST upon delivery to the COMPANY of the final print-ready files, the PSD files, the AI files, the InDesign Files, and any other files pertaining to the game created by the ARTIST and [Wiseman].

(Doc. No. 118 at ¶ 31).

C.   **GB Entertainment Files For Trademark Protection**:

On November 30, 2017, GB Entertainment filed Application No. 87703934 to register the trademark "Webcomic Name" in International Class 028: "Board games; Card games; Game cards; Party games; Plush dolls; Plush toys; Stuffed dolls and animals; Stuffed toy animals; Tabletop games; Soft sculpture plush toys; Stuffed and plus toys."

(Doc. No. 118 at ¶ 36). On December 11, 2018, the USPTO approved of GB Entertainment's application and issued Registration No. 5629281 (the "281 Mark"). (Doc. No. 118 at ¶ 44).

On October 9, 2018, GB Entertainment filed Application No. 88147369 to register the trademark "Webcomic Name" in international class 016: "comic books; comic strips; comic strips' comic features; comics; newspaper comic strips" (the "369 Application"). In support of the 369 Application, GB Entertainment submitted screenshots of: (1) Plaintiff's Facebook page, @webcomicname, which displays two variations on the Pink Blob as well as a stylized Webcomic Name logo; (2) Plaintiff's Patreon page, including a 3-panel comic featuring the Pink Blob titled "Help Me Patreon," and a banner featuring the Pink Blob along with a stylized Webcomic Name logo; and (3) a "shop" page on Plaintiff's Facebook, which, along with two variations on the Pink Blob in the profile picture and banner, includes images of two t-shirts featuring a yellow cat and a third variation of the Pink Blob. (Doc. No. 39-11 at ¶¶s 7-9).

On November 8, 2018, GB Entertainment filed Application Serial Number 88185795 (the "795 Application"). (Doc. No. 118 at ¶ 50). GB Entertainment filed the 795 Application for the phrase: "Oh No" in International Class 16: "Bookmarkers; Bookmarks; Comic books; Comic magazines; Comic strips; Comic strips' comic features; Comics; Stickers; Newspaper comic strips," and International Class 25: T-shirts; Graphic T-shirts; Short-sleeved or long-sleeved t-shirt). (Doc. No. 118 at ¶ 50). In support of the 795 Application, GB Entertainment submitted: (1) a product page of Plaintiff's Facebook shop for a t-shirt featuring the Pink Blob and a speech bubble with the phrase "oh no;" (2) the same Facebook shop page submitted with the 369 Application; (3) a portion of Plaintiff's

website, webcomicname.com, displaying a 3-panel comic titled "Invasive" which features the Plink Blob and a purple character, as well as a partial view of another 3-panel comic; (4) a different portion of Plaintiff's website featuring the same banner as the Patreon page as well as the entirety of the partial 3-panel comic, which features the Pink Blob and is titled "New Life;" and (5) a photo of a speech-bubble-shaped plush toy upon which the phrase "oh no" is embroidered. (Doc. No. 39-12 at ¶¶s 8-12).

D.   **Plaintiff Delivers Game Files**:

Simultaneously, in October 2018, per the Agreement, Plaintiff delivered 250 set up game cards and 150 punch cards and then requested payment of the first advance. (Doc. No. 118 at ¶ 31). Nonetheless, Goldner refused to pay, claiming that the files provided were not "final" and claiming a need to "editorialize" the files prior to providing Plaintiff's payment. (Doc. No. 118 at ¶ 32). To date, Plaintiff still has not been paid. (Doc. No. 118 at ¶¶s 34-35).

III.   **ARGUMENT**:

A.   **Legal Standard**:

It is well-established that "[t]he Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. If, however, the party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error. Where a party makes merely perfunctory responses, argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition, the court reviews for clear error. Parties may not attempt to relitigate the entire content of the hearing and are not to be afforded a second bite at the apple." *Thomas v. Astrue*, 674 F.Supp.2d 507, 510-511 (S.D.N.Y. 2009).

B.     **This Court Must Review Judge Netburn's Report and Recommendation For Clear Error As Defendants Raise No New Arguments As To Their Interpretation of the Agreement**:

Fundamentally, this Court should review Defendants' Objections to Judge Netburn's Report and Recommendation for clear error because Defendants merely rehash the same arguments as to why the Agreement grants them rights in Plaintiff's preexisting copyrighted work presented to Judge Netburn in Defendants' initial briefing. It is well-understood that objecting to a Magistrate's Report and Recommendation is ***not*** an opportunity to rehash arguments made before the magistrate. *See e.g.*, *Llanos v. Goord*, 555 F.Supp.2d 454, 456 (S.D.N.Y. 2008) ("If a party makes only conclusory or general objections, or ***simply reiterates his original arguments***, the Court review the Report and Recommendation only for clear error."). In their Objections to the Report and Recommendation, Defendants argue that Judge Netburn erred in her interpretation of the Agreement because Sections 1(A), 1(C), 2(B), 2(D), and 3(C) of the Agreement could potentially indicate, to a reasonable juror, that Plaintiff provided Defendants with authorization to use their preexisting copyrighted work in support of the '369 Application and the '795 Application to the USPTO. (Doc. No. 148 at 8-10). As detailed further below, those arguments are identical to the arguments Defendants made in their initial briefing before Judge Netburn, and Defendants do not identify any new authority to suggest that Judge Netburn erred in her legal analysis. Therefore, this Court should review Defendants' Objections to Judge Netburn's Report and Recommendation for clear error because Defendants do not present new arguments.

1.     **Defendants' Identical Arguments Regarding Section 1(A) of the Agreement**:

As to Section 1(A) of the Agreement, in their initial briefings before Judge Netburn, Defendants argued: "[w]ith respect to [the Agreement] itself, it is clear that the rights it grants to Defendants. Provision 1(A) of the agreement assigns 100% of the copyright, trademark, and

patents to Defendants, in exchange for 5% of the net sales to be paid to Plaintiff for the first 18 months, then 4% of the net sales thereafter." (Doc. No. 136 at 4). As to Section 1(A), Judge Netburn correctly concluded that Section 1(A) is "**_explicitly limited_**" to the WORKS, and that "[t]he screenshots at issue are unrelated to the WORKS, as they involve Plaintiff's existing brand and artwork, not the game and plush toys the parties intended to create." (Doc. No. 146 at 12). In their Objections to Judge Netburn's Report and Recommendation, Defendants argue "[f]urther, when read in whole, a reasonable jury could interpret the Agreement as a whole to allow for Defendants to seek trademark protection utilizing the images submitted to the USPTO." (Doc. No. 148 at 10). Judge Netburn expressly addressed Defendants' **_broad_** interpretation of the Agreement, and expressly rejected Defendants' interpretation as "fantastical." (Doc. No. 146 at 14). Because Judge Netburn did not clearly err in her interpretation of Section 1(A), Judge Netburn's Report and Recommendation should be affirmed in its entirety.

### 2.   **Defendants' Identical Arguments Regarding Section 1(C) of the Agreement**:

As to Section 1(C) of the Agreement, in their initial briefings before Judge Netburn, Defendants argued: "1(C) of the Agreement further agrees that "If ARTIST creates a new work with a character or storyline that infringes on any of COMPANY's copyrighted properties, ARTIST agrees to transfer any copyright he may have in that new work to COMPANY." (Doc No. 136 at 4-5). As to Section 1(C), Judge Netburn correctly concluded: "Section 1(C) obligates Plaintiff to transfer to Defendants any potential new work that infringes on any of Defendants' copyrighted properties. This section does not effectuate any assignment of rights from Plaintiff to Defendants." (Doc. No. 146 at 12). Indeed, in their Objections, Defendants repeat the same argument: "[a]nd while the Magistrate denotes that this section does not effectuate any assignment of rights from Plaintiff to Defendants, it is clear by the language of the section that Plaintiff agrees

to the transfer of the copyright of such work." (Doc. No. 148 at 8). Again, Judge Netburn expressly addressed Defendants' **broad** interpretation of Section 1(C) of the Agreement, and correctly rejected Defendants' interpretation of Section 1(C) as not effectuating any assignments of rights from Plaintiff to Defendants. Because Judge Netburn did not clearly err in her interpretation of Section 1(C), Judge Netburn's Report and Recommendation should be affirmed in its entirety.

3.    **Defendants' Identical Arguments Regarding Section 2(B) of the <u>Agreement</u>**:

As to Section 2(B) of the Agreement, in their initial briefings before Judge Netburn, Defendants argued: "[r]eading the contract under Plaintiff's incredibly narrow definition not only ignores most of the Agreement but would certainly render this provision superfluous. If the WORKS were indeed limited to a board game and stuffed animal, this assignment of rights would be rendered meaningless."). (Doc. No. 136 at 5). Judge Netburn correctly concluded that: "[t]his section is plainly limited to the WORKS and the rights therein and with respect thereto could, for example, cover the sharing of proceeds and rights to a hypothetical Webcomic Name Game themed comic book…Thus, as with Section 1(A), this section has no relation to the screenshots of Plaintiff's existing branding and artwork." (Doc. No. 146 at 12-13). Indeed, in their Objections, Defendants rehash the same argument: "[t]he development of the WORKS as a multi-media brand development strategy is evident throughout the Agreement, including Section 2(B) which grants various additional rights to the Defendants." (Doc. No. 148 at 9-10). Judge Netburn addressed Defendants' **broad** interpretation of Section 2(B) of the Agreement, correctly rejected Defendants' interpretation, and correctly interpreted Section 2(B) of the Agreement as being limited to the WORKS, **not** related to the screenshots. Because Judge Netburn did not clearly err in her interpretation of Section 2(B), Judge Netburn's Report and Recommendation should be affirmed in its entirety.

4.      **Defendants' Identical Arguments Regarding Section 3(C) of the
        <u>Agreement</u>**:

As to Section 3(C) of the Agreement, in their initial briefings before Judge Netburn,
Defendants argued: "[t]he notion is further enforced by Section 3(C) of the Agreement, which
requires Plaintiff to transfer any new work which he creates which contains characters set to appear
in the WORKS." (Doc. No. 136 at 5). In interpreting Section 3(C), Judge Netburn correctly
concluded that: "[i]t instead contemplates a scenario wherein Plaintiff creates either a sequel to the
WORKS or an entirely different work involving the same characters as the WORKS and requires
them to "submit" that work to Defendants." (Doc No. 146 at 13). Indeed, in their Objections,
Defendants reiterate the same argument: "[t]his provision makes clear that any work created by
Plaintiff which uses characters that appear in the WORKS will be submitted to the company
pursuant to the percentages discussed in Section 1(A), with the company retaining 100% of the
copyright." (Doc. No. 148 at 9). Judge Netburn addressed Defendants' ***broad*** interpretation of
Section 3(C) of the Agreement, correctly interpreted Section 3(C) of the Agreement to be
applicable only to sequels to the WORKS, and correctly identified that because sequels to the
WORKS were not created, Section 3(C) afforded Defendants no rights in Plaintiff's preexisting
copyrighted work. Because Judge Netburn did not clearly err in her interpretation of Section 3(C),
Judge Netburn's Report and Recommendation should be affirmed in its entirety.

C.      **Defendants Waived Any Objections As To Judge Netburn's Interpretation of
        the <u>WORKS</u>**:

This Court should affirm Judge Netburn's Report and Recommendation because
Defendants ***do not*** dispute Judge Netburn's interpretation of the WORKS (even though Judge
Netburn's Report and Recommendation clearly outlined the consequences for failure to object to
a portion of her Report and Recommendation), the seminal provision of the Agreement through
which all of Defendants' purported rights flow. Ultimately, by logical extension, Defendants do

not dispute that the Agreement did not grant them rights to the entire suite of Plaintiff's intellectual property. (Doc. No. 146 at 7, 25). It is well-understood that failure to object to a portion of Magistrate's Report and Recommendation causes that portion of the Report and Recommendation to be deemed admitted. *See e.g.*, *Steadman v. Citigroup Global Markets Holdings Inc.*, 592 F.Supp.3d 230, 239 (S.D.N.Y. 2022) ("Moreover, a party generally waives judicial review of an issue when he or she fails to make timely objection to a magistrate judge's report, as long as all parties receive clear notice of the consequences of their failure to object."). After receiving ***clear notice*** of the consequences for failure to object to Judge Netburn's Report and Recommendation, Defendants chose not object to Judge Netburn's interpretation of the term WORKS, and ultimately, Defendants conceded they only had rights to the WORKS: "(1) the yet-to-be-developed tabletop game, (2) plush toys, and (3) future derivations thereof." (Doc. No. 146 at 7). Accordingly, as detailed further below, Judge Netburn correctly determined that Defendants infringed on Plaintiff's copyrighted work because the Agreement only provided Defendants with rights in the WORKS, which were not created, and did not provide Defendants with rights in Plaintiff's preexisting copyrighted work.

D.      **Judge Netburn Correctly Concluded That Defendants Infringed on Plaintiff's Copyrighted Work**:

Regardless of whether this Court reviews Judge Netburn's Report and Recommendation for clear error or *de novo*, Judge Netburn correctly determined that Defendants infringed on Plaintiff's copyrighted work because (1) "[i]t is undisputed that in submitting the '369 Application and the '795 Application, Defendants copied Plaintiff's copyrighted work", (2) "[t]he terms of the Agreement that Defendants rely upon are unambiguous and no reasonable jury could interpret them in the way Defendants seek to do. Accordingly, the Court should grant summary judgment on Count One in favor of Plaintiff." (Doc. No. 146 at 14-15). In objecting to Judge Netburn's

Report and Recommendation, as to the copyright infringement claim, Defendants make two arguments: (1) a reasonable jury could find that the Agreement authorized Defendants to use Plaintiff's preexisting copyrighted work, *i.e.*, the captured screenshots, and (2) there are genuine issues of material fact as to when the captured screenshots images were published and as to whether the captured screenshots are properly subject to copyright protection. (Doc. No. 148 at 10-13). Those arguments must fail because (1) Judge Netburn carefully considered all provisions of the Agreement and correctly interpreted the limited scope of the rights assigned in the Agreement, and (2) Defendants did not raise the issues of the date of publication in opposition to Plaintiff's Motion for Summary Judgment and did not raise the issue of whether the captured screenshots are properly subject to copyright protection and are therefore precluded from doing so here. *See e.g.*, *Greer v. Fox Corporation*, No. 20-cv-5484, 2022 WL 4093155, *2 (S.D.N.Y. Sept. 7, 2022) ("In addition, a district court generally will not consider new arguments raised for the first time in objections to a magistrate's judge's report and recommendation that could have been raised before the magistrate but were not."); *Silva v. Peninsula Hotel*, 509 F.Supp.2d 364,366 (S.D.N.Y. 2007) ("If, however, the party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error."). Therefore, this Court should affirm Judge Netburn's Report and Recommendation in its entirety as Judge Netburn did not clearly err in her analysis of the issues in this case.

1.    **The Agreement Did Not Provide Defendants With Rights to Plaintiff's Preexisting Copyrighted Work**:

As detailed above, Judge Netburn correctly determined that the Agreement provided Defendants with *no* rights in Plaintiff's preexisting copyrighted works and that Defendants infringed on those preexisting copyrighted works when they submitted them in connection with the '369 Application and the '795 Application *without* Plaintiff's approval. What's more,

Defendants' reliance on Sections 1(A), 1(C), 2(B), 2(D), and 3(C) of the Agreement is entirely misplaced because, as Judge Netburn correctly analyzed, Plaintiff's preexisting copyrighted works were independent from the not yet created WORKS, and neither Defendants' rights in the WORKS nor Defendants' future rights in hypothetical sequels to the WORKS permitted Defendants to reach back into Plaintiff's preexisting copyrighted works and to use those works in the '369 Application and the '795 Application. (Doc No. 146 at 12-13). Significantly, because Defendants do not dispute that they submitted Plaintiff's preexisting work to the USPTO, this Court should adopt Judge Netburn's Report and Recommendation in its entirety as Defendant's use of Plaintiff's preexisting work was without authorization and constituted copyright infringement.

2. **Defendants Did Not Raise The Issue Of The Date of Publication Before Jude Netburn**:

This Court should not consider Defendants' Objections to the Report and Recommendation based on a purported genuine issue of material fact as to the date of publication because Defendants did not raise this issue before Judge Netburn. Defendants cannot use their Objections to the Report and Recommendation as a second bite at the apple to make new arguments to this Court. *Charlot v. Ecolab, Inc.*, 97 F.Supp.3d 40,46 (E.D.N.Y. 2015) ("Furthermore, even on de novo review of specific objections, the court will not consider arguments, case law, and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance."). Simply, Defendants made one argument in response to Plaintiff's Motion For Summary Judgment: "Plaintiff's Interpretation of the Collaboration Agreement is Unduly Narrow and Contradicts the Plain Terms of the Agreement," and one argument in support of their Cross-Motion For Summary Judgment: "Plaintiff Is Not Entitled to Judgment on Copyright Infringement and False Designation Origin Causes of Action." (Doc. Nos. 125, 136). ***Both*** of which focus on Plaintiff's interpretation of the Agreement, and ***neither*** of which were based on an argument regarding the date of

publication. Thus, this argument is not properly before this Court and must not be considered.

(a)    **There Can Be No Genuine Dispute As to the Date of Publication**:

Even if this Court were to consider the issue of the date of publication, Defendants have still failed to demonstrate that there is a *genuine* issue of material fact because Defendants merely allege, *without* citing to any facts, "[t]hus, if these screenshots were indeed works that were created *after* the Parties had entered into the Agreement, these works would have been required to be submitted to Defendants." (Doc. No. 148 at 9). It is well-established that "[o]nce the moving party has made an initial showing that there is no genuine issue of material fact, the non-moving party cannot rely on the mere existence of a scintilla of evidence to defeat summary judgment but must set forth specific facts showing that there is a genuine issue for trial." *Securities and Exchange Commission v. Norstra Energy Inc.*, 202 F.Supp.3d 391, 394 (S.D.N.Y. 2016). Simply, Plaintiff presented admissible evidence, through Plaintiff's Declaration, that the 'Oh No' image as early as 2015 and started creating the 'Webcomic Name' comic as early as 2016, and therefore met their burden in demonstrating that there is no genuine dispute as to the date of publication. (Doc No. 119 at ¶¶s 5, 6). *See also*, (Doc. No. 118 at ¶¶s 5,6). Remarkably, in response to Plaintiff's Declaration and Plaintiff's Rule 56.1 Statement of Undisputed Facts, Defendants *admitted* these facts.[1] (Doc. No. 129 at ¶¶s 5, 6). Defendants, now, cannot concoct an issue of fact where they already admitted that none exists solely for the purpose of objecting to Judge Netburn's Report and Recommendation. For this very simple reason, Defendants' last-ditch argument still fails because Defendants previously admitted the very facts they now wish to dispute. Accordingly,

---

[1] For the Court to comprehend the *brazen* nature of Defendants' infringement, the Court need only consider that Defendants took Plaintiff's 'Oh-No' t-shirt, which Plaintiff had been commercializing since 2015, and used that t-shirt in support of the '369 Application and '795 Application. Compare, (Doc. No. 39-11); (Doc. No. 39-12); and (Doc. No. 119-1).

Judge Netburn's Report and Recommendation should be affirmed in all aspects.

        3.      **Defendants Did Not Raise the Issue of the Foreign Works Before Judge Netburn**:

This Court should not consider any objections to Judge Netburn's Report and Recommendation based on whether the 'Oh No' image and Webcomic Name are properly copyrightable as foreign works because Defendants did not raise that issue before Judge Netburn in their initial briefing. It is well-understood that "[i]n addition, new arguments and factual assertions cannot properly be raised for the first time in objections to the report and recommendation, and indeed may not be deemed objections at all." *Piligian v. Icahn School of Medicine at Mount Sinai*, 490 F.Supp.3d 707, 716 (S.D.N.Y. 2020). At no point in their initial briefings before Judge Netburn did Defendants raise the issue of whether these works were properly subject to copyright protection. Indeed, Defendants' ***only*** argument to Judge Netburn as to why Plaintiffs were not entitled to summary judgment on their claim for copyright infringement was that the Agreement provided Defendants with the right to use Plaintiff's preexisting copyrighted work. (Doc. Nos. 125, 136). Therefore, this argument is not properly before this Court and must not be considered.

        (a)      **There Can Be No Genuine Dispute That Plaintiff Had a Protectable Interest in Their Preexisting Work**:

Even if the Court were to consider Defendants' new argument, Defendants have failed to establish that there is a dispute of material fact as to whether Plaintiff had a protectable interest in their preexisting works because Plaintiff is a citizen of the United Kingdom, and Plaintiff first published their work in the United Kingdom. As Judge Netburn correctly reasoned, "[o]n the other hand, non-United States works – generally, works first published outside the United States in a foreign country that is a signatory to the Berne Convention – are exempt from registration. An unpublished work is a non-United States work if the author is not a national, domiciliary, or

habitual resident of the United States." *See* 17 U.S.C. § 101. (Doc. No. 146 at 9). Building on that, Judge Netburn correctly held: "[b]ecause Plaintiff is a British citizen and resident, they are entitled to copyright protection of their work that is either unpublished or was first published outside of the United States." (Doc. No. 146 at 9). Significantly, it is undisputed that the 'Oh No' image and Webcomic Names were first created and published in the United Kingdom. (Doc No. 119 at ¶¶s 5, 6). *See also*, (Doc. No. 118 at ¶¶s 5,6). Therefore, Plaintiff had a protectable interest in those works and Defendants blatantly infringed on Plaintiff's copyright when they submitted the 'Oh No' image and Webcomic Name to the USPTO in connection with the '369 Application and '795 Application. (Doc. No. 146 at 10-11). For this very simple reason, Defendants' last-ditch argument still fails because Defendants previously admitted the very facts they now wish to dispute. Accordingly, Judge Netburn's Report and Recommendation should be affirmed in all aspects.

E.     **Judge Netburn Correctly Concluded That The '281 Mark is Properly Subject to Cancellation**:

This Court should adopt judge Netburn's Report and Recommendation in its entirety because Judge Netburn correctly concluded that the '281 Mark is subject to cancellation because (1) Defendants ***never*** used the '281 Mark ***in commerce*** and because (2) the game Pretending to Grownup did not make use of the '281 Mark as it was ***never*** marketed as a Webcomic Name brand game. It is well-established that "[a] [trade]mark only qualifies for registration ***only*** if its owner uses it in commerce*"* and because to be used in commerce, the mark must "differentiate or identify the origin of [the holder's] goods or services." *Am. Express Co. v. Goetz*, 515 F.3d 156, 161 (2d Cir. 2008); *Gameologist Grp., LLC v. Sci. Games Int'l, Inc*., 508 F. App'x 31, 32 (2d Cir. 2013). As Judge Netburn correctly concluded: "… it is undisputed that no units of the WORKS were ever sold," and "… Defendants' alleged use of the Webcomic Name merely identified the illustration's origin and did not distinguish the goods being sold – the game Pretending to Grownup – from

those sold by others." (Doc. No. 146 at 19, 20). Therefore, this Court should affirm Judge Netburn's Report and Recommendation in its entirety because the '281 Mark is properly subject to cancellation as it was never used in commerce and the Pretending to Grownup Game was never marketed with the Webcomic Names mark.

### 1.    <u>**Defendants' Advanced No New Arguments**</u>:

At base, this Court should adopt Judge Netburn's Report and Recommendation in its entirety because Defendants advanced no new arguments as to why the '281 Mark is properly subject to cancellation in their Objections to Judge Netburn's Report and Recommendation that were not addressed in their initial briefings before Judge Netburn. Simply, it is well-understood that Objections to a Report and Recommendation ***are not*** an opportunity for a second bite at the apple, and therefore, this Court should not consider Defendants' Objections to Judge Netburn's Report and Recommendation. *See e.g.*, *United States v. Gladden*, 394 F.Supp.3d 465, 480 (S.D.N.Y. 2019) ("In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not."). Fundamentally, Defendants argued before Judge Netburn that the use of 'Webcomic Names' in the Pretending to Grownup Game constituted 'use in commerce' such that the '281 Mark is not subject to cancellation. (Doc. No. 136 at pg. 8-9). Judge Netburn expressly rejected this argument, and Defendants did not (because they cannot) raise any new arguments as to why Judge Netburn erred in her decisions in their Objections to Judge Netburn's Report and Recommendation. Thus, for this very simple reason, this Court should adopt Judge Netburn's Report and Recommendation in its entirety.

### 2.    <u>**The '281 Mark Was Never Used in Commerce:**</u>

Even if this Court were to consider Defendants' Objections to the Report and Recommendation, Judge Netburn correctly concluded that the '281 Mark was not used in

commerce because (1) the WORKS were never created, and (2) the Pretending to Grownup Game ***was not*** marketed, branded with the 'Webcomic Names' mark. (Doc. No. 146 at 19-21).

(a)     **The WORKS Were Never Created**:

Judge Netburn correctly concluded that the '281 Mark is subject to cancellation because the WORKS were never created. (Doc. No. 146 at 19) ("second, although it is undisputed that no units of the WORKS were ever sold, Defendants claim that they have nonetheless used the mark Webcomic Name in commerce."). Defendants do not dispute that the WORKS were never created and, by extension, Defendants do not genuinely dispute that the '281 Mark is subject to cancellation on this fact alone. (Doc. No. 148 pg. 14-15). Therefore, on this basis alone, this Court should adopt Judge Netburn's Report and Recommendation in its entirety.

(b)     **The Pretending to Grownup Game Does Not Constitute Use in Commerce**:

Addressing Defendants' sole argument as to why the '281 Mark is not properly subject to cancellation, Judge Netburn correctly concluded that use of three variations on the Blob character and use the phrase "oh no" in a single guest artist card (out of thirty-two guest artist cards) in a game marketed and sold as 'Pretending to Grownup' is insufficient to conclude that the '281 Mark has been used in commerce because "…Defendants may have used the words Webcomic Name, but they did not make use of the ['281 Mark]." (Doc. No. 146 at 20). It is axiomatic that "[a] [trade]mark is used in commerce when it is employed ***to identify*** goods or services sold to consumers in a given market." *Cross Com. Media Inc. v. Collective, Inc*., 841 F.3d 155, 167 (2d Cir. 2016). Because the Pretending to Grownup Game ***was not*** identified as a Webcomic Name product and ***was not*** marketed as a Webcomic Name product, Judge Netburn correctly concluded that the '281 Mark is properly subject to cancellation. (Doc. No. 146 at 20).

Judge Netburn correctly concluded that use of Webcomic Name's artwork as part of the

Pretending to Grownup Game did not constitute 'use in commerce' because "…Defendants' alleged use of the Webcomic Name merely identified the illustration's origin and did not distinguish the goods being sold – the game Pretending to Grownup – from those sold by others." (Doc. No. 146 at 20). *See e.g.*, *Mechanical Plastics Corp. v. Titan Technologies, Inc.*, 823 F.Supp. 1137, 1143 (S.D.N.Y. 1993) ("A trademark is designed ***to identify the origin and source of goods***, to assure consistency of quality on repeat purchases, and to serve as an advertisement by which a manufacturer can bypass individual retailers to reach consumers directly.") (emphasis added). Here, as Judge Netburn correctly concluded, Defendants presented ***no evidence*** that 'Webcomic Name' appeared anywhere on the guest artist card in the Pretending to Grownup game, which confirms that the '281 Mark was not used in commerce because there was nothing to identify the guest artist card as Webcomic Name's. (Doc. No. 146 at 20). Indeed, Defendants, ***themselves***, submitted the image Plaintiff assigned to Defendants for use in the game Pretending to Grownup in support of their Motion for Summary Judgment, and "Webcomic Name" appears nowhere on that card. (Doc. No. 127-2). Meaning, the entire purpose of trademark protection was not fulfilled because the guest card was not identified or associated in any way with "Webcomic Name."

What's more, as Judge Netburn correctly concluded, even if the printed guest artist card noted that the illustration was courtesy of "Webcomic Name," that still would not satisfy "use in commerce" because the game was marketed, sold and branded under a different mark "Pretending to Grownup." (Doc. No. 146 at 20). As Defendants themselves conceded, "[t]he talismanic test is whether or not the mark was used in any way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark*."* *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F.Supp.2d 365, 371 (S.D.N.Y. 2007). Here, there is nothing to identify or distinguish the single guest artist card as a "Webcomic

Name" good or product because the single guest artist card is cleared distinguished as part of the broader Pretending to Grownup game, which was the product being marketed and sold. Therefore, this Court should adopt Judge Netburn's Report and Recommendation in its entirety.

(c)     **Defendants Had No Rights to Register the '369 Application (Among Others) In Any Category:**

Although not expressly before this Court (as the '369 Application is still pending registration), Plaintiff clarifies, for this Court's edification, that Defendants conflate Judge Netburn's comments regarding Defendants' various different fraudulent trademark filings with her analysis regarding cancellation of the '281 Mark, the only mark before this Court. (Doc. No. 148 at 15). As Judge Netburn correctly commented, the Agreement limited Defendants' rights to the WORKS: the tabletop game and the plush toy, ***neither*** of which were developed, and as a result, Defendants did not have rights to file the '369 Application (among various other marks) in categories other than those applicable to tabletop games and plush toys. (Doc. No. 148 at 15). When Defendants submitted the '369 Application, Defendants submitted that application under international classes 16 and 25: the classes for comics and t-shirts despite the Agreement's clear language. (Doc. No. 39-11). Ultimately, Defendants misinterpret Judge Netburn's comments, and those comments should not distract this Court from adopting Judge Netburn's Report and Recommendation in its entirety.

F.     **Judge Netburn Correctly Concluded That Defendants Are Not Entitled to Summary Judgment on Their Claim For False Designation Of Origin:**

Judge Netburn correctly determined that Defendants are not entitled to summary judgment on their claim for false designation of origin because Defendants "…must cite to specific facts in the record or an absence of evidence to support an essential element of Plaintiff's claim if they are to prevail on their own." (Doc. No. 146 at 17). It is axiomatic that "[o]n a motion for summary judgment, the party bearing the burden of proof at trial must come forward with evidence on each

-21-

element of its claim or defense illustrating its entitlement to relief." *BWP Media USA Inc. v. Hollywood Fan Sites LLC*, 115 F.Supp.3d 397, 399 (S.D.N.Y. 2015). In their Objections to Judge Netburn's Report and Recommendation, Defendants merely argue "[n]onetheless, the Magistrate improperly attempts to shift that burden upon Defendants, requiring them rather to prove a negative." (Doc. No. 148 at 13). Defendants miss the fundamental point of Judge Netburn's holding: Defendants cross-moved for summary judgment on Plaintiff's claim for false designation of origin, which means that the burden shifted to Defendants to demonstrate its entitlement to summary judgment. (Doc. No. 125 at 9). Therefore, because Defendants did not point to facts in the record establishing that they *did not* use Plaintiff's copyrighted work in commerce[2], Defendants are not entitled to affirmative summary on Plaintiff's claim for false designation of origin claim.

### G.    Judge Netburn Correctly Concluded That Neither Party Is Entitled to Summary Judgment On Their Breach of Contract Claim:

Judge Netburn correctly concluded that neither party is entitled to summary judgment on their claims for breach of contract because there is a material issue of fact as to whether Plaintiff delivered "final" files to Defendants as the term "final" is not defined in the Agreement, and there is a material issue of fact as to whether Plaintiff's termination of the Agreement was valid. (Doc. No. 146-24).

#### 1.    Defendants Are Not Entitled To Summary Judgment:

Judge Netburn correctly concluded that Defendants are not entitled to summary judgment because there is a material issue of fact as to whether Plaintiff had cause to terminate the

---

[2] Ironically, Defendants cannot have it both ways: either they did not use the mark in commerce (in which case the '281 Mark is properly subject to cancellation) or they did use the mark in commerce (in which case Plaintiff's claim for false designation of origin survives).

Agreement. (Doc. No. 146 at 24). It is a basic principle of New York contract law that "[u]nder New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." *Process America, Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016). As Judge Netburn properly concluded "[t]his is particularly concerning because Defendants' actions thus far, which they attempt to justify with a plainly erroneous reading of the Agreement, call into question their good faith, leaving open the possibility that Plaintiff's termination was valid." (Doc. No. 146 at 24). Consequently, Judge Netburn correctly concluded that Defendants are also not entitled to summary judgment because there is a material dispute as to whether Defendants' actions constituted a material breach of the Agreement such that Plaintiff rightfully terminated the Agreement.

Importantly, in Defendants' Objections to Judge Netburn's Report and Recommendation and in their initial briefings before Judge Netburn, Defendants do not brief whether they performed under the Agreement, a necessary finding for this Court to affirmatively grant summary judgment to Defendants. *See e.g.*, *Donohue v. Hochul*, 32 F.4th 200, 206-207 (2d Cir. 2022) ("In order to prevail on their New York breach of contract claim, the CSEA Plaintiffs must establish (1) an agreement, (2) adequate performance on their part, (3) breach by the State, and (4) damages.") (internal citations and quotations omitted). Meaning, because Defendants **affirmatively** moved for summary judgment on their claim that Plaintiff improperly terminated the Agreement, it is Defendants' burden to demonstrate that they performed under the Agreement, and that Plaintiff's breach was unexcused. *Donohue*, 32 F.4th at 206. Therefore, as Judge Netburn correctly concluded "[a]lso, in seeking declaratory judgment, Defendants seem to confuse the standards for defeating a summary judgment motion and prevailing on one; they merely rebut Plaintiff's arguments and

make no attempt to cite to undisputed facts demonstrating that Plaintiff's termination was without basis." (Doc. No. 146 at 24). For the very simple reason, that Defendants have not briefed the quintessential elements of their breach of contract claim, Defendants are not entitled to summary judgment.

IV.   **CONCLUSION**:

For the reasons set forth above, Plaintiff requests that this Court affirm Judge Netburn's well-reasoned Report and Recommendation in its entirety.

## **CERTIFICATION OF COMPLIANCE**

Pursuant to Local Civil Rule 11.1, I, Christie R. McGuinness, hereby certify that this Memorandum of Law complies with the formatting rules, and the total number of words in this Memorandum of Law, excluding the caption, certification of compliance, table of contents, and table of authorities, is 7,389.

This the 20th day of June, 2023.

/s/ Christie R. McGuinness
Christie R. McGuinness

## **CERTIFICATE OF SERVICE**

I, Christie R. McGuinness, hereby certify that on June 20th, 2023, the foregoing document was filed electronically with the Clerk of the Court using the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Christie R. McGuinness
Christie R. McGuinness