UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALEXANDER NORRIS,

                                    Plaintiff,

                    -v-

MARC GOLDNER, *et al.*,

                                    Defendants.

---

19 Civ. 5491 (PAE) (SN)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This copyright and trademark action arises out of the breakdown of a business

relationship between plaintiff Alexander Norris, a visual artist behind a popular webcomic series,

and defendants Marc Goldner and his companies, which manufacture toys, games, and books.

Norris's best-known character is "Blob."  In each comic strip, Blob suffers one of life's banal

misfortunes and exclaims its catchphrase, "Oh no."  A representative example appears below:



Dkt. 119, Ex. 3 at 4.

The dispute between Norris and Goldner centers on their contract.  In Norris's view, their

contract is of only limited scope, giving Goldner copyright rights with respect only to a planned

Blob-themed boardgame and stuffed animal.  In Goldner's view, the contract is far broader,

conveying rights not just to the planned boardgame and its derivatives, but also to all of Norris's

work featuring Blob.  In this action, Norris brings a range of claims against Goldner and his

companies, arising from Goldner's (1) registering trademarks derived from Norris's webcomics and (2) failing to pay Norris under their contract.  Whether those claims are viable turns in large part on how the contract is read.

Pending now are cross-motions for summary judgment.  In a thorough and perceptive Report and Recommendation (the "Report"), the Hon. Sarah Netburn, United States Magistrate Judge, adopted the narrower construction of the parties' contract urged by Norris.  Her Report recommends granting Norris's motion in part and denying defendants' motion in full.  The Court agrees with Judge Netburn's interpretation of the contract and adopts the Report in substantial part.  The Court enters summary judgment for Norris as to the copyright and trademark-cancellation claims.  However, as to Norris's trademark-infringement claim, because the evidence cannot establish that defendants ever "use[d]" the relevant mark "in commerce," 15 U.S.C. § 1125, the Court departs from the Report, and enters partial summary judgment for defendants.

## I.      Background[1]

### A.      Facts

#### 1.      The Parties and Their Agreements

---

[1] The facts which form the basis of this decision are taken from the parties' submissions on the instant motions—specifically, Norris's Local Rule 56.1 statement, Dkt. 118 ("Pl. 56.1"), and counterstatement, Dkt. 132 ("Pl. Counter 56.1"); Norris's declaration (and accompanying exhibits), Dkt. 119 ("Norris Decl."), whose attachments include the parties' contract, Dkt. 119, Ex. 5 ("Collaboration Agreement"), and the transcript of Goldner's deposition, Dkt. 120, Ex. 2 ("Goldner Dep. Tr."); Goldner's Local Rule 56.1 statement, Dkt. 126 ("Def. 56.1"), and counterstatement, Dkt. 129 ("Def. Counter 56.1"); and Goldner's declarations (and accompanying exhibits), Dkt. 127 ("Goldner Decl."), including the partial transcript of Norris's deposition, Dkt. 128, Ex. 1 ("Norris Dep. Tr.").

In 2015, Norris first used Blob in a webcomic.  Pl. 56.1 ¶¶ 1–3; *see also* Norris Decl. ¶ 5; Norris Decl., Ex. 1 at 1 (screenshots of Blob's first comics).[2]  Blob, in Norris's words, "tap[s] into the current internet zeitgeist of self-conscious pessimism to hilarious and heartbreaking effect."  Norris Decl. ¶ 4.  In 2016, buoyed by Blob's success, Norris launched "Webcomic Name," a weekly comic strip based on Blob, and acquired the associated domain, webcomicname.com.  Pl. 56.1 ¶¶ 6–8; *see also* Norris Decl. ¶ 6.  That same year, Norris set up an online shop, "The 'Oh No' Shop," which sold merchandise that featured Blob and its catchphrase, "Oh no."  Pl. 56.1 ¶ 9; *see also* Norris Decl., Ex. 1 at 2–4.  Although "Webcomic Name" began as the name of just a comic strip, it soon became Norris's overarching brand for "illustrations, literary works, and workshops."  Pl. 56.1 ¶ 8; *see also* Norris Decl. ¶¶ 6–7.

Enter boardgame designer Jason Wiseman.  By early 2017, Wiseman and Norris had embarked upon two collaborations.  The first related to Wiseman's tabletop card game, "Pretending to Grownup," which had, in late 2016, received 6,000 orders on a crowdfunding platform and was about to enter its first printing.  *See* Goldner Dep. Tr. at 17–19.  The game featured a "bonus card," illustrated by Norris, that depicted Blob and its catchphrase.  *See* Goldner Decl. ¶ 2.  In a separate agreement, Norris "g[a]ve . . . full ownership of the single guest illustration" to Wiseman and "any successors or assigns . . . for any future use."  *Id.*, Ex. 2 at 2

---

[2] Unless otherwise stated, the facts in paragraphs cited from Norris's and Goldman's Rule 56.1 statements were unopposed by the adversary.  Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and are denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

("Norris and Wiseman Agreement").  The second collaboration related to a proposed tabletop card game that would "incorporate the style, concept, and characters of 'Webcomic Name.'" Norris Decl. ¶ 12; *see also* Pl. 56.1 ¶ 12.  Wiseman told Norris he was considering an external boardgame publisher, Marc Goldner, to publish and distribute that game.  Norris Decl. ¶¶ 9–10; *see also* Pl. 56.1 ¶ 14.

On February 6, 2017, Wiseman emailed Goldner, with whom he had worked in the past, to discuss, among other things, Pretending to Grownup and the as-yet-untitled Webcomic Name card game.  *See* Goldner Dep. Tr. at 17–18; Goldner Decl., Ex. 1 at 2.  Goldner and his companies, Golden Bell Entertainment, LLC ("GB Entertainment") and Golden Bell Studios, LLC ("GB Studios"), work with "writers, artists, designers, and other creators" to publish and distribute toys, games, and books.  Def. Br. at 2.  In the email, Wiseman told Goldner that he had "100% free reign [sic]" over both properties and proposed that Wiseman and Goldner work together "to reduce [Wiseman's] workload."  Goldner Decl., Ex. 1 at 2; *see also* Goldner Dep. Tr. at 19–22.

From there, things moved quickly.  That same week, on February 12, GB Entertainment entered into a contract with Wiseman.  In it, GB Entertainment agreed to publish, print, and market several of Wiseman's board games, including "the properties tentatively entitled 'Pretending to Grownup' . . . and 'Webcomic Name Game.'"  Dkt. 131, Ex. 1 at 1 ("Wiseman and GB Entertainment Agreement").  In exchange, Wiseman agreed to transfer "100% of the copyright and 100% of the trademark" of both works to GB Entertainment, to split the profits of future sales, and to have the same terms apply to "[a]ll future derivative works."  *Id.* at 1–3. Norris was not a party to this contract; instead, Wiseman and Norris appear to have had a

separate, informal agreement to split the proceeds of Webcomic Name Game. *See* Goldner

Decl., Ex. 3 at 2.

A few months later, Goldner decided that he should have a direct relationship with

Norris, rather than only working with Norris through Wiseman. *See* Goldner Dep. Tr. 38. On

June 26, Goldner emailed Norris to introduce himself, and suggested that Norris sign a contract

with GB Entertainment "so its [sic] all official and you're getting half the payment as promised

and complimentary games." Goldner Decl., Ex. 3 at 2. In the same email, Goldner expressed his

enthusiasm for the "derivative merchandise" that would accompany the Webcomic Name Game,

including "the cutest Stuffed Plush ever," and noted that the "potential[] for a stand alone comic,

a children's book, or something else." *Id.*

On July 1, Goldner sent Norris a proposed contract. *See* Goldner Decl., Ex. 4 at 3. A

few days later, on July 3, Norris replied, expressing concerns. *See id.* at 1. Norris wrote: "I will

be working with publishers on a book . . . . I want to make it clear that in no way does Golden

Bell take ownership of any of the characters, images or story content except in its application in a

tabletop game." *Id.* On July 11, to reassure Norris, Goldner sent an edited draft of the contract

that "specified its [sic] for game and stuffed animal." *Id.* Goldner explained that Wiseman "had

agreed to us purchasing the rights for the [Webcomic Name] game already and that part of the

deal was already done." *Id.* "You are obviously in the free and clear," Goldner wrote, "to work

on your property outside of the context of our contract." *Id.*

On August 10, Goldner and Norris executed the amended contract. Pl. 56.1 ¶ 27; Def.

56.1 ¶ 5. By its terms, the agreement was "with respect to the production of the properties

tentatively entitled 'Webcomic Name Game' and 'Webcomic Name Stuffed Animals' (the

'WORKS') . . . and any tie-ins, spinoffs, or other commercial development of the WORKS such

as Sequels, Prequels, Reboots, Remakes, and Expansions."  Collaboration Agreement at 2.  In short, GB Entertainment was to receive "100% of the copyright, 100% of the trademark, . . . and 95% of the net sales of [the] WORKS," and Norris was to receive a "$3,125 upfront advance against net sales royalties within 30 days of [GB Entertainment] receiving the final files . . . for 'Webcomic Name Game'" and "an additional $2,500 . . . upon delivery to [GB Entertainment] of the final print-ready files, the PSD files, the AI files, the InDesign Files, and any other files pertaining to the [Webcomic Name Game]."  *Id.*  Other clauses governed future works.  *See id.* at 4.

Two months later, on October 31, Norris entered into an agreement with Andrews McMeel Universal, a book publisher, to publish a book of Norris's Blob-themed comic strips. *See* Goldner Decl., Ex. 14 at 2.

## 2.    The Parties' Competing Trademark Applications

After their contract was signed, GB Entertainment filed several trademark applications related to Norris's illustrations and their proposed Blob-themed game.  First, on November 30, 2017, GB Entertainment filed an application to register "Webcomic Name" as a trademark in International Class ("IC") 28 for "Board games; Card games; Game cards; Party games; Plush dolls; Plush toys; Stuffed dolls and animals; Stuffed toy animals; Tabletop games; Soft sculpture plush toys; Stuffed and plush toys."[3]  Norris Decl., Ex. 7 (the "First Application") at 1–2.  The

---

[3] To register a trademark, an applicant must specify "the goods in connection with which the mark is used."  15 U.S.C. § 1051(a)(2).  Under the Nice Convention, ratified by the United States in 1957, all goods are classified, for trademark purposes, within categories known as international classes.  *See* 23 U.S.T. 1336, 550 U.N.T.S. 45 (as last revised at Geneva on Oct. 2, 1979).  IC 28, for instance, covers "[g]ames, toys and playthings."  37 C.F.R. § 6.1.  In some cases, a business might use one mark to identify goods in two or more categories.  Unilever's single trademark, for instance, covers both its "liquid soaps," which fall within IC 3, and its "[c]offee, tea, and tea substitutes," which fall within IC 30.  *See* UNILEVER, Registration No.

U.S. Patent and Trademark Office ("USPTO") approved GB Entertainment's application as Registration No. 5,629,281 (the "'281 Mark").  *See* Norris Decl., Ex. 8 at 1.

Second, on October 9, 2018, GB Entertainment filed an application to register "Webcomic Name" as a trademark in IC 16 for "Comic books; Comic strips; Comic strips' comic features; Comics; Newspaper comic strips," and in IC 25 for "T-shirts."  Norris Decl., Ex. 9 (the "Second Application") at 1–2.  As part of this application, Goldner filed specimens to show his use of the mark in commerce, including screenshots of Norris's social-media platforms that include cartoons of Blob.  *See id.* at 7–9.  This application has since been abandoned.[4]

Third, on November 8, 2018, GB Entertainment filed an application to register "Oh No" as a trademark in IC 16 for "Bookmarkers; Bookmarks; Comic books; Comic magazines; Comic strips; Comic strips' comic features; Comics; Stickers; Newspaper comic strips," in IC 25 for "T-shirts; Graphic T-shirts; Short-sleeved or long-sleeved t-shirts," and in IC 28 for "Plush toys; Stuffed toy animals; Stuffed and plush toys; Toy stuffed animals."  Norris Decl., Ex. 10 (the "Third Application") at 1–2.  Like the Second Application, this application included screenshots

---

6,200,651.  An applicant who wishes to use a mark in multiple categories may register either one multi-class trademark (as Unilever chose to do), which covers all specified uses, or separate single-class applications.  *See* 37 C.F.R. §§ 2.86–.87.

[4] *See* Notice of Abandonment, USPTO (Jan. 4, 2021, 6:10 PM), *available at* https://tsdr.uspto.gov/documentviewer?caseId=sn88147369&docId=NOA20210104205425&linkId=1#docIndex=0&page=1.  This fact did not appear in either party's brief.  But a court may take judicial notice of any fact "that is not subject to reasonable dispute because . . . it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2), (d).  Government records are such sources.  *See, e.g.*, *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015).

of Norris's social-media platforms, as well as a speech-bubble plush toy embroidered with the phrase "oh no." *See id.* at 8–13.  This application, too, has since been abandoned.[5]

At some point in 2018, Norris learned of GB Entertainment's trademark applications.[6] On December 4, 2018, Norris filed a competing application to register "Webcomic Name" as a trademark in IC 16 for "Comic books; Comic strips and comic strip's [sic] comic features, appearing in print media, namely, comic books, books, newspapers, magazines," and in IC 41 for "Providing online non-downloadable webcomics and comic strips, books, reviews, periodicals and magazines."  Norris Decl., Ex. 11 at 1–2.  That same day, Norris also filed a copyright application for several sample Webcomic Name comics.  Norris Decl., Ex. 3 at 1–2.  Norris's trademark application was refused because of the likelihood of confusion with GB Entertainment's earlier registered '281 Mark, *see* Norris Decl., Ex. 12 at 4, but Norris's copyright application was approved, *see* Norris Decl., Ex. 3 at 1.

### 3.     Development of the Webcomic Name Game

Once the contract was signed in 2017, progress slowed on the development of the Webcomic Name Game.  Norris attests to "f[alling] off the face of the earth a while" and having little contact with Goldner until November 2017.  Goldner Decl., Ex. 8 at 2; *see also* Goldner Decl., Ex. 9 at 2.

On November 29, 2017, Norris sent to Goldner four concept sketches of potential plush toys, *see* Goldner Decl., Ex. 8 at 2, and on December 11, 2017, Norris pledged to begin work on

---

[5] *See* Notice of Abandonment, USPTO (Feb. 1, 2021, 6:11 PM), *available at* https://tsdr.uspto.gov/documentviewer?caseId=sn88185795&docId=NOA20210201205408&linkId=1#docIndex=0&page=1.

[6] The precise date is disputed.  Norris claims Goldner only mentioned the applications in November 2018, *see* Pl. 56.1 ¶ 54, whereas Goldner claims he discussed at least one of the applications with Norris several months earlier, in February 2018, *see* Def. Counter 56.1 ¶ 54.

the Webcomic Name Game once the book was finalized in March 2018, *see* Goldner Decl., Ex. 9 at 2.  Over the next several months, there was more back-and-forth between Norris, Goldner, and Wiseman, including a discussion of proposed boardgame mechanics and designs.  *See* Goldner Decl., Ex. 10 at 2; Goldner Decl., Ex. 11 at 2.

In late 2018, the parties' relationship became more fraught.  On October 1, 2018, Norris sent Goldner invoices for "both parts of the advance."  Goldner Decl., Ex. 12 at 4; *see also* Def. 56.1 ¶ 22; Collaboration Agreement at 2 (promising $3,125 upon receipt of "final files" and $2,500 upon receipt of "print-ready files").  Norris told Goldner: "Not all of the print-ready files have been delivered yet . . . .  I will upload the rest as soon as this first payment has gone through . . . ."  Goldner Decl., Ex. 12 at 4.  That same day, Goldner responded, explaining that GB Entertainment "MUST receive the final files before paying as required in the contract," and asking Norris to "[p]lease upload the files today."  *Id.*

The parties dispute whether Norris ever sent the "final files" for Webcomic Name Game.  Norris attests to having delivered the final files via an online file-sharing service on October 2, 2018.  Pl. 56.1 ¶ 34; *see also* Norris Decl. ¶ 19; Norris Decl., Ex. 6 at 1.  Goldner retorts that Norris never provided the final files; instead, he states, the shared folder that had been used by Norris to deliver files to GB Entertainment "did not contain any such files."  Goldner Decl. ¶ 23.  Norris was never paid either advance.  *See* Pl. 56.1 ¶ 35.

### 4.    Earlier Proceedings and Termination of the Agreement

On March 25, 2019, Norris filed a petition with the Trademark Trial and Appeal Board ("TTAB"), an administrative tribunal within the USPTO, *see* 15 U.S.C. § 1067, to cancel GB Entertainment's '281 Mark.  *See* Norris Decl., Ex. 13 at 1.[7]

In the days after that filing, Goldner's counsel wrote Norris's publisher, demanding that it "immediately and permanently cease all use of or reference to" the '281 Mark, *see* Norris Decl., Ex. 17 at 1–2, and Norris's counsel, claiming that GB Entertainment "is the exclusive owner of the copyrights to Webcomic and 'Oh No'" and that Norris's "engagement with Andrews McMeel" constitutes a "breach" of the Collaboration Agreement, *see* Norris Decl., Ex. 18 at 1–2. A week later, on April 1, Norris's counsel responded, expressing "bewilder[ment]" at GB Entertainment's suggestion that "'Oh No' [was] part of the Works . . . subject to the Agreement." Norris Decl., Ex. 20 at 1.  Norris's counsel concluded that Norris had no choice but to terminate the contract given GB Entertainment's "improper[] attempt[] to use the Collaboration Agreement as a vehicle to misappropriate [Norris's] intellectual property."  *Id.*

## B.    Procedural History

On June 12, 2019, Norris commenced this action, naming Goldner, GB Entertainment, and GB Studios as defendants, and bringing claims of copyright infringement, false designation of origin, and breach of contract, seeking damages, cancellation of the '281 Mark, and a declaratory judgment.  *See* Dkt. 1.  A year later, on July 13, 2020, the Hon. Alison J. Nathan, to whom this matter was then assigned, granted Norris's motion to file a supplemental complaint. *See* Dkt. 37.  Norris did so on August 8, 2020, bringing the same claims.  *See* Dkt. 39.  On April 10, 2022, this case was reassigned to this Court.

---

[7] Norris's TTAB proceeding has been stayed pending the outcome of this action.  *See* Pl. 56.1 ¶ 57; *see also* Notice of Suspension, *Norris v. Golden Bell Ent., LLC*, Cancellation No. 92,070,899 (T.T.A.B. Sept. 26, 2022).

On October 17, 2022, Norris moved for summary judgment, *see* Dkt. 117, and on September 16, 2022, defendants cross-moved for the same, *see* Dkt. 124.  The Court referred both motions to Judge Netburn, who had been responsible for the general pretrial supervision of the case, for a Report and Recommendation.  *See* Dkt. 121, 135.  On April 19, 2023, Judge Netburn held argument.  *See* Dkt. 144 ("Tr. of Oral Arg.").

On May 22, 2023, Judge Netburn issued the Report.  Dkt. 146 ("Report").  As more fully developed below, the Report recommends granting Norris's motion in part and denying defendants' motion in full.  *Id.* at 1.  On June 6, 2023, defendants filed objections.  Dkt. 148 ("Obj.").  On June 20, 2023, Norris filed a reply.  Dkt. 149 ("Pl. Reply to Obj.").

## II.    Legal Standards

### A.    Reports and Recommendations

After a magistrate judge has issued a Report and Recommendation, a district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  To accept the portions of a report to which no timely objection has been made, "a district court need only satisfy itself that there is no clear error on the face of the record."  *Acevedo v. Lempke*, No. 10 Civ. 5285 (PAE) (HBP), 2014 WL 4651904, at *3 (S.D.N.Y. Sept. 17, 2014) (quoting *King v. Greiner*, No. 2 Civ. 5810 (DLC), 2009 WL 2001439, at *4 (S.D.N.Y. July 8, 2009)).  When a timely and specific objection has been made, the court is obligated to review the contested issues *de novo*.  *See* Fed. R. Civ. P. 72(b)(3); *Hynes v. Squillace*, 143 F.3d 653, 656 (2d Cir. 1998).  "Courts generally do not consider new evidence raised in objections to a magistrate judge's report and recommendation."  *Tavares v. City of New York*, No. 08 Civ. 3782 (PAE), 2011 WL 5877548, at *2 (S.D.N.Y. Nov. 23, 2011); *see also Pan Am. World Airways v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40 n.3 (2d Cir. 1990) ("A district

judge is not required to hear or rehear any witness, and Pan Am had no right to present further testimony when it offered no justification for not offering the testimony at the hearing before the magistrate.").[8]

### B.     Motions for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show . . . that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[8] Norris argues that the Court should review several of defendants' objections only for clear error, because the arguments made in support are "identical" to arguments before Judge Netburn. *See* Pl. Reply to Obj. at 7–11.  If a party's objections are "merely perfunctory" or conclusory, clear-error review is appropriate, *Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006), given Federal Rule of Civil Procedure 72(b)(1)'s requirement that a party file "specific written objections" to a report and recommendation. Fed. R. Civ. P. 72(b)(2).  But that does not preclude a party from renewing, in a developed manner, arguments made and rejected before the magistrate judge.  Indeed, "the only way for [a defendant] to raise arguments" before the district court may be "to reiterate" arguments previously made.  *Moss v. Colvin*, 845 F.3d 516, 520 n.2 (2d Cir. 2017) (per curiam) (cleaned up); *see also, e.g.*, *Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 121 (2d Cir. 2022) ("To the extent that the objection sought to revisit an issue already argued, it was only because, in [the objecting party's] view, the magistrate judge's specific error was a fundamental one.").

Here, defendants have developed their arguments before this Court with sufficient specificity, such that the "portions of the report" to which defendants specifically object—even if in a matter reprising arguments made below—are subject to "*de novo*" determination." 28 U.S.C. § 636(b)(1)(C).  Norris's notion that a party that develops before the district judge an argument that had been made before the magistrate judge must establish clear error at the second stage would all but eliminate *de novo* review of reports, given that new legal theories "cannot properly be raised for the first time in objections to the report and recommendation, and indeed may not be deemed objections at all." *Piligian v. Icahn Sch. of Med. at Mount Sinai*, 490 F. Supp. 3d 707, 716 (S.D.N.Y. 2020) (citation omitted); *see Watson v. Geithner*, No. 11 Civ. 9527 (AJN) (HBP), 2013 WL 5441748, at *2 (S.D.N.Y. Sept. 27, 2013) (noting predicament created by requiring new arguments upon review of a report while forbidding arguments that are *so* new as to be deemed waived).

When the movant has properly supported its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

## III.   Discussion

Norris and defendants each moved for summary judgment on all five counts. The Report recommends granting summary judgment to Norris (and therefore denying defendants' motion) as to two counts: Count One, alleging copyright infringement in connection with defendants' trademark applications, and Count Three, seeking cancellation of the '281 Mark. The Report otherwise recommends denying both sides' summary judgment motions as to the remaining three counts: Count Two, alleging false designation of origin; Count Four, seeking damages for breach of contract; and Count Five, seeking a declaratory judgment that Norris validly terminated the Agreement.

Only defendants filed objections to the Report.  *See* Dkt. 148 ("Obj.").  They object to the Report's recommendation on all counts except Count Five.

As to the portion of the Report addressing Count Five, the Court reviews it for clear error. *See Encarnacion-Cross v. McAuliffe*, No. 17 Civ. 3603 (PAE) (GWG), 2018 WL 3384438, at *1 (S.D.N.Y. July 11, 2018).  Finding none, the Court adopts Judge Netburn's recommendation as to that Count in full.

### A.    Copyright Infringement

Defendants object on three grounds to the Report's recommendation that the Court grant summary judgment to Norris on the copyright-infringement claim.  The Court first reviews the governing legal standards and then addresses these arguments in turn.

### 1.    Applicable Legal Standards

To establish copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *see also Matthew Bender & Co. v. W. Pub. Co.*, 158 F.3d 674, 679 (2d Cir. 1998).  As to the first element, once an "original work[] of authorship" is "fixed in any tangible medium of expression," 17 U.S.C. § 102(a), a copyright "vests initially in the author . . . of the work," *id.* § 201(a).  Registration is, in some cases, required to maintain suit for infringement; it is not required, however, to possess a copyright in the first place.[9]  *See* 17 U.S.C. § 408(a) (noting that "registration is not a condition of copyright protection").

---

[9] Under 17 U.S.C. § 411(a), registration is a prerequisite to suit "for infringement of the copyright in any United States work."  Non–U.S. citizens' unpublished works are exempt from registration, 17 U.S.C. §§ 101, 411(a), as are works "first published outside the United States," *DigitAlb, Sh.a v. Setplex, LLC*, 284 F. Supp. 3d 547, 554 (S.D.N.Y. 2018).  The Report appears

As to the second element, a "plaintiff must show both that his work was 'actually copied' and that the portion copied amounts to an 'improper or unlawful appropriation.'" *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (quoting *Castle Rock Ent. Inc. v. Carol*

---

to have concluded the works at issue fall into one of these two categories. *See* Report at 9 (describing this regime and noting Norris's foreign citizenship and residence).

In a brief footnote, defendants assert that there is "no apparent authority indicating that works first published on the internet constitute foreign works"; they thus suggest, for the first time, that Norris must "register[] prior to initiating a cause of action for copyright infringement." Obj. at 7 n.1. That argument fails for two reasons. First, it is waived. In litigating summary judgment before Judge Netburn, defendants did not argue Norris's action failed for lack of registration. *See* Def. Br. at 7–9 (arguing only that Norris's "copyright was validly assigned to [d]efendants"); Dkt. 136 ("Def. Reply Br.") at 4–6 (same). There was no impediment to so arguing then. *See United States v. Gladden*, 394 F. Supp. 3d 465, 480 (S.D.N.Y. 2019). And because § 411(a) is not jurisdictional, this Court does not have an independent obligation to consider its application here. *See Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157 (2010) (§ 411(a) "does not restrict a federal court's subject-matter jurisdiction").

Second, on the merits, defendants' argument fails, as both of § 411(a)'s exceptions appear to apply. As to the first, the record makes highly doubtful that the works at issue—Norris's social-media pages—are "published" at all. *Cf.* Melville B. Nimmer, *Copyright Publication*, 56 COLUM. L. REV. 185, 185 (1956) ("[P]ublication [has] . . . become a legal word of art, denoting a process much more esoteric than is suggested by the lay definition of the term."). The Act defines "publication" as the "the distribution of copies . . . of a work to the public by sale or other transfer of ownership, or by rental, lease or lending." 17 U.S.C. § 101. And "'merely posting a digital file' on the Internet"—as Norris did here—"does not amount to 'publication' under the Copyright Act." *McLaren v. Chico's FAS, Inc.*, No. 10 Civ. 2481 (JSR), 2010 WL 4615772, at *4 (S.D.N.Y. Nov. 9, 2010). As a citizen of the United Kingdom, Norris is not required to register before initiating an infringement action to protect these unpublished works. Even if the works were considered published, the second exception—for non-U.S. citizens' foreign works—would likely apply. Defendants have not pointed to evidence on which a jury could find that the works, if published at all, were "first published . . . in the United States" or published "simultaneously in the United States" and elsewhere. 17 U.S.C. § 101. Norris lives and works in the United Kingdom, Norris Decl. ¶ 2, and defendants have not mustered evidence of an initial or simultaneous publication in the United States. *See Moberg v. 33T LLC*, 666 F. Supp. 2d 415, 424 (D. Del. 2009) (holding that a Swedish artist's photographs, first posted on a German art website, constituted foreign works, and noting that it would unreasonable to require a foreign artist "to survey all the copyright laws throughout the world, determine what requirements exist as preconditions to suits in those countries should one of its citizens infringe on the artist's rights, and comply with those formalities, all prior to posting any copyrighted image on the Internet").

*Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998)).  To be "improper or unlawful," the "amount of the copyrighted work that is copied . . . must be more than '*de minimis*.'"  *Castle Rock*, 150 F.3d at 138 (quoting *Ringgold v. Black Ent. Television, Inc.*, 126 F.3d 70, 75 (2d Cir. 1997)).  "The unauthorized reproduction and distribution of a copyrighted work generally infringes the copyright unless such use is specifically protected by the Act."  *Tasini v. N.Y. Times Co.*, 206 F.3d 161, 165 (2d Cir. 2000).

Copyrights are, of course, alienable, and thus subject to assignment and license.  *See* 17 U.S.C. § 201(d); *see also, e.g.*, *Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984) ("It is elementary that the lawful owner of a copyright is incapable of infringing a copyright interest that is owned by him.").  A valid license "immunizes the licensee from a charge of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor."  *Davis v. Blige*, 505 F.3d 90, 100 (2d Cir. 2007).  "The existence of a license is an affirmative defense, placing upon the party claiming a license 'the burden of coming forward with evidence' of one."  *Spinelli v. Nat'l Football League*, 903 F.3d 185, 197 (2d Cir. 2018) (quoting *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995)).

### 2.   Discussion

It is undisputed that, in both the Second Application (to trademark "Webcomic Name" for comic strips) and the Third Application (to trademark "Oh No"), Goldner copied Norris's work.  *See* Pl. 56.1 ¶¶ 48, 52; Def. Counter 56.1 ¶¶ 48, 52; *see also* Goldner Dep. Tr. at 123, 125. The Second Application included, as "specimens . . . showing the mark as used in commerce," screenshots of: (1) Webcomic Name's Facebook page with two sketches of Blob and a stylized logo; (2) Norris's Patreon account with a partially obscured three-panel comic of Blob; and (3) the home page for Webcomic Name's Facebook shop, which featured a t-shirt with Blob's

likeness (the "oh no t-shirt").  *See* Second Application at 6–9.  And the Third Application included screenshots of: (1) the product page for the "oh no t-shirt" on Webcomic Name's Facebook shop; (2) Webcomic Name's Facebook page; (3) two three-panel Blob comics ("Invasive" and "New Life") on Norris's website; and (4) the banner image of Blob on Norris's website.  *See* Third Application at 8–12.  All agree, too, that this use of Norris's artwork without authorization would infringe Norris's copyright.  *See, e.g.*, Report at 10–11; Def. Br. at 8 (asserting that "the alleged 'copying' of material actually involves materials lawfully licensed").

The decisive issue thus is whether GB Entertainment was authorized to use these images in its trademark applications.  The Report concluded it was not, because the Collaboration Agreement is limited to "the game and plush toys the parties intended to create."  Report at 12.  As a result, GB Entertainment did not acquired rights in Norris's "existing brand and artwork," including the "material in the screenshots" at issue here.  *Id.*  Thus, no portion of the Agreement "work[s] to convey" Norris's "copyright in unrelated preexisting work, much less the characters themselves."  *Id.* at 14.

Defendants make three objections to this aspect of the Report.  First, defendants argue that the Report neglected to consider the possibility that the images at issue were first created after August 10, 2017, the date Goldner and Norris entered into their contract.  Obj. at 8–9.  Defendants, however, have not adduced evidence on which a jury could so find.  On the contrary, the evidence is indisputable that at least some images used in GB Entertainment's trademark applications were created before the Collaboration Agreement and thus formed part of Norris's "existing brand and artwork."  Report at 12.  Examples are the two sketches of Blob on Norris's Facebook page, a screenshot of which was included in both applications.  *See* Second

Application at 7; Third Application at 9.  Those sketches were demonstrably uploaded to Facebook on February 16, 2017, and October 5, 2016, respectively.[10]

 Defendants' challenge to this aspect of the Report is overtly based on hypotheticals. Defendants do not point to admissible evidence that the images used in the trademark applications were created after the parties signed the Collaboration Agreement.  "*[I]f* it can be shown that the materials were published after the agreement had been entered into on August 10, 2017," one sentence begins.  Obj. at 8 (emphasis added).  "*[I]f* these screenshots were indeed works that were created after the Parties had entered into the Agreement," reads another.  *Id.* at 9 (emphasis added).  "[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment."  *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018).  This Court is "not required to draw every conceivable inference from the record in favor of the nonmoving party, but only those inferences that are reasonable."  *Bishop v. Air Line Pilots Ass'n Int'l,* 5 F.4th 684, 693 (7th Cir. 2021) (quoting *United States v. Luce*, 873 F.3d 999, 1005 (7th Cir. 2017)).  Here, the evidence is both ample and unitary of Norris's use of the characters and concepts at issue from 2015 onwards.  *See, e.g.*, Norris Decl. ¶¶ 5–6; *see also, e.g.*, Third Application at 2 (stating that the "oh no t-shirt" was first used in commerce in 2016).

---

[10] *See* Webcomic Name, FACEBOOK (Feb. 16, 2017), https://www.facebook.com/photo/?fbid=805656782919740&set=a.320054752815724; Webcomic Name, FACEBOOK (Oct. 5, 2016), https://www.facebook.com/photo/?fbid=724130417739044&set=a.320054759482390.  These pages are subject to judicial notice.  The date of publication of these posts "is not subject to reasonable dispute because . . . it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," namely, the website to which these posts were uploaded in the first place.  Fed. R. Evid. 201(b)(2), (d); *see, e.g.*, *Schroeder v. Volvo Grp. of N. Am., LLC*, No. 20 Civ. 5127 (VAP), 2020 WL 6562242, at *3 (C.D. Cal. Sept. 3, 2020) (collecting cases in which judicial notice was taken of social-media posts).

Even if defendants had adduced evidence of works created after the execution of the Collaboration Agreement, defendants' first objection to the Report would still lack merit, because it is premised on a flawed reading of that agreement.  Defendants point to Section 3(C) of the agreement, which reads in full:

> ARTIST shall submit to COMPANY all sequels to the WORKS or other works using characters that appear in the WORKS and any other unrelated characters. COMPANY will take due diligence to copyright all said WORKS with the same percentages and profit splits as discussed above for future works relating to the WORKS above.  If COMPANY acquires the NEW WORK, the provisions of this Agreement shall apply to the NEW WORKS.

Collaboration Agreement at 3.  Defendants construe this provision, in conjunction with Section 1(A)'s assignment of "100% of the copyright" of "the WORKS" to GB Entertainment, to "make[] clear" that GB Entertainment holds the copyright in "any work created by [Norris] which uses characters" from Webcomic Name Game.  Obj. at 9.  Thus, defendants urge, if the artwork at issue was created by Norris after August 10, 2017, and if that artwork used "characters," like Blob, "that appear in the WORKS," then GB Entertainment holds the copyright to it and cannot have infringed.[11]  *Id.*

---

[11] Defendants' brief, however, fails to address the obvious question: What does it mean for a "character[]" to "appear in the WORKS"?  At the moment, one might argue, there are no "WORKS" in which characters could have appeared—after all, neither the Webcomic Name Game nor the stuffed animals were ever "created by ARTIST."  *See, e.g.*, Goldner Dep. Tr. at 75 ("[T]he [Webcomic Name] game has not been sold.  It has been marketed, but it has not been sold.  We have not done a mass production copy and sold it to consumers or B-to-C or B-to-B retailers."); *id.* at 142 ("[W]e haven't manufactured [the plushies] or mass manufactured.").  *But see id.* at 74 ("[The Webcomic Name Game] has been developed.  Development can take years. So created—created, I don't know, that's a legal term of art, but it's been in development. . . . There has been a lot of progress, but it is not completed . . . .").  On the other hand, one might argue the development of the sample Blob plush, *see* Goldner Decl. ¶ 16; Goldner Decl., Ex. 8 at 2, means that at least Blob has "appear[ed] in the WORKS" for purposes of Section 3(C). Neither of the parties' briefs, nor the Report, raise this question.  As a result, the Court declines to reach it, and instead assumes for the sake of argument that the artwork at issue falls within Section 3(C)'s scope.

Aspects of Section 3(C) of the agreement are indeed broadly worded.  But defendants'
sweeping construction—under which Norris would have effectively ceded to defendants the
copyright interests to all future works—overlooks parts of the agreement in tension, or
incompatible with, that reading.  For one, the third sentence of Section 3(C) itself makes clear
that the Agreement does not categorically so apply, stating that "the provisions of this
Agreement" apply "*[i]f*" GB Entertainment "acquires the NEW WORK."  Collaboration
Agreement at 3 (emphasis added).   And Section 1(H) preserves for Norris "the right to pursue
his Comic 'Webcomic Name' outside of the context of this agreement."  *Id.* at 1.

In contract interpretation, it is axiomatic that "[p]articular words should be considered,
not as if isolated from the context, but in the light of the obligation as a whole and the intention
of the parties as manifested thereby." *Kass v. Kass*, 696 N.E.2d 174, 180–81 (N.Y. 1998)
(quoting *Atwater & Co. v. Panama R.R. Co.*, 159 N.E. 418, 419 (N.Y. 1927)).  "[A]n
interpretation of a contract that affords a reasonable and effective meaning to all the terms of a
contract is generally preferred to one that leaves a part unreasonable or of no effect." *Shepley v.
New Coleman Holdings Inc.*, 174 F.3d 65, 72 (2d Cir. 1999).  In light of these principles, the
second sentence of Section 3(C) is best read in conjunction with the third; that is, *if* GB
Entertainment acquires Norris's future works, *then* it must, with due diligence, copyright those
works, and split profits per the preexisting agreement.  The first sentence, which obliges Norris
to "submit" work to GB Entertainment for its further consideration, and possible negotiation and
acquisition, bolsters that common-sense conclusion.  Defendants' interpretation, in contrast,
would short-circuit that process, or make it purposeless.  There would appear to be nothing to
negotiate about (or to acquire) had Norris's title over the artworks already passed to defendants,
with "the same percentages and profit splits as discussed above" applicable.  And that reading

would also effectively void Norris's contractual "right to pursue his Comic 'Webcomic Name' outside the context of this agreement." Collaboration Agreement at 1. The Court thus rejects defendants' argument that GB Entertainment is contractually immune from Norris's claim of infringement as to works post-dating the agreement.

Defendants' second objection is that the Report ignored Section 2(D) of the contract, which they contend authorizes GB Entertainment to use content derived from Norris's social media and website. Obj. at 9–10. Section 2(D) reads in relevant part:

> COMPANY and ARTIST shall share access to all Social Media accounts with administrative privileges and COMPANY shall be the Domain Registrant and Administrator of any domains.

Collaboration Agreement at 2. By its terms, however, Section 2(D) does not assist defendants. It gives GB Entertainment access to Norris's online accounts; but it does not transfer ownership over the assets therein or give GB Entertainment a license for future use of those assets. And it is ownership or a license that defendants require, not mere access. *See Spinelli*, 903 F.3d at 197. GB Entertainment's "administrative privileges" do not stretch so far.

Defendants' third objection is that Norris purportedly "knew of and approved" GB Entertainment's use of the images. Obj. at 10–12. They point to a phone call in September 2017, a month after the Collaboration Agreement was executed, in which, Goldner attests, he discussed with Norris "a daily calendar of Webcomic Name comics" that would include past comics "published via his social media accounts," and there was "mutual excitement over the idea." Goldner Decl. ¶ 9. But the parties' "mutual excitement," without more, would not grant defendants a license. Defendants do not identify evidence that Norris, outside of the agreement, authorized the use of the relevant artwork in GB Entertainment's trademark applications.

21

Defendants thus have not offered evidence sufficient to defeat summary judgment.  *See Anderson*, 477 U.S. at 252.

The Court therefore adopts this aspect of the Report and holds that Norris is entitled to summary judgment as to the copyright infringement claim.

### B.       False Designation of Origin

The Report recommended that both sides' summary judgment motions be denied as to Norris's false designation of origin claim.  Defendants challenge the recommendation to deny their motion, arguing that the Report overlooked Norris's failure to adduce evidence sufficient to prove an essential element, "use in commerce."  Obj. at 17.

### 1.       Applicable Legal Standards

Under Section 43(a) of the Lanham Act, no person may "use[] in commerce . . . any false designation of origin . . . which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a)(1)(A).  To prevail, a plaintiff "must show, first, that he or she has a valid mark that is entitled to protection, and, second, that the defendant's actions are likely to cause confusion as to the origin or sponsorship of the defendant's goods."  *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 649 (S.D.N.Y. 2016) (citing *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 224 (2d Cir. 2012)).

At the threshold, however, a plaintiff must "show use in commerce" by the defendant of the plaintiff's trademark.  *Kelly-Brown v. Winfrey*, 717 F.3d 295, 305–06 (2d Cir. 2013) (citing 15 U.S.C. §§ 1114, 1125(a)(1)); *see also, e.g.*, *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009) (plaintiffs must show "defendant has made 'use in commerce' of the

plaintiff's trademark as the term 'use in commerce' is defined in 15 U.S.C. § 1127"). "The term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1227. To be used on goods, a mark must be "placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale." *Id.*

### 2.      Discussion

Norris's theory of liability on the false designation of origin claim is based solely on defendants' unauthorized use of Norris's artwork in GB Entertainment's various trademark applications. *See* Pl. Br. at 15 ("Defendants' unauthorized copying of the copyrighted materials, then passing them off as their own, constitutes a false designation of origin. . . . Goldner took screenshots of Norris's works and submitted those screenshots to the USPTO, each time[] asserting that GB Entertainment was the 'owner' of each mark.").

As the Report recognized in denying Norris's motion for summary judgment, that conduct is insufficient, as a matter of law, to establish a claim for false designation of origin. "A trademark application falls outside the scope of a 'use in commerce' as defined in § 1227." *Unicorn Crowdfunding, Inc. v. New St. Enter., Inc.*, 507 F. Supp. 3d 547, 564–65 (S.D.N.Y. 2020). "Such an application seeks 'merely to reserve a right in a mark,' and does not involve goods or services sold or rendered in commerce." *Id.* (quoting 15 U.S.C. § 1227). For this reason, the Report correctly recognized that GB Entertainment's trademark applications cannot qualify as "use in commerce" for trademark purposes. *See* Report at 17.

Defendants argue, based on this point, that the Report should have gone further and recommended that the Court grant defendants' motion for summary judgment. In urging denial

of that motion, the Report noted that defendants' briefing "merely rebut[ted] [Norris's] arguments and cite[d] to no facts demonstrating that they have *not* used [Norris's] marks or passed them off as their own in other contexts." *Id.* (emphasis in original).  Defendants argue that, in fact, Norris's inability to come forward with evidence of "use in commerce"—an element of the claim—entitles them to summary judgment.  Obj. at 13.

Defendants are correct.  Norris, the plaintiff, bore the burden of proof on each element of this claim.  As such, defendants' burden, as the moving party, was to establish the absence of evidence on the "use in commerce" element, and defendants did so.  "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.  Their brief noted that a trademark application is a "legal action taken . . . to protect intellectual property . . . , not a commercial action of advertising or selling a product," and that Norris had failed to adduce evidence of use in commerce.  Def. Br. at 9.  No more was required.  "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial."  *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001).  Where a defendant can "point to an absence of proof on plaintiff's part," the plaintiff must "designate specific facts showing that there is a genuine issue for trial."  *Id.* (quoting *Celotex*, 477 U.S. at 324).  Norris has not done so.  Norris has not adduced evidence that defendants used the relevant marks in contexts other than their trademark applications, which, Norris confirms, is the sole basis for this claim.  *See* Pl. Br. at 15; Dkt. 130 ("Pl. Reply Br.") at 8–10 (arguing that defendants' "false application to the USPTO" constitutes "use in commerce").

To be sure, the Complaint alleges broader misappropriation of Norris's marks, as the Report noted.  Report at 17 n.18.  But at summary judgment, a plaintiff must come forward with

evidence supporting each essential element of a claim.  "A plaintiff cannot defeat a motion for summary judgment by merely restating the conclusory allegations contained in his complaint." *Contemp. Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 107 (2d Cir. 1981).  Instead, a plaintiff must "designate specific facts" supporting those allegations.  *Celotex*, 477 U.S. at 324.  Because Norris has not done so here, there is no "genuine issue for trial."  *Id.* (quoting Fed. R. Civ. P. 56(e)).

The Court accordingly adopts the Report insofar as it recommends denial of Norris's motion for summary judgment on the false designation of origin claim, but, departing from the Report, holds that Goldner is entitled to summary judgment on this claim.[12]

## C.       Cancellation of the '281 Mark

Defendants next object to the Report's recommendation to grant Norris' claim for cancellation of defendants' '281 Mark—the "Webcomic Name" for, *inter alia*, board games and stuffed animals—on the grounds that it has not been used in commerce.

### 1.       Applicable Legal Standards

A trademark is "any word, name, symbol, or device, or any combination thereof " that a person uses "to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods."  15 U.S.C. § 1127.  "[E]very trademark's 'primary' function" is "to identify the origin or ownership of the article to which it is affixed."

---

[12] Had defendants not satisfied their burden of production on this point, the Court would still have authority to so rule *sua sponte*.  *See, e.g.*, *Jian Yang Lin v. Shanghai City Corp.*, 950 F.3d 46, 49 (2d Cir. 2020).  "Where it appears clearly upon the record that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court, a *sua sponte* grant of summary judgment against that party may be appropriate if those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law."  *Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir. 1996); *Unicorn Crowdfunding, Inc.*, 507 F. Supp. 3d at 564 & n.12.

*Jack Daniel's Props., Inc. v. VIP Prod. LLC*, 143 S. Ct. 1578, 1583 (2023) (quoting *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 412 (1916)).  Put simply, "a mark tells the public who is responsible for a product."  *Id.*

Under the Lanham Act, "any person who believes that he is or will be damaged by the registration of a mark" may file a petition for its cancellation with the Trademark Trial and Appeal Board.  15 U.S.C. § 1064.  For trademarks "not yet five years on the register, cancellation may be based on any ground in the Lanham Act that would have barred registration in the first instance."  *Patsy's Italian Restaurant, Inc. v. Banas*, 658 F.3d 254, 266 (2d Cir. 2011) (quoting 3 THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 20:52 (4th ed. 2009)).  "In any action involving a registered mark," a court may "order the cancellation of registrations, in whole or in part."  15 U.S.C. § 1119; *see also Nike, Inc. v. Already, LLC*, 663 F.3d 89, 98 (2d Cir. 2011) ("[D]istrict courts are authorized to cancel registrations, but only . . . in connection with a properly instituted and otherwise jurisdictionally supportable action involving a registered mark."), *aff'd on other grounds*, 568 U.S. 85 (2013).

To be valid, a trademark must be "use[d] in commerce."  15 U.S.C. § 1127.  "[A] person who has a bona fide intention . . . to use a trademark in commerce may request registration" of the mark.  *Id.* § 1051(b)(1).  However, "no mark shall be registered until the applicant" has filed a "statement of use . . . specifying the date of the applicant's first use of the mark in commerce."  *Id.* §§ 1051(b)(3), (d); *see Imperial Tobacco Ltd., Assignee of Imperial Grp. PLC v. Philip Morris, Inc.*, 899 F.2d 1575, 1578 n.1 (Fed. Cir. 1990) ("[A]ctual use of the mark in commerce is a prerequisite to the issuance of a registration . . . .").  If a mark has not been used in commerce, it is subject to cancellation.  *See, e.g.*, *Soc. Techs. LLC v. Apple Inc.*, No. 18 Civ. 5945 (VC), 2019 WL 6873871, at *3 (N.D. Cal. Dec. 17, 2019) (Chhabria, J.) (ordering cancellation of

trademark for lack of "bona fide use of the mark in commerce"), *aff'd*, 4 F.4th 811 (9th Cir.

2021).  "A mark is used in commerce when it is employed 'to identify . . . goods or services' sold

to consumers 'in a given market.'"  *Cross Com. Media, Inc. v. Collective, Inc.*, 841 F.3d 155,

167 (2d Cir. 2016) (quoting *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007)).

In addition, "only the owner of a mark is entitled to apply for registration."  *In re Wella

A.G.*, 787 F.2d 1549, 1554 (Fed. Cir. 1986).  "If one who is not the owner seeks registration, the

application must be denied and any registration which issues is invalid."  *Id.*  After all, although

federal law recognizes trademarks, it "does not create" them; its role is to "help protect marks"

that arise organically out of actual use in commerce.  *B & B Hardware, Inc. v. Hargis Indus.,

Inc.*, 575 U.S. 138, 142 (2015).

### 2.    Discussion

The '281 Mark for "Webcomic Name" covers "Board games; Card games; Game cards;

Party games; Plush dolls; Plush toys; Stuffed dolls and animals; Stuffed toy animals; Tabletop

games; Soft sculpture plush toys; Stuffed and plush toys."  Norris Decl., Ex. 8 at 1.  Because the

'281 Mark was approved on December 11, 2018, *see id.*, Norris's suit, filed in June 2019, was

timely initiated within the five-year window to cancel the mark "on any ground in the Lanham

Act that would have barred registration in the first instance," *Patsy's Italian Restaurant, Inc.*,

658 F.3d at 266.

The Report identified two distinct grounds on which to cancel the '281 Mark.  First, it

concluded, defendants' prior use of "Webcomic Name" does not constitute "use of a mark in

commerce," because the words had been used "merely [to] identif[y] [an] illustration's origin

and did not distinguish the goods being sold . . . from those sold by others."  Report at 20.

Second, it concluded that, although the Collaboration Agreement entitles defendants to use of

"Webcomic Name *Game*" as a trademark in "certain categories," it does not "convey ownership of the more general 'Webcomic Name' mark in any category except stuffed animals." *Id.* at 21. As such, it concluded that defendants are not the "rightful owners" of the '281 Mark in goods other than stuffed animals.  *Id.*

As to the first ground, defendants object that the '281 Mark has been used in commerce. The sole example defendants offer is as a "bonus card" in Pretending to Grownup, one of GB Entertainment's boardgames.  Obj. at 14.  Small print on the bottom of the card reads: "Artwork courtesy of Webcomic Name."  Goldner Decl. ¶ 31.  Defendants' objections state that the card has been "heavily and primarily featured in promotional products used by Golden Bell Studios to promote the Pretending to Grownup game, such as being displayed on Amazon.com alongside the game."  Obj. at 14.

Defendants' objections on this point need not be considered in light of the second ground for cancellation set forth in the Report, which the Court finds persuasive.  As to this ground, defendants respond that it is improper to analyze the '281 Mark with reference on a good-by-good basis.  Defendants urge an "holistic" approach in which a Mark could survive on the basis of goods which the owner is legally authorized to sell using the Mark even if the good has been used in commerce only in connection with goods as to which the owner has no such right.  *Id.* at 16.  On this theory, because defendants are the "lawful owners" of the mark with respect to stuffed animals, which fall within IC 28, defendants are the lawful owners of the mark "within the category as a whole."  *Id.*

Here, however, defendants' ownership of the mark with respect to stuffed animals is not enough to validate the '281 Mark.  To be sure, there is force to the conceptual point that the proper remedy in most cases for an overbroad application may be to amend the application to

narrow its proper purview.  Although a trademark applicant must specify "the goods in connection with which the mark is used," 15 U.S.C. § 1051(a)(1); *see also* 37 C.F.R. § 2.32(a)(1)(6), an application that is overbroad as to the goods it identifies is not void *ab initio*. Rather, "an application will not be deemed void . . . absent proof . . . of a lack of bona fide intention to use the mark on *all* of the goods identified in the application, not just *some* of them." *The Wet Seal, Inc. v. Fd Mgmt., Inc.*, 82 U.S.P.Q.2d 1629, 2007 WL 458529 at *2 (T.T.A.B. 2007) (emphasis added).  In such cases, the court should, if possible, "determine as to which goods and services the applicant lacked bona fide intent, and excise the overbroad portions of the application."  *Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 875 (6th Cir. 2017); *see also* 37 C.F.R. § 2.71(a) ("The applicant may amend the application to clarify or limit . . . the identification of goods . . . .").

Here, however, amendment of defendants' application cannot cure its defects.  As the Report explained, defendants' ownership of the mark "Webcomic Name" is limited, at most, to "stuffed animals."  Report at 21.  For the amended mark to be valid, then, there would have to be evidence of use of the mark in connection with the sale of stuffed animals.  *See, e.g.*, *Ranch v. Tribe*, 78 U.S.P.Q.2d 1696, 2006 WL 802407 at *2 (T.T.A.B. 2006) ("It is clear that an applicant cannot obtain a [trademark] registration . . . for goods or services upon which it has not used the mark.").  The record evidence does not permit the finding that defendants ever used the mark to sell stuffed animals.  Defendants, in fact, concede the point.  *See* Pl. 56.1 ¶ 42; Def. 56.1 ¶ 42; *see also* Goldner Dep. Tr. 142 ("[W]e have not sold [any stuffed animals] because we haven't manufactured them or mass manufactured.").  Use of the sample Blob plush to "solicit[]" further interest in the plush in anticipation of its eventual release, *see* Goldner Dep. Tr. 140, is insufficient as a matter of law to constitute "use in commerce," *see, e.g.*, *Am. Express Co. v.*

*Goetz*, 515 F.3d 156, 161 (2d Cir. 2008) ("[T]here can be no trademark absent goods sold.");

*Buti v. Perosa, S.R.L.*, 139 F.3d 98, 105 (2d Cir. 1998) ("[M]ere advertising or promotion of a

mark . . . is insufficient to constitute 'use' of the mark 'in commerce.'").  Without use in

commerce, there is no trademark to protect.  *See Imperial Tobacco*, 899 F.2d at 1578 n.1.

There is, in sum, no charter to amend the registration to conform it to the goods (board

games) on which the mark has arguably been used, as defendants do not own the mark with

respect to those goods.  *See In re Wella A.G.*, 787 F.2d at 1554 ("[O]nly the owner of a mark is

entitled to apply for registration.").  And there is no charter to amend the registration to conform

it to the scope of defendants' ownership of the mark (stuffed animals), as defendants have not

used the mark in commerce with respect to those goods.  Under the circumstances, cancellation

of the mark is the only available remedy.  *Cf. Kelly Servs.*, 846 F.3d at 869 (amendment is

appropriate if it can "cure" the identified defects).

The Court therefore adopts this aspect of the Report and orders cancellation of the '281

Mark.

### D. Breach of Contract and Declaratory Judgment

Norris claims a contract breach on two grounds: that defendants (1) engaged in

unauthorized use of Norris's trademarks and (2) failed to pay Norris under the Collaboration

Agreement.  Count Four seeks damages.  Count Five seeks a declaratory judgment that, in light

of these breaches, Norris validly terminated the Agreement.  The Report recommended denial of

both sides' motions for summary judgment on these counts.  Defendants object to the Report's

recommendation that their motion for summary judgment on Count Four be denied.

### 1. Applicable Legal Standards

"To establish a contract breach under New York law, a plaintiff must show: '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Goldberg v. Pace Univ.*, 535 F. Supp. 3d 180, 192–93 (S.D.N.Y. 2021) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)).

"A party may unilaterally terminate a contract where the other party has breached and the breach is material." *Lanvin Inc. v. Colonia, Inc.*, 739 F. Supp. 182, 195 (S.D.N.Y. 1990). To justify termination, "a breach must be . . . so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Babylon Assocs. v. County of Suffolk*, 475 N.Y.S.2d 869, 874 (2d Dep't 1984) (quoting *Callanan v. Powers*, 92 N.E. 747, 752 (N.Y. 1910)).

## 2. Discussion

The Report recommended rejecting Norris's first theory of breach—that defendants had used Norris's trademarks "well beyond" the scope authorized in the Collaboration Agreement. Report at 22 (citing Pl. Br. at 17). It reasoned that the agreement did not provide defendants a *license*, but instead *assigned* them various rights. *See id.* at 21–23. As a result, defendants' misappropriation of Norris's *other* rights could not constitute a breach of their contract. *Id.* at 23. Neither party filed objections to this well-reasoned conclusion, which the Court adopts.[13]

---

[13] Defendants argue that they are entitled to summary judgment because, as found by the Report, Norris's first theory of breach is not viable. *See* Obj. at 16–17. But summary judgment is used to resolve claims, not non-dispositive legal theories. *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying . . . the part of each claim . . . on which summary judgment is sought."); *see also, e.g.*, *SEC v. Thrasher*, 152 F. Supp. 2d 291, 295 (S.D.N.Y. 2001) ("The plain language of Federal Rule of Civil Procedure 56 indicates that it is not appropriate to use summary judgment as a vehicle for fragmented adjudication of non-determinative issues.").

As to Norris's second theory—that defendants breached by failing to pay the $3,125 advance due upon delivery of the "final files" for Webcomic Name Game—the Report reasoned that it could not be resolved on summary judgment. That was because of a factual dispute as to whether Norris delivered the "final files" at all, and thus performed. *Id.* at 22 & n.21 (quoting Collaboration Agreement at 1). Norris attests to delivering the final files on October 2, 2018. Pl. 56.1 ¶ 34; *see also* Norris Decl. ¶ 19; Norris Decl., Ex. 6 at 1. Goldner attests that Norris did not do so. Goldner Decl. ¶ 23.

Defendants resist that there is a dispute of material fact. They rely on Norris's counsel's statement at argument that the delivered files "need[ed] tweaks"; thus, they argue, those files could not have been "final" within the meaning of the agreement. Obj. at 16 (quoting Tr. of Oral Arg. at 36). That is mistaken. The Collaboration Agreement distinguishes between the "final files" (upon which a $3,125 advance was due) and the "print-ready files" (upon which an additional $2,500 was due). Collaboration Agreement at 1. On the present record, it is not clear which files (if any) were sent to defendants. *Compare* Norris Decl. ¶ 19, *with* Goldner Decl. ¶ 23. And the parties have not litigated how the contractual term "final"—which the agreement does not define—would apply to the files in the form in which Norris claims to have delivered them (that is, whether the unidentified "tweaks" that remained to be made were such as to make the agreement non-final). On the present record, summary judgment on this point cannot be entered for the defense. *See Anderson*, 477 U.S. at 255.

The Court therefore adopts this aspect of the Report and denies both parties' motions for summary judgment as to Norris's contract claims.

**CONCLUSION**

For the foregoing reasons, the Court grants Norris's motion for summary judgment as to Count 1 (copyright infringement) and Count 3 (cancellation of the '281 Mark), and grants defendants' cross-motion as to Count 2 (false designation of origin). The Court otherwise denies both parties' motions.

This case will now proceed to trial on Norris's two remaining claims. The Court directs the parties promptly to confer, and, by **September 20, 2023**, to submit a joint pretrial order consistent with the Court's Individual Rules governing jury trials. Any motions *in limine* are due on the same date as the joint pretrial order; opposition briefs are due one week later.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 24, 2023
      New York, New York