# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MARC GOLDNER, Individually and as Officer of GOLDEN BELL ENTERTAINMENT, LLC, a California company and GOLDEN BELL STUDIOS, LLC, GOLDEN BELL ENTERTAINMENT, LLC., a Nevada Company and GOLDEN BELL STUDIOS, LLC., | : : : : : : | Civil Action No. |
| | : | |
| Plaintiffs | : | COMPLAINT |
| v. | : : | |
| ALEXANDER NORRIS, | : : | |
| And | : : | |
| ANDREWS MCMEEL UNIVERSAL, LLC AND ANDREWS MCMEEL PUBLISHING, LLC | : : : | |
| Defendants | | |

## **COMPLAINT**

Plaintiffs, by and through their undersigned counsel, bring this action against Defendant Alex Norris, Andrews McMeel Publishing, and Andrews McMeel Universal and allege as follows:

### **INTRODUCTION**

1.     This action arises out of a Collaboration Agreement between Alex Norris ("Norris") and Golden Bell Entertainment, LLC. ("Golden Bell"), and an Intellectual Property Assignment Instrument obtained through Jason Wiseman for a Guest Artist card created by Norris for a game called Pretending to Grownup designed by Wiseman and acquired by Golden Bell.

2.        Golden Bell Entertainment, LLC is a startup company began by three founders who bonded at college over their love of comics, games, film, among other things. The startup seeks to acquire intellectual properties and licenses to create and develop brands that they see potential in. Their multi-media branded approach fused with a transmedia and metaverse vision is unique to the industry. Indeed, like most startups, Golden Bell is a small company with big dreams.

3.        On February 6, 2017, Wiseman told Golden Bell that he had "100% free reign over" a list of properties – with Webcomic Name being one of them. It was at this time that Golden Bell was first introduced to Webcomic Name's existence by Wiseman. Shortly after, on February 12, 2017, Golden Bell entered into an agreement with Wiseman which included a game from Webcomic Name that Wiseman would design. Thereafter, by Wiseman's direction, Golden Bell first reached out to Norris on June 26, 2017 then followed up again on June 29, 2017 to no immediate response. By Golden Bell's third email, Norris finally responded in July of 2017.

4.        Months later, after patiently waiting for Norris' agent to review the proposed contract from Golden Bell, in August of 2017, Golden Bell Entertainment entered into a Collaboration Agreement ("Agreement") with Norris to further expand their rights over Webcomic Name. The Agreement called for the creation of a game, creation of stuffed animals, options on Norris' next game-length work, book-length work, and manuscript-length work in Section 3(D), as well as the rights, interest, and licenses including but not limited to the following: Comic Book Rights, Motion Picture Rights, Animation Rights, Graphic Rights, Sequel Rights, Remake Rights, Television Rights, Gaming Rights, Film Rights, Stage Rights, Radio Rights, Publication Rights, Interactive Rights, Music Rights, Merchandising Rights, and Digital Rights in Section 2(B), all of which were to be based on the Webcomic Name property and contemplated turning the content and characters into other works in other mediums as well. The Agreement further granted Golden

Bell 100% of the copyright, trademark, and patent rights associated with the works to be created. Section 1(F) also stated, "The ARTIST hereby confirms that all rights, interests, and licenses relating to the multi-media property "Webcomic Name Game" has been transferred to the COMPANY upon the signing of this agreement and the contract signed between Jason Wiseman and the COMPANY." Section 2(C) stated that "the COMPANY shall have sole ownership of the original artwork used and created for the WORKS". Section 2(D) assigned exclusive rights to the Social Media of the works and the Domain Registration. Section 2(L) also granted the COMPANY the ability to utilize cameo appearances of the characters appearing in the WORKS in other COMPANY properties unrelated to the WORKS in order to boost awareness of the WORKS. Section 2(N) also granted the COMPANY the right to use and to license Norris' name, image, and likeness. Further, Norris appointed COMPANY as his exclusive agent as per Section 2(E).

5.      The Agreement between the parties followed Golden Bell's purchase of the rights to the multi-media property including, but not limited to, a tabletop game based on Webcomic Name. The rights were initially conveyed by a third party, Jason Wiseman.

6.      The collaboration efforts between the parties began amicably, though Norris proved to be an inconsistent communicator from nearly the very beginning and an uncooperative collaborator the longer the process went on. As time went on, Norris often left communications unanswered for weeks at a time.

7.      Norris provided rough sketches for the stuffed animal toys referenced in the contract and provided feedback on the early prototypes through WhatsApp communications. However, Norris became unresponsive when asked for additional feedback, often going radio silent for weeks on end.

8.      After numerous delays, Norris provided rough black and white sketches of cards for the game to Golden Bell based off of Webcomic Name. Although the files were incomplete and not ready to be used for production of the game, the progress was the first sign of hope that Golden Bell had seen since entering into the Agreement nearly a year prior. Attempting to remain positive to encourage Norris and prevent any animosity, Golden Bell applauded the black and white sketches.

9.      Sadly, as time went on, Norris' communications to Golden Bell became fewer and fewer. Golden Bell sent yet another email on November 16, 2018, informing Norris that the plush toys were done and following up regarding Golden Bell's past communication about the book option, game edits, and (again) offering to pay Norris once he delivered the final files. Ultimately, Norris stopped communicating with Golden Bell altogether, choosing to sue Golden Bell Entertainment, Golden Bell Studios, and one of the Principals, Marc Goldner.

10.     To date, Norris has not provided Golden Bell with the final files as required by the Collaboration Agreement. Additionally, in violation of the Agreement, Norris has made disparaging remarks about Golden Bell which have permanently and irrevocably tarnished their brand name and image to third parties. These remarks have not only damaged Golden Bell's reputation throughout the Webcomic community but has cost the company legitimate business opportunities after at least two known third parties ceased negotiations with Golden Bell based on Norris' comments.

11.     Norris failed to abide by his contractual obligations regarding Golden Bell's option to publish Norris' book-length work. Norris entered into an agreement to publish a book with a third-party publisher after execution of the Agreement with Golden Bell. The book contained all of the characters which were to appear in the game and as related stuffed animal toys, another

4

breach of the agreement. The book also contained misappropriated ideas that were created exclusively to be used in the game during the extensive development process for Webcomic Name.

12.     Lastly, Norris claims to have withdrawn from the contract but according to Section 2(I) if one of the parties to the contract "shall voluntarily withdraw from the collaboration, then the other party or Parties shall have the right to complete the works…and ownership of the WORKS will revert solely to that Party or Parties."

13.     As a result of Norris's conduct, Golden Bell has and continues to suffer reputational and monetary damages.

## JURISDICTION AND VENUE

14.     Jurisdiction is proper as the Court has subject matter jurisdiction under 28 U.S.C. §1331, 28 U.S.C. §1338, 15 U.S.C. §1119, 17 U.S.C. § 501, 28 U.S.C. § 2201-02, 28 U.S.C. § 1332, and supplemental jurisdiction of these claims under 28 U.S.C. § 1367.

15.     Venue is proper in this district under 28 U.S.C. §1391.

## PARTIES

16.     Upon information and belief, Defendant Alex Norris is a citizen and resident of the United Kingdom.

17.     Upon information and belief, Defendant Andrews McMeel Universal, LLC is a corporation based in Missouri.

18.     Plaintiff Golden Bell Entertainment, LLC is a California Limited Liability company whose principal place of business is in New York.

19.     Plaintiff Golden Bell Studios, LLC is a Nevada Limited Liability Company whose principal place of business is New York.

20.     Plaintiff Marc Goldner is a resident of the state of Connecticut.

## STATEMENT OF RELEVANT FACTS

21.     In February of 2017, Golden Bell purchased the rights to a multi-media property called Pretending to Grownup from a third-party Jason Wiseman ("Wiseman"). Pretending to Grownup started as a card game which had thirty-two (32) guest artist cards. One (1) of those guest artist cards was created by Norris using the Webcomic Name characters. The use of the characters was assigned to Wiseman and included "any future use" of the guest artist card. Golden Bell acquired Pretending to Grownup including the guest artist card drawn by Norris. (See Exhibit 1). Prior to signing with Golden Bell, Wiseman represented that he had "100% free reign" over numerous properties, including Webcomic Name.

22.     In June of 2017, Golden Bell connected with Norris through a 'soft-introduction' by Wiseman and began negotiating the Collaboration Agreement. (See Exhibit 2). Rather than creating the art in-house, Golden Bell wanted to keep the game true to the spirit of the comics and its characters, and true to Golden Bell's mission, vision, and values of the company. The founding partners objective of the company is to work hand in hand with writers, artists, designers, and other creators to make new products come to life in an oversaturated industry by building and creating new and unique brands. Thus, Golden Bell reached out to the original artist of Webcomic Name to collaborate on the game and to keep Norris involved in the future development of growing the Webcomic Name brand. In Golden Bell's first communication with Norris on June 26, 2017, the company explained that there are "potentials for a stand alone [sic] comic, a children's book, or something else" and Golden Bell explained that there would be "derivative merchandise [that] will accompany the game[.]" (See Exhibit 2). Golden Bell was straightforward from the beginning of their plans to work on the Webcomic Name brand and not just a game for it.

23.     After emailing a draft of a Collaboration Agreement to Norris, Norris responded to Marc Goldner ("Goldner"), one of Golden Bell's Members, on July 3, 2017, stating "[t]he main query I have about the contract is the part about 'the artist will retain 0% of the copyright….'". (See Exhibit 3). Goldner responded to Norris via email, noting "[t]o answer your question about copyright, Jason had agreed to us purchasing the rights for the game already and that part of the deal was already done." (Id).

24.     Norris informed Golden Bell that he was going to have a publishing company and his agent review the agreement. After failing to execute the Agreement for several weeks, Norris reached out to Goldner via Facebook on August 9, 2017, stating "[h]ey Marc! My agent just told me go ahead because it looks fine- should be able to sign tomorrow when I'm at my desk etc.!" (See Exhibit 4).

25.     On August 10, 2017, the parties entered into a Collaboration. The Agreement called for the creation, production, and distribution of a game and stuffed animals, as well as any tie-ins, spinoffs, or other commercial development based on Webcomic Name and its characters, which the Agreement referred to as "the WORKS." Additionally, the Agreement stated that "the proceeds from the sale or any and all other disposition of the WORKS and the rights, interest, and licensed therein with respect thereto, including but not limited to the following: Comic Book Rights, Motion Picture Rights, Animation Rights, Graphic Rights, Sequel Rights, Remake Rights, Television Rights, Gaming Rights, Film Rights, Stage Rights, Radio Rights, Publication Rights, Interactive Rights, Music Rights, Merchandising Rights, and Digital Rights." Further, Section 3(D) of the Agreement granted Golden Bell options on Norris' next game-length work, book-length work, and manuscript-length work, which Norris later acknowledged. (See Exhibit 5).

26. According to the Agreement, Norris was required to create final files for a game designed by Golden Bell and Wiseman. Norris was also obligated to provide sketches for a line of Stuffed Animals conceived by Golden Bell.

27. Shortly after the Agreement was executed sometime in early September of 2017, Goldner and Norris had a recorded telephone conference wherein the parties had discussed plans related to building the multimedia brand of Webcomic Name. Both Goldner and Norris expressed their excitement to collaborate. Further, Goldner reinforced the idea that the company viewed Webcomic Name as a brand that it would continue to build and wanted Norris to be a part of that vision.

28. On the call the parties discussed utilizing Webcomic Name and its characters in other mediums. Norris, Goldner, and Rachel Korsen, another Golden Bell Founding Partner, discussed a daily calendar of Webcomic Name comics. There was mutual excitement over the idea, though Goldner noted that Golden Bell would need additional comics from Norris because Norris had not published enough Webcomic Name comics to cover a whole year (365 Days), and Golden Bell and Norris agreed they'd be using the comics Norris published via his social media accounts for Webcomic Name. This was just one example of 'other commercial development' of the WORKS. On that same call, Goldner explained that Golden Bell was a media company and not simply a game or toy company, reinforcing Golden Bell's first email to Norris that the company was planning on a 'sky is the limit' type of approach such as children's books, stand-alone comics, and other products including but not limited to animated content and digital derivatives such as Non-Fungible Tokens.

29.     On the call and in preceding communications thereafter, Norris and Goldner discussed producing a wide range of products including calendars to t-shirts. The additional products were clearly far outside the scope of merely a game and stuffed animal toys.

30.     The Agreement explicitly stated in Section 1(A) that "ARTIST shall retain 0% of the copyright, 0% of the trademark, 0% of the patent and 5% of the net sales of WORKS for the first 18 months then it will revert to 4% of the net sales of the WORKS thereafter, and COMPANY shall retain 100% of the copyright, 100% of the trademark, 100% of the patent and 95% of the net sales of the WORKS for the first 18 months then it will revert to 96% of the net sales of the WORKS thereafter." (See Exhibit 5). The Agreement further stated that "[i]f ARTIST creates a new work with a character or storyline that infringes on any of COMPANY's copyrighted properties, ARTIST agrees to transfer any copyright he may have in that new work to COMPANY."

31.     Pursuant to these provisions, on November 30, 2017, Golden Bell filed a trademark application Serial No. 87703934 with the USPTO on an intent to use basis for the mark "Webcomic Name" in class 028. The USPTO approved that application, with Registration No. 5629281 on December 11, 2018.

32.     Section 3(B) of the Agreement provided a deadline of February 17, 2018 for completion of the WORKS to be used in the game. Norris failed to abide by the Agreement and caused undue delay without any proper timely communication provided to Golden Bell. Due to Norris' delay, Golden Bell suffered severe economic losses.

33.     The Agreement also reflects the parties desire to expand the Webcomic Name brand. Section 2(B) of the Agreement states that the parties shall share the proceeds, rights, interest, and licenses to the WORKS and its characters in a number of different mediums, such as

motion pictures, animation, gaming, television, sequels, comic books, and more. Section 3(C) of the Agreement, states "ARTIST shall submit to COMPANY all sequels to the WORKS or other works using characters that appear in the WORKS….".

34.     In addition to the WORKS and any subsequent work done by Norris which contains the characters from the WORKS, Section 3(D) of the Agreement also gave Golden Bell the option to publish Norris' next "game-length," "book-length," and "manuscript-length" works.

35.     Aside from the intellectual property clauses of the Agreement, the Agreement contains a number of warranties. Section 4(E) states that "ARTIST agrees not to make any statements, written or verbal, or cause or encourage others to make any statements, written or verbal, that defame, disparage or in any way criticize the personal or business reputation, practices, or conduct of COMPANY, its employees, directors, [or] officers…." Norris hasn't just done this once, or twice, but continually breaches this provision causing undue hardship and damage to Golden Bell.

36.     As referenced above, communications between the parties was inconsistent throughout the relationship. Norris routinely took days or weeks to respond to communications, often times requiring multiple follow-ups from Golden Bell. Norris's failure to communicate only got worse with time. Norris gave one excuse after the other for his failure to perform under the terms of the contract. Due to Norris' delays and his failure to complete WORKS on time, Golden Bell and Norris had agreed that Norris would be making additional expansions and other art assets for Webcomic Name at no additional charge – this was never done and can be chalked up to another broken promise by Norris' unreliable, inconsistent, and untruthful word.

37.     Despite the inconsistent communications, slight progress on the WORKS was made in the beginning. Norris and Golden Bell agreed to produce five plush stuffed animal toys: a pink

blob, an orange blob, a sexy pink blob, a cat, and a word bubble featuring the characters' catch phrase "Oh No" on one side, and "O kay" on the other. (See Exhibit 6). Norris drew the initial sketches of the toys, and provided them to Golden Bell, which made prototypes with numerous revisions and editorials, by Golden Bell's Rachel Korsen both with Norris and the factory, taking into account how to best bring to life the Webcomic Name characters.

38.     Yet, progress on completing the game files was almost non-existent. Norris provided infrequent updates on progress and failed to keep Golden Bell up to date related to work completed with Wiseman. Golden Bell asked numerous times to be kept in the loop of all communication and design efforts with Wiseman because two of Golden Bell's members, Marc and Rob, were co-designer on the game mechanics utilized in the game for Webcomic Name that predated Wiseman's involvement for a game created by Golden Bell called The Sunday Comics, based off their first published property, a newspaper comics publication -- The Sunday Comics. Norris sent Golden Bell messages that he had not yet completed or worked on the game, citing that he took on too much work. For instance, in a December 11, 2017 email, just two months before the deadline for completion of the game, Norris admitted to not working on the game at all. (See Exhibit 7). Golden Bell continued to suffer, as production and release of the game had to be continually pushed back. This caused Golden Bell to miss solicitation deadlines and to miss not one but two Quarter 4 sales periods which is when most sales take place in this industry. This began to create a lot of damage to Golden Bell's reputation due to their perceived unreliability to meet projected deadlines. Further, this made Golden Bell look untrustworthy and unable to meet the deadlines that they set due to Norris' failure to perform that lost Golden Bell sales and customers. Golden Bell is still trying to recover, not only from the loss of sales, but also from the loss of reputation.

39.     On April 5, 2018, Norris finally stated that he would draw the cards in black and white sketches to allow for creation of a test game, "and then finalise [sic] them." (See Exhibit 8). On May 14, 2018, Norris stated that he could "get the sketched cards ready for testing in two weeks…." (See Exhibit 9).

40.     Norris eventually delivered 377 sketch black and white cards to Golden Bell on June 21, 2018 when the final files, which are *not* sketch black and white cards, were supposed to be delivered by February 17, 2018. As Norris previously acknowledged, black and white sketches were not "final" cards. In order to produce the game, the cards would have to be colored and properly lined before being converted into a format that was suitable for mass printing. Of the 377 black and white cards, Norris subsequently claimed to have provided 400 cards via Dropbox that contained colored sketches and demanded immediate payment from Golden Bell. The game was supposed to include at least 500 cards. Goldner responded that the files would need to be accessed, reviewed, and edited by Golden Bell, a process that was explained to Norris as necessary numerous times, before any payment was made. When Golden Bell attempted to access the Dropbox folder, none of the cards Norris claimed to have provided were there, with the Dropbox link indicating that the finals had been deleted. Norris refused to upload *any* color files for Golden Bell to access or review until payment was made, which is contrary to Section 1(G) of the Agreement stating that Norris would receive his "advance against net sales royalties within 30 days of the COMPANY receiving the final files…". Golden Bell never received the final files or any colored files to be reviewed.

41.     As stated, Norris failed to produce final cards as required by the Agreement. Norris, who exhibited traits of someone with seller's remorse, refused to produce final files without receipt of payment while also admitting that "[n]ot all of the print-ready files have been delivered…I will

upload the rest as soon as the first payment has gone through…" on October 1, 2018. Payment before receipt was not part of the terms of the Agreement.

42.     In addition to failing to produce final cards, Norris failed to produce other necessary files to complete the game, such as art for a rulebook, art for game tokens, art for the back of the two different sets of cards, final logo, final font with punctuations, and has only provided incomplete box art with no final front, no sides, and no back of the box. While Norris did deliver a sketch for the front of the box for the game, though as Norris admits, it is not in the necessary file format for printing. (See Exhibit 10). Golden Bell requested a high-resolution file that would be layered but only a low-resolution unlayered .PNG file was provided. Additionally, Norris did not and has not to this day, provided art for the sides or back of the box, rendering the file for the front of the box useless.

## Norris Fails to Abide By Other Conditions of the Agreement

43.     In addition to Norris' failure to produce the final files to complete the game, Norris failed to abide by Section 3(D) of the Agreement. On October 31, 2017, over two months after entering into the Agreement with Golden Bell, Norris entered into a publishing agreement with Andrews McMeel publishing. (See Exhibit 11). Despite the fact that Section 3(D) of the Agreement explicitly states that Golden Bell had an option to publish Norris' next book-length work. At no point did Norris provide Golden Bell with the option to publish any book, let alone the work detailed in his publishing agreement with Andrews McMeel.

44.     On April 2, 2019, Andrews McMeel Publishing published Norris' book titled "Oh No." The book features characters from Webcomic Name and includes the punchline signature, "Oh No", of the end of every Webcomic Name comic. In addition to Norris' failure to provide Golden Bell with the option to publish "Oh No", the book contained a compilation of Webcomic

Name comics featuring the characters set to be made into stuffed animals and featured in the Webcomic Name Game, in direct violation of Sections 2(A), 2(B), and 3(C) of the Agreement. (See Exhibit 5). Additionally, that same book published by McMeel used existing comics that were published on the Webcomic Name social media pages that were assigned to Golden Bell to be used for 'other commercial development' of the Webcomic Name brand for other mediums, such as the calendar discussed by the parties. Further, Norris had misappropriated ideas and concepts from the sketch cards for the game developed of Webcomic Name to create new comics that became a part of the "Oh No" book published by Andrews McMeel without Golden Bell's consent to publish, monetize, or reproduce the works as per Section 2(M) of the Agreement.

45.     Shortly before the book was published, on March 28, 2019, Plaintiffs sent Norris and Andrews McMeel a cease-and-desist letter, informing them that any book published utilizing the "Webcomic Name" mark would infringe upon Defendants trademark as issued by the USPTO.

46.     On October 4, 2018, nearly a year after entering into the publishing agreement with Andrews McMeel, Norris reached out to Golden Bell offering them the option on his next book, which he had titled "Animals." (See Exhibit 12). Golden Bell responded that they would be exercising their option on Norris' book, and asked Norris to provide them the files so they could discuss next steps. Norris had no intention of providing the files or allowing Golden Bell to publish the book. At the time, Golden Bell had no idea that there was an 'Oh No' book being published by Andrews McMeel behind Golden Bell's back.

47.     While Norris deliberately failed to provide the necessary materials for the game and stuffed animals and published a book that rightfully should have been offered to Golden Bell, he also improperly impeded Golden Bell's ability to promote the WORKS. Section 2(D) of the Agreement stated that "COMPANY will exclusively handle all worldwide distribution,

production, marketing, reprinting, sales, logistics, warehousing, social media, and publication of the WORKS. COMPANY and ARTIST shall share access to all Social Media accounts with administrative privileges and COMPANY shall be the Domain Registrant and Administrator of any domains. (See Exhibit 5). Despite Section 2(D), Norris has refused to provide any access to social media accounts for promotional purposes nor provided access and assigned the Webcomic Name and Oh No domains to Golden Bell. Instead, Norris continues to solely profit off of the rights assigned to Golden Bell relating to Webcomic Name with complete disregard. Norris' social media following has grown nearly three times in size since entering into the contract with Golden Bell, and the Webcomic Name brand has been utilized in partnerships independent of Golden Bell, such as the aforementioned "Oh No" book and a partnership with Hello Kitty.

48.     Further, in violation of the Agreement, Norris has damaged the family friendly brand by creating 'Blob Erotica', Norris has published, monetized, and reproduced derivatives of the WORKS in violation of Section 2(M), Norris has not credited the COMPANY on all forms of publicity of the works as per Section 2(F), and Norris has refused to grant Golden Bell access to the social media accounts for Webcomic Name, nor has he transferred the Webcomic Name and Oh No domains as per Section 2(D). On top of this, Alex has refused to collaborate with the COMPANY on the writing, drawing, illustrations, and sketches of the WORKS as per Section 2(A) and has completely ignored all of Company's editorial, suggestions, design input, and collaboration efforts.

49.     In addition, after communications between Norris and Golden Bell broke down, Norris began making negative comments about Golden Bell. In a Facebook post in a group titled "buncha nerds or something THE GROUP," Norris posted "ALSO if you get approached for a project with a publisher etc, do not go with them simply because you have seen that one of us has

worked with them in the past. Always reach out to the other artist to ask their experience of working with those people, as they might have had a negative experience and got stuck in a contract [golden bell emoji with a red slash through it]." (See Exhibit 13).

50.     Upon information and belief, Norris has made similarly disparaging comments in private communications. These communications have had a severe impact on Golden Bell's reputation throughout the Webcomic and gaming communities and directly affected business operations. For instance, upon information and belief, Norris' comments caused an artist by the name of EnzoComics to cease negotiations with Golden Bell and Wiseman for the publishing of a game based on the comic Dungeon Construction, even though the parties were on the brink of formalizing their partnership. Further, just days after Norris' initial remarks in the Facebook Post, Wiseman sent a termination letter to Golden Bell after having worked together on nearly a dozen different projects.

51.     In addition to being damaging to Golden Bell's business operations, Norris' comments are in direct breach of Section(E) of the Agreement, which calls for Norris to not make any disparaging remarks which could damage Golden Bell's reputation.

52.     On or about November 8, 2022, Norris initiated a crowdfunding campaign via gofundme.com to recover legal fees. In the post describing the fundraising efforts, which was posted to Norris' own social media and reposted thousands of times, Norris stated that Defendants were utilizing the Collaboration Agreement between the parties to "take all of my intellectual property."

53.     This statement was made despite knowing its falsity. As discussed above, all actions taken by Plaintiffs have been done within the scope of the agreement.

54.     This statement has damaged the business reputation of Plaintiffs and caused irreparable harm. Plaintiffs have subsequently received hundreds of messages in the form of social media posts, private messages, and phone calls from third parties accusing them of thievery. After this, Golden Bell suffered a DDoS attack (Distributed Denial-of-Service attack) which rendered their websites such as GoldenBellDirect.com inoperable for extended periods of time. Norris has made it impossible for Golden Bell to conduct business.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### BREACH OF CONTRACT
**[By Golden Bell Studios, LLC and Golden Bell Entertainment, LLC against Alex Norris]**

55.     Plaintiffs repeat and allege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

56.     On August 10, 2017, Norris and Golden Bell entered into a valid contract.

57.     Since executing the contract, Golden Bell has performed all its contractual duties. Golden Bell cannot continue to perform its contractual duties until Norris performs his contractual duties of delivering final files.

58.     Golden Bell has on numerous occasions asked Norris to send the final files for the game relating to Webcomic Name in order to receive the part of the advance in the amount of $3,125 which is only due upon delivery of the final files – Norris has *refused* to send the final files.

59.     Since entering into the Agreement with Golden Bell, Norris has refused to abide by his responsibilities set forth therein.

60.     To this day, over five years after entering into the contract, Norris has failed to provide final files, as required by Sections 1(G) and 3(B) of the Agreement, even though he claims

to have them. Further, Norris failed to produce final files by the date of February 17, 2018, as stated by Section 3(B) of the contract.

61.     Norris' failure to deliver the WORKS has deprived Golden Bell of the ability to produce and distribute the WORKS, resulting in significant monetary damages.

62.     In addition to his failure to provide final files for the WORKS, Norris has refused to abide by Section 3(D) of the Agreement. Despite that section explicitly stating that Golden Bell would have an option to publish Norris' next 'book-length' work, Norris entered into a publishing agreement with Andrews McMeel over two months **after** executing the Agreement with Golden Bell. At no point did Norris reach out to Golden Bell with respect to Golden Bell's option to publish this book.

63.     Rather, on April 2, 2019, Andrews McMeel published Norris' book titled "Oh No," despite Golden Bell's contractual right to do so and after being informed of Andrews McMeel of Golden Bell's rights to Webcomic Name and "Oh No". To make matters worse, the book "Oh No" contains almost exclusively characters and themes set to appear in the WORKS, in direct violation of Sections 1(C) and 3(C) of the Agreements, which relates to subsequent works completed by Norris containing characters and themes that appear in the WORKS, as well as Section 2(B) of the contract granting Golden Bell Publication Rights to the Works and derivatives thereof.

64.     Norris' refusal to abide by his requirement of providing Golden Bell the option to publish his next book-length work has resulted in significant monetary damages from missing out on a valuable revenue stream that is contractually owed to Golden Bell.

65.     Further, in direct violation of Section 2(D), Norris has refused to provide any access to such social media accounts. Norris' refusal has severely limited Golden Bell's ability to market the products on social media, a necessary tool to increase fan excitement and raise money via

popular crowdfunding sources and/or pre-order sources and to generate retailer business-to-business interest. Norris even refused to discuss publicly his collaboration and partnership with Golden Bell yet promoted other projects such as his book with Andrews McMeel and a collaboration with Hello Kitty.

66.     Finally, Norris has failed to abide by his agreement. Section 4(E) of the Agreement, in which Norris agrees not to make any disparaging remarks about Golden Bell, or its directors and officers. Norris' social media posts in a popular webcomic Facebook group, in which he included the "golden bell emoji with a slash through it," is a direct assault informing that community not to work with Golden Bell. Since that post was made, Golden Bell has been unable to sign any other Webcomic artists but in the past had signed nearly 100 contracts with artists for their publications, one of which was The Sunday Comics, for their publishing divisions two of which are Polar Press and Webcomic World, and other products they make such as games and toys. This reputational harm has required Golden Bell to shift their business practices to nearly exclusively focus on creating Licensed Toys and Games for AAA Licensors such as Naruto Shippuden and Le Petit Prince. While grateful for those opportunities, Golden Bell has been unable to focus on original content with higher margins due to Norris' actions. Norris has handcuffed Golden Bell's business operations and the intangible subjective nature of being able to be 'fulfilled' as creators, has been stripped by Norris' attacks on Golden Bell's members. This harm has prevented Golden Bell from growing original brands they would develop and/or acquire due to the tarnished reputation that stemmed from Norris' disparaging statements.

67.     Further, upon information and belief, Norris has made similar disparaging comments in private communications within the community. As a result, despite Norris being the party to repeatedly fail to live up to his side of the bargain, Norris has substantially damaged the

reputation of Golden Bell in the webcomic and gaming communities, leading to lost opportunities for future collaborations and loss of business revenue. Norris' disparaging remarks despite him agreeing not to make such remarks has and continues to cause monetary damages to Golden Bell.

**SECOND CAUSE OF ACTION:**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**[By Golden Bell Studios, LLC and Golden Bell Entertainment, LLC against Alex Norris]**

68.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

69.     Upon information and belief, in direct violation of Section 4(E) of the Agreement, Norris made numerous disparaging comments about Golden Bell to third parties. Two such parties were an individual who goes by the name EnzoComics and none other than Jason Wiseman himself.

70.     Golden Bell and Jason Wiseman, alongside EnzoComics, were developing a game based on the comic Dungeon Construction and were on the verge of executing a collaboration agreement similar to the Agreement at issue in this action.

71.     Upon information and belief, after learning of a pending deal with Golden Bell, Norris made disparaging comments to EnzoComics, encouraging him not to work with Golden Bell.

72.     Upon information and belief, after communications with Norris about Golden Bell, EnzoComics notified Wiseman, who then notified Golden Bell, that he was no longer willing to develop a game based on Dungeon Construction as a result of Norris' comments.

73.     As a result of Norris' comments, Golden Bell has and continues to suffer economic damages in the form of not being able to produce a game based on EnzoComic's comic Dungeon Construction.

74. Then on October 8, 2018 – just a few days after Norris posted on social media encouraging people to not work with Golden Bell and showed a 'Golden Bell with a Slash through it emoji', Golden Bell received an email from Wiseman as a notice to terminate Wiseman's agreement with Golden Bell.

75. Golden Bell and Jason Wiseman were working on no less than 5 other games together. They were as several games based on Disney and ABC's LOST which Wiseman never completed, promoted, playtested, or helped to crowdfund which was originally envisioned and planned by Golden Bell and Wiseman. These games weren't able to be effectively completed, marketed, playtested, or sold, and ultimately led to Disney terminating the license which resulted in lost revenue for Golden Bell and damaged relationships within the licensing community as well as a loss of reputation with Disney and potentially millions of fans.

76. Upon information and belief, after communications between Norris and Wiseman, Wiseman decided to terminate his numerous agreements with Golden Bell and effectively resigned.

77. As a result of Norris' comments and communications, Golden Bell has and continues to suffer economic damages.

### THIRD CAUSE OF ACTION:
### COPYRIGHT INFRINGEMENT
### [By Golden Bell Studios, LLC and Golden Bell Entertainment, LLC against Alex Norris and Andrews McMeel Publishing, LLC]

78. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

79. As previously noted, the Agreement between the parties states that Golden Bell retained 100% of the copyright related to the WORKS, which is defined as a tabletop game and stuffed animals based upon Norris' Webcomic Name.

80. The Agreement further assigned, under the same terms of the Agreement, any disposition of the WORKS, including but not limited to: "Comic Book Rights, Motion Picture Rights, Animation Rights, Graphic Rights, Sequel Rights, Remake Rights, Television Rights, Gaming Rights, Film Rights, Stage Rights, Radio Rights, Publication Rights, Interactive Rights, Music Rights, Merchandising Rights, and Digital Rights."

81. The Agreement additionally stated that the "COMPANY shall have sole ownership of the original artwork used and created for the WORKS."

82. Further, the Agreement required Norris to "submit to COMPANY all sequels to the WORKS or other works using characters that appear in the WORKS and any other unrelated characters. COMPANY will take due diligence to copyright all said WORKS with the same percentage and profit splits as discussed above for future works relating to the WORKS above. If COMPANY acquires the NEW WORK, the provisions of this Agreement shall apply to the NEW WORKS."

83. As previously mentioned, Norris has created and provided Golden Bell rough sketches containing characters for both the board games and stuffed animals, as well as their signature catchphrase "oh no." Pursuant to 17 U.S.C 102, upon affixing these characters to a tangible medium of expression, copyright protections attached to those characters. Further, pursuant to the Agreement, Golden Bell became the 100% owners of said copyright.

84. Norris has, and continues to, infringe upon Golden Bell's lawful copyright by utilizing the characters intended to appear in the WORKS. Norris continues to publish comics online containing said characters. Norris sells merchandise on his website "theohnoshop.com," much of which contains characters and artwork which appear in the rough sketches provided by Norris to Golden Bell. Additionally, as previously mentioned, Norris published a book titled "Oh

No" with a third-party publisher, which was a compilation of Webcomic Name comics, all of which contain the characters and catchphrase to which Golden Bell owns 100% of the copyright.

85.     The "Oh No" book also contained misappropriated ideas that were created exclusively to be used in the game during the extensive development process for Webcomic Name. The black and white sketches presented by Norris to Golden Bell for the game relating to Webcomic Name were then further developed, finalized, and colored for Andrews McMeel and the "Oh No" book that they illegally published, instead of fulfilling Norris' contractual obligations and deadlines with Golden Bell that were already nearly a year late and behind schedule.

86.     On April 2, 2019, Andrews McMeel Publishing and Alexander Norris published a book titled "Oh No" utilizing the mark "Webcomic Name" without permission or authority to do so from Plaintiffs.

87.     The Book "Oh No" utilized characters, storylines, and other intellectual property that were 100% the copyright of Golden Bell.

88.     Both Andrews McMeel and Norris' infringement is willful.

89.     As a result of Norris' infringement, Golden Bell has and continues to suffer actual damages and lost profits. Additionally, Golden Bell is entitled to injunctive relief, statutory damages, attorneys' fees, and the costs of this action in connection to Norris' continued infringement. Golden Bell is additionally entitled to declaratory relief, in the form of a judicial declaration stating that Golden Bell is the lawful owner of the copyright pursuant to the Agreement between the parties.

**FOURTH CAUSE OF ACTION:**
**TRADEMARK INFRINGEMENT**
**[By Golden Bell Studios, LLC and Golden Bell Entertainment, LLC against**
**Alexander Norris and Andrews McMeel Publishing**

90.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

91.     Plaintiffs own a valid trademark via trademark application Serial No. 87703934 with the USPTO on an intent to use basis for the mark "Webcomic Name" in class 028. The USPTO approved that application, with Registration No. 5629281 on December 11, 2018.

92.     On April 2, 2019, Andrews McMeel Publishing and Alexander Norris published a book titled "Oh No" utilizing the mark "Webcomic Name" without permission or authority to do so from Plaintiffs.

93.     The infringement by Norris and Andrews McMeel Publishing was knowing and willful.

As a result of this infringement, Plaintiffs continue to suffer actual damages and lost profits.

**FIFTH CAUSE OF ACTION:**
**DEFAMATION PER SE**
**By Marc Goldner, Golden Bell Studios, LLC and Golden Bell Entertainment, LLC against**
**Alexander Norris**

94.     Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

95.     On or about November 8, 2022, Norris initiated a crowdfunding campaign via gofundme.com to recover legal fees. In the post describing the fundraising efforts, which was posted to Norris' own social media and reposted thousands of times, Norris stated that Defendants were utilizing the Collaboration Agreement between the parties to "take all of my intellectual property."

96.     This statement was made despite knowing its falsity. As discussed above, all actions taken by Plaintiffs have been done within the scope of the agreement.

97.     This statement has damaged the business reputation of Plaintiffs and caused irreparable harm. Plaintiffs have subsequently received hundreds of private messages and public comments from users accusing them of thievery.

98.     In addition, after communications between Norris and Golden Bell broke down, Norris began making negative comments about Golden Bell. In a Facebook post in a group titled "buncha nerds or something THE GROUP," Norris posted "ALSO if you get approached for a project with a publisher etc, do not go with them simply because you have seen that one of us has worked with them in the past. Always reach out to the other artist to ask their experience of working with those people, as they might have had a negative experience and got stuck in a contract [golden bell emoji with a red slash through it]."

99.     As a result of Norris' defamatory statements, Plaintiffs continue to suffer actual damages and lost profits, as well as suffering the reputational harm associated with such false statements.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against the Defendant, as follows:

1.     For monetary damages in an amount to be determined at trial, but not less than $500,000.

2.     An award of the costs and disbursements of this action, including reasonable attorneys' fees, costs, and expenses pursuant to Section 4(F) of the Agreement;

3.    For a declaratory judgement of the respective rights of Golden Bell with respect to the copyrights and trademarks assigned to them in the Agreement and other contractual rights within the agreement, and

4.    For such further relief as the Court may deem just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: May 10, 2023
New York, New York

**GERARD FOX LAW P.C.**

Gerard P. Fox (pro hac vice forthcoming)
Ryan Dolan, Esq.
1345 Sixth Avenue, 33rd Floor
New York, New York 10105 Telephone:
(646) 690-4980
Facsimile: (646) 368-9328
gfox@gerardfoxlaw.com
rdolan@gerardfoxlaw.com

*Attorneys for Plaintiffs,*
Marc Goldner, Golden Bell
Entertainment LLC, Golden Bell Studios,
LLC