UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXANDER NORRIS d/b/a WEBCOMIC NAME,<br><br>        Plaintiff,<br><br>    -against-<br><br>MARC GOLDNER, GOLDEN BELL ENTERTAINMENT, LLC, and GOLDEN BELL STUDIOS, LLC,<br><br>        Defendants. | Case No. 19-cv-5491 (PAE) (SN) |

## DECLARATION OF MARC GOLDNER

I, MARC GOLDNER, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am one of the founders of Golden Bell Entertainment, LLC ("GBE") and Golden Bell Studios, LLC ("GBS") (GBE and GBS collectively, "Golden Bell"). I submit this declaration based on my own personal knowledge, as well as that I have learned in my capacity as a Manager of one of the Golden Bell entities named in this lawsuit.

2. Golden Bell was started by three business partners with a vision of creating an organization that provides wholesome and relatable entertainment content and products for the world to enjoy. Through agreements with various rights owners, GBE seeks out brands and properties with a relatively small reach but big potential if properly merchandised and commercialized, and builds on creative concepts to yield successful revenue streams via the creation of a wide array of entertainment products ranging from animated projects to merchandise, including toys, games, books, apparel and beyond. GBS's role is to act as a sales and distribution arm for GBE's properties; it also enters into licensing deals for third-party IP. Past partners include Disney, Viz, and Funimation.

3.      GBE believed that intellectual property relating to a certain comic strip could be one of these types of successful merchandising opportunities, where the creator and Golden Bell would work together to mutually create more success for the IP. In particular, in February 2017, GBE signed an agreement with Jason Wiseman, who I knew to be a collaborator with plaintiff Alexander Norris ("Plaintiff"), the designer behind a variety of webcomic series, including *Dorris McComics*, *Hello World!*, *How to Love*, and most pertinent here, one called "Webcomic Name" featuring various amorphous blob figures, and which most of the strips end in one of the "relatable" blobs saying "Oh No." A copy of that agreement is attached hereto as Exhibit A. The agreement was designed to grant certain ownership rights as well as additional rights pertaining to derivative works. Part of the Wiseman game that he was creating, "Pretending to Grownup," included key art created by Plaintiff (in particular, a guest artist card that wound up being called "Unexpected Pregnancy," and the agreement also gave GBE the right to make "any future use" of the comic.

4.      Wiseman had represented that he had authority to negotiate on behalf of Plaintiff, and we had no reason to believe otherwise. In addition, at times, including in his deposition, Plaintiff referred to Wiseman as a friend with whom he had a working relationship; the two had an agreement with each other as well.

5.      In August 2017, GBE entered into an agreement directly with Plaintiff relating to Webcomic Name, pertaining to games and stuffed plush animals, along with a wide array of derivative works associated with the webcomic, encompassing comic book rights, graphic rights, animation rights, publication rights, merchandising rights, digital rights, and an option on Plaintiff's next book-length work, manuscript-length work, and next game. A copy is attached hereto as Exhibit B. While Plaintiff was entitled to the right to "pursue" Webcomic Name

outside the context of the agreement, it did not allow Plaintiff to maintain unlimited rights to the Webcomic Name IP. Specifically, the agreement granted GBE 100% of the copyright, 100% of the trademark, and other rights pertaining to Webcomic Name in exchange for an up-front fee on delivery of certain materials, plus running royalties. The value GBE was to provide also included marketing and publicity, which led to an enhanced social media presence, while Plaintiff was entitled to keep all revenue from Patreon, GoComics, Webtoon, his TheOhNoShop.com webstore, and convention sales, as well as from all non-included IP (e.g., the various series mentioned above except for Webcomic Name). Plaintiff also later expressly gave us an option pertaining to the book called "Animals." *See* Exhibit C (confirmation of option with book cover art).

6. In general, at least until 2019 shortly after Wiseman and Plaintiff hired Ms. Perdomo (who also filed the 2018 copyright application) and attacked us out of thin air in their effort to use litigation as a means to terminate the deal without authorization, our relationship with Plaintiff was very collaborative. We spoke, emailed, and texted a lot. We discussed new products and product ideas and new designs. Plaintiff repeatedly sent us images for use in product development, and was aware that we were filing trademark applications to protect the products we were developing. Based on our discussions, we thought we had wide range to use Plaintiff's illustrations as part of our submissions to the U.S. Patent & Trademark Office (USPTO). Indeed, even Plaintiff called himself an "agreeable person." *See* Exhibit D (deposition transcript) at 62:17-18.

7. As is the case with any professional entertainment company, it is important to register trademarks with the USPTO to help provide notice, receive enhanced damages, assist with takedowns on Amazon and other online platforms, and make recordations with customs, all

3

of which helps guard against infringement and counterfeiting of intellectual property rights. This protection benefits both sides of a deal, and it is why we freely discussed this with Plaintiff at least as early as February 2018. Just with respect to our company, GBE has invested resources in obtaining and/or creating internally a combined total of over 100 trademark registrations for its various brands in the United States alone. One example of others doing this is available here, the registration record for Universal's beloved "Minions" character: https://tsdr.uspto.gov/documentviewer?caseId=sn86306064&docId=ORC20170320110451&linkId=6#docIndex=5&page=1. There are countless other instances of filings for trademarks pertaining to IP that has been acquired by a developer, publisher, licensing entity, or an entertainment company like GBE. This is why we proceeded with the trademark filings at issue: to prevent infringement of a property to which GBE was planning on giving a lot of attention as part of its development, marketing plans, creative development, and merchandising roadmap that would include product design, services, advertising, and so on. We had also noticed an infringement on Amazon around that time that we wanted to get removed, and we believed that the applications would help with getting the infringing listing down. Sections 2(O)-(Q) of our collaborator agreement even reflected an understanding that GBE would engage in such enforcement.

8.     When we chose specimens to submit to the USPTO as part of our trademark applications starting in November 2017, we were not looking to give the USPTO free copies of the webcomic to read: the point of any submission like this is to show the USPTO what the IP is, and that is what we did here. Therefore, as part of that submission, we included copies of screenshots from Plaintiff's website, as well as products and marketing material we had developed under the agreement and a catalog page and banner using materials that Plaintiff

approved and supplemented with additional materials. From our discussions, we believed that we could make these screenshots for our use. For example, during one of our phone calls in September 2017, Plaintiff agreed that it was a "good idea" for GBE to send a plush factory "images from the comic," and that GBE could use Plaintiff's comics for a calendar. In general, Plaintiff told us to pull any images we wanted to that Plaintiff had created for Webcomic Name for our use as part of the agreement. One of the claimed images in this case, called "Sexy Blob," is a cover photo of the Webcomic Name Facebook page that was made into a plushie that the agreement expressly authorized us to make.

9. Until 2019, we had no idea that that our use of these images would be limited in any way; as noted above, he knew we were filing trademark applications. We still believe we were authorized to make the submissions we did, and it is notable to me that even after we made the submissions, Plaintiff continued sending us images for our use and without any suggestion that there was any violation going on. *See* Exhibit E (a copy of text a thread between Plaintiff and me from February 2018). It was not until we received a cease-and-desist letter (roughly around the same time that Plaintiff chose to back away from our deal) that he objected on vague grounds used to justify improper "termination," and even that letter did not mention the trademark applications. After all, we all believed that under various provisions of the collaborator agreement—including the ownership in Section 1(A), the conveyance in Section 2(A), the various rights provided to GBE in Section 2(B) such as "Comic Book Rights" and "Digital Rights," and Section 2(N), which provided for "any use"—our permissions with respect to protecting the products under the agreement meant what the agreement said: any use.

10. I understand that Plaintiff, without our knowledge, applied to register a set of his webcomics with the U.S. Copyright Office as an "unpublished collection." Attached as Exhibit F

is a true and correct copy of the copyright certificate that was filed with the Court. The certificate lists "Different," "Dog," "Imagination," "Impossible," and "Procrastination" under the title "Webcomic Name Collection Volume 1."

11.     However, after our attorney, Ryan Dolan, left the Gerard Fox law firm, we started to wonder about the nature and extent of effort put into digging into some core issues in the case. On our awareness of this upcoming motion, we started digging into Plaintiff's uses. We were shocked to discover through the "Wayback Machine" that Plaintiff had deleted extensive amounts of evidence showing that some of the allegedly "unpublished" works in the copyright registration had actually been distributed in the United States, before any other country in fact as far as we know, before December 4, 2018, when the copyright application was filed. This includes publication on October 27, 2017 of three of the five visual works ("Imagination," "Impossible," and "Different") as prints for sale, another ("Procrastination") being offered as a print for sale in U.S. dollars at least as of July 22, 2018, and three comics ("Imagination," "Impossible," and "Different") shown as being available on Plaintiff's webstore (TheOhNoShop.com) at least as of October 2017. We also found an image of Plaintiff selling "Impossible" as a print at a comic convention in Kansas City in late April 2017, and the publication of the aforementioned comic strips on the digital comics distributor and platform called GoComics, a U.S.-based website owned by U.S. publisher Andrews McMeel, which also had been deleted. Those, as well, had been deleted from the GoComics site. Attached as Exhibit G is a true and correct copy of these pre-filing uses that we found (including copies from the "Wayback Machine" showing the prior distributions), which exist in primarily spoliated evidence that Plaintiff did not produce in discovery. Exhibit G also includes a consumer's post about physical prints at least as of December 3, 2017.

12. Throughout 2018, Plaintiff began missing deadlines repeatedly. At first he claimed he had taken on too much work and was working on a book that we believed was unrelated (but we later discovered was not). Then, toward the latter half of 2018 and into early 2019, after being so enthusiastic initially and for over a year later about the deal after it commenced, Plaintiff started acting strangely. First, he stopped responding to my messages entirely for periods much longer than usual, and then he continuously failed to deliver the required work product that he had agreed to give us under the agreement that he signed. Rather than sending us required game files, he sent us an invoice for the advance that was payable only on delivery to GBE of the final files.

13. Then, all of a sudden, Wiseman and Plaintiff, using the same counsel, went on the attack against us, both asserting various claims that caught us off-guard and seemed to have no merit. Plaintiff essentially ambushed us, threatening damage to us, disparaging and defaming us online, and summoning the internet trolls to threaten me, my significant other and her artwork and other endeavors, my business partners, and our company, to the point that we had to transition to an entirely new business model. Plaintiff used this campaign of disparagement as a springboard to portray himself as some sort of victim despite signing an agreement with eyes-wide-open. In addition to the nature of what he said, he falsely claimed that we had taken *everything* from him, when the Agreement was obviously very limited and he was continuing to boast about selling out of products and otherwise parading his success relating to his IP that was not part of our deal. Attached as Exhibit H are true and correct copies of posts from Plaintiff documenting these claims.

14. Plaintiff used this false and offensive campaign to raise hundreds of thousands of dollars on Go Fund Me (even though at the time, fundraising for this purpose was not permitted

7

per the platform's terms of service, *see* https://www.gofundme.com/c/terms) so that he could try to crush us into letting him out of a contract that he signed willingly and with his eyes open. Not long after he launched his campaign in November 2022, our website experienced a DDoS attack. And, even more shockingly, all of this was over a purported issue with a tiny subset of images submitted to the USPTO as part of two trademark applications that were designed to protect the brand he created and we were shepherding into becoming a household name. Attached hereto as Exhibits I and J respectively are representative examples of what Plaintiff did to us and what he reaped for himself in terms of funds (in an amount equivalent to roughly $350,000), simply because he regretted signing a contract and did not know the proper way to deal with his "seller's remorse."

15. It is important to note that Plaintiff has abandoned his breach claims and all other claims, settling for "winning" on such a paltry technicality as the submission of some images to the USPTO. He is still bound to the agreement and evidently has no other quarrel in court relating to it. But the damage has been done, and he does not deserve another penny.

16. If Plaintiff had concerns, we could have discussed them like rational business actors. We note with interest that Plaintiff has backed away entirely from his claims seeking to undo the contract itself; this confirms to us that Plaintiff knows there was no basis for his all-out attack driven solely by a technicality, namely, the requirement to submit examples of use to the USPTO. Plaintiff's scorched-earth tactics have been disproportionate, cruel, and vicious. It is simply unconscionable that Plaintiff now wants nearly three quarters of a million dollars from us over a well-intended act to protect the IP in Plaintiff's own creations from infringers and counterfeiters.

17. To my knowledge, Golden Bell never consented to any dismissal without prejudice of Plaintiff's claims. In fact, as an officer of GBE, I can state that after what Plaintiff has put us through in order to bully us in the worst form to force us to let him out of an agreement that he and his collaborator willingly signed, we never would have allowed Plaintiff to walk away and litigate some other day.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: February 16, 2024
       Washington, DC

_____
MARC GOLDNER